# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, a nonprofit corporation, HEALTHY ENVIRONMENT FOR ALL LIVES, an unincorporated association, MEDICAL ADVOCATES FOR HEALTHY AIR, a nonprofit corporation, NATIONAL PARKS CONSERVATION ASSOCIATION, a nonprofit corporation, and SIERRA CLUB, a nonprofit corporation; | No. |
|      Petitioners, | **PETITION FOR REVIEW** |
|   vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and MARTHA GUZMAN ACEVES, in her official capacity as Regional Administrator for Region IX of the U.S. Environmental Protection Agency, | |
|      Respondents. | |

Pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), and Rule 15(a) of the Federal Rules of Appellate Procedure, Committee for a Better Arvin, Healthy Environment for All Lives, Medical Advocates for Healthy

Air, National Parks Conservation Association, and Sierra Club petition this Court

for review of the final rule entitled "Clean Air Plans; Contingency Measures for

the Fine Particulate Matter Standards; San Joaquin Valley, California."

Respondents U.S. Environmental Protection Agency, Michael S. Regan, and

Martha Guzman Aceves published the final rule in the Federal Register on October

4, 2024, at 89 Fed. Reg. 80749 (Oct. 4, 2024), attached as Exhibit 1.

Respectfully submitted this 2nd day of December, 2024.

EARTHJUSTICE

s/ Colin O'Brien
Colin O'Brien, California Bar No. 309413
cobrien@earthjustice.org
Earthjustice
50 California St., Ste. 500
San Francisco, CA 94111
(415) 217-2000

*Attorney for Petitioners*
*Committee for a Better Arvin, Healthy Environment for*
*All Lives, Medical Advocates for Healthy Air, National*
*Parks Conservation Association, and Sierra Club*

LAW OFFICE OF BRENT J. NEWELL

s/ Brent J. Newell
Brent J. Newell, California Bar No. 210312
Law Office of Brent J. Newell
245 Kentucky Street, Suite A4
Petaluma, CA 94952
(661) 586-23724
brentjnewell@outlook.com

*Attorney for Petitioners*

2

*Committee for a Better Arvin, Healthy Environment for
All Lives, Medical Advocates for Healthy Air, National
Parks Conservation Association, and Sierra Club*

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that I caused to be electronically filed the **Petition for Review** on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system. I certify that I caused to be served the foregoing document on this date by Certified Mail to the following unregistered case participants:

Michael S. Regan
Administrator
U.S. Environmental Protection
   Agency
Office of the Administrator
Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dimple Chaudhary
Acting General Counsel
U.S. Environmental Protection
   Agency
Office of General Counsel
Mail Code: 2310A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Merrick Garland
Attorney General of the United
   States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Martha Guzman Aceves
Regional Administrator, Region IX
U.S. Environmental Protection
   Agency
75 Hawthorne Street
San Francisco, CA 94105

Ismail J. Ramsey
United States Attorney for the
Northern District of California
c/o Civil Process Clerk
United States Attorney's Office for the
Northern District of California
450 Golden Gate Avenue
P.O. Box 36055
San Francisco, CA 94102

Todd Kim
Assistant Attorney General
Environment & Natural Resources
   Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

I certify under penalty of perjury that the foregoing is true and correct.

Executed on December 2, 2024 in San Francisco, California.

s/ Colin C. O'Brien

**EXHIBIT 1**

Federal Register / Vol. 89, No. 193 / Friday, October 4, 2024 / Rules and Regulations 80749

**Subpart VV—Virginia**

■ 6. In § 52.2420, the table in paragraph (e)(1) is amended by revising the entry "Maintenance plan for the Virginia

portion of the Washington, DC-MD-VA Nonattainment Area for the 2008 8-hour ozone National Ambient Air Quality Standard" to read as follows:

**§ 52.2420  Identification of plan.**

\*     \*     \*     \*     \*

(e) \* \* \*

(1) \* \* \*

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| Maintenance plan for the Virginia portion of the Washington, DC-MD-VA Non-attainment Area for the 2008 8-hour ozone National Ambient Air Quality Standard. | Arlington, Fairfax, Loudoun, and Prince William Counties and the Cities of Alexandria, Fairfax, Falls Church, Manassas, and Manassas Park. | 10/11/23 | 10/4/2024, [INSERT **FEDERAL REGISTER** CITATION]. | Added § 52.2428(n). |
| \* | \* | \* | \* | \* |

\*     \*     \*     \*     \*

■ 7. In § 52.2428:

■ a. Remove the heading from paragraph (h); and

■ b. Add paragraph (n).

The addition reads as follows:

**§ 52.2428  Control Strategy: Carbon monoxide and ozone.**

\*     \*     \*     \*     \*

(n) EPA approves updates to the 2008 8-Hour Ozone national ambient air quality standard (NAAQS) maintenance plan for the Virginia portion of the Washington, DC-MD-VA 2008 8-Hour Ozone NAAQS Maintenance Area. The updates include revised motor vehicle emissions budgets (MVEBs) and updates to the applicable onroad and nonroad mobile emissions for VOC and $NO_X$ for the years 2025 and 2030. EPA also

approves the allocation of a portion of the safety margins for VOC and $NO_X$ in the ozone maintenance plan to the 2025 and 2030 MVEBs. The revised MVEBs for VOC and $NO_X$ applies to all future transportation conformity determinations and analyses for the entire Washington, DC-MD-VA Maintenance Area for the 2008 8-Hour Ozone NAAQS.

TABLE 5 TO PARAGRAPH (n)—REVISED ONROAD MOTOR VEHICLE EMISSIONS BUDGETS USING MOVES 3.0.4

| Year | VOC onroad emissions (tpd) | $NO_X$ onroad emissions (tpd) |
|---|---|---|
| 2014 Attainment Year | 61.25 | 136.84 |
| 2025 Predicted Emissions without Safety Margin | 27.92 | 46.52 |
| 2025 Safety Margin | 5.58 | 9.30 |
| 2025 Interim Budget with Safety Margin | 33.50 | 55.82 |
| 2030 Predicted Emissions without Safety Margin | 21.75 | 34.26 |
| 2030 Safety Margin | 4.35 | 6.85 |
| 2030 Final Budget with Safety Margin | 26.10 | 41.11 |

[FR Doc. 2024–22535 Filed 10–3–24; 8:45 am]

BILLING CODE 6560–50–P

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

[EPA–R09–OAR–2023–0477; FRL–11532–03–R9]

**Clean Air Plans; Contingency Measures for the Fine Particulate Matter Standards; San Joaquin Valley, California**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking final action to approve two state implementation plan (SIP) submissions under the Clean Air

Act (CAA) that address the contingency measure requirements for the 1997 annual, 2006 24-hour, and 2012 annual fine particulate matter ($PM_{2.5}$) national ambient air quality standards (NAAQS or "standards") for the San Joaquin Valley $PM_{2.5}$ nonattainment area in California. The two SIP submissions include the area's contingency measure plan element and two specific contingency measures that would apply to residential wood burning heaters and fireplaces and to non-agricultural, rural open areas. A third contingency measure, applicable to light-duty on-road motor vehicles, has been approved into the California SIP in a separate action by the EPA, and the related emission reductions from the third measure are accounted for in this final rule. The EPA is finalizing approval of the SIP submissions because the Agency has determined that they are in

accordance with the applicable requirements for such SIP submissions under the CAA and the EPA's implementing regulations for the $PM_{2.5}$ NAAQS.

**DATES:** This rule is effective November 4, 2024.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R09–OAR–2023–0477. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are

available through *https:// www.regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information. If you need assistance in a language other than English or if you are a person with a disability who needs a reasonable accommodation at no cost to you, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section.

**FOR FURTHER INFORMATION CONTACT:** Rory Mays, Planning and Analysis Branch (AIR–2), Air and Radiation Division, EPA Region IX, 75 Hawthorne St., San Francisco, CA 94105; phone: (415) 972– 3227; email: *mays.rory@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document, "we," "us" and "our" refer to the EPA.

**Table of Contents**

I. Background
  A. Proposed Action
  B. Changes to Proposed Action
II. Public Comments and EPA Responses
III. Environmental Justice Considerations
IV. EPA Action
V. Incorporation by Reference
VI. Statutory and Executive Order Reviews

**I. Background**

*A. Proposed Action*

On December 20, 2023 (88 **Federal Register** (FR) 87988), the EPA proposed to approve California's contingency measure SIP submissions for the 1997 annual, 2006 24-hour, and 2012 annual $PM_{2.5}$ NAAQS submitted by the California Air Resources Board (CARB) for the San Joaquin Valley nonattainment area in California. Specifically, the SIP submissions include the "$PM_{2.5}$ Contingency Measure State Implementation Plan Revision (May 18, 2023)" (herein referred to as the "SJV $PM_{2.5}$ Contingency Measure SIP"), revisions to San Joaquin Valley Unified Air Pollution Control District (SJVUAPCD or "District") Rule 4901 (amended May 18, 2023)[1] that add $PM_{2.5}$ NAAQS contingency provisions that we refer to herein as the "Residential Wood Burning Contingency Measure," and revisions to Rule 8051 (amended September 21, 2023)[2] that add $PM_{2.5}$ NAAQS contingency provisions that we refer to herein as the "Rural Open Areas Contingency Measure." CARB submitted the SJV $PM_{2.5}$ Contingency Measure SIP and the Residential Wood Burning Contingency Measure on June

8, 2023,[3] and the Rural Open Areas Contingency Measure on October 16, 2023,[4] as revisions to the California SIP.

In addition, in a separate proposed rule also published on December 20, 2023, the EPA proposed approval of a third contingency measure, applicable to light-duty on-road motor vehicles, and the related emission reductions from the third measure are accounted for in this final rule.[5] We refer to the third contingency measure as the "Smog Check Contingency Measure."

We proposed to approve the SJV $PM_{2.5}$ Contingency Measure SIP, the Residential Wood Burning Contingency Measure, and the Rural Open Areas Contingency Measure because we determined that they, along with emission reductions from the Smog Check Contingency Measure, comply with the contingency measure SIP requirements of CAA section 172(c)(9) and EPA's implementing regulations at 40 CFR 51.1014. We collectively refer herein to CARB's contingency measure SIP submissions for the 1997 annual, 2006 24-hour, and 2012 annual $PM_{2.5}$ NAAQS for the San Joaquin Valley as the State's "2023 SIP Submissions."

In sections I and II of the proposed rule, we presented background information on the 1997 annual and 24-hour, the 2006 24-hour and 2012 annual $PM_{2.5}$ NAAQS, the nonattainment designations and classifications of the San Joaquin Valley for these $PM_{2.5}$ NAAQS, and the resultant contingency measure SIP obligations; summarized our prior $PM_{2.5}$ contingency measure findings of failure to submit[6] and disapprovals for the San Joaquin Valley;[7] described the SIP submissions at issue in this action; and provided the basis for our preliminary conclusion

that the SIP submissions met applicable procedural requirements.[8] In section III of the proposed rule, we summarized the contingency measure SIP requirements under the CAA and the EPA's implementing regulations, relevant EPA guidance, and legal precedent, including a brief discussion of relevant decisions by the Ninth Circuit Court of Appeals[9] and the D.C. Circuit Court of Appeals.[10][11]

In addition, we described the EPA's long-standing approach to contingency measures and the EPA's revised approach for addressing the contingency measure SIP requirements, as presented in the EPA's draft guidance, entitled "Draft: Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter (DRAFT— 3/17/23—Public Review Version)," herein referred to as the "Draft Revised Contingency Measure Guidance."[12] Two principal differences between the draft revised guidance and existing guidance on contingency measures relate to the EPA's recommendations concerning the specific amount of emission reductions that implementation of contingency measures should achieve[13] and the timing for when the emission reductions from the contingency measures should occur. The Draft Revised Contingency Measure Guidance also provides recommended procedures for developing a demonstration, if applicable, that the area lacks sufficient feasible measures to achieve one year's worth (OYW) of reductions, building on existing guidance that the state should provide a reasoned justification for why the smaller amount of emission reductions is appropriate.

In section IV of the proposed rule, we described the two specific District $PM_{2.5}$ contingency measures proposed for approval in this action (*i.e.,* the District's Residential Wood Burning

---

[1] SJVUAPCD Rule 4901 is titled "Wood Burning Fireplaces and Wood Burning Heaters."

[2] SJVUAPCD Rule 8051 is titled "Open Areas."

[3] CARB adopted the SJV $PM_{2.5}$ Contingency Measure SIP and Residential Wood Burning Contingency Measure as SIP revisions on June 7, 2023, through Executive Order S–23–010 and submitted the SIP revisions to the EPA electronically on June 8, 2023, as attachments to a letter dated June 7, 2023, from Steven S. Cliff, Ph.D., Executive Officer, CARB to Martha Guzman, Regional Administrator, EPA Region IX.

[4] CARB adopted the Rural Open Areas Contingency Measure as a SIP revision on October 13, 2023, through Executive Order S–23–014 and submitted the SIP revision to the EPA electronically on October 16, 2023, as an attachment to a letter dated October 13, 2023, from Steven S. Cliff, Ph.D., Executive Officer, CARB to Martha Guzman, Regional Administrator, EPA Region IX.

[5] 88 FR 87981 (December 20, 2023). We note that the EPA finalized approval of the Smog Check Contingency Measure. 89 FR 56222 (July 9, 2024).

[6] 83 FR 62720 (December 6, 2018). In response to our finding of failure to submit, the EPA proposed a Federal Implementation Plan (FIP) to address the contingency measure requirements for the 1997 annual, 2006 24-hour and 2012 annual $PM_{2.5}$ NAAQS at 88 FR 53431 (August 8, 2023).

[7] 86 FR 67343 (November 26, 2021) and 86 FR 67329 (November 26, 2021).

[8] 88 FR 87988, 87989–87993 (December 20, 2023).

[9] *Bahr* v. *EPA,* 836 F.3d 1218, 1235–1237 (9th Cir. 2016) and *Assoc. of Irritated Residents* v. *EPA,* 10 F.4th 937, 946–47 (9th Cir. 2021) ("*AIR* v. *EPA*" or "*AIR*").

