No. 24-7270

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

COMMITTEE FOR A BETTER ARVIN, *et al.*,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*,

and

CALIFORNIA AIR RESOURCES BOARD, *et al.*,

*Respondents-Intervenors.*

Petition for Review of Final Action of the
U.S. Environmental Protection Agency

---

## PETITIONERS' OPENING BRIEF

---

BRENT J. NEWELL
LAW OFFICE OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
Telephone: (661) 586-3724
brentjnewell@outlook.com

COLIN O'BRIEN
TYLER SZETO
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Telephone: (415) 217-2000
cobrien@earthjustice.org
tszeto@earthjustice.org

*Attorneys for Petitioners*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

GLOSSARY ............................................................................................. x

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 2

STATEMENT OF ISSUES PRESENTED ............................................... 2

ADDENDUM ......................................................................................... 3

STATEMENT OF THE CASE ................................................................. 3

    I.    The air quality crisis in the San Joaquin Valley. ........................ 3

    II.    The Clean Air Act's strategy for addressing PM2.5 pollution. ................... 6

    III.    The Clean Air Act's contingency measure requirement. .......................... 10

    IV.    Repeated failures to attain the PM2.5 NAAQS in the Valley. .................. 12

        A.    1997 Annual PM2.5 Standard. ............................................ 12

        B.    2006 24-Hour PM2.5 Standard. ......................................... 14

        C.    2012 Annual PM2.5 Standard. ........................................... 14

    V.    PM2.5 contingency measures in the San Joaquin Valley. ........................ 16

        A.    Inadequate proposals and unlawful approvals. ..................... 16

        B.    EPA moves to weaken contingency measure requirements. ................. 18

        C.    PM2.5 contingency measures submitted for EPA approval. ................. 20

            1.    Residential Wood Burning Contingency Measure. ........................ 20

            2.    Rural Open Areas Contingency Measure. ......................... 21

3.    Smog Check Contingency Measure............................................22

D.    EPA's proposal to approve the PM2.5 contingency measures..............23

E.    EPA approves the PM2.5 contingency measures as proposed. ..............26

F.    Air Advocates' petition for review. .......................................28

STANDING ........................................................................................28

SUMMARY OF THE ARGUMENT ....................................................32

STANDARD OF REVIEW ..................................................................34

ARGUMENT ......................................................................................36

I.    EPA violated the Clean Air Act when it approved PM2.5 contingency measures for the Valley that do not provide emissions reductions equivalent to one year's worth of reasonable further progress. ................36

A.    Section 172(c)(9) of the Clean Air Act requires contingency measures to provide one year's worth of reasonable further progress. .................36

B.    EPA's "one year's worth of progress" benchmark violates section 172(c)(9) of the Clean Air Act............................................................41

II.    EPA premised its Approval on non-Statutory, standardless considerations of feasibility and unlawfully approved contingency measures that only achieve *de minimis* NOx emissions reductions. ........................................45

A.    EPA fabricated a feasibility exemption from contingency measure requirements that the agency applied arbitrarily. ................................46

B.    Section 172(c)(9) of the Clean Air Act does not condone contingency measures that merely provide de minimis NOx emissions reductions..50

III.    EPA unlawfully and arbitrarily approved contingency measures that will become deficient after one triggering event. ..............................................54

CONCLUSION AND RELIEF REQUESTED ....................................57

Certificate of Compliance for Briefs..................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am.'s Cmty. Bankers v. FDIC*,
200 F.3d 822 (D.C. Cir. 2000)................................................................31

*Ass'n of Irritated Residents v. EPA*,
10 F.4th 937 (9th Cir. 2021) ..........................................................*passim*

*Ass'n of Irritated Residents v. EPA*,
686 F.3d 668 (9th Cir. 2012) .............................................7, 8, 47, 56

*Bahr v. EPA*,
836 F.3d 1218 (9th Cir. 2016) ...........................................17, 18, 44

*City of Chicago v. Env't Def. Fund*,
511 U.S. 328 (1994).......................................................................47

*Comm. for a Better Arvin v. EPA*,
786 F.3d 1169 (9th Cir. 2015) ...................................................*passim*

*Ctr. for Energy & Econ. Dev. v. EPA*,
398 F.3d 653 (D.C. Cir. 2005)........................................................31

*CTS Corp. v. Waldburger*
573 U.S. 1 (2014)..........................................................................40

*Eli Lilly & Co. v. Medtronic, Inc.*,
496 U.S. 661 (1990).......................................................................43

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018)........................................................................37

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)......................................................................39

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).................................................................29, 30

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir.2003) ......................................................34, 35

iii

*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001) ...............................................................30

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ...........................................................................28

*Interstate Nat. Gas Co. v. S. Cal. Gas Co.*,
209 F.2d 380 (9th Cir. 1953) ...............................................................15

*King v. Burwell*,
576 U.S. 473 (2015) ...........................................................................39

*Latino Issues F. v. EPA*,
558 F.3d 936 (9th Cir. 2009) ...............................................................34

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ......................................................................35, 41

*Lopez v. Garland*,
116 F.4th 1032 (9th Cir. 2024) .........................................................36, 42

*Massachusetts v. EPA*,
549 U.S. 497 (2007)............................................................................29

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ..............................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................................35

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*,
627 F.3d 730 (9th Cir. 2010) .................................................................4

*Nat'l Audubon Soc'y, Inc. v. Davis*,
307 F.3d 835 (9th Cir. 2002) ...............................................................31

*Nat'l Res. Def. Council, Inc. v. EPA*,
507 F.2d 905 (9th Cir. 1974) ...............................................................30

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ...............................................................29

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2008) ..................................................15, 16

*Or. Nat. Res. Council v. Allen*,
476 F.3d 1031 (9th Cir. 2007) ..........................................................35

*Portland Cement Ass'n v. EPA*,
665 F.3d 177 (D.C. Cir. 2011)..........................................................56

*Safe Air for Everyone v. EPA*,
488 F.3d 1088 (9th Cir. 2007) ............................................................8

*Sierra Club v. EPA*,
671 F.3d 955 (9th Cir. 2012) ............................................................34

*Singh v. Ashcroft*,
393 F.3d 903 (9th Cir. 2004) ............................................................15

*Skaff v. Meridien N. Am. Beverley Hills, LLC*,
506 F.3d 832 (9th Cir. 2007) ............................................................50

*Skidmore v. Swift & Co.*,
323 U.S. 134, 140 (1944)..................................................................42

*Tcherepnin v. Knight*
389 U.S. 332 (1967)..........................................................................40

*Union Elec. Co. v. EPA*,
427 U.S. 246 (1976)............................................................................6

*Wadler v. Bio-Rad Lab'ys, Inc.*,
916 F.3d 1176 (9th Cir. 2019) ..........................................................40

**Statutes**

5 U.S.C. § 706(2)(A)..............................................................................34

42 U.S.C. § 7401(b) ............................................................................6, 40

42 U.S.C. § 7401(b)(1)..............................................................................6

42 U.S.C. § 7407(d)(1)..............................................................................7

42 U.S.C. § 7409(a) ..................................................................................6

42 U.S.C. § 7410(a)(1) .................................................................................... 7

42 U.S.C. § 7410(a)(1)–(2) ............................................................................. 8

42 U.S.C. § 7410(a)(2)(A) ............................................................................ 57

42 U.S.C. § 7410(k) ........................................................................................ 8

42 U.S.C. § 7501(1) ........................................................................... 10, 37, 45

42 U.S.C. § 7502(c) ...................................................................................... 43

42 U.S.C. § 7502(c)(1) .................................................................................. 48

42 U.S.C. § 7502(c)(2) ............................................................................. 9, 40

42 U.S.C. § 7502(c)(6) .................................................................................... 8

42 U.S.C. § 7502(c)(9) .......................................................................... *passim*

42 U.S.C. § 7509(c) ....................................................................... 13, 14, 37, 55

42 U.S.C. § 7511a(c)(2)(B) ..................................................................... 37, 45

42 U.S.C. § 7511b(e)(1)(A) .......................................................................... 48

42 U.S.C. § 7513(c) ........................................................................................ 8

42 U.S.C. § 7513(c)(1) .................................................................................... 8

42 U.S.C. § 7513(c)(1)-(2) ........................................................................... 40

42 U.S.C. § 7513(c)(2) .................................................................................... 8

42 U.S.C. § 7513(e) ....................................................................... 9, 14, 15, 40, 48

42 U.S.C. § 7513a(a)–(b) ............................................................................... 8

42 U.S.C. § 7513a(b)(1)(B) .......................................................................... 48

42 U.S.C. § 7513a(b)(2) ............................................................................... 40

42 U.S.C. § 7513a(c)(1) .................................................................................. 9

42 U.S.C. § 7513a(d) ................................................................... 9, 12, 13, 40

42 U.S.C. § 7513b ............................................................................................48

42 U.S.C. § 7607(b)(1) ......................................................................................2

42 U.S.C. § 7607(f) ..........................................................................................57

**Regulations**

40 C.F.R. § 51.1000 .........................................................................................10

40 C.F.R. § 51.1004(a)(1)(i) ..............................................................................8

40 C.F.R. § 51.1004(a)(2)(i) ..............................................................................8

40 C.F.R. § 51.1005(b) ......................................................................................9

40 C.F.R. § 51.1005(c) .....................................................................................13

40 C.F.R. § 51.1010(b) ......................................................................................9

40 C.F.R. § 51.1010(c) ......................................................................................9

40 C.F.R. § 51.1012(a) ......................................................................................9

40 C.F.R. § 51.1014(a) .....................................................................................54

**Federal Register Notices**

57 Fed. Reg. 13498 (Apr. 16, 1992) ...............................................................11

59 Fed. Reg. 41998 (Aug. 16, 1994) ..........................................................10, 11

62 Fed. Reg. 38652 (July 18, 1997) ..................................................................7

71 Fed. Reg. 61144 (Oct. 17, 2006) ..................................................................7

76 Fed. Reg. 69896 (Nov. 9, 2011) .............................................................16, 53

77 Fed. Reg. 12652 (Mar. 1, 2012) .................................................................55

78 Fed. Reg. 3086 (Jan. 15, 2013) ....................................................................7

80 Fed. Reg. 18528 (Apr. 7, 2015) ..................................................................12

80 Fed. Reg. 49190 (Aug. 17, 2015) ...............................................................16

81 Fed. Reg. 2993 (Jan. 20, 2016) ................................................14

81 Fed. Reg. 29498 (May 12, 2016) ..............................................16

81 Fed. Reg. 58010 (Aug. 24, 2016) .............................................11

81 Fed. Reg. 84481 (Nov. 23, 2016) .............................................12

84 Fed. Reg. 11198 (Mar. 25, 2019) .............................................17

85 Fed. Reg. 17382 (Mar. 27, 2020) .............................................24

85 Fed. Reg. 44192 (July 22, 2020) ..........................................14, 55

86 Fed. Reg. 38652 (July 22, 2021) ..............................................16

86 Fed. Reg. 49100 (Sept. 1, 2021) ..............................................18

86 Fed. Reg. 67329 (Nov. 26, 2021) ..........................................12, 16

86 Fed. Reg. 67343 (Nov. 26, 2021) ..........................................15, 18

87 Fed. Reg. 4503 (Jan. 28, 2022) ................................................7

87 Fed. Reg. 60494 (Oct. 5, 2022) ................................................15

88 Fed. Reg. 17571 (Mar. 23, 2023) .............................................19

88 Fed. Reg. 45276 (July 14, 2023) ..........................................5, 13, 24

88 Fed. Reg. 86581 (Dec. 14, 2023) .............................................13

88 Fed. Reg. 87981 (Dec. 20, 2023) .............................................55

88 Fed. Reg. 87988 (Dec. 20, 2023) ..........................................*passim*

89 Fed. Reg. 16202 (Mar. 6, 2024) ..........................................4, 6, 7

89 Fed. Reg. 56222 (July 9, 2024) ..........................................23, 53, 55

89 Fed. Reg. 80749 (Oct. 4, 2024) ..........................................*passim*

89 Fed. Reg. 91263 (Nov. 19, 2024) ..........................................13, 55

89 Fed. Reg. 101602 (Dec. 16, 2024) .........................................19, 20

**Other**

Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399
(1990)........................................................................................11

H.R. Rep. No. 101-490, *reprinted in Congressional Research Service,*
*A Legislative History of the Clean Air Act Amendments of 1990*
(1993)........................................................................................38

## GLOSSARY

| | |
|---|---|
| BACM | best available control measures; required in certain areas by CAA § 189(b)(1)(B), 42 U.S.C. § 7513a(b)(1)(B) |
| Act or CAA | Clean Air Act, 42 U.S.C. §§ 7401–7671q |
| CARB | California Air Resources Board |
| District | San Joaquin Valley Unified Air Pollution Control District |
| EPA | United States Environmental Protection Agency |
| Five Percent Plan | required by CAA § 189(d), 42 U.S.C. § 7513a(d), for a serious nonattainment area's failure to attain a NAAQS |
| MSM | most stringent measures; required by CAA § 188(e), 42 U.S.C. § 7513(e), for a serious particulate matter nonattainment area to extend its attainment date |
| NAAQS or standard | national ambient air quality standard |
| NOx | nitrogen oxides; precursors to the atmospheric formation of fine particulate matter |
| PM2.5 | particulate matter with a diameter of 2.5 micrometers and smaller (also referred to as "fine particulate matter") |
| RACM | reasonably available control measures; required in certain areas by CAA §§ 172(c)(1), 189(a)(1)(C), 42 U.S.C. §§ 7502(c)(1), 7513a(a)(1)(C) |
| RFP | reasonable further progress; required by CAA § 172(c)(2), 42 U.S.C. § 7502(c)(2), and defined by CAA § 171(1), 42 U.S.C § 7501(1) |
| SIP | State Implementation Plan |
| Valley | San Joaquin Valley |

x

**INTRODUCTION**

California's San Joaquin Valley "has long been 'an area with some of the worst air quality in the United States,' and it has repeatedly failed to meet air quality standards." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) ("*AIR II*") (citation omitted). Petitioners Committee for a Better Arvin, *et al*. ("Air Advocates") challenge the U.S. Environmental Protection Agency's ("EPA") approval of pollution controls known as "contingency measures," which the Clean Air Act ("Act") requires for areas like the Valley with persistently high and unhealthy levels of air pollution, including harmful fine particulate matter ("PM2.5"). Air Advocates ask the Court to remand EPA's approval because the contingency measures do not comply with the Act, and EPA's approval was otherwise arbitrary and capricious.

Among the Act's comprehensive requirements for achieving health-based national ambient air quality standards ("NAAQS" or "standards"), Congress ordered states to develop contingency measures to serve as a backup plan for when their primary strategies fail to attain, or make reasonable further progress toward, the NAAQS. For more than thirty years, EPA has interpreted section 172(c)(9) of the Act, 42 U.S.C. § 7502(c)(9), to require contingency measures that achieve meaningful emissions reductions. In its recent approval of PM2.5 contingency measures for the Valley, however, EPA abandoned its long-standing

1

interpretation—ignoring the Act's statutory language, structure, and legislative history to require only trifling emissions reductions. EPA's approval violates the Clean Air Act, is arbitrary and capricious, and deprives Valley residents of the statutory health protections Congress required.

## STATEMENT OF JURISDICTION

This petition for review challenges a final EPA action applicable to California's San Joaquin Valley, taken pursuant to the Clean Air Act. This Court has jurisdiction pursuant to section 307(b)(1) of the Act, 42 U.S.C. § 7607(b)(1), which provides that a petition for review of a final EPA action "which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." Such a petition for review must be filed within sixty days from the date EPA published notice of its final action in the Federal Register. *Id*. On October 4, 2024, EPA published notice of the final rule challenged in this petition for review. 1-ER-2, 89 Fed. Reg. 80749 (Oct. 4, 2024). On December 2, 2024, Air Advocates timely filed their petition for review. Docket Entry No. 1.

## STATEMENT OF ISSUES PRESENTED

1. Whether EPA's approval of contingency measures for the San Joaquin Valley violates section 172(c)(9) of the Clean Air Act, 42 U.S.C. § 7502(c)(9), when EPA adopted a new interpretation of the Act that does not require contingency measures to provide meaningful emissions reductions.

2. Whether EPA's approval of contingency measures for the Valley violates section 172(c)(9) of the Clean Air Act, 42 U.S.C. § 7502(c)(9), or is otherwise arbitrary and capricious, when EPA adopted a subjective, non-statutory exemption based on undefined feasibility considerations and approved contingency measures that only achieve *de minimis* emissions reductions.

3. Whether EPA's approval of contingency measures for the Valley violates section 172(c)(9) of the Clean Air Act, 42 U.S.C. § 7502(c)(9), or is otherwise arbitrary and capricious, when EPA has conceded that the measures, adopted to provide backup controls for three separate NAAQS, will be rendered deficient upon a single finding by EPA triggering the measures.

## ADDENDUM

Pursuant to Circuit Rule 28-2.7, all relevant statutes, regulations, and legislative history are included in the addendum that accompanies this brief.