[10] *Sierra Club* v. *EPA,* 21 F.4th 815, 827–828 (D.C. Cir. 2021).

[11] 88 FR 87988, 87993–87994.

[12] 88 FR 87988, 87994. See also, 88 FR 17571 (March 23, 2023) (notice of availability of the EPA's Draft Revised Contingency Measure Guidance).

[13] The EPA's long-standing recommendation was that states should adopt contingency measures sufficient to provide emission reductions equivalent to one year's worth (OYW) of reasonable further progress (RFP). In the Draft Revised Contingency Measure Guidance, the EPA recommends a different amount that contingency measures should achieve—one that is defined in terms of OYW of "progress" rather than OYW of RFP.

Contingency Measure and Rural Open Areas Contingency Measure) and provided our evaluation of the measures relative to the requirements of CAA section 172(c)(9) and 40 CFR 51.1014. In short, we preliminarily concluded that the contingency measures met the requirements for such measures because both measures are designed to be both prospective and conditional, include appropriate triggering mechanisms for requirements, and are structured to be implemented in a timely manner without significant further action by the District, CARB, or the EPA and to achieve the estimated emission reductions within roughly a year or two of the triggering event.[14] Furthermore, both requirements that would be triggered are not required for any other CAA purpose, and the emission reductions from the measures are not included in any reasonable further progress (RFP) or attainment demonstration for the PM$_{2.5}$ NAAQS in the San Joaquin Valley. For these reasons, we proposed to approve District's Residential Wood Burning Contingency Measure and Rural Open Areas Contingency Measure.[15]

In section V of the proposed rule, we summarized how the District and CARB had applied the revised approach to fulfilling the contingency measure SIP requirement in the context of the PM$_{2.5}$ NAAQS in the San Joaquin Valley, and we presented our evaluation thereof.[16] Specifically, we discussed our evaluation of the District's and CARB's identification and evaluation of potential control measures, adoption of certain contingency measures, comparison of those contingency measures against OYW of emission reductions, and reasoned justification for not adopting further contingency measures, which we recap in the following paragraphs.

In the SJV PM$_{2.5}$ Contingency Measure SIP, the District described its ongoing stationary source regulatory efforts, identified potential control measures as candidate contingency measures, and analyzed the technological and/or economic feasibility of each candidate measure, including the feasibility of implementing such measures within 60

days and achieving the resulting emission reductions within one to two years of the triggering event.[17] The District also provided in-depth analysis of potential control measures for five source categories, ultimately adopting measures for two source categories (wood burning fireplaces/heaters and rural open areas) and providing a justification in the form of an infeasibility demonstration for not adopting contingency measures for the other three source categories (commercial charbroiling, almond harvesting, and oil and gas production combustion equipment).

Similarly, CARB identified potential mobile source control measures, assessed whether each candidate measure could be implemented within 60 days of a triggering event and achieve emission reductions within one to two years, and then analyzed their technological and/or economic feasibility.[18] Regarding timing of emission reductions from mobile sources, CARB concluded that new engine standards and fleet regulations are not appropriate for contingency measures given the time needed for manufacturers to design, develop, and deploy cleaner engines or equipment at scale, especially for zero-emission equipment.

The District and CARB ultimately adopted three contingency measures identified through their respective evaluation processes: the Residential Wood Burning Contingency Measure, the Rural Open Areas Contingency Measure, and the Smog Check Contingency Measure. Each of these measures can be implemented without further action by the District, CARB, or the EPA and achieve emission reductions within one to two years of the triggering event, consistent with the contingency measure requirements under CAA section 172(c)(9) and the EPA's recommendations regarding timing in the Draft Revised Contingency Measures Guidance.[19] In addition, the revisions to SJVUAPCD Rule 4901

establishing the Residential Wood Burning Contingency Measure resolved deficiencies identified in the EPA's disapproval of prior contingency provisions in Rule 4901, thereby ensuring that the direct PM$_{2.5}$ and NO$_X$ emission reductions will be achieved, irrespective of which county may exceed the applicable PM$_{2.5}$ NAAQS at the time of any finding of failure to attain or other applicable determination.[20]

The District then assessed how the emission reductions from the Residential Wood Burning Contingency Measure would compare against OYW of progress as defined in the Draft Revised Contingency Measure Guidance. As part of our evaluation and for the proposed rule, we prepared an independent assessment of the emission reductions to include the two additional contingency measures that were adopted and submitted after the submission of the SJV PM$_{2.5}$ Contingency Measure SIP and to provide a comparison of the emission reductions relative to OYW of progress to the long-standing recommendation of OYW of RFP. In our proposed rule, we found that the combined 0.5873 tons per day (tpd) of direct PM$_{2.5}$ emission reductions from the District contingency measures (for residential wood burning and for rural open areas) would exceed both OYW of RFP (0.44–0.58 tpd, depending on the applicable PM$_{2.5}$ NAAQS) and OYW of progress (0.41–0.52 tpd, depending on the applicable PM$_{2.5}$ NAAQS).[21]

With respect to NO$_X$ emissions, the combined 0.1647–0.1977 tpd emission reductions from all three contingency measures would provide a portion of the reductions toward OYW of emission reductions, and, after consideration of interpollutant trading of excess direct PM$_{2.5}$ emission reductions from the two District contingency measures for equivalent NO$_X$ emission reductions, would amount to 1.3 percent (%) to 6.3% of OYW of RFP or 8.8% to 15.7% of OYW of progress for NO$_X$.[22]

---

[14] 88 FR 87988, 87995–87998.

[15] Id.

[16] 88 FR 87988, 87999–88009.

[17] SJV PM$_{2.5}$ Contingency Measure SIP, pp. 9–11.

[18] SJV PM$_{2.5}$ Contingency Measure SIP, section 5.3 ("Measure Analysis"); and Smog Check Contingency Measure, Appendix A ("Infeasibility Analysis").

[19] Draft Revised Contingency Measures Guidance, pp. 40–42.

[20] 88 FR 87988, 87996.

[21] 88 FR 87988, 88004–88005, Table 2 and Table 3. Note that CARB did not estimate any direct PM$_{2.5}$ emission reductions from implementation of the Smog Check Contingency Measure.

[22] 88 FR 87988, 88005.

As the $NO_X$ emission reductions fall short of OYW of progress, CARB and the District documented their control measure analyses across the wide range of source categories under each agency's respective jurisdiction (e.g., on-road sources, off-road sources, stationary point sources, and area sources) for $NO_X$ emissions. We described the District's and CARB's infeasibility demonstrations, and our evaluation thereof, in detail and proposed that they adequately justify the contingency measures selected by CARB and the District for the 1997 annual, 2006 24-hour, and 2012 annual $PM_{2.5}$ NAAQS in the San Joaquin Valley. In light of the three adopted contingency measures and reasoned justifications for not adopting additional contingency measures, we proposed to approve the SJV $PM_{2.5}$ Contingency Measure SIP, the Residential Wood Burning Contingency Measure, and the Rural Open Areas Contingency Measure, taking into account the emission reductions from the Smog Check Contingency Measure (as applied to the San Joaquin Valley), as meeting the contingency measure requirements of CAA section 172(c)(9) and 40 CFR 51.1014 for these $PM_{2.5}$ NAAQS in the San Joaquin Valley.

See our December 20, 2023 proposed rule (88 FR 87988) for more information on the SIP submissions and our evaluation thereof.

*B. Changes to Proposed Action*

In our proposed rule, we evaluated the SIP submissions for compliance with contingency measure SIP requirements, in part, by comparing the emission reductions from the contingency measures with OYW of progress and OYW of RFP. In so doing, we relied on emissions estimates for the three individual contingency measures—two (the Residential Wood Burning Contingency Measure and the Rural Open Areas Contingency Measure) that we proposed to approve in the proposed rule (and that we are finalizing in this action) and one (the Smog Check Contingency Measure) that we proposed to approve in a separate action.[23] In Table 2 of the proposed rule, we summarized the estimated emission reductions from the contingency measures, and in Table 3 of the proposed rule, we presented the estimated emission reductions as percentages of OYW of RFP and OYW of progress both with and without trading emission reductions between direct $PM_{2.5}$ and $NO_X$.

In both of these tables in the proposed rule, we discounted the emission reductions from implementation of the Smog Check Contingency Measure by an amount calculated by CARB to reflect the effect of a decrease in Moyer Program funding in the San Joaquin Valley if the Smog Check Contingency Measure were triggered.[24] However, in our final rule approving the Smog Check Contingency Measure SIP, we indicated that we agreed with comments challenging the discount that we had applied and concluded that the discount was inappropriate due to timing considerations.[25] By no longer discounting the emission reductions attributed to the Smog Check Contingency Measure, the estimates for total emission reductions for implementation of all three contingency measures are slightly greater than had been presented in the proposed rule. The change in emissions estimates and percentages is minor and does not change any of the preliminary conclusions that we made in connection with our proposed action on the SJV $PM_{2.5}$ Contingency Measure SIP. Nonetheless, in the interest of presenting the most accurate information available, we are republishing Tables 2 and 3 to reflect the updated estimates of emission reductions from the Smog Check Contingency Measure.

TABLE 2—REVISED ANNUAL AVERAGE EMISSION REDUCTIONS FROM DISTRICT AND CARB CONTINGENCY MEASURES

[tpd]

| Contingency measure | 1997 Annual $PM_{2.5}$ NAAQS | | 2006 24-Hour $PM_{2.5}$ NAAQS | | 2012 Annual $PM_{2.5}$ NAAQS | |
|---|---|---|---|---|---|---|
| | Direct $PM_{2.5}$ | $NO_X$ | Direct $PM_{2.5}$ | $NO_X$ | Direct $PM_{2.5}$ | $NO_X$ |
| District: Residential Wood Burning (first triggering event) | 0.5793 | 0.0817 | 0.5793 | 0.0817 | 0.5793 | 0.0817 |
| District: Non-agricultural Rural Open Areas | 0.008 | .................. | 0.008 | .................. | 0.008 | .................. |
| CARB: Smog Check (first triggering event) | .................. | 0.117 | .................. | 0.120 | .................. | 0.086 |
| Total | 0.5873 | 0.1987 | 0.5873 | 0.2017 | 0.5873 | 0.1677 |

TABLE 3—REVISED EPA EVALUATION OF DISTRICT AND CARB CONTINGENCY MEASURES AS PERCENTAGE OF ONE YEAR'S WORTH OF RFP AND ONE YEAR'S WORTH OF PROGRESS

| $PM_{2.5}$ NAAQS | Pollutant | One year's worth of RFP | | | One year's worth of progress | | |
|---|---|---|---|---|---|---|---|
| | | Reductions target | % OYW (no trading) | % OYW (with trading)[a] | Reductions target | % OYW (no trading) | % OYW (with trading)[a] |
| 1997 Annual | Direct $PM_{2.5}$ | 0.44 | 132 | 100 | 0.41 | 142 | 100 |
| | $NO_X$ | 16.7 | 1.2 | 6.3 | 7.9 | 2.5 | [b] 15.8 |
| 2006 24-hour | Direct $PM_{2.5}$ | 0.58 | 101 | 100 | 0.52 | 112 | 100 |
| | $NO_X$ | 18.4 | 1.1 | 1.3 | 6.7 | 3.0 | [b] 8.9 |
| 2012 Annual | Direct $PM_{2.5}$ | 0.46 | 129 | 100 | 0.43 | 138 | 100 |
| | $NO_X$ | 15.3 | 1.1 | 6.3 | 8.7 | 1.9 | 13.1 |

[a] The EPA has calculated % OYW (With Trading) for $NO_X$ based on the 6:1 ratio presented in the SJV $PM_{2.5}$ Contingency Measure SIP.

[23] We proposed to approve the Smog Check Contingency Measure SIP at 88 FR 87981.

[24] The Carl Moyer Program distributes incentive grants to fund the incremental cost of cleaner-than-required engines, equipment, and other technology and is funded, in part, by abatement fees that are assessed on vehicles exempted from Smog Check testing.

[25] 89 FR 56222, 56225.

**Federal Register** / Vol. 89, No. 193 / Friday, October 4, 2024 / Rules and Regulations **80753**

---

[b] The percentage of OYW of Progress (With Trading) is 0.1% higher in this table for NO$_X$ for the 1997 annual and 2006 24-hour PM$_{2.5}$ NAAQS relative to Table 3 of our proposed rule.

## II. Public Comments and EPA Responses

The EPA's proposed action provided a 30-day public comment period. During this period, we received comment letters from three organizations or groups. CARB submitted a letter supporting the EPA's proposed approval.[26] A group of four environmental, public health, and community organizations (collectively referred to herein as ''Valley EJ Organizations'') submitted adverse comments,[27] and a separate group of five environmental, public health, and community organizations (collectively referred to herein as ''CVAQ'') submitted adverse comments.[28] To the extent that certain comments by the Valley EJ Organizations solely pertain to the Smog Check Contingency Measure and the State's commitments to submit attainment contingency measures for the 1997 ozone NAAQS, we have addressed those comments in a separate final rule on the Smog Check Contingency Measure.[29]

*Comment 1:* The Valley EJ Organizations assert that the EPA's proposed approval of the PM$_{2.5}$ contingency measures departs from the EPA's long-standing interpretation requiring OYW of RFP. They further state that the proposed approvals based on the Draft Revised Contingency Measure Guidance violate CAA section 172(c)(9) by severing the amount of required emission reductions from the parallel and related RFP requirement when the EPA shifts from its OYW of RFP to its new OYW of progress interpretation. The Valley EJ Organizations further assert that the plain meaning does not allow, and the EPA cannot provide a reasoned justification for, an interpretation that requires less than that which the Act requires for RFP and that, here, the

PM$_{2.5}$ contingency measures plainly provide reductions far less than OYW of RFP. The CVAQ Comment Letter echoes these points, stating that the emission reductions from the Residential Wood Burning Contingency Measure and the Rural Open Areas Contingency Measure would ''fall well short of the emission reductions needed to comply with the weakened average annual reduction requirement in EPA's draft guidance even when allowing for the interpollutant substitution of excess direct PM$_{2.5}$ emissions for NO$_X$ emissions.''[30]

*Response to Comment 1:* Regarding emission reduction metrics (*i.e.*, the recommended amount of emission reductions that contingency measures should achieve), we disagree with commenters as to what is required under the CAA and with the commenters' broader framing of contingency measures within the overall planning requirements for nonattainment areas. While there is a statutory link between RFP and the contingency measure requirements of CAA section 172(c)(9), it does not function as the commenter suggests (*i.e.*, to establish an amount of emission reductions that contingency measures should achieve). The statutory text of this provision is as follows:

CAA section 172(c)(9) (''Contingency measures'')—''Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.''