## STATEMENT OF THE CASE

**I.    The air quality crisis in the San Joaquin Valley.**

The San Joaquin Valley consists of the eight counties located in the southern half of the Central Valley in California. 2-ER-114, 116, 88 Fed. Reg. 87988, 87990 (Dec. 20, 2023). Despite its more rural character, the Valley suffers from very poor

air quality, with residents breathing "an air that kills" owing to "dangerous levels of particulate matter" and other pollution. *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 731 (9th Cir. 2010).

Inhalable airborne particles, the primary ingredient of smoke, haze, and airborne dust, are harmful to human health. Fine particulate matter pollution, also called "PM2.5," consists of the smallest particles (2.5 micrometers in diameter and smaller) and is produced chiefly by combustion processes and by atmospheric reactions of pollutants such as nitrogen oxides ("NOx"), sulfur oxides ("SOx"), volatile organic compounds, and ammonia. 2-ER-115–116, 88 Fed. Reg. at 87989–90. Sources of PM2.5 "include both stationary (e.g., fuel combustion for electricity production and other purposes, industrial processes, agricultural activities) and mobile (e.g., diesel- and gasoline-powered highway vehicles and other engine-driven sources) sources." 89 Fed. Reg. 16202, 16214/1 (Mar. 6, 2024).[1]

Fine particulate matter can penetrate deep into a person's lungs and may even enter a person's bloodstream. 2-ER-80. According to EPA, "numerous health studies demonstrat[e]" that exposure to PM2.5 is associated with "serious health effects," including "aggravation of respiratory and cardiovascular disease (as

---

[1] Air Advocates may cite to the 1st, 2nd, or 3rd column on a page as printed in the *Federal Register*. For example, the citation 89 Fed. Reg. 16202, 16214/1 cites to the 1st column from the left on page 16214.

indicated by increased hospital admissions, emergency room visits, absences from school or work, and restricted activity days), changes in lung function," and even "premature mortality." 2-ER-116, 88 Fed. Reg. at 87990/1. "[O]lder adults, people with heart and lung disease, and children" are "particularly sensitive to PM2.5 exposure." *Id*.

According to the American Lung Association, counties in the San Joaquin Valley rank among the worst in the United States for PM2.5. For short-term exposure to PM2.5, the Valley counties of Kern, Fresno, Kings, and Tulare rank as the first, second, fourth, and eighth most polluted counties, respectively. 2-ER-78. With respect to long-term PM2.5 exposures, Kern, Tulare, Kings, Fresno, and Stanislaus rank as the first, second, fifth, sixth, and sixteenth most polluted counties, respectively. *Id*. While persistently unhealthy levels of PM2.5 are harmful to everyone, a disproportionately high number of "susceptible populations in underserved communities" are affected in the Valley, owing to the fact that the Valley's minority, low-income, and linguistically-isolated populations and population with less than a high school education are all higher than the national average. 2-ER-191, 234, 88 Fed. Reg. 45276, 45319 (July 14, 2023); 2-ER-302–03.

EPA has also identified a number of adverse welfare impacts associated with elevated PM2.5 levels, including adverse impacts on visibility. *See* 89 Fed. Reg. at 16205, 16206 n.6.

## II. The Clean Air Act's strategy for addressing PM2.5 pollution.

Congress adopted the Clean Air Act as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976). Congress did so to protect and enhance the nation's air quality in order to promote public health and welfare. 42 U.S.C. § 7401(b). To achieve this goal, the Clean Air Act "established a uniquely important system of cooperative federalism in the quest for clean air." *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015).

The Act directs EPA to establish national ambient air quality standards (or NAAQS) that all areas of the country must achieve. 42 U.S.C. § 7409(a). EPA must set each standard at a level sufficient "to protect the public health" with "an adequate margin of safety." *Id*. § 7409(b)(1).

With respect to PM2.5 pollution, EPA has set several health-based NAAQS relevant to this case:

- In 1997, EPA established its original PM2.5 standards: an annual average ambient concentration of 15 $\mu g/m^3$ and a 24-hour concentration of 65 $\mu g/m^3$, to protect people from long-term and short-term PM2.5 pollution exposure,

respectively. 3-ER-464, 62 Fed. Reg. 38652, 38652 (July 18, 1997) ("1997 Annual PM2.5 Standard" and "1997 24-Hour PM2.5 Standard").[2]

- In 2006, to better protect the public from short-term exposures, EPA increased the stringency of the 24-hour standard by lowering the allowable ambient concentration from 65 $\mu g/m^3$ to 35 $\mu g/m^3$. 3-ER-458–59, 71 Fed. Reg. 61144, 61145 (Oct. 17, 2006) ("2006 24-Hour PM2.5 Standard").

- In 2012, EPA promulgated a more stringent annual average standard of 12 $\mu g/m^3$ because of significant evidence of harm from exposures below the 1997 standard. 3-ER-454, 78 Fed. Reg. 3086, 3086 (Jan. 15, 2013) ("2012 Annual PM2.5 Standard").[3]

After a NAAQS like each of the several PM2.5 standards is promulgated or revised, EPA must designate whether each area of the country meets or violates the new standard. 42 U.S.C. § 7407(d)(1). For those areas that fail to meet the NAAQS ("nonattainment areas"), the Act requires states to develop plans and strategies— collectively called the State Implementation Plan ("SIP")—to reduce air pollution and attain the health-based national standards. *Id.* § 7410(a)(1); *see also Ass'n of*

---

[2] In 2020, EPA made a finding that the Valley attained the 1997 24-Hour PM2.5 Standard, *see* 2-ER-304–05, 87 Fed. Reg. 4503, 4503–04 (Jan. 28, 2022), so this case only addresses the 1997 Annual PM2.5 Standard.

[3] In 2024, EPA further increased the stringency of the annual standard, lowering it to 9 $\mu g/m^3$ when it found significant evidence of harm from PM2.5 exposures below the 2012 standard. *See* 89 Fed. Reg. at 16203–04.

*Irritated Residents v. EPA*, 686 F.3d 668, 671 (9th Cir. 2012) ("*AIR I*") ("[S]tates have primary responsibility . . . , and they must detail their efforts in a [SIP] for each region within that state."). A SIP must contain enforceable emissions limitations necessary to attain the standards and meet applicable requirements of the Act. 42 U.S.C. §§ 7410(a)(1)–(2), 7502(c)(6).

Congress directed EPA to review state plans and strategies to ensure compliance. *Id.* § 7410(k). Upon EPA approval, a state's submission becomes federal law and does not change unless and until EPA approves a change. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1096 (9th Cir. 2007).

The Act provides for the classification of PM2.5 nonattainment areas as either "moderate" or "serious" and assigns deadlines that provide areas more time to attain the standards in exchange for adopting more stringent control measures in their SIPs. *See* 42 U.S.C. §§ 7513(c), 7513a(a)–(b). For example, moderate nonattainment areas are only required to adopt "reasonably available control measures" (RACM), but they must attain the NAAQS as expeditiously as practicable but no later than six years after designation. *Id.* § 7513(c)(1); 40 C.F.R. § 51.1004(a)(1)(i). In contrast, serious nonattainment areas are afforded no more than ten years to attain the standard, but they must adopt "best available control measures" (BACM) and are still obligated to attain the standard as expeditiously as practicable. 42 U.S.C. § 7513(c)(2); 40 C.F.R. § 51.1004(a)(2)(i).

Pursuant to section 188(e) of the Act, 42 U.S.C. § 7513(e), a state may request a further extension of the ten-year attainment deadline for a serious area—up to five years—but such an area must adopt "the most stringent measures" (MSM) and demonstrate attainment by the most expeditious alternative date practicable. *Accord* 40 C.F.R. §§ 51.1005(b), 51.1010(b). The Act defines MSM as "the most stringent measures that are included in the [SIP] of any State or are achieved in practice in any State, and can feasibly be implemented in the area." 42 U.S.C. § 7513(e).

If a serious nonattainment area fails to attain the standard by the attainment deadline (or extended deadline), section 189(d) of the Act, 42 U.S.C. § 7513a(d), requires the area to add—on top of all other existing requirements—further control measures sufficient to achieve at least a five percent reduction in PM2.5 pollution from the most recent inventory of emission sources (i.e., a "Five Percent Plan"). *Accord* 40 C.F.R. § 51.1010(c).

Whether classified as moderate or serious, all nonattainment areas share one bottom-line requirement: their SIPs must "require reasonable further progress" (sometimes shortened to "RFP") such that the area will reduce emissions and make steady progress toward meeting the NAAQS. 42 U.S.C. § 7502(c)(2); *see also id*. § 7513a(c)(1) (reiterating RFP requirement for particulate matter nonattainment areas); 40 C.F.R. § 51.1012(a) (same). The Act defines "reasonable further

9

progress" as "such annual incremental reductions in emissions of the relevant air pollutant as are required by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable national ambient air quality standard by the applicable date." 42 U.S.C. § 7501(1); *accord* 40 C.F.R. § 51.1000.

## III. The Clean Air Act's contingency measure requirement.

Despite the Act's detailed requirements for nonattainment SIPs, "Congress recognized that a State's implementation plan might not succeed." *AIR II*, 10 F.4th at 942. The Act therefore mandates that a nonattainment SIP include "contingency measures" in case the primary strategy fails. 42 U.S.C. § 7502(c)(9). More specifically, section 172(c)(9) of the Act, states that an attainment plan "shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part." *Id*. As EPA has explained, "[t]he purpose of contingency measures is to ensure that additional measures beyond or in addition to the required 'core' control measures (i.e., RACM for moderate areas and BACM for serious areas) immediately take effect when the area fails . . . to attain the [PM2.5] NAAQS in order to provide interim public health and welfare protection" as the state prepares a new SIP submission to rectify the problem. 3-ER-468, 472, 59 Fed. Reg. 41998, 42015/1 (Aug. 16, 1994).

Congress adopted the contingency measure requirement as part of its 1990 amendments to the Act, and EPA first provided its views on section 172(c)(9), 42 U.S.C. § 7502(c)(9), in an implementing rule issued in 1992. *See* Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399, 2414–15 (1990); 3-ER-476, 57 Fed. Reg. 13498, 13498 (Apr. 16, 1992). In that rule, EPA stated that, for a PM2.5 nonattainment area, "contingency emissions reductions should be approximately equal to the emissions reductions necessary to demonstrate [reasonable further progress] for one year." 3-ER-477–78, 57 Fed. Reg. at 13543–44; *see also* 3-ER-472, 59 Fed. Reg. at 42015 (requiring "emission reductions equivalent to 1 year's average increment of [reasonable further progress]").

More recently, in 2016, EPA reiterated its interpretation of section 172(c)(9), 42 U.S.C. § 7502(c)(9), in a rule summarizing the statutory SIP requirements that apply to designated PM2.5 nonattainment areas. In that rule, known as the 2016 PM2.5 SIP Requirements Rule, EPA maintained its view that "the emissions reductions associated with contingency measures . . . should be approximately equivalent to 1 year's worth of emissions reductions necessary to achieve [reasonable further progress] for the area . . . ." 3-ER-427, 435, 81 Fed. Reg. 58010, 58093/2 (Aug. 24, 2016).

11

**IV.    Repeated failures to attain the PM2.5 NAAQS in the Valley.**

Air quality in the San Joaquin Valley has repeatedly failed to meet the PM2.5 NAAQS, and poor air quality that violates the health-based standards persists.

**A.    1997 Annual PM2.5 Standard.**

EPA designated the San Joaquin Valley as a serious nonattainment area for the 1997 Annual PM2.5 Standard and initially set December 31, 2015, as the attainment deadline. 3-ER-445, 447, 80 Fed. Reg. 18528, 18530/2 (Apr. 7, 2015). In 2016, based on its review of air quality monitoring data, EPA found that the Valley failed to improve air quality sufficiently to attain the standard. 3-ER-423, 81 Fed. Reg. 84481, 84481 (Nov. 23, 2016).

Having failed to meet the attainment deadline, in 2018, California adopted and submitted for EPA approval a revised plan to meet the 1997 Annual PM2.5 Standard. Submitted pursuant to section 189(d) of the Act, 42 U.S.C. § 7513a(d), the plan purported to reduce emissions five percent annually (i.e., a "Five Percent Plan") and projected attainment by December 31, 2020. 3-ER-312–13, 86 Fed. Reg. 67329, 67329–30 (Nov. 26, 2021). EPA did not make a decision on the plan until November 2021, when EPA disapproved it because air monitoring data indicated that the Valley failed to attain the standard by the new attainment deadline, December 31, 2020. *Id.* at 67330 & n.4, 67341.

12

Contemporaneous with EPA's disapproval of California's original Five Percent Plan, California submitted a revised Five Percent Plan in November 2021 and claimed that the Valley would attain the 1997 Annual PM2.5 Standard by December 31, 2023. 2-ER-193–194, 226, 88 Fed. Reg. at 45278–79, 45311. EPA approved the plan and set December 31, 2023, as the attainment date. 2-ER-139, 88 Fed. Reg. 86581, 86581 (Dec. 14, 2023).

In May 2024, California requested a one-year extension of the December 31, 2023 attainment date. 89 Fed. Reg. 91263, 91263 (Nov. 19, 2024). Effective December 19, 2024, EPA approved the request over the objection of community groups and set December 31, 2024, as the applicable attainment deadline. *Id.* at 91268/2.[4]

As of the date of filing this brief, EPA has not yet made a finding whether the San Joaquin Valley has attained the 1997 Annual PM2.5 Standard. The Act requires EPA to make a finding "as expeditiously as practicable but not later than 6 months after" the attainment date (i.e., June 30, 2025). 42 U.S.C. § 7509(c).

---

[4] Petitioners Medical Advocates for Healthy Air and Sierra Club have challenged EPA's final rule granting the one-year extension in *Little Manila Rising v. EPA*, No. 24-6990 (9th Cir. Nov. 19, 2024). The petition for review argues that the PM2.5 SIP Requirements Rule, 40 C.F.R. § 51.1005(c), does not authorize any extension of the applicable attainment date for a serious area subject to section 189(d) of the Act, 42 U.S.C. § 7513a(d).

13

**B.      2006 24-Hour PM2.5 Standard.**

In 2016, EPA determined that the San Joaquin Valley could not practicably attain the 2006 24-hour PM2.5 Standard by the moderate area attainment date of December 31, 2015, and reclassified the Valley as a serious nonattainment area. 3-ER-436, 81 Fed. Reg. 2993, 2993 (Jan. 20, 2016). At the time, EPA directed California to submit a plan to achieve the standard "as expeditiously as practicable and no later than December 31, 2019." *Id*.

In 2020, California requested—and EPA approved—a five-year extension of the attainment date for the 2006 24-Hour PM2.5 Standard, as authorized by section 188(e) of the Act, 42 U.S.C. § 7513(e). 3-ER-358, 371, 85 Fed. Reg. 44192, 44205 (July 22, 2020). EPA's approval established December 31, 2024, as the new applicable attainment date. *Id*.

As of the date of filing this brief, EPA has not yet made a finding whether the San Joaquin Valley has attained the 2006 24-Hour PM2.5 Standard. EPA must determine by June 30, 2025, whether the Valley attained the standard. *See* 42 U.S.C. § 7509(c).

**C.      2012 Annual PM2.5 Standard.**

In 2021, EPA found that the Valley could not practicably attain the 2012 Annual PM2.5 Standard by the moderate area attainment date of December 31, 2021, reclassified the Valley as a serious area, and set December 31, 2025, as the

applicable attainment date. 3-ER-327, 331, 86 Fed. Reg. 67343, 67347 (Nov. 26, 2021).

California subsequently submitted a serious area attainment plan, but EPA proposed to disapprove that plan for several reasons, including California's failure to demonstrate that the plan would attain the 2012 Annual PM2.5 Standard by December 31, 2025. 87 Fed. Reg. 60494, 60530 (Oct. 5, 2022). Rather than face EPA disapproval, California withdrew the Valley's serious area plan. 2-ER-300–01.

On August 22, 2024, the California Air Resources Board ("CARB") submitted a request to extend the attainment date by the maximum five-year period to December 31, 2030, as allowed by section 188(e) of the Act, 42 U.S.C. § 7513(e). *See* Letter from Steven Cliff, Executive Officer, CARB, to Martha Guzman, Region Administrator, EPA (Aug. 22, 2024); CARB, Resolution 24-10, at 3–4 (2024).[5] To date, EPA has neither approved a plan to attain the standard by

---

[5] Air Advocates request the Court take judicial notice of CARB Resolution 24-10 and the letter from Steven Cliff to Martha Guzman, dated August 22, 2024, which submitted the SIP for the 2012 Annual PM2.5 Standard to EPA. The Court may take judicial notice of these documents as either generally known within the territorial jurisdiction of this Court or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned, even though such facts were not part of the administrative record. *See Singh v. Ashcroft*, 393 F.3d 903, 905–07 (9th Cir. 2004). A court "may take judicial notice of records and reports of administrative bodies." *Interstate Nat. Gas Co. v. S. Cal. Gas Co.,* 209 F.2d 380, 385 (9th Cir. 1953); *see also Or. Nat. Desert Ass'n v. Bureau of Land*

December 31, 2025, nor made a decision on California's section 188(e) extension request.