Thus, while section 172(c)(9) requires contingency measures where an area fails to make RFP, the language does not specify what amount of emission reductions such measures should achieve (*i.e.*, does not explicitly tie the amount of reductions to RFP). Moreover, the statutory text also has a link to attainment, but it too does not specify what amount of emission reductions contingency measures should achieve.

While Congress did not specify an amount that contingency measures must achieve to comply with CAA section 172(c)(9), Congress must have intended the amount to be material because, without a specified amount, a state would not know how to comply with

the requirement. Thus Congress must have at least implicitly delegated to the EPA the authority to determine an amount of emissions reductions that contingency measures should achieve and thereby give meaning to the requirement and provide states with a basis to comply with CAA section 172(c)(9) for a given nonattainment area. The EPA has taken a policy approach to this question, and in the past, the EPA has indicated that the recommended amount is OYW of RFP but allowed states to provide a reasoned justification for adopting contingency measures that would provide less than the recommended amount. Under the Draft Revised Contingency Measure Guidance, the EPA is continuing to take a policy approach but is recommending OYW of progress and describing a specific analytical framework that states may use to develop a reasoned justification if the state is unable to identify and adopt contingency measures that can achieve the recommended amount of emissions reductions.[31]

In support of our revised approach, we first note that, for both RFP and attainment purposes, contingency measures are intended to provide for continued progress in the event that an area fails to meet an RFP milestone or fails to attain the NAAQS by the applicable attainment date. They are not themselves expected to provide for either RFP or attainment. With respect to RFP, the CAA provides certain remedies if the contingency measures do not make up the shortfall for a given RFP milestone.[32] With respect to a failure to attain by the applicable attainment date, the CAA too provides a remedy by requiring a new attainment plan.[33]

---

[26] Letter dated January 17, 2024, from Steven S. Cliff, Executive Officer, CARB, to Martha Guzman, Regional Administrator, EPA Region IX.

[27] Letter dated January 19, 2024, from Brent Newell, Attorney for Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air, and Healthy Environment for All Lives, to Jeffrey Buss and Rory Mays, Air and Radiation Division, EPA Region IX, including 16 exhibits (''Valley EJ Organizations Comment Letter'').

[28] Letter dated January 19, 2024, from Central Valley Air Quality Coalition, National Parks Conservation Association, Little Manila Rising, Valley Improvement Projects, and Leadership Counsel for Justice and Accountability, to Rory Mays, Air and Radiation Division, EPA Region IX (''CVAQ Comment Letter'').

[29] 89 FR 56222, 56224–56229.

[30] CVAQ Comment Letter, p. 2.

[31] OYW of RFP is calculated differently for ozone and particulate matter (PM). For ozone, annual RFP is essentially defined as three percent of the base year emissions inventory (EI). For PM, annual RFP is the average annual reductions between the base year EI and the projected attainment year EI (*i.e.*, the projected attainment inventory for the nonattainment area). In contrast, OYW of progress is calculated the same way for ozone and PM: by determining the average annual reductions between the base year EI and the projected attainment year EI, determining what percentage of the base year EI this amount represents, then applying that percentage to the projected attainment year EI to determine the amount of reductions needed to ensure ongoing progress if contingency measures are triggered. See also 88 FR 87988, 87994 and the EPA's Draft Revised Contingency Measure Guidance, pp. 21–23.

[32] See CAA sections 182(g)(3) and 189(c)(3).

[33] See CAA section 179(d).

In reviewing our long-standing approach to contingency measures, the EPA observed that basing the amount of emission reductions on the annual amount of reductions needed to meet the separate RFP requirement—OYW of RFP—may in some cases lead to an amount that is greater than what typically would be needed to make up for a shortfall in RFP or for attainment purposes.[34] The OYW of RFP approach was unnecessarily conservative for estimating the amount of emission reductions needed for contingency measure purposes because a given percentage of the base year inventory tends to represent a much more significant portion of the attainment projected inventory.

In shifting to the OYW of progress approach, the EPA recognizes attainment of the NAAQS as the primary objective of the nonattainment plan requirements, and thus the appropriate metric should be attainment-focused. In the absence of a CAA-specified amount of emission reductions required for contingency measures, the EPA's new approach is a better reading of the contingency measure SIP requirement given our understanding of the statutory purpose of contingency measures following a failure to attain or to meet an RFP milestone, which is to ensure uninterrupted progress toward attainment while the next steps unfold in response to the failure. In addition, unlike the previous approach, the EPA's new approach takes into account the declining emissions inventories between the base year and attainment year for a given nonattainment area and aligns the metric for determining the amount of emission reductions that contingency measures should achieve for ozone and particulate matter (PM). The alignment between ozone and PM is a better reading of the statute considering that the relevant statutory provision, CAA section 172(c)(9), applies to all the NAAQS.

As to the specific SIP submission addressed in this document, we acknowledge that CARB and the District used the newly-recommended metric in preparing the SJV PM$_{2.5}$ Contingency Measure SIP for which the EPA is now finalizing approval but, in this instance, the SIP submission and the EPA's evaluation thereof would have been the same in substance if the previous metric (i.e., OYW of RFP) had been used instead. This is because, using either metric, the SIP submissions include contingency measures that collectively

provide for OYW of progress or RFP for direct PM$_{2.5}$ and a portion of OYW of progress or RFP for NO$_X$.[35] The only difference is the extent to which the emission reductions from the contingency measures fall short of each metric for NO$_X$ reductions. Using the OYW of progress metric (with trading), the contingency measures are estimated to achieve between 8.9% and 15.8% of OYW of progress for NO$_X$ as compared to between 1.3% and 6.3% of OYW of RFP for NO$_X$ using the previously-recommended metric (with trading).[36] Using either metric, the EPA would have expected the State to provide a reasoned justification for not adopting contingency measures sufficient to achieve greater NO$_X$ emission reductions; consistent with the EPA's recommendations in the Draft Revised Contingency Measure Guidance, CARB and the District provided such reasoned justification in their infeasibility demonstrations.

*Comment 2:* The Valley EJ Organizations assert that the EPA's proposed approval of the State's 2023 SIP Submissions circumvents three recent court decisions [37] and unlawfully and arbitrarily (a) lowers the amount of emission reductions required for contingency measures ("by severing the statutory link to [RFP]," i.e., by shifting from OYW of RFP under the EPA's prior interpretation to OYW of progress under the EPA's revised interpretation), (b) extends implementation of contingency measures from one year to two years, and (c) invents a new feasibility exemption that does not appear in CAA section 172(c)(9). The commenters state that the EPA's proposed approval relies on the Draft Revised Contingency Measures Guidance "to replicate the arbitrary and capricious interpretation the [AIR] court invalidated."

*Response to Comment 2:* In relevant part, the *Bahr* and *Sierra Club* decisions stand for the proposition that contingency measures under CAA section 172(c)(9) must be conditional and prospective, and thus, already-implemented control measures cannot serve as contingency measures. The *AIR* decision stands for the proposition that surplus emission reductions from already-implemented measures cannot be relied upon as a justification for adoption of contingency measures that provide for less than the recommended amount of emission reductions for such measures. However, none of the cited

court decisions bear on the questions of the amount of emission reductions that contingency measures should achieve, the timeline for achieving the emission reductions from contingency measures, or the consideration of feasibility of additional measures as justification for not adopting contingency measures sufficient to achieve the recommended amount of such measures.

Moreover, our proposed approval of the SJV PM$_{2.5}$ Contingency Measure SIP is consistent with the three cited decisions in that the SIP relies on contingency measures (Residential Wood Burning Contingency Measure, the Rural Open Areas Contingency Measures, and the Smog Check Contingency Measure) that are designed to be conditional and prospective. In addition, as discussed further in the following paragraph, the State has not relied on emission reductions from already-implemented measures.

The rationale for our approval of the SJV PM$_{2.5}$ Contingency Measure SIP is not the same as the rationale for our approval, later withdrawn in response to the *AIR* decision, of the contingency measure element for San Joaquin Valley for the 2008 ozone NAAQS that was at issue in the *AIR* case. In the case of the contingency measure element for the 2008 ozone NAAQS, the EPA took into account the surplus emission reductions from already-implemented measures in the milestone years and the years following the attainment date, not as constituting contingency measures per se, but rather, as justification for approving a contingency measure element that included a single contingency measure that would provide for far less than the recommended amount.

The Court found that, by doing so, the EPA had "severed the relationship between the requirement of contingency measures and the benchmark of reasonable further progress, without an adequate explanation of why the new—and far more modest—contingency measure is reasonable." [38] The Court did not indicate that the Agency could not depart from previous guidance but cautioned that the EPA "must give a reasoned explanation for departing from agency practice or policy." [39] The Court concluded that "[I]f already-implemented measures cannot themselves be contingency measures—and *Bahr* makes clear that they cannot—then neither can they be a basis for declining to establish contingency measures that would otherwise be

---

[34] EPA's Draft Revised Contingency Measures Guidance, pp. 21–23.

[35] See Table 3 of this final rule.
[36] See Table 3 of this final rule.
[37] The commenter cites *Bahr* v. *EPA,* 836 F.3d 1218 (9th Cir. 2016) ("*Bahr*"); *Sierra Club* v. *EPA,* 21 F.4th 815 (D.C. Cir. 2021) ("*Sierra Club*"); *AIR* v. *EPA,* 10 F.4th 937 (9th Cir. 2021) ("*AIR*").

[38] *AIR* v. *EPA,* 10 F.4th 937, 946 (9th Cir. 2021).
[39] Id.

appropriate." [40] The Court rejected the EPA's rationale for allowing consideration of surplus emission reductions from already-implemented measures, reasoning that the EPA could not approve a contingency measure element "lacking robust contingency measures by assuming that they will not be needed. Because the agency did not provide a reasoned explanation for approving the state plan, the rule is arbitrary and capricious." [41]

In the wake of the *AIR* decision, and other case law interpreting the contingency measure SIP requirement, the EPA undertook an internal process to reconsider previous guidance provided by the Agency to states for preparation of SIP submissions to meet the contingency measure requirements—a process that led to the publication of the Draft Revised Contingency Measure Guidance. Among other things, in the Draft Revised Contingency Measure Guidance, the EPA explains why the Agency believes that it is appropriate to update its prior guidance with respect to the recommended amount of emission reductions that contingency measures should achieve and the considerations that states could use to justify adoption of contingency measures that do not provide for the recommended amount of emission reductions. [42] We found that an update to our contingency measures guidance was justified in light of changed factual circumstances [43] and a current understanding of what remaining controls may be available for states to adopt as contingency measures. For a more detailed explanation of our rationale for updating the metric, see Response to Comment 1, and for a more detailed explanation for allowing for consideration of feasibility, see Response to Comment 4.

With respect to this action, CARB and the District have adopted a contingency measure element that includes three

---

[40] Id.

[41] Id. at 947.

[42] EPA's Draft Revised Contingency Measure Guidance, pp. 21–28 (revised metric) and pp. 29–40 (reasoned justification for adoption of contingency measures that provide for less than the recommended amount of emission reductions).

[43] By "changed circumstances," we are referring to recent court decisions that have invalidated key aspects of EPA's historical approach to implementing the contingency measure requirement and the evolution toward more stringent control programs in the 30 years since the EPA first articulated its contingency measure guidance where, as described in Response to Comments 3, the progressively stringent control measures adopted to meet prior attainment and RFP planning requirements are already implemented measures and therefore ineligible to serve as contingency measures and result in a narrowing pool of candidate contingency measures.

---

contingency measures that would collectively achieve the recommended amount of emission reductions for one of the two pollutants or precursors at issue, and they have provided a reasoned justification in the form of infeasibility demonstrations for adopting contingency measures that provide for less than the recommended amount for the other relevant pollutant or precursor. The EPA's approval of a contingency measure element that relies, in part, on CARB and the District's infeasibility demonstrations, rather than relying on surplus emission reductions from already-implemented measures, stands in contrast to the EPA action on the SIP submission at issue in *AIR.* The EPA does not assume that contingency measures would not be needed for San Joaquin Valley but rather that CARB and the District have adequately demonstrated that there are no feasible contingency measures for that particular pollutant or precursor that are left to adopt or that could be implemented within one to two years of the triggering event.

*Comment 3:* For areas with more severe air pollution, such as Serious $PM_{2.5}$ nonattainment areas, the commenters state that the EPA has not articulated a reasoned justification for why OYW of progress is consistent with the CAA remedial scheme that imposes more stringent requirements on such areas. They suggest that a voluntary reclassification of an area (*e.g.,* from "Moderate" to "Serious" for $PM_{2.5}$) would lower the average annual reductions needed for contingency measures (*e.g.,* if the same attainment year inventory applied for a Moderate or Serious areas, then the annual average reduction would be lower due to averaging over more years).

In addition, the commenters illustrate a purported fatal flaw in the EPA's interpretation of OYW of progress using a table that shows OYW of progress for $NO_X$ in a hypothetical ozone reclassification from Serious to Extreme (in tons per day of $NO_X$) and state that a lesser amount of emission reductions for contingency measures for such hypothetical Extreme ozone nonattainment area runs contrary to the structure of the Act.