## V. PM2.5 contingency measures in the San Joaquin Valley.

### A. Inadequate proposals and unlawful approvals.

In developing PM2.5 nonattainment plans for the San Joaquin Valley, California has repeatedly offered up contingency measures that EPA disapproved, owing to California's failure to adopt compliant measures. For example, on three occasions, EPA disapproved contingency measures the state proposed to meet the 1997 Annual PM2.5 Standard. 76 Fed. Reg. 69896, 69897 (Nov. 9, 2011) (disapproving measures "for failing to provide sufficient emissions reductions"); 80 Fed. Reg. 49190, 49191 (Aug. 17, 2015) (proposing disapproval for reliance on non-SIP measures to provide contingency reductions); 81 Fed. Reg. 29498, 29498–99 (May 12, 2016) (finalizing disapproval); 3-ER-335, 352, 86 Fed. Reg. 38652, 38669 (July 22, 2021) (proposing disapproval for "several deficiencies"); 3-ER-324, 86 Fed. Reg. at 67341 (finalizing disapproval).

Separately, this Court has twice faulted EPA for unlawful approvals of contingency measures in violation of Clean Air Act section 172(c)(9), 42 U.S.C.

---

*Mgmt.*, 625 F.3d 1092, 1112 n.14 (9th Cir. 2008) (taking judicial notice of an agency handbook). The resolution and letter are available on CARB's website at https://ww2.arb.ca.gov/resources/documents/2024-san-joaquin-valley-pm2-5-plan?keywords=2025.

§ 7502(c)(9). Though the two cases addressed attainment plans for PM10 (coarse particulate matter less than ten micrometers in diameter) and ozone, respectively, they have been consequential for the development of the PM2.5 contingency measures challenged here.

In 2016, in *Bahr v. EPA*, the Court ruled that EPA violated the Act when it approved "[c]ontrol measures that have already been implemented" as contingency measures. 836 F.3d 1218, 1235–37 (9th Cir. 2016). Declining to defer to EPA's statutory interpretation, the Court ruled that Clean Air Act section 172(c)(9), 42 U.S.C. § 7502(c)(9), plainly requires "control measures that will be implemented in the future," once "triggered by the state's failure 'to make reasonable further progress' or to attain the NAAQS." *Id.* at 1235.

Following *Bahr*, in *AIR II*, this Court rejected EPA's approval of ozone contingency measures for the San Joaquin Valley that sought to "combine emissions reductions achieved through contingency measures with . . . 'additional emission reductions projected to occur that a state has not relied upon . . . to meet other nonattainment requirements.'" 10 F.4th at 946 (quoting 84 Fed. Reg. 11198, 11206 (Mar. 25, 2019)). The Court called out EPA's approval as "a transparent effort to circumvent *Bahr*." *Id*. Further, the Court ruled that EPA's attempt to rely on "emissions reductions from existing measures to make up for what everyone agrees otherwise would be an inadequate contingency measure" was unlawful

17

because EPA "severed the relationship between the requirement of contingency measures and the benchmark of reasonable further progress . . . without an adequate explanation." *Id.*

After the *Bahr* and *AIR II* decisions, EPA disapproved contingency measures submitted by California for the 2006 24-Hour and 2012 Annual PM2.5 Standards in the Valley because, among other reasons, the proffered measures improperly relied on reductions from already implemented measures. 86 Fed. Reg. 49100, 49125, 49134 (Sept. 1, 2021); 3-ER-329–30, 86 Fed Reg. at 67345–46.

**B.     EPA moves to weaken contingency measure requirements.**

EPA convened an internal Contingency Measure Task Force in response to the *Bahr* and *AIR II* decisions and began a collaboration with California regulators to change EPA's interpretation of section 172(c)(9), 42 U.S.C. § 7502(c)(9). 2-ER-84–96; 2-ER-310. In July 2022, EPA and California regulators reached agreement that EPA would revise its long-standing interpretation that required contingency measures to accomplish emissions reductions equivalent to one year's worth of reasonable further progress:

> In the longer-term, EPA will commit to revising prior national guidance on meeting contingency measure requirements. This effort would include: (1) revisiting the general bases for calculating the amount of [reasonable further progress] that contingency measures should account for, (2) acknowledging feasibility constraints where they are demonstrated to exist, and (3) clarifying the variety of measures that can fulfill the contingency measure requirements.

18

2-ER-100.

In January 2023, EPA staff agreed to help staff of the San Joaquin Valley Unified Air Pollution Control District ("District") calculate the amount of emissions reductions that EPA's new, not-yet-public interpretation of section 172(c)(9), 42 U.S.C. § 7502(c)(9), would require for the PM2.5 contingency measures the District and state authorities were required to develop. 2-ER-102.

In March 2023, EPA published for public comment a document entitled, *Draft Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter* ("Draft Revised Contingency Measure Guidance"). 2-ER-255, 88 Fed. Reg. 17571 (Mar. 23, 2023) (notice); 2-ER-257 (draft guidance). The Draft Revised Contingency Measure Guidance expressly states that it "does not establish legally binding requirements" and "[o]nly final EPA actions taken to approve or disapprove [SIP] submissions that implement any of the recommendations in this guidance would be final actions" subject to judicial review. 2-ER-259 n.1.[6]

---

[6] EPA did not finalize the Draft Contingency Measure Guidance prior to finalizing the agency's approval of PM2.5 contingency measures for the Valley challenged in this case. On December 16, 2024, EPA published a notice in the *Federal Register* announcing the *Final Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter* ("Final Guidance"). 89 Fed. Reg.

**C.     PM2.5 contingency measures submitted for EPA approval.**

Following EPA's issuance of its draft revised guidance, California submitted to EPA three separate measures intended, collectively, to meet the Valley's contingency measure requirements for the 1997 Annual, 2006 24-Hour, and 2012 Annual PM2.5 Standards. 2-ER-114, 118, 121–124, 88 Fed. Reg. at 87988, 87992, 87995–98; *accord id*. at 87999/3 (noting "the same set of contingency measures has been submitted to address the contingency measure requirements for more than one PM2.5 NAAQS").

### 1.  Residential Wood Burning Contingency Measure.

The purpose of the Valley's "Residential Wood Burning Contingency Measure" is to "extend certain wood-burning curtailment restrictions Valley-wide." 2-ER-117, 88 Fed. Reg. at 87991. This contingency measure builds on an existing District rule (Rule 4901) that imposes episodic residential wood burning restrictions—which vary by county and type of device—when air quality forecasts indicate pollution levels will exceed certain thresholds. 2-ER-121, 88 Fed. Reg. at 87995. The contingency measure, if triggered, requires the District to increase its woodburning restrictions. 2-ER-122, 88 Fed. Reg. at 87996/1; 2-ER-248. More

---

101602 (Dec. 16, 2024). The Final Guidance reiterates that it does not establish legally binding requirements and does not constitute final agency action. Final Guidance, at 2 n.1, https://www.epa.gov/system/files/documents/2024-12/cmtf-final-guidance-signature-version-11-22-24_clean_0.pdf.

20

specifically, upon an initial finding that the Valley has failed to make reasonable further progress, failed to attain a PM2.5 standard by the attainment date, or failed to meet a quantitative milestone or submit a milestone report ("triggering events"), the contingency measure would extend lower curtailment thresholds typically reserved for the most polluted "hot spot" counties to all counties. 2-ER-122, 88 Fed. Reg. at 87996/1. And if a second triggering event occurs, the measure would lower the threshold for disallowing the use of certain unregistered woodburning devices in all Valley counties. *Id.*

## 2. Rural Open Areas Contingency Measure.

The Rural Open Areas Contingency Measure is intended to "extend certain fugitive dust requirements to certain open areas that are not currently subject to control requirements." 2-ER-117, 88 Fed. Reg. at 87991/1. Pursuant to an existing District rule (Rule 8051), open areas of certain sizes in the Valley must implement control measures to stabilize the land surface and prevent windblown fugitive dust. 2-ER-123–24, 88 Fed. Reg. at 87997–98. Upon the occurrence of a triggering event, the contingency measure would "lower the applicability threshold for rural open areas from 3.0 acres to 1.0 acres," requiring more rural properties to implement control measures and "thereby reducing windblown fugitive dust, including the direct PM2.5 portion of such dust emissions." 2-ER-123, 88 Fed. Reg. at 87997/3; *see also* 2-ER-167–69. The Rural Open Areas Contingency

21

Measure is designed to address only one triggering event. 2-ER-123, 88 Fed. Reg. at 87997.

### 3. Smog Check Contingency Measure.

The Smog Check Contingency Measure purports to reduce pollution by expanding the scope of vehicles subject to the vehicle inspection and maintenance program known as "Smog Check." 2-ER-124, 88 Fed. Reg. at 87998/3. Administered by CARB, the Bureau of Automotive Repair, and the Department of Motor Vehicles, the purpose of the program "is to reduce emissions from in-use motor vehicles in need of repairs," but "certain vehicles are exempt from the biennial inspection requirement, including vehicles eight or fewer model years old." *Id.* The contingency measure specifies that, upon the occurrence of an initial triggering event, CARB must initiate a process that "would narrow the newer vehicle exemption [from Smog Check] from eight or fewer model years old to seven or fewer model years old throughout the San Joaquin Valley." *Id.*; *see also* 2-ER-188–90. Upon a second triggering event, the measure requires CARB to "further narrow the newer vehicle exemption by another year" to six or fewer model years old. 2-ER-124, 88 Fed. Reg. at 87998/3 n.87; *see also* 2-ER-189.

California intends for the Smog Check Contingency Measure to not only provide contingency emissions reductions for the 1997 Annual, 2006 24-Hour, and

22

2012 Annual PM2.5 NAAQS, but for three ozone NAAQS as well. 2-ER-175–76 tbl.1; 2-ER-21, 25 tbl.2, 89 Fed. Reg. 56222, 56226 tbl.2 (July 9, 2024).

**D.  EPA's proposal to approve the PM2.5 contingency measures.**

On December 20, 2023, EPA proposed approval of the Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures as meeting the requirements of section 172(c)(9), 42 U.S.C. § 7502(c)(9), for the 1997 Annual, 2006 24-Hour, and 2012 Annual PM2.5 Standards in the Valley. 2-ER-114, 88 Fed. Reg. at 87988. EPA's proposed approval also proposed abandonment of the agency's long-standing interpretation of section 172(c)(9), reflecting the less stringent approach it had pledged to California regulators it would follow.

First, EPA proposed to revise its long-standing interpretation of the amount of emissions reductions that contingency measures should achieve, namely, one year's worth of reasonable further progress. Instead, EPA proposed to apply a lesser target for emissions reductions, called "one year's worth of 'progress.'" 2-ER-120, 125–31, 88 Fed. Reg. at 87994, 87999–8005. According to EPA:

> One year's worth of ''progress'' is calculated by determining the average annual reductions between the base year emissions inventory and the projected attainment year emissions inventory, determining what percentage of the base year emissions inventory this amount represents, then applying that percentage to the projected attainment year emissions inventory to determine the amount of reductions needed to ensure ongoing progress if contingency measures are triggered.

2-ER-120, 88 Fed. Reg. at 87994.

23

Utilizing the one year's worth of progress benchmark, EPA's proposed rule identified lower emissions reductions targets for the PM2.5 contingency measures than would have applied had EPA required the Valley to reduce emissions equal to the one year's worth of reasonable further progress benchmark. 2-ER-130–31 tbl.3, 88 Fed. Reg. at 88004–05 tbl.3. The proposed rule indicated that the disparity would be particularly pronounced for reductions in the precursor pollutant NOx. For example, whereas California would have been required to reduce 18.4 tons of NOx emissions to demonstrate one year's worth of reasonable further progress for the 2006 24-Hour PM2.5 Standard, based on one year's worth of progress, EPA proposed to lower the emissions reduction target to just 6.7 tons of NOx, a 64% reduction. *Id*. Employing the one year's worth of progress approach, EPA similarly proposed to slash the NOx emissions reduction target for the 1997 Annual PM2.5 Standard (lowering it from 16.7 to 7.9 tons) and 2012 Annual PM2.5 Standard (lowering it from 15.3 to 8.7 tons). *Id*.[7]

Second, beyond setting lower emissions reduction targets based on one year's worth of progress, EPA suggested it would depart even further from its

---

[7] The Valley's emissions reductions targets for direct PM2.5 are smaller than the targets for NOx and less affected by EPA's new one year's worth of progress benchmark (as opposed to one year's worth of reasonable further progress) because the Valley's PM2.5 attainment SIPs rely primarily on precursor NOx reductions to demonstrate the plans will attain the PM2.5 standards. 2-ER-212–13 tbl.4, 88 Fed. Reg. at 45297–98 tbl.4 (1997 Annual PM2.5 Standard); 3-ER-373, 402 tbl.6, 85 Fed. Reg. 17382, 17411 tbl.6 (Mar. 27, 2020) (2006 24-Hour PM2.5 Standard).

previous interpretation of section 172(c)(9), 42 U.S.C. § 7502(c)(9), proposing to excuse California from meeting these lower targets based on an "infeasibility demonstration." 2-ER-120, 131–35, 88 Fed. Reg. at 87994, 88005–09. Asserting that the agency possesses authority to accept a "reasoned justification" from a state that only certain "existing and potential control measures . . . are feasible," EPA proposed to find that California "adequately" justified limiting itself to adopting the Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures. 2-ER-120, 131, 88 Fed. Reg. at 87994, 88005.

EPA's proposed rule acknowledged that accepting California's infeasibility analysis—and its assertion that no measures beyond the three PM2.5 contingency measures are feasible—ultimately "would provide only a portion" of the emissions reductions required to meet one year's worth of progress for NOx (and an even smaller portion of the emissions reductions required to meet one year's worth of reasonable further progress). 2-ER-131, 88 Fed. Reg. at 88005. EPA's proposed rule stated that, under the most favorable estimation scenario, the Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures will only produce 15.7% of the NOx reductions required to meet the one year's worth of progress target for the 1997 Annual PM2.5 Standard; 8.8% of the NOx reductions required to meet the one year's worth of progress target for the 2006 24-Hour PM2.5 Standard; and 13.1% of the NOx reductions required to meet the one

year's worth of progress target for the 2012 Annual PM2.5 Standard. *Id.* EPA's estimates for the percentages of one year's worth of reasonable further progress of NOx emissions accomplished by the contingency measures are even lower, at 6.3%, 1.3%, and 6.3% of the respective targets. *Id.*[8]

On January 19, 2024, Air Advocates submitted comments objecting to the proposed approval of the PM2.5 contingency measures for the Valley. 2-ER-31; 2-ER-103.

### E. EPA approves the PM2.5 contingency measures as proposed.

On October 4, 2024, EPA approved the Residential Wood Burning Contingency Measure, Rural Open Areas Contingency Measure, and Smog Check Contingency Measure as the contingency measures for the 1997 Annual, 2006 24-hour, and 2012 Annual PM2.5 Standards. 1-ER-2, 1-ER-18, 89 Fed. Reg. at 80749, 80765.

EPA's final approval largely adopts the analysis, findings, and conclusions presented in the agency's proposed rule. The final rule does, however, provide revised estimates for total emissions reductions for implementation of all three

---

[8] EPA estimates percentages of the targets accomplished "with trading" and "no trading." 2-ER-130–31 tbl.3, 88 Fed. Reg. at 88004–05 tbl.3. "Trading" refers to "interpollutant trading," wherein EPA credited some "excess" reductions of direct PM2.5 emissions as counting towards the emissions reduction targets for NOx by applying a 6:1 trading ratio for NOx to PM2.5. 2 ER-129–30, 88. Fed. Reg. at 88003–04.

26

contingency measures that were "slightly greater" than the proposed rule. 1-ER-5, 89 Fed. Reg. at 80752. *Compare id*. at tbls.2 & 3, *with* 2-ER130–31 tbls.2 & 3, 88 Fed. Reg. at 88004–05 tbls.2 & 3.

In response to Air Advocates' comments, the final rule also acknowledges that, if one triggering event occurs, the Valley's package of three PM2.5 contingency measures will be rendered deficient. As described above, "all three contingency measures provide for implementation of more stringent requirements upon a first triggering event, and two of the contingency measures also provide for implementation of yet more stringent requirements upon a second triggering event (i.e., further tightening of the requirements beyond that triggered by the first event)." 1-ER-12, 89 Fed. Reg. at 80759/1. Still, in the final rule, EPA admits that the measures collectively are only sufficient to address one triggering event across the three PM2.5 NAAQS that the measures purport to address:

> [W]e find that a SIP deficiency would arise upon the first triggering event notwithstanding the existence of the built-in provisions for further reductions upon a second triggering event. This is because the adequacy of the contingency measure SIP depended on measures that are now being implemented as a result of the first triggering event, meaning they can no longer be used to satisfy the contingency measure requirements for subsequent triggering events.

1-ER-12, 89 Fed. Reg. at 80759/2. EPA stated "we expect that CARB and the District would adopt and submit a SIP revision" including "additional contingency measures as needed" within one year of the triggering event. *Id*.

27

**F.      Air Advocates' petition for review.**

On December 2, 2024, Air Advocates timely filed their petition for review. Docket Entry No. 1. On January 2, 2025, CARB and the District move to intervene in the case. Docket Entry No. 12. On February 10, 2025, the Court granted intervention. Docket Entry No. 16.