*Response to Comment 3:* As explained in more detail in our Response to Comment 1, with respect to this specific action, the use of the new OYW of progress metric here does not materially impact our approval where the SJV $PM_{2.5}$ Contingency Measure SIP falls short of the emissions reductions recommended under either metric. However, we note that, contrary to commenters' assertions, the EPA's

interpretation of the contingency measure requirement under CAA section 172(c)(9) is consistent with the CAA's general scheme of subjecting areas with higher classifications to more stringent requirements. More specifically, the increased stringency relates to the types of measures that qualify as contingency measures rather than the amount of emission reductions that such measures must achieve.

Under the EPA's interpretation of the contingency measure requirement, contingency measures must be designed to provide emission reductions (if triggered) that are not otherwise required to meet other attainment plan requirements and not relied upon to demonstrate RFP nor attainment. Thus, for example, contingency measures in $PM_{2.5}$ nonattainment areas classified as Moderate, which are thereby subject to the reasonably available control measures (RACM) requirement, must be measures that go beyond the RACM requirement, whereas contingency measures in $PM_{2.5}$ nonattainment areas classified as Serious (and thus subject to the best available control measures (BACM) requirement) must be measures that go beyond the BACM requirement. In other words, reclassification of an area to a higher classification shrinks the pool of candidate contingency measures because some of the candidate contingency measures will be required to be adopted and implemented in the reclassified area to meet the specific control requirements for that classification and, thus, will be unavailable for adoption as contingency measures. The candidate contingency measures that remain eligible to meet the contingency measure SIP requirement under the higher classification are different, and potentially more stringent, than those that had been available to meet the requirement under the lower classification. While more stringent measures would achieve further emission reductions, if triggered, they may achieve a smaller scale of emission reductions than the prior iterations of increasingly stringent control measures on a given emission source; stringency (a relative measure) is not the same as tons per day of emission reductions (an absolute measure).

Regarding the commenters' assertion that areas with more severe air pollution should have contingency measures that achieve a larger amount of emission reductions (*i.e.,* OYW of RFP), we look once more to the broader framing of contingency measures within the overall planning requirements for nonattainment areas. The EPA finds that the statutory and regulatory

requirements to demonstrate attainment as expeditiously as practicable, and the absence of a specific statutory metric for how much emission reductions contingency measures should achieve, give priority to adopting control measures to attain in the first place, even if that leaves fewer options for contingency measures in the event of a failure to attain or to make RFP.

In the SJV PM$_{2.5}$ Contingency Measure SIP, the State elaborates further on using an attainment-focused metric by highlighting the scarcity of potential control measures that would qualify as contingency measures given the facts and circumstances of the San Joaquin Valley,[44] where the progressively stringent set of control measures adopted to meet prior attainment and RFP planning requirements are already implemented measures and therefore ineligible to serve as contingency measures.[45] This scarcity concept echoes the tension between the CAA requirements for attainment and contingency measures, and the prioritization of adopting measures to attain in the first place. Notwithstanding, the EPA does not endorse the scarcity concept as a starting point, but rather recommends the detailed analytical approach to identifying and evaluating potential control measures that can serve as contingency measures, as described in the Draft Revised Contingency Measures Guidance, and that the State employed in developing the PM$_{2.5}$ Contingency Measure SIP.

Regarding the commenters' suggestion that a state could reduce the amount of emission reductions needed for contingency measures by requesting a voluntary reclassification that would extend the amount of time to attain while relying on the same level of emission reductions, we disagree that such an action runs contrary to the general remedial scheme of the CAA that imposes more stringent requirements on reclassified areas. Under the statutory and regulatory requirements for PM$_{2.5}$, a State may request reclassification from Moderate to Serious, but only where it can show that it is impracticable to attain by the Moderate area attainment year.[46] Thus, a combination of direct PM$_{2.5}$ and plan precursor emission reductions that would achieve attainment would constrain the ability of the State to seek such reclassification—it would instead be practicable to attain by the Moderate area attainment date. Similarly, if the Moderate area attainment year were approaching and air quality for two of three design value years indicated that the area would not achieve the standard, then the air quality basis resulting from prior attainment planning would be insufficient to attain. In either case, the State would need to develop a Serious area plan that achieves additional emission reductions and also addresses the additional control requirements for Serious areas (*e.g.,* tighter new source review requirements, BACM and best available control technology (BACT), and, if the State were to seek an attainment date extension under CAA section 188(e), most stringent measures (MSM)).

For these reasons, as well as those described in Response to Comment 1 of this document, we conclude that the EPA's revised metric for contingency measure emission reductions (OYW of progress) does not run contrary to the general remedial scheme of the CAA that imposes more stringent requirements on areas reclassified to a higher classification. Lastly, the EPA finds that the comment on a hypothetical scenario for an ozone nonattainment area is outside the scope of this rulemaking because we are not acting on ozone contingency measure SIP submissions in this action.

*Comment 4:* Regarding feasibility assessments, the Valley EJ Organizations state that the CAA does not subject the contingency measure requirements to a feasibility standard and reject the State's and the EPA's proposed reliance on infeasibility demonstrations. The commenters argue that Congress made no exceptions to the contingency measure requirements nor did it provide authority to relax those requirements based on technological or economic challenges. They state that the CAA requirements for RACM or reasonably available control technology (RACT) include a ''reasonably available'' qualifier and that those for MSM are expressly limited to ''feasible'' measures, while such terms do not appear in the CAA requirements for contingency measures. They contend that the EPA conflates the contingency measure requirements with the primary requirements to attain the NAAQS in the first place. They further state that Congress expressly provided limited authority to relax the CAA requirements for RFP but did not do so for contingency measures.

The commenters state that the RACM requirements (under CAA sections 172(c)(1), 181(a)(1), and 188(c)(1)) require that the primary attainment strategy include ''all'' RACM and other available control measures that would expedite attainment and that the MSM provision (for Serious PM$_{2.5}$ nonattainment areas that cannot attain the standards within 10 years, under CAA section 188(e)) requires additional control measure implementation. They argue that contingency measures should not comprise the same controls that the CAA already requires for attainment and that failed to attain the NAAQS in the first place and that the EPA unlawfully and arbitrarily excuses contingency measures needed when the feasible measures the State has already adopted result in a failure to attain the NAAQS (citing *AIR,* 10 F.4th at 946).

Given these alleged flaws in the EPA's interpretation, the commenters state that the EPA's proposed approval violates the plain meaning of the CAA contingency measure requirement, fails to reasonably explain the Agency's relaxation of the emission reductions that contingency measures must provide, and is therefore arbitrary and capricious.

*Response to Comment 4:* As discussed in Response to Comment 1, Congress must have at least implicitly delegated to the EPA the authority to determine an amount of emissions reductions that contingency measures should achieve and thereby give meaning to the requirement and provide states with a basis to comply with CAA section 172(c)(9) for a given nonattainment area. The EPA is continuing to take a policy approach to this question and is recommending OYW of progress and describing a specific analytical framework that states may use to develop a reasoned justification if the state is unable to identify and adopt contingency measures that can achieve the recommended amount of emissions reductions. More specifically, as stated in our proposed rule and the EPA's Draft Revised Contingency Measures Guidance, where a state is unable to identify contingency measures that would provide approximately OYW of emission reductions, the state should provide a reasoned justification (referred to herein as an ''infeasibility demonstration'') that explains and documents how it has evaluated all existing and potential control measures relevant to the appropriate source categories and pollutants in the nonattainment area and has reached reasonable conclusions regarding whether such measures are feasible.[47] Thus, while the EPA acknowledges that

---

[44] SJV PM$_{2.5}$ Contingency Measure SIP, section 4.1 (''Stringency of District's Regulatory Program'') and section 5.2 (''CARB's Opportunities for Contingency Measures'').

[45] SJV PM$_{2.5}$ Contingency Measure SIP, pp. 53–54.

[46] CAA section 188(b)(1) and 40 CFR 51.1002(b)(1).

[47] 88 FR 87988, 87994 and EPA's Draft Revised Contingency Measure Guidance, p. 29.

CAA section 172(c)(9) does not explicitly provide for consideration of whether specific measures are feasible, the EPA does not read the statute to require air agencies to adopt and impose infeasible measures.[48]

As stated in the proposed rule, the statutory provisions applicable to other nonattainment area plan control measure requirements, including RACM/RACT, BACM/BACT, and MSM, allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible (depending on the requirement).[49] For example, the MSM provision in CAA section 188(e) requires plans to include "the most stringent measures that are included in the implementation plan of any state or are achieved in practice in any state, and can feasibly be implemented in the area." While the contingency measures provisions do not include such caveats, the EPA does not conclude that the contingency measures provisions should be read to require plans to include infeasible measures. Thus, the EPA anticipates that a demonstrated lack of feasible measures would be a reasoned justification for adopting contingency measures that achieve less than the recommended amount of emission reductions.[50]

The EPA does not, as the commenters suggest, simply conflate the contingency measure requirements with other control requirements (e.g., RACM/ RACT, BACM/BACT, and MSM) that are integral to demonstrating attainment of the ozone and/or PM$_{2.5}$ NAAQS. Rather, while the analytical approach to identifying and evaluating existing and potential control measures may be similar to those used for RACM/RACT, BACM/BACT, and MSM (e.g.,

identifying the universe of control devices that can reduce NO$_X$ emissions from combustion equipment and whether they are technologically and economically feasible as applied to a specific type of emission source in the area), the EPA expects that the state "should not simply repeat the control strategy's infeasibility showing."[51] The contingency measure requirement is in addition to the other control measure requirements.

A conclusion that a measure is not reasonable or feasible, for example, for RACM does not automatically disqualify it as a potential contingency measure. If the state identifies control measures that it determines are not needed to attain nor to collectively advance attainment, those measures would not be required to satisfy the RACM requirement but would remain as candidates for contingency measures. To the extent that the adopted contingency measures achieve a small amount of emission reductions, the state should provide a more robust infeasibility showing that there are no additional feasible contingency measures that could achieve the recommended amount of reductions.[52] Furthermore, to the extent that the state's analyses and development of contingency measures occur after the state's analyses and development of the SIP submissions to meet the attainment control strategy requirements of the CAA (including associated control requirements and RFP), the state should update their analyses to reflect the latest potential control measures.

In the case of the SJV PM$_{2.5}$ Contingency Measure SIP, submitted in 2023, CARB and the District documented their analyses to identify and evaluate potential control measures that might serve as contingency measures. These analyses are updated relative to their 2021 submission of the Serious area attainment plan for the 1997 annual PM$_{2.5}$ NAAQS and to their 2019 submissions of the Serious area attainment plan for the 1997 24-hour PM$_{2.5}$ NAAQS (including BACM demonstration), Serious area plan for the 2006 24-hour PM$_{2.5}$ NAAQS (including demonstrations for BACM and MSM), and Moderate area plan for the 2012 annual PM$_{2.5}$ NAAQS (including RACM demonstration). The EPA has approved these attainment plan control strategies in successive actions[53] and they represent an overall

stringent set of control requirements. The State did not set aside measures for lack of their ability to collectively advance attainment (as might be possible in theory, e.g., for RACM for an ozone nonattainment area).

In their updated analyses, CARB and the District considered the wide range of emission sources under their primary jurisdiction, identified potential control measures, analyzed their technological and economic feasibility, and assessed whether they could achieve emission reductions within one to two years of a triggering event, consistent with the EPA's discussion of the timing objective inherent to the contingency measure requirement.[54] For the potential control measures identified through this process, the District further analyzed possible contingency measures for wood burning fireplaces and wood burning heaters, rural open areas, commercial charbroiling, almond harvesting, and oil and gas production combustion equipment, and ultimately adopted the Residential Wood Burning Contingency Measure and the Rural Open Areas Contingency Measure.

CARB, in turn, made a reasonable case that new engine standards and new fleet requirements require more time to implement than would be appropriate for contingency measures (i.e., would exceed one to two years after a triggering event) and that the State's technology-forcing and zero-emission-based nature of its mobile source regulations reduce or eliminate opportunities for yet-further emission reductions that could qualify as contingency measures.[55] Nevertheless, through its process CARB ultimately adopted the Smog Check Contingency Measure.

The three contingency measures proposed for approval stand in contrast to the commenters' argument that the feasibility assessment process put forward in the EPA's Draft Revised Contingency Measure Guidance, in the State's 2023 SIP Submissions, and the EPA's proposed approval thereof would simply re-employ the control measures originally employed to attain the PM$_{2.5}$ NAAQS in the San Joaquin Valley. Furthermore, in many instances the

---

[48] Id.

[49] Id.

[50] Moreover, we note that contingency measures under CAA section 172(c)(9), once triggered, are generally permanent and become one of the baseline control measures for the next milestone demonstration or the new attainment plan that must be adopted and submitted by the state for an area that has failed to attain the NAAQS by the applicable attainment date. As noted in this document, technological and economic feasibility is a hallmark of such control measures. In contrast, CAA section 110(a)(2)(G) requires states to adopt and submit contingency plans to address emergency episodes as part of their SIPs, and the contingency plans for emergency episodes identify emission control actions to be taken at different episode levels, which are much higher than the NAAQS, without consideration of economic or technological feasibility. See, generally, 40 CFR 51.150–51.152 and appendix L to 40 CFR part 51. One significant difference, however, between the emission control actions for emergency episode plans under CAA section 110(a)(2)(G) and the control measures relied upon for RFP and attainment is that the former are temporary and are implemented only while the emergency episode persists whereas the latter are, as noted, permanent controls for the area.

[51] EPA's Draft Revised Contingency Measure Guidance, p. 31.

[52] EPA's Draft Revised Contingency Measure Guidance, p. 31.

[53] 88 FR 86581 (December 14, 2023) (approving the State's demonstrations for BACM and five

percent annual emission reductions under CAA section 189(d) for the 1997 annual PM$_{2.5}$ NAAQS); 87 FR 4503 (January 28, 2022) (approving the State's BACM demonstration for the 1997 24-hour PM$_{2.5}$ NAAQS); and 85 FR 44192 (July 22, 2020) (approving the State's demonstrations for BACM and MSM for the 2006 24-hour PM$_{2.5}$ NAAQS).

[54] 88 FR 87988, 88000–88001 (summary of State's feasibility analyses), and 88005–88009 (the EPA's evaluation of the State's feasibility analyses). See also Draft Revised Contingency Measures Guidance, pp. 40–42.