**STANDING**

Air Advocates have standing to challenge EPA's approval of California's PM2.5 contingency measures for the San Joaquin Valley because their respective members are residents of the Valley, or work and recreate in the Valley, and suffer from the Valley's continuing fine particulate matter air pollution crisis. EPA's approval allows California to avoid implementing the robust air pollution control measures promised by the Clean Air Act.

An organization has standing to bring an action on behalf of its members if: (1) neither the claim asserted nor the relief requested require its members to participate directly in the lawsuit; (2) it is seeking to protect interests that are germane to its purpose; and (3) its members would have standing to sue individually. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Direct participation of the members of Air Advocates' organizations is not necessary in this case, and the interests Air Advocates seek to advance through this

28

litigation fall squarely within each of their organization's respective missions. *See* Decls. of Veronica Aguirre ¶¶ 3–4; Estela Escoto ¶¶ 4–5, 8; Kevin Hamilton, ¶¶ 4, 13; Gordon Nipp ¶¶ 6–7; Mark Rose ¶¶ 6–10.[9] Each of the Air Advocate organizations has members with standing to bring this suit individually because: (1) at least one of its members has suffered an "injury in fact;" (2) the injury is fairly traceable to EPA's illegal conduct; and "(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *AIR II*, 10 F.4th at 943 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).[10]

Air Advocates' members satisfy the "injury in fact" requirement because they live, work, and recreate in the San Joaquin Valley and are suffering from the health and welfare impacts of PM2.5 pollution in the Valley. *See generally* Decls. of Veronica Aguirre, Estela Escoto, William Fjelbo, Kevin Hamilton, Vincent Hoenigman, Gordon Nipp, Mark Rose. For example, their members and members' families suffer adverse health consequences and discomfort when air pollution levels are high; they curtail physical exercise and outdoor activities due to high

---

[9] Air Advocates have concurrently filed a Motion for Leave to File Standing Declarations. All cited declarations are attached to this brief.

[10] Only one petitioner need establish standing. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 n.3 (9th Cir. 2005).

pollution concentrations, lessening their quality of life and impairing recreational enjoyment; and they witness diminished aesthetic views—both locally and in nearby parks—as well as upsetting environmental degradation. *See* Aguirre Decl. ¶¶ 7–9; Escoto Decl. ¶¶ 10–13; Fjelbo Decl. ¶¶ 9–10, 12–14; Hamilton Decl. ¶¶ 14, 20–32; Hoenigman Decl. ¶¶ 4, 6, 8–10; Nipp Decl. ¶¶ 9, 11–18; Rose ¶¶ 15–21.

This Court has held that a petitioner "will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act." *Nat'l Res. Def. Council, Inc. v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974); *accord AIR II*, 10 F.4th at 943 (stating that group "members have established injury in fact by submitting declarations containing credible allegations of respiratory distress" resulting from "pollution in the Valley"); *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) ("[E]vidence of a credible threat to the plaintiff's physical well-being from airborne pollutants" establishes injury in fact.). Further, recreational and aesthetic injuries from air pollution confer standing. *Laidlaw*, 528 U.S. at 183; *AIR II*, 10 F.4th at 943.

The continuing injuries suffered by Air Advocates' members are traceable to EPA's conduct because EPA's approval allowed California to adopt unlawfully weak contingency measures that fail to provide the emission reductions required under the Clean Air Act. Although the inadequate contingency measures only activate upon the occurrence of a triggering event like a failure to meet an

30

attainment deadline, an injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation "are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (alteration in original) (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). This Court previously ruled that parties challenging an EPA approval of contingency measures met the traceability requirement because the Valley "has repeatedly failed to meet air quality standards," meaning "[t]he threat" that it will continue to do so and therefore activate contingency measures "is neither conjectural nor hypothetical, but a reasonable inference from the historical record." *AIR II*, 10 F.4th at 944.

A favorable order by this Court will provide redress to Air Advocates for the illegal and harmful effects that flow from EPA's violations of the Clean Air Act. An order remanding EPA's approval means that California will need to revisit its decision making and adopt meaningful control measures in compliance with the Clean Air Act. *See, e.g., Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005) (holding that "the redressability requirement may be satisfied . . . by vacating the challenged rule and giving the aggrieved party the opportunity to participate in a new rulemaking") (quoting *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 828–29 (D.C. Cir. 2000)); *see also AIR II*, 10 F.4th at 943 (concluding that

31

parties challenging EPA's approval of contingency measures satisfied redressability requirement).

For the above reasons, Air Advocates have standing to challenge EPA's approval of California's PM2.5 contingency measures for the Valley.

## SUMMARY OF THE ARGUMENT

The Clean Air Act direct states to adopt contingency measures as part of the SIP to compensate for any shortfall if the SIP fails to make reasonable further progress or to attain a NAAQS. Shortly after Congress amended the Act in 1990, EPA contemporaneously interpreted section 172(c)(9) of the Act, 42 U.S.C. § 7502(c)(9), to establish the amount of emissions reductions contingency measures must achieve. EPA equated that amount to the annual amount required for reasonable further progress ("one year's worth of reasonable further progress") and maintained that benchmark for more than thirty years. The plain language, statutory scheme, and congressional intent support the best reading of section 172(c)(9) to require that contingency measures achieve emissions reductions amounting to one year's worth of reasonable further progress.

EPA unlawfully and arbitrarily approved the Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures as meeting the contingency measures requirements for each of the 1997 Annual, 2006 24-Hour, and 2012 Annual PM2.5 Standards in three significant ways. First, EPA abandoned

32

the one year's worth of reasonable further progress benchmark and approved the contingency measures based on a new "one year's worth of progress" benchmark. One year's worth of progress discounts contingency measures to between one-half and one-third of one year's worth of reasonable further progress. This new interpretation severed contingency measures from the reasonable further progress benchmark even though California's obligation to achieve reasonable further progress remains unchanged. The new interpretation also subordinates contingency measures in the two-step statutory scheme where Congress wanted the SIP to have both a Plan A primary strategy and Plan B contingency measures if the SIP fails.

Second, EPA approved the three contingency measures even though the measures would provide *de minimis* emissions reductions notwithstanding the one year's worth of progress benchmark. EPA did so by inventing a "feasibility" exemption absent from the plain language of section 172(c)(9) and in conflict with the statutory scheme. EPA's approval subjectively excused California from providing nothing more than "trifling emission control measures." *Comm. for a Better Arvin*, 786 F.3d at 1178.

Third, EPA unlawfully and arbitrarily approved the three contingency measures when the measures will become deficient after providing emissions reductions for just the first "triggering event." EPA conceded this deficiency but approved the contingency measures nonetheless premised upon an unenforceable

33

"expectation" California would adopt and submit additional contingency measures.

Congress adopted section 172(c)(9) to provide meaningful, back-up air pollution controls. The best reading of the statute should retain the statutory link to reasonable further progress and require contingency measures to achieve emissions reductions equivalent to one year's worth of reasonable further progress without exception.

## STANDARD OF REVIEW

The Clean Air Act does not specify a standard of review for challenges to EPA approvals of SIP revisions. Accordingly, this Court has applied the general standard of review for agency actions set forth in section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Sierra Club v. EPA*, 671 F.3d 955, 961 (9th Cir. 2012) (citation omitted). Section 706 of the APA states, in relevant part: "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the Court reviews the record "to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors, and may not rubber-stamp . . . administrative decisions that [are] . . . inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute . . . ." *Latino Issues F. v. EPA*, 558 F.3d 936, 941 (9th Cir. 2009) (quoting *Friends of Yosemite*

34

*Valley v. Norton*, 348 F.3d 789, 793 (9th Cir.2003)).

This Court reviews EPA's construction of the Clean Air Act de novo, exercising its "independent judgment in deciding whether [the] agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391, 392 n.4, 412 (2024). *Loper Bright* instructs the Court to "deploy[] its full interpretive toolkit" in order to determine the statute's "single, best reading." *Id*. at 400, 409; *accord id*. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.")

In reviewing whether an agency action is arbitrary, capricious, or an abuse of discretion under the APA, the court "must determine whether there is a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007) (citation omitted). Where an agency has "offered an explanation for its decision that runs counter to the evidence before the agency," the court will reverse an agency's action under the arbitrary and capricious standard of review. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I.    EPA violated the Clean Air Act when it approved PM2.5 contingency measures for the Valley that do not provide emissions reductions equivalent to one year's worth of reasonable further progress.**

**A.    Section 172(c)(9) of the Clean Air Act requires contingency measures to provide one year's worth of reasonable further progress.**

Congress adopted section 172(c)(9) of the Act, 42 U.S.C. § 7502(c)(9), to provide meaningful back-up air pollution controls when the primary strategies in a SIP fail. The language of the provision, the legislative history, and the statutory scheme all reinforce that requiring contingency measures to achieve one year's worth of reasonable further progress is the best reading of the provision. Applying the traditional tools of statutory interpretation, this Court should interpret section 172(c)(9) to require meaningful emissions reductions equivalent to the one year's worth of reasonable further progress benchmark and, therefore, remand EPA's approval of the Valley's PM2.5 contingency measures which do not meet the statutory standard.

The Court's statutory analysis starts with the plain language of section 172(c)(9), s*ee Lopez v. Garland*, 116 F.4th 1032, 1043 (9th Cir. 2024), which reflects Congress's intent that contingency measures should achieve emissions reductions equivalent to one year of reasonable further progress. Section 172(c)(9) states that a plan to attain the PM2.5 standards "shall provide for the

36

implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the [NAAQS] by the attainment date applicable under this part." 42 U.S.C. § 7502(c)(9). The use of the disjunctive word "or" in the phrase "to make reasonable further progress, *or* to attain the [NAAQS]" shows Congress wanted contingency measures to address and make up for failures of either statutory requirement. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018).

While the language of section 172(c)(9) requires nonattainment areas to adopt contingency measures to address potential failures "to make reasonable further progress, or to attain the [NAAQS]," 42 U.S.C. § 7502(c)(9), only the reference to "reasonable further progress" suggests a specific quantity of emissions to be reduced. Congress defined "reasonable further progress" to mean "annual incremental reductions . . . for the purpose of ensuring attainment." 42 U.S.C. § 7501(1).[11] Conversely, Congress did not define "attain" or "attainment" as an amount of pollution to be reduced. Rather, attainment is an outcome, and the Act directs EPA to make attainment findings "based on the area's air quality as of the attainment date." 42 U.S.C. § 7509(c). The language of section 172(c)(9), 42 U.S.C. § 7502(c)(9), thus supports reading the section to equate the amount of

---

[11] Congress separately defined reasonable further progress for ozone nonattainment areas to mean 3% of baseline emissions unless EPA makes specific findings otherwise. *See* 42 U.S.C. § 7511a(c)(2)(B).

37

pollution required to be reduced by contingency measures with the amount of emissions reductions needed to make one year's worth of reasonable further progress.

The legislative history of the 1990 Clean Air Act Amendments confirms that Congress wanted contingency measures to accomplish emissions reductions comparable to one year's worth of reasonable further progress. In explaining the contingency measure requirement in section 172(c)(9), the House Report states that "[s]uch measures are to take effect without further action by the State or Administrator, and *are to be adequate to compensate for any emission reduction shortfall.*" H.R. Rep. No. 101-490, *reprinted in Congressional Research Service, A Legislative History of the Clean Air Act Amendments of 1990*, at 3248 (1993) (emphasis added). Because contingency measures are triggered by a failure to achieve reasonable further progress or to attain a NAAQS, the only way to ensure that such measures are "adequate to compensate for any emission reduction shortfall" is to tie the performance of the measures to the underlying failure—i.e., to one year's worth of reasonable further progress.

This Court, in its recent decision in *AIR II*, both highlighted and gave effect to the statutory link between contingency measures and reasonable further progress. Recognizing "the need for robust contingency measures," the Court rejected EPA's approval of weak measures that "severed the relationship between

38

the requirement of contingency measures and the benchmark of reasonable further progress." *AIR II*, 10 F.4th at 946–47. According to the Court, EPA lacked an "adequate explanation" for approving "far more modest" contingency measures instead of insisting that they meet "the benchmark of reasonable further progress." *Id*. at 946.

Other provisions of the Act reinforce that section 172(c)(9) is best read as requiring contingency measures to reduce emissions equivalent to one year's worth of reasonable further progress. The Court should "read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000)).

Here, Section 172(c)(9) prescribes a crucial role for contingency measures among the escalating steps that Congress established for areas that fail to attain the PM2.5 NAAQS. Specifically, "[c]ontingency measures serve the purpose of providing additional emission reductions during the period after a failure to meet [reasonable further progress] or failure to attain as the state prepares a new SIP submission to rectify the problem." 2-ER-119, 88 Fed. Reg. at 87993/3. Intended to provide meaningful emissions reductions during the time interval between a state's failing and soon-to-be-more-stringent SIP, contingency measures should be understood to require one year's worth of reasonable progress. Otherwise, any

39

lesser requirement undermines the consistent, stepwise progress toward attainment that the Clean Air Act's PM2.5 nonattainment provisions were intended to achieve. *See* 42 U.S.C. § 7513a(b)(2), (d) (requiring more stringent plans after moderate and serious areas' failure to attain).

Further, interpreting section 172(c)(9) to require contingency measures to reduce emissions equivalent to one year's worth of reasonable further progress best serves the Clean Air Act's broader remedial scheme. "It is a 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" *Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1187 (9th Cir. 2019) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). The purpose of the Act is to protect and enhance the nation's air quality in order to promote public health and welfare. 42 U.S.C. § 7401(b). Congress wanted to achieve these goals by attaining the particulate matter standards as expeditiously as practicable while also mandating minimum annual incremental reductions. 42 U.S.C. §§ 7502(c)(2) (requiring reasonable further progress), 7513(c)(1)–(2), (e) (requiring attainment as expeditiously as practicable). Section 172(c)(9) therefore should be interpreted as requiring meaningful and material contingency measures based on one year's worth of progress to protect public health if a SIP fails because the interpretation is "grounded in the statute's text and structure." *Wadler*, 916 F.3d at 1187 (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 134 (2014)).

**B.** **EPA's "one year's worth of progress" benchmark violates section 172(c)(9) of the Clean Air Act.**

In its final rule approving PM2.5 contingency measures for the Valley, EPA abandoned the agency's long-standing use of a one year's worth of reasonable further progress benchmark in favor of a weak alternative untethered from the Act's statutory language and structure. Rather than abiding by the statutory link to reasonable further progress set forth in section 172(c)(9), 42 U.S.C. § 7502(c)(9), EPA invents a new concept it calls "one year's worth of progress." Applying the one year's worth of progress approach, EPA lowered the amount of NOx emissions reductions that would be required under one year's worth of reasonable further progress by 53%, 64%, and 43% for the 1997 Annual, 2006 24-Hour, and 2012 Annual PM2.5 Standards, respectively. *See* 1-ER-5 tbl.3, 89 Fed. Reg. at 80752 tbl.3.

Asserting that the language of section 172(c)(9) "does not specify what amount of emission reductions" contingency measures should achieve, EPA offers three explanations for why the agency "has taken a policy approach" and retreated from its thirty-year-old position requiring stringent contingency measures. 1-ER-6, 89 Fed. Reg. at 80753. Because the agency has abandoned a prior interpretation that was "issued contemporaneously with the statute" and "remained consistent over time" until now, its new interpretation does not command a high degree of respect. *See Loper Bright*, 603 U.S. at 394. Even more fundamentally, as discussed

41

below, none of EPA's reasons reflect valid reasoning grounded in the language of the statute, meaning they lack the "power to persuade." *See Lopez*, 116 F.4th at 1039 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

*First*, EPA argues that continued adherence to the one year's worth of reasonable further progress benchmark could hypothetically result in reducing emissions more than necessary. 1-ER-7, 89 Fed. Reg. at 80754/1. EPA does not substantiate its reasoning with any statutory text, structure, or legislative history. Instead, EPA observes that one year's worth of reasonable further progress "*may in some cases* lead to an amount that is greater than what typically would be needed to make up for a shortfall in [reasonable further progress] or for attainment purposes." *Id.* (citing Draft Revised Contingency Measures Guidance, 2-ER-278–80) (emphasis added). But EPA does not provide any evidence or examples showing particulate matter contingency measures over-performing in the San Joaquin Valley or anywhere else. *See generally* 1-ER-7, 89 Fed. Reg. at 80754. Nor does it explain why, even if valid, this particular concern should dictate interpretation of section 172(c)(9) of the Act.

*Second*, EPA asserts that it has shifted its approach to better "recognize[] attainment of the NAAQS as the primary objective of the nonattainment plan requirements." 1-ER-7, 89 Fed. Reg. at 80754/1. According to EPA, it interprets section 172(c)(9) to "give priority to adopting control measures to attain in the first

42

place, even if that leaves fewer options for contingency measures in the event of a failure to attain or make [reasonable further progress]." 1-ER-9, 89 Fed. Reg. at 80756/1. EPA does not attempt to reconcile its interpretation with the text of section 172(c)(9), which refers to both an area's failure "to make reasonable further progress, or to attain the [NAAQS] by the attainment date." 42 U.S.C. § 7502(c)(9).