[55] 88 FR 87988, 88008–88009.

reason for which the EPA agreed with the State for not adopting a potential control measure as a contingency measure was not based on any affirmation that a measure was economically infeasible, but rather was based on other reasons. In evaluating CARB and the District's infeasibility demonstrations in the SJV $PM_{2.5}$ Contingency Measure SIP, we relied heavily on the "EPA Source Category and Control Measure Assessment and Reasoned Justification Technical Support Document, Proposed Contingency Measures Federal Implementation Plan for the Fine Particulate Matter Standards for San Joaquin Valley, California," July 2023 ("EPA's Reasoned Justification TSD") given its breadth and depth, as well as the expertise of EPA Region IX staff, to review the State's demonstrations, understand where the State's analyses and the EPA's analyses draw largely similar conclusions, and identify those source categories where the control measure analyses differ.

For example, for the potential control measure of requiring electric water heaters and furnaces at point of sale, the EPA determined that such a measure would not be feasible because we expect that it would result in negligible emission reductions within two years after trigger, consistent with the District's suggestion that the attrition-based nature of implementation of this contingency measure option deem the measure infeasible.[56] For the potential control measure of requiring low-dust almond harvesters, the EPA determined that such a measure would be infeasible based only on the timing of emission reductions.[57]

For the potential control measure of requiring the installation of control devices on commercial under-fired charbroilers, the EPA determined that such measure would be infeasible based on fire safety certification concerns and lack of demonstrated implementation of controls.[58] For the potential control measure of lower $NO_X$ emission limits on oil and gas production equipment with a total rated heat input of greater than 5.0 million Btu per hour, the EPA determined that it would be technologically infeasible to meet the lower limits within the two-year timeframe for contingency measures due to the likely requirement that affected units would need to install selective catalytic reduction (SCR) devices to

meet the lower limits (*i.e.,* the planning, engineering, and installation of SCR would take more than two years).[59] Similarly, for the potential control measure of lower $NO_X$ emission limits for boilers, steam generators, and process heaters with a total rated heat input of 5.0 million Btu per hour or less, the EPA expects that units required to meet lower limits than those already adopted in Rules 4307 and 4308 would require installation of SCR, which cannot be feasibly achieved within the two-year timeframe for contingency measures.[60]

In sum, the EPA maintains that it does not read the statute to require air agencies to adopt and impose infeasible measures. Furthermore, as applied to the SIP submissions subject to this rulemaking, we continue to find that the State's three contingency measures for the San Joaquin Valley for the 1997 annual, 2006 24-hour, and 2012 annual $PM_{2.5}$ NAAQS, in conjunction with the State's infeasibility demonstrations that adequately justify the contingency measures selected by the State, meet the contingency measure requirement under CAA section 172(c)(9) and 40 CFR 51.1014.

*Comment 5:* The Valley EJ Organizations assert that the EPA unlawfully and arbitrarily proposes approval of the $PM_{2.5}$ contingency measures based on the Agency's new interpretation in the Draft Revised Contingency Measures Guidance by extending the implementation period from one year to two years.

*Response to Comment 5:* With respect to the issue of extending the period in which the emission reductions from contingency measures can be considered in meeting the contingency measure SIP requirement, we note that the commenters raise this particular objection to the EPA's proposed approval in a single sentence and fail to elaborate on how extending the time period for achieving the emission reductions from contingency measures from one to two years conflicts with the CAA or the EPA's implementing regulations.

In this instance, we proposed, and are now taking final action, to approve two specific contingency measures (the Residential Wood Burning Contingency Measures and the Rural Open Areas Contingency Measures), both of which, if triggered, will achieve emission reductions within a year of the triggering event. Our approval of the

2023 SIP Submissions as meeting the contingency measure SIP requirement for San Joaquin Valley for the relevant $PM_{2.5}$ NAAQS also relies on emission reductions from a third contingency measure (the Smog Check Contingency Measure) that we have approved in a separate action.

As explained in the EPA's final rule on CARB's Smog Check Contingency Measure, the emission reductions from the Smog Check Contingency Measure may not be fully achieved until the second year after the triggering event.[61] However, as further explained in that final rule, and consistent with the Draft Revised Contingency Measure Guidance, in instances where there are insufficient contingency measures available to achieve the recommended amount of emission reductions within one year of the triggering event, contingency measures that provide reductions within two years of the triggering event could be appropriate to consider toward achieving the recommended amount of emission reductions.[62] Contingency measures that result in additional emission reductions during the second year following the triggering event, as contemplated by the Draft Revised Contingency Measure Guidance, can still serve the important purpose of contingency measures to continue progress toward attainment, as the State develops and submits, and the EPA acts on, a SIP submission to address the underlying condition (*e.g.,* failure to make RFP or to attain by the applicable attainment date) that triggered the contingency measures in the first place.

*Comment 6:* The Valley EJ Organizations state that, after a first triggering event, the EPA unlawfully and arbitrarily allows California discretion in adopting further contingency measures, fails to evaluate whether the emission reductions to follow a second triggering event would meet either OYW of RFP or OYW of progress, and allows California to "'double dip' for contingency measure purposes" without enforceable provisions that would require adoption and submission of additional contingency measures.

*Response to Comment 6:* Our approval relates to the SIP requirements for contingency measures under CAA section 172(c)(9) and 40 CFR 51.1014 for the 1997 annual, 2006 24-hour and 2012 annual $PM_{2.5}$ NAAQS. Under the applicable requirements, states with $PM_{2.5}$ nonattainment areas must provide contingency measures that can be

---

[56] 88 FR 87988, 88007, and EPA's Reasoned Justification TSD, pp. 43–51.

[57] 88 FR 87988, 88007, and EPA's Reasoned Justification TSD, pp. 43–51.

[58] 88 FR 87988, 88008, and EPA's Reasoned Justification TSD, chapter V.

[59] 88 FR 87988, 88008, and EPA's Reasoned Justification TSD, pp. 9–22.

[60] 88 FR 87988, 88008, and EPA's Reasoned Justification TSD, pp. 9–22.

[61] 89 FR 56222, 56224–56225.

[62] Id.

triggered in the event of a failure to meet any RFP requirement in an attainment plan, to meet any quantitative milestone in an attainment plan, to submit a quantitative milestone report, or to attain the applicable $PM_{2.5}$ NAAQS by the applicable attainment date.

Neither the CAA nor the EPA's regulations specify a minimum number of contingency measures or prescribe separate contingency measures for different contingency measure triggers. The CAA and the EPA's regulations also do not preclude the reliance on the same contingency measures for separate NAAQS, and the commenter does not identify any specific statutory or regulatory requirement that does so. Moreover, it is not uncommon for a state or district to rely on a core set of control measures for multiple NAAQS. For example, the State and District rely on a core set of $NO_X$ control measures as part of the control strategies for demonstrating RFP and attainment for both ozone and $PM_{2.5}$ in the San Joaquin Valley. Regardless, we acknowledge that neither the State nor District has submitted an enforceable commitment to submit additional contingency measures in response to the triggering of the contingency measures. The EPA does not believe that such commitment is required.

In this instance, the 2023 SIP Submissions rely on three contingency measures, all of which provide for an initial triggering event and two of which provide for a second triggering event. In other words, all three contingency measures provide for implementation of more stringent requirements upon a first triggering event, and two of the contingency measures also provide for implementation of yet more stringent requirements upon a second triggering event (*i.e.,* further tightening of the requirements beyond that triggered by the first event).

While the EPA is not requiring CARB or the District to provide separate contingency measures for each of the triggering events or separate contingency measures for different $PM_{2.5}$ NAAQS in San Joaquin Valley, we find that a SIP deficiency would arise upon the first triggering event notwithstanding the existence of the built-in provisions for further reductions upon a second triggering event. This is because the adequacy of the contingency measure SIP depended on measures that are now being implemented as a result of the first triggering event, meaning they can no longer be used to satisfy the contingency measure requirements for subsequent triggering events. In response, we expect that CARB and the District would adopt and submit a SIP revision within one year of the triggering event to demonstrate that the SIP continues to meet contingency measure requirements. We would also expect the SIP revision to take into account the emission reductions from the two remaining contingency measures and to include additional contingency measures as needed to ensure that the San Joaquin Valley continues to meet the contingency measure requirements of CAA section 172(c)(9) and 40 CFR 51.1014.

*Comment 7:* CVAQ asserts that the "hot spot" approach under District Rule 4901, "Wood Burning Fireplaces and Wood Burning Heaters," "cannot meet the basic control measure requirements of the [CAA]" and that the emission reductions from expanding applicability to previously exempt areas would not be surplus to the controls that should be required in the San Joaquin Valley. If, however, residential wood burning is to be used as a contingency measure, CVAQ contends that the contingency measure in Rule 4901 should ban all non-essential wood burning. CVAQ further contends that the District must adopt contingency measures that would achieve OYW of RFP emission reductions in each county of the San Joaquin Valley to protect its most vulnerable communities. In addition, citing comments made by residents during 2023 District workshops that report incidents of poor enforcement of the rule, CVAQ asserts that Rule 4901 has no assurance of actual emission reductions and no concrete commitments for enforcement. CVAQ advocates for accountability measures to ensure actual emission reductions and enforcement of residential wood burning regulations.

*Response to Comment 7:* The EPA maintains that the Residential Wood Burning Contingency Measure in SJVUAPCD Rule 4901 meets the contingency measure requirements and provides reasonable assurance of emission reductions. As explained in our proposed rule,[63] Rule 4901 includes a tiered mandatory curtailment program that establishes different curtailment thresholds based on the type of devices (*i.e.,* registered clean-burning devices vs. unregistered devices) and different counties (*i.e.,* "hot spot" vs. non-hot spot), notwithstanding narrow exemptions (*e.g.,* for households where a wood burning fireplace or heater is the sole source of heat, per section 5.7.4.2 of Rule 4901). During a "Level One Episodic Wood Burning Curtailment," operation of wood-burning fireplaces and other unregistered wood-burning heaters or devices is prohibited, but properly operated, registered wood-burning heaters may be used. During a "Level Two Episodic Wood Burning Curtailment," operation of any wood-burning device is prohibited.

In 2019, the District lowered the curtailment thresholds in Madera, Fresno, and Kern counties, which the District identified as hot spot counties, because they were "either new areas of gas utility or areas deemed to have persistently poor air quality."[64] Table 4 presents the wood burning curtailment thresholds in Rule 4901, as revised in 2019.

TABLE 4—RESIDENTIAL WOOD BURNING CURTAILMENT THRESHOLDS IN RULE 4901

[as amended in 2019]

| Episodic wood burning curtailment levels | Hot spot counties (Madera, Fresno, and Kern) | Non-hot spot counties (San Joaquin, Stanislaus, Merced, Kings, and Tulare) |
|---|---|---|
| Level One (No Burning Unless Registered) | 12 µg/m³ | 20 µg/m³. |
| Level Two (No Burning for All) | 35 µg/m³ | 65 µg/m³. |

Contrary to the commenters' assertion that the hot spot approach cannot meet the basic control measure requirements of the CAA, the EPA approved the State's demonstration for Rule 4901 (2019 amendments) as BACM and MSM for the 2006 24-hour $PM_{2.5}$ NAAQS,[65] as RACM for the 2012 annual $PM_{2.5}$ NAAQS,[66] and as BACM for the 1997

63 88 FR 87988, 87995.

64 2018 $PM_{2.5}$ Plan, Appendix J, 60.

65 85 FR 44192.

66 86 FR 67343.

annual PM$_{2.5}$ NAAQS.[67] In 2022, the Ninth Circuit upheld the EPA's approval of the State's BACM and MSM demonstration for the 2006 24-hour PM$_{2.5}$ NAAQS, including those relating to residential wood burning.[68] Therefore, the hot spot approach in Rule 4901 (2019 amendments), as applied to the particular facts and circumstances of the San Joaquin Valley for the 1997 annual, 2006 24-hour, and 2012 annual PM$_{2.5}$ NAAQS, meets the applicable control requirements for controlling direct PM$_{2.5}$ emissions from residential wood burning.

The Residential Wood Burning Contingency Measure (i.e., the 2023 amendments to Rule 4901) would, upon a first triggering event, lower the thresholds for the five non-hot spot counties to match those of the hot spot counties (i.e., 12 µg/m$^3$ for Level One Curtailment and 35 µg/m$^3$ for a Level Two Curtailment) and the emission reductions in those five counties would be surplus because lowering the thresholds for the five non-hot spot counties would go beyond the requirements of Rule 4901, as amended in 2019, that the EPA has approved as meeting RACM, BACM, and MSM. Furthermore, upon a second triggering event, the Level One Curtailment threshold would be further lowered to 11 µg/m$^3$ for all eight counties in the San Joaquin Valley, resulting in further emission reductions that would be surplus to the already implemented measure and surplus to the reductions from the first triggering event.