Moreover, EPA's reading of section 172(c)(9) ignores the Act's purposeful sequence of the Plan A primary strategy and Plan B contingency measures. The Act's nonattainment provisions neither state nor suggest that contingency measures must yield to a state's primary attainment strategy. To the contrary, Congress listed contingency measures on equal footing with elements comprising the primary attainment strategy, including enforceable measures necessary and appropriate to attain the NAAQS, reasonable further progress, and controls for major stationary sources. *See* 42 U.S.C. § 7502(c). The Court should give effect to contingency measures as a key component of the sequential, separate, and distinct requirements in the statutory scheme. *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 668–69 (1990) (interpreting provision of the Federal Food, Drug, and Cosmetic Act based on the Act's "structure . . . taken as a whole").

EPA insists that its reading of section 172(c)(9) operates "consistent[ly] with the CAA's general scheme of subjecting areas with higher classifications to more

43

stringent requirements." 1-ER-8, 89 Fed. Reg. at 80755/3. The agency's interpretation has the opposite effect, however, relieving areas with higher nonattainment classifications—like the San Joaquin Valley here—of the obligation to enact robust contingency measures to address SIP failures. Perversely, EPA's reading of section 172(c)(9) means that people living in the highly polluted Valley will receive the benefit of fewer immediate particulate matter reductions when a SIP fails.

At bottom, EPA's insistence that it will focus almost exclusively on primary attainment strategies at the expense of adopting meaningful PM2.5 contingency measures unlawfully continues EPA's practice of excusing the Valley from instituting robust contingency measures based on already adopted measures in the SIP. As this Court explained in *AIR II*: "If already-implemented measures cannot themselves be contingency measures—and *Bahr* makes clear that they cannot— then neither can that be a basis for declining to establish contingency measures that would otherwise be appropriate." 10 F.4th at 946 (referencing *Bahr*, 836 F.3d at 1236).

*Third*, EPA touts that its one year's worth of progress approach will provide consistency between ozone-based contingency measures governed by a different section of the Act and PM2.5-based contingency measures. According to EPA, its new interpretation of section 172(c)(9) "takes into account the declining emissions

inventories between the base year and attainment year for a given nonattainment area and aligns the metric for determining the amount of emission reductions that contingency measures should achieve for ozone and particulate matter (PM)." 1-ER-7, 89 Fed Reg. at 80754/1.

While ozone and PM2.5 nonattainment areas are both subject to section 172(c)(9)'s requirement to institute contingency measures to address a failure "to make reasonable further progress, or to attain the [NAAQS]," 42 U.S.C. § 7502(c)(9), the plain language of the Act differentiates what constitutes reasonable further progress for ozone areas from what constitutes reasonable further progress for particulate matter areas. For ozone nonattainment areas, section 182 defines reasonable further progress as reductions in emissions equivalent to 3% of the baseline. *Id.* § 7511a(c)(2)(B). In contrast, section 171 defines reasonable further progress for particulate matter areas as "annual incremental reductions in emissions" necessary to attain the NAAQS. *Id.* § 7501(1). Congress opted to treat ozone and particulate matter nonattainment areas differently in the statutory scheme, and EPA's interest in treating them similarly does not justify weakening contingency measures for PM2.5 areas.

**II.    EPA premised its Approval on non-Statutory, standardless considerations of feasibility and unlawfully approved contingency measures that only achieve *de minimis* NOx emissions reductions.**

As set forth above, the best reading of section 172(c)(9) of the Act, 42

U.S.C. § 7502(c)(9), requires contingency measures to reduce emissions equivalent to one year's worth of reasonable further progress. For the Valley, not only did EPA apply its new, much weaker benchmark of "one year's worth of progress"—it largely exempted California from meeting even this much lower bar. It did so on the basis of a purported "infeasibility demonstration" wherein California claimed that it could not feasibly adopt any contingency measures beyond the Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures. Section 172(c)(9) does not include any feasibility exception, however, nor does it otherwise allow the standardless and arbitrary approach to evaluating feasibility that EPA applied here. Further, section 172(c)(9) does not condone the approval of contingency measures that only deliver *de minimis* NOx emissions reductions.

## A. EPA fabricated a feasibility exemption from contingency measure requirements that the agency applied arbitrarily.

The plain language of section 172(c)(9) does not identify any exceptions for feasibility considerations or otherwise. The provision flatly declares that an attainment plan "shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part." 42 U.S.C. § 7502(c)(9).

EPA admits, as it must, that "section 172(c)(9) does not explicitly provide for consideration of whether specific measures are feasible." 1-ER-10, 89 Fed.

46

Reg. at 80757/1; *accord* 2-ER-120, 88 Fed. Reg. at 87994/3. Nonetheless, in approving the Valley's three PM2.5 contingency measures, EPA averred that it could exempt a state from the requirement to adopt robust contingency measures so long as a state "explains and documents how it evaluated all existing and potential control measures . . . and has reached reasonable conclusions regarding whether such measures are feasible." 1-ER-9, 89 Fed. Reg. at 80756/3.

As support for its interpretation of section 172(c)(9), EPA highlights that "the statutory provisions applicable to other nonattainment area plan control measure requirements, including RACM/RACT, BACM/BACT, and MSM, allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible." 1-ER-10, 89 Fed. Reg. at 80757/1. But far from supporting EPA, Congress's inclusion of language addressing feasibility in other, comparable provisions but not in section 172(c)(9) indicates the omission was intentional because "[i]t is generally presumed that Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another." *City of Chicago v. Env't Def. Fund,* 511 U.S. 328, 338 (1994) (noting "Congress knew how to draft a[n] . . . exemption . . . when it wanted to."); *see also AIR I,* 686 F.3d at 675. Consequently, the Court should not infer that section 172(c)(9) allows EPA to grant an exemption that does not appear in the next.

47

In any event, even if something akin to a feasibility exemption could be read into section 172(c)(9), EPA fails to identify the contours of the exemption or the criteria that it will consider when evaluating state claims of infeasibility. Crucially, the Act does not define feasibility (or infeasibility) in one universal way, with the relevant factors variable across controls measures.[12] Indeed, EPA concedes that determining infeasibility for the various nonattainment plan control measures "depend[s] on the requirement." 1-ER-10, 89 Fed. Reg. at 80757/2.

Sowing even further confusion, EPA states that, "while the analytical approach to identifying and evaluating existing and potential" contingency measures "may be similar to those used for RACM/RACT, BACM/BACT, and MSM . . . , the EPA expects that the state 'should not simply repeat the control strategy's infeasibility showing'" for such other measures. 1-ER-10, 89 Fed. Reg. at 80757. EPA seems to suggest that there may be a higher threshold for deeming a control measure infeasible for purposes of section 172(c)(9), noting "[t]he contingency measure requirement is in addition to the other control measure

_____

[12] *See, e.g.,* 42 U.S.C. § 7502(c)(1) (requiring "reasonably available control measures" or RACM for all moderate nonattainment plans); *id.* § 7511b(e)(1)(A) (defining "best available controls" for certain ozone sources); *id.* § 7513(e) (addressing "feasibility" for purposes of determining the "most stringent measures" or MSM for serious particulate matter areas); *id.* § 7513a(b)(1)(B) (requiring "best available control measures" or BACM for serious particulate matter nonattainment areas); *id.* § 7513b (requiring EPA to issue "RACM and BACM guidance" for certain sources of particulate matter).

requirements," but EPA does not otherwise identify any standards, criteria, or other clues about how it will administer the exception to section 172(c)(9) that it made out of whole cloth. Nothing in section 172(c)(9) suggests EPA may grant standardless exemptions that threaten to swallow the whole of the contingency measure requirement, or to otherwise exercise its authority in such an arbitrary manner.

Finally, it bears noting that EPA undermines its subjective finding that California reasonably excluded candidate contingency measures. In the same final action, EPA states that it expects California can and will adopt and submit additional contingency measures if EPA declares California must do so. 1-ER-12, 89 Fed. Reg. at 80759/2. According to the final rule, upon the occurrence of the first triggering event which would render the contingency measures deficient, EPA "expect[s] the SIP revision to take into account the emission reductions from the two remaining contingency measures and to include additional contingency measures as needed." *Id*. There must be more viable contingency measures available if EPA expects California to be at the ready adopt and submit them as needed.

**B.** **Section 172(c)(9) of the Clean Air Act does not condone contingency measures that merely provide *de minimis* NOx emissions reductions.**

The Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures collectively provide *de minimis* NOx emissions reductions, while EPA accepted the District and CARB's subjective assertions that all other potential contingency measures are infeasible. *See* 1-ER-9–11, 89 Fed. Reg. at 80756–58; 2-ER131–35, 88 Fed. Reg. at 88005–09. The plain language of section 172(c)(9) of the Act, 42 U.S.C. § 7502(c)(9), requires much more, however. As a matter of "statutory interpretation[,] the ancient principle that the law does not care about trifles" applies to the Clean Air Act. *Comm. for a Better Arvin*, 786 F.3d at 1178 (citing *Skaff v. Meridien N. Am. Beverley Hills, LLC*, 506 F.3d 832, 839–40 (9th Cir. 2007)).

As described above, Congress intended section 172(c)(9) to require contingency measures that achieve meaningful emissions reductions adequate to address shortfalls in achieving reasonable further progress or attaining the NAAQS, and thus the best reading of the statute mandates one year's worth of reasonable further progress. *See supra* Sections I.A–B. Yet EPA approved the District and CARB's infeasibility demonstration, condoning California's decision to adopt nothing more than three anemic measures that, at bottom, achieve nothing more than *de minimis* NOx emissions reductions. Even if this Court does not agree

50

with Air Advocates' reading of section 172(c)(9), the Court should not allow EPA to interpret the Act in a manner that diminishes the statutory obligation to nothingness. *See Comm. for a Better Arvin*, 786 F.3d at 1178 (The Clean Air Act does not care about trifles.).

The three PM2.5 contingency measures provide a trifle of NOx emissions reductions. Calculated as a percentage of one year's worth of reasonable further progress—i.e., the emissions reduction benchmark EPA required states to meet for thirty years—EPA estimates that the contingency measures provide NOx emissions reductions equivalent to less than 2% of the benchmark for all three PM2.5 NAAQS. 1-ER-5 tbl.3, 89 Fed. Reg. at 80752 tbl.3. Even EPA's alternative, more generous estimates (i.e., with "trading" that credits certain PM2.5 emissions reductions as NOx reductions, *see supra* at 26 n.8) indicate that the three contingency measures achieve only 6.3%, 1.3%, and 6.3% of one year's worth of reasonable further progress for NOx for the 1997 Annual, 2006 24-Hour, and 2012 Annual PM2.5 Standards, respectively. 1-ER-5 tbl.3, 89 Fed. Reg. at 80752 tbl.3.[13]

Tables 2 and 3 in EPA's final rule summarize the paltry emissions reductions achieved by the three PM2.5 contingency measures:

---

[13] Even if EPA's new, more lenient benchmark of "one year's worth of progress" is applied, the contingency measures still only achieve only 15.8%, 8.9%, and 13.1% of the emissions reduction target for NOx for the 1997 Annual, 2006 24-Hour, and 2012 Annual PM2.5 Standards, respectively. 1-ER-5 tbl.3, 89 Fed. Reg. at 80752 tbl.3.

TABLE 2—REVISED ANNUAL AVERAGE EMISSION REDUCTIONS FROM DISTRICT AND CARB CONTINGENCY MEASURES
[tpd]

| Contingency measure | 1997 Annual PM$_{2.5}$ NAAQS | | 2006 24-Hour PM$_{2.5}$ NAAQS | | 2012 Annual PM$_{2.5}$ NAAQS | |
|---|---|---|---|---|---|---|
| | Direct PM$_{2.5}$ | NO$_X$ | Direct PM$_{2.5}$ | NO$_X$ | Direct PM$_{2.5}$ | NO$_X$ |
| District: Residential Wood Burning (first triggering event) | 0.5793 | 0.0817 | 0.5793 | 0.0817 | 0.5793 | 0.0817 |
| District: Non-agricultural Rural Open Areas | 0.008 | ............... | 0.008 | ............... | 0.008 | ............... |
| CARB: Smog Check (first triggering event) | ............... | 0.117 | ............... | 0.120 | ............... | 0.086 |
| Total | 0.5873 | 0.1987 | 0.5873 | 0.2017 | 0.5873 | 0.1677 |

TABLE 3—REVISED EPA EVALUATION OF DISTRICT AND CARB CONTINGENCY MEASURES AS PERCENTAGE OF ONE YEAR'S WORTH OF RFP AND ONE YEAR'S WORTH OF PROGRESS

| PM$_{2.5}$ NAAQS | Pollutant | One year's worth of RFP | | | One year's worth of progress | | |
|---|---|---|---|---|---|---|---|
| | | Reductions target | % OYW (no trading) | % OYW (with trading) [a] | Reductions target | % OYW (no trading) | % OYW (with trading) [a] |
| 1997 Annual | Direct PM$_{2.5}$ | 0.44 | 132 | 100 | 0.41 | 142 | 100 |
| | NO$_X$ | 16.7 | 1.2 | 6.3 | 7.9 | 2.5 | [b]15.8 |
| 2006 24-hour | Direct PM$_{2.5}$ | 0.58 | 101 | 100 | 0.52 | 112 | 100 |
| | NO$_X$ | 18.4 | 1.1 | 1.3 | 6.7 | 3.0 | [b]8.9 |
| 2012 Annual | Direct PM$_{2.5}$ | 0.46 | 129 | 100 | 0.43 | 138 | 100 |
| | NO$_X$ | 15.3 | 1.1 | 6.3 | 8.7 | 1.9 | 13.1 |

[a] The EPA has calculated % OYW (With Trading) for NO$_X$ based on the 6:1 ratio presented in the SJV PM$_{2.5}$ Contingency Measure SIP.

1-ER-5 tbls.2 & 3, 89 Fed. Reg. at 80752 tbls.2 & 3.

As another point of comparison, the emissions reductions achieved by the three PM2.5 contingency measures are similar to emissions reductions that EPA, in proceedings before this Court, insisted were *de minimis*. In *Committee for a Better Arvin*, community groups challenged EPA's decision *not* to approve two California rules for inclusion in the attainment plan for the 1997 Annual PM2.5 Standard for the Valley, which would have made the rules federally enforceable. *See* 786 F.3d at 1177–78. EPA insisted the two rules were properly omitted because "it determined that [the rules] produced only *de minimis* emission reductions and so did not affect EPA's overall attainment and reasonable further progress evaluations." *Id*. at 1178. Accepting EPA's view that the rules only provided

52

"trifling emission control measures," this Court upheld its decision. *Id*. The two rules at issue in *Committee for a Better Arvin*—known as the Diesel Particulate Matter Rule and Solid Waste Vehicle Collection Rule, *see id.*—were estimated to collectively reduce 2.48 tons per day of NOx statewide, with EPA assuming that less than 25% of those reductions (0.62 tons per day) occurred in the Valley.[14] Similarly here, EPA has estimated that the three PM2.5 contingency measures together will only reduce between 0.1677 and 0.2017 tons per day of NOx for the three NAAQS. 1-ER-5 tbl.2, 89 Fed. Reg. at 80752 tbl.2.[15] Such *de minimis* reductions simply do not fulfill section 172(c)(9)'s requirement to adopt contingency measures.

---

[14] EPA described the statewide emissions reductions from the Diesel Particulate Matter Rule as 0.1 tons per day of PM2.5 and 0.18 tons per day of NOx and noted its assumption that less than 25% of the reductions were attributable to the Valley. 76 Fed. Reg. at 69908/2. EPA described the statewide emissions reductions from the Solid Waste Vehicle Collection Rule as 0.17 tons per day of PM2.5 and 2.3 tons per day of NOx and likewise assumed less than 25% of the reductions were attributable to the Valley. *Id*.

[15] EPA also estimates that the three contingency measures will reduce 0.5873 tons per day of direct PM2.5. 1-ER-5 tbl.2, 89 Fed. Reg. at 80752 tbl.2. In some of its calculations, EPA credited (or "traded") some of these direct PM2.5 reductions toward achieving NOx benchmarks, but none of EPA's "trading" figures are denominated in terms of NOx tons per day reduced. *See* 2-ER-129–31, 88 Fed. Reg. at 88003–05; 1-ER-5, 89 Fed. Reg. at 80752.

### III. EPA unlawfully and arbitrarily approved contingency measures that will become deficient after one triggering event.