We note that the Residential Wood Burning Contingency Measure would alone, if triggered, achieve 0.5793 tpd direct PM$_{2.5}$ emission reductions, which would exceed OYW of RFP (per EPA's long-standing approach) and OYW of progress (per EPA's draft revised approach) for direct PM$_{2.5}$ emissions in the San Joaquin Valley. Given that the Residential Wood Burning Contingency Measure is primarily a control for direct PM$_{2.5}$,[69] and that it would achieve the recommended amount of reductions for that pollutant (in terms of OYW of RFP or OYW of progress), the District was not required to restrict residential wood burning further than what the District has chosen to do for the purposes of meeting the contingency measure SIP requirements for the relevant PM$_{2.5}$ NAAQS. Thus, the District was not required to include a ban on all non-essential wood burning to meet the contingency measure SIP requirements. Furthermore, in reviewing the District's evaluation of potential control measures for residential wood burning,[70] we relied heavily on the EPA's detailed evaluation of source categories and measures that we considered as potential additional contingency measures as part of our federal implementation plan (FIP) proposal but determined to be infeasible or otherwise unsuitable for contingency measures.[71]

Regarding the commenters' contention that the District must adopt contingency measures that would achieve OYW of RFP emission reductions in each county of the San Joaquin Valley, we reiterate that CAA section 172(c)(9) does not specify what amount of emission reductions contingency measures should achieve, much less whether contingency measures should achieve particular amounts of emission reductions within geographical regions within a nonattainment area (e.g., in each county). In both our long-standing interpretation and draft revised interpretation of the contingency measure requirement, the amount of emission reductions (e.g., OYW of progress) should be estimated for the nonattainment area as a whole, consistent with the emissions inventories for the base year, RFP years, and attainment year that are based on the whole area.[72]

Regarding comments on the enforceability of Rule 4901 and assurance of actual emission reductions, we note that the District included responses to similar comments received during the District's public comment process on the public draft SJV PM$_{2.5}$ Contingency Measure SIP.[73] We maintain that Rule 4901 is adequately enforceable and that the emission reductions are reasonably estimated, for the following reasons. The District explains the method it used to estimate the emission reductions from the Residential Wood Burning Contingency Measure, including its use of an 80% compliance rate.[74] In calculating these estimates, the District incorporates data by county, device type (wood stoves and fireplaces), registration (unregistered vs. registered), which incorporates certification of cleaner-burning devices), fuel type (e.g., natural gas, wood, pellets), and average curtailment days with and without the contingency provisions.

In evaluating the emission reductions estimates from the District, and as part of the EPA's FIP proposal for PM$_{2.5}$ contingency measures in the San Joaquin Valley,[75] we found that an 80% control efficiency rate is reasonable in this case given the District's extensive public outreach and enforcement of its curtailment program.[76] The EPA concludes that the District's method is a detailed and reasonable means to estimate the emission reductions from the Residential Wood Burning Contingency Measure.

Regarding enforcement, the District states that it dedicates staff to both compliance assistance and enforcement and describes several aspects of its enforcement efforts.[77] On curtailment days, District staff surveil neighborhoods, focus on areas where non-compliance is historically high or the subject of common complaints, and respond to complaints from the public. The District responds to complaints during business hours, weekends, holidays, and night-time hours and uses technology such as global positioning system (GPS) and low-light imaging cameras (for night-time enforcement) to assist their response. During the most recent wood burning season (November 2023–February 2024), District staff spent approximately 3,500 hours on proactive monitoring and enforcement and issued 470 notices of violation of Rule 4901.[78] The EPA concludes that the District implements a reasonably robust enforcement program to ensure compliance with the wood burning

---

[67] 88 FR 86581.

[68] *Medical Advocates for Healthy Air* v. *EPA*, Case No. 20–72780, Dkt. #58–1 (9th Cir., April 13, 2022), pp. 8–9.

[69] Based on the estimates included in Table 2 (revised) in this final rule, NO$_X$ reductions from the Residential Wood Burning Contingency Measure would be approximately 14% of the reductions of direct PM$_{2.5}$.

[70] SJV PM$_{2.5}$ Contingency Measure SIP, section 4.2 ("District Feasibility Analysis"), pp. 26–31.

[71] 88 FR 87988, 88005–88006, and the EPA's Reasoned Justification TSD. For our discussion of the EPA's evaluation of a potential wood burning ban, see p. 82 of the EPA's Reasoned Justification TSD.

[72] EPA's Draft Revised Contingency Measures Guidance, pp. 23–24. Notwithstanding, for informational purposes we note that the EPA considered the geographic scope of each of the three contingency measures proposed for approval, including the Residential Wood Burning Contingency Measure. 88 FR 87988, 88010–88011.

[73] SJV PM$_{2.5}$ Contingency Measure SIP, Appendix J ("Comments and Response").

[74] SJV PM$_{2.5}$ Contingency Measure SIP, Appendix C ("Emission Reduction Analysis for Rule 4901"), C–7.

[75] EPA's Reasoned Justification TSD, section II ("Combustion: Residential Wood Burning"), pp. 5–6.

[76] See, e.g. SJVUAPCD, "Report On 2021–2022 Winter Residential Woodsmoke Reduction," April 21, 2022 ("District's 2022 Report"), pp. 19–28.

[77] District's 2022 Report, pp. 26–28.

[78] SJVUAPCD, "Report on 2023–2024 Winter Residential Woodsmoke Reduction Strategy," PowerPoint presentation prepared for SJVUAPCD Citizens Advisory Committee, June 4, 2024, slide 16. For summary information concerning enforcement of Rule 4901 in previous seasons, see SJVUAPCD, "Report On 2022–2023 Winter Residential Woodsmoke Reduction," April 20, 2023, p. 28.

**Federal Register** / Vol. 89, No. 193 / Friday, October 4, 2024 / Rules and Regulations **80761**

prohibitions required when a Level One or Level Two Curtailment is called by the District.

In sum, neither the District nor the EPA has assumed perfect compliance with the provisions of the Residential Wood Burning Contingency Measure (*i.e.*, 100% control efficiency when a ''No Burn'' day is called for a given geographic region within San Joaquin Valley); the District has provided reasonable assurance of 80% control efficiency based on its outreach, enforcement, and performance analyses; and the District reasonably estimates the amount of emission reductions to follow either a first triggering event (0.5793 tpd direct $PM_{2.5}$ and 0.0817 tpd $NO_X$) or a second triggering event (0.1078 tpd direct $PM_{2.5}$ and 0.0148 tpd $NO_X$). Therefore, we continue to find that the Residential Wood Burning Contingency Measure is adequately enforceable and its associated emission reductions are reasonably estimated.

*Comment 8:* CVAQ states that the Rural Open Areas Contingency Measure is ''essentially meaningless given that agricultural operations are exempt.'' They note that agricultural operations can implement a Fugitive $PM_{10}$ Management Plan (FPMP) as an alternative to compliance requirements and that a more meaningful contingency measure would enforce these FPMPs for all agricultural operations.

*Response to Comment 8:* While the estimated emission reductions of 0.008 tpd direct $PM_{2.5}$ from the Rural Open Areas Contingency Measure are small, we disagree with the commenters' characterization of the measure's value. Specifically, section 7.0 (''Contingency Provision'') of Rule 8051, ''Open Areas'' (2023 amendments) would, if triggered, lower the applicability threshold for rural open areas from 3.0 acres to 1.0 acre, and owners and operators of those 1.0 to 3.0-acre parcels would be newly subject to the fugitive dust control requirements of Rule 8051.[79] This measure, if triggered, would affect entities such as construction, oilfield, truck stop, and equipment and vehicle storage owners/operators, as identified in the District's ''Regulation VIII Recordkeeping Reporting Forms'' (revised June 1, 2009), as well as other residential, industrial, institutional, governmental, or commercial lot owners/operators. When such entities disturb 1,000 or more square feet of surface area within a 1.0 to 3.0-acre parcel, they would be required to apply fugitive dust control measures, consistent with the control requirements of section 5.0 of Rule 8051. Moreover, while the emission reductions from the Rural Open Areas Contingency Measure are small on a regional basis, they will be more meaningful for residents and workers in the immediate vicinities of the open areas to which Rule 8051 would apply if and when the contingency measure is triggered.

With respect to agricultural operations in the San Joaquin Valley and FPMPs, fugitive dust control requirements are governed by Rule 8081, ''Agricultural Sources,'' which covers off-field sources like unpaved roads, unpaved vehicle and equipment traffic areas, and bulk materials.[80] Under section 7.0 of Rule 8081, an agricultural operator may implement an FPMP for unpaved roads and unpaved vehicle/equipment traffic areas as a compliance alternative to the control requirements in sections 5.2.2, 5.3.1, and 5.3.2 of the rule. An FPMP must achieve 50% control efficiency for fugitive dust ($PM_{10}$) and go through a review and approval process prior to being implemented. It must be implemented on all days that vehicle traffic exceeds the applicable vehicle trip thresholds in sections 5.2.2, 5.3.1, and 5.3.2. Under section 7.4 of Rule 8081, failure to comply with an approved FPMP is deemed a violation of the rule.

By comparison, sections 5.2.2, 5.3.1, and 5.3.2 require that visible dust emissions (VDE) be limited to a 20% opacity standard and comply with requirements for stabilization of unpaved roads[81] by application of at least one of a discrete set of control techniques (*e.g.*, watering, uniform layer of washed gravel, chemical/organic dust stabilizers/suppressants). Section 5.2.2 applies to unpaved roads based on vehicle daily trips; sections 5.3.1 and 5.3.2 apply to unpaved vehicle/equipment traffic areas with thresholds based on annual and daily vehicle trips, respectively.

If, as the commenters suggest, all agricultural operations were required, following a contingency measure triggering event, to implement an FPMP, it is unclear whether such contingency measure would achieve emission reductions that are surplus to those that are being achieved under the existing rule. For agricultural operations already implementing an FPMP, such contingency measure would result in no change in emission reductions. For agricultural operations implementing controls under section 5.2.2, 5.3.1, and 5.3.2 of Rule 8081 (*i.e.*, not implementing an FPMP), it is unclear whether an FPMP would achieve more emission reductions than the standard control provisions (limit VDE to 20% opacity). Consistent with our final rule approving the 2003 San Joaquin Valley attainment plan for the 1987 $PM_{10}$ NAAQS into the California SIP,[82] we believe that the FPMP's 50% control efficiency requirement is equivalent to the minimum control efficiency expected from compliance with surface stabilization requirements in the rule that otherwise apply.

Furthermore, within the SJV $PM_{2.5}$ Contingency Measure SIP, the District states that it evaluated potential additional controls (including those implemented by other jurisdictions) within the application of Regulation VIII, ''Fugitive $PM_{10}$ Prohibitions,'' and that the existing fugitive dust controls (including those under Rule 8081) meet or exceed the requirements for RACM, BACM, and MSM, and did not identify any further potential contingency measure, with the exception of the potential measure in Rule 8051 (*i.e.*, the measure ultimately adopted as the Rural Open Areas Contingency Measure).[83] In the EPA's review of potential control measures (including those implemented by other jurisdictions), we similarly did not identify additional measures for unpaved roads that would be suitable as contingency measures.[84] Therefore, we

---

[79] The definition of open areas is provided in Rule 8011, ''General Requirements,'' section 3.36 (''. . . vacant portions of residential or commercial lots and contiguous parcels that are immediately adjacent to and owned and/or operated by the same individual or entity are considered one open area. . .'').

[80] We note that Rule 4550, ''Conservation Management Practices'' includes fugitive dust control requirements for on-field agricultural operations in the San Joaquin Valley, but does not include provisions for FPMPs, unlike Rule 8081. Also, while there are provisions for FPMPs in Rule 8061, ''Paved and Unpaved Roads'' and Rule 8071, ''Unpaved Vehicle/Equipment Traffic Areas,'' those rules pertain to non-agricultural roads and vehicle/equipment traffic areas, respectively, rather than the agricultural operations referenced in the comments.

[81] By definition under section 3.59 of Rule 8011, stabilization of unpaved roads and unpaved vehicle/equipment traffic areas requires that VDE be limited to 20% opacity.

[82] 69 FR 30006 (May 26, 2004). We note that, at that time, EarthJustice compared the 20% opacity and other aspects of the control requirements in section 5.0 of Rule 8081 to the 50% control efficiency requirement and lack of 20% opacity requirement in the compliance alternative in section 7.0 of Rule 8081 and asserted that the FPMP compliance alternative should not be included. 69 FR 30006, 30018. While we agreed that the FPMP alternative does not contain an explicit requirement for sources to comply with 20% opacity, it is unclear whether compliance with 20% opacity would necessarily increase control efficiency for unpaved roads or unpaved vehicle/equipment traffic areas above the minimum 50% control required under the FPMP provisions of Rule 8081.

[83] SJV $PM_{2.5}$ Contingency Measure SIP, p. 25.

[84] EPA's Reasoned Justification TSD, pp. 109–114.

disagree with the commenters that enforcing FPMPs on all agricultural operations would qualify as a contingency measure. Nonetheless, we recommend that the District continue to explore potential contingency measures for dust emissions from agricultural sources, whether within the construct of the FPMP framework in Rule 8081 or more broadly, *e.g.,* within the construct of other rules such as Rule 4550, "Conservation Management Practices."

*Comment 9:* The Valley EJ Organizations state that the EPA's proposed approval of the State's contingency measures ignores Presidential and other federal orders that direct the EPA and other federal agencies to prioritize environmental justice, including Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad" (January 27, 2021) and Executive Order 14096, "Revitalizing our Nation's Commitment to Environmental Justice for All" (April 21, 2023).[85] They further argue that the EPA exacerbates the "environmental justice crisis" by denying the residents of the San Joaquin Valley meaningful pollution reductions. To convey the magnitude of this concern, the commenters cite to American Lung Association rankings of counties for $PM_{2.5}$ and ozone pollution (where many San Joaquin Valley counties rank among the worst in the nation) and the EPA's review of environmental justice indices (where many San Joaquin Valley counties exceed the 90th percentile) and describe the sequence of failures to attain the NAAQS by the applicable attainment dates in San Joaquin Valley, as well as recent air quality design values for the 1997 8-hour ozone NAAQS and the 1997 annual $PM_{2.5}$ NAAQS that portend the same.

In addition, CVAQ argues that the EPA's proposed approval goes against the Biden Administration's environmental justice priorities by "refusing to hold the region's largest polluters accountable, discounting community priorities and continuing racist polluting practices." They state that EPA is only looking at technological feasibility and costs to industry and is not analyzing social and health impacts in determining the cost of not taking action.

*Response to Comment 9:* We agree that the San Joaquin Valley has many communities with EJ concerns that are disproportionately impacted by $PM_{2.5}$ and other kinds of air pollution.