As described above, the Residential Wood Burning, Rural Open Areas, and Smog Check Contingency Measures collectively serve three PM2.5 NAAQS, with all three of the measures providing emissions reductions for one triggering event. 1-ER-11–12, 89 Fed. Reg. at 80758–59. Although section 172(c)(9), 42 U.S.C. § 7502(c)(9), requires contingency measures to "be included in the [SIP]" and ready "to take effect . . . without further action by the State or the Administrator," EPA unlawfully and arbitrarily approved the Valley's contingency measures knowing they do not meet these statutory requirements for a second triggering event.[16]

Among the three PM2.5 contingency measures, two of them (Residential Wood Burning and Smog Check) are designed to institute emissions reductions upon the occurrence of a first and second triggering event. 2-ER-129, 88 Fed. Reg. at 88003/1. The third contingency measure (Rural Open Areas) provides for only one triggering event. *Id.* at n.118. But the second-level reductions provided by Residential Wood Burning are much less than the reductions achieved upon a first triggering event, leading EPA to conclude that "a SIP deficiency would arise upon

---

[16] Pursuant to section 172(c)(9), a finding that an area "fails to make reasonable further progress, or to attain the [NAAQS] by the attainment date" both trigger imposition of contingency measures. 42 U.S.C. § 7502(c)(9). EPA also treats a state's failure "to meet any quantitative milestone in an attainment plan" or a failure "to submit a quantitative milestone report" as a triggering event. 1-ER-12, 89 Fed. Reg. at 80759; 40 C.F.R. § 51.1014(a).

the first triggering event notwithstanding the existence of the built-in provisions for further reductions upon a second triggering event." 1-ER-12, 89 Fed. Reg. at 80759/2.

This is not a theoretical concern, as there is a very real possibility that at least one triggering event—resulting in an admitted SIP deficiency—will occur in 2025. EPA set December 31, 2024, as the attainment date for both the 1997 Annual and 2006 24-Hour PM2.5 Standards, and EPA must make its respective attainment determinations for these standards as expeditiously as practicable but no later than June 30, 2025. 89 Fed. Reg. at 91268/2; 3-ER-371, 85 Fed. Reg. at 44205; 42 U.S.C. § 7509(c).[17]

EPA's approval of the three contingency measures—knowing that there is a possibility if not a likelihood that they will be rendered deficient within less than the span of a year—is unlawful and arbitrary. Section 172(c)(9), 42 U.S.C. § 7502(c)(9), requires adequate contingency measures to be set forth in the SIP and poised for immediate implementation without any further action by the state or the EPA Administrator. Upon the occurrence of a single triggering event, California's

---

[17] In addition, the 1997 8-hour ozone standard has a June 15, 2024 attainment date in the Valley. 77 Fed. Reg. 12652, 12663 n.30, 12670 (Mar. 1, 2012). The Smog Check Contingency Measure serves a total of six NAAQS in the Valley, including the 1997 8-hour ozone standard. 2-ER-106, 112 tbl.2, 88 Fed. Reg. 87981, 87987 tbl.2 (Dec. 20, 2023). EPA must make an attainment determination for this standard no later than December 15, 2024, and has, to date, not made a determination. 42 U.S.C. § 7509(c).

measures for the Valley will no longer comply with this statutory requirement. Further, EPA's approval of the contingency measures in the face of a known deficiency is arbitrary. *See, e.g., AIR I*, 686 F.3d at 677 (ruling it was arbitrary and capricious for EPA to approve a SIP in the face of evidence indicating it was substantially inadequate); *cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (ruling it was arbitrary and capricious for EPA to base a decision on a premise the agency knew would be "disrupt[ed]").

According to EPA, if a triggering event occurs and the deficiency manifests, it "expect[s] that CARB and the District would adopt and submit a SIP revision within one year of the triggering event to demonstrate that the SIP continues to meet contingency measure requirements." 1-ER-12, 89 Fed. Reg. at 80759/2. EPA's optimism notwithstanding, it "acknowledge[s] that neither the State nor District has submitted an enforceable commitment to submit additional contingency measures in response to the triggering of the contingency measures." 1-ER-12, 89 Fed. Reg. at 80759/1. This admission that the sufficiency of California's SIP for the Valley depends on an expectation of further unenforceable action underscores another reason that EPA's approval is unlawful and arbitrary: the Act requires that all SIP measures must actually be included in the SIP to ensure that they are fully enforceable as a condition of approval, a requirement that

56

EPA's approval of the three PM2.5 contingency measures does not fulfill. *See*

*Comm. for a Better Arvin*, 786 F.3d at 1175 (citing 42 U.S.C. § 7410(a)(2)(A)).

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Court should grant this Petition, remand

EPA's approval of the PM2.5 contingency measures, and award Air Advocates

their costs of litigation, including reasonable attorneys' fees, pursuant to section

307(f) of the Act, 42 U.S.C. § 7607(f).

Respectfully submitted this 4th day of April, 2025.

LAW OFFICE OF BRENT J. NEWELL


    s/ Brent J. Newell

    Brent J. Newell

    *Counsel for Petitioners*


EARTHJUSTICE


    s/ Colin C. O'Brien

    Colin C. O'Brien

    Tyler Szeto

    *Counsel for Petitioners*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* <u>*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*</u>

**9th Cir. Case Number(s) 24-7270** _____

     I am the attorney or self-represented party.

     **This brief contains <u>13,313</u> words,** including 207 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ Brent J. Newell _____ **Date** April 4, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

No. 24-7270

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

COMMITTEE FOR A BETTER ARVIN, *et al.*,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*,

and

CALIFORNIA AIR RESOURCES BOARD, *et al.*,

*Respondents-Intervenors.*

Petition for Review of Final Action of the
U.S. Environmental Protection Agency

---

## STANDING DECLARATIONS IN SUPPORT OF
## PETITIONERS' OPENING BRIEF

---

BRENT J. NEWELL
LAW OFFICE OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
Telephone: (661) 586-3724
brentjnewell@outlook.com

*Attorneys for Petitioners*

COLIN O'BRIEN
TYLER SZETO
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Telephone: (415) 217-2000
cobrien@earthjustice.org
tszeto@earthjustice.org

For the reasons set forth in Petitioners' Unopposed Motion for Leave to File Standing Declarations, filed contemporaneously with Petitioners' Opening Brief, Petitioners Committee for a Better Arvin *et al.* herewith attach the sworn declarations of:

| | |
|---|---|
| Tab 1 | Veronica Aguirre |
| Tab 2 | Estela Escoto |
| Tab 3 | William Fjelbo |
| Tab 4 | Kevin Hamilton |
| Tab 5 | Vincent Hoenigman |
| Tab 6 | Gordon Nipp |
| Tab 7 | Mark Rose |

# Tab 1

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.* | **No. 24-7270** |
| Petitioners, | Agency No. EPA-R09-OAR-2023-0477 Environmental Protection Agency |
| vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Respondents, | |
| CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT. | |
| Respondent-Intervenors. | |

## DECLARATION OF VERONICA AGUIRRE

I, VERONICA AGUIRRE, do hereby declare as follows:

1.  I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.  I am the Co-Chair of the Board of Directors for Healthy Environment for All Lives (HEAL), an unincorporated association based in Avenal, California.

3. HEAL's mission is to advocate for transformational social change to bring environmental, climate, educational, and economic justice to marginalized communities on the westside of the San Joaquin Valley. As part of its environmental justice work, HEAL advocates for reducing air pollution.

4. Advocating for better air quality in Avenal starts with HEAL's effort to reduce the impacts from the Avenal landfill. HEAL also advocates for improved air quality through collective action at the San Joaquin Valley Unified Air Pollution Control District and at the California Air Resources Board through our membership in the Central Valley Air Quality Coalition. We believe that by working together with other organizations, we can improve air quality in the San Joaquin Valley and Avenal.

5. I live in Avenal and I have lived in Avenal for over 50 years. My family has been in Avenal since the 1950s. I currently live with my husband and my two daughters, while my adult son no longer lives in Avenal.

6. The San Joaquin Valley suffers from some of the worst air pollution in the country, exceeding several health-based air quality standards. For example, on information and belief, I understand that the Valley has been designated as a serious nonattainment area for the 1997 annual fine particulate matter (PM2.5) National Ambient Air Quality Standard ("standard"). On information and belief, I am also aware that the San Joaquin Valley has been designated as a serious

2

nonattainment area for the 2006 24-hour PM2.5 standard and the 2012 annual PM2.5 standard.

7. I have asthma and my two daughters have asthma. My son had asthma while living in Avenal. Because of our asthma, I am extremely concerned about the health effects of PM2.5 and ozone—another air pollutant that plagues the San Joaquin Valley—on not only my own health, but on the health of my children. I am well aware of the damage PM2.5 inflicts on our health and our lungs, as well as how it damages lung tissue, exacerbates asthma, and can even lead to premature death. When the levels of PM2.5 or ozone or both are high, my asthma and my children's asthma become more severe and we have to use our inhalers more frequently.

8. I enjoy walking and hiking to stay healthy and for recreation. But when the air is bad in the winter from PM2.5 pollution, my family and I avoid going outside. This really bothers me because I want to get exercise and be healthy.

9. My backyard has a view of Black Mountain, part of the Diablo Range, which I really enjoy. The view makes me feel good and I really enjoy it. It also reminds me of the adventures I had on Black Mountain when I was younger. But at times the PM2.5 and ozone pollution is so bad that it obscures the view of Black Mountain, and it reminds me of how dirty and polluted our air remains. This makes

3

me upset and frustrated because all this pollution harms me and my family and takes away the beauty of our community.

10. I am serving as a declarant in this proceeding to support HEAL's efforts to enforce the laws that protect the health and welfare of my family and community.

11. I am aware that the San Joaquin Valley has a history of failing to attain National Ambient Air Quality Standards by the dates required by the Clean Air Act, including standards for PM2.5.

12. I am concerned that EPA and other responsible authorities are neglecting the requirements of the Clean Air Act and failing to institute sufficient requirements to timely achieve pollution reductions and attain PM2.5 and ozone standards, including meaningful contingency measures.

13. I believe that the additional reductions from attainment contingency measures that would take effect upon the failure of the San Joaquin Valley to attain one or more PM2.5 standards would help my community and my family. I strongly believe that EPA should follow the law and insist that the San Joaquin Valley Unified Air Pollution Control District and the California Air Resources Board develop, adopt, and submit attainment contingency measures that fully comply with the Clean Air Act.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 21st day of March, 2025 in Avenal, California.

Veronica Aguirre

# Tab 2

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.* | No. **24-7270** |
| Petitioners, | Agency No. EPA-R09-OAR-2023-0477 Environmental Protection Agency |
| vs. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Respondents, | |
| CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT. | |
| Respondent-Intervenors. | |

## DECLARATION OF ESTELA ESCOTO

I, ESTELA ESCOTO, do hereby declare as follows:

1.     I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.     I currently reside in Arvin, California. Arvin is located in the San Joaquin Valley air basin. I have lived in Arvin for over 18 years.

3.      I am the President of the Committee for a Better Arvin (CBA), a California 501(c)(3) non-profit organization, located in Arvin, California. I have been a member of CBA since 2008.

4.      CBA's mission is to improve the quality of life in Arvin, inform and unite the community, address problems facing the community, and secure equality for all Arvin residents.

5.      Enforcing the Clean Air Act is in line with CBA's mission because Arvin has some of the worst air pollution in the San Joaquin Valley and in the United States. Improving air quality would drastically improve the quality of life and the health of Arvin residents.

6.      CBA is a membership organization, and any resident of Arvin can become a member by attending three consecutive meetings and receiving approval from a majority of CBA's members. Decisions on behalf of CBA are made through a majority vote at meetings.

7.      The San Joaquin Valley suffers from some of the worst air pollution in the country, exceeding several health-based air quality standards. For example, on information and belief, I understand that the Valley has been designated as a serious nonattainment area for the 1997 annual fine particulate matter (PM2.5) National Ambient Air Quality Standard ("standard"). On information and belief, I

2

am also aware that the San Joaquin Valley is a serious nonattainment area for the 2006 24-hour PM2.5 standard and the 2012 annual PM2.5 standard.

8. CBA has pursued advocacy and litigation to ensure that Clean Air Act requirements are enforced. For example, in 2018 and 2021, CBA participated as a plaintiff in separate lawsuits to compel the U.S. Environmental Protection Agency (EPA) to take overdue actions required to address PM2.5 in the San Joaquin Valley. (*Committee for a Better Arvin et al. v. EPA*, N.D. Cal. case no. 3:18-cv-05700; *Comité Progreso de Lamont et al. v. EPA*, N.D. Cal. case no 3:21-cv-08733.) CBA was also a plaintiff in a lawsuit to compel the California Air Resources Board to adopt contingency measures for the 2008 8-hour ozone standard in the San Joaquin Valley. (*Central California Environmental Justice Network et al. v. Randolph*, E.D. Cal. case no 2:22-cv-01714-DJC-CKD.) More recently, CBA submitted comments to EPA on its proposal to approve inadequate contingency measures to address PM2.5 pollution.

9. I understand that PM2.5 pollution damages lung tissue, exacerbates asthma, reduces lung capacity, increases respiratory and cardiovascular hospital admissions, increases school and work absenteeism, and causes premature mortality.

10. I am concerned about the health effects of PM2.5 pollution on my health, the health of my family, and the health of my friends and neighbors.

3

11.     When PM2.5 levels are high, especially in the winter months, the polluted air makes breathing difficult. I get very bad coughs as a result of the air feeling thick and difficult to breathe. For that reason, I will stay home and use an air purifier to allow me to breathe easier.

12.     I am worried about my husband's health and his ability to work to provide for our family. He suffers from breathing difficulties when PM2.5 levels are bad. I am worried that he might not be able to work because of how the air pollution affects him.

13.     When the air quality is good, I enjoy the view of the mountains near Arvin. I believe the mountains help to make our community more beautiful. I am upset that, on many days in the winter and the summer, the PM2.5 and ozone air pollution form a grayish fog that blocks the view of the mountains, and I am reminded about the pollution in the air.

14.     I am aware that the San Joaquin Valley has a history of failing to attain National Ambient Air Quality Standards by the dates required by the Clean Air Act.

15.     I am concerned that EPA and other responsible authorities are neglecting the requirements of the Clean Air Act and failing to institute sufficient requirements to timely achieve pollution reductions and attain PM2.5 and ozone standards, including meaningful contingency measures.

4

16. We have an environmental justice and health crisis in Arvin. I am serving as a declarant in this proceeding to support CBA's efforts to enforce the laws that protect the health and welfare of my family and my community.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of April, 2025 in Arvin, California.


Estela Escoto

5

# Tab 3

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.* <br><br> Petitioners, <br><br> vs. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, <br><br> Respondents, | **No. 24-7270** <br><br> Agency No. EPA-R09-OAR-2023-0477 Environmental Protection Agency |
| CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT. <br><br> Respondent-Intervenors. | |

## DECLARATION OF WILLIAM FJELLBO

I, WILLIAM FJELLBO, declare as follows:

1.      I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.      I am a paying member of National Parks Conservation Association (NPCA) and have been since 2015.

3. I am a resident of Coarsegold, California, where I have lived with my wife Janet since 1992.

4. I work as a general practice attorney based out of my home in Coarsegold and travel frequently throughout the San Joaquin Valley and central Sierra Nevada region for my work.

5. I am also heavily involved in environmental advocacy as a member of several environmental groups, such as the Sierra Club, where I currently serve as political committee chair of the Sierra Club's Tehipite Chapter headquartered in Fresno and have previously served as chair and vice-chair.

6. As a resident of Madera County in the foothills of the Sierra Nevada Mountains, I live within the boundaries of the San Joaquin Valley Air Pollution Control District and regularly experience poor air quality both at home and when I travel locally. Because of these experiences, as well as my extensive work on local environmental issues, I am aware of the significant air pollution issues in my community, including the fine particulate matter (PM2.5) air pollution issues affecting the San Joaquin Valley and nearby national parks.

7. On information and belief, I understand that the San Joaquin Valley has been designated as a serious nonattainment area for the 1997 annual PM2.5 National Ambient Air Quality Standard ("standard"). On information and belief, I

2

am also aware that the San Joaquin Valley is a serious nonattainment area for the 2006 24-hour PM2.5 standard and the 2012 annual PM2.5 standard.

8.      I understand that studies show PM2.5 pollution causes adverse health effects. For example, on information and belief, I understand that PM2.5 pollution damages lung tissue, exacerbates asthma, reduces lung capacity, increases respiratory and cardiovascular hospital admissions, increases school and work absenteeism, and causes premature mortality.

9.      I am personally concerned about the harm that excess PM2.5 pollution could have on my health and that of my wife, who is subject to frequent sinus infections that are worsened by particulate air pollution. There are days when my wife and I choose not to leave the house because of concerns about air pollution, which has been compounded by increased wildfires in the region. I am also concerned with the impact that PM2.5 pollution is having on other individuals in my community, especially younger residents, because of how it causes or exacerbates various health problems, like asthma.

10.      Living roughly a half an hour from the southern entrance of Yosemite, for many years now my wife and I have visited the park every two months or so and we plan to continue doing so for the foreseeable future. I also have visited both Sequoia and Kings Canyon National Parks about every two to three years, with my

3

most recent visit occurring in early January of 2021. I plan to continue visiting Sequoia and Kings Canyon on a regular basis every few years into the future.

11. On information and belief, I understand that, in addition to harmful health consequences, PM2.5 pollution is recognized as a main cause of reduced visibility (haze) in certain areas of the country, including many national parks and wilderness areas.

12. During my frequent visits to Yosemite, I often experience bad air quality in the form of haze that significantly impacts my views of scenery in the distance. I can remember many occasions in which I experienced hazy skies in places like Yosemite Valley. This frequent haze is extremely depressing and is not what anyone should expect when visiting a national park. Moreover, there are times of the year when my wife and I will not visit Yosemite or will alter which days we choose to visit because of air pollution concerns. This is also true for visiting Sequoia and Kings Canyon National Parks, which I understand have even worse overall air quality than Yosemite.