However, we disagree that the EPA's proposed approval ignores Presidential orders to prioritize environmental justice. First, the Residential Wood Burning Contingency Measure and the Rural Open Area Contingency Measure, as well as the Smog Check Contingency Measure, would, following a triggering event, reduce emissions from residential wood burning, rural open areas, and light-duty vehicles across the San Joaquin Valley, including minority and low-income populations, as described in section VI ("Environmental Justice Considerations") of our proposed rule.[86]

While not a comprehensive solution to address the disproportionately high $PM_{2.5}$ concentrations to which these populations are exposed, the three contingency measures would achieve more than OYW of emission reductions for direct $PM_{2.5}$ and a portion of the OYW of emission reductions for $NO_X$, as described in our proposed rule[87] and updated in section I.B of this document. Therefore, our proposed approval of these measures is directionally consistent with Executive Orders 14008 and 14096, as well as Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority and Low-Income Populations" (February 11, 1994).[88]

To the extent that the commenters disagree with the EPA's Draft Revised Contingency Measure Guidance or our application thereof to the facts and circumstances of the San Joaquin Valley, we maintain that the CARB and the District's 2023 SIP Submissions meet the requirements of CAA section 172(c)(9) and 40 CFR 51.1014 and are approving the submissions on that basis. The EPA carefully reviewed the extensive recommendations put forward by environmental, public health, and community organizations regarding additional potential control measures on

stationary and area sources in the San Joaquin Valley[89] and documented our analyses thereof in the EPA's Reasoned Justification TSD.[90] We relied heavily on that TSD in our evaluation of the CARB and the District's 2023 SIP Submissions and, where our conclusions differed from CARB or the District's conclusions with respect to the basis of a potential additional control measure not meeting the contingency measure requirements, we explained those differences, as noted in the latter part of Response to Comment 4 of this document. Nevertheless, those control measure recommendations retain their value for consideration as CARB and the District develop, and the EPA reviews, further SIPs for the San Joaquin Valley, even while we conclude that they are not required to meet the contingency measure requirements for the $PM_{2.5}$ NAAQS in the San Joaquin Valley at this time.

Regarding CVAQ's comments regarding technological feasibility and costs to industry versus social and health impacts, we agree that the State, in its 2023 SIP Submissions, and the EPA, in our review thereof, considered the technological feasibility of potential control measures and reviewed available information regarding the economic feasibility of potential control measures (*i.e.,* which captures costs to industry). However, we did not assess the public health and social costs of not requiring potential control measures during our review of the State's 2023 SIP Submissions because such an assessment is not required for the contingency measure requirements of the CAA, nor the related control

---

[85] Valley EJ Organizations Comment Letter, pp. 4–6. See also, 86 FR 7619 (February 1, 2021) (Executive Order 14008) and 88 FR 25251 (April 26, 2023) (Executive Order 14096).

[86] 88 FR 87988, 88009–88011. In section VI of our proposed rule, we discuss environmental justice considerations in the context of Executive Order 12898 ("Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations") rather than by reference to Executive Orders 14008 or 14096. Executive Order 12898 directs federal agencies "to identify and address disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law." Executive Order 14008 directs federal agencies to take certain actions directed toward "disadvantaged communities" that are described as "historically marginalized and overburdened." Executive Order 14096 builds upon and supplements Executive Orders 12898 and 14008. All three Executive Orders direct federal agencies to identify and address disproportionate environmental effects, even while the particular directives and protected classes vary among the three orders.

[87] 88 FR 87988, 88003–88005.

[88] 59 FR 7629 (February 16, 1994).

[89] See letter dated October 22, 2021, from environmental organizations to Michael S. Regan, Administrator, EPA, Subject: "Meeting Request to Discuss PM–2.5 Crisis in the San Joaquin Valley," and letter dated May 18, 2022, from environmental organizations to Michael S. Regan, Administrator, Environmental Protection Agency, Subject: "Meeting Request to Discuss PM–2.5 Crisis in the San Joaquin Valley" (referred to in the EPA's Reasoned Justification TSD as the "EarthJustice Letters").

[90] EPA's Reasoned Justification TSD, p. 6 (within section II ("Control Measure Identification and Evaluation Methodology")), pp. 13–17 (large boilers, steam generators, and process heaters), 29 (non-road, reciprocal internal combustion engines), pp. 58–59 (flares), pp. 73–76 (glass and related products), 80–84 (residential fuel combustion), p. 85 (fugitive dust controls), pp. 129–131 (managed burning and disposal), pp. 134–136 (commercial cooking), p. 147 (new source review), pp. 149–151 (indirect source review), and pp. 151–152 (soil $NO_X$). We also noted that we did not review the environmental organizations' recommendations for primarily VOC-related controls, as the EPA has approved the State's demonstrations that VOCs are not significant precursors for 1997 annual, 2006 24-hour, and 2012 annual $PM_{2.5}$ NAAQS in the San Joaquin Valley. See, *e.g.,* p. 53 (petroleum production and marketing), and p. 88 (confined animal facilities).

measure requirements (*e.g.,* RACM/RACT, BACM/BACT, or MSM) upon which contingency measures build.[91]

In addition, while the EPA may in certain circumstances have discretion to consider environmental justice in implementing the requirements of the Act, Executive Orders 12898, 14008, and 14096 do not provide any independent authority for action. The EPA has determined that this action satisfies the requirements of CAA section 172(c)(9) for the 1997 annual, 2006 24-hour, and 2012 annual PM$_{2.5}$ NAAQS in the San Joaquin Valley. Under the CAA, the EPA is required to approve a SIP submission that meets the requirements of the CAA and applicable federal regulations.

Although these Executive Orders do not provide us with an independent basis to disapprove CARB and the District's SIP submission, we conducted an environmental justice analysis to provide additional context and information about this rulemaking to the public, as described in section III of this document and section VI of our proposed rule. Overall, we expect that this action and the codification of the Residential Wood Burning Contingency Measure and the Rural Open Areas Contingency Measure, as well as the codification of the Smog Check Contingency Measure in our separate final action, will contribute to reduced negative environmental and health impacts on all populations in the San Joaquin Valley, including communities with EJ concerns. For these reasons, this action is not expected to have a disproportionately high or adverse human health or environmental effect on a particular group of people. The EPA remains committed to working with CARB and the District to ensure that the PM$_{2.5}$ attainment requirements for this area satisfy applicable CAA requirements and thereby protect all populations in the area, including communities with EJ concerns, from disproportionately high or adverse air pollution impacts.

*Comment 10:* The Valley EJ Organizations allege that, following the 2021 Ninth Circuit Court decision in *AIR* v. *EPA,* the EPA began colluding with CARB and California air districts to weaken the contingency measure requirement. The Valley EJ Organizations further state that, during meetings of a workgroup called the

"Padilla Contingency Measures Subgroup," the EPA committed to revise its long-standing interpretation of the contingency measure requirements, including specific elements that would relax emission reduction requirements and contend that the EPA's commitment yielded the Draft Revised Contingency Measure Guidance.[92] The commenters also contend that the EPA now proposes, as it allegedly agreed to during the Padilla Contingency Measures subgroup proceedings, to "eviscerate the amount of contingency measure emission reductions" and that the "EPA has predetermined the outcome of these proposed rulemakings in an agreement with CARB and the air districts during the Padilla Contingency Measures Subgroup proceedings," thereby violating the procedural due process clause of the Fifth Amendment to the U.S. Constitution, CAA section 307, the Administrative Procedure Act, and Executive Orders 14008 and 14096.[93]

The Valley EJ Organizations include several documents obtained from the EPA via a Freedom of Information Act request to support their allegation of collusion.[94] These include, among other things, documents relating to EPA engagement in 2021–2023 with the California Air Pollution Control Officers Association (CAPCOA), the "Padilla Contingency Measures Subgroup," a letter from South Coast Air Quality Management District, discussions with California air districts and CARB senior staff, and an email from EPA Region IX to SJVUAPCD. The commenters state that these documents indicate that the EPA worked closely with California air agencies to fashion an agreement to weaken the contingency measure requirement and that the EPA shared its revised guidance with the California agencies several months before releasing the revised guidance to the general public without regard for the public health consequences from weakening the contingency measure requirement.[95]

*Response to Comment 10:* We disagree that the EPA colluded with California air agencies to weaken the contingency measure requirement following the 2021 *AIR* v. *EPA* decision by the Ninth Circuit Court of Appeals. In this context, collusion refers to a secret agreement for an illegal purpose. The process we followed to reconsider and revise preexisting contingency

measure guidance was not secret, nor was our agreement to reconsider and revise the guidance made for an illegal purpose.

The Clean Air Act is referred to as a model of cooperative federalism. Under the CAA, the EPA is responsible for establishing the NAAQS, and the states are responsible for developing SIPs and SIP revisions to provide for implementation, maintenance, and enforcement of the NAAQS. In turn, the EPA is responsible for promulgating regulations establishing SIP requirements and for providing guidance to the states in developing SIPs and SIP revisions to meet the various requirements under the CAA and our implementing regulations.

In that capacity, it is appropriate for the EPA to reconsider previously-issued guidance in the wake of court decisions that bear on EPA actions on SIPs that relied on that guidance.[96] In this instance, as discussed in the Draft Revised Contingency Measure Guidance, we issued the draft revised guidance document because recent court decisions had invalidated key aspects of EPA's historical approach to implementing the contingency measure requirement, and these court decisions had the effect of prohibiting an approach that many air agencies have historically used to meet the contingency measure requirement.[97]

The EPA developed the Draft Revised Contingency Measure Guidance based on the recommendations of an ad hoc internal working group, referred to as the Contingency Measure Task Force, that the EPA assembled soon after the D.C. Circuit Court of Appeals decision in *Sierra Club* v. *EPA.*[98] The Contingency Measure Task Force was comprised of EPA program staff and attorneys from both the EPA regions and headquarters. During the process of developing options for EPA management consideration and preparing the Draft Revised Contingency

---

[91] Nevertheless, beyond the scope of this rulemaking, the public may be interested in the EPA's estimates of the monetized benefit per ton of reducing PM$_{2.5}$ and ozone precursor emissions for certain emission sectors; available at *https://www.epa.gov/benmap/sector-based-pm25-benefit-ton-estimates.*

[92] Valley EJ Organizations Comment Letter, p. 2.

[93] Valley EJ Organizations Comment Letter, p. 11.

[94] Valley EJ Organizations Comment Letter, Exhibits 4 through 12.

[95] Valley EJ Organizations Comment Letter, pp. 8–11.

[96] See, for example, EPA Office of Transportation and Air Quality, "Implementing Clean Air Act Section 182(d)(1)(A): Transportation Control Measures and Transportation Control Strategies to Offset Growth in Emissions Due to Growth in Vehicle Miles Travelled," EPA–420–B–12–053, August 2012 (revised guidance in light of the Ninth Circuit Court of Appeals decision in *Association of Irritated Residents* v. *EPA,* 632 F.3d 584, at 596–597 (9th Cir. 2011), reprinted as amended on January 27, 2012).

[97] Draft Revised Contingency Measure Guidance, p. 2.

[98] The *Sierra Club* v. *EPA* decision adopted the rationale of an earlier decision by the Ninth Circuit Court of Appeals in *Bahr* v. *EPA* that invalidated already-implemented measures as contingency measures for the purposes of CAA section 172(c)(9). *Sierra Club* v. *EPA,* 21 F.4th 815, 827–28 (D.C. Cir. 2021) and *Bahr* v. *EPA,* 836 F.3d 1218 (9th Cir. 2016).

Measure Guidance, California air agencies made their views known to the EPA, but those agencies played no part in the drafting or review of the recommendations made by the Contingency Measure Task Force to EPA management or the substance of the Draft Revised Contingency Measure Guidance itself.

Also in the spirit of cooperative federalism, the EPA routinely communicates with state and local air agencies responsible for SIPs and SIP revisions regarding compliance with SIP requirements. Again, the states are responsible for adoption and submission of SIPs and SIP revisions and there are consequences for failure to meet SIP submission deadlines.

In this instance, the EPA engaged with state and local air agencies to hear their concerns over meeting the contingency measure SIP requirements and to provide a description of the types of revisions to the contingency measure guidance that EPA staff were developing for consideration by EPA management. The impetus for heightened interest on the part of state and local air agencies was the need to meet near-term deadlines for submission of SIP revisions addressing the contingency measure SIP requirements for multiple ozone and PM$_{2.5}$ NAAQS. Documents cited by the commenter as evidence of collusion simply reveal that the EPA was responsive to state and local agency requests for insight as to what the contingency measure guidance revisions might entail if and when approved by EPA management. Thus the air agencies that developed SIP revisions in reliance on the descriptions by EPA staff of not-yet-approved revisions to the contingency measure guidance were taking a risk that the guidance, once made publicly available, would differ in material ways from what EPA staff had described.

With respect to the commitments that the EPA made in connection with the Padilla Contingency Measures Subgroup,[99] the EPA did not commit to making any specific revisions to the contingency measure guidance or to making any revisions to the guidance that are inconsistent with the CAA or case law. Rather, the Agency committed "to explore interpretations and approaches that are consistent with the court decisions" and, among other

things, "to revisit" the general bases for calculating the amount of emission reductions that contingency measures should provide, but as noted previously, the EPA did not commit to any particular outcome. The Contingency Measure Task Force followed through on these commitments through meetings and review of draft documents that were internal to the EPA and eventual publication of notice in the **Federal Register** of the availability of the Draft Revised Contingency Measure Guidance for public review and comment. We believe the revised draft guidance provides an approach that state and local air agencies may use to meet the contingency measure SIP requirements under the CAA.

The EPA issued the Draft Revised Contingency Measure Guidance on March 17, 2023, and sought public comment on section 3 ("Showing that the CMs Achieve Sufficient Reductions"), section 4 ("Reasoned Justification for Less Than OYW of Progress"), and section 5 ("Guidance on Timing of Reductions from CMs") of the draft guidance over a 30-day period ending April 24, 2023.[100] We applied the underlying concepts of the draft guidance in our evaluation of the SJV PM$_{2.5}$ Contingency Measure SIP, described as much in our proposed rule, and provided a 30-day comment period ending January 9, 2024, consistent with the public notice requirements of the CAA and the Administrative Procedure Act.[101]

For this action, we evaluated the two individual District contingency measures, the Residential Wood Burning Contingency Measure and the Rural Open Areas Contingency Measure, to determine whether they met the requirements for such measures under the CAA and the EPA's regulations. We also considered the sum of the emission reductions from the two individual District contingency measures plus CARB's Smog Check Contingency Measure relative to the recommended amount we have indicated contingency measures should achieve. Because the measures, considered together, would not achieve the recommended amount of emission reductions for NO$_X$, CARB and the District submitted infeasibility demonstrations documenting the unavailability of additional feasible contingency measures for that PM$_{2.5}$ precursor.