13. In addition to my visibility and health concerns regarding air quality in the Sierra Nevada national parks, I am also concerned with the impacts that PM2.5 pollution and other pollutants that go on to form PM2.5, like NOx, have on local ecosystems. I have read about the effects that air pollution has on plant life, including giant sequoias, and am greatly saddened by such impacts. I also live on a

4

small lake that frequently experiences severe algae blooms due to excess nitrogen from sources like nitrogen oxides (NOx) pollution. Knowing how harmful these algae blooms are to the lake I live on, it is extremely worrisome to know that similar impacts are occurring in high altitude lakes in the Sierra Nevada mountains, far from the sources of nitrogen pollution.

14.    Through my environmental advocacy work I have come to understand that state agencies like the California Air Resources Board and San Joaquin Valley Air Pollution Control District are required to develop and submit plans to EPA that address pollutants like PM2.5 and follow planning deadlines set under the Clean Air Act.

15.    I am aware that the San Joaquin Valley has a history of failing to abide by planning deadlines, failing to adopt legally sufficient plans, and failing to attain PM2.5 standards by the dates required by the Clean Air Act.

16.    I am concerned that EPA and other responsible authorities are neglecting the requirements of the Clean Air Act and failing to institute sufficient requirements to timely achieve pollution reductions and attain PM2.5 standards, including meaningful contingency measures.

17.    I do not believe EPA met the requirements under the Clean Air Act to institute meaningful contingency measures to address PM2.5 pollution, and thus I strongly support this litigation by NPCA to help clean up the air in my community

and national parks and ensure that the San Joaquin Valley comes into attainment with federal PM2.5 standards.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 28th day of March, 2025 in Coarsegold, California.

William Fjellbo

6

Tab 4

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.*<br><br>    Petitioners,<br><br>vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>    Respondents,<br><br>CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT.<br><br>    Respondent-Intervenors. | **No. 24-7270**<br><br>Agency No.<br>EPA-R09-OAR-2023-0477<br>Environmental Protection Agency |

## DECLARATION OF KEVIN HAMILTON

I, KEVIN HAMILTON, do hereby declare as follows:

1.    I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.    I currently reside in Fresno, California. Fresno is located within the San Joaquin Valley air basin and within the jurisdiction of the San Joaquin Valley Air Pollution Control District.

3. I have been a Registered Respiratory Therapist for 42 years as well as an Asthma Clinical Specialist for 28.

4. I am a founding member of the Medical Advocates for Healthy Air ("Medical Advocates"). Formed in 2001, Medical Advocates is a California non-profit organization based in Fresno consisting of medical professionals living in the San Joaquin Valley who regularly treat patients suffering from respiratory ailments that are caused or greatly exacerbated by the Valley's unhealthy levels of air pollution. Its mission is to advocate for the expeditious attainment of state and federal health-based air quality standards in the San Joaquin Valley through public education, litigation, and other means.

5. I was the Founder, Executive Director, and Senior Director of Government Affairs for Central California Asthma Collaborative ("CCAC"), a non-profit organization with offices in Kern and Fresno California. CCAC is dedicated to providing education and direct services, building regional capacity, and advocating for sensible policies that improve health through the prevention and management of chronic disease. I have retired from my previous roles at CCAC but I continue to work as a consultant to CCAC as a respiratory therapist to treat patients and as a policy advocate.

6. I am also the former Medical Program Coordinator for both California Asthma Among the School Aged ("CAASA") and the Together for Asthma

2

Control ("TAC") Project. CAASA, a University of California San Francisco School of Public Health funded project, provided both in-home and medical management to children with asthma and their families including assessing the economic impact of asthma to the community. TAC was an American Lung Association project that worked with various clinics throughout Fresno County to help families with asthmatic children aged five and under to better care for their children. Both CAASA and TAC are innovative programs for providing best practice modeling of asthma care for underserved children and their families. As the Medical Program Coordinator, I was responsible for training physicians, case managers, and other primary care providers in change management using the continuous quality improvement model.

7. For sixteen years, I worked as the Program Coordinator for the Asthma Education and Management Program at Community Medical Centers in Fresno. There, I developed then administered the program and coordinated its activities with other organizations with similar goals to improve public health in the five California counties of Fresno, Madera, Tulare, Kings, and Kern. I also consulted with five county health agencies to help them address the respiratory health needs of their populations and participated in the creation of the first California Asthma Strategic Plan as well as its 2004 update.

8. I am a member of the Fresno/Madera Regional Asthma Coalition, a

coalition that aims to educate the public on air quality issues. Its goals are to provide health education and management assistance to patients and health care providers with regard to asthma and various pulmonary-related chronic diseases; to improve the health of the community at large by actively participating in and sponsoring health education-related events and community-based classes; to track and report on outcomes of all interventions; and to provide ongoing follow-up to all patients of the program at regular intervals. The Fresno/Madera Regional Asthma Coalition is one of the three original asthma coalitions (Fresno, New York, and Chicago) established under National Institute of Health charter in 1997. I have served as both chair and vice-chair of the Fresno County Regional Asthma Coalition.

9. In 1994, I developed the UCSF Resident Training Lecture series focusing on the special needs of patients suffering from chronic pulmonary disease. I was also a guest instructor on respiratory related disease for the University of California at Davis's Nurse Practitioner Training Program from 1996-2001. In 1996, I developed and initiated the "Asthma Education and Management Program in the Primary Care Setting" Program as part of the Pediatrics and Family Practice Medicine programs at the University Medical Center.

4

10. I have co-published six papers on asthma in various journals, magazines, and newsletters, including the Journal of the American Medical Association. I published an article in the American Journal of Public Health regarding asthma education.

11. In 2000, I was awarded the American Lung Association Award, their highest honor for outstanding participation in the fight against lung disease. In 2006, I was the first non-physician to receive the Physicians for Social Responsibility award for the Practice of Socially Responsible Medicine. In 2013, I was awarded the Community Hero Award by the College of Health and Human Sciences at California State University Fresno for my work on air pollution, asthma, environmental justice, and the environment.

12. I am invited by various groups and organizations approximately 10-15 times per year to present lectures on the effects of pollution on health. I have delivered lectures to senior groups, children's groups, and other community groups to educate them on air quality and the health impacts of air pollution.

13. Medical Advocates has been a petitioner or plaintiff in several lawsuits relating to air pollution in the San Joaquin Valley, including PM2.5 pollution. For example, Medical Advocates achieved successful outcomes in *Medical Advocates for Healthy Air et al. v. EPA*, No. 20-72780, 2022 WL 1109656 (9th Cir. April 13, 2022) (improper EPA approval of 2006 24-hour PM2.5 plan);

5

*Comité Progreso de Lamont et al. v. EPA*, N.D. Cal. No. 3:21-cv-8733-WHA (EPA failure to take final action on PM2.5 plans, resolved by consent decree); *Committee for a Better Arvin et al. v. EPA*, N.D. Cal. No. 18-cv-05700-RS (EPA failure to make findings that Valley PM2.5 plans were overdue).

14. I live, raise my family, work (including treating patients suffering from air pollution-related health effects), recreate, and conduct educational, research, advocacy, and other activities in the San Joaquin Valley and have done so for the past thirty-eight years. I am harmed by exposure to high levels of PM2.5 pollution. The adverse effects of such pollution, as I describe below, include actual or threatened harm to my health, my family's health, my patients' health, my professional, educational, and economic interests, and my aesthetic enjoyment of the environment in the San Joaquin Valley.

15. I am concerned about air quality, especially PM2.5 and ozone pollution, for many reasons, both personal and professional. As a health professional, I have participated in extensive research on air pollution in the San Joaquin Valley and the serious health effects associated with chronic exposure to polluted air including the UC Berkeley, UCSF and CCAC's Children's Health and Air Pollution Study (CHAPS) which is now in its 8th year and is and has clearly illustrated the impact of PM2.5 and ozone air pollution in the Central Valley on developing children both in utero to 16 years of age.

6

16. The effects of PM2.5 and ozone pollution on health include but are not limited to coughing and breathing impairment, chronic bronchitis, exacerbation of asthma and other respiratory diseases, decreased lung function, and premature death.

17. I am concerned about the debilitating and potentially fatal effects of PM2.5 and ozone pollution on both the most sensitive groups and the general public. According to the California Air Resources Board, the term "sensitive groups" means the elderly and specifically elderly women and people with pre-existing conditions such as diabetes, heart disease, and lung disease including asthma. It should be noted for the record that these so-called "sensitive groups" make up 62% of Fresno County's population and almost 50% of the entire Valley population.

18. I am also concerned about the economic costs to Valley residents who pay a high price each year in medical bills, lost economic growth due to missing work and educational opportunities due to missing school, suffering, and premature death.

19. Because of the debilitating and chronic effects of air pollution, I have worked with the Fresno Unified School District to create the first ever Air Quality Advisory position to advise the District and its Calendar Committee charged with re-organizing schools' schedules to minimize children's exposure to air pollutants.

7

Since then, the CCAC team has worked successfully with over 1500 schools in the San Joaquin Valley to ensure they have access to the local air district's Real Time Air Advisory Network (RAAN). Many of those schools have added that information to their school's internet home page and encouraged parents to check it regularly so they can make informed decisions about whether outside activities are appropriate. Parents and teachers plan outside activities with RAAN to make sure it is safe to breathe outside that day.

20.     Before I moved to Fresno, I was an avid runner. I used to run 3 to 4 miles per day and was in very good physical condition. However, when I started running after moving to Fresno, I found myself feeling short of breath after just one mile. Often, I would discover that PM2.5 were very high on the days I struggled to breathe. I would also see that the newspapers published warnings of high PM2.5 levels for those days. Sometimes I would hear the radio announcing a "Spare the Air" advisory, warning people not to exercise outside. Within a few months, the high levels of pollution in the air forced me to stop running. It is very upsetting to me that I am unable to exercise outdoors without jeopardizing my health.

21.     My wife and two daughters have suffered from respiratory problems since we moved to Fresno, which distresses me very much. My oldest daughter, who is now forty-six, did not have any respiratory problems until the fall after we

8

moved to Fresno. She had her first asthma attack at nine years old, which I knew from my work to be unusual; most cases of asthma come on when children are zero to six years old and 70-80% go into remission by age 7. Her asthma problems require her to follow a regimen of steroid inhalers every day. She tried to stop taking them a couple times, but she starts to cough, and it impedes her ability to do her normal daily activities. Five years ago, she and her family moved to Dayton, Nevada hoping to get some relief from this problem. While it was of some help to her daughter (my granddaughter), doctors have determined that my daughter's chronic asthma here in the Valley has left her with chronic lung disease related to scarring from multiple attacks over the years.

22.     My younger daughter, who is now thirty-six, began to suffer from allergies when she turned six. Her allergies worsen on days when PM2.5 levels are high, and she must use an inhaler. She loves to play soccer and ride her bicycle instead of driving her car but when air pollution is bad, she has to stay inside or drive around with the air conditioning on, and windows closed. She also periodically gets migraine headaches on days when PM2.5 and ozone levels are high.

23.     My wife also has asthma. She developed asthma three years after we moved here, and she has it worse than either of our daughters. She must use a high-powered steroid inhaler and a long-acting bronchodilator twice a day. Like our

9

younger daughter, she regularly gets migraines when PM2.5 pollution levels are high. She has been hospitalized twice because of her migraine problems. She is also an avid gardener, but for the past 21 years she has been upset about not being able to garden because of the high pollution levels.

24. I have three grandchildren who live in the Valley or lived here until relatively recently, and all suffer from respiratory problems. My youngest granddaughter is 15 years old and has suffered several respiratory events that required the use of an inhaler to help her breathe.

25. My grandson, who is 23 years old, suffered asthma symptoms almost since birth until he joined the Army and moved to Washington State a few years ago where his asthma has apparently gone into remission. While growing up in the Valley, he had to miss at least a day or two of school every month, which required my daughter to put her employment in jeopardy to stay home with him.

26. My 22-year-old granddaughter's asthma has now become more severe, and she still must use a steroid inhaler all year. Her asthma has caused her to miss many days of work and college and to be taken to the ER multiple times. This has significantly affected the quality of life of my daughter's family, forcing them to curtail their camping activities and other outdoor recreation in the Valley. When they leave the Valley for recreation, however, the children have no breathing problems and do not need any medication, steroid or otherwise.

10

27. Neither my daughters nor my wife must use their inhalers when we travel outside of the San Joaquin Valley. We go to Ohio for one month every other year, and when we are there, they do not have to use inhalers at all. We also spend a week or two on the northern California coast or in the mountains, and by the third day of the trip they are all medication free. I have several friends in the area who similarly are able to breathe better and reduce their dependence on medications when they leave the San Joaquin Valley.

28. Watching my wife, children, and grandchildren suffer from the effects of air pollution is very distressing to me, especially since I know they would not suffer so much if we lived somewhere that had cleaner air.

29. My entire family and I are very concerned about the current pollution problems in the San Joaquin Valley, particularly because they do not appear to be improving. In my work, I counsel people with severe respiratory problems who have the resources to move out of Fresno if possible. For those with limited resources, this is not an option. I do not move because I am professionally committed to this area and its public health and am actively working to correct the problem rather than run away.

30. Friends and patients tell me that you used to be able to see the mountain ranges on both sides of the Valley—the Sierra Nevada to the east, and the Coastal Range to the west—every day. Now, because of the thick PM2.5 haze

11

and ozone that blankets the San Joaquin Valley in the winter and summer, respectively, I cannot remember the last time I saw the Coastal Range, which is 45 miles away. The Sierra Nevada's are only sixteen miles away, and I can only see those mountains less than one-third of the days in the year.

31. When I leave the San Joaquin Valley, I can really see how bad the air is. When I drive to Los Angeles, I go over the Tehachapi Mountain Range. When I look back and see a brown or gray haze, it saddens me. When I come home from the coast, I feel similarly depressed realizing that I'm diving back down into the brown or gray air hanging over the San Joaquin Valley. The brown smog that forms when ozone concentrations are high creates a pollution ceiling above the Valley floor. Similarly, a gray haze forms in the Valley's air when PM2.5 levels are high in the winter. I find the brown and gray layers of pollution that cloak Fresno depressing and they detract from my enjoyment of the Valley, especially when I am doing an outdoor activity.

32. The health and social impacts caused by high levels of air pollution place a financial burden on my family and me. Each month I make co-payments of approximately $400 for my family's medications. I also believe that air pollution adversely affects property values in the Valley including the value of my residence. I believe the poor air quality in the San Joaquin Valley has prevented real estate including my own house in Fresno from appreciating to its full potential.

12

33.     As my family and I know all too well, the San Joaquin Valley suffers from some of the worst air pollution in the country, exceeding several health-based air quality standards. For example, I am aware that the Valley has been designated as a serious nonattainment area for the 1997 PM2.5 National Ambient Air Quality Standard ("standard"). I am also aware that the San Joaquin Valley is a serious nonattainment area for the 2006 24-hour PM2.5 standard and the 2012 annual PM2.5 standard.

34.     I am aware that the San Joaquin Valley has a history of failing to attain National Ambient Air Quality Standards by the dates required by the Clean Air Act.

35.     I am concerned that EPA and other responsible authorities are neglecting the requirements of the Clean Air Act and failing to institute sufficient requirements to timely achieve pollution reductions and attain PM2.5 standards, including meaningful contingency measures.

36.      I do not believe EPA has met the requirements under the Clean Air Act to institute meaningful contingency measures to address PM2.5 pollution. The requirements of the Clean Air Act should be fully implemented in the San Joaquin Valley to protect my health and the health of my family and patients.

13

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of April, 2025 in Fresno, California.

_____
Kevin Hamilton

# Tab 5

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.* <br><br> Petitioners, <br><br> vs. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, <br><br> Respondents, | **No. 24-7270** <br><br> Agency No. EPA-R09-OAR-2023-0477 Environmental Protection Agency |
| CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT. <br><br> Respondent-Intervenors. |  |

## DECLARATION OF VINCENT HOENIGMAN

I, VINCENT HOENIGMAN, do hereby declare as follows:

1.      I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.      I am an active member of National Parks Conservation Association (NPCA) and have been for the last 28 years. I also currently serve on NPCA's National Board of Trustees as well as on NPCA's Pacific Regional Council.

3.     I reside in San Francisco, where I have lived for approximately the last 35 years. I share my house with my wife, my son, and my daughter.

4.     From childhood on I have been very susceptible to air pollution, experiencing shortness of breath and breathing problems that often have forced me to stay inside during particularly smoggy days. Into adulthood, this susceptibility has made me extremely cautious when it comes to exposing myself or my family to air pollution. For instance, whenever forest fires impact air quality in San Francisco and near our home on Lake Tahoe, I have refrained from exercising outdoors for fear of breathing in high amounts of fine particulate matter (PM2.5) air pollution. I am also worried that my susceptibility to air pollution could be passed down onto my children, and fear for their health during particularly smoggy days.