We reviewed and evaluated the infeasibility demonstrations and in our proposed rule provided the rationale for our conclusion that the individual

District contingency measures met the applicable requirements for such measures and that CARB and the District had provided a reasoned justification, through the infeasibility demonstrations, for not adopting contingency measures sufficient to achieve the recommended amount of emission reductions for NO$_X$. In this action, we are finalizing our approval of the SJV PM$_{2.5}$ Contingency Measure SIP for the reasons given in the proposed rule, as clarified and supplemented in responses to comments. While the Valley EJ Organizations object to the consideration of feasibility in connection with the contingency measure SIP requirement, the commenters have raised no specific objection our evaluation of the infeasibility demonstrations from CARB and the District upon which our final approval rests.

In summary, in our proposed rule on the State's contingency measure SIP submissions for the PM$_{2.5}$ NAAQS in the San Joaquin Valley, as well as our Draft Revised Contingency Measures Guidance, we articulated a reasoned justification for the change in EPA policy on the contingency measure requirements and respond in this document to comments opposing those policy changes, and we explained how we were reviewing the 2023 SIP Submissions in light of the new guidance. The EPA believes that such actions satisfy the applicable requirements for public process under the CAA and Administrative Procedure Act, as well as our responsibilities to engage state and local air agencies on CAA requirements and the development of SIP revisions in the wake of applicable court decisions.

## III. Environmental Justice Considerations

As described in detail in our proposal, the EPA reviewed environmental and demographic data for the San Joaquin Valley using the EPA's EJ screening and mapping tool ("EJSCREEN") and compared the data to the corresponding data for the United States as a whole, and to California as a whole.[102] The results of the analysis are provided for

---

[99] The Padilla Contingency Measures Subgroup was one of several such ad hoc groups assembled in response to an inquiry from U.S. Senator Padilla. See the letter dated December 3, 2021, from Joseph Goffman, Principal Deputy Assistant Administrator to U.S. Senator Alex Padilla, responding to letter dated October 19, 2021, from U.S. Senator Alex Padilla to Michael Regan, Administrator, EPA.

[100] 88 FR 17571.
[101] 88 FR 87988.

[102] EJSCREEN provides a nationally consistent dataset and approach for combining environmental and demographic indicators. EJSCREEN is available at *https://www.epa.gov/ejscreen/what-ejscreen*. The EPA used EJSCREEN to obtain environmental and demographic indicators representing each of the eight counties in the San Joaquin Valley. These indicators are included in EJSCREEN reports that are available in the rulemaking docket for this action. EPA Region IX, "EJSCREEN Analysis for the Eight Counties of the San Joaquin Valley Nonattainment Area," August 2022.

informational and transparency
purposes.

This final action approves the State's
contingency measure SIP submissions
for the 1997 annual, 2006 24-hour, and
2012 annual PM$_{2.5}$ NAAQS in the San
Joaquin Valley. Information on these
PM$_{2.5}$ NAAQS and their relationship to
health impacts can be found at 62 FR
38652 (July 18, 1997), 71 FR 61144
(October 17, 2006), and 78 FR 3086
(January 15, 2013), respectively. We
expect that this action and resulting
emission reductions will generally be
neutral or contribute to reduced
environmental and health impacts on all
populations in the San Joaquin Valley,
including communities with EJ
concerns. At a minimum, this action
would not worsen existing air quality
and is expected to help ensure the area
is meeting requirements to attain and/or
maintain air quality standards. Further,
there is no information in the record
indicating that this action is expected to
have disproportionately high or adverse
human health or environmental effects
on a particular group of people.

## IV. EPA Action

For the reasons described in our
proposed rule and in responses to
comments and under CAA section
110(k)(3), the EPA is taking final action
to approve SIP revisions submitted by
CARB on June 8, 2023, and October 16,
2023, for the San Joaquin Valley to
address the contingency measure SIP
requirements for San Joaquin Valley for
the 1997 annual, 2006 24-hour, and
2012 annual PM$_{2.5}$ NAAQS.

The SIP submissions include the
contingency measure plan element for
San Joaquin Valley for the relevant
PM$_{2.5}$ NAAQS (referred to herein as the
"SJV PM$_{2.5}$ Contingency Measure SIP")
and two specific contingency measures,
referred to herein as the Residential
Wood Burning Contingency Measure
and the Rural Open Areas Contingency
Measure. We are approving the SJV
PM$_{2.5}$ Contingency Measure SIP as
meeting the applicable requirements of
CAA section 172(c)(9) and 40 CFR
51.1014 for San Joaquin Valley for the
applicable PM$_{2.5}$ NAAQS based on our
approval of these two contingency
measures, the emission reductions from
the two contingency measures and the
Smog Check Contingency Measure, and
our review of the State's infeasibility
demonstrations provided in the SJV
PM$_{2.5}$ Contingency Measure SIP.

The Residential Wood Burning
Contingency Measure and the Rural
Open Areas Contingency Measure are
included in amendments to SJVUAPCD
Rule 4901 ("Wood Burning Fireplaces
and Wood Burning Heaters") and Rule
8051 ("Open Areas"), respectively. We
are taking final action to approve the
two specific contingency measures
because they meet the requirements
under CAA section 172(c)(9) and 40
CFR 51.1014 for such measures.

As discussed in Section I.B of the
proposed rule, on November 26, 2021,
the EPA disapproved the contingency
measure SIP elements submitted for the
2006 24-hour and 2012 annual PM$_{2.5}$
NAAQS for San Joaquin Valley.[103]
These disapprovals were effective on
December 27, 2021. In a separate action
published on November 26, 2021, also
effective December 27, 2021, the EPA
disapproved the contingency measure
element for the 1997 annual PM$_{2.5}$
NAAQS for San Joaquin Valley.[104]

In our November 26, 2021 final
disapprovals, we noted that offset and
highway sanctions under CAA sections
179(b)(2) and 179(b)(1), respectively,
would not apply if California submits,
and the EPA approves, a SIP submission
or submissions that correct the
deficiencies identified in our final
actions prior to the imposition of
sanctions.[105] Through this final
approval action, we find that California
has corrected the deficiencies associated
with the contingency measure elements
for the 1997 annual, 2006 24-hour and
2012 annual PM$_{2.5}$ NAAQS for San
Joaquin Valley. Thus, upon the effective
date of this final rule, all sanctions and
any sanctions clocks associated with the
disapprovals of the contingency
measure elements for the 1997 annual,
2006 24-hour and 2012 annual PM$_{2.5}$
NAAQS for San Joaquin Valley will be
permanently terminated.[106]

Lastly, based on this final action, we
find that our FIP obligation arising from
our December 6, 2018 finding of failure
to submit is terminated, and thus, we
will not be taking final action on our
August 8, 2023 proposed PM$_{2.5}$
contingency measure FIP for San
Joaquin Valley.[107]

## V. Incorporation by Reference

In this rule, the EPA is finalizing
regulatory text that includes
incorporation by reference. In
accordance with requirements of 1 CFR
51.5, the EPA is finalizing the
incorporation by reference of
SJVUAPCD Rule 4901 ("Wood Burning
Fireplaces and Wood Burning Heaters"),
amended May 18, 2023, which regulates
emissions from wood burning
fireplaces, wood burning heaters, and
outdoor wood burning devices, and
Rule 8051 ("Open Areas"), amended
September 21, 2023, which regulates
fugitive dust from open areas. The May
18, 2023 version of Rule 4901 and the
September 21, 2023 version of Rule
8051 will replace the previously
approved versions of these rules,
respectively, in the California SIP. The
EPA has made, and will continue to
make, these documents available
through *www.regulations.gov* and at the
EPA Region IX Office (please contact the
person identified in the **FOR FURTHER
INFORMATION CONTACT** section of this
preamble for more information).

## VI. Statutory and Executive Order Reviews

Under the Clean Air Act, the
Administrator is required to approve a
SIP submission that complies with the
provisions of the Clean Air Act and
applicable Federal regulations. 42
U.S.C. 7410(k); 40 CFR 52.02(a). Thus,
in reviewing SIP submissions, the EPA's
role is to approve state choices,
provided that they meet the criteria of
the Clean Air Act. Accordingly, this
action merely approves a state plan and
related measures as meeting Federal
requirements and does not impose
additional requirements beyond those
imposed by state law. For that reason,
this action:

• Is not a significant regulatory action
subject to review by the Office of
Management and Budget under
Executive Orders 12866 (58 FR 51735,
October 4, 1993) and 14094 (88 FR
21879, April 11, 2023);

• Does not impose an information
collection burden under the provisions
of the Paperwork Reduction Act (44
U.S.C. 3501 *et seq.*);

• Is certified as not having a
significant economic impact on a
substantial number of small entities
under the Regulatory Flexibility Act (5
U.S.C. 601 *et seq.*);

• Does not contain any unfunded
mandate or significantly or uniquely
affect small governments, as described
in the Unfunded Mandates Reform Act
of 1995 (Pub. L. 104–4);

• Does not have federalism
implications as specified in Executive
Order 13132 (64 FR 43255, August 10,
1999);

[103] 86 FR 67343.

[104] 86 FR 67329.

[105] 86 FR 67329, 67341 and 86 FR 67343, 67346–
67347. We note that, concurrent with our proposed
rules to approve the State's 2023 SIP submissions,
the EPA issued an interim final determination that
stayed offset sanctions and deferred highway
sanctions. 88 FR 87934 (December 20, 2023).

[106] In addition, CAA section 110(c) FIP
obligations arising from the disapprovals of the
contingency measure elements will be permanently
terminated.

[107] See our December 20, 2023 proposed rule at
88 FR 87991 for a discussion of the finding of
failure to submit and related FIP obligation.

**80766** **Federal Register** / Vol. 89, No. 193 / Friday, October 4, 2024 / Rules and Regulations

• Is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because it approves a state program;

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001); and

• Is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian tribe has demonstrated that a tribe has jurisdiction. In those areas of Indian country, the final rule does not have tribal implications and will not impose substantial direct costs on tribal governments or preempt tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, February 16, 1994) directs Federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on communities with EJ concerns to the greatest extent practicable and permitted by law. The EPA defines EJ as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." The EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."

CARB and the District did not evaluate EJ considerations as part of the SIP submissions addressed in this action; the CAA and applicable implementing regulations neither prohibit nor require such an evaluation. The EPA performed an EJ analysis, as described in section III of this document and section VI of the EPA's proposed rule, entitled "Environmental Justice Considerations." The EPA conducted this analysis for the purpose of providing additional context and information about this rulemaking to the public, and the EPA does not rely on this analysis as a basis for this final action. In addition, the EPA has addressed comments on Executive Orders relating to EJ in Response to Comment 9 of this document. Due to the nature of the action being taken here, this action is expected to have a neutral to positive impact on the air quality of the affected area. In addition, there is no information in the record upon which this decision is based inconsistent with the stated goal of E.O. 12898 of achieving EJ for communities with EJ concerns.

This action is subject to the Congressional Review Act, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by December 3, 2024. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review, nor does it extend the time within which a petition for judicial review may be filed, and it shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Ammonia, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

Dated: September 25, 2024.

**Martha Guzman Aceves,**
*Regional Administrator, Region IX.*

For the reasons discussed in the preamble, part 52, chapter I, title 40 of the Code of Federal Regulations is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for Part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart F—California

■ 2. Section 52.220 is amended by adding paragraphs (c)(334)(i)(B)(*3*), (c)(535)(i)(A)(*2*), (c)(618) and (619) to read as follows:

### § 52.220   Identification of plan—in part.

*   *   *   *   *
(c) *   *   *

(334) *   *   *
(i) *   *   *
(B) *   *   *
(*3*) Previously approved on February 17, 2006, in paragraph (c)(334)(i)(B)(*2*) of this section and now deleted with replacement in paragraph (c)(619)(i)(A)(*1*) of this section: Rule 8051, "Open Areas," amended on August 19, 2004.

*   *   *   *   *
(535) *   *   *
(i) *   *   *
(A) *   *   *
(*2*) Previously approved on July 22, 2020, in paragraph (c)(535)(i)(A)(*1*) of this section and now deleted with replacement in paragraph (c)(618)(i)(A)(*1*) of this section: Rule 4901, "Wood Burning Fireplaces and Wood Burning Heaters," amended on June 20, 2019.

*   *   *   *   *
(618) The following plan revisions were submitted electronically on June 8, 2023, by the Governor's designee, as an attachment to a letter dated June 7, 2023.

(i) *Incorporation by reference.* (A) San Joaquin Valley Unified Air Pollution Control District.

(*1*) Rule 4901, "Wood Burning Fireplaces and Wood Burning Heaters," amended on May 18, 2023.

(*2*) [Reserved]
(B) [Reserved]
(ii) *Additional materials.* (A) San Joaquin Valley Unified Air Pollution Control District.

(*1*) "$PM_{2.5}$ Contingency Measure State Implementation Plan Revision (May 18, 2023)," adopted on May 18, 2023, excluding Rule 4901, "Wood Burning Fireplaces and Wood Burning Heaters."

(*2*) [Reserved]
(B) [Reserved]
(619) The following plan revision was submitted electronically on October 16, 2023, by the Governor's designee, as an attachment to a letter dated October 13, 2023.

(i) *Incorporation by reference.* (A) San Joaquin Valley Unified Air Pollution Control District.

(*1*) Rule 8051, "Open Areas," amended on September 21, 2023.

(*2*) [Reserved]
(B) [Reserved]
(ii) [Reserved]

*   *   *   *   *

### § 52.237   [Amended]

■ 3. Section 52.237 is amended by removing and reserving paragraphs (a)(9), (10) and (11).

[FR Doc. 2024–22681 Filed 10–3–24; 8:45 am]

**BILLING CODE 6560–50–P**