5.     I know from sources I have read that breathing in PM2.5 air pollution is a severe health risk and can exacerbate or lead to issues like asthma and lung disease. I am also aware that elevated PM2.5 air pollution from the San Joaquin Valley often makes its way into the Sierra Nevada mountains, where it harms overall air quality in national parks like Yosemite, Sequoia, and Kings Canyon.

6.     I have been an avid lover of nature and our national parks since childhood and have spent much of my adult life working to see that these resources are protected and preserved. I can remember the first time I visited Yosemite

around the age of 10, and the impression it left on me continues in my work with NPCA to this day. Since then, I have visited Yosemite over 15 times. I have also visited Sequoia National Park roughly 3 times, and Kings Canyon National Park roughly twice. I generally visit one of these parks every 2 to 3 years and definitely plan to visit them again in the near future.

7. Given my longstanding love of our national parks, I was troubled to discover that the San Joaquin Valley, in which all or parts of Yosemite, Sequoia, and Kings Canyon National Parks are located, has yet to meet health-based PM2.5 standards set well over twenty years ago, in 1997, and that EPA has approved a plan by the State of California that I believe falls short of what is needed to reduce PM2.5 pollution in the region as required under the Clean Air Act.

8. With my own breathing problems and my concern for my family's health, I am extremely worried about air quality when I visit the Sierra Nevada national parks. I have experienced firsthand the smoggy skies in these 3 parks and am very worried about the impact it may have on my health and the health of my family when we visit. I fear PM2.5 pollution in the Sierra parks could exacerbate my existing health issues, causing me to cut short hikes, or change my plans for what activities I might choose to do while in the parks. I also foresee the possibility that PM2.5 pollution may change when or where I decide to visit these parks. For instance, I may avoid the parks entirely during times of the year when PM2.5

3

levels are elevated or choose to visit the eastern side of the Sierra as opposed to the western side.

9.     The more that I have learned about this issue, the more I have become upset by the impact it has on my ability to enjoy the sights these parks have to offer. Seeing the extremely smoggy air in these parks is very disappointing and depressing. It is obvious that these parks are far more beautiful when the sky is clear, and you can see all the sights in the distance. I have memories of days when the mountains faded endlessly into the distance beneath clear, blue skies. Unfortunately, I also have memories from days when the nearest ridge is just a pale silhouette under hazy, white skies and the more distant peaks are completely obscured.

10.     I am also concerned about published reports I have read discussing the impact particulate matter precursors, like nitrogen compounds, have on algae blooms in high altitude Sierra lakes. I have witnessed the impact that nitrogen deposition has had on water clarity in Tahoe and hate to think that the same thing is happening in what should be some of the most isolated and pristine lakes in the country.

11.     For the reasons above, I fully support NPCA in their lawsuit to ensure that requirements of the Clean Air Act for controlling PM2.5 pollution are enforced.

4

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 31st day of March, 2025 in San Francisco, California.

Vincent Hoenigman

# Tab 6

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.*<br><br>    Petitioners,<br><br>vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>    Respondents, | **No. 24-7270**<br><br>Agency No.<br>EPA-R09-OAR-2023-0477<br>Environmental Protection Agency |
| CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT.<br><br>    Respondent-Intervenors. | |

# DECLARATION OF GORDON NIPP

I, GORDON NIPP, do hereby declare as follows:

1.    I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.    I live in Bakersfield, California. Bakersfield is located at the southern end of the San Joaquin Valley air basin. I have lived in this area for over 44 years.

3. I am 84 years old. I am a retired professor of mathematics at California State University, Los Angeles.

4. I am a member of the Sierra Club in good standing. I first became a member around 1971 and have been an active volunteer since.

5. I am the Vice-Chair of the Kern Kaweah Chapter of the Sierra Club. I have held this role for approximately 15 years. In that capacity and through my volunteer work I have become familiar with Sierra Club's organization, purpose, and membership structure.

6. The Sierra Club is a California nonprofit corporation with its headquarters in Oakland, California and members in all 50 states. The Sierra Club's mission is to protect and restore the environment, promote responsible use of resources, and educate the public. As a national organization dedicated to the protection of public health and the environment, including air quality, Sierra Club has members living in all eight counties comprising the San Joaquin Valley. The Sierra Club is a membership-based organization where Sierra Club members vote for the leaders in each Chapter and vote for each of the candidates for the Board of Directors.

7. The Sierra Club has actively participated in the development of Clean Air Act attainment plans for the San Joaquin Valley, including commenting on U.S. Environmental Protection Agency ("EPA") actions with respect to air quality

2

in the San Joaquin Valley. Sierra Club has also successfully challenged EPA actions for the San Joaquin Valley as unlawful on several occasions, including *Sierra Club v. EPA*, 671 F.3d 955 (9th Cir. 2012) (EPA approval of 1-hour ozone plan), and *Medical Advocates for Healthy Air v. EPA*, No. 20-72780, 2022 WL 1109656 (9th Cir. Apr. 13, 2022) (EPA approval of 2006 24-hour PM2.5 plan).

8. On information and belief, I understand that the San Joaquin Valley is a serious nonattainment area for the 1997 annual fine particulate matter (PM2.5) National Ambient Air Quality Standard ("standard"). On information and belief, I am also aware that the San Joaquin Valley is a serious nonattainment area for the 2006 24-hour PM2.5 standard and the 2012 annual PM2.5 standard. On information and belief, I am further aware that the San Joaquin Valley is an extreme nonattainment area for the 1997, 2008, and 2015 8-hour ozone standards.

9. I am concerned about the effects of PM2.5 and ozone pollution on my health, the health of my family, and the health of my friends and neighbors. I am especially concerned for my own health since I was diagnosed with asthma by a doctor over ten years ago.

10. I understand that PM2.5 pollution damages lung tissue, exacerbates asthma, reduces lung capacity, increases respiratory and cardiovascular hospital admissions, increases school and work absenteeism, and causes premature mortality. I also understand that ozone pollution causes shortness of breath, asthma

3

attacks, increased hospital and emergency room visits, and increased risk of premature death.

11.     Poor air quality in the San Joaquin Valley impacts my day-to-day life. Because of my asthma, I have to take extra precautions.

12.     I feel asthmatic symptoms in my chest and it is hard to breathe. I use an inhaler to treat my asthma. My frequency of inhaler use increases during the winter when PM2.5 levels are highest in the San Joaquin Valley and in summer when ozone levels in the Valley are highest.

13.     I prefer to engage in outdoor activities three or four times per week, although sometimes this is not possible due to poor air quality. For example, I enjoy hiking at Hart Park and Lake Ming in Bakersfield, but I avoid hikes when the air quality is bad during the winter and summer.

14.     I frequently check the local Air District's air quality data in the local newspaper and on the internet.

15.     When either one of these indicates poor air quality, I try to stay inside as much as possible and avoid the dirty air.

16.     Much of the time I am hesitant to go outside, engage in exercise, or leave my windows open because of poor air quality.

17.     When the air quality is especially poor, I am extra cautious about closing doors and taking extra steps to keep the dirty air outside. My wife and I

4

also have several air filtration systems in the house that we run on poor air quality days.

18. I live on a hillside on the east side of Bakersfield, on View Street, and my house faces the Kern Canyon and the southern Sierra Nevada mountains. I very much enjoy the beautiful scenery of the mountains, but when the air quality is bad, air pollution obscures the views from my home. It makes me sad when I cannot enjoy the view of the mountains because of air pollution.

19. I am aware that the San Joaquin Valley has a history of failing to attain National Ambient Air Quality Standards by the dates required by the Clean Air Act. For example, the San Joaquin Valley failed to meet the attainment deadline for the 1997 annual PM2.5 standard, so it was reclassified from a "moderate" nonattainment area to "serious." EPA set December 31, 2015, as the attainment deadline for the San Joaquin Valley as a serious nonattainment area for the 1997 annual PM2.5 standard, but the Valley did not meet the deadline. EPA approved a one-year extension of the deadline to December 31, 2024, as requested by the California Air Resources Board, and EPA has still not made a finding that the Valley meets the 1997 PM2.5 standard.

20. I am also aware that the San Joaquin Valley has not met deadlines for attainment of the 2006 24-hour PM2.5 standard or the 1997 8-hour ozone standard. The attainment deadlines for the 2006 24-hour PM2.5 standard and the 1997 8-

hour ozone standard are December 31, 2024, and June 15, 2024, respectively. EPA has not made any finding with regard to whether the Valley met those standards on time. I am aware that design value data for those standards for the 2021-2023 period indicates the Valley does not attain those standards.

21.    I am concerned that EPA and other responsible authorities are neglecting the requirements of the Clean Air Act and failing to institute sufficient requirements to timely achieve pollution reductions and attain PM2.5 and ozone standards, including meaningful contingency measures.

22.    I am serving as a declarant in this proceeding to support Sierra Club's efforts to enforce the laws that protect my health, the health and welfare of my family and community, to oppose attempts to weaken clean air protections, and to protect and restore the natural beauty of the San Joaquin Valley.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 12th day of March, 2025 in Bakersfield, California.

_____
Gordon Nipp

6

# Tab 7

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| COMMITTEE FOR A BETTER ARVIN, *et al.*<br><br>Petitioners,<br><br>vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Respondents, | **No. 24-7270**<br><br>Agency No.<br>EPA-R09-OAR-2023-0477<br>Environmental Protection Agency |
| CALIFORNIA AIR RESOURCES BOARD and SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT.<br><br>Respondent-Intervenors. | |

**DECLARATION OF MARK ROSE**

I, MARK ROSE, do hereby declare as follows:

1.	I am over 18 years old and not a party to this action. I make this declaration of my own personal knowledge.

2.	I currently reside in Sacramento, California.

3.	I am the Sierra Nevada Program Manager for the National Parks Conservation Association (NPCA). I have worked at NPCA for over 7 years. In my

role, I oversee NPCA's campaign work to protect and preserve Yosemite, Sequoia, and Kings Canyon National Parks, as well as to fight threats to the parks that extend beyond their borders including from areas such as the San Joaquin Valley. Part of my job includes working with our membership department to track and engage NPCA local members near these three Sierra Nevada National Parks.

4.    NPCA is a membership organization headquartered in Washington, DC, with a Pacific Regional Office located in Oakland, CA, and a Sierra Nevada Field Office located in Sacramento, CA. NPCA is recognized as a not-for-profit corporation under Section 501(c)(3) of the United States Internal Revenue Code.

5.    NPCA currently has over 330,000 active (dues paying) members nationwide, and approximately 1,200,000 (non-dues paying) supporters. Additionally, as of March 2025, NPCA has approximately 39,000 active members in California and over 1,920 active members in the counties that make up the San Joaquin Valley Air Pollution Control District (Fresno, Kern, Kings, Madera, Merced, San Joaquin, Stanislaus, and Tulare). NPCA's membership department carefully tracks active members and regularly updates their databases to reflect items such as current addresses and the membership status of active members versus lapsed-payment prior members.

6.    NPCA's primary mission is to protect and preserve America's national parks and their resources, including air quality, for the use and enjoyment

2

of present and future generations. Since its founding in 1919, NPCA has worked to execute our mission through advocacy, education, and strategic litigation to enforce environmental laws.

7.     For decades, NPCA has worked to strengthen and protect air quality in national parks nationwide through implementation and enforcement of the Clean Air Act, including targeting sources of air pollution that affect our parks. We have worked extensively to ensure implementation and enforcement of the Clean Air Act's regional haze program—a program designed to restore clean and clear air to national parks and wilderness areas by requiring states to pursue pollution reduction from industries such as power plants, oil refineries, and other sources.

8.     In California, NPCA has worked on clean air issues in the Sierra Nevada and San Joaquin Valley for around 20 years. For instance, NPCA commented on the state's regional haze plan and led a campaign focused on public awareness of air pollution issues in the Sierra Nevada parks. Specific to fine particulate matter (PM2.5) in the San Joaquin Valley, NPCA was heavily engaged in the state and local rulemaking processes related to California's 2018 PM2.5 State Implementation Plan (plan) for well over 6 years—submitting comments to EPA, the California Air Resource Board (CARB), and the Valley Air District, as well as attending a variety of meetings, workshops, and hearings related to the plan.

3

9.     NPCA has also successfully challenged EPA actions for the San Joaquin Valley as unlawful on several occasions, including *Medical Advocates for Healthy Air et al. v. EPA*, No. 20-72780, 2022 WL 1109656 (9th Cir. April 13, 2022) (EPA approval of 2006 24-hour PM2.5 plan); *Comité Progreso de Lamont et al. v. EPA*, N.D. Cal. No. 3:21-cv-8733-WHA (EPA failure to take final action on PM2.5 plans, resolved by consent decree); *Committee for a Better Arvin et al. v. EPA*, N.D. Cal. No. 18-cv-05700-RS (EPA failure to make findings that Valley PM2.5 plans were overdue).

10.    More recently, NPCA joined with other groups to submit comments to EPA on its proposal to approve inadequate contingency measures to address PM2.5 pollution.

11.    Through my work at NPCA, I am aware that the San Joaquin Valley air basin has been designated as a serious nonattainment area for the 1997 PM2.5 National Ambient Air Quality Standard (standard). I am also aware that the San Joaquin Valley is a serious nonattainment area for the 2006 24-hour PM2.5 standard and the 2012 annual PM2.5 standard.

12.    I am aware that the San Joaquin Valley has a history of failing to attain National Ambient Air Quality Standards by the dates required by the Clean Air Act, including PM2.5 standards. For example, I understand that the San Joaquin Valley failed to meet the attainment deadline for the 1997 annual PM2.5

4

standard, so EPA reclassified it from a "moderate" nonattainment area to "serious," and set December 31, 2015 as the new attainment deadline. I also understand that the Valley did not meet this deadline, and EPA subsequently approved a revised plan for the Valley pursuant to section 189(d) of the Clean Air Act and set a new attainment date of December 31, 2023. EPA subsequently extended the deadline to December 31, 2024. On information and belief, I understand that EPA has still not made a finding that the Valley meets the 1997 PM2.5 standard.

13. Further, I am aware that the San Joaquin Valley has not met the deadline for attainment of the 2006 24-hour PM2.5 standard. Pursuant to section 188(e) of the Clean Air Act, EPA granted a five-year extension and set December 31, 2024 as the attainment deadline for the 2006 24-hour standard. On information and belief, EPA has not made any finding with regard to whether the Valley met the standard, and available data indicates the Valley has not attained the standard.

14. In both my professional and personal capacities, I am concerned that EPA and other responsible authorities are neglecting the requirements of the Clean Air Act and failing to institute sufficient requirements to timely achieve pollution reductions and attain PM2.5 standards, including the adoption of meaningful contingency measures.

15. Through my work at NPCA, I am aware that Yosemite, Sequoia, and Kings Canyon are harmed by PM2.5 pollution originating from within the San

5

Joaquin Valley Air District.

16. In addition to my role as NPCA's Sierra Nevada Program Manager, I am a paying dues member of NPCA. In my free time, I frequently visit Yosemite, Sequoia, and Kings Canyon National Parks for personal enjoyment.

17. For both work and personal recreation, I generally visit Yosemite, Sequoia, and Kings Canyon National Parks at least once every two to three months.

18. While in each of these three parks I have seen firsthand the severe effect that PM2.5 air pollution has on overall visibility. This reduced visibility (or haze) has an obvious and direct impact on my ability to fully enjoy the incredible scenery that these parks have to offer. I can think of numerous occasions while in one of those three parks during PM2.5 season where features I knew were in the distance were partially or wholly obscured by haze.

19. I have read numerous studies outlining the significant harm that inhaling elevated levels of particulate matter can have on my health. Consequently, my wife and I limit the dates for when we choose to visit these parks for recreation by paying close attention to air quality alerts and PM2.5 levels. Similarly, when in the parks, I gauge the level of activity that I partake in based on current air quality levels, sometimes forsaking a longer hike because of my awareness that exercise subjects me to inhaling even more dirty air than normal.

6

20.     As an employee and member of NPCA, I am also concerned with the secondary damage that PM2.5 pollution is causing to plant and animal life in these parks. I am aware of reports linking PM2.5 precursor pollutants to harmful effects on the wellbeing of Sierra ecosystems. These precursor impacts include ammonia and nitrogen oxide pollution interfering with essential ecosystem functions—such as altering the ability of plants like Jeffrey pines to photosynthesize or the deposition of excess nitrogen causing extensive algae blooms in high altitude lakes.

21.     I am also aware of reports linking PM2.5 precursor air pollution to the ongoing tree mortality crisis that has devastated the Sierras over the last several years. I have seen firsthand the impact tree mortality has had on Yosemite, Sequoia, and Kings Canyon, and know how key those ecosystems are to biodiversity in the p arks. With numerous other environmental stressors like drought, large scale wildfires, and bark beetles already harming Sierra forests, our parks cannot afford additional damage from preventable air pollution.

22.     For the reasons discussed above, both as an employee and as a member, I fully support NPCA in their lawsuit to ensure that requirements of the Clean Air Act governing EPA's duty to develop robust contingency measures to control PM2.5 pollution in the San Joaquin Valley are enforced.

7

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 31st day of March, 2025 in Sacramento, California.

Mark Rose

8