**Case No. 24-7270**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

COMMITTEE FOR A BETTER ARVIN, et al.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

Respondents,

and

CALIFORNIA AIR RESOURCES BOARD, et al.,

Respondent-Intervenors.

---

On Petition for Review of an Order of the
United States Environmental Protection Agency

---

# RESPONDENTS' SUPPLEMENTAL EXCERPTS OF RECORD INDEX & VOLUME 1 OF 1


ADAM R.F. GUSTAFSON
*Deputy Assistant Attorney General*
SARAH IZFAR
Environment and Natural Resources Division
U.S. Department of Justice
150 M Street, N.E., Suite 4.1114
Washington, D.C. 20002
(202) 305-0490
sarah.izfar@usdoj.gov

Of Counsel:

YASMIN PEREZ ORTIZ
JEFFERSON WEHLING
*Attorneys*
U.S. EPA

**Index to Respondents' Supplemental Excerpts of Record ("SER")**

| **Agency Record Number** | **Document Name** | **Date** | **SER No.** |
|---|---|---|---|
| A-54 | EPA Region IX, "EPA Proposed Contingency Measures Technical Support Document, Proposed Contingency Measures Federal Implementation Plan for the Fine Particulate Matter Standards for San Joaquin Valley, California," July 2023, including attachment EPA Region IX, "Calculations for Proposed Rural Open Areas Contingency Measure," July 2023. | July 2023 | SER-003 |
| B-4 (Excerpt) | 2018 Plan for the 1997, 2006, and 2012 PM2.5 Standards—Chapter 2: Air Quality Challenges and Trends | Nov. 15, 2018 | SER-176 |

# EPA Source Category and Control Measure Assessment and Reasoned Justification Technical Support Document

# Proposed Contingency Measures Federal Implementation Plan for the Fine Particulate Matter Standards for San Joaquin Valley, California

**U.S. Environmental Protection Agency, Region IX**

**July 2023**

## Contents

I. Introduction .................................................. 3
II. Control Measure Identification and Evaluation Methodology.................................. 4
III. Reasoned Justification for Proposing Measures Achieving Less than One Year's Worth of Reasonable Further Progress (RFP) or Progress........................................................... 6
A. Fuel Combustion ...................................... 8
1. Boilers, Steam Generators, and Process Heaters ..................................................... 9
2. Reciprocal Internal Combustion Engines – Nonroad Engines ................................ 23
3. Combustion Turbines .......................... 36
4. Residential and Commercial Fuel Combustion .......................................... 43
B. Waste Disposal....................................... 51
1. Overview ............................................ 51
2. Evaluation........................................... 51
3. Conclusion .......................................... 52
C. Cleaning and Surface Coating ................. 52
D. Petroleum Production and Marketing..... 52
1. Wet Cooling Towers ............................ 53
2. Flares .................................................. 54
3. Conclusion .......................................... 59
E. Industrial Processes ............................... 63
1. Chemical ............................................. 63
2. Food and Agriculture........................... 63
3. Mineral Processes ............................... 64
4. Metal Processes .................................. 68
5. Wood and Paper................................. 71
6. Glass and Related Products................. 71
7. Electronics .......................................... 76
8. Other (Industrial Processes)................ 76
F. Solvent Evaporation ................................ 76
G. Miscellaneous Processes ......................... 77
1. Residential Fuel Combustion............... 77
2. Fugitive Dust Categories...................... 84
3. Fires ................................................. 120
4. Managed Burning and Disposal (Open Burning) ............................................. 120
5. Commercial Cooking ......................... 131
6. Other (Miscellaneous Processes) ....... 136
H. Mobile Sources ................................... 136
1. Overview .......................................... 136
2. Evaluation......................................... 136
3. Conclusion ........................................ 146
IV. Feasibility of Additional Recommendations as Contingency Measures............................. 146
A. New Source Review and Emission Reduction Credits .................................... 146
1. Background ...................................... 146
2. Evaluation of Earthjustice Recommendations ................................ 147
B. Indirect Source Review .......................... 148
1. Overview .......................................... 148
2. Regulatory Context ........................... 148
3. Evaluation of Earthjustice Recommendations ................................ 149
4. Conclusion ........................................ 150
C. Soil $NO_X$ ................................................ 151
1. Background ...................................... 151
2. Evaluation of Earthjustice Recommendation ................................ 151
3. Conclusion ........................................ 152
D. General Conformity ............................. 152
1. Background ...................................... 152
2. Regulatory Context ........................... 153
3. Evaluation of SJVUAPCD Recommendation ................................ 155
4. Conclusion ........................................ 156
E. In-Use Motor Vehicles .......................... 156
1. Background ...................................... 156
2. Regulatory Context ........................... 157
3. Consideration of Expanding Enhanced I/M Program......................................... 159
4. Conclusion ........................................ 161
V. Supplemental Information ........................ 165
A. Almond Harvesting Cost Effectiveness.. 165
1. Calculated Emission Reductions ........ 165
2. Calculated Dollar Per Ton Cost Effectiveness ........................................ 167

# I. Introduction

The Environmental Protection Agency (EPA) is proposing a contingency measures federal implementation plan (FIP) for the San Joaquin Valley for the 1997 annual, 2006 24-hour, and 2012 annual fine particulate matter ($PM_{2.5}$) national ambient air quality standards (NAAQS). The EPA's $PM_{2.5}$ State Implementation Plan (SIP) Requirements Rule directs states to implement control measures for sources of direct $PM_{2.5}$ emissions and sources of emissions of $PM_{2.5}$ plan precursors.[1] The EPA has identified the precursors of $PM_{2.5}$ to be oxides of nitrogen ($NO_X$), sulfur dioxides ($SO_X$), volatile organic compounds (VOC), and ammonia. As described in the notice of proposed rulemaking (NPRM) for the proposed contingency measures FIP, in a separate action on the State's 2021 submission of a revised attainment plan for the 1997 annual $PM_{2.5}$ NAAQS, the EPA proposed to approve a comprehensive precursor demonstration submitted by the California Air Resources Board (CARB or "State") and the San Joaquin Valley Unified Air Pollution Control District (SJVUAPCD or "District") indicating that $SO_X$, VOC, and ammonia emissions do not contribute significantly to $PM_{2.5}$ levels that exceed the 1997 annual $PM_{2.5}$ NAAQS in the San Joaquin Valley.[1] Similarly, the EPA approved the State's precursor demonstration submitted with plan elements for the 2006 24-hour $PM_{2.5}$ NAAQS.[2] On the basis of the proposed approval of the precursor demonstration for the 1997 annual $PM_{2.5}$ NAAQS, and approval of the precursor demonstration for the 2006 24-hour $PM_{2.5}$ NAAQS, we are not proposing FIP contingency measures that apply to emissions of $SO_2$, VOC, or ammonia, but do identify such measures for emissions of direct $PM_{2.5}$ and $NO_X$.

As described in the proposed contingency measures FIP NRPM, we estimate that the contingency measures proposed by the EPA under this FIP, if finalized, would achieve emissions reductions amounting to more than one year's worth (OYW) of reasonable further progress (RFP) or "progress" for direct $PM_{2.5}$ (as discussed in the NPRM) but less than one year's worth of RFP or progress for $NO_X$. While these measures would provide emissions reductions of less than OYW of RFP or progress for $NO_X$, even when taking into account interpollutant trading, we are proposing to determine that the contingency measures included in the proposed contingency measures FIP are appropriate due to the scarcity of other controls that could feasibly be implemented to meet contingency measure requirements in the San Joaquin Valley. This technical support document (TSD) provides the EPA's reasoned justification for proposing contingency measures that would achieve less than OYW of RFP or progress.

The EPA has previously indicated in guidance in the $PM_{2.5}$ State Implementation Plan (SIP) Requirements Rule, that states should adopt contingency measures that would achieve approximately one year's worth of RFP, but that states may provide a reasoned justification to explain why measures that achieve less than that amount are appropriate. More recently, the EPA has been developing additional guidance providing more specific recommendations for how states may make such a showing. To satisfy the statutory contingency measure requirement with a set of measures achieving less than OYW of RFP or progress, the EPA's Draft Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter

---

[1] 88 FR 45276 (July 14, 2023).
[2] 85 FR 44192 (July 22, 2020). See the EPA's proposed action at 85 FR 17382 (March 27, 2020) for more detail about the EPA's review of the State's precursor demonstration.

("Draft Guidance")[3] recommends that states demonstrate that they have considered all existing and potential control measures relevant to the appropriate source categories and pollutants in the nonattainment area, and have reached reasonable conclusions regarding whether such measures are feasible. Consistent with the procedures outlined in the Draft Guidance, we have broadly evaluated all emissions source categories in the San Joaquin Valley to identify controls for consideration as contingency measures. We are proposing two such specific controls as contingency measures, which are described in the NPRM and in the "Proposed Contingency Measures TSD"[4] accompanying the proposed contingency measures FIP. The available information for the remaining source categories and controls does not yet support their proposal as contingency measures for this FIP. In support of our reasoned justification for proposing contingency measures achieving less than OYW of RFP or progress, our evaluation of all emissions sources in the San Joaquin Valley and the feasibility of associated controls not proposed for implementation as contingency measures in the San Joaquin Valley is described in the following sections. We emphasize that the EPA is only evaluating these potential controls with respect to contingency measures requirements for the 1997 annual, 2006 24-hour, and 2012 annual fine particulate matter $PM_{2.5}$ NAAQS in the San Joaquin Valley at the time of this action. The EPA does not intend for this evaluation to apply to other nonattainment control measures requirements, such as best available control measures (BACM), best available control technology (BACT), and most stringent measures (MSM) requirements, to apply to other iterations of the $PM_{2.5}$ NAAQS or other NAAQS, or to any other nonattainment areas. Any evaluation of the feasibility of control measures as potential contingency measures must be focused on the specific facts and circumstances for a particular NAAQS in a particular nonattainment area.

In particular, our current evaluation of control measures for boilers (Section III.A.1), almond harvesting (Section III.G.2.b), commercial charbroiling (Section III.G.5), and vehicle inspection and maintenance programs (Section IV.E) does not currently support the proposal of such controls as contingency measures for this FIP for the reasons explained in this TSD. However, because these reasons are specific to this FIP and not necessarily applicable to future planning requirements, we encourage SJVUPACD to review the feasibility of emission controls for these sources along with the evaluations presented in this TSD when considering control strategies to meet $PM_{2.5}$ attainment planning requirements in the future.

# II. Control Measure Identification and Evaluation Methodology

Section 4 of the Draft Guidance outlines the procedures for preparation of a reasoned justification for providing contingency measures achieving less than OYW of RFP or progress. These procedures, which involve the identification of existing and potential controls not already included in the applicable attainment plan and evaluation of the feasibility of such controls, are outlined in a four-step process:

[3] EPA, Office of Air Quality Planning and Standards, Air Quality Policy Division, "DRAFT: Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter" ("Draft Guidance"), March 16, 2023.

[4] EPA, Region IX, "EPA Proposed Contingency Measures Technical Support Document for the Proposed Contingency Measures Federal Implementation Plan for the Fine Particulate Matter Standards for San Joaquin Valley, California" ("Proposed Contingency Measures TSD"), July 2023. The Proposed Contingency Measures TSD is available in the docket for the proposed contingency measures FIP.

1. Identify existing and potential control measures, i.e., measures not already included in the plan, that could be applied to sources in the nonattainment area.[5]
2. Review each of the measures identified in Step 1 to determine whether it is feasible as a contingency measure for the applicable attainment plan. If feasible, include the measure in the CM submission. (Check to see if OYW of RFP or progress is met, and if so, the infeasibility justification is no longer needed).
3. For the remaining measures (i.e., the infeasible measures from Step 2), document the reason why the air agency reached the conclusion that each measure is infeasible as a contingency measure for the applicable attainment plan, including whether the conclusion is based on technological, economic, or other infeasibility considerations.
4. Prepare the infeasibility justification to include with the SIP submission by identifying each measure determined to be infeasible in Step 3, explaining the reason for each such determination, and providing supporting information and analysis that supports each conclusion.

Step 1 involves the identification of controls that could be applied to sources in the nonattainment area. The Draft Guidance describes four types of measures[6] that should be identified:

- "On-the-books" control measures are the measures that already apply to relevant sources in the nonattainment area.
- "On-the-way" control measures are the measures in the area's nonattainment plan that will be implemented during the upcoming planning period.
- "Existing" control measures are the measures that are not yet on-the-books or on-the-way, but which could prospectively be applied to sources in the nonattainment area because they are presently being implemented for sources outside the relevant nonattainment area or are presently being implemented for different sources in the nonattainment area.
- "Potential" control measures are the identifiable measures that may be feasible for sources in the nonattainment area but have not been previously implemented elsewhere.

Under Step 1, a comprehensive emissions inventory for the nonattainment area is examined as a starting point for identifying on-the-books, on-the-way, existing, and potential control measures. For the proposed contingency measures FIP, we examined 2023 inventories of direct $PM_{2.5}$ and $NO_X$ emissions in the San Joaquin Valley. The emissions inventories we relied on for this evaluation represent 2023 emissions projected from a 2017 base year and were obtained from the latest version of the California Emissions Projection Analysis Model, CEPAM2019v1.03.[7] Emissions inventory information gathered under Step 1 is then used to inform additional work in Step 1 to identify existing and potential control

---

[5] The term "control measure" is used in this document to broadly refer to any air agency requirement that reduces emissions. To be creditable for SIP purposes, such reductions must be quantifiable, surplus, enforceable, and permanent. Control measures may require the installation of a new control device or application of a new control technique, or they may involve changes to the structure of an existing rule such as the lowering of an emissions limit or changing its form, eliminating an exemption, prohibiting a specified activity, or accelerating a compliance date, so long as such changes generate SIP-creditable emissions reductions.
[6] Draft Guidance, 32.
[7] CEPAM2019v1.03 is accessible as an online tool at https://ww2.arb.ca.gov/applications/cepam2019v103-standard-emission-tool.

measures for the categories relevant to the inventory. [8] Under Step 2, the existing and potential measures identified in Step 1 are evaluated to determine their feasibility as contingency measures for the nonattainment area. Under Step 3, for any measures determined in Step 2 to be infeasible, the reasons for concluding that they are infeasible (e.g., technical/economic) are described for each such measure, and under Step 4, the infeasibility determinations are documented to support the reasoned justification for the plan achieving less than OYW of RFP or progress. The evaluations, conclusions, and documentation comprising Steps 1 through 4 of the reasoned justification for this proposed contingency measures FIP are presented in Section III of this TSD.

We note that our identification of potential control strategies under Step 1 is informed by two letters sent by environmental groups to the EPA in 2021[9] and 2022.[10] These letters, sent by Earthjustice and signed by numerous other environmental groups, include recommendations for improvements to SJVUAPCD's $PM_{2.5}$ control strategy. These letters are referred to herein as the "Earthjustice Letters." Where the recommendations in the Earthjustice Letters relate to specific sources or source categories in the San Joaquin Valley emissions inventory, we evaluate such recommendations under the appropriate source category in Section III of this TSD. Other recommendations apply to SJVUAPCD's control strategy more broadly and are evaluated for their potential implementation as contingency measures in Section IV of this TSD.

# III. Reasoned Justification for Proposing Measures Achieving Less than One Year's Worth of Reasonable Further Progress (RFP) or Progress

This section contains our evaluation of all direct $PM_{2.5}$ and $NO_X$ source categories in the San Joaquin Valley and associated control measures. In order to identify relevant source categories for this evaluation, we started with the categories identified by the state in the emissions inventory for the area. Table III-1 below lists all source categories in the San Joaquin Valley emissions inventory, as output by CEPAM, and 2023 direct $PM_{2.5}$ and $NO_X$ emissions inventory data for each source category, reported in tons per day (tpd) and as percentages of the total San Joaquin Valley inventory. Detailed 2023 emissions inventory data including emissions contributions from source subcategories are included in a spreadsheet attachment uploaded to the docket for the proposed contingency measures FIP.[11]

---

[8] In our identification of potential contingency measures under Step 1, we indicate that certain measures currently implemented by the SJVUAPCD have been determined to meet non-contingency measure requirements such as BACM and MSM. By statute, contingency measures are additional requirements designed to go beyond other attainment planning requirements, so a determination that a source category is subject to an on-the-books measure that represents BACM or MSM does not foreclose the possibility that more stringent measures could qualify as contingency measures.

[9] Letter dated October 22, 2021, from environmental organizations to Michael S. Regan, Administrator, EPA, Subject: "Meeting Request to Discuss PM-2.5 Crisis in the San Joaquin Valley."

[10] Letter dated May 18, 2022, from environmental organizations to Michael S. Regan, Administrator, Environmental Protection Agency, Subject: "Meeting Request to Discuss PM-2.5 Crisis in the San Joaquin Valley."

[11] See *2023-07 SJV $PM_{2.5}$ Precursor Inventory for Contingency Measure Evaluation.xlsx* provided in the docket for the proposed contingency measures FIP.

*Table III-1. San Joaquin Valley Emission Source Categories & 2023 Emissions Inventory Overview*

| Source Category | $PM_{2.5}$ Emissions (tpd) | % of 2023 SJV $PM_{2.5}$ Inventory | $NO_X$ Emissions (tpd) | % of 2023 SJV $NO_X$ Inventory |
|---|---|---|---|---|
| 010 - Electric Utilities | 0.90 | 1.35% | 2.41 | 1.51% |
| 020 - Cogeneration | 0.33 | 0.49% | 0.71 | 0.45% |
| 030 - Oil and Gas Production (Combustion) | 1.59 | 2.39% | 2.12 | 1.33% |
| 040 - Petroleum Refining (Combustion) | 0.06 | 0.09% | 0.21 | 0.13% |
| 050 - Manufacturing and Industrial | 0.27 | 0.40% | 1.43 | 0.89% |
| 052 - Food and Agricultural Processing | 0.51 | 0.76% | 4.23 | 2.65% |
| 060 - Service and Commercial | 0.46 | 0.68% | 4.74 | 2.97% |
| 099 - Other (Fuel Combustion) | 0.01 | 0.01% | 0.51 | 0.32% |
| 110 - Sewage Treatment | 0.01 | 0.01% | 0.05 | 0.03% |
| 120 - Landfills | 0.12 | 0.18% | 0.24 | 0.15% |
| 130 - Incinerators | 0.01 | 0.01% | 0.04 | 0.02% |
| 140 - Soil Remediation | < 0.01 | < 0.01% | < 0.01 | < 0.01% |
| 199 - Other (Waste Disposal) | 0.04 | 0.06% | 0.01 | < 0.01% |
| 210 - Laundering | 0.01 | 0.01% | 0.00 | 0.00% |
| 220 - Degreasing | 0.05 | 0.08% | 0.00 | 0.00% |
| 230 - Coatings and Related Process Solvents | 0.30 | 0.46% | < 0.01 | < 0.01% |
| 240 - Printing | < 0.01 | < 0.01% | 0.00 | 0.00% |
| 250 - Adhesives and Sealants | < 0.01 | < 0.01% | 0.00 | 0.00% |
| 299 - Other (Cleaning and Surface Coatings) | < 0.01 | < 0.01% | 0.00 | 0.00% |
| 310 - Oil and Gas Production | 0.03 | 0.05% | 0.19 | 0.12% |
| 320 - Petroleum Refining | 0.02 | 0.04% | 0.01 | 0.01% |
| 330 - Petroleum Marketing | 0.02 | 0.03% | 0.06 | 0.04% |
| 399 - Other (Petroleum Production and Marketing) | 0.00 | 0.00% | 0.00 | 0.00% |
| 410 - Chemical | 0.30 | 0.45% | 0.31 | 0.19% |
| 420 - Food and Agriculture | 0.56 | 0.84% | 0.00 | 0.00% |
| 430 - Mineral Processes | 1.10 | 1.65% | 0.21 | 0.13% |
| 440 - Metal Processes | 0.02 | 0.03% | 0.00 | 0.00% |
| 450 - Wood and Paper | 0.20 | 0.30% | 0.00 | 0.00% |
| 460 - Glass and Related Products | 0.17 | 0.25% | 3.37 | 2.11% |
| 470 - Electronics | < 0.01 | < 0.01% | < 0.01 | < 0.01% |
| 499 - Other (Industrial Processes) | 0.18 | 0.27% | 0.01 | 0.01% |
| 510 - Consumer Products | 0.00 | 0.00% | 0.00 | 0.00% |
| 520 - Architectural Coatings and Related Process Solvents | 0.00 | 0.00% | 0.00 | 0.00% |
| 530 - Pesticides/Fertilizers | 0.00 | 0.00% | 0.00 | 0.00% |
| 540 - Asphalt Paving / Roofing | 0.00 | 0.00% | 0.00 | 0.00% |
| 610 - Residential Fuel Combustion | 3.00 | 4.50% | 4.84 | 3.03% |
| 620 - Farming Operations | 12.96 | 19.45% | 0.00 | 0.00% |

| Source Category | $PM_{2.5}$ Emissions (tpd) | % of 2023 SJV $PM_{2.5}$ Inventory | $NO_X$ Emissions (tpd) | % of 2023 SJV $NO_X$ Inventory |
|---|---|---|---|---|
| 630 - Construction and Demolition | 1.57 | 2.36% | 0.00 | 0.00% |
| 640 - Paved Road Dust | 5.11 | 7.67% | 0.00 | 0.00% |
| 645 - Unpaved Road Dust | 3.69 | 5.54% | 0.00 | 0.00% |
| 650 - Fugitive Windblown Dust | 7.23 | 10.86% | 0.00 | 0.00% |
| 660 - Fires | 0.20 | 0.30% | 0.03 | 0.02% |
| 670 - Managed Burning and Disposal | 13.75 | 20.64% | 6.66 | 4.17% |
| 690 - Cooking | 3.98 | 5.97% | 0.00 | 0.00% |
| 699 - Other (Miscellaneous Processes) | 0.00 | 0.00% | 0.00 | 0.00% |
| 710 through 890 (Mobile Source Categories) | 7.85 | 11.78% | 127.24 | 79.70% |
| **Total** | **66.61** | **100%** | **159.65** | **100%** |

We note that mobile source categories (i.e., categories 710 through 890, as reported by CEPAM) comprise nearly 80% of the $NO_X$ emissions inventory in the San Joaquin Valley. Mobile sources generally fall under the jurisdiction of the federal government to establish controls, unless the state qualifies for and has obtained a waiver, and thus typically are subject to particular regulatory constraints and require lead times in excess of two years. Section III.H of this document describes feasibility challenges for mobile source contingency measures. The dominance of mobile sources for $NO_X$ emissions significantly limits the ability for SJVUAPCD to achieve OYW of $NO_X$ reductions from contingency measures.

## A. Fuel Combustion

As shown in Table III-1, the 2023 San Joaquin Valley emissions inventory is categorized by the type of source generating the emissions and not the equipment generating the emissions. Because we expect the analysis of potential contingency measures to be similar across each source category that combust fuel, we evaluated $PM_{2.5}$ and $NO_X$ emissions by equipment category instead of by source category. That is, the technologies available to reduce emissions from fuel combustion in each source category are expected to depend more on the equipment combusting fuel than the type of source generating the emissions (although this can also be a consideration). The other sections of this document evaluate potential contingency measures by source category.

As demonstrated in Table III-2, fuel combustion sources contribute 4.12 tpd direct $PM_{2.5}$ and 16.37 tpd of $NO_X$ to the 2023 San Joaquin Valley emissions inventory. We have grouped our analysis of fuel combustion equipment into four categories: (1) boilers, steam generators, and process heaters; (2) engines; (3) combustion turbines; and (4) residential and commercial fuel combustion.

*Table III-2. Fuel Combustion Emissions Inventory Contributions*

| Industry | $PM_{2.5}$ (tpd) | $NO_X$ (tpd)) |
|---|---|---|
| 010 – Electric Utilities | 0.90 | 2.41 |
| 020 – Cogeneration | 0.33 | 0.71 |
| 030 – Oil & Gas Production | 1.59 | 2.12 |
| 040 – Petroleum Refining | 0.06 | 0.21 |
| 050 – Manufacturing & Industrial | 0.27 | 1.43 |
| 052 – Food & Agricultural Processing | 0.51 | 4.23 |
| 060 – Service & Commercial | 0.46 | 4.74 |
| 099 – Other | 0.01 | 0.51 |
| 610 – Residential Fuel Combustion | 3.00 | 4.84 |
| **Total** | **7.12** | **21.21** |

## 1. Boilers, Steam Generators, and Process Heaters

### *a. Overview*

Boilers, steam generators, and process heaters fueled by gas or liquid fuel are used to produce hot water, produce steam, and transfer heat from combustion gases to liquid or process streams. These units emit direct $PM_{2.5}$ and $NO_X$ and can be found at facilities representing a wide range of industries including but not limited to electrical utilities, cogeneration, oil and gas production, petroleum refining, manufacturing and industrial, food and agricultural processing, and service and commercial facilities. These units have significant variability in technology, size, use and age of equipment, as well as variability in potential controls for various pollutants, the affected industries, and the regulatory strategies used by different agencies.

### *b. Evaluation*

#### i. Available Control Technologies

Boilers, steam generators, and process heaters typically control $NO_X$ emissions using technologies that reduce $NO_X$ formation, such as low- $NO_X$ burners (LNB) and ultra-low $NO_X$ burners (ULNB), and flue gas recirculation (FGR). Selective catalytic reduction (SCR) is the most common post-combustion add-on control technology. Emission limits between 7 and 9 parts per million by volume (ppmv)[12] are generally achievable with ULNB (this may also include the use of FGR). To achieve an emissions limit of 5 ppmv or lower, operators typically use SCR.

There are emerging technologies that have demonstrated achieving 5 ppmv and lower without the use of SCR and these include ULNB for boilers smaller than 20 million British thermal units (MMBtu) per hour (MMbtu/hr).[13]

[12] Throughout this document, limits expressed in ppmv are assumed to be at 15% oxygen ($O_2$).
[13] Solex Burner 5 ppm $NO_X$ Performance information, *https://www.johnzinkhamworthy.com/wp-content/uploads/solex-burner.pdf* (last visited July 27, 2023).

We are not aware of any common add-on control technologies for reducing $PM_{2.5}$ from gas or liquid fuels for this category, such as natural gas or ultra-low sulfur diesel (ULSD). Although rules and permits may set requirements on the type of fuel burned and the sulfur content of fuel.

### ii. On-the-Books and On-the-Way Control Measures

District Rule 4306 ("Boilers, Steam Generators, and Process Heaters – Phase 3") and Rule 4320 ("Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr") establish $NO_X$ emissions limits for the operation of liquid and gaseous fuel-fired boilers, steam generators, and process heaters with heating capacity greater than 5.0 MMBtu/hr. Rules 4306 and 4320 apply to the same units. Rule 4306 sets $NO_X$ emissions limits that must be met by the specified compliance dates, while Rule 4320 allows owner/operators to pay an annual $NO_X$ emissions fee to the District in lieu of meeting the specified emissions limits.[14] In most cases, the limits in Rule 4320 are more stringent than in Rule 4306. Rule 4320 is meant to encourage new technology development, and, in some instances, the limits in Rule 4320 have not yet been demonstrated to have been achieved in practice. That is, in some instances, owners/operators will continue to pay an emissions fee until a technology is available to achieve the lower limit and the owner/operator decides to install it.

We consider the current "on-the books" standards to be the Tier 1 standards in Rule 4306 and Rule 4320. To comply with the limits ranging from 9 to 30 ppmv we expect the equipment would need a LNB or ULNB to comply. For refinery units to meet 5 ppmv, we expect the equipment to need SCR.

The District's most recent amendments to Rules 4306 and 4320 were adopted on December 17, 2020. The amendments for both rules introduced a new "on-the way" set of $NO_X$ emission limits (Tier 2) with new compliance deadlines. The Tier 2 $NO_X$ emission limits are slightly lower than the Tier 1 emission limits for certain categories. The Tier 2 limits generally range between 5 to 30 ppmv in Rule 4306 and 2.5 to 9 ppmv in Rule 4320.

The new (Tier 2) limits in Rules 4306 and 4320 are generally based on the use of ULNB and/or SCR. For units between 5 MMBtu/hr and 75 MMBtu/hr, it is assumed units could consider ULNB or SCR, and generally units 75 MMBtu/hr and above are expected to use SCR (but may also use LNB or ULNB). The use of ULNB is associated with reduced fuel efficiency and units above 20 MMBtu/hr are more likely to install SCR to improve fuel efficiency. Rule 4306 has a compliance date of December 31, 2023, for most units and December 31, 2029, for units in five specific subcategories.

The limits achieved by ULNB and SCR are variable and each system is adjusted based on its applicable rule and permit limits. As a result, to achieve the new Tier 2 limits some units will not need to newly install ULNB or SCR but will instead tune existing equipment. In other instances, units with existing LNB or ULNB will need to replace existing burners or newly install SCR to comply because they cannot be tuned to the lowest limits currently being achieved. The District generally set a longer compliance date for units in five specific subcategories if such units already[15] had permit limits lower than the Tier 1 limits applicable under Rule 4306.

---

[14] Additionally, units considered "low use" by limiting their use through permit limits below certain thresholds have less stringent requirements.

[15] Permit limits had to be in place by no later than 6 months after the December 2020 rule amendment date.

The five categories are:

1. A.1b. Fire Tube Units with a total rated heat input > 5.0 MMBtu/hr to ≤ 20.0 MMBtu/hr, permitted less than or equal to 9 ppmv as of 6 months from date of rule amendment;
2. A.5b. All other units permitted less than or equal to 12 ppmv as of 6 months from date of rule amendment;
3. B.1b. Fire Tube Boilers with a total rated heat input > 20.0 MMBtu/hour and ≤ 75 MMBtu/hour permitted less than or equal to 9 ppmv as of 6 months from date of rule amendment;
4. B.2b. All other units with a total rated heat input > 20.0 MMBtu/hour and ≤ 75 MMBtu/hour permitted less than or equal to 9 ppmv as of 6 months from date of rule amendment; and
5. B.3b. Units with rated heat input > 75 MMBtu/hour permitted less than or equal to 7 ppmv as of 6 months from date of rule amendment.

The fee-based compliance option in Rule 4320 remained unchanged from the 2008 to 2020 version of the rule and the fee calculation is still based on annual $NO_X$ emissions from each unit and a fee rate in Rule 9510 as adopted on December 15, 2005. The fee is currently set at $9,350/ton (plus a 4% administrative fee). The compliance deadline for Rule 4320 is December 31, 2023. Because many of the limits in Rule 4320 are now lower, more owner/operators are expected to need to pay the fee beginning December 31, 2023, or further reduce emissions.

*Table III-3. On-the-Books and On-the-Way Control Measures (Boilers, Steam Generators, and Process Heaters)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4306 – Boilers, Steam Generators, and Process Heaters – amended October 16, 2008 *(On-the-books)* | Gaseous fuel or liquid fuel fired boiler, steam generator, or process heater with total rated heat input greater than 5 million Btu per hour | The various limits in the rule apply to different types of units based on use and size but can be achieved using the following control technologies: LNB, ULNB, SCR |
| SJVUAPCD Rule 4306 – Boilers, Steam Generators, and Process Heaters – amended December 17, 2020 *(On-the-way)* | Gaseous fuel or liquid fuel fired boiler, steam generator, or process heater with total rated heat input greater than 5 million Btu per hour | See specific limits and control requirements in Table III-4. Comparison of Existing Control Requirements (Boilers, Steam Generators, and Process Heaters); generally, ULNB and/or SCR needed to comply |
| SJVUAPCD Rule 4320 – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr – amended October 16, 2008 *(On-the-books)* | Gaseous fuel or liquid fuel fired boiler, steam generator, or process heater with total rated heat input greater than 5 million Btu per hour | The various limits in the rule apply to different types of units based on use and size but can be achieved using the following control technologies: ULNB and SCR. Additionally, Rule 4320 contains an option to pay a fee in lieu of complying with the emission limits |
| SJVUAPCD Rule 4320 – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr – amended December 17, 2020 *(On-the-way)* | Gaseous fuel or liquid fuel fired boiler, steam generator, or process heater with total rated heat input greater than 5 million Btu per hour | See specific limits and control requirements in Table III-4. Comparison of Existing Control Requirements (Boilers, Steam Generators, and Process Heaters); control measure varies based on compliance option – contains an option to pay a fee in lieu of complying with the emission limits |

### iii. Opportunities to Strengthen

UNLB and/or SCR are currently considered the best available technologies for this category of equipment. While there could be emerging technologies that achieve similar emissions reductions, we were not able to identify any other technologies that are performing better than UNLB or SCR. Because the requirements "on-the-way" in SJVUAPCD will require these technologies there is limited opportunity for additional measures to be adopted as contingency measures.

To find potential measures to consider as contingency measures we considered the control measures in place in other California jurisdictions such as South Coast Air Quality Management District (SCAQMD)[16] and Ventura County Air Pollution Control District (VCAPCD) that regulate boilers, steam generators and process heaters.[17] These rules are not structured identically across agencies or rules, which can make direct comparison difficult. For example, subcategories are organized differently amongst the rules and SJVUAPCD rules provides multiple compliance options. Table III-3 above summarizes the applicable on-the-books control measures in SJVUAPCD for boilers, steam generators, and process heaters. Table III-4 below summarizes the applicable control measures we identified in other jurisdictions.

Additionally, the Earthjustice Letters identified these examples of potential weaknesses in the existing rules that we consider further below:

- Rule 4306 and 4320 do not contain direct $PM_{2.5}$ limits,
- Rule 4306 and 4320 $NO_X$ limits do not reflect developments in new technology,
- Rule 4320 allows operators to pay a fee instead of adopting controls,
- Rule 4320 allows operators to choose from a menu of controls,
- Electrification of boilers is not required where feasible, and
- Rule 4306 allows a delay in implementation for certain limits.

### A) Require direct $PM_{2.5}$ limits in Rule 4306 and 4320

Requiring direct $PM_{2.5}$ limits is unlikely to result in emissions reductions for this category of units where there are no known add-on particulate matter control devices in use. The equipment in this category consists predominantly of gas-fired units and the majority of these units are expected to burn natural gas. Thus, we do not consider this a potential control measure. In addition, information to set technologically feasible direct $PM_{2.5}$ emissions limits for this equipment type is limited because measuring $PM_{2.5}$ emissions from equipment burning clean fuels (e.g., natural gas) is less common.[18] For example, EPA's New Source Performance Standards (NSPS) typically do not set particulate matter limits for natural gas-fired units. NSPS Db (Standards of Performance for Industrial-Commercial-Institutional Steam Generating Units) and NSPS Dc (Standards of Performance for Small Industrial-Commercial-Institutional Steam Generating Units) exempt units from installing a continuous opacity monitoring system if the affected facility burns only gaseous fuels, which are defined to include natural gas.

---

[16] The SCAQMD is transitioning away from the RECLAIM $NO_X$ trading program to traditional command and control regulation for many of these sources. Accordingly, for the last few decades, many boiler operators in the SCAQMD have had the option to either comply with more stringent $NO_X$ limits, or to pay to purchase tradable credits. For example, SCAQMD Rule 1109.1 was developed as part of the replacement to the RECLAIM program.

[17] We chose the particular agencies to review based on our knowledge of the agencies we anticipate would have the most stringent control measures.

[18] More testing of $PM_{2.5}$ emissions from gas-fired equipment of various sizes would be helpful to categorize the actual direct $PM_{2.5}$ emissions from this source category and potentially could be used to refine the expected impacts in the San Joaquin Valley. Larger units (>75 MMBtu/hr) and those not burning natural gas would be the highest priorities for characterizing direct $PM_{2.5}$ emissions for boilers and process heaters.

### B) Eliminate annual emissions fee compliance option from Rule 4320

Removing the annual emissions fee for this category would not be technologically feasible. Because Rule 4320 is meant to be a technology forcing rule, some of the limits in the rule have not been demonstrated to have been achieved in practice.

For example, several categories in the "on-the way" version of Rule 4320 have lower $NO_X$ emission limits than are required in any other control measures we reviewed. The categories of units that with these lower limits are:

- Category A.1 (fire tube boilers rated > 5 MMBtu/hr and ≤ 20 MMBtu/hr)
    - Rule 4320 limit: 5 ppmv
- Category B (B.1, B.2, and B.3 – boilers > 20 MMBtu/hr)
    - Rule 4320 limit: 2.5 ppmv
- Categories C.1 and C.2 (oilfield steam generators rated > 5 MMBtu/hr and ≤ 75 MMBtu/hr)
    - Rule 4320 limit: 6 ppmv for C.1 and 5 ppmv for C.2
- Categories D.3, D.4, and D.6 (refinery boilers >110 MMBtu/hr, refinery process heaters >5 MMBtu/hr and ≤40 MMBtu/hr, and refinery process heaters >110 MMBtu/hr).
    - Rule 4320 limit: 2.5 ppm for D.3, 5 ppmv for D.4, and 2.5 ppm for D.6

Of these categories, we are not aware that the limits in Rule 4320 have been demonstrated in practice to be achievable for units in categories B.2 (2.5 ppm), B.3 (2.5 ppmv), D.3 (2.5 ppmv), D.4 (5 ppmv), and D.6 (2.5 ppm). Thus, it would be technologically infeasible to remove the compliance fee option for these units where the applicable limit has not been demonstrated in practice.

Similarly, for categories A.1 (5 ppmv), B.1 (2.5 ppmv), C.1 (6 ppmv), and C.2 (5 ppmv), there are very few units that have achieved the Rule 4320 $NO_X$ limits. As of 2020, 11 units out of 550 units (2%) units in these categories were permitted to comply with the Rule 4320 $NO_X$ limits.[19] Given so few units are meeting these technology forcing limits and these limits are not required in other jurisdictions, we are determining it would be technologically infeasible, based on information available to us at this time, to require the remaining 98% to meet these limits by removing the fee compliance option.

The additional categories in Rule 4320 with lower $NO_X$ emission limits for the same categories in Rule 4306 are:

- Category A.5 (all other units with rated heat > 5 MMBtu/hr and ≤ 20 MMBtu/hr),
    - Rule 4320 limit: 5 ppmv
- Category C.3 and C.4 (oilfield steam generators with total rated heat input > 75.0 MMBtu/hr and units firing on less than 50% by volume, PUC quality gas),
    - Rule 4320 limit: 5 ppmv
- Category D.5 (Refinery process heaters with total rated heat input > 40.0MMBtu/hr to ≤ 110.0 MMBtu/hr), and
    - Rule 4320 limit: 5 ppmv

[19] SJVUAPCD, Final Staff Report, "Proposed Amendment to Rule 4306 (Boilers, Steam Generators, and Process Heaters- Phase 3) Proposed amendments to Rule 4320 (Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater Than 5.0 MMBtu/hr)," December 17, 2020, Appendix B: Emissions Reduction Analysis ("Boilers Staff Report: Appendix B").

- Category E. (refinery units limited by a permit to operate to an annual heat input >1.8 billion BTU/hear but ≤ 30 billion Btu/year).
  - Rule 4320 limit: 9 ppmv

As of 2020, 48 units out of 420 units (11%) in these categories were permitted to comply with the Rule 4320 $NO_X$ limits.[20]

### C) Electrification

We did not identify other instances of electrification being required for this size and types of units, nor did we identify manufacturers of electric equipment in this size range. While requiring electrification may be feasible for smaller units (generally less than 1 MMBtu/hr), we are not aware that electrification of units in this range (greater than 5 MMBtu/hr) is currently technologically feasible.

### D) Accelerate the compliance date for certain units in Rule 4306

The EPA explored whether accelerating the compliance dates to between mid-2026 and the end of 2027[21] for the five subcategories of sources that are eligible for an extended 2029 compliance date is feasible as a contingency measure. Rule 4306 only provides an extended compliance deadline for these five subcategories if the units already have a permitted emissions limit that is close to the new Rule 4306 limit. For example, Category A.1.b. Fire Tube Units permitted at less than or equal to 9 ppmv as of 6 months from date of rule amendment have additional time to meet a slightly lower limit of 7 ppmv limit.

It is reasonable to develop this type of compliance framework where operators can be confident that investments in recent equipment upgrades will remain economical as minor advances in ULNB and SCR occur.[22] Thus, a contingency measure that would accelerate these particular compliance dates by 2-3 years would both upset the expectations that operators very recently had to rely upon to invest in particular control strategies, and would undermine operators' confidence in this type of framework in the future, because regulatory uncertainty would make it less likely for future operators facing similar incentives to rely on the regulatory structure and upgrade equipment.

As a result of these considerations, the EPA does not believe that accelerating the compliance timeline for the 5 subcategories of units is a potential contingency measure for the San Joaquin Valley.

### E) Comparison to other jurisdictions, set lower $NO_X$ limits

Table III-4 provides a comparison of the District's on the way measures to the measures applicable in SCAQMD and VCAPCD. We chose these jurisdictions because we believe they are likely to have the most stringent rule limits in the country. We identified several instances where the District's rules could be

---

[20] Boilers Staff Report: Appendix B.

[21] We estimate that the earliest the contingency measure FIP could be triggered is early 2025. For units that only require tuning, we estimate compliance could be achieved within 18 months. On the longer timeline of needing to install SCR, such units would be given 3 years to comply.

[22] We acknowledge that a portion of units with extended compliance dates may need to newly install SCR to comply with the limits applicable after 2029 (versus upgrading existing ULNB or SCR systems). Had we identified removing the compliance timeline as a potential contingency measure, we would have likely found it technologically infeasible for such units to permit, install, and operate SCR within 2 years.

made more stringent and have listed them in Table III-4. Additionally, the Earthjustice Letters stated that Rule 4306 and 4320 $NO_X$ limits do not reflect developments in new technology and that Rule 4320 allows operators to choose from a menu of controls.

Table III-4 lists four categories where we and Earthjustice identified categories where other jurisdictions may have lower $NO_X$ emission limits. Specifically, the Earthjustice letters stated that $NO_X$ emission limits for firetube boilers with total rated heat input between 5 and 20 MMBtu/hr could be lowered and technology such as the Clearsign Core Firetube Boiler Burner can achieve 2.5 ppmv. However, there is only a single operating unit that is achieving the 2.5 ppmv limit and the manufacturer is not providing guarantees of 2.5 ppmv.[23] We consider this control technology to still be in the development phase, and it has not yet been demonstrated as technologically feasible.

We found categories in SCAQMD Rule 1146 and SCAQMD Rule 1109.1 which appear to have more stringent $NO_X$ limits than Rule 4306 and 4320:

- B2. (All other units with a total rated heat input > 20.0 MMBtu/hour and ≤ 75 MMBtu/hour)
    - SJVUAPCD requires these units to meet a limits of 7 ppmv and SCAQMD requires them to meet 5 ppmv. We expect SCR would be installed to meet 5 ppmv $NO_X$ for these units.
- C.3 (Oilfield Steam Generators with a total rated heat input > 75 MMBtu/hr.
    - SJVUAPCD requires these units to meet a limit of 7 ppmv and SCAQMD requires them to meet 5 ppmv. We expect SCR would be installed to meet 5 ppmv $NO_X$.
- Refinery Units: D1. Boiler with a total rated heat input ≤ 40 MMBtu/hr
    - Both Rules 4306 and SCAQMD Rule 1109.1 set a limit of 5 ppm for replacement units, but Rule 4306 does not specify what will constitute a replacement unit, allowing operators to infinitely delay compliance. SCAQMD Rule 1109.1 defines that a unit is considered replaced after, cumulatively, 50 percent or more of its burners have been replaced.
- Refinery Units: D5. Process Heaters with a total rated heat input > 40.0 MMBtu/hr and ≤110 MMBtu/hr
    - The limit in Rule 4306 is 15 ppmv or 9 for replacement units while the limit for this category of units in SCAQMD Rule 1109.1 is 5 ppmv with an interim limit of 18 ppmv. Rule 4306 does not specify what will constitute a replacement unit, allowing operators to infinitely delay compliance.

It would be technologically infeasible to design, permit, install and operate SCR within 2 years of contingency measures being triggered. For example, SCAQMD provided similar units three years to comply.

The Earthjustice letters identify a weakness in Rule 4320 of allowing operators to choose from a menu of controls and specifically cited the $PM_{2.5}$ control requirements in Section 5.4 of Rule 4320 which allow a choice between using specific fuel (gases), limiting sulfur in fuel used, installing an emission control system that reduces sulfur dioxide, or modifying refinery units to reduce sulfur emissions. These different options listed in section 5.4 are all feasible effective controls and redundant of each other and would result in negligible differences in emissions reductions. For example, Rule 4320 defines California

[23] Table of ClearSign ULNO$_X$ Experience List- Boiler Burners, *https://clearsign.com/wp-content/uploads/2023/07/ClearSign-Installed-List-Boiler-Burners.pdf* (accessed July 27, 2023).

Public Utility Commission (PUC) Quality Natural Gas as a gaseous fuel where the sulfur content is no more than one-fourth grain of hydrogen sulfide per one hundred standard cubic feet and no more than five grains of total sulfur per one hundred standard cubic feet. Because the sulfur content of natural gas is so low, uncontrolled $SO_2$ from boilers burning natural gas would be 0.0006 pound per million BTU, which is much lower than the 9 ppmv required in section 5.4.1.3 of Rule 4320.[24]

### *c. Conclusion*

We are not proposing any contingency measures for this category of units. For $PM_{2.5}$, we did not identify any control measures being used that are not required in the San Joaquin Valley for this category of sources, while recommendations to overlap existing requirements would result in negligible reductions. For $NO_X$, we considered several potential measures, but none were identified to be a suitable contingency measure. In many instances, SCR would be required to comply with more stringent requirements, and this would be technologically infeasible within 2 years.

[24] SJVUAPCD, Final Staff Report, "Proposed Amendment to Rule 4306 (Boilers, Steam Generators, and Process Heaters- Phase 3) Proposed amendments to Rule 4320 (Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater Than 5.0 MMBtu/hr)," December 17, 2020, 12.

*Table III-4. Comparison of Existing Control Requirements (Boilers, Steam Generators, and Process Heaters)*

| | **SJVUAPCD Rule 4306** – Boilers, Steam Generators, and Process Heaters as amended December 17, 2020 | **SJVUAPCD Rule 4320** – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr as amended December 17, 2020 | **South Coast AQMD Rule 1146** – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam | **Ventura County APCD Rule 74.15** Boilers, Steam Generators and Process Heaters |
|---|---|---|---|---|
| Applicability | Gaseous fuel or liquid fuel fired boiler, steam generator, or process heater with a total rated heat input greater than 5 million Btu per hour | Gaseous fuel or liquid fuel fired boiler, steam generator, process heater with a total rated heat input greater than 5 million Btu per hour | Boilers, steam generators, and process heaters of equal to or greater than 5 million Btu per hour rated input capacity used in all industrial, institutional, and commercial operations | Portable and stationary boilers, steam generators and process heaters fired on any gaseous fuel or liquid fuel with a rated heat input capacity equal to or greater than 5 million Btu per hour used, except for utility electric power generating units and water heaters |
| A. Units with a total rated heat input > 5.0 MMBtu/hr to ≤ 20.0 MMBtu/hr, except for Categories C through G units | | | | |
| A1. Fire Tube Boilers | 7 ppmv or 0.0085 pounds (lb) per MMBtu (lb/MMBtu) | 5 ppmv or 0.0061 lb/MMBtu | 7 ppmv | 9 ppmv |
| A2. Units at Schools | 9 ppmv or 0.011 lb/MMBtu | 9 ppmv or 0.011 lb/MMBtu | 9 ppmv | 9 ppmv or 12 ppmv |
| A3. Units fired on Digester Gas | 9 ppmv or 0.011 lb/MMBtu | 9 ppmv or 0.011 lb/MMBtu | 15 ppmv | 15 ppmv |
| A4. Thermal Fluid Heaters | 9 ppmv or 0.011 lb/MMBtu | 9 ppmv or 0.011 lb/MMBtu | 12 ppmv | 9 ppmv or 12 ppmv |
| A5. All other units | 9 ppmv or 0.011 lb/MMBtu | 5 ppmv or 0.011 lb/MMBtu | 9 ppmv | 9 ppmv or 12 ppmv |

| | **SJVUAPCD Rule 4306** – Boilers, Steam Generators, and Process Heaters as amended December 17, 2020 | **SJVUAPCD Rule 4320** – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr as amended December 17, 2020 | **South Coast AQMD Rule 1146** – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam | **Ventura County APCD Rule 74.15** Boilers, Steam Generators and Process Heaters |
|---|---|---|---|---|
| B. Units with a total rated heat input > 20.0 MMBtu/hr, except for Categories C through G units | | | | |
| B1. Fire Tube Boilers with a total rated heat input > 20.0 MMBtu/hr and ≤ 75 MMBtu/hr | 7 ppmv or 0.0085 lb/MMBtu | 2.5 ppmv or 0.003 lb/MMBtu | 7 ppmv | 9 ppmv |
| B2. All other units with a total rated heat input > 20.0 MMBtu/hr and ≤ 75 MMBtu/hour | 7 ppmv or 0.0085 lb/MMBtu | 2.5 ppmv or 0.003 lb/MMBtu | 9 ppmv for units with previous $NO_X$ limit less than or equal to 12 and greater than 5 ppmv prior to 12/7/18 or 5ppmv | 9 ppmv or 12 ppmv |
| B3. Units with a rated heat input > 75 MMBtu/hr | 5 ppmv or 0.0061 lb/MMBtu | 2.5 ppmv or 0.003 lb/MMBtu | 5 ppmv | 9 ppmv or 12 ppm |
| C. Oilfield Steam Generators | | | | |
| C1. Units with a total rated heat input > 5.0 MMBtu/hr and ≤ 20.0 MMBtu/hr [A] | 9 ppmv or 0.011 lb/MMBtu | 6 ppmv or 0.0073 lb/MMBtu | 9 ppmv for all others | 9 ppmv |

| | **SJVUAPCD Rule 4306** – Boilers, Steam Generators, and Process Heaters as amended December 17, 2020 | **SJVUAPCD Rule 4320** – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr as amended December 17, 2020 | **South Coast AQMD Rule 1146** – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam | **Ventura County APCD Rule 74.15** Boilers, Steam Generators and Process Heaters |
|---|---|---|---|---|
| C2. Units with a total rated heat input > 20.0 MMBtu/hr and ≤ 75.0 MMBtu/hr (90% are 62.5 MMBtu/hr) | 9 ppmv or 0.011 lb/MMBtu | 5 ppmv or 0.011 lb/MMBtu | 9 ppmv | 9 ppmv |
| C3. Units with a total rated heat input > 75.0 MMBtu/hr (98% are 85 MMBtu/hr) | 7 ppmv or 0.0085 lb/MMBtu | 5 ppmv or 0.011 lb/MMBtu | 5 ppmv | 9 ppmv |
| C4. Units firing on less than 50%, by volume, PUC quality gas | 15 ppmv or 0.018 lb/MMBtu | 5 ppmv or 0.011 lb/MMBtu | No equivalent | No equivalent |
| D. Refinery Units | | | | |
| D1. Boilers with a total rated heat input > 5.0 MMBtu/hr and ≤ 40.0 MMBtu/hr | 30 ppmv or 0.036 lb/MMBtu AND 5 ppmv or 0.0061 lb/MMBtu for replacement units | 5 ppmv or 0.0061 lb/MMBtu | 40 ppmv and 5 ppmv for replacement units* | N/A |

| | **SJVUAPCD Rule 4306** – Boilers, Steam Generators, and Process Heaters as amended December 17, 2020 | **SJVUAPCD Rule 4320** – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr as amended December 17, 2020 | **South Coast AQMD Rule 1146** – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam | **Ventura County APCD Rule 74.15** Boilers, Steam Generators and Process Heaters |
|---|---|---|---|---|
| D 2. Boilers with a total rated heat input > 40.0 MMBtu/hr and ≤110 MMBtu/hr | 9 ppmv or 0.011 lb/MMBtu AND 5 ppmv or 0.0061 lb/MMBtu for replacement units | 5 ppmv or 0.0061 lb/MMBtu | 5 ppmv* | N/A |
| D3. Boilers with a total rated heat input >110 MMBtu/hr | 5 ppmv or 0.0061 lb/MMBtu | 2.5 ppmv or 0.003 lb/MMBtu | 5 ppmv* with an interim limit of 7.5 ppmv | N/A |
| D4. Process Heaters with a total rated heat input > 5.0 MMBtu/hr and ≤ 40.0 MMBtu/hr | 30 ppmv or 0.036 lb/MMBtu AND 9 ppmv or 0.011 lb/MMBtu for replacement units | 5 ppmv or 0.0061 lb/MMBtu | 40 ppmv and 9 ppmv for replacement units * | N/A |
| D5. Process Heaters with a total rated heat input > 40.0 MMBtu/hr and ≤110 MMBtu/hr | 15 ppmv or 0.018 lb/MMBtu AND 9 ppmv or 0.011 lb/MMBtu for replacement units | 5 ppmv or 0.0061 lb/MMBtu | 5 ppmv* with an interim limit of 18 ppmv | N/A |
| D6. Process Heaters with a total rated heat input >110 MMBtu/hr | 5 ppmv or 0.0061 lb/MMBtu | 2.5 ppmv or 0.003 lb/MMBtu | 5 ppmv* with an interim limit of 22 ppmv | N/A |
| E. Low Use Units | | | | |

| | **SJVUAPCD Rule 4306** – Boilers, Steam Generators, and Process Heaters as amended December 17, 2020 | **SJVUAPCD Rule 4320** – Advanced Emission Reduction Options for Boilers, Steam Generators, and Process Heaters Greater than 5.0 MMBtu/hr as amended December 17, 2020 | **South Coast AQMD Rule 1146** – Emissions of Oxides of Nitrogen from Industrial, Institutional, and Commercial Boilers, Steam | **Ventura County APCD Rule 74.15** Boilers, Steam Generators and Process Heaters |
|---|---|---|---|---|
| E. Units limited by a Permit to Operate to an annual heat input of 9 billion Btu/year to 30 billion Btu/year "Low Use" (no more than 10 percent operating capacity) | 30 ppmmv or 0.036 lb/MMBtu | 9 ppmv or 0.011 lb/MMBtu<br><br>* Units limited by a Permit to Operate to an annual heat input >1.8 billion Btu/year but < 30 billion Btu/year | Operate units so stack is maintained with gas oxygen concentrations less than or equal to three percent on a dry basis for 15 min averaging period<br><br>Tune units at least twice a year or follow different tune up procedure | Operate units so stack is maintained with gas oxygen concentrations less than or equal to three percent on a dry basis for 15 min averaging period<br><br>Tune units at least twice a year or follow different tune up procedure |
| Liquid fueled units | 40 ppmv | 40 ppmv | 40 ppmv | 40 ppmv |
| PM Control Requirements | None specified | • Gaseous fuels must be public utility quality<br>• Sulfur content limits or operate an $SO_2$ control system<br>Liquid fuels only to be used during gas curtailment periods | None specified | None specified |

*These emission limits are from South Coast AQMD Rule 1109.1 Emissions of Oxides of Nitrogen from Petroleum Refineries and Related Operations, which was locally adopted on November 5, 2021 and not yet approved into the SIP.

## 2. Reciprocal Internal Combustion Engines – Nonroad Engines

### *a. Overview*

Reciprocating internal combustion engines used in nonroad applications are used in a wide array of industries, including electricity generation (either as stand-alone generators or in cogeneration applications); oil and gas production; agriculture; and commercial/institutional settings (including as back-up electricity generators). $NO_X$ and $PM_{2.5}$ emissions are generated by engines combusting either gaseous or liquid fuels.

As summarized in Table III-5, from the San Joaquin Valley 2023 $PM_{2.5}$ emissions inventory, engines contributed 5.3 tpd of $NO_X$ and 0.29 tpd of $PM_{2.5}$ emissions. Regarding $NO_X$, engines used in the food and agriculture sector contribute 64% of emissions (e.g., from water pumps in crop fields). Nearly all those emissions come from diesel-fired engines.

*Table III-5. Nonroad Engine Emissions Inventory Contributions*

| **Industry** | **$NO_X$ (tpd)** | **$PM_{2.5}$ (tpd)** |
|---|---|---|
| Electric Utilities | 0.040 | 0.016 |
| Cogeneration | 0.002 | 0.002 |
| Oil & Gas Production | 0.60 | 0.026 |
| Petroleum Refining | 0.002 | 0.0013 |
| Manufacturing & Industrial | 0.39 | 0.047 |
| Food & Agricultural Products | 3.4 | 0.14 |
| Service & Commercial | 0.39 | 0.049 |
| Other | 0.51 | 0.007 |
| **Total** | **5.3** | **0.29** |

### *b. Evaluation*

Available control technologies for nonroad engines are summarized below for the four types of engine configurations. Each engine type produces emissions of $NO_X$ and $PM_{2.5}$ at different rates and can have differing approaches for controlling emissions.

- Compression-ignition (CI) engines: primarily diesel engines but could also be dual-fuel (diesel and natural gas) engines; particulate matter emissions can be controlled by diesel particulate filters (DPF) and limiting fuel sulfur content; $NO_X$ can be controlled with either combustion controls[25] and/or exhaust treatment (oxidation catalyst as part of a DPF (also called a diesel oxidation catalyst) and SCR);
- Spark-ignition (SI) four-stroke rich burn engines: primarily natural gas; $NO_X$ emissions are inherently lower from rich burn engines (compared to lean burn), add-on controls include three-way catalysts (also known as non-selective catalytic reduction (NSCR)); particulate matter emissions from burning natural gas are inherently low enough that any control approach generally focuses only on limiting fuel sulfur content;

[25] For example, exhaust gas recirculation.

- SI four-stroke lean burn: primarily natural gas; $NO_X$ emissions can be controlled by combustion techniques or exhaust controls, such as SCR; particulate matter emissions from burning natural gas are inherently low enough that any control approach generally focuses only on limiting fuel sulfur content; and
- SI two-stroke lean burn: primarily natural gas; typically, combustion controls are applied to reduce $NO_X$, including layered combustion[26]; as with other SI engines fired on natural gas, particulate matter emissions are inherently low enough that any control approach generally focuses only on limiting fuel sulfur content.

Existing federal regulations require stationary CI nonroad engines to be certified by manufacturers to the EPA's tiered engine standards (Tiers 1-4, where Tier 4 is the most stringent).[27] Since 2014, new CI engines must be certified to Tier 4 standards.[28] However, EPA's regulations do not require owners/operators to replace older engines that are uncertified or certified to lower tier levels. Typically, EPA-certified Tier 4 engines are not required to install additional controls to meet BACT/LAER requirements for $NO_X$ and PM. A review of the RACT/BACT/LAER Clearinghouse (RBLC) did not identify any "beyond Tier 4" controls to consider for CI engines.

Existing federal regulations require stationary SI engine to meet emissions standards, but do not require all new SI engines to be EPA-certified to those standards. Like CI engines, these regulations do not require owner/operators to replace older engines or upgrade engines to meet the most recent standards. However, to meet BACT/LAER determinations for $NO_X$, the addition of add-on $NO_X$ controls is often required (SCR or a NSCR, depending on engine type).[29] Because SI engines typically burn clean gaseous fuels, add-on particulate matter controls are not required to meet BACT/LAER.

Table III-6 below summarizes the applicable on-the-books and on-the-way control measures applicable in SJVUAPCD for nonroad engines.

[26] In a layered or stratified charge arrangement: a pre-stratified control kit is applied that results in lower combustion temperatures and lower $NO_X$ formation. EPA has also included the following as example technologies that could be considered layered stratification: turbochargers and inter-cooling, pre-chamber ignition or high energy ignition, improved fuel injection control, air/fuel ratio control.
[27] See 40 CFR part 60, Subparts IIII and 40 CFR part 1039.
[28] Except for engines qualifying as emergency engines, which must be certified to Tier 2 or Tier 3 standards.
[29] *https://cfpub.epa.gov/rblc/index.cfm?action=Search.BasicSearch&lang=en*

*Table III-6. On-the-Books and On-the-Way Control Measures in SJVUAPCD (Nonroad Engines)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4701 – Internal Combustion Engines (last amended 8/21/2003) | Internal combustion engines >50 brake horsepower (bhp) that require permits to operate (PTO) | Limits $NO_X$ emissions by engine type, application and location. Compliance dates between 1997 and 2001. $NO_X$ limits between 50 ppm and 300 ppm (see below). Detailed limits not included because Rule 4702 contains equivalent or more stringent limits. Engines used in agricultural operations are exempt from Rule 4701, but not Rule 4702. |
| SJVUAPCD Rule 4702 – Internal Combustion Engines (last amended 8/19/2021) | Internal combustion engines >/=25 bhp | Provides separate emissions limits for both engines in agricultural operations (AO) and non-AO engines; controls needed vary depending on engine type, could be combustion modifications, NSCR, or SCR; *On-the-books* and *on-the-way* measures described below |
| *On-the-books* in Rule 4702 | SI engines, rich burn in non-agricultural operations | Waste-gas fueled: 50 ppm $NO_X$<br><br>Cyclic loaded, field gas fueled (oil wells): 50 ppm $NO_X$<br><br>Limited use: 50 ppm $NO_X$<br><br>All others: 11 ppm $NO_X$ (assume 3-way catalyst required) |
| *On-the-way* in Rule 4702 | SI engines, rich burn in non-agricultural operations | Waste gas fueled, cyclic loaded field gas fueled, limited use: 11 ppm $NO_X$ (assume 3-way catalyst required) |
| *On-the-books* in Rule 4702 | *On-the-books* for SI engines, rich burn used in agricultural operations | 90 ppm or 80% reduction (unless certified and installed before 6/15/2005, then HC+NOX < 0.6 g/bhp-hr) |
| | *On-the-way* for SI engines, rich burn used in agricultural operations | 0.15 g/bhp-hr or 11ppm $NO_X$ (assume 3-way catalyst required) |

| Rule | Applicability | Control Measure |
|---|---|---|
| *On-the-books* in Rule 4702 | SI Engines, Lean Burn in Non-Agricultural Operations | 2-stroke, gaseous fueled, < 100 hp: 75 ppm $NO_X$<br><br>Limited use: 65 ppm NOX<br><br>Used for gas compression: 65 ppm or 93% reduction<br><br>Waste gas fueled: 65 ppm or 90% reduction<br><br>All others: 11 ppm $NO_X$ (assume SCR required) |
| *On-the-way* in Rule 4702 | SI engines, lean burn used in non-agricultural operations | Used for gas compression or waste gas fueled: 40 ppm $NO_X$<br><br>Limited use: 11 ppm $NO_X$ (assume SCR required) |
| *On-the-books* in Rule 4702 | SI engines, lean burn in agricultural operations | 150 ppm or 70% reduction (unless certified and installed before 6/15/2005, then HC+NOX < 0.6 g/bhp-hr) |
| *On-the-way* in Rule 4702 | SI engines, lean burn used in agricultural operations | 0.6 g/bhp-hr or 43 ppm |
| *On-the-books* in Rule 4702 | Diesel engines, non-certified, installed before 1/1/2015 | 50 bhp – 500 bhp: EPA Tier 3 or 4<br><br>>500 bhp to 750 bhp and <1000 annual operating hours: EPA Tier 3<br><br>>750 bhp and <1000 annual operation hours: EPA Tier 4 |
| *On-the-way* in Rule 4702 | Diesel engines, non-certified, installed before 1/1/2015 | No requirement for engines subject to Tier 3 standards to meet Tier 4 standards |
| *On-the-books* in Rule 4702 | Diesel engines, certified Tier 1 or Tier 2 | EPA Tier 4 (highest tier level) |
| *On-the-books* in Rule 4702 | Diesel engines, certified Tier 3 or Tier 4 | Meet applicable tier standard at time of installation |

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| *On-the-way* in Rule 4702 | Diesel engines | No requirement for Tier 3 certified to meet Tier 4 standards |
| *On the way i*n Rule 4702 | | The option to pay a fee instead of comply with $NO_X$ limits expires 12/31/2023. |
| *On-the-books* in CARB Stationary Diesel Engine Airborne Toxic Control Measures (ATCM)[30] | Diesel engines >50 bhp | Fuel standards, $NO_X$ limits that are the same as EPA certification standards; sets particulate matter limits beyond federal standards, including for agricultural engines, DPF expected to be needed to comply |
| *On-the-way* in CARB Stationary Diesel Engine ATCM | | No *on-the-way* measures in the ATCM |

Summary of Control Measures Applicable to Nonroad Engines in the San Joaquin Valley

For $PM_{2.5}$ emissions, California's ATCM for stationary diesel engines establishes particulate matter emissions limits for new and existing diesel-fired engines. Because *existing* engines are required to comply, this standard sets more stringent requirements than existing federal standards for particulate matter that generally only apply to new diesel engines. We expect most diesel engines have been equipped with a DPF to meet these standards.

For $NO_X$ emissions, beginning with engine model year 2014, new nonroad CI engines have been required to be certified to the EPA's Tier 4 standards.[31] SJVUAPCD requires existing CI engines to meet Tier 3 or 4 standards, and any newly installed engines to meet EPA Tier 4 standards. Upgrading any remaining Tier 3 engines to Tier 4 standards is expected to require the addition of SCR.

[30] *https://ww2.arb.ca.gov/sites/default/files/classic/diesel/documents/finalreg2011.pdf*
[31] Exception for emergency engines that are subject to Tier 2 or Tier 3 standards.

For SI engines, SJVUAPCD will require most SI engines to meet a $NO_X$ limit of 11 ppmv. To meet this limit, we expect add-on $NO_X$ controls will be needed to comply (either SCR or 3-way catalyst). The exceptions to this are the following limits/categories:

- SI engines, lean burn, used for gas compression or are waste gas fueled (>50% waste gas): 40 ppmv $NO_X$
- SI engines, lean burn used in agricultural operations: 0.6 g/bhp-hr[32] or 43 ppmv $NO_X$

If these lean burn engines were subject to the lower 11 ppmv $NO_X$ limit, we would expect SCR would need to be installed to comply.

Review of Control Measures fo Nonroad Engines in Other Jurisdictions

Table III-7 below compares and summarizes the applicable control measures in SJVUAPCD with the requirements in other jurisdictions. Our evaluation included the South Coast Air Quality Management District (SCAQMD), the Sacramento Metropolitan Air Quality Management District (SMAQMD), and the Maricopa County Air Quality Department (MCAQD).

The control measures required by SJVUPACD are closest to those required by the SCAQMD, which requires most engines to meet an 11 ppm $NO_X$ limit. Under SCAQMD's rule, some engines used in agricultural operations can be exempt from this requirement if a Tier 4 diesel engine is installed (and other requirements are met). Overall, the SCAQMD's regulation is designed to incentivize electrification. The SJVUAPCD's *on-the-way* measures may have a similar effect for those engines that will need to install SCR to comply. However, as described above and summarized below, some engines in the San Joaquin Valley are not expected to need SCR to comply and do not have *on-the-way* control measures that we anticipate would require installation of SCR:

- Existing diesel engines meeting EPA's Tier 3 standards;
- Lean burn SI engines that (1) are for gas compression, (2) burn gaseous waste fuel, or (3) are used in agricultural operations.

However, installation of SCR as a contingency measure is not expected to be able to achieve reductions within 1-2 years of being triggered. While passive $NO_X$ control methods, like 3-way catalysts or modified combustion techniques, are simpler to install and should be able to achieve reductions within 2 years, SCR (requiring ammonia/urea injection) typically needs a longer lead time to design and install. For example, SCAQMD Rule 1110.2 was amended on February 1, 2008 and provided more than 2 years to meet the 11 ppm $NO_X$ limit (July 1, 2010 for larger units and July 1, 2011 for smaller units).[33]

[32] This emissions limit appears to be equivalent to the lowest $NO_X$ limit an SI engine can be certified to under 40 CFR part 1048. A review of EPA's certified engines data indicates add-on controls is not needed to meet this standard; *https://www.epa.gov/compliance-and-fuel-economy-data/annual-certification-data-vehicles-engines-and-equipment.* See spreadsheet for Small Nonroad Spark Ignition (NRSI) Engines, Model Years 2011- Present; May 2023.
[33] *http://www.aqmd.gov/docs/default-source/rule-book/support-documents/rule-1110_2/compliance-guide-to-rule-1110-2.pdf*; see page 3, Table VIa.

Recommendations Reviewed from the Earthjustice Letters

- Remove the compliance fee option prior to December 31, 2023.
  - This date will have passed prior to contingency measures potentially being triggered.
- A new program of electrification should be considered to force conversion at the most feasible locations.
  - Similar to the approach used by SCAQMD, this could be incentivized by requiring all remaining units to meet limits that would require installation of the best available technology. As discussed above, the remaining units without such controls would need to install SCR. However, as described above, we believe SCR would be technologically infeasible to install within 2 years.
- Update the District's BACT guidelines for emergency diesel engines.
  - The District's BACT guidelines are not a part of a rule or regulation and would not make for a suitable contingency measure. But, the use of Tier 4 certified or Tier 4 compliant diesel engines for emergency use applications has been demonstrated in practice and should be considered in BACT determinations.
- Consider diesel oxidation catalyst and DPFs
  - These technologies are considered above.
- Consider "lean $NO_X$ catalyst"
  - A review of the material cited, indicates that this technology would achieve significantly less reductions as typical SCR. Limited information was presented regarding this technology, and we are not aware that it has progressed beyond the research and development stage.

*c. Conclusion*

We are not proposing any contingency measures for nonroad engines. While there appear to be nonroad engines in the San Joaquin Valley that could meet lower limits by installing SCR, we expect it would be technologically infeasible within 2 years to install SCR and begin to obtain reductions. Contingency measures should be measures that would result in the projected emission reductions within a year after the triggering event, or within two years with proper justification. A contingency measure that will not result in emissions until further in the future would not serve the purpose of contingency measures to provide additional emission reductions during the period that the state should be developing a new SIP submission to address the failure that triggered the contingency measure.

*Table III-7. Comparison of Existing Control Requirements (Reciprocal Internal Combustion Engines)*

| | **SJVUAPCD Rule 4702 – Internal Combustion Engines** | **SCAQMD Rule 1110.2 – Emissions from Gaseous and Liquid-Fueled Engines** | **SMAQMD Rule 412 – Stationary Internal Combustion Engines Located at Major Sources of $NO_X$** | **Maricopa County, AZ Rule 324 – Stationary Reciprocating Internal Combustion Engines** | **CA ATCM for Diesel Stationary RICE** |
|---|---|---|---|---|---|
| Applicability (Equipment, size, fuel type) | All internal combustion engines >50 bhp*<br><br>*for non-AO engines >25 to </=50 bhp, if non-certified, these may not be offered for sale. | Any internal combustion engine rated >50 bhp | Stationary IC engines rated >50 bhp located at major sources of $NO_X$*<br><br>*Major sources have potential to emit >25 tons/yr | Stationary IC engines >125 bhp used for cogeneration; located not at a major $NO_X$ source<br><br>Stationary IC engines >50 bhp used for cogen not at a major $NO_X$ source if all engines aggregate to more than 125 bhp<br><br>Stationary IC engines >50 bhp at major $NO_X$ sources<br><br>Nonroad engines >125 bhp with potential to emit: 0.5 tons/yr $PM_{2.5}$; 1.0 tons/yr $NO_X$, 0.5 tons/yr VOC; or 1.0 tons/yr CO. | All stationary diesel engines >50 bhp |

| | SJVUAPCD Rule 4702 – Internal Combustion Engines | SCAQMD Rule 1110.2 – Emissions from Gaseous and Liquid-Fueled Engines | SMAQMD Rule 412 – Stationary Internal Combustion Engines Located at Major Sources of $NO_X$ | Maricopa County, AZ Rule 324 – Stationary Reciprocating Internal Combustion Engines | CA ATCM for Diesel Stationary RICE |
|---|---|---|---|---|---|
| **Control Measure** | | | | | |
| $NO_X$ emissions limit(s) | Non-AO Spark-Ignited (SI) engines by 12/31/2023:<br><br>1. Rich-burn:<br>a. 11 ppmv<br>2. Lean-burn:<br>a. Gas compression engines: 40 ppmv<br>b. >50% waste gas: 40 ppmv<br>c. Others: 11 ppmv<br>AO SI Engines:<br><br>• Rich-burn (by 12/31/2023): 11 ppmv or 0.15 g/bhp-hr<br>• Lean-burn (by 12/31/2029): 0.6 g/bhp-hr or 43 ppmv | Stationary engines with approved emission control plan: 11 ppmv<br><br>Other stationary engines without an emission control plan, biogas-fired: 11 ppmv<br><br>Limits for low-use engines*:<br><br>• < 500 bhp = 45 ppmv<br>• >/= 500 bhp = 36 ppmv<br><br>*low use engines <500 HOP/yr or 1 billion Btu's per year. Slightly higher limits are also applicable to landfill or biogas fired engines to account for efficiency. | SI rich-burn: 25 ppmv or 90% control<br><br>SI lean-burn: 65 ppmv or 90% control<br><br>CI: 80 ppmv or 90% control | CI engines >250 bhp: 530 ppmv<br><br>CI engines >399 bhp: 550 ppmv<br><br>(at major sources, all CI: 530 ppmv<br><br>SI lean-burn: 110 ppmv<br><br>SI rich-burn: 20 ppmv | Generally the same as EPA certified standards |

| | **SJVUAPCD Rule 4702 – Internal Combustion Engines** | **SCAQMD Rule 1110.2 – Emissions from Gaseous and Liquid-Fueled Engines** | **SMAQMD Rule 412 – Stationary Internal Combustion Engines Located at Major Sources of $NO_X$** | **Maricopa County, AZ Rule 324 – Stationary Reciprocating Internal Combustion Engines** | **CA ATCM for Diesel Stationary RICE** |
|---|---|---|---|---|---|
| | Certified AO and non-AO compression-ignited (CI) engines (no later than 6/1/2018):<br><br>• EPA certified Tier 1 or 2: EPA Tier 4<br>• EPA certified Tier 3 or 4: CI standard in effect at time of installation<br><br>Non-certified AO and non-AO CI engines (by 2011):<br><br>• 50 – 500 bhp: EPA Tier 3 or Tier 4<br>• 500 – 750 bhp and <1000 annual HOP: EPA Tier 3<br>• >750 bhp and <1000 annual HOP: EPA Tier 4 | Non-emergency electrical generators: 2.5 ppmv or 0.070 lb/MWh<br><br>Note: agricultural and non-agricultural engines held to the same standards but different compliance schedules applied. | | | |

| | **SJVUAPCD Rule 4702 – Internal Combustion Engines** | **SCAQMD Rule 1110.2 – Emissions from Gaseous and Liquid-Fueled Engines** | **SMAQMD Rule 412 – Stationary Internal Combustion Engines Located at Major Sources of $NO_X$** | **Maricopa County, AZ Rule 324 – Stationary Reciprocating Internal Combustion Engines** | **CA ATCM for Diesel Stationary RICE** |
|---|---|---|---|---|---|
| PM control requirements | SI engines: control via sulfur limits<br><br>CI engines: via applicable EPA Tier requirements | None specified<br><br>CI engines: via applicable EPA Tier requirements | None specified<br><br>CI engines: via applicable EPA Tier requirements | CI: 0.40 g/bhp-hr<br><br>All SI: not applicable<br><br>CI engines: via applicable EPA Tier requirements (generally lower than 0.40 g/bhp-hr) | CI: 0.02 – 0.03 g/kW-hr, compliance deadlines vary based on engine type and whether considered new or in-use (equal to or more stringent than federal standards) |
| Exemptions (to $NO_X$ or particulate matter emissions limits) | • Engines used to propel implements of husbandry<br>• Engines used exclusively to power wind machines<br>• Some de-rated AO and non-AO engines with de-rating before 6/1/2005 (below 50 bhp)<br>• Engines powering mobile agricultural equipment<br>• State-registered or Rule 2280 registered portable equipment engines | • Engines powering orchard wind machines<br>• Emergency standby engines, engines use for fire-fighting and flood control, and any other emergency engines limited to 200 hours/yr<br>• Laboratory engines<br>• Engines used for performance testing<br>• Auxiliary engines used to power other engines/ turbines during start-ups | • Emergency standby engines<br>• Engines used exclusively for agricultural purposes<br>• Engine test stands<br>• Engine control evaluations<br>• Nonroad engines<br>• Motor vehicle engines<br>• Flight line engines<br>• Low use engines:<br>○ SI: varies by engine size, range is 40-200 hours/yr | • Emergency standby engines used for power, emergency services, sewage overflow<br>• Compressed gas stationary RICE used for solar testing and research<br>• Engine performance verification, including at the production facility<br>• Engine development and testing<br>• Flight line engines<br>• Nonroad engines<br>• Low use engines: | Some emergency engines not required to install particulate matter controls |

| | SJVUAPCD Rule 4702 – Internal Combustion Engines | SCAQMD Rule 1110.2 – Emissions from Gaseous and Liquid-Fueled Engines | SMAQMD Rule 412 – Stationary Internal Combustion Engines Located at Major Sources of $NO_X$ | Maricopa County, AZ Rule 324 – Stationary Reciprocating Internal Combustion Engines | CA ATCM for Diesel Stationary RICE |
|---|---|---|---|---|---|
| | • Emergency standby or low use engines<br>• Public safety equipment | • Portable engines registered under state registration (Title 13, Article 5 of CCR)<br>• Agriculture stationary engines that: cannot get electrical service or operator does not qualify for state funding under CA Health and Safety Code Section 44229; and replace engines with Tier 4 replacement engines; and does not operate the Tier 4 engines in a manner to exceed the not-to-exceed standards of 40 CFR Part 1039 Section 1039.101(e).<br>• Some additional exemptions also | ○ CI: varies by engine size, range is 200-1,435 hours/yr | ○ Engines </=1000 bhp operating <200 hours/yr<br>○ Engines >1000 bhp operating <100 hours/yr | |

| | SJVUAPCD Rule 4702 – Internal Combustion Engines | SCAQMD Rule 1110.2 – Emissions from Gaseous and Liquid-Fueled Engines | SMAQMD Rule 412 – Stationary Internal Combustion Engines Located at Major Sources of $NO_X$ | Maricopa County, AZ Rule 324 – Stationary Reciprocating Internal Combustion Engines | CA ATCM for Diesel Stationary RICE |
|---|---|---|---|---|---|
| | | apply (see the Rule section (i). | | | |
| $NO_X$ emissions compliance alternative | Payment of $NO_X$ emissions fee in lieu of meeting the emissions limits: sunsets 12/31/2023 after which engines must meet limits for non-AO SI engines | None listed. | | | |

## 3. Combustion Turbines

### *a. Overview*

Industries operating in the San Joaquin Valley that use combustion turbines include the following: electric utilities; cogeneration; oil and gas production; food and agriculture; and commercial operations. Most often combustion turbines are used to generate power for supplying the electrical grid or for on-site use. Natural gas and diesel/distillate oil are the most common fuels combusted, however, other fuels used in the San Joaquin Valley according to the emissions inventory include jet naphtha, jet A fuel, and other, unspecified fuels.

$NO_X$ and $PM_{2.5}$ emissions result from fuel combustion. Daily emissions in tpd are summarized below by industry along with their percent contribution to total inventoried San Joaquin Valley emissions for all sources.

*Table III-8. Combustion Turbine Emissions Inventory Contributions*

| **Industry** | **$PM_{2.5}$ (tpd)** | **$NO_X$ (tpd)** |
|---|---|---|
| Electric Utilities | 0.75 | 1.3 |
| Cogeneration | 0.33 | 0.71 |
| Oil and Gas Production | 0.0007 | 0.007 |
| Food and Agriculture | 0.004 | 0.003 |
| Service and Commercial | 0.054 | 0.24 |
| **Total** | **1.1** | **2.2** |

### *b. Evaluation*

Over 85% of $NO_X$ emissions for this category are attributable to natural gas-fired combustion turbines used for electricity generation and combined heat and power (cogeneration). Control of $NO_X$ from combustion turbines can be accomplished using combustion controls, such as water or steam injection, dry low $NO_X$ and ultra-low $NO_X$ burners (DLN and ULN); or post-combustion controls, typically selective catalytic reduction (SCR).[34] It is common for both control technologies to be applied (e.g. DLN + SCR + oxidation catalyst).

In the San Joaquin Valley, emissions from combustion turbines are mainly regulated by Rule 4703 (Stationary Gas Turbines), last amended in September 2007. This rule applies to all stationary gas turbines that are rated equal to or greater than 0.3 megawatts (MW) or with a maximum heat input of 3.0 MMBtu/hr. "Gas turbines" can be fired on gaseous or liquid fuels. Laboratory units used for research or testing purposes; firefighting or flood control units; and emergency standby units used <100 hours/yr are exempt from the rule.

Rule 4703 establishes limits for $NO_X$ emissions based on unit size and fuel type (gas or oil). The rule contains three different $NO_X$ emissions tiers applicable to all units, and each tier has its own compliance date and $NO_X$ emissions limits. Emissions limits are expressed on a volume basis (ppmv at 15% $O_2$).[35] The

[34] *https://www.epa.gov/system/files/documents/2022-03/combustion-turbine-nox-technology-memo.pdf*
[35] Note that all volume-based $NO_X$ limits in this document are specified at dry conditions and 15% $O_2$.

emissions limits shown below are the Tier 3 limits that went into effect in the 2010-2012 timeframe.[36] Note that any unit that achieves at least 95% $NO_X$ control is considered to meet the Tier 3 $NO_X$ compliance limits. Tier 2 $NO_X$ limits are listed for combined cycle plants since these were not updated for Tier 3. The currently applicable emission limits under Rule 4703 are further detailed in Table III-9.

*Table III-9. On-the-Books and On-the-Way Control Measures (Combustion Turbines)*

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| SJVUAPCD Rule 4703 | Applies to stationary gas turbines > 0.3 MW or with maximum heat input >3.0 MMBtu/hr;<br><br>Exemptions: Laboratory units, firefighting or flood control units, emergency standby units used <100 hr/yr | See $NO_X$ limits identified below. |
| *On-the-books* | <3 MW | Gas-fired: 9 ppmv<br>Liquid-fired: 25 ppmv<br>(Assume ULNB used to comply) |
| *On-the-books* | 3 – 10 MW pipeline turbine | Gas-fired: 8 ppmv (steady state), 12 ppmv (non-steady state)<br>Liquid-fired – 25 ppmv<br>(Assume ULNB used to comply) |
| *On-the-books* | 3 – 10 MW, all others operated <877 hrs/yr | Gas-fired – 9 ppmv;<br>Liquid-fired 25 ppmv<br>(Assume ULNB used to comply) |
| *On-the-books* | 3 – 10 MW, all others operated >877 hrs/yr | Gas-fired: 5 ppmv<br>Liquid-fired 25 ppmv<br>(Assume SCR used to comply) |
| *On-the-books* | >10 MW, simple cycle operated <=200 hr/yr | Gas-fired: 25 ppmv;<br>Liquid-fired: 42 ppmv |
| *On-the-books* | >10 MW, simple cycle operated >200 hr/yr but no greater than 877 hr/yr | Gas-fired 5 ppmv<br>Liquid-fired 25 ppmv<br>(Assume SCR used to comply) |

[36] Operators with no more than 2 units had to achieve compliance by 10/01/2011 or within 90 days of the next major overhaul after 7/1/2009. Since major overhauls are generally needed every 3 to 5 years, all of these operators should be in compliance with the Tier 3 limits by now.

| Rule | Applicability | Control Measure |
|---|---|---|
| *On-the-books* | >10 MW, simple cycle operated >877 hr/yr | Standard compliance: Gas-fired 5 ppmv; liquid-fired 25 ppmv<br>Enhanced compliance: Gas-fired 3 ppmv; Liquid-fired 25 ppmv<br><br>(Assume SCR used to comply) |
| *On-the-books* | >10 MW combined cycle | Standard compliance: Gas-fired 5 ppmv; liquid-fired 25 ppmv<br>Enhanced compliance: Gas-fired 3 ppmv; Liquid-fired 25 ppmv<br>(Assume SCR used to comply) |

For the >10 MW units, operators were given the option of meeting standard $NO_X$ limits in all units by April 2005 or meeting the enhanced limits by April 2008. When we approved Rule 4703 it was assumed that new units installed after 2008 would be required to meet the enhanced $NO_X$ limit.

An operator of two or more units located at the same site or contiguous sites can also achieve compliance with the $NO_X$ limits by implementing an Alternative Emission Control Plan (AECP). The AECP must result in all units achieving a combined $NO_X$ emissions factor no higher than 90% of the aggregated $NO_X$ emissions factor of all units that would achieve compliance with the applicable emissions limits specified in the rule (i.e., this would allow for over-control of some units while some still don't meet the $NO_X$ limits specified in the rule).

Overall, SJVUAPCD requires most gas-fired turbines to install SCR. The exceptions are:

- Units less than 3 MW
- Units between 3-10 MW, pipeline units (gas compressor units)
- Units between 3-10 MW, operated <877 hrs/hr
- Simple cycle units >10 MW, operated <200 hrs/yr

A review of the RBLC indicates that many combustion turbines that generate electricity can achieve lower limits than Rule 4703:

- Gas-fired units: 2 ppm for combined cycle units, 2.5 ppm for simple cycle units;
- Diesel-fired units: 5ppm.

We are not aware of any post combustion controls in use for particulate matter emissions from combustion turbines.

We also examined stationary gas turbine rules in other California air districts. See Table III-10 below. The SCAQMD requires most combustion turbines greater than 0.3 MW to install SCR and meet either 2 ppm

or 2.5 ppm $NO_X$ limits.[37] Relevant exceptions include: gas compressor units that will need SCR but have a higher limit of 3.5 ppm $NO_X$ (beginning in 2024), units burning <75% landfill gas that must meet a 12.5 ppm limit (upon replacement, older limit of 25 ppm applies until replacement). There were no emissions limits specified for direct particulate matter emissions in any of the regulations we reviewed. Rule 4703 limits particulate matter through sulfur content limits for liquid fuels (0.05% by weight).

The potential contingency measures for this category would involve requiring installation of SCR on additional units or modification of SCR. In 2018, the SCAQMD provided approximately 6 years for compliance with new limits for combustion turbines in SCAQMD in Rule 1135. SCAQMD recently (February 22, 2023) proposed to revise Rule 1135 to provide an additional 3 months for compliance. SCAQMD Rule 1134 provides 24-36 months from issuance of a permit to construct to meet revised emission limits. Based on this information, we find that achieving emissions reductions within 2 years is technologically infeasible for this category. Because of space constraints, we expect the size of a combustion turbine to affect the time needed to install and/or upgrade controls (with larger units needing more time than smaller units.)

*c. Conclusion*

We are not proposing any contingency measures for combustion turbines because potential measures relate to SCR and emissions reductions could not be achieved within 2 years.

*Table III-10. Comparison of Existing Control Requirements (Combustion Turbines)*

| **Source** | **$NO_X$ Limit (ppmv)[a]** | | | |
|---|---|---|---|---|
| | **SJVUAPCD 4703** | **SCAQMD 1134, 1109.1 and 1135** | **BAAQMD 9-9** | **RBLC** |
| <3 MW: gas fuel | 9 | • Rule 1134/1135: 2.5 (simple cycle NG)<br>• Rule 1134:<br>9 (produced gas)<br>12.5 (other)<br>• Rule 1109.1 –<br>2 (NG)<br>3 (other gaseous fuel) | ~<0.5 MW units: exempt<br>42 (NG)<br>50 (RFG, WG, LPG) | 2 (<25 MW non-EGU NG) |

[37] The SCAQMD is transitioning away from the RECLAIM $NO_X$ trading program to traditional command and control regulation for many of these sources. Accordingly, for the last few decades, many boiler operators in the SCAQMD have had the option to either comply with more stringent $NO_X$ limits, or to pay to purchase tradable credits. For example, the most recent requirements added to SCAQMD Rule 1109.1 were developed as part of the replacement to the RECLAIM program.

| Source | $NO_X$ Limit (ppmv)[a] | | | |
|---|---|---|---|---|
| | **SJVUAPCD 4703** | **SCAQMD 1134, 1109.1 and 1135** | **BAAQMD 9-9** | **RBLC** |
| <3 MW: liquid fuel | 25 | [c] | <0.5 MW units: exempt<br><br>65 | No data |
| 3 – 10 MW pipeline turbine: gas fuel[b] | 8 | Rule 1134 -<br><br>3.5 (gas compressors) | 25-42 (NG)<br><br>50 (RFG, WG, LPG) | 2 (<25 MW non-EGU NG) |
| 3 – 10 MW pipeline turbine: liquid fuel | 25 | [c] | 65 | No data |
| 3 – 10 MW other turbines (<877 hr/yr): gas fuel | 9 | Rule 1134/1135 -<br><br>2.5 (simple cycle NG)<br><br>Rule 1134 -<br><br>9 (produced gas)<br><br>12.5 (other)<br><br>Rule 1109.1 –<br><br>2 (NG)<br><br>3 (other gaseous fuel) | 25-42 (NG)<br><br>50 (RFG, WG, LPG) | 2 (<25 MW non-EGU NG) |
| 3 – 10 MW other turbines (<877 hr/yr): liquid fuel | 25 | [c] | 65 | No data |

| Source | $NO_X$ Limit (ppmv)[a] | | | |
|---|---|---|---|---|
| | **SJVUAPCD 4703** | **SCAQMD 1134, 1109.1 and 1135** | **BAAQMD 9-9** | **RBLC** |
| 3 – 10 MW other turbines (>877 hr/yr): gas fuel | 5 | Rule 1134/1135 -<br><br>2.5 (simple cycle NG)<br><br>Rule 1134 -<br><br>9 (produced gas)<br><br>12.5 (other)<br><br>Rule 1109.1 –<br><br>2 (NG)<br><br>3 (other gaseous fuel) | 25-42 (NG)<br><br>50 (RFG, WG,LPG) | 2 (<25 MW non-EGU NG) |
| 3 – 10 MW other turbines (>877 hr/yr): liquid fuel | 25 | [c] | 65 | No data |
| >10 MW simple-cycle (<200 hr/yr): gas fuel | 25 | Rule 1134/1135<br><br>2.5 (NG)<br><br>Rule 1109.1 –<br><br>2 (NG)<br><br>3 (other gaseous fuel) | 15 (~15 to 25 MW)<br><br>9 (~>25 to 50 MW)<br><br>5 (~>50 MW NG)<br><br>9 (~>50 MW RFG, WG) | 2 (>25 MW) |
| >10 MW simple-cycle (<200 hr/yr): liquid fuel | 42 | [c] | 42 (~15 to 25 MW)<br><br>25 (~>25 MW) | 4 (>25 MW EGU ULSD) |

| Source | $NO_X$ Limit (ppmv)[a] | | | |
|---|---|---|---|---|
| | SJVUAPCD 4703 | SCAQMD 1134, 1109.1 and 1135 | BAAQMD 9-9 | RBLC |
| >10 MW simple-cycle (>200 hr/yr): gas fuel | 5 | Rule 1134/1135 -<br><br>2.5 (NG)<br><br>Rule 1109.1 –<br><br>2 (NG)<br><br>3 (other gaseous fuel) | 15 (~15 to 25 MW)<br><br>9 (~>25 to 50 MW)<br><br>5 (~>50 MW NG)<br><br>9 (~>50 MW RFG, WG) | 2 (>25 MW) |
| >10 MW simple-cycle (>200 hr/yr): liquid fuel | 25 | [c] | 42 (~15 to 25 MW)<br><br>25 (~>25 MW) | 4 (>25 MW EGU ULSD) |
| >10 MW combined-cycle, standard compliance: gas fuel | 5 | Rule 1134/1135 -<br><br>2 (NG)<br><br>Rule 1109.1 –<br><br>2 (NG)<br><br>3 (other gaseous fuel) | 15 (~15 to 25 MW)<br><br>9 (~>25 to 50 MW)<br><br>5 (~>50 MW NG)<br><br>9 (~>50 MW RFG, WG) | 2 (>25 MW) |
| >10 MW combined-cycle, standard compliance: liquid fuel | 25 | [c] | 42 (~15 to 25 MW)<br><br>25 (~>25 MW) | 4 (>25 MW EGU ULSD) |
| >10 MW combined-cycle, enhanced compliance: gas fuel | 3 | Rule 1134/1135 -<br><br>2 (NG)<br><br>Rule 1109.1 –<br><br>2 (NG)<br><br>3 (other gaseous fuel) | 15 (~15 to 25 MW)<br><br>9 (~>25 to 50 MW)<br><br>5 (~>50 MW NG)<br><br>9 (~>50 MW RFG, WG) | 2 (>25 MW) |

| Source | $NO_X$ Limit (ppmv)[a] | | | |
|---|---|---|---|---|
| | **SJVUAPCD 4703** | **SCAQMD 1134, 1109.1 and 1135** | **BAAQMD 9-9** | **RBLC** |
| >10 MW combined-cycle, enhanced compliance: liquid fuel | 25 | [c] | 42 (~15 to 25 MW)<br><br>25 (~>25 MW) | 4 (>25 MW EGU ULSD) |

[a] Abbreviations: EGU – electricity generating unit; RFG – refinery gas; NG – natural gas; LPG – liquefied petroleum gas; WG – waste gas

[b] 12 ppmv is the limit under non-steady state operating conditions.

[c] SCAQMD 1134 disallows the use of liquid fuel in gas turbines except for units located in the outer continental shelf (OCS) or units providing emergency power to a health facility during a natural gas curtailment; Rule 1135 has similar provisions for EGUs during natural gas curtailment. $NO_X$ limits during these periods are specified in the permit.

## 4. Residential and Commercial Fuel Combustion

### *a. Space and Water Heaters*

#### i. Overview

Source categories 610-606 (Residential Fuel Combustion-Space Heating) and 610-608 (Residential Fuel Combustion-Water Heating) are comprised of small appliances or furnaces in residential buildings that typically burn natural gas leading to combustion emissions of criteria pollutants and GHGs. Space and water heating comprise nearly 90 percent of all building-related natural gas demand in California.[38] In the San Joaquin Valley, these heaters account for nearly 2% of the area's annual $NO_X$ emissions. However, this category is comprised of numerous small sources that creates a challenge for providing opportunities for quick implementation of emissions control measures that would result in non-negligible emissions reductions within 1-2 years of being triggered. Table III-11 summarizes the annual emissions of $NO_X$ and $PM_{2.5}$ from these sources in the 2023 San Joaquin Valley $PM_{2.5}$ emissions inventory. Note that residential wood combustion is evaluated in Section III.G.1 of this document.

[38] 79 Kenney, Michael, Nicholas Janusch, Ingrid Neumann, and Mike Jaske. 2021. California Building Decarbonization Assessment. California Energy Commission. Publication Number: CEC-400-2021-006-CMF. Web link: *https://www.energy.ca.gov/data-reports/reports/building-decarbonization-assessment*

*Table III-11. Emissions Inventory Contributions (Space and Water Heaters)*

| **Source Category** | **$NO_X$ (tpd)** | **$PM_{2.5}$ (tpd)** |
|---|---|---|
| 060-020: Service and Commercial-Space Heating | 1.060 | 0.096 |
| 060-030: Service and Commercial-Water Heating | 0.782 | 0.060 |
| 610-606: Residential Fuel Combustion-Space Heating | 1.960 | 0.192 |
| 610-608: Residential Fuel Combustion-Water Heating | 1.190 | 0.202 |
| **Total** | 3.92 | 0.55 |

Manufacturers of water heaters have implemented combustion modifications to meet the $NO_X$ limits required in rules by the SJVUAPCD and other jurisdictions. This is done using burner designs such as low $NO_X$ burners and ultra low-$NO_X$ burners, incorporating design principles that include staged air burners, staged fuel burners, pre-mix burners, internal recirculation, and radiant burners.

It is important to note that the SJVUAPCD on-the-books measures as well as existing rules in other jurisdictions for these emission categories typically use wording such as "a person shall not supply, sell, offer for sale, install, or solicit the installation of" the type of unit being covered by the rule. Other wording includes "this rule applies to manufacturers, distributors, retailers, and installers" of the type of unit covered. Essentially, this means that these rules cover new units manufactured or installed after the effective date of the rule. Thus, the difficulty with obtaining emission reductions from these emissions sources is that these rules do not affect the existing population of units and only come into effect when an existing unit needs to be replaced or a unit is installed in a new home or establishment. According to the International Association of Certified Home Inspectors (NACHI), a conventional water heater has an expected service life of 6 to 12 years, a pool water heater has a typical life of 8 years, furnaces have a typical life of 15 to 25 years, and heat pumps and heat exchangers typically last 10 to 15 years.[39] Note that these life expectancies are guidelines only, and a number of factors can influence the actual life of these units including the quality of the unit, weather, usage, installation, and maintenance.

#### ii. Evaluation

The SJVUAPCD currently has three rules on the books that regulate $NO_X$ emissions from these sources. Rule 4902 regulates $NO_X$ emissions from residential water heaters; Rule 4905 regulates emissions from residential natural gas-fired furnaces; and Rule 4308 regulates $NO_X$ emissions from small boilers, process heaters, and water heaters including the commercial sector. The emissions limits that currently apply to newly manufactured or installed residential space and water heaters and commercial water heaters are itemized in Table III-12.

---

[39] International Association of Certified Home Inspectors, InterNACHI's Standard Estimated Life Expectancy Chart for Homes, *https://www.nachi.org/life-expectancy.htm*, accessed June 8, 2023.

*Table III-12. On-the-Books Control Measures (Space and Water Heaters)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4308 (as amended November 14, 2013) | Applies to boilers, steam generators, process heaters and water heaters rated from 0.075 to 2 MMBtu/hr; exemptions:<br><br>• Units installed in manufactured homes<br>• Units installed in recreational vehicles<br>• Hot water pressure heaters | Pool Heaters using PUC gas:<br><br>• >= 0.075 to <= 0.4 MMBtu/hr: 0.068 lb/MMBtu or 55 ppmv<br>• >0.4 to < 2.0 MMBtu/hr: 0.024 lb/MMBtu or 20 ppmv<br><br>All other units using PUC gas: 0.024 lb/MMBtu or 20 ppmv<br><br>Units fired on non-PUC gas or liquid fuel:<br><br>• >= 0.075 to <= 0.4 MMBtu/hr: 0.093 lb/MMBtu or 77 ppmv<br>• > 0.4 MMBtu/hr: 0.036 lb/MMBtu or 30 ppmv |
| SJVUAPCD Rule 4905 (as amended December 16, 2021) | Applies to natural gas-fired, fan-type central furnaces <175,000 Btu/hr and combination heating and cooling units <65,000 Btu/hr;<br><br>Exemptions:<br><br>• Units to be installed with propane conversion kits for propane firing only | Condensing, Non-condensing, Weatherized, and Manufactured Home Units: 14 ng/joule of heat output<br><br>Emission fee compliance option for manufacturers; fee end date has passed for all unit types except Manufactured Home units with fee end date of 9/30/2023 |

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4902 (as amended March 19, 2009) | Applies to PUC quality natural gas-fired residential water heaters <= 75,000 Btu/hr; exemptions:<br><br>• Water heaters > 75,000 Btu/hr<br>• Water heaters using fuels other than PUC quality natural gas<br>• Water heaters used exclusively in recreational vehicles | Natural gas-fired mobile home water heater: 40 ng $NO_X$/joule of heat output<br><br>Natural gas-fired pool heater: 40 ng $NO_X$/joule<br><br>Natural gas-fired water heater (excluding mobile home water heaters, instantaneous water heaters, and pool heaters): 10 ng $NO_X$/joule<br><br>Natural gas-fired instantaneous residential water heaters: 14 ng $NO_X$/joule |

In addition to the existing regulations in the San Joaquin Valley, we examined water and space heater emission rules in other districts as well as other measures that are currently being considered by other jurisdictions and measures that have been recommended for implementation in the San Joaquin Valley. See Table III-13 below.

*Table III-13. Other Control Measures Considered (Space and Water Heaters)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 1121 (as amended 9/3/04) | Residential Type, Natural Gas-Fired Water Heaters rated < 75,000 Btu/hr; exemptions:<br><br>• Water heaters rated > = 75,000 Btu/hr<br>• Water heaters used in recreational vehicles<br>• Water heaters in mobile homes (except where specified) | • 10 ng $NO_X$/joule or 15 ppmv<br>• Gas-fired mobile home water heaters: 40 ng/joule or 55 ppmv |

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| SMAQMD Rule 414 (as amended 10/25/2018) | Water Heaters, boilers, or process heaters rated <1 million Btu/hr fired with gaseous or nongaseous fuels; exemptions:<br><br>• Water heaters in recreational vehicles<br>• Pool/spa heaters <75,000 Btu/hr<br>• Water heaters, boiler, and process heaters fired with liquefied petroleum gas<br>• Hot water pressure washers fired with gaseous or liquid fuels | <75,000 Btu/hr:<br><br>• Mobile Home: 40 ng $NO_X$/joule or 55 ppmv $NO_X$<br>• All others: 10 ng $NO_X$/joule or 15 ppmv $NO_X$<br><br>75,000 to < 400,000 Btu/hr:<br><br>• Pool/spa: 40 ng $NO_X$/joule or 55 ppmv $NO_X$<br>• All others: 14 ng $NO_X$/joule or 20 ppmv $NO_X$<br><br>400,000 to < 1 million Btu/hr:<br><br>• All types—14 ng $NO_X$/joule or 20 ppmv $NO_X$ |
| BAAQMD Regulation 9, Rule 6 (as amended 3/15/2023) | Natural Gas-Fired Water Heaters and Boilers; exemptions:<br><br>• Natural gas-fired water heaters and boilers rated > 2 million Btu/hr<br>• Natural gas water heaters used in recreational vehicles<br>• Water heaters using a fuel other than natural gas<br><br>Natural gas-fired pool/spa heaters rated <400,000 Btu/hr | Natural gas-fired storage tank water heaters <=75,000 Btu/hr:<br><br>• 10 ng $NO_X$/joule (excludes water heaters used for mobile homes)<br>• *0 ng $NO_X$/joule (manufactured after 1/1/27; excludes water heaters used for mobile homes)*<br><br>Natural gas-fired boilers and water heaters >75,000 to 2 million Btu/hr:<br><br>• 14 ng $NO_X$/joule<br>• *0 ng $NO_X$/joule (manufactured after 1/1/31)*<br><br>Natural gas-fired boilers and water heaters 400,000 to 2 million Btu/hr: 14 ng $NO_X$/joule<br><br>Natural gas-fired mobile home water heaters: 40 ng $NO_X$/joule<br><br>Natural gas-fired pool/spa heaters >400,000 to 2 million Btu/hr: 14 ng $NO_X$/joule |

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| San Diego Air Pollution Control District (SDAPCD) Rule 69.5.1 (effective 7/1/16) | Natural Gas-Fired Water Heaters <= 75,000 Btu/hr; exemptions:<br><br>• Water heaters rated > 75,000 Btu/hr<br>• Water heaters used in recreational vehicles<br>• Water heaters used exclusively to heat swimming pools and hot tubs<br>• Water heaters using fuels other than natural gas<br>• Instantaneous water heaters | Natural gas-fired water heater (excluding mobile home water heaters): 10 ng $NO_X$/joule or 15 ppmv<br><br>Natural gas-fired mobile home water heater: 40 ng $NO_X$/joule or 55 ppmv |
| VCAPCD Rule 74.11 (revised 1/12/10) | Natural Gas-Fired Water Heaters < 75,000 Btu/hr; exemptions:<br><br>• Water heaters rated > 75,000 Btu/hr<br>• Natural gas water heaters used in recreational vehicles | Natural gas-fired water heater (excluding mobile home water heaters): 10 ng $NO_X$/joule<br><br>Natural gas-fired mobile home water heater: 40 ng $NO_X$/joule |
| VCAPCD Rule 74.11.1 (revised 9/11/12) | Large Water Heaters and Small Boilers; exemptions | Units rated 75,000 to 400,000 Btu/hr: 14 ng $NO_X$/joule<br><br>Units rated 400,000 to 1 million Btu/hr: 20 ppmv $NO_X$ (after 1/1/13) |
| VCAPCD Rule 74.22 (adopted 11/9/93) | Natural Gas-Fired, Fan-Type Central Furnaces; exemptions:<br><br>• Units installed in mobile homes | 40 ng $NO_X$/joule |
| BAAQMD Regulation 9, Rule 4 (as amended 3/15/2023) | Natural Gas-Fired Furnaces rated 175,000 Btu/hr or less; exemptions: | Natural gas-fired fan type central furnace:<br><br>• 40 ng $NO_X$/joule (1984+)<br>• *14 ng $NO_X$/joule (2024+)*<br><br>*0 ng $NO_X$/joule (manufactured after 1/1/29)* |

| Rule | Applicability | Control Measure |
|---|---|---|
| CARB Zero-emission standard for Space and Water Heaters | Space Heaters and Water Heaters, implementation begins in 2030 | Zero emissions, presumably electric/solar |
| SCAQMD R-CMB-01 | Residential Water Heating, proposed adoption date of 2024, implementation date of 2029 | Replacement with Zero Emission or Low $NO_X$ Appliances |
| SCAQMD R-CMB-02 | Residential Space Heating, proposed adoption date of 2024, implementation date of 2029 | Replacement with Zero Emission or Low $NO_X$ Appliances |
| Other Identified Potential Measures | Residential Space and Water Heating | • Develop incentives for early replacement of residential space and water heaters with high-efficiency electric heat pumps or zero-emission heaters<br>• Require that, at replacement, natural gas and propane water or space heaters be replaces with units that run on electricity<br>• Require a zero- $NO_X$ appliance standard in existing buildings.<br><br>Require new residential buildings to be all-electric as currently implemented in 77 jurisdictions across California states[40] |

We compared the measures in place in SJVUAPCD to those in the other jurisdictions shown above. None of the current limits in these other jurisdictions are more stringent than those currently in place in the San Joaquin Valley. These include regulated limits of 10 ng $NO_X$/joule for water heaters and 14 ng $NO_X$/joule for space heaters. In additional to the rules shown above, we found additional furnace rules to be no more stringent than the SJVAPCD rules. For example, SCAQMD Rule 1111 (as amended 10/1/21) includes a 14 ng $NO_X$/joule emission limit for most residential natural gas-fired fan-type central furnaces. SMAQMD has no rules more stringent than the SJVUAPCD for residential or commercial units rated 2 MMBtu/hr or less. VCAPCD limits space heaters of less than 175,000 Btu/hr to 40 $NO_X$/joule in Rule 74.22. SDAQMD limits natural gas-fired fan-type central furnaces of less than 175,000 Btu/hr to 40 $NO_X$/joule in Rule 69.6.

Note that, as shown in the table above, BAAQMD includes zero emissions regulations for furnaces and water heaters. However, these apply to units manufactured in 2027 or later. Additionally, the coverage

[40] J. Gable, Sierra Club, "California's Cities Lead the Way on Pollution-Free Homes and Buildings," February 14, 2023, *https://www.sierraclub.org/articles/2021/07/californias-cities-lead-way-pollution-free-homes-and-buildings*.

of some of these rules may differ slightly from the coverage of units in the San Joaquin Valley. However, due to the time required for turnover of existing units, additional coverage of units would not be feasible as a contingency measure in this FIP as we expect it would result in negligible reductions within 2 years. As explained in EPA guidance, contingency measures should be measures that would result in the projected emission reductions within a year after the triggering event, or within two years with proper justification. A contingency measure that might not result in emissions until further in the future would not serve the purpose of contingency measures to provide additional emission reductions during the period that the state should be developing a new SIP submission to address the failure that triggered the contingency measure.

#### A) On-the-Way Measures

CARB's 2022 State SIP Strategy includes a Zero-Emission Standard for Space and Water Heaters measure. Under this measure, beginning in 2030, 100 percent of sales of new space and water heaters would need to meet a zero emissions standard. By 2037, this is expected to reduce $NO_X$ emissions in the San Joaquin Valley by 2.3 tpd. In addition, SCAQMD's 2022 Air Quality Management Plan (adopted December 2, 2022) includes the following measures to require zero-emission $NO_X$ appliance standards for replacement units starting in 2029. Low $NO_X$ technologies would be permitted as transitional alternatives in cases where installing a zero-emission unit is infeasible. These control measures would also include incentive funds to facilitate the transition to zero emission technologies and promote further emission reductions earlier than required. In addition, a mitigation fee will be considered where appropriate. The mitigation fee collected would be utilized as incentives to accelerate the adoption of zero emission units or utilized to assist in panel upgrades or infrastructure at residences in disadvantaged communities. SCAQMD also has a CLEANair Furnace Rebate Program which offers rebates for replacing an existing gas furnace with low- $NO_X$ technologies or an all-electric heat pump system (current rebate is $1,500).

These on-the-way measures go beyond the current regulations in place in the San Joaquin Valley. However, these measures are not feasible to be included as contingency measures as meaningful reductions would not be achieved within the two-year timeframe needed for a contingency measure.

#### B) Potential Measures

The identified potential measures encompass mandating the electrification of new space heaters and water heaters. While such measures would eventually provide significant emission reductions in this source category, the slow replacement period for these appliances would not result in meaningful reductions within 2 years of being triggered. As the typical life of these heaters can be from 10 to 20 years or more, emission reductions would not be meaningful within the two-year timeframe needed for contingency measures.

### iii. Conclusion

We considered additional potential measures that involve replacing existing space and water heaters with electric units or requiring that new units be electric and found these potential measures would not result in meaningful reductions within 2 years. Therefore, we have not identified any feasible controls to propose as contingency measures for the Residential Fuel Combustion-Space Heating and Residential Fuel Combustion-Water Heating source categories at this time.

While not appropriate as a contingency measure, it is recommended that SJVUAPCD consider developing control measures or programs that would incentivize the early replacement of existing gas space and water heaters with electric appliances. Such actions could significantly reduce emissions from this significant source category in the longer-term future.

## B. Waste Disposal

### 1. Overview

Waste Disposal categories in the San Joaquin Valley emissions inventory include 110 - Sewage Treatment, 120 - Landfills, 130 - Incinerators, 140 - Soil Remediation, and 199 - Other (Waste Disposal). Collectively, these source categories contribute 0.18 tpd $PM_{2.5}$ emissions and 0.34 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. These emissions are contributed predominantly by flares, composting, and incinerators. Flare emissions under the waste disposal source categories are predominately generated by landfill flares. Smaller quantities of emissions are generated by sewage treatment and incineration flares combusting digester gas, process gas, waste gas, and natural gas. Composting emissions are generated by the decomposition of organic materials. Incinerator emissions are primarily generated by waste disposal activities in the industrial sector and involve combustion of distilled oil, liquified petroleum gas, natural gas, pathological waste and waste gas.

### 2. Evaluation

#### *a. Landfills*

Our evaluation of control measures for flares, including landfill flares, is provided in Section III.D (Petroleum Production and Marketing) of this document. Our evaluation of control measures for equipment other than flares did not identify any particulate matter or $NO_X$ controls for consideration as contingency measures. For example, SJVUPACD Rule 4642 (Solid Waste Disposal Sites) includes requirements for the collection and destruction of VOC from solid waste disposal sites, but it does not include particulate matter or $NO_X$ control measures. Existing regulations for landfill emissions sources in other jurisdictions, e.g., Bay Area Air Quality Management District (BAAQMD) Regulation 8-34, Mojave Desert Air Quality Management District (MDAQMD) Rule 1126, South Coast Air Quality Management District (SCAQMD) Rule 1150.1, also only regulate emissions of VOC and do not include particulate matter or $NO_X$ control measures.

#### *b. Composting*

Our evaluation of control measures for composting did not identify any particulate matter or $NO_x$ controls for consideration as contingency measures. For example, SJVUAPCD Rule 4566 (Organic Material Composting) and SJVUAPCD Rule 4565 (Biosolids, Animal Manure, and Poultry Litter Operations) includes composting mitigation measures to reduce VOC, but they do not include particulate matter or $NO_x$ control measures. Existing regulations for composting emissions sources in other jurisdictions, e.g., Antelope Valley Air Quality Management District (AVAQMD) Rule 1133, Imperial County Air Pollution Control District (ICAPCD) Rule 430, SCAQMD Rule 1133.2, and SCAQMD Rule 1133.3, also regulate emissions of VOC and ammonia, but do not include particulate matter or $NO_x$ control measures.

#### *c. Incinerators*

Our review of incinerator control measures did not identify any incinerator control measures for further consideration as potential contingency measures in the San Joaquin Valley. SJVUAPCD Rule 4203 (Particulate Matter Emissions from Incineration of Combustible Refuse) limits particulate matter emissions from the incineration of combustible refuse, establishes concentration limits and establishes an allowable emissions rate, and prohibits the discharge of visible emissions. SJVUAPCD Rule 4302 (Incinerator Burning) prohibits the use of any incinerator except for a multiple chamber incinerator or one equally effective in controlling air pollution. Our review included requirements in other state and local air agencies and did not identify requirements for control of incinerator emissions beyond those of Rules 4203 and 4302. For example, neither BAAQMD nor SCAQMD implement rules with similar particulate matter emissions requirements as in the applicable SJVUAPCD regulations. See BAAQMD Regulation 11, Rule 13 (Medical Waste Incinerators), and SCAQMD Rule 1406 (Control of Dioxin Emissions from Medical Waste Incinerators), which primarily regulate dioxin emissions from medical waste incinerators.

### 3. Conclusion

As detailed above, we did not identify any potential contingency measures to evaluate for the waste disposal category in the San Joaquin Valley. This evaluation did not cover flares at landfills. Please see Section III.D (Petroleum Production and Marketing) for our evaluation of control measures for flares.

## C. Cleaning and Surface Coating

Cleaning and Surface Coating source categories reported by CEPAM include 210 - Laundering, 220 - Degreasing, 230 - Coatings and Related Process Solvents, 240 - Printing, 250 - Adhesives and Sealants, and 299 - Other (Cleaning and Surface Coating). These source categories contribute 0.37 tpd $PM_{2.5}$ emissions and less than 0.01 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. We consider any measures that would address the 0.01 tpd $NO_X$ emissions from this category to be unquestionably negligible and have not evaluated them further as potential contingency measures.

Emissions from these source categories are primarily VOC from the application and use of solvents, coatings, inks, adhesives and sealants. Particulate matter emissions are generated by sources in these categories via spraying, material handling, and mixing processes. Our review of control measures indicates that most areas require that source operators utilize an emissions control device with a control efficiency of at least 90%. Additionally, most air agencies require implementation of similar best management practices and good housekeeping to minimize emissions, e.g., requirements to install enclosures for coating operations and prohibiting the use of spray coating unless a high transfer efficiency method is used. We did not identify any measures implemented with particulate matter emissions control benefits that are not already implemented in the San Joaquin Valley. Thus, we have not identified any Cleaning and Surface Coating control measures for further consideration as contingency measures in the San Joaquin Valley.

## D. Petroleum Production and Marketing

Petroleum Production and Marketing categories reported by CEPAM include 310 - Oil and Gas Production, 320 - Petroleum Refining, and 330 - Petroleum Marketing, and 399 – Other (Petroleum Production and Marketing). These source categories contribute 0.26 tpd $PM_{2.5}$ emissions and 0.08 tpd

$NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. The primary $PM_{2.5}$ and $NO_X$ emissions sources in these categories are flares and cooling towers. Our evaluation of control measures for flares and cooling towers also applies to other source categories with these emissions.

We note that the Earthjustice Letters include recommendations for revisions to rules regulating only VOC emissions, such as SJVUAPCD Rules 4402 (Crude Oil Production Sumps), 4623 (Storage of Organic Liquids), and 4624 (Transfer of Organic Liquids). As described in Section I of this document and in further detail in the NPRM for the proposed contingency measures FIP, based upon the EPA's proposed approval of the State's comprehensive precursor demonstration, we are not proposing FIP contingency measures for VOC in this action. We therefore do not address recommendations for rules regulating only VOC emissions in this document.

### 1. Wet Cooling Towers

#### *a. Overview*

Wet cooling towers are heat exchange devices used to cool process fluids by circulating the fluids with ambient air. Cooling towers are generally used to lower the temperature of circulating water in process equipment in oil and gas, petroleum refining, chemical, food processing, and other industries. Small amounts of particulate matter can be emitted from cooling towers via the production of drift, when dissolved solids in the circulating fluid are entrained in the cooling air and discharged from the cooling tower. As described in the EPA's compilation of air pollutant emission factors (AP-42), drift eliminators are usually incorporated into cooling tower design to remove droplets from the air stream before exiting the tower.[41] Emissions from cooling towers are generally very low; in the 2023 San Joaquin Valley emissions inventory, cooling towers across all source categories account for less than 0.03 tpd $PM_{2.5}$ emissions.

#### *b. Evaluation and Conclusion*

We assume all cooling towers are equipment with drift eliminators as part of the basic cooling tower design. We did not identify any other technologies in use for this category. BACT determinations usually specify that cooling towers must be equipment with "high efficiency" drift eliminators. [42] We also did not identify any federal, state, or local regulations that control particulate matter emissions from cooling towers. The only state and local regulations we identified in Region IX pertaining to cooling towers apply specifically to cooling towers treated with hexavalent chromium. [43] The only federal requirement that

---

[41] EPA's AP-42, Section 13.4 for Wet Cooling Towers, page 13.4-3 at *https://www.epa.gov/sites/default/files/2020-10/documents/13.4_wet_cooling_towers.pdf*

[42] SJVUAPCD has BACT guidelines for cooling towers; see *http://www.valleyair.org/busind/pto/bact/bactLoader.htm*. ICAPCD stated in Section 4.1 of the Staff Report for their 2018 $PM_{10}$ Redesignation Request and Maintenance Plan that the cooling towers installed at Imperial Irrigation District El Centro Generating Station Units 2 and 3 installed cooling towers with drift eliminators rated at 0.0005%, which at the time of installation satisfied BACT. SCAQMD claimed drift eliminators as BACT in, BCM-02 EMISSION REDUCTIONS FROM COOLING TOWERS; see *https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2016-air-quality-management-plan/final-2016-aqmp/appendix-iv-a.pdf*.

[43] Several other California district rules regulate hexavalent chromium treated cooling towers, including Lake County Air Quality Management District Rule 2.461, Bay Area Air Quality Management District Rule 11-10, Eastern Kern Air Pollution Control District Rule 429.1, Feather River Air Quality Management District Rule 11.2, Imperial County Air Pollution Control District Rule 1003, and San Diego County Air Pollution Control District Rule 1202.

applies to cooling towers is under 40 CFR 63.654 and requires monitoring and repair of leaks of VOC from heat exchange systems.

Any potential emissions reductions would also depend on the amount of total dissolved solids (TDS) in the cooling tower's makeup water. Given the very low emissions from this category, we believe a contingency measure requiring existing drift eliminators to be upgraded to "higher" efficiency drift eliminators as a potential contingency measure would only achieve negligible emissions reductions. We are not considering this as a potential contingency measure for the San Joaquin Valley.

### 2. Flares

#### *a. Overview*

Flaring is a high-temperature oxidation process used to burn waste gases containing combustible components including volatile organic compounds, natural gas, and methane. Flares are used to burn waste gas from landfills, chemical industrial processes, oil wells, refineries, sewage digesters, rocket engine testing, nuclear power plants, and ammonia fertilizer plants. Flares are also used to release pressure for safety and emergency purposes.

As flares are VOC destruction devices, flaring control techniques involve either modifying design to increase the destruction efficiency or reducing flaring. Flares that are properly designed can destroy approximately 98% of VOC and are an alternative to venting (a controlled method of releasing pollutants to the atmosphere).[44] During flaring, the waste gas stream is combusted in open air and is sometimes combined with steam gas or air to promote a higher destruction efficiency. The flaring process emits various pollutants including particulate matter, $NO_X$, and uncombusted or incompletely combusted hydrocarbons.

The EPA requirements for flares are located at 40 CFR Part 60.18 (addressing operational requirements for flares), 40 CFR Part 63.11 (addressing work standard practices for flares), and 40 CFR Part 60 Subpart Ja (NSPS Ja, Standards of Performance for Petroleum Refineries for which Construction, Reconstruction, or Modification commenced after May 14, 2007). There are currently no EPA control techniques guidelines for flares.

In the 2023 San Joaquin Valley emissions inventory, oil and gas flares contribute 0.05 tpd direct $PM_{2.5}$ and 0.20 tpd $NO_X$ emissions, and waste disposal flares (i.e., landfill, sewage treatment, and incinerator flares) contribute 0.12 tpd direct $PM_{2.5}$ and 0.30 tpd $NO_X$ emissions.

#### *b. Evaluation*

In the San Joaquin Valley, SJVUAPCD Rule 4311 regulates $NO_X$ and VOC flaring emissions from numerous sources including refineries, unrecoverable gases from oil wells, vented gases from blast furnaces, unused gases from coke ovens, gaseous wastes from chemical industries, and landfills. The current rule was approved into the SIP on December 19, 2022. There are 262 flares permitted in the San Joaquin Valley, including 161 flares in oil and gas production, 17 flares in open landfills, and 11 flares in closed

---

[44] U.S. Environmental Protection Agency. "Compilation of Air Pollution Emission Factors" (AP-42). Chapter 13.5. Research Triangle Park: U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, updated April 2015. Available at *https://www3.epa.gov/ttn/chief/ap42/ch13/index.html*.

landfills.[45] SJVUAPCD last amended Rule 4311 on December 17, 2020, to satisfy the District's control measure commitments in the District's "2018 Plan for the 1997, 2006, and 2012 $PM_{2.5}$ Standards" ("2018 $PM_{2.5}$ Plan") and "2016 Plan for the 2008 8-Hour Ozone Standard" ("2016 Ozone Plan") by reducing flare emissions.[46, 47] The District amended Rule 4311 to require owners and operators of flares exceeding annual capacity throughput thresholds to install ultra-low $NO_X$ (ULN) flaring technologies and to encourage alternative uses of waste gas to reduce flaring.

[45] SJVUAPCD, Final Draft Staff Report, "Proposed Amendments to Rule 4311 (Flares)." Permitted flare data is provided as of December 17, 2020.
[46] SJVUAPCD, 2018 Plan for the 1997, 2006, and 2012 $PM_{2.5}$ Standards, submitted May 10, 2019.
[47] SJVUAPCD, 2016 Plan for the 2008 8-Hour Ozone Standard, adopted June 16, 2016.

*Table III-14. On-the-Books Control Measures (Flares)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4311 – Flares | See Table III-16. Comparison of Existing Control Requirements | Contains provisions to reduce flaring activities with emission limits, operation limits, requirements to monitor, record, and report flaring activities. The generalized standard requirements include:<br><br>• Ground level enclosed flares have $NO_X$ and VOC emission limits for ground level enclosed flares;<br>• $NO_X$ and VOC emission limits by operation category for flares (including ground level) at oil and gas, chemical, landfill, digester, or organic liquid loading operations. [48] If the emission limits cannot be met the operator must limit flaring to the required annual throughput.<br>• If annual throughput thresholds is exceeded for two consecutive years, flare operator must replace or modify flare to meet applicable $NO_X$ and VOC limits.<br><br>See Table III-16. Comparison of Existing Control Requirements (Flares) for specific limits and control requirements. |

[48] For clarity, ground level enclosed flares must meet the $NO_X$ and VOC emission limits set in Table 1 of SJVUAPCD Rule 4311, but if the ground level enclosed flares are at an oil and gas, chemical, landfill, digester, or organic liquid loading operation the flare must instead meet the $NO_X$ and VOC limits in Table 3 of SJVUAPCD based on operation category. If the ground level enclosed flares cannot meet the limits in Table 3, they must reduce flaring to the required annual throughput for their operation category. If the ground level enclosed flares cannot meet the annual throughput for two consecutive years, they must replace or modify the flare to meet the emission limits in Table 3.

We also evaluated the regulations imposed by several other state air agencies and local air districts to identify other potential control measures for flares in other jurisdictions. The control measures we reviewed are summarized below in Table III-15.

*Table III-15. Other Control Measures Considered (Flares)*

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| Bay Area Air Quality Management District (BAAQMD) Rule 12-11, Flare Monitoring at Petroleum Refineries; BAAQMD Rule 12-12, Flares at Petroleum Refineries | BAAQMD Rules 12-11 and 12-12 apply to flares at refineries, exemptions are flares that are used to control emissions from organic liquid storage, loading racks, marine vessel loading terminals, wastewater treatment systems, and pump seals. | Rule 12-11 contains requirements for monitoring flares in several ways that include vent gas flow and composition, pilots and purging, and video monitoring.<br><br>Rule 12-12 contains management practices for flaring such as flare minimalization plans (FMPs), operating and design standards, recordkeeping and reporting requirements. |
| Santa Barbara County Air Pollution Control District Rule 359 Flares and Thermal Oxidizers | See Table III-16. Comparison of Existing Control Requirements (Flares) | Contains requirements for flares and thermal oxidizers including sulfur content limits, technology-based standards, FMPs, emergency event provisions, and emission limits for ground-level enclosed flares. See specific limits and control requirements in Table III-16. Comparison of Existing Control Requirements (Flares). |
| SCAQMD Rule 1118 Control of Emissions from Refinery Flares | See Table III-16. Comparison of Existing Control Requirements (Flares) | Contains requirements to monitor, record, and report flaring activities to control and minimize refinery flare emissions; see specific limits and control requirements in Table III-16. Comparison of Existing Control Requirements (Flares) |

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD 1118.1 Control of Emissions from Non-Refinery Flares | See Table III-16. Comparison of Existing Control Requirements (Flares) | Contains emission limits, annual percent capacity thresholds, requirements for FMPs, recordkeeping and reporting for flaring activities at non-refinery facilities. See specific limits and control requirements in Table III-16. Comparison of Existing Control Requirements (Flares). |
| Texas Administrative Code Rules §115.152 Control Requirements, §115.122 Control Requirements, §111.111 Requirements for Specified Sources | In the Beaumont-Port Arthur, Dallas-Fort Worth, El Paso, and Houston-Galveston-Brazoria areas §111.111 applies to gas flares, §115.122 applies to any vent gas streams, and §115.152 applies to solid waste landfills. | §115.152 requires open flares to be designed and operated in accordance with 40 CFR §60.18.<br><br>§115.122 requires smokeless flares to be lit at all times when VOC vapors are routed.<br><br>§111.111 sets requirements for visible emissions from flares and details reporting and recordkeeping requirements |

We compared the provisions of SJVUAPCD Rule 4311 with control measures implemented in other jurisdictions in Table III-16. For example, SJVUAPCD Rule 4311 and SCAQMD Rule 1118.1 both require either flare throughput reduction or flare replacement to meet applicable emission limits when the applicable annual capacity threshold is exceeded. However, each jurisdiction takes a different approach to setting annual capacity thresholds. SJVUAPCD Rule 4311 sets annual thresholds based on heat capacity in MMBtu per year. SCAQMD Rule 1118.1 sets annual thresholds based on a percentage of capacity that a flare is used. For example, under SJVUAPCD Rule 4311, if a landfill flare throughput exceeds 90,000 MMBtu per year, then the operator of the flare is required to take action to reduce the annual throughput or comply with more stringent emissions limits, while under SCAQMD Rule 1118.1, if a landfill flare exceeds 20% of its maximum volumetric flow rate (i.e., capacity) in a year, then the operator of the flare is required to take action to reduce the throughput or comply with more stringent emissions limits. The District previously determined that the percentage-based approach would not capture their highest utilized flares. [49]

Additionally, we evaluated the recommendations included in the Earthjustice Letters for amendments to the flare control strategy in the San Joaquin Valley, which include amending the applicability provisions of Rule 4311 to additionally include the percent of annual capacity thresholds in SCAQMD Rule 1118.1 such that additional flares would be potentially subject to the more stringent requirements in Rule 4311.

[49] See SJVUAPCD's Final Draft Staff Report for the Proposed Amendments to Rule 4311 (Flares). The District evaluated the percentage-based annual threshold as an alternative approach to applicability thresholds. SJVUAPCD found that the alternative method did not capture their highest utilized flares and was not cost effective. The staff report did not clearly document the District's basis for this conclusion or consider the percentage-based approach as an additional basis for determining applicability. Rule 4311 thresholds may be stringent enough that additional flares would not be captured, but a clearer evaluation is needed to confirm this determination.

However, as noted above, the SJVUAPCD has previously determined that the percentage-based approach would not capture their highest utilized flares.

Earthjustice also recommended banning flaring in the oil & gas industry except in emergencies, which Earthjustice noted are adopted measures in New Mexico Administrative Code § 19.15.27 (Venting and Flaring of Natural Gas), Colorado Rule 903 (Venting or Flaring Natural Gas), and Alaska Statutes § 31.05.095 (Waste Prohibited). However, each of these rules includes several exemptions from the flaring ban in addition to emergencies. For example, Alaska Statues Section 31.05.170(15)(H) allows waste from the release, burning, or escape into the open air of gas, from a well producing oil or gas if authorized by the Alaska Oil and Gas Conservation Commission. Also, the Alaska Administrative Code allows flaring or venting for a period not exceeding one hour as the result of a planned lease operation, and flaring pilot or purge gas to test or fuel the safety flare system, as authorized for safety.[50] Code of Colorado Regulations 404-1 § 100 Rule 903 allows flaring during oil and gas production and completion when the operator obtains Director's approval to flare through an approved gas capture plan pursuant to Rule 903.e. New Mexico Administrative Code § 19.15.27 allows flaring during initial flowback during well completion. These regulations include further non-emergency exemptions not listed here. As no other jurisdictions have adopted and implemented regulations that truly ban flaring except for emergencies, we are determining that such a measure is not currently technologically feasible in the San Joaquin Valley and are not proposing this as a contingency measure at this time. In addition, SJVUAPCD Rule 4311 includes ground level enclosed flare limits, flare annual throughput limits, flare minimalization plan requirements, flare $NO_X$ and VOC emission limits, and a petroleum refinery flare sulfur dioxide emission limit to reduce flaring. We find these measures in combination to be comparable to the practices implemented in other jurisdictions.

### 3. Conclusion

For the reasons described in this section, we are not proposing any contingency measures for flares. We determined that banning flaring except in emergencies has not been demonstrated to be technologically feasible. We otherwise did not identify potential controls for consideration as contingency measures.

[50] Alaska Administration Code (AAC) Title 20 Miscellaneous Boards and Commissions Chapter 25. Alaska Oil and Gas Conservation Commission 20 AAC 25.235. "Gas disposition." (amended November 7, 1999).

*Table III-16. Comparison of Existing Control Requirements (Flares)*

| | SJVUAPCD 4311 | SCAQMD 1118 | SCAQMD 1118.1 | SBCAPCD 359 |
|---|---|---|---|---|
| Applicability | Operations involving the use of flares | Flares used at petroleum refineries, sulfur recovery plants, and hydrogen production plants | Non-refinery facilities | Flares and thermal oxidizers at oil and gas production sources |
| Exemptions | • Flares used for well testing, tank degassing, and pipeline degassing operations;<br>• Flares that combust regeneration gas;<br>• Emergency flares not subject to emission limits;<br>• Flares operated at municipal solid waste landfills that combust less than 2,000 million standard cubic feet (MMscf) of landfill gas per calendar year and that have ceased accepting waste;<br>• Flares that combust only propane or butane or a combination of propane and butane. | | • Flares at asphalt plants, biodiesel plants, hydrogen production plants fueled in part with refinery gas, petroleum refineries, sulfuric acid plants, and sulfur recovery plants;<br>• Flares subject to SCAQMD Rule 1147;<br>• Flares routing only propane or butane or a combination of propane and butane directly into the flare burner;<br>• Flares at a landfill that collects less than 2,000 MMscf of landfill gas per calendar year and has either ceased accepting waste. | • Burning of sulfur, hydrogen sulfide, acid sludge or other sulfur compounds in the manufacturing of sulfur or sulfur compounds;<br>• Burning of any gas with a net heating value of less than 300 Btu/scf provided the fuel used to incinerate such gas does not contain sulfur compounds in excess of the rules set limits;<br>• Permitted flares at 1.7 MMBTU/hr or less are exempt from emission limits. |

| | SJVUAPCD 4311 | SCAQMD 1118 | SCAQMD 1118.1 | SBCAPCD 359 |
|---|---|---|---|---|
| Control Measures | • Ground level flare emission limits;<br>• Emission limits for flares based on operation. If the flares at the operation do not meet limits, they must agree to throughput limits for two years or replace with ULN flares to meet the limits;<br>• If flare's annual throughput exceeds applicability thresholds, owner or operator must modify or replace flare to meet emission limits or decrease throughput.<br>• Petroleum refineries and major sources are subject to flare minimization plans. | • Requires scoping document;<br>• Specific cause analysis for flare events;<br>• Monitoring for presence of flame during flaring. | • $NO_X$, VOC, and CO limits for flares installed, replaced, or relocated after January 2019;<br>• Comply with annual percent capacity thresholds;<br>• If applicability thresholds exceeded for two consecutive years, flare must be replaced to meet emission limits or throughput reduced. | $NO_X$ and VOC emission limits for ground level flares and thermal oxidizers exceeding 120 standard cubic feet per day |
| Annual Capacity Thresholds | • Oil and gas and chemical operations: 25,000 MMBtu per year<br>• Landfill operations: 90,000 MMBtu per year<br>• Digester operations: 100,000 MMBtu per year<br>• Organic liquid loading operations: 25,000 MMBtu per year | | • Any gas combusted in an open flare: 5%<br>• Digester gas: 70%<br>• Landfill gas: 20%<br>• Produced gas: 5% | |

| | SJVUAPCD 4311 | SCAQMD 1118 | SCAQMD 1118.1 | SBCAPCD 359 |
|---|---|---|---|---|
| $NO_X$ Emission Limits | • Flares at oil and gas operations or chemical operations: 0.018 lb/MMBtu<br>• Flares at landfill operations: 0.025 lb/MMBtu<br>• Flares at digester operations located at major source: 0.025 lb/MMBtu<br>• Flares at digester operations not located at a major source: 0.060 lb/MMBtu<br>• Flares at organic liquid loading operations: 0.034 lb/1,000 gallons loaded | | • Digester gas at major source: 0.025 lb/MMBtu<br>• Digester gas at minor source: 0.06 lb/MMBtu<br>• Landfill gas: 0.025 lb/MMBtu<br>• Produced gas: 0.018 lb/MMBtu<br>• Other flare gas: 0.06 lb/MMBtu<br>• Organic liquid storage: 0.25 lb/MMBtu<br>• Organic liquid loading: 0.034 lb/1,000 gallons loaded | |
| Enclosed Flare $NO_X$ Emission Limits | • Without steam-assist (<10 MMBtu): 0.0952 lb/MMBtu<br>• Without steam-assist (10-100 MMBtu): 0.1330 lb/MMBtu<br>• Without steam-assist (>100 MMBtu): 0.5240 lb/MMBtu<br>• With steam-assist: 0.068 lb/MMBtu | | | • Exceeding 120,000 scf/day without steam-assist (<10 MMBtu): 0.0952 lb/MMBtu<br>• Without steam-assist (10-100 MMBtu): 0.1330 lb/MMBtu<br>• Without steam-assist (>100 MMBtu): 0.5240 lb/MMBtu<br>• With steam-assist: 0.068 lb/MMBtu |

## E. Industrial Processes

### 1. Chemical

Processes that contribute emissions to source category 410 - Chemical include the manufacture of ammonia, fertilizers, and fiberglass. Such sources contribute 0.30 tpd direct $PM_{2.5}$ and 0.31 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory, with the majority contributed by fiberglass manufacturing. Glass manufacturing emissions and control measures are evaluated under the Glass and Related Products source category in section III.E.6 of this document. Our analysis did not identify any potential control measures limiting particulate matter or $NO_X$ for the remaining processes covered by this category.[51]

We did not identify any potential control measures related to this category. To the extent that any particulate matter and $NO_X$ emissions are generated by fuel combustion sources in this category, refer to our evaluation of fuel combustion sources in section III.A.

### 2. Food and Agriculture

Source category 420 - Food and Agriculture includes emissions from various types of processing operations including almond processing, milk and dairy products, and cotton processing. The reported 2023 San Joaquin Valley emissions for this category include 0.56 tpd $PM_{2.5}$ emissions and zero $NO_X$ emissions.

Almond processing operations generate dust from the movement of trash, hulls, shells, and meats. Dust can also be generated from milk and dairy processing operations, such as packaging and pasteurization. We did not identify any control measures that specifically apply to these types of processing operations in SJVUAPCD, SCAQMD, BAAQMD, SMAQMD, SDAPCD, Calaveras County Air Pollution Control District (CCAPCD), or Yolo-Solano Air Quality Management District (YSAQMD). However, operations in the jurisdiction of SJVUAPCD are subject to the general particulate matter emission control requirements in SJVUAPCD Rule 4201 (Particulate Matter Concentration), Rule 4202 (Particulate Matter Emission Rate), and applicable rules in Regulation VIII (Fugitive $PM_{10}$ Prohibitions) Rules 8011 through 8081. In addition, SJVUAPCD BACT Guideline 5.2.2 establishes BACT for almond processing as the use of a control device that achieves greater than 99% control efficiency (fabric filter baghouse, cartridge-type dust collector, or equivalent).[52] We did not identify additional control measures that have not already been required by SJVUAPCD for almond processing.

For cotton processing, Rule 4204 (Cotton Gins) limits $PM_{10}$ emissions. We explored requirements by air agencies from the top six cotton ginning states in the United States, including Texas, Georgia, Mississippi, Arkansas, North Carolina, and Alabama, and found the primary control device for cotton gins to be the use of high efficiency cyclones or perforated drums, which are the same types of controls required by SJVUAPCD Rule 4204.

---

[51] BAAQMD Regulation 12 Rule 5 (Phosphate Fertilizer Plants) limits fluoride emissions, but particulate matter and $NO_X$ emissions are not regulated. We did not find any other rules for these processes in Region IX.

[52] *https://www.valleyair.org/busind/pto/bact/BACT-Guideline-5.2.2.pdf*

As we did not identify any potential emissions control measures more stringent than those currently implemented in the San Joaquin Valley for the source types described in this section, we did not identify any contingency measures to propose for this source category.

### 3. Mineral Processes

#### *a. Overview*

Source category 430 - Mineral Processing contributes 1.10 tpd $PM_{2.5}$ emissions and 0.21 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. Asphalt concrete production equipment such as auxiliary heaters and dryers (for heating or drying aggregates) and emergency and non-emergency engines generate $NO_X$ emissions from this source category. $PM_{2.5}$ emissions from this category are generated by asphaltic concrete production, surface blasting, sand and gravel excavation and processing, and cement concrete manufacturing and fabrication. To the extent that any $PM_{2.5}$ and $NO_X$ emissions are generated by fuel combustion sources in this category, refer to our evaluation of combustion equipment sources in section III.A of this document. This section includes our evaluation of non-combustion related particulate matter emissions from the mineral processes source category.

Fugitive particulate matter emissions sources in this category include earth moving activities, surface blasting, bulk material handling and mixing, wind erosion of exposed surfaces and storage piles, as well as vehicle traffic on unpaved and paved roadways. Point sources of particulate matter emissions also occur where dust collectors are used for material recovery and emissions control during the production process. For example, baghouses are used at asphalt batch plants where moist aggregate is transported into the drum dryer to be dried out, and at concrete batch plants where ingredients for concrete are introduced into the mixer where they undergo agitation.

#### *b. Evaluation*

We reviewed control measures for this source category implemented by SJVUAPCD and several other state and local air agencies. Each jurisdiction’s approach to regulating this source category varies. The relevant rules specific to this source category are not structured identically across jurisdictions or rules, which can make direct comparison difficult. Table III-17 and Table III-18 summarize the control measures we considered for this source category.

*Table III-17. On-the-Books Control Measures (Mineral Processes)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 2280 (Portable Equipment Registration) | Establishes standards for registration of certain portable emissions units for operation at participating districts. The complete list of units subject to Rule 2280 is provided at section 2.0 of the rule. Covered sources include confined and unconfined abrasive blasting operations, concrete batch plants, sand and gravel screening, rock crushing, and pavement crushing and recycling operations. | • 20% opacity limits (40% for unconfined abrasive blasting);<br>• Control equipment including fabric or cartridge type filter dust collectors, wet suppression systems;<br>• 99% arrestance requirement for dust collection equipment;<br>• Other source-specific requirements. |
| SJVUAPCD Rule 4201 (Particulate Matter Concentration) | Applies to any source operation which emits or may emit dust, fumes, or total suspended particulate matter. | 0.1 grain per dry standard cubic foot (gr/dscf) dust emissions limit for all sources |
| SJVUAPCD Rule 4202 (Particulate Matter Emission Rate) | Applies to any source operation which emits or may emit particulate matter. | Establishes emission limits based on process throughput; see section 4.0 of Rule 4202. |

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Regulation VIII (Fugitive $PM_{10}$ Prohibitions) | Applies to specified outdoor fugitive dust sources; complete list provided at SJVUPACD Rule 8011, section 3.0 (Definitions). | • Rule 8011 establishes general requirements for fugitive dust sources;<br>• Rule 8021 contains requirements for construction, demolition, excavation, extraction, and other earthmoving activities;<br>• Rule 8031 contains standards for the outdoor handling, storage and transport of bulk materials;<br>• Rule 8041 contains standards for control of carryout and trackout at those sources subject to a SJVUAPCD fugitive dust rule;<br>• Rule 8061 contains requirements for paved and unpaved roads;<br>• Rule 8071 contains requirements for unpaved vehicle and equipment traffic areas. |

*Table III-18. Other Control Measures Considered (Mineral Processes)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 2100 (Registration of Portable Equipment) | Establishes standards for registration of certain portable emissions units. The complete list of units subject to Rule 2100 is provided at section (b) of the rule. Covered sources include confined and unconfined abrasive blasting, Portland concrete batch plants, sand and gravel screening, rock crushing, and unheated pavement crushing and recycling operations. | • 20% opacity limits (40% for unconfined abrasive blasting);<br>• Control equipment including fabric or cartridge type filter dust collectors, wet suppression systems;<br>• 99% particulate matter control efficiency requirement for dust collection equipment;<br>• Other source-specific requirements. |

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 1157 ($PM_{10}$ Emission Reductions from Aggregate and Related Operations) | Applies to all permanent and temporary aggregate and related operations; exemptions listed under section (h) of Rule 1157. | • Opacity limits;<br>• Requires control measures (such as watering, use of dust suppressant) for paved and unpaved roads, and unpaved vehicle and equipment traffic areas;<br>• Requires control of carry-out and trackout;<br>• Requirements for handling, storage and transport of bulk materials including storage piles, material loading, unloading, and transferring;<br>• Requirements for storage piles;<br>• Control requirements for conveyors, crushing equipment and screening equipment. |
| BAAQMD Regulation 6 (Particulate Matter), Rule 1 (General Requirements) | Applies to all types of emission sources; exemptions include temporary sandblasting, open outdoor fires, wood burning devices, and metal recycling and shredding operations. | • 20% opacity limit;<br>• 0.15 gr/dscf limit for exhaust gas;<br>• Throughput-based emission limits at section 311 of Regulation 6, Rule 1 |
| BAAQMD Regulation 6 Particulate Matter, Rule 6 (Prohibition of Trackout) | Applies to large bulk material sites, large construction sites, and large disturbed surface sites | • Prohibits trackout to the public paved road for a distance of 25 feet;<br>• 20% opacity limit during cleanup of trackout;<br>• Monitoring and recordkeeping requirements. |

The control measures we identified for mineral process sources rely on a range of control measures that generally fall into several common categories. We compared the requirements of SJVUAPCD Rule 2280 and Regulation VIII (specifically Rules 8011 through 8071) with the requirements of the rules identified in other air jurisdictions, notably SCAQMD and BAAQMD. Our evaluation indicates that the requirements of SJVUAPCD Rule 2280 and Rules 8011 through 8071 are comparable to the rules being implemented in other jurisdictions. Overall, we did not identify any particulate matter control measures implemented in other jurisdictions that are not incorporated in SJVUAPCD's rules to consider as potential contingency measures.

#### c. Conclusion

Our review of controls for this category did not identify mineral process controls for consideration as potential contingency measures. We are not proposing any contingency measures for this source category at this time.

### 4. Metal Processes

#### a. Overview

Source category 440 – Metal Processes includes secondary metal production, metal plating and coating operations, and other unspecified industrial processes that involve mineral and metal products, aluminum, iron, and steel. Sources in this category contribute 0.02 tpd $PM_{2.5}$ emissions and zero $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory.

#### b. Evaluation

As part of our evaluation, we reviewed control measures established for this source category by SJVUAPCD, BAAQMD and SCAQMD. The relevant rules specific to this source category are not structured identically, which can make direct comparison difficult. Table III-19 and Table III-20 summarize the metal process control measures we identified. Note that CEPAM reports chrome plating and coating $PM_{2.5}$ and $NO_X$ emissions as zero; SJVUAPCD Rule 7011 (Chromium Plating and Chromic Acid Anodizing Facilities) and similar requirements in other jurisdictions were not considered. Other metal coating regulations controlling only VOC emissions are also not discussed in this section.

*Table III-19. On-the-Books Control Measures (Metal Processes)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 7060 - Toxic Metals from Non-Ferrous Metal Melting | Applies to existing non-ferrous metal melting furnaces | • 99% particulate matter control efficiency requirement for dust collection equipment;<br>• 10% opacity limit;<br>• Good operating practices demonstrated through a maintenance plan or procedures approved by the District;<br>• Good housekeeping practices. |

*Table III-20. Other Control Measures Considered (Metal Processes)*

| Rule | Applicability | Control Measure |
|---|---|---|
| BAAQMD Regulation 11 Rule 15 - Airborne Toxic Control Measure for Emissions of Toxic Metals from Non-Ferrous Metal Melting | Applies to a wide range of non-ferrous metal melting operations | • Particulate matter control device with 99% or greater control efficiency;<br>• Good operating practices demonstrated through maintenance plan or procedures approved by BAAQMD;<br>• 10% opacity limit for fugitive emissions; good housekeeping practices. |
| SCAQMD Rule 1407 - Control of Emissions of Arsenic, Cadmium, and Nickel from Non-Chromium Metal Melting Operations | Applies to facilities conducting non-chromium metal melting operations | • Particulate matter control device with 99% or greater control efficiency;<br>• Good operating practices and good housekeeping practices. |
| SCAQMD Rule 1407.1 – Control of Toxic Air Contaminant Emissions from Chromium Alloy Melting Operations | Applies to facilities conducting chromium alloy melting, including smelters (primary and secondary), foundries, die-casters, mills, and other establishments conducting miscellaneous melting processes | • Chromium emission limits requiring monitoring to demonstrate compliance;<br>• 10% opacity limit;<br>• Prescribes building requirements for chromium alloy melting operations;<br>• Requires cleaning using approved cleaning method and at certain minimum frequencies. |

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 1420.2 - Emission Standards for Lead from Metal Melting Facilities | Applies to metal melting facilities that melt 100 tons or more of lead per year | • Ambient lead concentration limits;<br>• Ambient air monitoring to demonstrate compliance;<br>• Requires total enclosure for select process areas;<br>• Particulate matter control devices of no less than 99% control efficiency;<br>• HEPA filter or equivalent filtration media that is of a minimum of 99.97% control efficiency for 0.3 µm particles. |
| SCAQMD Rule 1426 - Emissions from Metal Finishing Operations | Applies to owners and operators of metal finishing facilities | • Enclosure;<br>• Good housekeeping measures;<br>• Best management practices. |
| SCAQMD Rule 1430 - Control of Emissions from Metal Grinding Operations at Metal Forging Facilities | Applies to metal grinding and metal cutting operations at metal forging facilities | • Enclosures for metal grinding and cutting operations;<br>• Emission control devices; 0.2 gr/dscf at control device outlet;<br>• HEPA filter or filters of equivalent control efficiency 99.97% for 0.3 µm particles at final stage of control device;<br>• Housekeeping requirements. |
| SCAQMD Rule 1460 - Control of Particulate Emissions from Metal Recycling and Shredding Operations | Applies to metal recycling facilities and metal shredding facilities | • Good housekeeping;<br>• Best management practices. |

The metal process controls we identified rely on a range of control measures that generally fall into several common categories. We compared the requirements of the relevant SJVUAPCD rules generally with those identified in SCAQMD and BAAQMD.

We did identify minor differences in the structure and scope of individual control measures between the rules implemented by SJVUAPCD and BAAQMD and those implemented by SCAQMD. For example, Our

review of the available control measures did not identify an available measure not being implemented in SJVUAPCD. SJVUAPCD and BAAQMD rules generally regulate the non-ferrous metal melting facilities in one rule, while the SCAQMD rules divide this source category into more facility types has separate rules for chromium and non-chromium metal melting. SCAQMD also implements specific measures for more types of metal processes including metal finishing operations (Rule 1426), metal grinding and metal forging operations (Rule 1430), and metal recycling and shredding operations (SCAQMD Rule 1460). We therefore have not identified any metal process controls for consideration as contingency measures in the San Joaquin Valley at this time.

#### *c. Conclusion*

We reviewed the available control measures for this category and, in general, we found that the available measures are already being implemented by SJVUAPCD. Therefore, we are not proposing any contingency measures for this source category at this time.

### 5. Wood and Paper

Source category 450 - Wood and Paper includes emissions from sawmills, woodworking, and other related processes. These sources contribute 0.20 tpd $PM_{2.5}$ emissions and zero $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory.

We did not identify any source-specific SJVUAPCD control measures related to this category. However, sources in this category are subject to the general particulate matter requirements in SJVUAPCD Rules 4201 and 4202. We explored relevant regulations in other jurisdictions, e.g., BAAQMD and SCAQMD. We also did not identify any relevant source-specific rules in BAAQMD. SCAQMD Rule 1137 includes requirements for control of $PM_{10}$ emissions from wood working operations with a pneumatic conveyance system.

To comply with the limits required established at SJVUAPCD Rules 4201 and 4202, wood and paper implement controls required by rules for other sources, such as those for cotton gins, and mineral processing, which are no less stringent than requirements for wood and paper sources implemented by other jurisdictions (e.g., SCAQMD Rule 1137). As we have not identified any more stringent controls for wood and paper sources, we have not identified any controls from this category for consideration as contingency measures.

### 6. Glass and Related Products

#### *a. Overview*

Source category 460 - Glass and Related Products consists of glass manufacturing facilities represented by three different glass industry types in the San Joaquin Valley: container glass, flat glass, and fiberglass. Particulate matter is emitted from the glass production process when materials melted in glass furnaces combine with gases to form condensates. $NO_X$ emissions are generated by the combustion of fuels in glass furnaces and by the reaction of nitrogen and oxygen at high temperatures in glass furnaces. Controls for direct particulate matter emissions from glass furnaces include electrostatic precipitator (ESP) and filtration systems. Controls for $NO_X$ emissions from glass furnaces include the use of oxygenated fuels and SCR. The Glass and Related Products source category contributes 0.17 tpd direct $PM_{2.5}$ emissions and 3.37 tpd $NO_X$ emissions in the 2023 San Joaquin Valley emissions inventory.

*b. Evaluation*

In the San Joaquin Valley, emissions from glass production facilities are regulated by SJVUAPCD Rule 4354. Twelve glass furnaces at six facilities in the San Joaquin Valley are subject to Rule 4354. Rule 4354 limits emissions of $NO_X$ and $PM_{10}$, as well as carbon monoxide, volatile organic compounds, and sulfur oxides, from glass melting furnaces. Rule 4354 applies to all glass melting furnaces in the San Joaquin Valley, while electric furnaces, glass furnaces with a permitted glass production capacity of less than five tons per day, glass production facilities with actual total $NO_X$ emissions of less than eight tons per year, and glass production facilities with actual total VOC emissions of less than eight tons per year are exempt from the rule. Additionally, Rule 4354 includes alternative provisions during periods of start-up, shutdown, or idling.

Rule 4354 establishes limits for $NO_X$ and $PM_{10}$ emissions from glass furnaces (in pounds of pollutant per ton glass produced) based on the type of furnace (i.e., container glass, fiberglass, or flat glass). Emission limits are evaluated on either block 24-hour or rolling 30-day averaging periods. On December 16, 2021, the SJVUAPCD adopted revisions to Rule 4354, including more stringent $NO_X$ and $PM_{10}$ emissions limits for all glass furnace types. $PM_{10}$ emission limits under the December 16, 2021 revisions to Rule 4354 are effective January 1, 2024. The December 16, 2021 revisions to Rule 4354 include a compliance schedule for $NO_X$ emission limits, including a "Phase I" $NO_X$ emission limit compliance deadline for existing furnaces by January 1, 2024, and a "Phase II" $NO_X$ emission limit deadline for existing furnaces by the date of next furnace rebuild after January 1, 2024, and no later than January 1, 2030. The currently applicable emission limits under Rule 4354 are listed under Table III-21, and the phased emission limits under the December 16, 2021 revisions to Rule 4354 are listed under Table III-22.

*Table III-21. On-the-Books Control Measures (Glass and Related Products)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4354 (in effect through December 31, 2023) | Applies to glass furnaces; exemptions:<br>• Electric furnaces<br>• Production capacity < 5 tons per day<br>• Actual $NO_X$ emissions < 8 tons per year<br>• Actual VOC emissions < 8 tons per year<br>• SSM | <u>$NO_X$</u><br>• Container glass: 1.5 lb/ton$^B$<br>• Fiberglass: 1.3 lb/ton$^A$; 3.0 lb/ton$^A$<br>• Flat glass (standard): 3.7 lb/ton$^A$; 3.2 lb/ton$^B$<br>• Flat glass (enhanced): 3.4 lb/ton$^A$; 2.9 lb/ton$^B$<br><br><u>$PM_{10}$</u><br>• Container glass: 0.50 lb/ton$^A$<br>• Fiberglass: 0.50 lb/ton$^A$<br>• Flat glass: 0.70 lb/ton$^A$<br><br>$^A$ Block 24-hour avg<br>$^B$ Rolling 30-day avg |

*Table III-22. On-the-Way Control Measures (Glass and Related Products)*

| Rule | Applicability | Control Measure |
| --- | --- | --- |
| SJVUAPCD Rule 4354 (compliance dates beginning January 1, 2024) | Applies to glass furnaces; exemptions:<br><br>• Electric furnaces<br>• Production capacity < 5 tons per day<br>• Actual NOX emissions < 8 tons per year<br>• Actual VOC emissions < 8 tons per year<br>• SSM | $NO_X$<br><br>• Container glass: 1.1 lb/ton[B] (Phase I); 0.75 lb/ton[B] (Phase II)<br>• Fiberglass: 1.3 lb/ton[A], 3.0 lb/ton[A] (Phase I); 1.3 lb/ton[A], 3.0 lb/ton[A] (Phase II)<br>• Flat glass: 2.8 lb/ton[A], 2.5 lb/ton[B] (Phase I); 1.7 lb/ton[A], 1.5 lb/ton[B] (Phase II)<br><br>$PM_{10}$<br>• Container glass: 0.20 lb/ton[A]<br>• Fiberglass: 0.50 lb/ton[A]<br>• Flat glass: 0.20 lb/ton[A]<br><br>[A] Block 24-hour avg<br>[B] Rolling 30-day avg |

Our evaluation included glass furnace rules in other California air districts to identify existing measures for the Glass and Related Products industry. Among the measures we reviewed were South Coast Air Quality Management District (SCAQMD) Rule 1117 and Bay Area Air Quality Management District (BAAQMD) Regulation 9, Rule 12. We also considered a recommendation in the Earthjustice Letters for replacement of existing glass furnaces with electric units. The other glass furnace control measures we identified are summarized in Table III-23 below.

*Table III-23. Other Control Measures Considered (Glass and Related Products)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 1117 | Applies to current & former RECLAIM facilities operating container glass melting (excludes flat glass) or sodium silicate furnaces; exemptions:<br>• Production capacity < 100 tons per year<br>• Remelt facilities using exclusively glass cullet, marbles, chips, etc.<br>• Fiberglass furnaces | Container glass: 0.75 lb/ton*<br>Sodium silicate: 0.5 lb/ton*<br>Limits on hours of operation w/o exhaust emission controls operating (including SSM)<br>*30-day rolling avg |
| BAAQMD Regulation 9 Rule 12 | Applies to glass melting furnaces; exemptions:<br>• Electric furnaces<br>• Production < 5 tons per day | 5.5 lb/ton (3-hour avg) |
| Other identified potential measures | N/A | Require electric furnaces for all glass melting. |

The on-the-books and on-the-way provisions of SJVUAPCD Rule 4354 summarized in Table III-21 and Table III-22 above include $NO_X$ and $PM_{10}$ emission limits for glass furnaces and specify limits for units producing container glass, fiberglass, and flat glass. We compared the applicability and emissions limits of Rule 4354 to those of the other measures considered in Table III-23.

The provisions of SJVUAPCD Rule 4354 adopted on December 16, 2021, include $NO_X$ and $PM_{10}$ emissions limits for container glass, fiberglass, and flat glass furnaces. Rule 4354 applies to glass furnaces in the San Joaquin Valley, except for electric furnaces, furnaces with a glass production capacity of less than five tons per day, and furnaces with less than eight tons per year of actual $NO_X$ or VOC emissions. Rule 4354 includes alternative work practice standards for periods of startup, shutdown, or idling.

In comparison, SCAQMD Rule 1117 applies only to facilities producing container glass and sodium silicate, except for furnaces with a glass production capacity of less than 100 tons per year and remelt facilities using exclusively glass cullet, marbles, chips, etc. Rule 1117 limits only $NO_X$ emissions, does not apply to flat glass or fiberglass furnaces and includes exemptions for periods of startup, shutdown, or idling. BAAQMD Regulation 9 Rule 12 applies to glass melting furnaces, except for electric furnaces and furnaces with a glass production capacity of less than five tons per day, and limits only $NO_X$ emissions.

As demonstrated in Table III-22 and Table III-23 above, the $NO_X$ emissions limits required by the December 16, 2021 amendments to SJVUAPCD Rule 4354 are established at the same level as those in

SCAQMD Rule 1117 and are more stringent than those in BAAQMD Regulation 9 Rule 12. SJVUAPCD Rule 4354 is the only rule among those evaluated to include $PM_{10}$ emission limits. Thus, the control measures identified in other jurisdictions are determined to be already on-the-books or on-the-way in the San Joaquin Valley.

We note that, in our evaluation of SJVUAPCD's BACM and MSM demonstration for the 2006 $PM_{2.5}$ NAAQS in the 2018 plan, we determined that Rule 4354 (as adopted at the time of the evaluation) established BACM and MSM control requirements for the glass furnace category at the time, and we recommended that SJVUAPCD (1) evaluate the cost effectiveness and technical feasibility of combining oxy-fuel firing combustion controls with selective catalytic reduction (SCR) post-combustion controls, and (2) consider requiring all flat glass units to comply with the Tier 4 "Enhanced Option" in Rule 4354.[53] The December 16, 2021 revisions to Rule 4354 (summarized in Table III-22 below) effectively incorporate our recommendations for enhancements to glass furnace controls.

While SCAQMD Rule 1117 includes the same $NO_X$ emission limit for container glass as that of SJVUAPCD Rule 4354, and this limit is currently in effect in the South Coast Air Basin, sources may not need to comply with the Phase II $NO_X$ limits under SJVUAPCD Rule 4354 until December 31, 2029. The Earthjustice Letters recommend that the phased emission limits in Rule 4354 be enacted immediately. We note that there is only one container glass production facility in the South Coast Air Basin subject to Rule 1117, and this facility already had sufficient controls installed to meet the 0.75 lb/ton $NO_X$ emission limit at the time Rule 1117 was amended to include this limit. SJVUAPCD Rule 4354 includes a phased compliance schedule to provide operators with the time necessary to install the additional controls needed to meet the Phase II limits, namely selective catalytic reduction, ceramic catalytic filter, or oxy-fuel firing for $NO_X$, and to align the installation of controls with upcoming furnace rebuilds. Because the SJVUAPCD has already adopted the most stringent $NO_X$ limits identified for glass furnaces and has included a compliance schedule for facilities to meet these limits under SJVUAPCD Rule 4354, we are considering the most stringent glass furnace $NO_X$ limits to be on-the-way in the San Joaquin Valley and are not proposing to accelerate the implementation schedule in Rule 4354 as a contingency measure at this time.

We also considered recommendations included in the Earthjustice Letters for amendments to the glass furnace control strategy in the San Joaquin Valley, including requiring sources to meet applicable emission limits at each individual unit, requiring electric furnaces for glass melting operations in the San Joaquin Valley, and adding direct $PM_{2.5}$ limits to Rule 4354. The Earthjustice Letters note that Rule 4354 allows furnace operators to meet applicable emissions limits across multiple emissions units by considering multiple furnaces or furnace batteries as a single unit, whereas this option could be removed to require all individual units to meet the applicable emission limits. Removing the emissions averaging approach would not necessarily reduce emissions overall. Additionally, the Earthjustice Letters state that Rule 4354 establishes limits on $PM_{10}$ emissions, whereas the limits could be established for $PM_{2.5}$ emissions to regulate $PM_{2.5}$ more directly. Establishing $PM_{2.5}$ emissions limits in addition to the existing $PM_{10}$ limits is not likely to result in SIP-creditable emissions reductions. Thus, we do not consider these recommendations as potential contingency measures.

---

[53] EPA, "Technical Support Document, EPA Evaluation of BACM/MSM, San Joaquin Valley $PM_{2.5}$ Plan for the 2006 $PM_{2.5}$ NAAQS," February 2020.

We also evaluated the recommendation from the Earthjustice Letters to require electric furnaces for glass melting operations in the San Joaquin Valley as a potential contingency measure. Among the glass production facilities in the San Joaquin Valley, one facility is permitted to operate an electric glass melting furnace, which may suggest that District-wide replacement of existing glass furnaces with electric units may be a feasible control measure. However, the existing electric furnace in the San Joaquin Valley has been inoperable for over 10 years and has a limited production capacity compared to the other glass melting furnaces in the Valley. In researching electric glass furnace technology, SJVUAPCD staff have found that electric glass furnaces are limited by lower glass pull rates compared to conventional glass furnaces and are suitable only for the production of container glass. SJVUAPCD found that numerous electric furnaces would be required to replace the production capacity of existing glass furnaces, that electric furnaces would incur greater operation and maintenance costs, and that the typical electric furnace has a useful life less of four years (compared to 10-12 years for natural gas furnaces). For these reasons, replacement of glass furnaces with electric units is technologically infeasible as a contingency measure in the San Joaquin Valley at this time.

#### *c. Conclusion*

We reviewed the potential control measures for this source category and found that the control measures implemented for glass melting furnaces are already on-the-books or on-the-way in the San Joaquin Valley. We also evaluated a recommendation from the Earthjustice Letters to require the replacement of glass furnaces with electric units, and we found this potential measure to be technologically infeasible. Therefore, we have not identified any feasible controls to propose as contingency measures for the Glass and Related Products source category at this time.

### 7. Electronics

EMFAC reports less than 0.01 tpd each of direct $PM_{2.5}$ and $NO_X$ emissions from the source category 470 - Electronics in the 2023 San Joaquin Valley emissions inventory. The small quantity of emissions reported for this source category are attributed to cooling towers and other unspecified chemical processes. Control measures for cooling towers are evaluated in Section III.D of this document. We have otherwise identified no controls for consideration as contingency measures for this source category.

### 8. Other (Industrial Processes)

Source category 499 – Other (Industrial Processes) consists of miscellaneous industrial sources, largely reported as “Other” and “Material not Specified” in the San Joaquin Valley emissions inventory. These sources contribute 0.18 tpd $PM_{2.5}$ and 0.01 tpd $NO_X$ emissions to the San Joaquin Valley emissions inventory. Combustion sources most likely contribute to the emissions reported for this source category. Our evaluation of control measures for fuel combustion sources is contained in section III.A of this document.

## F. Solvent Evaporation

Source categories in the Solvent Evaporation group include 510 - Consumer Products, 520 - Architectural Coatings and Related Process Solvents, 530 - Pesticides/Fertilizers, and 540 - Asphalt Paving and Roofing. These source categories emit primarily VOC, and CEPAM reports zero $PM_{2.5}$ and $NO_X$ emissions for these categories. As described in Section I of this document and in further detail in the NPRM for the proposed contingency measures FIP, based upon the EPA’s proposed approval of the State’s comprehensive

precursor demonstration, we are not proposing FIP contingency measures for VOC in this action. See Section IV.C ("Soil $NO_X$") of this TSD for additional discussion of the issue of $NO_X$ emissions from use of pesticides and fertilizers.

## G. Miscellaneous Processes

### 1. Residential Fuel Combustion

#### *a. Overview*

Source category 610 - Residential Fuel Combustion consists of several subcategories, including wood combustion and fuel combustion (space heating, water heating, cooking, and other appliances, such as clothes dryers, barbecues, and water heaters used for pools, spas and hot tubs). Residential wood combustion sources are evaluated in this section; fuel combustion sources (particularly space heaters and water heaters) are evaluated under Section III.A.

Residential wood burning includes wood-burning heaters (i.e., woodstoves, pellet stoves, and wood-burning fireplace inserts), which are used primarily for heat generation, and wood-burning fireplaces, which are used primarily for aesthetic purposes. All of these devices emit direct $PM_{2.5}$ and $NO_X$. However, properly operated wood-burning heaters (i.e., woodstoves, pellet stoves, and wood-burning fireplace inserts), that have been certified under the EPA's NSPS emit lower levels of $PM_{2.5}$ compared to wood-burning fireplaces and uncertified wood-burning heaters.

Residential fuel combustion sources contribute 3.00 tpd direct $PM_{2.5}$ and 4.84 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory (approximately and 4.5% and 3.0% of the San Joaquin Valley $PM_{2.5}$ and $NO_X$ inventories), including 2.53 tpd direct $PM_{2.5}$ and 0.38 tpd $NO_X$ emissions from residential wood burning. To demonstrate the emissions reductions achievable with various measures relative to applicable SIP-approved inventories, we have also considered the 2018 $PM_{2.5}$ Plan inventories for this category, presented in Table III-24 below.[54]

*Table III-24. Residential Wood Burning Emissions from the San Joaquin Valley 2018 $PM_{2.5}$ Plan (annual average, tpd)*

| | 2013 | 2017 | 2019 | 2020 | 2022 | 2023 | 2024 | 2025 | 2026 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| **$PM_{2.5}$** | 3.26 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 |
| **$NO_X$** | 0.49 | 0.42 | 0.42 | 0.42 | 0.42 | 0.42 | 0.42 | 0.42 | 0.42 | 0.42 |

In the proposed contingency measures FIP, we propose a contingency measure that would lower the curtailment levels for all counties in the San Joaquin Valley to the current thresholds for certain "hot spot" counties. The proposed measure is explained in greater detail in the NPRM for the proposed

[54] 2018 $PM_{2.5}$ Plan, App. C, p. C-257. These values do not account for the 2019 amendments to Rule 4901, which were credited with 0.20 tpd (annual average) of direct $PM_{2.5}$ reductions beginning in 2020. See 85 FR 17382, 17415 (March 27, 2020). They also do not account for changeouts performed under the District's Burn Cleaner program.

contingency measures FIP as well as in the associated Proposed Contingency Measures TSD. Additional controls beyond the proposed measure are evaluated in this section.

SJVUAPCD Rule 4901 (Wood Burning Fireplaces and Wood Burning Heaters) (amended May 18, 2023) establishes requirements for the sale, transfer, operation, and installation of wood burning devices and on the advertising of wood for sale intended for burning in a wood-burning fireplace, wood-burning heater, or outdoor wood-burning device in the San Joaquin Valley.

One of the most effective ways to reduce wintertime smoke is a curtailment program that restricts use of wood-burning heaters and fireplaces on days that are conducive to buildup of particulate matter concentrations (i.e., days where ambient $PM_{2.5}$ and/or $PM_{10}$ concentrations are forecast to be above a particular level, known as a "curtailment threshold").[55]

Rule 4901 includes a tiered mandatory curtailment program (effective November through February) that establishes different curtailment thresholds based on type of device (i.e., registered clean-burning devices[56] vs. unregistered devices) and county (i.e., hot spot vs. non-hot spot). During a Level One Episodic Wood Burning Curtailment, operation of wood-burning fireplaces and unregistered wood-burning heaters is prohibited, but properly operated, registered wood-burning heaters may be used.[57] During a Level Two Episodic Wood Burning Curtailment, operation of any wood-burning device is prohibited.[58] However, the rule includes an exemption from the curtailment provisions for (1) locations where natural gas service is not available and (2) residences for which a wood-burning fireplace or wood burning heater is the sole available source of heat.[59]

In order to implement this program, the District develops daily air quality forecasts, based on EPA and California Air Resources Board guidance, which include a projection of the maximum $PM_{2.5}$ concentration in each county for the following day.[60] This maximum county $PM_{2.5}$ concentration forecast is then compared with the curtailment thresholds in Rule 4901. If a county's $PM_{2.5}$ forecast exceeds the applicable threshold, then a curtailment is declared for the county for the following day.

In 2019, the District lowered the curtailment thresholds in the counties of Madera, Fresno, and Kern. The District identified these counties as "hot spots" because they were "either new areas of gas utility or areas deemed to have persistently poor air quality."[61]

---

[55] EPA, "Strategies for Reducing Residential Wood Smoke," March 2013, 6.
[56] In order to be registered, a device must either be certified under the NSPS at time of purchase or installation and at least as stringent as Phase II requirements or be a pellet-fueled wood burning heater exempt from EPA certification requirements at the time of purchase or installation (section 5.9.1). The rule includes requirements for documentation and inspection to verify compliance with these standards (sections 5.9.2 and 5.10).
[57] Rule 4901, section 5.7.1.
[58] Rule 4901, section 5.7.2.
[59] Rule 4901, section 5.7.4.
[60] Email dated October 9, 2019, from Jon Klassen (SJVUAPCD) to Meredith Kurpius (EPA Region IX), Subject: "RE: Info to support Rule 4901."
[61] 2018 $PM_{2.5}$ Plan, Appendix J, 60.

*Table III-25. Curtailment Thresholds in SJVUAPCD Rule 4901*

| Level | Hot Spot Counties (Madera, Fresno, and Kern) | Non-Hot Spot Counties (San Joaquin, Stanislaus, Merced, Kings, and Tulare) |
|---|---|---|
| Level One (No Burning Unless Registered) | 12 micrograms per cubic meter ($\mu g/m^3$) | 20 $\mu g/m^3$ |
| Level Two (No Burning for All) | 35 $\mu g/m^3$ | 65 $\mu g/m^3$ |

The 2019 revision also added a contingency provision to the rule that would lower the curtailment levels for any county that failed to attain the applicable standard to levels consistent with current thresholds for hot spot counties. However, the EPA disapproved this provision because it did not meet CAA requirements for contingency measures.[62]

On May 18, 2023, the District adopted a new contingency measure in section 5.7.3 of Rule 4901 that would be triggered by a final determination by the EPA that the District failed to meet one or more of the following triggering events of the applicable $PM_{2.5}$ NAAQS:

1. Any Reasonable Further Progress requirement;
2. Any quantitative milestone;
3. Submission of a quantitative milestone report; or
4. Attainment of the applicable $PM_{2.5}$ NAAQS by the applicable attainment date.

Following the first such triggering event, the measure would lower the thresholds for the non-hot spot counties to the current thresholds for hot spot counties (i.e., 12 $\mu g/m^3$ for unregistered devices; 35 $\mu g/m^3$ for registered devices). Following the second such event, the measure would further lower the threshold for unregistered devices to 11 $\mu g/m^3$.

### *b. Evaluation*

Our evaluation included review of controls for residential wood burning devices in various rules and ordinances adopted by other jurisdictions. Because wood burning rules often contain many different components, we focused our review on those elements where the EPA or commenters have previously identified more stringent provisions in other rules.

[62] 86 FR 67329, 67338 (November 26, 2021).

Specifically, the Earthjustice Letters include the following observations:[63]

> (1) Rule 4901 (Wood Burning Fireplaces and Wood Burning Heaters) contains many provisions that are less stringent than those in other air districts and jurisdictions, and
>
> (2) Rule 4901 (Wood Burning Fireplaces and Wood Burning Heaters), section 5, imposes more stringent emissions limits in so-called "hot spot" counties than in the rest of the District, even though the limits are feasible throughout the whole District.

As noted above, the District recently adopted a contingency measure that would apply the "hot spot" thresholds to all counties, thus addressing the second concern raised by the environmental groups. We have considered each of the recommendations from the Earthjustice Letters. The measures considered for this source category are summarized in Table III-26.

[63] Earthjustice Letters, attachment C, 38-46.

*Table III-26. Other Control Measures Considered (Residential Fuel Combustion)*

| Rule | Applicability | Control Measure |
|---|---|---|
| Puget Sound Clean Air Agency Regulation I, section 13.07(a) | Uncertified woodstoves | Owners of uncertified woodstoves in the Tacoma-Pierce $PM_{2.5}$ nonattainment area (except sole source households) were required to dispose of or render inoperable their uncertified devices by 2015. |
| BAAQMD Regulation 6-3, section 6-3-110 | Sole source definition | Effective November 1, 2016, limited to households whose sole source of heat is an EPA certified wood-burning device that is registered with BAAQMD and who does not have available to them a permanently-installed natural gas, propane or electric heating device. |
| BAAQMD Regulation 6-3 | Curtailment season | No defined season – curtailment applies year-round |
| BAAQMD Regulation 6-3, section 6-3-304 | Health hazard disclosures | Requires anyone selling or leasing property with a wood-burning device to disclose the health hazards of wood smoke as part of the signed disclosure documents in the real estate purchase or rental transaction |
| SCAQMD Rule 445, section (e) | Cooking | Prohibits all non-essential residential wood-burning including residential wood-burning for the purpose of cooking, both indoor and outdoor, on days forecast above 30 $\mu g/m^3$ |
| Oregon Department of Environmental Quality 340-262-1000, Wood Burning Contingency Measures for $PM_{2.5}$ Nonattainment Areas | Opacity limit | Forbids wood-smoke emissions greater than 20% opacity for more than three minutes in any 60-minute period including startup time in any $PM_{2.5}$ nonattainment area that does not attain by the applicable deadline. |

In Table III-26, we compare the on-the-books and on-the-way provisions of Rule 4901 to each of the other measures considered. Our evaluation of each existing measure and its suitability for adoption as a contingency measure is provided in the following sections.

### i. Prohibition on the Operation of Any Uncertified Wood Heater

At least two other jurisdictions (Santa Rosa, California and the Tacoma-Pierce County Smoke Reduction Zone in Washington) have banned the use of uncertified heaters (except in sole source households), suggesting that such a measure may be technologically and economically feasible. We estimate that this measure would achieve an additional 0.34 tpd (annual average) emissions reductions.[64] In contrast to an outright prohibition on the use of uncertified heaters, our proposed contingency measure, if triggered, would target emissions reductions from these heaters to the days and locations that are forecasted to have worse air quality (i.e., exceeding the 2012 annual NAAQS of 12 µg/m$^3$), while allowing use of uncertified heaters on days and locations with better air quality forecasts (i.e., below 12 µg/m$^3$).

While the District's Burn Cleaner program provides incentive funding for uncertified device changeouts, current levels of funding are not sufficient to cover the cost of mandatory replacement of all remaining uncertified devices in the District. We estimate that there are presently more than 8,000 uncertified devices within the District.[65] Although the Burn Cleaner program has been well funded with more than $23 million dollars available in 2021-2022, most of this funding has been used to install gas or certified wood-burning inserts in open hearth fireplaces, rather than to replace uncertified wood heaters.[66]

Given that many devices remain that need to be replaced, we expect that a prohibition on operating uncertified wood heaters would take more than 1-2 years to implement. For example, the prohibition in the Tacoma-Pierce County Smoke Reduction Zone in Washington (a much smaller area) provided three years for compliance. In addition, insufficient funding of the Burn Cleaner program in this short period of time could result in the measure disproportionately impacting low-income residents. Therefore, we do not consider a prohibition on uncertified devices to be an appropriate contingency measure for the San Joaquin Valley. However, the District should explore a prohibition on uncertified devices on a longer timeframe, with adequate incentive funding for low-income residents.

### ii. Removal of Exemption for Homes without Access to Piped Natural Gas

As noted above, Rule 4901 includes an exemption from the curtailment provisions for locations where natural gas service is not available. In contrast, BAAQMD bans the use of wood-burning devices in such areas if the household has propane or electric heat.[67] According to an analysis developed by SJVUPACD, heating costs associated with propane are significantly higher than those associated with piped natural gas, and households without natural gas therefore frequently use wood burning as a supplemental heat source to save on heating costs.[68] We note that this analysis is based on national average fuel usage and cost data. The analysis also does not distinguish between wood heaters, which are used primarily for heat, and fireplaces, which are used primarily for ambience. We are not aware of District-specific data regarding these cost and usage issues, and we encourage the District to conduct a survey to gather information concerning use of wood as a supplemental heat source in households without piped natural

---

[64] See *Remaining Emissions from Uncertified Devices.xlsx*.
[65] *Remaining Emissions from Uncertified Devices.xlsx*.
[66] 2022-12-14 2021annualreport_burncleanerincentivemeasure_appendixc.xlsx (11,563 out of 14,608 projects had open hearth fireplaces or fireboxes as the old device).
[67] BAAQMD Regulation 6-3, "Wood-Burning Devices", Section 6-3-110.
[68] SJVUPACD, "Negative and Regressive Impact of Removing Propane Exemption from Rule 4901," Attachment to Email dated March 27, 2023 from Jon Klassen (SJVUAPCD) to Meredith Kurpius (EPA Region IX), Subject: "Propane Analysis and RWC Contingency ER Calculations."

gas. Nonetheless, given the potentially significant increases in heating costs for households without piped natural gas, which could result from removal of the exemption, we are not proposing to remove the exemption as a contingency measure at this time.

#### iii. Extension of the Curtailment Program to the Entire Year

Most California woodburning rules (e.g., SJVUAPCD Rule 4901, SCAQMD Rule 445, and SMAQMD Rule 421) define the wood burning season as the months of November through February. Other areas include additional months (e.g., Albuquerque City Ordinance § 9-5 applies during the months of October through February) or apply year-round (e.g., Utah R307-302 and BAAQMD 6-3).[69]

In response to comments raised on our proposed action on the San Joaquin Valley Serious Area Plan for the 2006 $PM_{2.5}$ NAAQS in 2020, we evaluated the additional emission reductions that could be achieved by applying thresholds as low as 25 $\mu g/m^3$ and extending the curtailment season to include October and March in the San Joaquin Valley.[70] We found that such an extension would result in additional annual average $PM_{2.5}$ emission reductions of less than 0.01 tpd $PM_{2.5}$ compared to the current season of November through February.[71] While we did not include the entire year in this analysis, we expect that the emission reductions from the additional months would be minimal, given that, in total, these months comprise an estimated 1-1.5% of annual wood burning.[72] For these reasons, we are not proposing to adopt such an extension as part of the contingency measures FIP.

#### iv. Requirement for Sole-Source Households to Register and Use Certified Devices

We have previously recommended that the District require sole-source households to register with the District and use a properly operated EPA-certified device.[73] For the reasons described under (A) above, we do not think a ban on uncertified devices could be implemented within 2 years as a contingency measure and if sufficient incentive funding is not available such a timeline could disproportionately impact low-income residents.

#### v. Prohibition on Wood Smoke Emissions Greater than 20% Opacity for More than Three Minutes in Any 60-minute Period Including Startup Time

In addition to the limits in Rule 4901, SVJUAPCD Rule 4101,"Visible Emissions", which the District amended on February 17, 2005, and the EPA approved into the SIP on August 11, 2005,[74] also includes an opacity limit that applies to wood burning devices.[75] In particular, Rule 4101 prohibits discharge of

---

[69] EPA, "Response to Comments Document for the EPA's Final Action on the San Joaquin Valley Serious Area Plan for the 2006 $PM_{2.5}$ NAAQS" June 2020, 132.

[70] Memorandum dated June 25, 2020, from Rynda Kay, EPA Region IX, to docket number EPA-R09-OAR-2019-0318, Subject: "Comparison of residential wood burning rules", Table 5.

[71] Id.

[72] SJVUAPCD, "2015 Area Source Emissions Inventory Methodology 610—Residential Wood Combustion," dated October 18, 2016, Table 3.

[73] EPA, "Technical Support Document for EPA's Proposed Rulemaking for the California State Implementation Plan (SIP), San Joaquin Valley Unified Air Pollution Control District, Rule 4901 Wood Burning Fireplaces and Wood Burning Heaters," December 2019, 11.

[74] 70 FR 46770 (August 11, 2005).

[75] SJVUAPCD Rule 4101, paragraph 2 (rule applies to "any source operation which emits or may emit air contaminants").

"any air contaminant, other than uncombined water vapor, for a period or periods aggregating more than three (3) minutes in any one (1) hour which is as dark or darker in shade as that designated as No. 1 on the Ringelmann Chart."[76] This rule applies at all times including during startup and refueling. The shade designated as No. 1 on the Ringlemann Chart is equivalent to 20% opacity. Thus, the approved SIP for SJVUAPCD already forbids wood smoke emissions greater than 20% opacity for more than three minutes in any 60-minute period including startup time.

##### vi. Increased Fines for Violation

Rule 4901 does not specify the fines that apply to violations of the curtailment program, and such penalty provisions are generally not appropriate for inclusion in SIPs because they could create conflicts with federal enforcement provisions under CAA section 113. Similarly, such a contingency measure would not be appropriate for the proposed FIP.

##### vii. Other measures

The Earthjustice Letters also recommend that the District adopt additional provisions included in SCAQMD and BAAQMD rules, such as health hazard disclosures, curtailment of residential wood-fired cooking, and a time limit on repair exemptions. The EPA's listing of residential wood combustion control measures does not include an estimated control efficiency for any of these measures, so we cannot attribute any emissions reductions to them at this time.[77] Accordingly, we do not consider them to be appropriate for inclusion in a contingency measure FIP.

#### *c. Conclusion*

Residential fuel combustion emissions in the San Joaquin Valley are regulated by SJVUAPCD Rule 4901. In May 2023, the District adopted a new contingency measure in Rule 4901 that would lower the thresholds for the non-hot spot counties to the current thresholds for hot spot counties. We compared the on-the-books and on-the-way provisions of Rule 4901 with similar controls in other jurisdictions, focusing on recommendations for residential fuel combustion controls by environmental groups in the Earthjustice Letters. We have concluded that these measures either would either be infeasible to implement within two years or would not result in significant emissions reductions within that time frame. Our proposed FIP includes a contingency measure that would lower the curtailment levels for all counties in the San Joaquin Valley to the current thresholds for hot spot counties upon trigger. Based on the evaluation presented in this section, we are not proposing any additional measures beyond the proposed curtailment level lowering measure.

### 2. Fugitive Dust Categories

Fugitive dust source categories reported by CEPAM include 620 – Farming Operations, 630 – Construction and Demolition, 640 – Paved Road Dust, 645 – Unpaved Road Dust, and 650 – Fugitive Windblown Dust. Fugitive dust emissions are typically generated through the pulverization of surface

---

[76] Id., paragraph 5.1.
[77] EPA, "Strategies for Reducing Residential Wood Smoke," March 2013, Appendix D.

materials by mechanical force or by entrainment of dust particles in turbulent air streams.[78] Fugitive dust particulate matter emissions are typically reduced and managed using control techniques or measures that prevent materials from being deposited onto surfaces (preventative) or that remove deposited materials from surfaces (mitigative). Examples of these measures include watering, elimination of dirt carryout on paved roads at construction sites and cleaning up of spillage on travel surfaces within a specific timeframe after said spillage occurs. SJVUAPCD Regulation VIII series (8000 Rule series), as well as other rules like SJVUAPCD Rule 4550, “Conservation Management Practices” (amended August 19, 2004), regulate these forms of fugitive particulate matter emissions in the San Joaquin Valley.

The Earthjustice Letters point out that the District’s fugitive dust rules do not require sources to adopt “all feasible controls” and that allowing sources to choose one option from a menu of controls does not require that all feasible, effective controls are in place. As shown in our analyses below for each fugitive dust category, the list of control measure options is extensive and covers a wide range of sources and activities. However, if overlapping, all the of options listed for a particular activity will not be technologically and economically feasible at every affected sources. For example, applying gravel to an unpaved road and then a chemical dust suppressant is not a realistic set of control measures that should overlap. But, applying dust suppressants and a speed limit is assumed to be technologically and economically feasible, where the use of the dust suppressant would already be considered technologically and economically feasible. In other instances, a single option from the available list may be all that is needed (e.g., if the options are: pave the road, apply a chemical dust suppressant, apply and maintain gravel, or water application). Evaluating, as a potential contingency measure, which combination of controls should or should not be triggered in each scenario is challenging. On the other hand, simply requiring affected sources to apply “all feasible measures” from the list of options would not be enforceable. We believe the concerns raised in the Earthjustice Letters could be better addressed through improvements in enforceability, such as ongoing monitoring of visible emissions to ensure chosen measures are effective and recordkeeping/periodic reporting of routine actions taken to implement control measures. Given these concerns, we are not considering the recommendation to require “all feasible controls” as a contingency measure for the fugitive dust category.

The following sections contain our analysis of fugitive dust source categories and associated control measures in the San Joaquin Valley.

### *a. General Requirements for Fugitive Dust Sources*

The SJVUAPCD’s fugitive dust rules are in the Regulation VIII series and consist of SJVUAPCD Rule 8011 (General Requirements) (amended August 19, 2004) for general requirements, and additional category-specific rules (SJVUAPCD Rules 8021-8081). Rule 8011 primarily establishes definitions, prohibition on the use of certain chemicals and other materials for soil stabilization purposes, test methods, and recordkeeping requirements that are broadly applicable and referenced by other rules under Regulation VIII. It does not establish specific control measure requirements, and as a result the remainder of our evaluation focused on the other 8000 series rules that apply to specific source categories.

---

[78] EPA, “Compilation of Air Pollutant Emissions Factors, Volume 1: Stationary Point and Area Sources,” Chapter 13, Section 2, available at *https://www.epa.gov/sites/default/files/2020-10/documents/13.2_fugitive_dust_sources.pdf* (last updated January 1995).

Rule 8011 also establishes an option for sources subject to SJVUAPCD Rules 8061 (Paved and Unpaved Roads) (amended August 19, 2004), 8071 (Unpaved Vehicle/Equipment Traffic Areas) (amended September 16, 2004), and 8081 (Agricultural Sources) (amended September 16, 2004) to demonstrate compliance with the paved and unpaved road requirements of those rules by implementing a fugitive $PM_{10}$ management plan (FPMP).

### *b. Farming Operations*

#### i. Overview

Source category 620 - Farming Operations consists of fugitive dust particulate matter emissions caused by farming related activities, including tilling dust, harvesting operations, and various animal specific feedlot operations. Similarly, the EPA's national emissions inventory indicates that dust emissions from this source category are generated from agricultural tilling and dust kicked up by animal hooves and feet. Farming operation emissions account for about 19% of the San Joaquin Valley $PM_{2.5}$ emissions inventory, contributing 12.96 tpd in 2023. The largest contributor to particulate matter emissions from farming operations is the "Harvest Operations – Dust" subcategory. Relative to other harvesting operations, almond harvesting generates a high rate of particulate matter emissions at 31.2 pounds $PM_{10}$ per acre per year. Almond harvest in California typically occurs in September and October and uses several specialized machines. The process begins with mechanical tree "shakers" vigorously shaking the almonds to the canopy floor. The almonds remain on the canopy floor to dry in the sun before being swept into rows by a "sweeper" machine. After they are swept, a "harvester" machine drives over the rows vacuuming up the nuts in a process referred to as "pickup." Subsequently, the components of the almond harvest emission factor include these various stages of the harvesting operation: almond shaking (3.47 pounds per acre per year [lb/acre/year]), almond sweeping (4.15 lb/acre/year), and almond pickup (23.6 lb/acre/year).[79] In December 2019, the Almond Board of California announced environmental goals for almond orchards by 2025, including a goal of reducing dust during almond harvest by 50%.[80]

The U.S. Department of Agriculture 2022 California Almond Acreage Report estimates that California's 2022 almond acreage was 1,630,000 acres, of which 1,350,000 acres were bearing almonds in 2022.[81] This report provides information by county, and the total bearing acreage of almonds in the San Joaquin Valley in 2022 was estimated to be 1,159,189 acres or approximately 85% of the total almond bearing acres in California. Based on the bearing acreage of almonds in the San Joaquin Valley estimated with data from the 2022 California Almond Acreage Report, almond harvesting pickup operations emitted an estimated 1,710 tons $PM_{2.5}$ per year or 4.68 tpd direct $PM_{2.5}$. We calculated this estimate using emission

---

[79] CARB, "Miscellaneous Process Methodology 7.5, Agricultural Harvest Operations," revised March 2017, Table B ("Crop Emission Factor Assumption and $PM_{10}$ Harvest Emissions Factor") and Table 2 ("Monthly Agricultural Harvest Activity by Crop for 2012"). The components of the almond harvest emission factor include almond shaking (3.47 lb/acre/year), almond sweeping (4.15 lb/acre/year), and almond pickup (23.6 lb/acre/year). Id. at Table 1 ("Emission Factors for California Harvesting Operations"). See also, 2018 $PM_{2.5}$ Plan, App. B, p. B-27, for a brief explanation of the emissions methodology used for Farming Operations in the Plan, and CARB's webpage on emissions methodologies for Farming Operations, available at: https://ww2.arb.ca.gov/carb-miscellaneous-process-methodologies-farming-operations.

[80] Almond Board of California, "Almond Orchard 2025 Goals," December 2019.

[81] U.S. Department of Agriculture, "2022 California Almond Acreage Report," released April 27, 2023. Available at: *https://www.nass.usda.gov/Statistics_by_State/California/Publications/Specialty_and_Other_Releases/Almond/Acreage/202304almac.pdf*.

factors from CARB's 2012 adoption of a Revised Harvesting Emission Factor for Almonds, which reports the emission factor for almond harvesting operations at 31.2 lb $PM_{10}$ per acre per year.[82] The pickup portion of the harvest produces 23.6 lb $PM_{10}$ per acre per year or 75.6% of the total $PM_{10}$ emissions. Baticados et al. estimate the average ratio of $PM_{10}$ to $PM_{2.5}$ emissions from the use of low-dust and conventional harvesters at 12.5%.[83] Therefore, we estimate that the fine particulate emission factor for almond harvesting pickup operations at 2.95 lb $PM_{2.5}$ per acre per year.

### ii. Evaluation

We reviewed control measures currently in practice for the farming operations category. While there are several states and districts that have established fugitive dust rules, many of them exempt agricultural sources from regulation. Table III-27 below summarizes the applicable on-the-books control measures for farming operations. We did not identify any on-the-way control measures for this category, although we note that, per commitments in the 2018 $PM_{2.5}$ Plan, the SJVUAPCD is undergoing a process to evaluate potential enhancements to Rule 4550 and the conservation management practices (CMP) program to reduce dust from agricultural operations. The District has hosted public meetings and workshops to evaluate such enhancements but has not yet adopted any new measures.[84] Table III-28 below summarizes the applicable control measures we identified in other jurisdictions with existing fugitive dust requirements for farming operations as well as an additional potential control measure based upon a voluntary program for almond harvesting operations implemented in the San Joaquin Valley, described in greater detail below.[85]

Rule 4550 requires farms with 100 acres or more, dairies with 500 or more mature cows, cattle feedlots with 190 or more cows, turkey ranches with 55,000 or more turkeys, chicken ranches with 125,000 or more chickens, and chicken egg ranches with 82,000 or more laying hens to implement CMPs. Rule 4550 requires owners/operators of agricultural sources to submit a CMP application to the SJVUAPCD for approval and to implement the selected CMPs. This rule established a menu-based approach of conservation management practices farmers can choose from for various categories applicable to their operations.[86] The EPA approved Rule 4550 (adopted on August 19, 2004) into the California SIP on February 14, 2006.[87]

---

[82] CARB, "2012 Adoption of a Revised Harvesting Emission Factor for Almonds," September 7, 2012. Available at: *https://ww3.arb.ca.gov/ei/areasrc/fullpdf/2012almondef.pdf.*

[83] Baticados et al., "Particulate matter emission factors using low-dust harvesters for almond nut-picking operations," September 9, 2019. Available at *https://www.tandfonline.com/doi/pdf/10.1080/10962247.2019.1655500.*

[84] SJVUAPCD, "Public Scoping Meeting for Potential Amendments to District Rule 4550 (Conservation Management Practices), December 16, 2021 (presentation), and SJVUAPCD, "Public Workshop for Potential Amendments to District Rule 4550 (Conservation Management Practices)," November 7, 2022 (presentation).

[85] A list of each individual management practice contained in the evaluated rules is too voluminous to include here in its entirety. Table III-29 summarizes and groups these measures into certain broad control measure categories that we consider representative of the overall range of dust control measures.

[86] SJVUAPCD, "List of Conservation Management Practices", May 20, 2004. Available at: *http://www.valleyair.org/farmpermits/applications/cmp/cmp_list.pdf*

[87] 71 FR 7683 (February 14, 2006).

The SJVUAPCD has a voluntary incentive program, "Low-Dust Nut Harvester Replacement Program", that funds replacement of conventional nut harvesters with low-dust models.[88] A list of eligible equipment is available and includes models that reduce $PM_{2.5}$ emissions from almond harvesting operations between 41% and 62%, with an average reduction of 51%.[89] We evaluated a potential contingency measure requiring affected almond orchards with over 1,000 bearing acres of almonds to use a low-dust harvester from the District's Low-Dust Nut Harvester Replacement Program's eligible equipment list for at least 80% of their harvest. One of the CMP categories in Rule 4550 is harvest activities, so under the potential measure, the use of a low-dust harvester would be in addition to their selected CMP for harvest activities.

Lastly, SJVUAPCD's Rule 4570 (Confined Animal Facilities) (amended October 21, 2010) establishes control measures from farming operations involving livestock in confined conditions. We received recommendations in the Earthjustice Letters related to this rule. However, Rule 4570 only regulates VOC emissions, and as described in Section I of this document and in further detail in the NPRM for the proposed contingency measures FIP, based upon the EPA's proposed approval of the State's comprehensive precursor demonstration, we are not evaluating FIP contingency measures for VOC in this action.

*Table III-27. On-the-Books Control Measures (Farming Operations)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4550 – Conservation Management Practices (includes District CMP handbook and CMP list) | See Table III-29. Comparison of Existing Control Requirements (Farming Operations) | Contains requirements for land preparation, harvesting activities, windblown dust control, and poultry, dairy, and feedlot operations; see specific limits and control requirements in Table III-29. Comparison of Existing Control Requirements (Farming Operations) |

[88] SJVUAPCD, "Low Dust Nut Harvester Replacement Program Eligible Equipment," February 2023. Available at *https://ww2.valleyair.org/media/0ryd2fxz/supplemental-document-eligible-equipment-february-2023.pdf*
[89] These estimates are based solely on research conducted in the 2019 Baticados et al. paper.

*Table III-28. Other Control Measures Considered (Farming Operations)*

| Rule | Applicability | Control Measure |
|---|---|---|
| Imperial County APCD Rule 806 – Conservation Management Practices (amended October 16, 2012) | See Table III-29. Comparison of Existing Control Requirements (Farming Operations) | Contains requirements for land preparation, harvesting activities, and fallow land; see specific limits and control requirements in Table III-29. Comparison of Existing Control Requirements (Farming Operations) |
| Mojave Desert AQMD Rule 411 – Conservation Management Practices for Agricultural Operations (adopted August 23, 2021) | See Table III-29. Comparison of Existing Control Requirements (Farming Operations) | Contains requirements for land preparation, harvesting activities, and fallow land; see specific limits and control requirements in Table III-29. Comparison of Existing Control Requirements (Farming Operations) |
| Low-Dust Nut Harvester Replacement | Almond harvest operations with over 1,000 bearing acres of almonds | Require sources to use a low-dust harvester from SJVUAPCD Low-Dust Nut Harvester Replacement Program's eligible equipment list for at least 80% of their harvest |

The farming operation control measures we identified rely on a range of control measures that generally fall into several common categories. We compared the requirements of Rule 4550 with the requirements of the rules identified in other jurisdictions. Our evaluation indicates that Rule 4550 contains CMP options that align with general fugitive dust control options for agricultural activities found in other comparable rules. The list of CMP options referenced by Rule 4550[90] also includes several livestock-specific practices not found in ICAPCD Rule 801, "Construction and Earthmoving Activities" (adopted November 08, 2005), or MDAQMD Rule 411, "Conservation Management Practices for Agricultural Operations" (adopted August 23, 2021), which focus primarily on crop activities.

Table III-29 below lists the scope of applicability for the farming operations control measures identified and summarizes the individual control requirements contained within each rule. As demonstrated in Table III-29, Rule 4550 contains CMP options that are comparable with the rules identified in other jurisdictions and generally contain the same control measures required in other jurisdictions. We did not identify any general dust control measures or management practices contained in other jurisdictions that are not also contained in Rule 4550.

[90] The rules we evaluated each vary in how they establish the list of available CMP options, with some including them in rule text, while others reference a handbook published by the District.

*Table III-29. Comparison of Existing Control Requirements (Farming Operations)*

| | **SJVUAPCD Rule 4550 – Conservation Management Practices (including District CMP handbook and CMP list)** | **Imperial County Rule 806 – Conservation Management Practices** | **Mojave Desert AQMD Rule 411 – Conservation Management Practices for Agricultural Operations** |
|---|---|---|---|
| Applicability | • Applies to agricultural operation sites, defined as the growing and harvesting of crops or the raising of fowl or animals, for the primary purpose of earning a living, or of conducting agricultural research or instruction by an educational institution;<br>• Contains various size thresholds, defined as either acreage or headcount of animals. | Applies to agricultural operation sites, defined as the growing or harvesting of crops for the primary purposes of making a living. | • Applies to agricultural operation sites, which include operations such as fallow land, tillage, animal feeding, organic or transgenic crops;<br>• Applicability threshold of 100 acres when < 5 separate residences within ¼ mile, 40 acres when > 5 separate residences within ¼ mile. |
| Control Measures - Land Preparation and Harvesting | Alternative Tilling; Bed/Row Size Spacing; Chemigation/Fertigation; Combined Operations; Conservation Irrigation; Cover Crops; Equipment Changes/ Technology Improvements; Fallow Land; Integrated Pest Control; Mulching; Night Farming; Non-Tillage/Chemical Tillage; Organic Pesticides; Precision Farming (GPS); Transgenic Crops | Alternative Tilling; Bed/Row Size Spacing; Chemigation/Fertigation; Combined Operations; Conservation Irrigation; Cover Crops; Equipment Changes/ Technology Improvements; Fallow Land; Integrated Pest Control; Mulching; Night Farming; Non-Tillage/Chemical Tillage; Organic Pesticides; Precision Farming (GPS); Transgenic Crops | Alternative Tilling; Bed/Row Size Spacing; Chemigation/ Fertigation; Combined Operations; Conservation Irrigation; Cover Crops; Equipment Changes; Fallow Land; Integrated Pest Control; Mulching; Night Farming; Non-Tillage/Chemical Tillage; Organic Pesticides; Precision Farming (GPS); Transgenic Crops |
| Control Measures - Harvest Activities | Alternative Tilling; Bed/Row Size Spacing; Chemigation/Fertigation; Continuous tray/ New drying techniques for dried fruit; Combined Operations; Conservation Irrigation; Cover Crops; Equipment Changes; Fallow Land; Integrated Pest Control; Mulching; Night Farming; Non-Tillage/Chemical Tillage; Organic Pesticides; Precision Farming (GPS); Transgenic Crops | Baling/Large Bales; Combined Operations; Equipment Changes/Technological Improvements; Green Chop; Hand Harvesting; Fallow Land; Night Harvesting; No Burning; Pre-Harvesting Soil Preparation; Shed Packing; Shuttle System/Large Carrier | Baling/Large Bales; Combined Operations; Equipment Changes/Technological Improvements; Green Chop; Hand Harvesting; Fallow Land; Night Harvesting; No Burning; Pre-Harvesting Soil Preparation; Shed Packing; Shuttle System/Large Carrier |

| | **SJVUAPCD Rule 4550 – Conservation Management Practices (including District CMP handbook and CMP list)** | **Imperial County Rule 806 – Conservation Management Practices** | **Mojave Desert AQMD Rule 411 – Conservation Management Practices for Agricultural Operations** |
|---|---|---|---|
| Control Measures - Unpaved Roads and Vehicular Traffic Areas | • Chips/Mulches, Organic Materials, polymers, road oil and sand; Gravel; Paving; Restricted Access; Speed Limit; Track-Out Control; Water Application; Field Windbreak;<br>• Additional measures required on any day where vehicle daily trips VDT > 50, or 3 axle VDT > 20;<br>• Paving, additional chemical stabilization, Water application, Permanent road closure, Restricted unauthorized vehicle access. | • Chips/Mulches, Organic Materials, polymers, road oil and sand; Gravel; Paving; Restricted Access; Speed Limit; Track-Out Control; Water Application; Field Windbreak;<br>• Additional measures required on any day where VDT > 50, or 3 axle VDT > 20;<br>• Paving, additional chemical stabilization, Water application, Permanent road closure, Restricted unauthorized vehicle access. | • Chips/Mulches, Organic Materials, polymers, road oil and sand; Gravel; Paving; Restricted Access; Speed Limit; Track-Out Control; Water Application; Field Windbreak;<br>• Additional measures required on any day where VDT > 50, or 3 axle VDT > 20;<br>• Paving, additional chemical stabilization, Water application, Permanent road closure, Restricted unauthorized vehicle access. |
| Control Measures - Cropland (Other) | Alternate Tilling; Application Efficiencies; Baling/Large Bales; Bulk Materials Control; Chemigation/Fertigation; Conservation Irrigation; Fallow Land; Grinding/Chipping/Shredding; Integrated Pest Management; Irrigation Power Units; Mulching; Night Farming; No Burning; Non-Tillage/Chemical Tillage; Organic Practices; Permanent Crops; Reduced Pruning; Soil Amendments; Soil Incorporation; Sulfur; Reduction or Elimination of Dusting; Surface Roughening; Transgenic Crops; Wind Barrier | Alternate Tilling; Application Efficiencies; Baling/Large Bales; Bulk Materials Control; Chemigation/Fertigation; Conservation Irrigation; Fallow Land; Grinding/Chipping/Shredding; Integrated Pest Management; Irrigation Power Units; Mulching; Night Farming; No Burning; Non-Tillage/Chemical Tillage; Organic Practices; Permanent Crops; Reduced Pruning; Soil Amendments; Soil Incorporation; Sulfur; Reduction or Elimination of Dusting; Surface Roughening; Transgenic Crops; Wind Barrier | Alternate Tilling; Application Efficiencies; Baling/Large Bales; Bulk Materials Control; Chemigation/Fertigation; Conservation Irrigation; Fallow Land; Grinding/Chipping/Shredding; Integrated Pest Management; Irrigation Power Units; Mulching; Night Farming; No Burning; Non-Tillage/Chemical Tillage; Organic Practices; Permanent Crops; Reduced Pruning; Soil Amendments; Soil Incorporation; Sulfur; Reduction or Elimination of Dusting; Surface Roughening; Transgenic Crops; Wind Barrier |
| Control Measures - Windblown Dust Control and Fallow Land | SJVUAPCD Rule 4550 and its associated CMP documents do not establish separate standards for Fallow Land. | Cover Crop; Conservation Tillage; Crop Residue Management; Cross Wind Strip-cropping; Field Windbreaks; Ridge Roughness; Surface Roughening; Wind Barrier | Cover Crop; Conservation Tillage; Crop Residue Management; Cross Wind Strip-cropping; Field Windbreaks; Ridge Roughness; Surface Roughening; Wind Barrier |

| | SJVUAPCD Rule 4550 – Conservation Management Practices (including District CMP handbook and CMP list) | Imperial County Rule 806 – Conservation Management Practices | Mojave Desert AQMD Rule 411 – Conservation Management Practices for Agricultural Operations |
|---|---|---|---|
| Control Measures - Poultry Operations | Manure Handling & Storage<br>Time of Manure Spreading; Cleanout frequency; Outdoor storage<br><br>Feeding<br>Boot or Sock<br><br>Open Areas<br>Vegetation; Reduced tillage; Windblocks; Dust suppressant<br><br>Unpaved Roads/Traffic Areas<br>Gravel; Restricted Access; Pave; Dust suppressant; Speed Limit; Track-Out Control; Vegetation | N/A | N/A |
| Control Measures - Dairy Operations | Corral/Manure Handling<br>Sprinkling of Open Corral; Frequency of scraping/cleanout; Freestall housing; Fibrous layer in dusty areas; Pull-type manure harvesting equipment; Scraping/harrowing<br><br>Overall Management/Feeding<br>Bulk Materials Control; Feeding near dusk; Wet feed during mixing; Wet material in wagon first before feeding; Downwind shelterbelts/boundary trees<br><br>Unpaved Roads/Traffic Areas<br>Gravel; Restricted Access; Pave; Dust suppressant; Speed Limit; Track-Out Control; Speed bumps; Appropriate equipment and vehicles | N/A | N/A |

| | **SJVUAPCD Rule 4550 – Conservation Management Practices (including District CMP handbook and CMP list)** | **Imperial County Rule 806 – Conservation Management Practices** | **Mojave Desert AQMD Rule 411 – Conservation Management Practices for Agricultural Operations** |
|---|---|---|---|
| Control Measures - Feedlot Operations | <u>Pens/ Manure Handling</u><br>Sprinkling of Open Corral; Frequency of scraping/cleanout; Shade for animal; Fibrous layer in dusty areas; Pull-type manure harvesting equipment<br><br><u>Overall Management/Feeding</u><br>Bulk Materials Control; Feeding near dusk; Wet feed during mixing; Wet material in wagon first before feeding; Downwind shelterbelts/boundary trees<br><br><u>Unpaved Roads/Traffic Areas</u><br>Gravel; Restricted Access; Pave; Dust suppressant; Speed Limit; Track-Out Control; Speed bumps; Appropriate equipment and vehicles | N/A | N/A |

In addition to the currently implemented measures compared in Table III-29, we identified a potential measure requiring affected almond orchards to replace almond harvesting equipment with low-dust harvesters from SJVUAPCD Low-Dust Nut Harvester Replacement Program's eligible equipment list. Additional information regarding estimated dollar-per-ton $PM_{2.5}$ cost-effectiveness for the potential measure requiring the use of low-dust almond harvesters is provided in section V.A of this document. Considering low-dust nut harvesters are available from multiple manufacturers, and the District has funded over 100 low-dust harvesters under its Low-Dust Harvester Replacement Program, we assume that low-dust nut harvesters are technologically feasible. However, current information discussed in the subsequent paragraphs suggests this would not be a suitable contingency measure because it would be unlikely to achieve emissions reductions within two years of being triggered as a contingency measure.

For the limited low-dust harvester models currently available, the lead time between placement of an order and delivery of the low-dust harvester is approximately one-year.[91] This estimate does not take into consideration the additional time needed before an order is placed to arrange financing and analyze equipment needs. The current lead time also accounts only for the current demand and does not consider the increased demand that would be generated by the triggering of the contingency measure. Manufacturers estimate it could take between 9 and 12 months to increase production to meet increased demand.[92] Moreover, the EPA does not have the authority to direct sales of harvesters toward only those entities that would need to comply with a proposed measure. Any delays in production resulting from increased demand would affect the suitability of this measure a contingency measure in light of the uncertainty that all affected sources could comply within two years of triggering.

Additionally, harvest emissions from almond operations only occur during harvest as opposed to year-round. The seasonality of this emissions source further complicates the suitability of this measure as a contingency measure, as the low-dust equipment must be available prior to harvest season to ensure emissions reductions occur promptly after the contingency measure is triggered. Harvest typically takes place between August and October, so equipment would need to be in operation prior to August to ensure reductions occur from this source. For example, if the potential measure were triggered in July 2024, it is unlikely low-dust harvesters could be deployed prior to July 2026, based on the lead time and demand considerations described previously in this section. As the measure to mandate low-dust nut harvester replacement is unlikely to achieve emissions reductions within two years of being triggered, it is not suitable for proposal as a contingency measure at this time.

#### iii. Conclusion

We compared Rule 4550 to comparable measures in other jurisdictions and did not identify any existing control measures or CMPs implemented for farming operations sources in other jurisdictions not already implemented in the San Joaquin Valley. Additionally, we evaluated a potential measure for mandatory low-dust almond harvester replacement in the San Joaquin Valley. We found that the potential measure is unlikely to achieve emissions reductions within two years of being triggered and is therefore not suitable for proposal as a contingency measure at this time.

---

[91] Email dated February 8, 2023, from Emily Kneeland (SJVUAPCD) to Meredith Kurpius (EPA Region IX), Subject: "RE: EPA data info request to SJV District on potential CM source categories."

[92] Conversations on April 14, 2023 between Flory Industries/Exact Corporation and EPA Staff Region IX.

### c. Construction and Demolition

#### i. Overview

Source category 630 - Construction and Demolition in the emissions inventory consists of fugitive dust particulate matter emissions caused by construction activities that result from building residential, commercial, industrial, institutional, or governmental structures. The emissions result predominantly from site preparation work, which may include scraping, grading, loading, digging, compacting, light-duty vehicle travel, and other operations. Similarly, the EPA's national emissions inventory indicates that these emissions result from activities including general construction, earthmoving, material handling, transport, storage, disturbed surfaces, and emissions from uncovered haul trucks. In the SJVUAPCD 2023 $PM_{2.5}$ emissions inventory, construction and demolition sources contribute 1.57 tpd $PM_{2.5}$ emissions and zero $NO_X$ emissions. According to CEPAM, the majority of $PM_{2.5}$ emissions in the Construction and Demolition category are residential, commercial, industrial, and institutional road dust, and road construction dust.

#### ii. Evaluation

Certain Districts regulate sources in this category under a single comprehensive rule that also applies to other dust generating activities, while the SJVUAPCD relies upon multiple rules that are more specific in scope, with separate rules for site construction activities, road construction activities, paved roads, and unpaved roads. Table III-30 below summarizes the applicable on-the-books control measures in the SJVUAPCD for construction and demolition sources; there are no on-the-way measures for this category. As part of our evaluation, we considered control measures being implemented in this source category by several other jurisdictions.[93] Table III-31 below identifies the control measures we reviewed in other jurisdictions.[94]

The control measures we reviewed for construction and demolition sources rely on a range of control measures that generally fall into several common categories. We compared the requirements of SJVUAPCD Rules 8021 (Construction, Demolition, Excavation, Extraction, and Other Earthmoving Activities) (amended August 19, 2004) and 8041 (Carryout and Trackout) (amended August 19, 2004) with the control measures in place in other jurisdictions. See Table III-32. As demonstrated in this table, Rules 8021 and 8041 establish control measures that are generally the same as the other measures reviewed.

---

[93] We note that SJVUAPCD Rules 8021 and 8041 contain provisions that are almost identical to fugitive dust rules contained in other California air districts, such as Imperial County APCD Rules 801 (Construction and Earthmoving Activities) and Rule 803 (Carryout and Trackout). We consider these SJVUAPCD rules representative of other California air district fugitive dust rules, and as a result have not included other California air district fugitive dust rules in this comparison.

[94] A list of each individual control measure or management practice contained in the evaluated rules is too voluminous to include here in its entirety. Table III-32 summarizes and groups these measures into certain broad control measure categories that we consider representative of the overall range of dust control measures.

*Table III-30. On-the-Books Control Measures (Construction and Demolition)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 8021 – Construction, Demolition, Excavation, Extraction, and Other Earthmoving Activities | See Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) | Contains requirements for construction, demolition, excavation, extraction, and other earthmoving activities; see specific limits and control requirements in Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) |
| SJVUAPCD Rule 8041 - Carryout and Trackout | See Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) | Contains standards for control of carryout and trackout at those sources subject to a SJVUAPCD fugitive dust rule; see specific limits and control requirements in Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) |

*Table III-31. Other Control Measures Considered (Construction and Demolition)*

| Rule | Applicability | Control Measure |
|---|---|---|
| Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control For Construction and Temporary Commercial Activities (amended January 21, 2020) | See Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) | Contains dust control requirements for construction and soil-disturbing activities; see specific limits and control requirements in Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) |
| Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations (amended January 27, 2010) | See Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) | Contains control requirements for dust generating operations; see specific limits and control requirements in Table III-32. Comparison of Existing Control Requirements (Construction and Demolition) |

### iii. Conclusion

We are not proposing any contingency measures for this category. We did not identify any available dust control measures that are not also already contained in SJVUAPCD's rules for this category. We therefore have not identified any additional construction and demolition source controls for consideration as contingency measures.

*Table III-32. Comparison of Existing Control Requirements (Construction and Demolition)*

| | SJVUAPCD Rule 8021 – Construction, Excavation, Extraction, and Earthmoving Activities | SJVUAPCD Rule 8041 - Carryout and Trackout | Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control for Construction and Temporary Commercial Activities | Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations |
|---|---|---|---|---|
| Applicability | • Construction, demolition, excavation, extraction, and other earthmoving activities;<br>• Excludes blasting, carryout, trackout, and building below square footage threshold;<br>• Dust control plan required for residential construction sites > 10 acres and nonresidential sites > 5 acres. | • Standards for where carryout or trackout has occurred or may occur on paved public roads or the paved shoulders of a paved public road at those sources subject to a SJVUAPCD fugitive dust rule (e.g., Rule 8021);<br>• Carryout and trackout caused by an agricultural source are exempt. | • Construction and temporary commercial activities that disturb or have the potential to disturb soils and that emit or have the potential to emit particulate matter into the atmosphere;<br>• Permit required for construction activities disturbing > 0.25 acres, mechanized trenching > 100 feet, mechanical demolition > 1,000 square feet, and temporary commercial activities > 0.25 acres. | • Applies to all dust generating operations, with certain exemptions including unpaved parking lots and roadways, vehicle use in open areas and vacant lots, livestock activities, and easements/rights of way/access roads for utilities;<br>• Permit required for any dust generating operation that disturbs surface area > 0.10 acres, whether under single control or under common control across separate but contiguous areas. |
| Require dust control plans or permits for construction and land clearing projects | Requires dust control plans that are approved by APCO | N/A | Requires applicable sources to obtain a Dust Control Operating Permit, including a Dust Mitigation Plan. | Requires applicable sources to obtain a Dust Control Permit, including a Dust Control Plan. |

| | **SJVUAPCD Rule 8021 – Construction, Excavation, Extraction, and Earthmoving Activities** | **SJVUAPCD Rule 8041 - Carryout and Trackout** | **Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control for Construction and Temporary Commercial Activities** | **Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations** |
|---|---|---|---|---|
| Limit visible dust emissions to 20% opacity | Pre-water site sufficient to limit Visible Dust Emissions (VDE) to 20% opacity | N/A | 20% opacity limit based on time average method or 50% opacity limit per instantaneous method reading | 20% opacity limit. Visible emissions beyond the property line prohibited for more than 30 seconds in any six minute period. |
| Limit scope or schedule of work to minimize disturbed surface area | Phase work to reduce the amount of disturbed surface area at any one time | N/A | Cease all construction activities, even if control measures are being implemented, when wind conditions cause exceedance of visible dust standard. | Phase work to reduce the amount of disturbed surface areas at any one time. |
| Apply water and or chemical suppressants | Apply water or chemical/organic stabilizers/suppressants sufficient to limit VDE to 20% opacity (alternatively may meet VDE limit by constructing and maintaining wind barriers) | N/A | Requires application of sufficient water to limit visible emissions for multiple activities, including use of rotary brushes, screening, paving preparation, staging areas, and others. | Requires application of water or chemical dust suppressant to various dust generating operations including stating areas, open storage piles, and material stacking and unloading operations. |

| | **SJVUAPCD Rule 8021 – Construction, Excavation, Extraction, and Earthmoving Activities** | **SJVUAPCD Rule 8041 - Carryout and Trackout** | **Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control for Construction and Temporary Commercial Activities** | **Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations** |
|---|---|---|---|---|
| Construction and use of wind barriers | Construct and maintain wind barriers sufficient to limit VDE to 20% opacity (alternatively may meet VDE limit by applying water or stabilizers/ suppressants) | N/A | Requires use of dirt berm, fencing, or other barrier to prevent disturbances to stabilized land. Affects both wind erosion as well as access restriction. | Wind fences are among one of several control measure options, in addition to water or chemical suppressant, that is required for disturbed surface areas. |
| Limit vehicular access or restrict speed at work site | Restrict vehicular access to area during periods of inactivity | N/A | Limit vehicle traffic and soil disturbance to areas not being immediately developed through use of barricades or barriers. | Limiting vehicle trips and vehicle speeds is listed as an alternative option to certain requirements to maintaining a soil crust or standing vegetative cover in disturbed surface areas. |
| Removal of visible carryout/trackout | N/A | Owners/operators shall remove all visible carryout and trackout at the end of each workday. Applies to urban areas 50 ft or more from unpaved surface exit point, and rural construction projects ≥10 acres in size. | Mud or dirt not allowed to accumulate at depth greater than 0.25 inches where trackout extends greater than 50 feet in length. Any trackout must be cleaned shall be cleaned up at the end of each workday or evening shift regardless of length. | Trackout, carry-out, spillage, or erosion must be cleaned up immediately when it extends a cumulative distance greater than 25 feet, or at the end of workday regardless of length. |

| | **SJVUAPCD Rule 8021 – Construction, Excavation, Extraction, and Earthmoving Activities** | **SJVUAPCD Rule 8041 - Carryout and Trackout** | **Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control for Construction and Temporary Commercial Activities** | **Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations** |
|---|---|---|---|---|
| Carryout/trackout prevention using trackout control device or other equivalent measure where unpaved roads join paved roads | N/A | Requires installation and maintenance of trackout control device at all access points to paved public roads; required at sites with > 150 vehicle trips per day and sites with paved interior roads. | N/A | Required at all work sites with disturbed surface area > 2 acres, and all work sites where 100 cubic yards of material are hauled on or off site per day. |
| Duty to Obtain Plan or Permit | Requires owners/operators of affected sources to submit a Dust Control Plan prior to commencement of construction activities. | N/A | No person shall commence any construction activities except in compliance with a Dust Control Operating Permit that authorizes such activities. | No person shall commence construction of, operate, or modify any dust generating operation over applicability thresholds without first obtaining a Dust Control Permit or permit revision from the Control Officer. |

| | **SJVUAPCD Rule 8021 – Construction, Excavation, Extraction, and Earthmoving Activities** | **SJVUAPCD Rule 8041 - Carryout and Trackout** | **Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control for Construction and Temporary Commercial Activities** | **Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations** |
|---|---|---|---|---|
| Plan or Permit Procedural Requirements | The APCO shall approve, disapprove, or conditionally approve the Dust Control Plan within 30 days of plan submittal. A Dust Control Plan is deemed automatically approved if, after 30 days following receipt by the District, if the District does not provide any comments to the owner/operator regarding the Dust Control Plan | N/A | Dust Control Operating Permit shall be issued or denied by the Control Officer. The Dust Mitigation Plan included in a permit application becomes part of the Dust Control Operating Permit upon permit issuance. | Dust Control Permit shall be granted by the Control Officer. The Dust Control Permit shall also include a Dust Control Plan that is approved by the Control Officer. |
| Plan or Permit Content | Dust Control Plan shall describe the dust control measures, which includes the control measure options of Rule 8021, to be implemented before, during and after any dust generating activity. | N/A | Permit and Dust Mitigation Plan is required to list all activities that may disturb the soil, and identify the best management practices applicable to the activities. | Permit and Dust Control Plan shall contain control measures, as required by Rule 310, for every actual and potential dust-generating operation. |

| | **SJVUAPCD Rule 8021 – Construction, Excavation, Extraction, and Earthmoving Activities** | **SJVUAPCD Rule 8041 - Carryout and Trackout** | **Clark County (NV) Air Quality Regulations Section 94 - Permitting and Dust Control for Construction and Temporary Commercial Activities** | **Maricopa County (AZ) Regulation III Rule 310 – Fugitive Dust from Dust Generating Operations** |
|---|---|---|---|---|
| Recordkeeping and Notification Requirements | Affected sources are required to maintain a copy of the Dust Control Plan on site at all times. | N/A | A complete copy of the current Permit must be kept on the project site at all times that construction activities occur. Projects required to obtain a permit must install signage that includes current Permit information near the main entrance to the project, and be visible and legible to the public. | A Dust Control permit and a Dust Control Plan, as approved by the Control Officer, shall be posted in a conspicuous location at the work site, within on-site equipment, or in an on-site vehicle, or shall otherwise be kept available on-site at all times. |

#### *d. Paved Road Dust*

##### i. Overview

Source category 640 – Paved Road Dust includes emissions resulting from vehicles traveling over paved surfaces. Resuspended particulate emissions (e.g., vehicle-related deposition like exhaust, material spillage, pavement wear, litter, etc.) from paved roads originate from loose materials present on the surface. The average speed of vehicles traveling on the road, average daily vehicular traffic, number of lanes and average daily vehicular traffic per lane, percentage of heavy vehicles present, and presence of curbs, storm sewers and parking lanes are significant factors that can contribute to paved road dust emissions. Although control techniques for paved roads that prevent material from being deposited onto the surface (preventive controls) are usually more cost effective than control techniques that remove deposited materials from the travel lanes (mitigative controls), both methods are used in conjunction to minimize particulate emissions within this category. Determining the correct strategies in minimizing particulate matter emissions, however, can often be complicated. For example, street sweeping gutters and curb areas may actually increase the redistribution of loose material onto the traveled portion of the road, which may produce a short-term increase in particulate matter emissions.[95]

In the 2023 San Joaquin Valley emissions inventory, paved road sources contribute 5.11 tpd direct $PM_{2.5}$ emissions, representing 7.67% of the total $PM_{2.5}$ emissions in the San Joaquin Valley. SJVUAPCD's Regulation VIII series regulates fugitive particulate matter emissions, including those categorized as paved road fugitive dust. This series reduces ambient particulate matter concentrations by requiring actions to prevent, reduce, or mitigate fugitive dust emissions. Rule 8061 regulates fugitive dust emissions from paved roads.

##### ii. Evaluation

Rule 8061 provisions are applicable to any new or existing public or private paved or unpaved road, or modified public or private road, street highway, freeway, alley way, access drive, access easement, or driveway. The rule establishes standards for the construction of new and modified paved roads. Additionally, the rule establishes thresholds that, once exceeded, require owner/operators to treat roads to reduce visible dust emissions (VDE). Table III-33 summarizes the on-the-books control measures that the EPA considers representative of the overall range of paved road dust control measures in the SJVUAPCD. As part of our evaluation, we reviewed control measures being implemented in other jurisdictions. Table III-34 summarizes comparable paved road dust control measures reviewed in other selected air districts.[96]

---

[95] EPA, "Compilation of Air Pollutant Emissions Factors, Volume 1: Stationary Point and Area Sources," Chapter 13, Section 2.1, available at *https://www.epa.gov/sites/default/files/2020-10/documents/13.2.1_paved_roads.pdf* (last updated January 2011).

[96] Due to the number of measures and conditions listed within these rules, the EPA chooses to present a summary that is representative of the control measures found within all evaluated rules.

*Table III-33. On-the-Books Control Measures (Paved Roads)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 8061 – Paved and Unpaved Roads | Applies to any new or existing public or private paved or unpaved road, road construction project, or road modification project.<br><br>Exemptions:<br><br>• Exemptions in Rule 8011;<br>• Maintenance and resurfacing of existing paved roads do not apply to section 5.2 (unpaved road) of this rule;<br>• Agricultural sources subject to Rule 8081;<br>• Emergency activities performed to ensure public health and safety as specified in Rule 8011, section 4.1;<br>• Equipment used to remove debris beyond the capabilities of $PM_{10}$-efficient street sweepers. | For new or modified paved roads:<br><br>• 4 feet paved shoulders for paved roads with 500-3000 annual average daily vehicle trips (AADT);<br>• 8 feet paced shoulders for paved roads greater than 3000 AADT;<br>• Medians constructed in conformance with the American Association of State Highway and Transportation Officials (AASHTO) guidelines for width of median shoulders for any paved road with AADT greater than 500 with some exceptions (e.g., speed limits are set at or below 45 miles per hour, medians are landscaped and maintained with grass).<br><br>For existing paved roads with unpaved shoulders:<br><br>• In urban areas, pave or stabilize 4-foot shoulders on 50% of existing paved public roads with the highest AADT;<br>• In rural areas, pave or stabilize 4-foot shoulders on 25% of existing paved public roads with the highest AADT.<br><br>Street sweepers:<br><br>• Purchase and use of only $PM_{10}$-efficient street sweepers;<br>• Operate and maintain in accordance with the manufacturer specifications;<br>• Prioritize the use of these sweepers, no less than once per month, on routine street sweeper routes with paved curbs which have been determined to have the greatest actual or potential for dirt and silt loadings.<br><br>Other dust mitigation activities:<br><br>• Follow dust minimizing practices during the removal of mud/dirt from travel lanes upon discovery of at least one inch thickness over an area of at least 50 square feet within 24 hours of discovery. |

*Table III-34. Other Control Measures Considered (Paved Roads)*

| Rule | Applicability | Control Measure |
|---|---|---|
| Clark County Division of Air Quality (CCDAQ) Section 93 - Fugitive Dust from Paved Roads and Street Sweeping Equipment (amended January 21, 2020) | Applies to paved roads and paved alleys which are located in a $PM_{10}$ nonattainment area.<br><br>Exemptions:<br><br>• Stationary sources, except that these control measures shall be considered as part of a BACT determination;<br>• Non-commercial and non-institutional private driveways. | For new or modified paved roads:<br><br>• 4 feet paved shoulders for paved roads;<br>• 8 feet paced shoulders for paved roads greater than 3000 AADT.<br>• Medians constructed in one of multiple ways (i.e., curbing, solid paving across the median, dust palliatives applied, with materials that prevent the trackout of mud and dirt).<br><br>Street sweepers:<br><br>• Purchase and use of only $PM_{10}$-efficient street sweepers.<br><br>Other dust mitigation activities:<br><br>• Use of dry rotary brushes or blower devices without the use of water is expressly prohibited |

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| SCAQMD Rule 1186 - $PM_{10}$ Emissions from Paved and Unpaved Roads, and Livestock Operations (amended July 11, 2008) | Applies to specified land uses and activities which result in fugitive dust as a result of vehicular travel on paved and unpaved public roads, and at livestock operations.<br><br>Exemptions:<br><br>• Essential public services that are in compliance with SCAQMD Rule 403 (Fugitive Dust);<br>• Visible roadway accumulations on roads with less than 500 ADT.<br>• Roads closed to vehicles;<br>• Events that lead to a State of Emergency called by the Governor. | For new or modified paved roads:<br><br>• 4 feet paved shoulders for paved roads with 500-3000 AADT;<br>• 8 feet paced shoulders for paved roads greater than 3000 AADT;<br>• Medians constructed in conformance with the American Association of State Highway and Transportation Officials (AASHTO) guidelines for width of median shoulders for any paved road with AADT greater than 500 with some exceptions (e.g., speed limits are set at or below 45 miles per hour, medians are landscaped and maintained with grass).<br><br>Steet sweepers:<br><br>• Acquire, maintain, and use only $PM_{10}$-efficient sweepers street sweeping equipment;<br>• Operate and maintain in accordance with the manufacturer specifications.<br><br>Other dust mitigation activities:<br><br>• Begin removal of visible roadway accumulations within 72 hours of any notification of such material and complete removal as soon as possible;<br>• Notify the Executive Officer if removal can't be completed within 10 days. |

Our evaluation did not identify dust control measures for this category that are not included in Rule 8061.[97]

[97] We acknowledge that there are some notable differences between SJVUAPCD Rule 8061 and other control measures that require further study. For example, CCDAQ Section 93 expressly prohibits the use of dry rotary brushes or blower devices without the use of water. This would be an improvement to the District's rules. Additionally, CCDAQ Section 93 does not include a minimum AADT threshold above which four-foot paved shoulders are required, whereas four-foot paved shoulders are required only for new or modified paved roads above 500 AADT under SJVUAPCD Rule 8061.

#### iii. Conclusion

Overall, we did not identify any potential paved road dust controls for implementation as contingency measures in the San Joaquin Valley.

### *e. Unpaved Road Dust*

#### i. Overview

Source category 645 – Unpaved Road Dust includes particulate emissions from vehicles traveling over unpaved roads or surfaces. The force and weight of vehicles on unpaved road surfaces grinds and minimizes surface materials on these roads. These particles are lifted and dropped onto the road surface, where they are then exposed and carried off by air currents. Determining the correct strategies in minimizing particulate matter emissions originating from unpaved roads is complex due to available control options that are broad in scope, effectiveness, and cost. For example, although paving is highly effective in terms of minimizing fugitive dust on unpaved roads, doing so is extremely costly and may not be optimal, or feasible, for industrial roads subject to heavy vehicle usage. Water and chemical suppressants, although requiring frequent re-application, may be a more feasible option as the associated costs are lower. Additionally, air districts may consider measures such as limiting access to unpaved roads based on vehicle type, vehicle speed, and vehicle daily trips (VDT).[98]

In the 2023 San Joaquin Valley emissions inventory, unpaved road sources contribute 3.69 tpd direct $PM_{2.5}$ emissions, representing 5.54% of the total $PM_{2.5}$ emissions in the San Joaquin Valley. SJVUAPCD's Regulation VIII series regulates fugitive particulate emissions, including those categorized as unpaved road fugitive dust. This series reduces ambient concentrations of particulate matter by requiring actions to prevent, reduce, or mitigate fugitive dust emissions. Rules 8061, 8071, and 8081 regulate fugitive dust emissions from unpaved roads, via provisions such as VDE limitations when vehicle traffic reaches or exceeds specified thresholds.

#### ii. Evaluation

Rule 8061 provisions are applicable to any new or existing public or private paved or unpaved road, or modified public or private road, street highway, freeway, alley way, access drive, access easement, or driveway. Rule 8071 provisions are applicable to any unpaved vehicle and equipment traffic area, including parking, fueling, service, shipping, receiving, and transfer areas. Finally, Rule 8081 applies to off-field agricultural sources like unpaved roads, unpaved vehicle and equipment traffic areas, and bulk materials. These rules establish thresholds that, once exceeded, require that roads are treated to reduce VDE and comply with conditions of a stabilized surface, both using several control measures listed within the rules.

---

[98] EPA, "Compilation of Air Pollutant Emissions Factors, Volume 1: Stationary Point and Area Sources," Chapter 13, Section 2.2, available at *https://www.epa.gov/sites/default/files/2020-10/documents/13.2.2_unpaved_roads.pdf* (last updated November 2006).

Our evaluation included review of control measures being implemented in other jurisdictions. Table III-35 and Table III-36 summarize the control measures the EPA considers representative of the overall range of dust control measures for unpaved roads.[99]

*Table III-35. On-the-Books Control Measures (Unpaved Roads)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 8061 – Paved and Unpaved Roads | Applies to any new or existing public or private paved or unpaved road, road construction project, or road modification project<br><br><u>Exemptions:</u><br><br>• Exemptions in Rule 8011;<br>• Any unpaved road segment with less than 26 annual average daily vehicle trips (AADT);<br>• Maintenance and resurfacing of existing paved roads do not apply to section 5.2 of this rule;<br>• Agricultural sources subject to Rule 8081;<br>• Emergency activities performed to ensure public health and safety; | <u>Control measures include:</u><br><br>• Watering;<br>• Uniform layer of washed gravel;<br>• Roadmix;<br>• Paving;<br>• Chemical/organic dust stabilizer/suppressants;<br>• APCO-approved method that limits VDE to 20% opacity.<br><br>On any unpaved road segment with AADT equal to or greater than 26, imit VDE to 20% opacity and comply with the requirements of a stabilized unpaved road by application and/or re-application of at least one control measure or implement an APCO-approved Fugitive $PM_{10}$ Management Plan specified in Rule 8011.<br><br>Construction of any new unpaved road within an urban area is prohibited unless the road meets the definition of a temporary unpaved road within an urban area.<br><br>Establish a maximum speed limit of 25 mph on each unpaved road with AADT equal to or greater than 26. |

[99] Due to the number of measures and conditions listed within these rules, only a summary of the applicable control measures are presented.

| Rule | Applicability | Control Measure |
|---|---|---|
| | • Equipment used to remove debris beyond the capabilities of $PM_{10}$-efficient street sweepers. | |
| SJVUAPCD Rule 8071 – Unpaved Vehicle/Equipment Traffic Areas | Applies to any unpaved vehicle/equipment traffic area<br><br>Exemptions:<br><br>• Unpaved vehicle and equipment traffic areas with less than 50 AADT;<br>• Agricultural sources subject to the requirements of Rule 8081. | Control measures include:<br><br>• Watering;<br>• Uniform layer of washed gravel;<br>• Roadmix;<br>• Paving;<br>• Vegetative Materials;<br>• Chemical/organic dust stabilizer/suppressants;<br>• APCO-approved method that limits VDE to 20% opacity.<br><br>Limit VDE to 20% opacity and comply with the requirements of a stabilized unpaved road by application and/or re-application of at least one control measure or implement an APCO-approved Fugitive $PM_{10}$ Management Plan specified in Rule 8011:<br><br>• Where 50 or more AADT will occur;<br>• For unpaved vehicle/equipment traffic areas with 150 VDT, or 150 VDT that are utilized intermittently for a period of 30 days or less during the calendar year during the period that the unpaved vehicle/equipment traffic area is utilized;<br>• On each day that 25 or more VDT with 3 or more axles will occur on an unpaved vehicle/equipment traffic area.<br><br>The District must be notified at least 48 hours before a special event that will result in 1,000 or more vehicles traveling/parking on an unpaved area by the owner/operator. During the duration of the special event vehicle travel/parking, the owner/operator shall limit VDE to 20% opacity and comply with the requirements of a stabilized unpaved road by the application and/or reapplication/maintenance of water or chemical/organic dust stabilizers/suppressants. |

| Rule | Applicability | Control Measure |
|---|---|---|
| | | On each day that 50 or more VDT, or 25 or more VDT with 3 or more axles, originates from within and remains exclusively within an unpaved vehicle/equipment traffic area, the owner/operator may apply/reapply water to limit VDE to 20% opacity.<br><br>Restrict access and periodically stabilize a disturbed surface area whenever a site becomes inactive. |
| SJVUAPCD Rule 8081 – Agricultural Sources | Applies to off-field agricultural sources.<br><br><u>Exemptions:</u><br><br>• On-field agricultural sources;<br>• Unpaved road segments with less than 75 VDT;<br>• Any unpaved vehicle and equipment parking and traffic area less than 1.0 acre and more than one mile from an urban area, or with less than 50 AADT or less than 150 VDT that are utilized intermittently for a period of 30 days or less during the calendar year. | <u>Control measures include:</u><br><br>• Watering;<br>• Uniform layer of washed gravel;<br>• Roadmix;<br>• Paving;<br>• Chemical/organic dust stabilizer/suppressants;<br>• APCO approved method that limits VDE to 20% opacity<br><br>On each day that 75 or more VDT, or 25 or more VDT with 3 or more axles, will occur on an unpaved road segment, limit VDE to 20% opacity and comply with the requirements of a stabilized unpaved road by application and/or re-application/maintenance of at least one control measure (including vegetative materials) or implement an approved Fugitive $PM_{10}$ Management Plan as specified in section 7.0.<br><br>Where 50 or more AADT will occur on an unpaved vehicle/equipment traffic area, limit VDE to 20% opacity and comply with the requirements of a stabilized unpaved road by the application and/or reapplication/maintenance of at least one control measure or implement an approved Fugitive $PM_{10}$ Management Plan as specified in section 7.0.<br><br>For unpaved vehicle/equipment traffic areas with 150 or more VDT, or 150 or more VDT that are utilized intermittently for a period of 30 days or less during the calendar year, implement at least one control option.<br><br>On each day that 25 or more VDT with 3 or more axles will occur on an unpaved vehicle/equipment traffic area, the owner shall limit VDE to 20% opacity and comply with the requirements of a stabilized unpaved road by the application and/or re- |

| Rule | Applicability | Control Measure |
|---|---|---|
| | | application/maintenance of at least one of the control measures.<br><br>On each day that 75 or more VDT, or 26 or more VDT with 3 or more axles, originates from within and remains exclusively within an unpaved vehicle/equipment traffic area, the owner/operator may apply/reapply water to limit VDE to 20% opacity.<br><br>Restrict access and periodically stabilize a disturbed surface area whenever a site becomes inactive. |

*Table III-36. Other Control Measures Considered (Unpaved Roads)*

| Rule | Applicability | Control Measure |
|---|---|---|
| CCDAQ Section 91 - Fugitive Dust from Unpaved Roads, Unpaved Alleys, and Unpaved Easement Roads (amended April 15, 2014) | Applies to unpaved roads, unpaved alleys, unpaved easements, and unpaved access roads for utilities and railroads.<br><br><u>Exemptions:</u><br><br>• Non-commercial, non-institutional private driveways, horse trails, hiking paths, bicycle paths, or other similar paths that have been officially designated by a governing body for exclusive use for purposes other than travel by motor vehicles;<br>• Stationary sources, except that these control measures shall be considered as part of a BACT determination. | Implement the following control measures for all unpaved roads having an ADT of 150 or more:<br><br>• Paving;<br>• Apply Dust Palliatives in compliance with stabilization standards;<br>• Apply and maintain an alternative control measure approved in writing by the Control Officer and Region IX Administrator.<br><br>Unless as an interim component of an active paving project, no unpaved roads or alleys can be constructed in public thoroughfares in hydrographic area 212, 216, and 217.<br><br>Control measures are considered effectively implemented when opacity does not exceed 20%. |

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 1157 - $PM_{10}$ Emissions Reductions from Aggregate and Related Operations (amended September 8, 2006) | Applies to all permanent and temporary aggregate and related operations. | Chemical stabilizers applied on internal unpaved haul roads to maintain a stabilized surface.<br><br>Signs posted stating haul trucks must not use these roads unless traveling to maintenance areas.<br><br>Apply chemical stabilizers to maintain a stabilized surface or gravel pad on unpaved non-haul roads and parking and staging areas. |

Our evaluation of available control measures did not identify any additional measures to consider including in Rules 8061, 8071, and 8081.[100]

#### iii. Conclusion

Unpaved road emissions are regulated in the San Joaquin Valley by Rules 8061, 8071, and 8081. We evaluated available control measures and did not identify any unpaved road dust controls for implementation as contingency measures in the San Joaquin Valley at this time.

### *f. Fugitive Windblown Dust*

#### i. Overview

Source category 650 – Fugitive Windblown Dust includes particulate emissions resulting from wind erosion of exposed agricultural lands, soil from unpaved roads, open aggregate storage piles, and exposed areas within industrial facilities. Due to environmental complexities and the understanding that windblown activities occur to some extent at all times varying from month to month, a wide arrange of control measures is used to minimize particulate matter emissions from this category.[101] In the 2023 San Joaquin Valley emissions inventory, fugitive windblown dust sources contribute 7.23 tpd direct $PM_{2.5}$ emissions, representing 10.86% of the total $PM_{2.5}$ emissions in the District. San Joaquin Valley SJVUAPCD's Regulation VIII series, along with Rule 4550, regulates fugitive particulate matter emissions categorized as fugitive windblown dust. SJVUAPCD Rules 4550, 8051 (Open Areas) (amended August 19, 2004), and 8081 contain specific control measures (e.g., limitations on visible dust emissions, wind barriers, covers over bulk materials, etc.) implemented under specific conditions to regulate particulate

---

[100] Although the specific range of control measure implementation varies from rule to rule (e.g., different ADT value thresholds where unpaved roads are exempted from control measures)

[101] EPA, "Compilation of Air Pollutant Emissions Factors, Volume 1: Stationary Point and Area Sources," Chapter 13, Section 2.4, available at *https://www.epa.gov/sites/default/files/2020-10/documents/13.2.4_aggregate_handling_and_storage_piles.pdf* (last updated November 2006) and; EPA, "Compilation of Air Pollutant Emissions Factors, Volume 1: Stationary Point and Area Sources," Chapter 13, Section 2.5, available at *https://www.epa.gov/sites/default/files/2020-10/documents/13.2.5_industrial_wind_erosion.pdf* (last updated November 2006).

matter emissions from a wide range of activities (e.g., farming, storage, transferring materials within an open area, etc.).

#### ii. Evaluation

Within the SJVUAPCD, fugitive windblown dust is regulated by Rule 4550 for agricultural operation sites, Rule 8051 for open areas above an area size threshold (depending on if the open area is within an urban or rural region), and Rule 8081 applies to off-field agricultural sources like unpaved roads, unpaved vehicle/equipment traffic areas, and bulk materials. These rules establish thresholds that, once exceeded, require that sources are treated to reduce visible dust emissions (VDE) and comply with conditions of a stabilized surface, both using various control measures listed within the rules.

As part of our evaluation, we reviewed control measures established for this source category by the District and several other jurisdictions. Table III-37 and Table III-38 summarize the control measures the EPA considers representative of the available control measures for fugitive windblown dust.[102]

*Table III-37. On-the-Books Control Measures (Fugitive Windblown Dust)*

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| SJVUAPCD Rule 4550 – Conservation Management Practices (includes District CMP handbook and CMP list) | Applies to agricultural operation sites<br><br><u>Exceptions:</u><br><br>• Agricultural operation sites less than 100 acres;<br>• Woodland and wasteland not under cultivation or used for pasture;<br>• Agricultural operation sites with low limit thresholds for the number of dairy cows, cattle turkeys, chickens, or laying hens | Conservation management practices (CMPs) are provided for:<br><br>• Poultry Operation: Open Areas (Vegetation, Reduced Tillage, Windblocks, Dust Suppressants)<br>• Overall Management/Feeding: Dairy and Feedlot Operations (Downwind Shelterbelts/Boundary Trees, Bulk Materials Control)<br>• Cropland: Other (Alternate Till, Wind Barrier, Surface Roughening, Permanent Crops, Mulching, Cover Crops, Bulk Materials Control, Night Farming)<br>• Poultry Operations: Manure Handling & Storage (Outdoor Storage, Time of Manure Spreading)<br><br>Owner shall implement applicable CMPs, after preparing and submitting a CMP application to the Air Pollution Control Officer (APCO) for approval, for each agricultural operation site. This shall be done no later than ten days after notification by the APCO of the CMP application approval. |

[102] Due to the number of measures and conditions listed within these rules, EPA chooses to present a summary of the control measures present.

| **Rule** | **Applicability** | **Control Measure** |
|---|---|---|
| SJVUAPCD Rule 8051 – Open Areas | Applies to any open area with at least 0.5 acres within urban areas or 3.0 acres within rural area and at least 1000 square feet of disturbed surface area.<br><br><u>Exemptions:</u><br><br>• Exemptions listed in 8011;<br>• Any weed abatement activity utilizing mowing and/or cutting, and which leaves at least three inches of stubble immediately after such mowing/cutting has occurred. | <u>Control measures include:</u><br><br>• Apply and maintain water or dust suppressants to all unvegetated areas;<br>• Establish vegetation on all previously disturbed areas;<br>• Pave, apply and maintain gravel, or apply and maintain chemical/organic stabilizers/suppressants.<br><br><u>For open areas:</u><br><br>Implement, apply, maintain, and reapply, if necessary, at least one or a combination of the Control Measures to comply at all times with the conditions for a stabilized surface and limit VDE to 20% opacity as defined in Rule 8011.<br><br><u>For vehicle use in open areas:</u><br><br>Prevent unauthorized vehicle access upon evidence of trespassing by posting “No Trespassing” signs or installing physical barriers such as fences, gates, posts, and/or other appropriate barriers to effectively prevent access to the area. |
| SJVUAPCD Rule 8081 – Agricultural Sources | This rule applies to off-field agricultural sources.<br><br><u>Exemptions:</u><br><br>• On-field agricultural sources;<br>• Any outdoor storage, handling, or transport of bulk materials that would be damaged by wetting;<br>• Outdoor storage of any bulk | <u>Control measures include:</u><br><br>• Apply water or suitable chemical/organic stabilizers/suppressants;<br>• Construct and maintain wind barriers with less than 50% porosity.<br><br><u>Control measures for storage of bulk materials:</u><br><br>• Comply with conditions for a stablized surface;<br>• Cover bulk materials with tarps, plastics, or other suitable materials and anchor the cover;<br>• Construct and maintain fences or wind barriers with less than 50% porosity along with applying water or suitable chemical/organic stabilizers/suppressants; |

| Rule | Applicability | Control Measure |
|---|---|---|
| | storage at a single site where no material is actively being added or removed and the area size is less than 100 cubic yards;<br>• Transport of bulk materials in an outdoor area for a distance of twelve feet or less with the use of a chute or conveyor device. | • Utilize a 3-sided structure with a height at least equal to the height of the storage pile and with less than 50% porosity.<br><br><u>Control measures for on-site transporting of bulk materials:</u><br><br>• Limit vehicular speed while traveling;<br>• Load all haul trucks such that the freeboard is not less than 6 inches when material is transported on any paved public access road and apply water to the top of the load or cover haul trucks with a suitable closure.<br><br><u>Control measures for off-site transporting of bulk materials:</u><br><br>• Clean the interior of the cargo compartment or cover the cargo compartment before the empty truck leaves the site;<br>• Prevent spillage or loss of bulk material from cargo openings;<br>• Load all haul trucks such that the freeboard is not less than 6 inches when material is transported on any paved public access road and apply water to the top of the load or cover haul trucks with a suitable closure.<br><br><u>Control measures for outdoor transport of bulk materials with a chute or conveyor:</u><br><br>• Fully enclose the chute or conveyor;<br>• Operate water spray equipment that wets materials;<br>• Wash separated or screened materials to remove conveyed materials.<br><br>Implement a 20% opacity VDE limit or comply with the conditions for a stabilized surfaced (as defined in Rule 8011), using the control measures listed above, prior to doing any outdoor handling, storage, and transporting of bulk materials. |

*Table III-38. Other Control Measures Considered (Fugitive Windblown Dust)*

| Rule | Applicability | Control Measure |
|---|---|---|
| ICAPCD Rule 804 - Open Areas (amended September 11, 2018) | Applies to any open area with at least 0.5 acres within urban areas or 3.0 acres within rural area and at least 1000 square feet of disturbed surface area.<br><br><u>Exemptions:</u><br>• Exemptions listed in ICAPCD Rule 800, Section E;<br>• Agricultural Operation Sites subject to ICAPCD Rule 806;<br>• Recreational OHV Use Areas on public lands subject to ICAPCD Rule 800. | <u>Control measures include:</u><br>• Apply and maintain water or dust suppressant(s) to all unvegetated areas;<br>• Establish vegetation on all disturbed areas;<br>• Pave, apply and maintain Gravel, or apply and maintain Chemical Stabilizers/Suppressants;<br>• Implement alternative BACM if approved by both the APCD and EPA. Alternative BACM may be approved by the APCD and EPA in accordance with a technical evaluation demonstrating that the proposed alternative BACM achieves particulate matter emission reductions equivalent to the BACM measures identified above and that the dust control method will achieve a stabilized surface and meet the 20% opacity requirement.<br><br><u>For open areas:</u><br>• Comply with one or more of the Control Measures to comply with the conditions of a Stabilized Surface (as defined in ICAPCD Rule 800) and limit VDE to 20% opacity.<br><br><u>For vehicle use in open areas:</u><br>• Within 30 days following initial discovery of evidence of trespass, prevent unauthorized vehicle access by posting "No Trespassing" signs or installing physical barriers such as fences, gates, posts, and/or appropriate barriers to effectively prevent access to the area. |

| Rule | Applicability | Control Measure |
|---|---|---|
| CCDAQ Section 90 - Fugitive Dust From Open Areas and Vacant Lots (amended January 21, 2020) | The provisions of this regulation shall apply to Open Areas and Vacant Lots which are located in a $PM_{10}$ nonattainment area.<br><br><u>Exemptions:</u><br><br>• Shall not apply to normal farm cultural practices or the raising of fowl or animals;<br>• Shall not apply to stationary sources as defined in their Section 0, except that these control measures shall be considered as part of a BACT determination. | One or more of the following control measures shall be applied to open areas and vacant lots greater than 5000 square feet that are disturbed:<br><br>• Prevent motor vehicle and/or off-road vehicle trespassing, parking, and/or access by installing barriers, curbs, fences, gates, posts, signs, shrubs, trees, or other effective traffic control measures where there is evidence of soil disturbance;<br>• Uniformly apply and maintain surface gravel or Dust Palliatives to all areas disturbed by Motor Vehicles in compliance with one of the stabilization standards described in this rule;<br>• Apply and maintain an alternative control measure approved in writing by the Control Officer and the Region IX EPA Administrator.<br><br>One or more of the following control measures shall be applied if machinery is used to clear weeds and/or trash from open areas and vacant lots greater than 5000 square feet:<br><br>• Pre-wet surface soils before mechanized weed abatement and/or trash removal occurs;<br>• Maintain dust control measures while mechanized weed abatement and/or trash removal is occuring;<br>• Pave, apply gravel, apply water, or apply a suitable Dust Palliative after mechanized weed abatement and/or trash removal occurs.<br><br>Submit dust mitigation plans for open areas and vacant lots having a cumulative area of 10,000 acres or greater. |

Our evaluation of available control measures for this category did not identify any available measures that are not being implemented in Rules 4550, 8051, and 8081. Each of these rules requires the use of one or more control measures that requires the applicable sources to meet at least one of two conditions:

- Sources that need to implement the control measure must comply with conditions of a stabilized surface (e.g., any disturbed surface area or open bulk storage pile that is resistant to windblown fugitive dust emissions); or
- A 20% opacity VDE limit.

Typically, both conditions need to be met for the applicable source to be in compliance with the rule.

Additionally, our review of control measures in other jurisdictions in Table III-38 did not identify any potential new control meaures to consider as contingency measures. However, in consideration of potentially feasible measures not necessarily being implemented in other jurisdictions, we are proposing a contingency measure related to fugitive windblown dust by lowering the applicability threshold for rural open areas in Rule 8051 from 3.0 acres to 1.0 acres. As a result, Rule 8051 would apply to any rural open area having 1.0 acre or more and containing at least 1,000 square feet of disturbed surface area. The proposed measure is explained in greater detail in the NPRM for the proposed contingency measures FIP as well as in the associated Proposed Contingency Measures TSD.

#### iii. Conclusion

We are proposing a contingency measure to lower the applicability threshold for rural open areas in Rule 8051. We did not identify any other potential control measures to propose for this category as a contingency measure.

### 3. Fires

Source Category 660 – Fires includes emissions from automobile fires and structure fires. The structural fire subcategory includes residential and commercial structures as well as mobile home fires. The fires source category contributes 0.20 tpd direct $PM_{2.5}$ and 0.03 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. The reported emissions are based on the number of vehicle fires per year and based on structural fires data from California Fire Incident Reporting System from the California State Fire Marshall's Office.[103] Considering the fires under this source category are non-routine and unpredictable, no control measures have been identified to mitigate emissions from these sources.

### 4. Managed Burning and Disposal (Open Burning)

#### a. *Overview*

Source category 670 - Managed Burning and Disposal consists of numerous sub-categories including various agricultural burning, forest management, and non-agricultural open burning. The majority of sources in this category involve agricultural waste and are regulated under District Rule 4103 (Open Burning) (amended April 15, 2010), while the remainder are regulated under District Rule 4106 (Prescribed Burning and Hazard Reduction Burning) (adopted June 21, 2001). This source category contributes 13.75 tpd direct $PM_{2.5}$ and 6.66 tpd $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. These emissions contributions are considerably higher than the projection of 3.0 tpd for managed burning and disposal sources as reported in SJVUAPCD's 2018 $PM_{2.5}$ Plan inventories for 2013 to 2028. [104] This difference is likely attributable to significant increases in both agricultural and prescribed burning in the San Joaquin Valley that occurred between the 2013 base year of the 2018 $PM_{2.5}$ Plan and the 2017 base year relied upon by CEPAM2019v1.03. The increase in agricultural burning

---

[103] CARB 1999 emission inventory summary for structure and automobile fires: *https://www.arb.ca.gov/ei/areasrc/arbmiscprocfires.htm.*
[104] 2018 $PM_{2.5}$ Plan, Appendix B, Table B-1.

was due in part to orchard and vineyard removals that occurred in response to drought conditions between 2012 and 2016.[105]

The predominant method for reducing emissions from open burning is by limiting the instances in which burning can occur. Most types of open burning are prohibited in the San Joaquin Valley, with the main exceptions being for certain agricultural materials, prescribed burns for land management, and burning for hazard reductions.

#### i. Burning of Agricultural Materials

Historically, burning of agricultural materials in an open field was a common practice for disposing of agricultural materials in the San Joaquin Valley. SJVUAPCD Rule 4103 bans virtually all open burning except for agricultural burning. Agricultural burning involves open burning of vegetative materials produced from growing and harvesting of crops. It includes the burning of grass and weeds in fence rows, ditch banks and berms in no-till orchard operations, the burning of fields being prepared for cultivation, the burning of agricultural wastes, and the operation or maintenance of a system for the delivery of water for agricultural operations.

SJVUAPCD Rule 4103 was originally adopted on June 18, 1992, to regulate and coordinate the use of open burning while minimizing smoke impacts on the public. Rule 4103 has since been amended numerous times and become progressively more stringent. The EPA last approved revisions to Rule 4103 on January 4, 2012.[106] Additionally, while the EPA has not issued any national standards for this source category (e.g., control techniques guidelines, new source performance standards, national emissions standards for hazardous air pollutants, and maximum achievable control technology requirements), California has adopted state regulations for open burning. California Senate Bill (SB) 705 requires the District to regulate the burning of diseased crops, establish best management practices (BMP) for the maintenance and control of weeds, and phase-out the open burning for numerous crop categories.[107] SB 705 establishes a schedule for the phase-out of open burning of specific types of agricultural material and provides for a postponement of phase-out requirements where justified by technical and economic impediments.

SJVUAPCD has implemented SB 705 via Rule 4103 and the District's Smoke Management Program. Under California Health and Safety Code (CHSC) sections 41855.5 and 41855.6, the District may postpone the open burning restrictions for the remaining crop categories if all of the following conditions are met:

1. There is no economically feasible alternative means of eliminating waste,
2. There is no long-term federal or state funding commitment for continued operation of biomass facilities in the Valley or development of alternatives to burning,
3. Continued issuance of permits for that specific category or crop will not cause, or substantially contribute to, a violation of an applicable federal ambient air quality standard, and

---

[105] See, e.g., "Final 2020 Staff Report and Recommendations on Agricultural Burning," SJVUAPCD, December 17, 2020, 5-6.
[106] 77 FR 214, codified at 40 CFR 52.220(c)(388)(i)(B)(*2*) and (*3*).
[107] California SB 705, signed into law on September 22, 2003, codified at California Health and Safety Code sections 41855.5 and 41855.6.

4. CARB concurs with the District's determinations.

Per the requirements of Rule 4103, every five years the District must review and make recommendations on agricultural burning in the San Joaquin Valley. The District's staff reports and the associated resolutions approving the postponements must be submitted to CARB and the EPA as SIP revisions. The most recent review of crop categories by the District and CARB occurred from 2020 to 2021, culminating in the submittal of an updated schedule to the EPA ("2021 Schedule"), which phases out the burning of most remaining crop categories by 2025.[108]

#### ii. Land Management and Hazard Reduction Burning

Prescribed burning is the planned application of fire conducted by state and federal land managers, local governments, utilities and private land owners to meet planned resource management objectives, such as forest management, wildlife habitat management, range improvement, fire hazard reduction, wilderness management, weed abatement, watershed rehabilitation, vegetation manipulation, disease and pest prevention, and ecosystem management. Hazard reduction burning involves the disposal of dry brush surrounding homes and business in the wildland-urban interface in order to ensure a barrier of fire protection of 100 feet in all directions. Such burning is only allowed if the District forecasts favorable meteorological and air quality conditions.

SJVUAPCD Rule 4106 applies to all rangeland improvement burning, forest management burning, wildland vegetation management burning, and to hazard reduction burning in the wildland/urban interface under the District's jurisdiction.

### *b. Evaluation*

Table III-39. On-the-Books Control Measures (Managed Burning and Disposal)Table III-39 briefly summarizes on-the-books and on-the-way controls for this source category in the San Joaquin Valley. As the full list of requirements and management practices contained in the evaluated rules is too voluminous to include here in its entirety, Table III-39 summarizes and groups these measures into certain broad control measure categories that we consider representative of the overall range of managed burning measures. Table III-40 lists the 2021 Schedule as an on-the-way measure. Lastly, Table III-41 briefly summarizes the control measures we identified in other jurisdictions as part of our evaluation.

---

[108] The 2021 Schedule is located at table 2-1 in the "Supplemental Report and Recommendations on Agricultural Burning," SJVUAPCD, June 17, 2021, accessible at *https://ww2.valleyair.org/media/aldmsd0b/final-supplemental-report-and-recommendations-on-agricultural-burning.pdf*.

*Table III-39. On-the-Books Control Measures (Managed Burning and Disposal)*

| Measure | Applicability | Requirements |
|---|---|---|
| SJVUAPCD Rule 4103 | Open burning conducted in the San Joaquin Valley Air Basin, except for prescribed burning and hazard reduction burning (regulated under District Rule 4106)<br><br>Exemptions:<br><br>• Fires used for cooking, campfires, and religious fires with clean fuel, dry wood or charcoal;<br>• Emergency burning by a fire agency;<br>• Respectful burning of an unserviceable American Flag;<br>• Bags used for agricultural chemicals;<br>• Raisin trays. | • No burning of garbage or other materials;<br>• Burning shall be allocated by the APCO dependent on dispersion conditions and shall avoid negative impacts to receptors;<br>• No permit shall be issued for the burning of the field crops, prunings, weed abatement, orchard removals, vineyard removals, surface harvested prunings and other materials, except for crops covered by section 5.5.2;<br>• Additional requirements for burning times, drying times, contraband burning;<br>• Permit required for burning of Russian Thistle;<br>• Conditional burning permit required for diseased materials with specific requirements;<br>• Burn plans required for fire suppression training, burning of contraband;<br>• BMP selection required for weed maintenance. |

| Measure | Applicability | Requirements |
|---|---|---|
| SJVUAPCD Rule 4106 | Applies to all prescribed burning and to hazard reduction burning in wildland-urban interface. | • No burning of garbage or green waste;<br>• District allocates burning permits based on predicted meteorological conditions and whether contaminants could create or contribute to an exceedance of an ambient air quality standard or impact smoke sensitive areas;<br>• Requirements such as minimizing smoke, ignition devices, keeping vegetation free of dirt, soil, and moisture;<br>• Requirement for prescribed burn conductors to complete prescribed burning smoke management training class approved by the APCO;<br>• Permits required for all hazard reduction burning, valid only on days that burning is not prohibited by the CARB, by the District or other designated agencies. |
| 2021 Schedule | Agricultural burning activities in San Joaquin Valley | Phases out the burning of select agricultural crop categories by 2025; see Table III-40 for more detail. |

*Table III-40. San Joaquin Valley Agricultural Burning Phase-Out Schedule (2021 Schedule) Overview*

| Crop Category | 2021 Schedule Provisions |
|---|---|
| Field Crops | <u>Rice Stubble</u><br><br>Effective January 1, 2021:<br><br>• Reduce allowed open burning acreage to up to 20% of the total acreage farmed per year;<br>• Prohibit open burning for residual rice stubble (left over from baling operations) and compacted stubble;<br>• Open burning permitted for weeds and vegetative materials on rice field levees and banks. |

| **Crop Category** | **2021 Schedule Provisions** |
|---|---|
| Orchard Removals | Small Other Orchard Removals (15 acres or less)<br><br>• Effective January 1, 2022, prohibit open burning at agricultural operations >500 acres<br>• Effective January 1, 2023, prohibit open burning at agricultural operations >200 acres<br>• Effective January 1, 2024, prohibit open burning at agricultural operations >100 acres<br>• Effective January 1, 2025, prohibit open burning of all orchard removals<br><br>Citrus Crops<br><br>Effective January 1, 2021:<br><br>• Prohibit open burning at agricultural operations with total citrus acreage at all sites >500 acres<br>• Prohibit open burning of removals >40 acres at a single location per year<br>• Maintain case-by-case determination for removals of 15-40 acres at agricultural operations ≤500 acres<br><br>Effective September 1, 2021:<br><br>• Lower agricultural operation acreage threshold to >200 acres<br>• Lower removal size threshold to >30 acres<br>• Maintain case-by-case for removals of 15-30 acres at agricultural operations ≤200 acres<br><br>Effective January 1, 2022:<br><br>• Prohibit open burning of all citrus removals, except removals ≤ 15 acres.<br><br>Apple, Pear, and Quince Crops<br><br>• Open burning permitted |
| Prunings | Apple, Pear, and Quince Crops<br><br>• Open burning permitted |

| Crop Category | 2021 Schedule Provisions |
| --- | --- |
| Surface Harvested Prunings | Almond, Walnut, and Pecan Crops<br><br>• Two-year phase-out schedule to prohibit open burning at sites with ≤ 20 acres of total prunings per year for agricultural operations whose total nut acreage at all sites is > 50 acres, accomplished by January 1, 2023;<br>• Prohibit open burning of all surface harvested prunings January 1, 2025.<br><br>Raisin Trays<br><br>• Prohibit open burning January 1, 2024. |
| Vineyard Removals | Grape and Kiwi Crops<br><br>For Spur-Pruned (Cordon) Vineyards:<br><br>• Effective January 1, 2022, prohibit open burning at agricultural operations > 2,000 acres;<br>• Effective January 1, 2023, prohibit open burning at agricultural operations > 1,000 acres;<br>• Effective January 1, 2024, prohibit open burning at agricultural operations > 250 acres;<br>• Effective January 1, 2025, prohibit open burning for all spur- pruned (cordon) vineyard removals.<br><br>For Cane-Pruned Vineyards:<br><br>• Effective January 1, 2022, prohibit open burning at agricultural operations > 500 acres;<br>• Effective January 1, 2023, prohibit open burning at agricultural operations > 250 acres;<br>• Effective January 1, 2024, prohibit open burning at agricultural operations > 100 acres;<br>• Effective January 1, 2025, prohibit open burning of all cane-pruned vineyard removals. |
| Weed Abatement | Ponding & Levee Banks<br><br>• Open burning permitted |
| Other Materials | Diseased Beehives<br><br>• Open burning permitted |

*Table III-41. Other Control Measures Considered (Managed Burning and Disposal)*

| Measure | Applicability | Requirements |
|---|---|---|
| BAAQMD Regulation 5 "Open Burning" (adopted November 20, 2019) | Open burning activities<br><br>Exemptions:<br><br>• Fires set only for cooking;<br>• Fires burning as safety flares or for the combustion of waste gases;<br>• Flame cultivation when the burning is performed with LPG or natural gas-fired burners designed and used to kill seedling grass and weeds and the growth is such that the combustion will not continue without the burner;<br>• Fires set for the purposes of fire training using one gallon or less of flammable liquid per fire. | • No specific agricultural crop phase-outs or bans;<br>• Recreational fires allowed on non-curtailment days;<br>• On permissive burn days, numerous select fire types are allowed with permission from the APCO. |
| SCAQMD Rule 444 "Open Burning" (amended July 12, 2013) | • Agricultural burning;<br>• Disposal of Russian thistle;<br>• Prescribed burning;<br>• Fire prevention/suppression training;<br>• Open detonation or use of pyrotechnics;<br>• Fire hazard removal;<br>• Disposal of infectious waste, other than hospital waste, research of testing materials, equipment or techniques;<br>• Disposal of contraband;<br>• Residential burning;<br>• Beach burning.<br><br>Exemptions:<br><br>• Fire suppression training by fire agencies;<br>• Open burning to protect crops from freezing;<br>• Open burning on islands located 15 miles or more from the mainland;<br>• Fireworks display;<br>• Explosives detonation;<br>• Recreational and ceremonial fires;<br>• Food preparation fires and fires for warmth at social gatherings. | • No specific agricultural crop phase outs or bans;<br>• Burning of waste/garbage is prohibited;<br>• No burning except on permissive burn days or marginal burn days on which burning is permitted in the applicable source or receptor area, and such burning is not prohibited by the applicable public fire protection agency;<br>• Specific requirements for burn authorization requests and permit conditions for each category of burning. |

| Measure | Applicability | Requirements |
|---|---|---|
| SMAQMD Rule 501 "Agriculture Burning" (amended April 3, 1997) | Agricultural burning, including:<br><br>• Agricultural waste disease prevention;<br>• Range improvement;<br>• Forest, wildlife and game habitat, irrigation system, and wild land vegetation management;<br>• Paper containers of agricultural chemicals.<br><br>Contains similar exemptions as San Joaquin Valley for agricultural operations, including burning of bags used for agricultural chemicals and emergency agricultural burns which would cause economic loss if denied. | • No specific crop phase outs or bans (subject to air basin-wide rice burning reduction);<br>• Permit holder must contact District for permission to burn and ensure that it is not a no-burn day and must contact the fire protection agency having jurisdiction over the burn location;<br>• Contains specific drying time requirements for different agricultural materials. |
| VCAPCD Rule 56 "Open Burning" (adopted November 11, 2003) | Combustible materials in open outdoor fires<br><br>Exemptions:<br><br>• Fires used only for the heating or cooking of food for human consumption;<br>• Recreational fires confined to a fireplace or barbecue pit;<br>• Flag burning;<br>• Fire suppression training;<br>• Fire agency or public officer may set fires to reduce hazards as needed. | • No specific crop phase-outs or bans;<br>• Permit required for open burning;<br>• Burning only allowed on permissive burn days;<br>• Open burning allowed for the disposal of agricultural wastes in the pursuit of agricultural operations, range improvement burning, wildland vegetation management burning, levee, reservoir, or ditch maintenance and the disposal of Russian thistle;<br>• Burn times, drying times, and permit conditions also specified. |

| Measure | Applicability | Requirements |
|---|---|---|
| PCAPCD Rule 301 "Nonagricultural Burning Smoke Management" (amended August 9, 2018) | Open outdoor fires, including the use of burn barrels;<br><br>Exemptions:<br>• Fire hazard reduction burning;<br>• Public officer waiver;<br>• Recreational or cooking fire;<br>• American Flag;<br>• Open burning conducted by public officers. | • No person shall ignite or allow open outdoor burning without a valid burn permit from the District for fire hazard reduction, mechanized burner, open burning conducted by public officers, right of way clearing, levee, ditch and reservoir maintenance.<br>• Separate burn permit required from fire protection agency with jurisdiction in area of the proposed burn project.<br>• Air Pollution Control Officer may prohibit or add additional specific burn permit conditions. |

We compared SJVUAPCD Rules 4103 and 4106 against the rules we identified in other jurisdictions. Our evaluation indicates that Rule 4103 contains requirements that align with general open burning control measures found in other comparable rules, but its ban on the burning of most agricultural crop categories makes it more stringent than other rules. We did not identify any other agricultural burning control measures being implemented in other jurisdictions that are not already included in Rule 4103.

We also evaluated recommendations included in the Earthjustice Letters on the SJVUAPCD's regulations for open burning. The recommendations included pointing out that the per-acre penalty for agricultural burning without a permit is lower than the cost to utilize the most sustainable alternatives to agricultural burning, which may disincentivize individuals from complying with open burn permit requirements. We interpret this recommendation to refer to the Stipulated Order of Abatement issued by the SJVUPACD in 2015, under which growers could pay a penalty to burn without a permit. CARB staff made a recommendation to a similar effect in a 2021 report:

> The District should consider seeking to raise the per acre penalty (currently at $750) for burning conducted pursuant to a Stipulated Order of Abatement that was granted in 2015 by the District Hearing Board to allow orchard removal burns to a level commensurate with chipping/shredding/tilling operations. Funds raised with this penalty should continue to be used to support the District's incentive-based grant program for alternatives to open burning. The penalty should be of a level to make the cost of open burning commensurate with that of alternatives such as soil incorporation.[109]

Following these recommendations, on June 15, 2022, the SJVUAPCD Central Hearing Board terminated the Stipulated Order of Abatement, thus eliminating the option for growers to pay a penalty to burn

[109] "Staff Recommendations – San Joaquin Valley Agricultural Burning Assessment," California Air Resources Board, February 5, 2021, p. 9.

without a permit.[110] Thus, to the extent that this recommendation referred to this order, it has already been addressed.

To the extent that the recommendation applies more generally, we note that Rule 4103 does not set a penalty level, and under State law, violations of District rules are subject to penalties established in the California Health and Safety Code.[111] In addition, because Rule 4103 and the 2021 Schedule have been approved into the California state implementation plan, they are requirements of an "applicable implementation plan" as defined in CAA section 302(q). Therefore, both citizens and the EPA may enforce these requirements under CAA sections 304(a)(1) and 113(a)(1), respectively. The current statutory civil monetary penalties for violations of the CAA are set forth in 40 CFR 19.4.

The Earthjustice Letters also included a recommendation that agricultural burning be banned earlier than 2025 given the availability of alternatives to agricultural burning such as composting, chipping, and reincorporating into soil, as well as the amount of state funding recently dedicated towards such alternatives. We note that, as described previously in this section, CARB and the SJVUAPCD have already banned burning for most crop categories prior to 2020 and are continuing to phase out burning for most remaining categories, as shown in Table III-41. Furthermore, CARB and the District have outlined several steps needed to establish the technological and economic feasibility of alternatives to open burning for these remaining categories, such as additional incentive funding and the implementation of demonstrations and pilot projects for alternatives.[112] They have also noted the importance of a phased approach to banning burning of the remaining crop categories, beginning with large agricultural operations which are better suited to absorb the costs of alternatives.[113]

Finally, the EPA is currently under a court-ordered deadline to sign a final rule promulgating a contingency measure FIP for San Joaquin Valley by September 30, 2024, unless the EPA has taken final action to fully approve a corresponding SIP revision by that time.[114] Accordingly, by the time such a FIP takes effect (generally 30 days after publication in the Federal Register), there would be approximately 60 days until January 1, 2025. Thus, even if the contingency measure were to be triggered almost immediately after promulgation of the FIP, it would not accelerate the January 1, 2025 ban on agricultural burning in the San Joaquin Valley and thus would not achieve emissions reductions relative to the current SIP-approved measure.

#### *c. Conclusion*

We are not proposing any contingency measures for this source category. Our review did not identify any control measures being implemented that are not already implemented in the San Joaquin Valley. We also considered whether an option to pay a penalty to burn should be removed and whether compliance could be accelerated for the on-the-way measures. However, these potential measures

[110] San Joaquin Valley Air Pollution Control District, Central Region Hearing Board Meeting, Action Summary Minutes Wednesday, June 15, 2022.
[111] See District Rule 1090.
[112] See, e.g., "Supplemental Report and Recommendations on Agricultural Burning," SJVUPACD, June 17, 2021., pp. 17-24.
[113] Id. at 5.
[114] *Comité Progreso de Lamont v. EPA*, N.D. Cal., 21-cv-08733.

were either already being implemented or would not achieve additional emissions reductions relative to on-the-way measures.

### 5. Commercial Cooking

#### a. *Overview*

Source category 690 – Commercial Cooking mostly includes emissions from commercial charbroiling, deep fat frying, and general cooking. The majority of San Joaquin Valley emissions in this category come from charbroiling, which consists of two types of commercial charbroilers: chain-driven and underfired. A chain-driven charbroiler is a semi-enclosed broiler that moves food mechanically through the device on a grated grill to cook the food for a specific amount of time. An underfired charbroiler has a metal "grid," a heavy-duty grill similar to that of a home barbecue, with gas burners, electric heating elements, or solid fuel (wood or charcoal) located under the grill to provide heat to cook the food. Underfired charbroilers are widely used in commercial kitchens to cook meats, including beef, burgers, and chicken. These heavy-duty appliances commonly use evenly spaced, gas-fired burners to produce direct-flame, radiant heat a few inches below slatted, cast-iron cooking surfaces.[115] The slatted cooking surface allows fat, oil, and grease (FOG) from the meat to fall into the burner flames, which produces flaring that brings the flame into direct contact with the meat. Charbroilers do not include flat-top or plancha grills with continuous cooking surfaces that prevent the flame from directly contacting the meat.

Commercial cooking sources contribute 3.98 tpd direct $PM_{2.5}$ emissions and zero $NO_X$ emissions to the 2023 San Joaquin Valley emissions inventory. Commercial charbroiling contributes roughly 75% of the $PM_{2.5}$ emissions from commercial cooking. The remaining emissions are identified as "unspecified cooking operations." Our analysis focuses on commercial charbroiling emissions.
The primary source of $PM_{2.5}$ from charbroiling is the burning of FOG and entrainment of the resulting aerosols in the products of combustion from the cooking flames. It is estimated that greater than 85% (by weight) of FOG particles from underfired charbroilers have aerodynamic diameters less than 1 µm.[116] The smoke and vapors generated by cooking on either type of charbroiler contain water, VOC, and PM. Larger particles and grease are typically captured by the grease filter of the ventilation hood over the charbroiler. The remaining VOC and particulate pollution are exhausted unless a secondary control is installed.

Catalytic oxidizers are used to control $PM_{2.5}$ emissions from chain-driven charbroilers, but they are not effective for reducing emissions from underfired charbroilers. For underfired charbroilers, the exhaust from these devices loses heat as it is directed to the control device, and the reactions at the catalyst cannot take place under these lower temperatures. In a chain-driven charbroiler, charbroiling exhaust is

---

[115] Specifications for Commercial Hoods and Kitchen Ventilation in the 2019 California Mechanical Code are classified under four duty categories: light, medium, heavy, and extra-heavy duty cooking service. Gas underfired charbroilers are listed as heavy-duty cooking appliances. Charbroilers utilizing solid fuel (e.g., charcoal, wood) are classified as extra-heavy-duty and are outside the scope of this evaluation. Available at *https://epubs.iapmo.org/2019/CMC/index.html#p=136*.

[116] SCAQMD, Approve and Adopt Technology Advancement Office Clean Fuels Program 2017 Annual Report and 2018 Plan Update and Resolution, Receive and File Revised Membership of Technology Advancement Advisory Group, and Approve and Adopt Membership Changes for Clean Fuels Advisory Group (March 2, 2018). Available at *http://www.aqmd.gov/docs/default-source/Agendas/Governing-Board/2018/2018-mar2-034.pdf* (accessed June 16, 2022).

directed through the catalytic oxidizer with little loss of temperature. Thus, electrostatic precipitators (ESP) and filter media are anticipated to be the potential control technologies for reducing $PM_{2.5}$ emissions from underfired charbroilers.[117]

*b. Evaluation*

SJVUAPCD Rule 4692 (Commercial Charbroiling) (amended June 21, 2018) reduces emissions by requiring catalytic oxidizers for chain-driven charbroilers that meet rule applicability thresholds. Rule 4692 requires emission controls for chain-driven charbroilers that cook 400 pounds of meat or more per week. Currently, Rule 4692 does not require emissions controls for underfired charbroilers, but it does require reporting and registration requirements. Section 5.2.1 requires that owners or operators of underfired charbroilers submit a one-time report, no later than January 1, 2019, including information pertaining to specified physical and operational characteristics of the charbroiler. Underfired charbroilers that do not meet the limited use exemption specified in Rule 4692, Section 4.1 are required to meet registration requirements under SJVUAPCD Rule 2250 (Permit-Exempt Equipment Registration) (adopted October 19, 2006).

As part of our evaluation of potential control measures, we reviewed control measures established for this source category by several other jurisdictions. We compared SJVUAPCD Rule 4692 with BAAQMD Regulation 6 Rule 2 (Commercial Cooking Equipment) (amended December 5, 2007), City of New York Title 24 of the Administrative Code, Section 24-149.4 (Commercial char broilers) (amended May 6, 2016), SCAQMD Rule 1138 (Control of Emissions from Restaurant Operations) (amended November 14, 1997), and VCAPCD Rule 74.25 (Restaurant Cooking Operations) (amended October 12, 2004).

Table III-42 and Table III-43 summarize on-the-books controls in the SJVUAPCD and the existing measures in other jurisdictions with commercial charbroiling requirements for restaurants, respectively. The tables broadly summarize the control measures applicable in each jurisdiction.

---

[117] San Joaquin Valley Air Pollution Control District. *Commercial Underfired Charbroiler Emissions Control Technologies.* Available at *http://www.valleyair.org/Grants/documents/rctp/Charbroiler-Control-Technologies.pdf* (accessed 06/01/2022).

*Table III-42. On-the-Books Control Measures (Commercial Cooking)*

| Rule | Applicability | Control Measure |
|---|---|---|
| SJVUAPCD Rule 4692 (amended June 21, 2018) | Chain-driven charbroilers and underfired charbroilers at commercial cooking operations<br><br>Exemptions:<br><br>• If a chain-driven or underfired charbroiler cooks less than 400 lbs of meat per week, OR less than 10,800 lbs in the most recent 12-month rolling period and the total amount of meat cooked per week does not exceed 875 lbs | **Chain-driven charbroilers:** reduce $PM_{10}$ emissions by 83% through the installation of an approved catalytic oxidizer.<br><br>**Underfired charbroilers:** Registration requirement; weekly recordkeeping requirement for both charbroiler categories. |

*Table III-43. Other Control Measures Considered (Commercial Cooking)*

| Rule | Applicability | Control Measure |
|---|---|---|
| BAAQMD Regulation 6 Rule 2 "Commercial Cooking Equipment" (amended December 5, 2007) | Chain-driven charbroilers at commercial cooking operations.<br><br>**Exemptions:**<br>Chain-driven charbroilers that cook less than 400 lbs of beef per week | Requires the installation of a certified catalytic oxidizer (controlled to 1.3 lbs of $PM_{10}$ per 1,000 lbs of beef cooked) |
| City of New York Title 24 of the Administrative Code, Section 24-149.4 "Commercial char broilers" (amended May 6, 2016) **and** NYC Rules, Title 15, Section 37-02 "Requirements for Emissions Control Devices" (amended September 16, 2016) | Chain-driven charbroilers at commercial cooking operations<br><br>**Exemptions:**<br>Charbroilers that cook less than 875 lbs of meat per week | Requires catalytic oxidizer or other control device that has been tested and certified to reduce $PM_{10}$ by 75%. |

| Rule | Applicability | Control Measure |
|---|---|---|
| SCAQMD Rule 1138 "Control of Emissions from Restaurant Operations" (amended November 14, 1997) | Chain-driven charbroilers<br><br>**Exemptions:**<br>- Exempt if (1) accept a permitting condition limiting the amount of meat cooked to less than 875 lbs per week; or (2) submit testing showing that emissions are less that 1lb per day of any criteria pollutant | Only operate a chain-driven charbroiler with an approved catalytic oxidizer. |
| VCAPCD Rule 74.25 "Restaurant Cooking Operations" (amended October 12, 2004) | Conveyorized (chain-driven) charbroilers)<br><br>**Exemptions:**<br>- Charbroilers placed into service prior to Oct. 2005 that cook less than 875 lbs per week (no exemption for throughputs for units installed after Oct. 2005) | Requires the installation of an approved control device to reduce particulate matter emissions by 83%. |
| BAAQMD Regulation 6 Rule 2 "Commercial Cooking Equipment" (amended December 5, 2007) | Underfired charbroilers at commercial cooking operations.<br><br>**Exemptions:**<br>Underfired charbroilers which cook less than 800 lbs of beef per week | New and existing units: 1lb $PM_{10}$ per 1000 lbs of beef cooked; control device must be tested and certified |
| City of New York Title 24 of the Administrative Code, Section 24-149.4 "Commercial char broilers" (amended May 6, 2016) **and** NYC Rules, Title 15, Section 37-02 "Requirements for Emissions Control Devices" (amended September 16, 2016) | Underfired charbroilers at commercial cooking operations<br><br>**Exemptions:**<br>Charbroilers that cook less than 875 lbs of meat per week | Existing units: Registration requirement for existing units.<br><br>New units: Install ESP or other control device tested and certified to reduce $PM_{10}$ emissions by 75% |

Additionally, we evaluated recommendations included in the Earthjustice Letters for amendments to the commercial charbroiling control strategy in the San Joaquin Valley, including requiring particulate matter control devices on new underfired charbroilers. For chain-driven charbroilers, SJVUAPCD Rule 4692 contains requirements for the use of catalytic oxidizers similar to those implemented in other jurisdictions and we did not identify any additional control measures to consider. For underfired

charbroilers, SJVUAPCD does not have measures similar to the BAAQMD and New York City Department of Environmental Protection that require ESP or similar devices to reduce $PM_{10}$ emissions. However, the EPA's review of potentially feasible measures for underfired charbroilers resulted in inconclusive information. We contacted the New York State Department of Environmental Conservation (NYSDEC), the BAAQMD, SJVUAPCD, and the SCAQMD to determine whether there were any installations of certified control devices in underfired charbroiling restaurants. Except for the SJVUAPCD (which identified a Habit Burger Grill in Stockton, CA), each agency indicated that they have no known installations.[118, 119] Thus, the jurisdictions with measures in place that require installing control devices for underfired charbroiling (BAAQMD and NYC) do not have any known installations that meet the applicable measure requirements.

SJVUAPCD implements a Restaurant Charbroiler Technology Partnership (RCTP) incentive program available for "hot spot" counties. Participating restaurants can be provided funding for the full cost of purchasing, installing, and maintaining installed systems during a demonstration period covering two years of operation. Participating restaurants are allowed to keep the equipment after the demonstration period has concluded. A Molitron UL Listed Enviro-Clean Air Scrubber was installed at the Habit Burger Grill in Stockton, California through this program. While a few restaurants have shown interest in the RCTP program, there have been no other installations under the program. Some of the challenges associated with installation and operation of charbroiler controls identified by the SJVUAPCD include space considerations, restaurant down-time, and device fire safety certification.[120, 121] However, the Habit Burger Grill has now installed the Molitron scrubbers on seven other new restaurants, five of which are located in the San Joaquin Valley.[122]

In addition to installation and operational challenges identified by the SJVUAPCD, for safety reasons, it is important that control devices used for underfired charbroiling have UL safety certification. Grease buildup of FOG from the hood to the emission point represents a significant fire hazard. For example, the UL 8782 standard ensures that pollution control devices can withstand the elevated temperature of charbroiler flue gas along with other safety items that ensure the device does not become a fire hazard.[123] The Molitron scrubber has this safety certification.[124]

---

[118] Email dated February 24, 2023 from R. Vaughn, Deputy Director of Strategic Planning, NYSDEC to S. Schwenk, Physical Scientist, EPA Region IX, Subject: Under-fired Charbroiling.
[119] Email dated February 27, 2023 from V. Lau, Advanced Project Advisor, BAAQMD to S. Schwenk, Physical Scientist, EPA Region IX, Subject: Under-fired Charbroiling.
[120] The District also claims that additional measures are not economically feasible. EPA contracted RTI International to prepare a technical support document evaluating $PM_{2.5}$ controls for commercial, natural gas, underfired charbroilers as contingency measures in the San Joaquin Valley Air District. While RTI had an estimated cost of controls to be between $20,000-$50,000 per ton of $PM_{2.5}$, the District's cost analysis was much higher, ranging between $74,000-$209,000 per ton. This information was provided by the District's Charbroiling Analysis and RTI's TSD on Underfired Charbroiling.
[121] Email dated February 28, 2023 from J. Klassen, Director of Air Quality Science and Planning, SJVUAPCD to S. Schwenk, Physical Scientist, EPA Region IX, Subject: Commercial Charbroiling.
[122] SJVUAPCD December 2020 Board Item #11. Available at *https://www.valleyair.org/Board_meetings/GB/agenda_minutes/Agenda/2020/December/final/11.pdf*.
[123] UL Solutions. Updates to UL 8782 – Pollution Control Units for Commercial Cooking. Available at https://www.ul.com/news/updates-ul-8782-pollution-control-units-commercial-cooking.
[124] Molitron Company Inc. Enviro-Clean Air Scrubber Brochure. Available at *https://molitron.com/wp-content/uploads/2021/04/Enviro-Clean-Air-Scrubber-Specifications.pdf*.

At this time, we are determining that controlling underfired charbroiling $PM_{2.5}$ emissions is not technologically feasible as a contingency measure in San Joaquin Valley. Significantly, it is concerning that no other jurisdiction requiring new installations of underfired charbroiling to be controlled was able to identify an example of an installed certified control device. This makes it difficult to demonstrate the technology could achieve emissions as a contingency measure.

##### *c. Conclusion*

For the reasons described above, we are determining that requiring underfired charbroilers to install $PM_{2.5}$ controls is technologically infeasible as a contingency measure at this time. However, given the considerable contribution to $PM_{2.5}$ emissions from the commercial charbroiling industry in the San Joaquin Valley, we encourage the District, control technology manufacturers, and the industry to continue to build on existing information to develop effective methods for reducing the industry's impact on public health. In addition, we strongly encourage SJVUAPCD to consider expanding its RTCP incentive program beyond "hot spot" counties.

#### 6. Other (Miscellaneous Processes)

As CEPAM reports zero direct $PM_{2.5}$ and $NO_X$ emissions from the source category 699 - Other (Miscellaneous Processes) in the 2023 San Joaquin Valley emissions inventory, we have identified no controls for this source category for consideration as contingency measures.

### H. Mobile Sources

#### *1.* Overview

Source categories 710 through 890 comprise the mobile sources with emissions reported by CEPAM. Mobile sources include a wide variety of vehicles, equipment and engines including on-road motor vehicles, aircraft, trains, ocean-going vessels, commercial harbor craft, recreational boats, off-road recreational vehicles, off-road equipment, and farm equipment. On-road motor vehicles comprise a wide variety of vehicle types, including light-duty passenger cars; light-, medium-, and heavy-duty trucks; motorcycles; buses; and motor homes.

#### 2. Evaluation

Table III-44 presents 2023 annual emissions of direct $PM_{2.5}$ and $NO_X$ from the various types of mobile sources in the San Joaquin Valley in tons per day and as percentages of the overall area-wide total (including all anthropogenic emissions sources).

*Table III-44. San Joaquin Valley 2023 Mobile Source Emissions*

| Mobile Source Category | Subcategory | Direct $PM_{2.5}$ Emissions (tpd) | Direct $PM_{2.5}$ as Percent of Area-Wide Total | $NO_X$ Emissions (tpd) | $NO_X$ as Percent of Area-Wide Total |
|---|---|---|---|---|---|
| On-Road Motor Vehicles | Light Duty Passenger (LDA) | 1.160 | 1.74 | 3.360 | 2.10 |
| | Light Duty Trucks (LDT1 and LDT2) | 0.475 | 0.72 | 3.111 | 1.95 |
| | Medium Duty Vehicles (MDV) | 0.322 | 0.48 | 2.578 | 1.61 |
| | Heavy-Duty Gas Trucks (LHDGT1, LHDGT2. MHDGT, HHDGT) | 0.075 | 0.11 | 0.985 | 0.61 |
| | Heavy-Duty Diesel Trucks (LHDDT1, LHDDT2, MHDDT, HHDDT) | 0.943 | 1.41 | 44.619 | 27.95 |
| | Motorcycles (MCY) | 0.005 | 0.01 | 0.726 | 0.45 |
| | Buses (UBD, UBG, SBG, SBD, OGG, OGC, OBD) | 0.069 | 0.09 | 1.341 | 0.84 |
| | Motor Homes (MH) | 0.009 | 0.01 | 0.186 | 0.12 |
| **Subtotal – On-Road Motor Vehicles** | | **3.057** | **4.59** | **56.907** | **35.64** |
| | | | | | |
| Other Mobile | Aircraft | 1.682 | 2.53 | 4.547 | 2.85 |
| | Trains | 0.325 | 0.49 | 15.123 | 9.47 |
| | Ocean-Going Vessels | 0.010 | 0.02 | 0.451 | 0.28 |
| | Commercial Harbor Craft | 0.001 | 0.00 | 0.035 | 0.02 |
| | Recreational Boats | 0.481 | 0.72 | 2.500 | 1.57 |

| | | | | | |
|---|---|---|---|---|---|
| | Off-Road Recreational Vehicles | 0.023 | 0.03 | 0.129 | 0.08 |
| | Off-Road Equipment (including PERP) | 0.795 | 1.19 | 19.872 | 12.45 |
| | Farm Equipment | 1.474 | 2.21 | 27.679 | 17.34 |
| **Subtotal - Other Mobile** | | **4.791** | **7.19** | **70.336** | **44.06** |
| | | | | | |
| **Total - Mobile** | | **7.848** | **11.78** | **127.243** | **79.70** |
| | | | | | |
| **Total – All Sources (Stationary, Area, Mobile, excluding natural sources)** | | **66.612** | **100.00** | **159.651** | **100.00** |

Source: CEPAM2019v.1.03; year 2023; annual average; San Joaquin Valley Air Basin; all sources other than natural sources. Note: PERP refers to portable engines and other types of equipment registered under CARB's Statewide Portable Equipment Registration Program (PERP).

As shown above, mobile source emissions represent a significant fraction of total area-wide emissions of both direct $PM_{2.5}$ and $NO_X$. Presently, approximately 12% of direct $PM_{2.5}$ emissions, and approximately 80% of $NO_X$ emissions, come from mobile sources. With respect to $PM_{2.5}$, the three most significant subcategories of mobile sources from the standpoint of emissions are aircraft, farm equipment, and light duty passenger cars. Nearly 90% of the aircraft-related emissions of direct $PM_{2.5}$ in the San Joaquin Valley are from military jets. With respect to $NO_X$, the three most significant subcategories of mobile sources are heavy-duty diesel trucks, farm equipment and off-road equipment, which together contribute approximately 58% of the area-wide total of $NO_X$ emissions.

As a general matter, the CAA assigns mobile source regulation to the EPA through title II of the Act and assigns stationary and area source regulations to both the EPA and the states through title I of the Act. In so doing, the CAA preempts various types of state regulation of mobile sources as set forth in section 209(a) (preemption of state emissions standards for new motor vehicles and new motor vehicle engines), section 209(e) (preemption of state emissions standards for new and non-new nonroad vehicles and engines),[125] and section 211(c)(4)(A) [preemption of state fuel requirements for motor vehicle emission control, i.e., other than California's motor vehicle fuel requirements for motor vehicle emission control—see section 211(c)(4)(B)].

For certain types of mobile source emission standards, the State of California may request a waiver (for motor vehicles and engines) or authorization (for nonroad engines and vehicles) for standards relating to the control of emissions and accompanying enforcement procedures. See CAA sections 209(b) (new motor vehicles) and 209(e)(2) (most categories of new and in-use off-road vehicles). Over the years,

[125] EPA regulations refer to "nonroad" vehicles and engines whereas California regulations refer to "off-road" vehicles and engines. These terms generally refer to the same types of vehicles and engines.

CARB has submitted many requests for waivers or authorizations of its standards and other requirements relating to the control of emissions from new on-road and new and non-new nonroad vehicles and engines, and the EPA has granted many such requests.

For example, the EPA has granted a waiver for CARB's Low Emission Vehicle (LEV III) criteria pollutant standards for light- and medium duty vehicles; see 78 FR 2112 (January 9, 2013) (Advanced Clean Cars), later partially withdrawn at 84 FR 51310 (September 27, 2019), re-instated 88 FR 14332 (March 14, 2022). EPA has also granted a waiver for CARB's heavy-duty vehicle standards, see ); see 88 FR 20688 (April 6, 2023) (Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks Regulation; Zero Emission Airport Shuttle Regulation; Zero-Emission Power Train Certification Regulation). In addition, the EPA has issued an authorization for CARB's In-Use Off-Road Diesel-Fueled Fleets Regulation; see 78 FR 58090 (September 20, 2013).

Once the EPA issues a waiver or authorization for a CARB mobile source regulation, CARB generally submits the regulation to the EPA for approval as part of the California SIP. In recent years, the EPA has taken action to approve many mobile source regulations as part of the California SIP.[126]

Multiple generations of increasingly stringent controls for mobile sources have had the effect of reducing emissions from such sources even as mobile source activity levels continue to grow in association with economic and population growth. Emission standards for mobile sources generally apply to manufacturers rather than owners or operators of vehicles, and thus, for the most part, mobile source emissions decrease when consumers purchase newer cleaner vehicles that replace older, more polluting vehicles, a process referred to as "vehicle turnover."

One way to accelerate the typical rate of vehicle turnover is to adopt retrofit or replacement requirements for owners or operators of older vehicles. CARB has adopted such a regulation, referred to as the Truck and Bus Regulation, for owners of certain in-use heavy-duty trucks and buses.[127] The EPA approved the Truck and Bus Regulation as part of the California SIP in 2012.[128] CARB's In-Use Off-Road Diesel-Fueled Fleets Regulation is another example of a CARB regulation that is intended to accelerate the natural rate of vehicle turnover of certain mobile sources.[129]

Yet another way to accelerate the typical rate of vehicle turnover is through incentive programs. The San Joaquin Valley relies upon incentive programs to accelerate the natural rate of turnover of farm equipment and thereby achieve emissions reductions through replacement of older equipment with newer, cleaner models. Specifically, CARB adopted the San Joaquin Valley Agricultural Equipment Incentive Measure to reduce $NO_X$ and direct $PM_{2.5}$ emissions from off-road diesel agricultural vehicles and equipment. In 2021, the EPA approved, in part, the San Joaquin Valley Agricultural Equipment

---

[126] See 81 FR 39424 (June 16, 2016); 82 FR 14446 (March 21, 2017) and 83 FR 23232 (May 18, 2018).
[127] Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles, codified at title 13 of the California Code of Regulations, section 2025.
[128] 77 FR 20308 (April 4, 2012).
[129] EPA approved the In-Use Off-Road Diesel-Fueled Fleets Regulation as part of the California SIP at 81 FR 39424 (June 16, 2016). CARB adopted amendments to this regulation in 2022 that are intended to further reduce emissions from this source category by requiring that fleets phase-out operation of their oldest and highest-emitting off-road diesel vehicles, prohibiting the addition of high-emitting vehicles to a fleet, and requiring the use of certain renewable diesel fuels.

Incentive Measure and credited the measure as achieving 4.83 tpd $NO_X$ and 0.24 tpd $PM_{2.5}$ emission reductions by 2024.[130] In addition, mobile source emissions can be reduced through vehicle inspection and maintenance (I/M) programs. We discuss potential contingency measures in the context of vehicle I/M programs for gasoline-powered motor vehicles in Section IV.E (In-Use Motor Vehicles) of this TSD.

The net effect on emissions in the San Joaquin Valley of the existing regulatory program for mobile sources is illustrated by comparing year 2023 emissions with the corresponding projected emission estimates for 2028 and 2033 as shown in Table III-45. The future year projections reflect both expected growth and adopted controls but do not include more recent regulatory changes adopted by CARB.

*Table III-45. San Joaquin Valley Mobile Source Emission Projections*

| | | **Direct $PM_{2.5}$ (tpd)** | | | **$NO_X$ (tpd)** | | |
|---|---|---|---|---|---|---|---|
| **Mobile Source Category** | **Subcategory** | **2023** | **2028** | **2033** | **2023** | **2028** | **2033** |
| On-Road Motor Vehicles | Light Duty Passenger (LDA) | 1.160 | 1.271 | 1.346 | 3.360 | 2.608 | 2.431 |
| | Light Duty Trucks (LDT1 and LDT2) | 0.475 | 0.504 | 0.531 | 3.111 | 1.926 | 1.396 |
| | Medium Duty Vehicles (MDV) | 0.322 | 0.291 | 0.278 | 2.578 | 1.377 | 0.904 |
| | Heavy-Duty Gas Trucks (LHDGT1, LHDGT2. MHDGT, HHDGT) | 0.075 | 0.067 | 0.062 | 0.985 | 0.627 | 0.422 |
| | Heavy-Duty Diesel Trucks (LHDDT1, LHDDT2, MHDDT, HHDDT) | 0.943 | 0.995 | 0.940 | 44.619 | 43.362 | 40.058 |
| | Motorcycles (MCY) | 0.005 | 0.005 | 0.005 | 0.726 | 0.702 | 0.703 |
| | Buses (UBD, UBG, SBG, SBD, OGG, OGC, OBD) | 0.069 | 0.067 | 0.062 | 1.341 | 1.099 | 0.791 |
| | Motor Homes (MH) | 0.009 | 0.008 | 0.007 | 0.186 | 0.141 | 0.111 |
| **Subtotal – On-Road Motor Vehicles** | | **3.057** | **3.169** | **3.233** | **56.907** | **51.844** | **46.814** |

[130] 86 FR 73106 (December 27, 2021).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Other Mobile | Aircraft | 1.682 | 0.687 | 0.693 | 4.547 | 4.543 | 4.544 |
| | Trains | 0.325 | 0.324 | 0.309 | 15.123 | 15.989 | 16.255 |
| | Ocean-Going Vessels | 0.010 | 0.011 | 0.012 | 0.451 | 0.481 | 0.460 |
| | Commercial Harbor Craft | 0.001 | 0.001 | 0.001 | 0.035 | 0.031 | 0.029 |
| | Recreational Boats | 0.481 | 0.397 | 0.337 | 2.500 | 2.390 | 2.236 |
| | Off-Road Recreational Vehicles | 0.023 | 0.024 | 0.025 | 0.129 | 0.142 | 0.149 |
| | Off-Road Equipment (including PERP) | 0.795 | 0.606 | 0.547 | 19.872 | 16.548 | 15.563 |
| | Farm Equipment | 1.474 | 1.070 | 0.770 | 27.679 | 19.758 | 14.322 |
| **Subtotal - Other Mobile** | | **4.791** | **4.121** | **3.694** | **70.336** | **59.881** | **53.645** |
| | | | | | | | |
| **Total - Mobile** | | **7.848** | **7.290** | **6.927** | **127.243** | **111.725** | **100.459** |
| | | | | | | | |
| **Total – All Sources (Stationary, Area, Mobile, excluding natural sources)** | | **66.612** | **66.020** | **65.780** | **159.651** | **141.819** | **129.193** |

Source: CEPAM2019v.1.03; years 2023, 2028 and 2032; annual average; San Joaquin Valley Air Basin; all sources other than natural sources. Note: PERP refers to portable engines and other types of equipment registered under CARB's Statewide Portable Equipment Registration Program (PERP).

As shown above, the emissions trend for direct $PM_{2.5}$ emissions from mobile sources is downward as reductions from off-road mobile sources offset increases from on-road mobile sources. For the latter category, combustion-related direct $PM_{2.5}$ emissions represent a diminishing percentage of overall direct $PM_{2.5}$ emissions increases, and non-combustion processes, such as tire and brake wear, represent an increasing percentage. Replacement of older vehicles with cleaner vehicles reduces combustion-related emissions but not brake and tire wear emissions that are generally proportional to vehicle activity. Overall, mobile source related emissions by 2033 continue to represent approximately the same percentage of the area-wide total for direct $PM_{2.5}$ emissions as they do in 2023 (i.e., approximately 11 to 12 percent).

For $NO_X$, mobile source emissions reductions contribute the most to overall expected emissions reductions in the San Joaquin Valley by 2033 but would continue to represent about 80 percent of the area-wide total for that $PM_{2.5}$ precursor. By 2033, heavy-duty diesel trucks would represent approximately 40 percent of the total mobile source emissions inventory of $NO_X$ for the San Joaquin Valley.

However, the emissions trends shown above do not reflect more recent mobile source regulations adopted by CARB to implement the 2016 State Strategy[131] and that target emissions reductions from medium- and heavy-duty trucks, including the Advanced Clean Trucks Regulation (adopted in 2020)[132] and the "Omnibus" Low-$NO_X$ Regulation (also adopted in 2020), which are expected to provide significant emissions reductions of $NO_X$ from on-road medium and heavy-duty vehicles over the next several decades.[133] In addition, in 2021, CARB adopted an inspection and maintenance (I/M) program for heavy-duty diesel-powered vehicles that is intended to achieve additional near- and long-term emissions reductions from the heavy-duty vehicle sector. The regulations supporting CARB's I/M program for heavy-duty diesel-powered vehicles are in effect as of January 1, 2023.

More recently, CARB has adopted an updated strategy, the 2022 State Strategy,[134] for mobile sources and certain area sources. Through adoption of the 2022 State Strategy, CARB has committed to undertake new regulatory initiatives to maintain or even accelerate the downward trend in emissions from mobile sources. These initiatives include, among others, an advanced clean fleet regulation and zero-emission truck measure, tighter on-road motorcycle emission standards, tier 5 off-road vehicle and engine standards, amendments to the In-Use Off-Road Diesel-Fueled Fleets Regulation, tighter spark-ignition marine engine standards, Commercial Harbor Craft Amendments, and an in-use locomotive regulation.

While CARB has the authority to establish emissions standards for new motor vehicles or new motor vehicle engines sold in California (upon the EPA's waiver of preemption under CAA section 209(b)), the EPA establishes such standards for vehicles and engines sold elsewhere in the Nation. The so-called "49-state" vehicles affect air quality in California, and EPA has taken or proposed actions to reduce the emissions from the "49-state" vehicle fleet. More specifically, the EPA has finalized Heavy-Duty vehicle and engine standards for model year 2027 and beyond,[135] and has proposed more stringent emission standards for criteria pollutants, including $NO_X$, for both Light-Duty and Medium-Duty vehicles for model years 2027-2032.[136] In addition, the EPA has proposed new greenhouse gas standards for heavy-duty

---

[131] CARB, Revised Proposed 2016 State Strategy for the State Implementation Plan (March 7, 2017), adopted by CARB on March 23, 2017 through Resolution 17-7.
[132] As noted above, the EPA granted CARB's waiver request for the Advanced Clean Trucks Regulation at 88 FR 20688 (April 6, 2023).
[133] EPA issued its Notice of Decision granting CARB's waiver request for the Advanced Clean Trucks Regulation at 88 FR 20688 (April 6, 2023). EPA published notice of opportunity for public hearing and comment on CARB's request for a waiver for the Omnibus Low-$NO_X$ Regulation at 87 FR 35765 (June 13, 2022) but has not yet taken final action on the request.
[134] CARB, 2022 State Strategy for the State Implementation Plan (September 22, 2022) ("2022 State Strategy"), adopted by CARB on September 22, 2022 through Resolution 22-14. On February 23, 2023, CARB submitted the 2022 State Strategy to the EPA for approval as a revision to the California SIP.
[135] 88 FR 4296 (January 24, 2023).
[136] 88 FR 29184 (May 5, 2023).

vehicles starting in model year 2028 that would also reduce heavy-duty vehicle emissions of $NO_X$ and other criteria pollutant precursors.[137]

The EPA is solely authorized under the CAA to establish emission standards for certain new vehicles and engines, including new engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower, and new locomotives or new engines used in locomotives.[138]

Regarding the fourth largest source of $NO_X$ in the San Joaquin Valley (trains), in November 2022 the EPA responded to a petition from the District that sought action by the EPA to address harmful emissions from locomotives.[139] The EPA committed in the response to undertake a notice and comment rulemaking process to reconsider existing locomotive preemption regulations to ensure that they don't inappropriately limit California's and other states' authorities under the CAA to address their air quality issues. In April 2023, the EPA proposed changes to the locomotive preemption regulations delivering on the Agency's commitment.[140]

The EPA also committed to engage with stakeholders including locomotive and locomotive engine manufacturers, technology suppliers, environmental justice communities, environmental and public health non-governmental organizations, other federal partners, state and local air quality agencies, railroad companies, and labor unions as the Agency develops options for how new locomotives can achieve the greatest degree of emission reduction achievable through the application of technology. That engagement, which is ongoing, has already highlighted that potential opportunities may exist to reduce emissions from locomotives through possible changes to the EPA's regulations to control unnecessary idling by new and remanufactured locomotives. Technologies that reduce the time that large high-emitting locomotive engines operate at idle have the potential to directly reduce particulate matter and $NO_X$ emissions from locomotives. The EPA is actively considering how best to address the emissions from idling locomotives among the suite of regulatory options being considered for new and remanufactured locomotives.

The EPA has not identified any engine or vehicle emission standards for consideration as contingency measures for the FIP. First of all, as a general matter, new mobile source engine or vehicle emission standards require significant lead time (more than two years) to allow manufacturers time to retool factories to produce compliant engines or vehicles. Retrofit or replacement requirements also require significant lead time to allow owners and operators to manage the process of retrofitting or replacing old engines or vehicles. The significant lead time associated with emissions reductions from implementation of mobile source controls supports the reliance on mobile sources as one of the principal control strategies for attaining the NAAQS in San Joaquin Valley, rather than as contingency measures held in reserve. Second, new and more stringent mobile source engine and vehicle emissions standards continue to be implemented or are in development such that most mobile source categories are or will be on track to transition to zero emissions in California. These regulations represent the most stringent emissions requirements for mobile sources and are generally technology- or market-forcing,

[137] 88 FR 25926 (April 27, 2023).
[138] CAA sections 209(e)(1) and 213.
[139] Letter dated November 9, 2022, from Joe Goffman, Principal Deputy Assistant Administrator, EPA to Liane M. Randolph, Chair, CARB, and letter dated November 9, 2022, from Joe Goffman, Principal Deputy Assistant Administrator, EPA to Samir Sheikh, Executive Director, SJVUAPCD.
[140] 88 FR 25926, 26092-26096 (April 27, 2023).

and, thus, are not suited for being held in reserve to be triggered by one of the findings in 40 CFR 51.1014(a).

In addition to implementation of tighter vehicle and engine emissions standards and vehicle I/M programs, vehicular emissions can be reduced through implementation of Transportation Control Measures (TCMs.) TCMs are strategies that reduce transportation-related air pollution and fuel use by reducing vehicle miles traveled and improving roadway operations.[141] Vehicle use can be reduced through less-polluting transportation alternatives, such as public transit, and strategies that decrease the need for vehicle trips, such as telecommuting. TCMs may also focus on making travel more efficient by carefully managing the transportation system.

CAA section 108(f) lists 16 types of TCMs, but the list is not intended to be exhaustive. The 16 TCMs types include:

(i) Programs for improved public transit;
(ii) Restriction of certain roads or lanes to, or construction of such roads or lanes for use by, passenger buses or high occupancy vehicles;
(iii) Employer-based transportation management plans, including incentives;
(iv) Trip-reduction ordinances;
(v) Traffic flow improvement projects that achieve emission reductions;
(vi) Fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit service;
(vii) Programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during period of peak use;
(viii) Programs for the provision of all forms of high-occupancy, shared-ride services;
(ix) Programs to limit portions of road surfaces or certain sections of the metropolitan area to the use of non-motorized vehicles or pedestrian use, both as to time and place;
(x) Programs for secure bicycle storage facilities and other facilities, including bicycle lanes, for the convenience and protection of bicyclists, in both public and private areas;
(xi) Programs to control extended idling of vehicles;
(xii) Programs to reduce motor vehicle emissions, consistent with title II of the CAA, which are caused by extreme cold start conditions;
(xiii) Employer-sponsored programs to permit flexible work schedules;
(xiv) Programs and ordinances to facilities non-automotive travel, provision and utilization of mass transit, and to generally reduce the need for single-occupant vehicle travel, as part of the transportation planning and development efforts of a locality, including programs and ordinances applicable to new shopping centers, special events, and other centers of vehicle activity;
(xv) Programs for new construction and major reconstructions of paths, tracks or areas solely for the use by pedestrian or other non-motorized means of transportation when economically feasible and in the public interest; and
(xvi) Program to encourage the voluntary removal from use and the marketplace of pre-1980 mode year light duty vehicles and pre-1980 model light duty trucks.

[141] EPA, "Transportation Control Measures - Information Document for Developing and Implementing Emissions Reductions Programs," EPA-430-R-09-040, March 2011.

In the San Joaquin Valley, county-based planning and transportation agencies, transit districts and local jurisdictions are responsible for identifying, adopting and implementing most types of TCMs. There are eight county-based planning and transportation agencies in the San Joaquin Valley. The county-based planning and transportation agencies are the metropolitan planning organizations (MPOs) for federal transportation planning purposes for their respective counties. The EPA's transportation conformity regulations require that the MPOs show timely implementation of all TCMs committed to in the applicable SIP, and the San Joaquin Valley MPOs are responsible for making the necessary demonstration of timely implementation when they determine conformity.

The San Joaquin Valley MPOs have identified and adopted a number of TCMs over the years and have worked with local transit agencies and local jurisdictions to do the same. The SJVUAPCD's 2016 Ozone Plan includes a list of TCMs implemented in the San Joaquin Valley to meet CAA requirements and to reduce vehicular emissions in support of the Valley's attainment plans for ozone and PM.[142] The TCMs vary among the counties and the various jurisdictions, but, in all, essentially all of the types of TCMs listed in CAA section 108(f) have been implemented in part or parts of the San Joaquin Valley.

In addition, in 2009, the SJVUAPCD adopted Rule 9410 (Employer Based Trip Reduction) to reduce VMT from private vehicles used by employees to commute to and from their worksites to reduce emissions of $NO_X$, VOC and PM. The EPA approved District Rule 9410 as a revision to the California SIP at 81 FR 6761 (February 9, 2016). Rule 9410 requires certain employers with at least 100 "eligible employees"[143] at a work site to establish programs to reduce employee commute-related vehicle travel, referred to in the rule as "employer trip reduction implementation plans" or "ETRIPs."[144] According to the SJVUAPCD, approximately 36% of employees in the San Joaquin Valley are employed at worksites with 100 or more employees.[145] Employers subject to the rule must, among other things, register with the SJVUAPCD, submit an ETRIP for each worksite to the District, and submit annual compliance reports to the District.[146]

More recently, in the SJVUAPCD's 2022 Plan for the 2015 8-Hour Ozone Standard, new TCMs are identified and included as part of the plan for implementation in the coming years.[147] The new TCMs include new projects that facilitate and encourage bicycle and pedestrian travel modes in support of transit-oriented development, that provide for eco-driving educational programs, that promote transit service, that promote rideshare and carpool programs.

TCMs are not good candidate contingency measures for a FIP because TCMs have to be developed through the area's transportation planning process which can take a significant amount of time and they

[142] 2016 Ozone Plan, Attachment D ("Adopted Transportation Control Measures") to Appendix D ("Mobile Source Control Strategy"), Tables D-10 - D17. The EPA approved different portions of the 2016 Ozone Plan at different times - see 83 FR 41006 (August 17, 2018), 84 FR 3302 (February 12, 2019), and 84 FR 11198 (March 25, 2019).
[143] "Eligible employees" do not include emergency health and safety employees, farm workers, field construction workers, on-call employees, part-time employees, seasonal employees, and volunteers, among others. See Rule 9410, sections 3.19 and 3.31.
[144] Rule 9410 defines ETRIP as a "group of measures implemented by an employer, designed to provide transportation information, assistance, and/ or incentives to employees" and intended to "reduce mobile source emissions by reducing the number of vehicle miles traveled to the worksite." Rule 9410, section 3.28.
[145] 80 FR 51153, 51154 (August 24, 2015), citing the SJVUAPCD Staff Report for Rule 9410.
[146] SJVUAPCD Rule 9410, sections 6.1, 6.3, and 6.5.
[147] SJVUAPCD, 2022 Plan for the 2015 8-Hour Ozone Standard, adopted December 15, 2022 ("2022 Ozone Plan"), Appendix D, Tables D-8 – D-15. CARB submitted the 2022 Ozone Plan to the EPA as a revision to the SIP on February 23, 2023.

are funded to large degree by FHWA and FTA based on transportation improvement programs developed by the MPOs in the area. The EPA is not in a position to make decisions about FHWA/FTA funding for these projects. Therefore, given the time it would take to advance these projects through the planning and funding processes TCMs are not viable candidates for a contingency measure FIP.

### 3. Conclusion

As new engine or vehicle emission standards would not generate emissions reductions within two years, and new, more stringent mobile source engine and vehicle emissions standards are being developed and implemented to facilitate the transition to zero emissions vehicles in California, we have not identified any engine or vehicle emission standards for consideration as potential contingency measures. Additionally, for the reasons described in this section, numerous factors limit the practicability of traditional TCMs in the context of a contingency measure FIP. A potential contingency measure for vehicle I/M programs is evaluated in Section IV.E of this TSD.

# IV. Feasibility of Additional Recommendations as Contingency Measures

## A. New Source Review and Emission Reduction Credits

### 1. Background

Most of the District's New Source Review (NSR) program for the pre-construction review of new or modified stationary sources is contained in SJVUAPCD Rules 2020 (Exemptions) and 2201 (New and Modified Stationary Source Review Rule). Generally, the EPA allows local permitting authorities flexibility in designing and implementing their NSR programs, so long as the programs are no less stringent than the federal requirements. For example, District Rule 2201 differs from the federal requirements in how emissions offset requirements are met in nonattainment areas, especially in how it calculates "surplus" emission reductions required to offset emissions increases from new major sources and major modifications. To account for these differences, Rule 2201 includes an offset equivalency tracking system that requires the District to submit an annual report to EPA comparing the offsets actually required by the District to those that would have been required under the federal requirements in terms of both the quantity of offsets required and the creditable "time-of-use" surplus value of the offsets.[148]

In 2019 and 2020, CARB conducted a review of the District's ERC system, including the equivalency demonstration, and concluded that there was a need to update the District's ERC program and

---

[148] "Time-of-use" surplus signifies that the offsetting emissions reductions are surplus of applicable requirements as of the issuance date of the ATC permit for the project whose emission increases the reductions are used to offset. The federal offset program requires all offsets to be time-of-use surplus. CAA 173(c)(2). In contrast, the quantity of offsets surrendered for construction permits issued by the District, as measured in Test 1, are surplus-adjusted only at the time the emission reduction credit (ERC) is initially issued ("time-of-issuance" surplus). Rule 2201 at section 3.2.2. Since emissions reductions may be credited years before they are used to offset a project, more stringent control requirements implemented in the interim period may significantly reduce the time-of-use surplus value relative to the time-of-issuance surplus value. Therefore, the District's allowance of ERCs valued at time-of-issuance is generally less stringent than federal requirements because it may assign higher value to a credit than is federally creditable.

processes.[149] In response to the findings in the report, the District committed to develop a new equivalency tracking database, including associated documentation, to adjust certain banked ERCs, update policies and procedures and provide greater overall transparency for the program.[150]

### 2. Evaluation of Earthjustice Recommendations

The Earthjustice Letters include two specific recommendations with respect to the SJVUPACD's NSR program, particularly as the program relates to oil and gas drilling sources. First, Earthjustice recommends the District's $PM_{10}$, $PM_{2.5}$ and $SO_X$ ERC banks should be examined for adequacy similar to the review conducted in 2019 and 2020 by CARB.[151] Second, Earthjustice recommends rescission of the permit exemption in Rule 2020, section 6.6.12,[152] for the storage or processing of fluids in a small producer's[153] tank with a throughput of 50 barrels of crude oil per day or less, if such tank is located at a heavy oil stationary source.

No further evaluation of either recommendation is needed in the context of this contingency measure FIP. First, the EPA recently finalized a limited approval and limited disapproval of an amended version of District Rule 2201, and the limited disapproval relates in part to the EPA's conclusion that certain changes are needed for the offset equivalency demonstration with respect to all pollutants, not just VOC and $NO_X$.[154] The EPA's action on amended Rule 2201 can be expected to ensure full federal offset equivalency in the event of an ERC shortfall. Additionally, "examining" the sufficiency of an ERC bank is not a potential SIP-creditable control measure.

Second, with respect to the exemption for low-volume storage or processing of fluids in a small producer's tank, any potential reductions from such a measure would relate only to VOC emissions while the scope of the contingency measure FIP is limited to emissions of direct $PM_{2.5}$ and the one $PM_{2.5}$ plan precursor, $NO_X$. In addition, removing a permit exemption for a piece of equipment would not result in SIP-creditable emissions reductions. The existing exemption does not allow the equipment to be exempt from any other federally applicable control requirements that otherwise apply. For example, except for the treatment of fugitive emissions, the federal NSR and title V operating permit programs do not allow for equipment to be excluded from the determination of whether a source is a major source. Similarly, any equipment part of a new major source or major modification under the federal NSR program would not be excluded from offset requirements or control technology determinations.

---

[149] CARB, "Review of the San Joaquin Valley Air Pollution Control District Emission Reduction Credit System," June 2020.
[150] Id, at i and ii.
[151] Letter from Earthjustice dated May 18, 2022 to Michael S. Regan, EPA Administrator, page 6 of attachment B.
[152] Id., at page 3 of attachment A and page 1 of attainment B.
[153] The term "small producer" in Rule 2020, section 3.17 references the definition of "small producer" in Rule 4623. Rule 4623 ("Storage of Organic Liquids"), which defines "small producer" in section 3.29 (of Rule 4623) as an operator in the business of crude oil production who produces an average of less than 6,000 barrels per day of crude oil from all operations within the county; and does not engage in refining, transportation, or marketing of refined petroleum products.
[154] 87 FR 45730 (July 29, 2022), at 45732-45734 (proposed limited approval and limited disapproval of District Rule 2201); 88 FR 43434 (July 10, 2023) (final limited approval and limited disapproval of District Rule 2201).

## B. Indirect Source Review

### 1. Overview

Under the CAA, "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations (i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or (ii) preventing maintenance of any such standard after such date.[155]

The term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution.[156] Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply, including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source are not considered indirect sources.

Indirect sources include, but are not limited to, highways and roads; parking facilities; retail, commercial and industrial facilities; recreation, amusement, sports and entertainment facilities; airports; office and government buildings; apartment and condominium buildings; education facilities.[157]

### 2. Regulatory Context

The CAA provides that any state may include in a SIP, but the EPA may not require as a condition of approval of such SIP, any indirect source review program. The EPA may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.[158]

The SJVUAPCD adopted an indirect source review program rule, Rule 9510 (Indirect Source Review) in 2005 and amended the rule in 2017. The EPA approved Rule 9510 in 2011 and then again, as amended, in 2021, as a revision to the San Joaquin Valley portion of the California SIP.[159]

SJVUAPCD Rule 9510 is an indirect source review (ISR) rule that establishes a mechanism to reduce or offset emissions of $NO_X$ and $PM_{10}$ in the San Joaquin Valley from the construction and use of development projects through design features, on-site measures, and off-site measures. The rule requires applicants of certain new development projects to reduce operational and construction equipment $NO_X$ and $PM_{10}$ emissions by specific percentages, as compared to an unmitigated baseline. The rule requires applicants to incorporate design features and on-site measures into the development project or pay a mitigation fee for emissions in excess of the requirement. SJVUAPCD uses the fees to fund off-site emission reduction projects.

---

[155] CAA section 110(a)(5)(D).
[156] CAA section 110(a)(5)(C).
[157] 40 CFR 52.22(b)(1)(i) (July 1, 1975 version).
[158] CAA section 110(a)(5)(A)(i).
[159] 76 FR 26609 (May 9, 2011); 86 FR 33542 (June 25, 2021).

As originally adopted, Rule 9510 applied to project applicants seeking "final discretionary approval" for a development project. However, through implementation of the original rule, the SJVUAPCD found that projects subject to final discretionary approval can vary between public agencies for the same type of project, especially large development projects. In response, in 2017 the SJVUAPCD modified Rule 9510 to ensure the rule is applied consistently to all large development projects in the San Joaquin Valley by adding additional applicability criteria for large development projects.

The EPA approved the original rule, and the amended rule, as a revision to the SIP. In both actions, the EPA approved the rule as strengthening the SIP while also concluding that it does not meet all the evaluation criteria for enforceability.[160] Because of the deficiencies related to enforceability, the EPA concluded that the rule should not be credited in any attainment and rate of progress/reasonable further progress demonstrations.[161]

In contrast to the state authority under the CAA to adopt indirect source review programs as part of a SIP, the EPA is expressly not authorized under the CAA to include any indirect source review program in a FIP, except for indirect source review programs that apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.[162] In addition, the EPA is not authorized to include any parking surcharge regulation in a FIP.[163]

### 3. Evaluation of Earthjustice Recommendations

The Earthjustice Letters recommend that the EPA evaluate revisions to Rule 9510 that would in effect eliminate the distinction in the applicability provision in the rule between large development projects and smaller development projects by replacing the phrase "to gain a final discretionary approval" in section 2.1 with the phrase "to gain approval from a public agency" from section 2.2.[164] Earthjustice also recommends that the EPA evaluate revisions to Rule 9510 to explicitly regulate $PM_{2.5}$ emissions.[165] (The rule already regulates emissions of $PM_{10}$ and $NO_X$.)

Expanding the applicability provision to applicants of smaller development projects that seek to gain approval from a public agency, and not just applicants of such projects that seek to gain a final discretionary approval, would increase the number of developments that would be subject to the requirements of the rule to reduce operational and construction equipment $NO_X$ and $PM_{10}$ emissions by specific percentages, as compared to an unmitigated baseline. As noted previously, Rule 9510 allows applicants to comply with the emission reduction requirements by incorporating design features and on-site measures into the development project or by paying a mitigation fee. Revisions to Rule 9510 to explicitly regulate direct $PM_{2.5}$ emissions would not necessarily result in emissions reductions that are not already being achieved by the rule through regulation of $PM_{10}$, of which $PM_{2.5}$ is a part.

---

160 75 FR 28509, at 28510-28511 (May 21, 2010); 86 FR 33542, at 33543 (June 25, 2021).
161 Id.
162 CAA section 110(a)(5)(B).
163 CAA section 110(c)(2)(B). The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles. CAA section 110(c)(2)(D)(i).
164 Letter from Earthjustice to Michael S. Regan, Administrator, EPA, dated May 18, 2022, attachment A, page 3 of October 22, 2021 Memorandum to Administrator Regan, EPA.
165 Id.

Earthjustice also compared the requirements of Rule 9510 with an indirect source review rule, Rule 2305 (Warehouse Indirect Source Rule – Warehouse Actions and Investments to Reduce Emissions (WAIRE) Program), adopted by the South Coast Air Quality Management District (SCAQMD),[166] and, based on that comparison, suggested that the EPA evaluate a number of ways that Rule 9510 could be revised to achieve additional emissions reductions in a manner similar to that provided for in SCAQMD Rule 2305.[167] The suggestions relate specifically to warehouses within the "light industrial facilities" category and include revising Rule 9510 to apply to owners and operators of warehouses, to apply to existing as well as new or modified warehouses, to differentiate between truck classes to determine emissions reduction needs, to require that impacts to adjacent communities be quantified, to require tracking of actual truck trips, and to expand applicability to include all warehouses 100,000 square feet or more of floor space.

### 4. Conclusion

No further evaluation of Rule 9510 as a contingency measure is needed. The EPA does not have the authority to promulgate the types of measures suggested by Earthjustice as part of a FIP. The EPA's authority to promulgate indirect source review programs as part of the SIP is limited to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources. Rule 9510 applies to certain types of land use development projects, the vast majority fall outside the scope of the EPA's authority with respect to indirect source review programs as part of a FIP.

Second, even if the EPA had the authority to revise Rule 9510 to include a contingency measure that would expand the rule's applicability or strengthen the rule's requirements, the EPA does not yet have the information to credit the rule with a specific amount of emissions reductions due to the preexisting concerns related to enforceability. The issues concerning enforceability and quantification of emissions reductions generally would confound quantification of any contingency provisions that might be built into the rule.

Unlike the EPA, the SJVUAPCD has the authority to expand the applicability of Rule 9510 or to revise the rule's requirements. However, until the issues concerning enforceability are fully addressed and resolved, the quantification of specific emissions reductions associated with any particular contingency provision or set of contingency provisions in the rule will remain problematic. Moreover, without a specific emissions reduction amount credited to the contingency measure, there would be no basis to determine the extent to which the contingency measure would contribute to the overall EPA-recommended amount of emissions reductions from contingency measures of one year's worth of RFP or progress. Lastly, while some of the suggestions by Earthjustice appear to have merit, the EPA lacks the authority to compel the SJVUAPCD to adopt any of them because the EPA may not require as a condition of approval of such SIP, any indirect source review program.[168]

More generally, and apart from revisions to SJVUAPCD Rule 9510, the EPA notes that, with respect to new or modified federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources, the transportation and general conformity

---

[166] SCAQMD, Rule 2305 ("Warehouse Indirect Source Rule – Warehouse Actions and Investments to Reduce Emissions (WAIRE) Program"), adopted May 7, 2021.
[167] Letter from Earthjustice to Michael S. Regan, Administrator, EPA, dated May 18, 2022, attachment B, page 3.
[168] CAA section 110(a)(5)(A)(i).

regulations[169] already require the type of review and mitigation that an indirect source review would likely provide, and thus, no contingency measures for those types of actions would be available.

## C. Soil $NO_X$

### 1. Background

"Soil $NO_X$" refers to $NO_X$ emissions released as byproduct of microbial processes involved in the biogeochemical nitrogen cycle. Some studies have suggested that use of fertilizers and pesticides may greatly increase the natural emissions rate of soil $NO_X$, but estimates vary greatly from study to study with soil $NO_X$ emission estimates ranging from 1% to 30-40% of total $NO_X$ emissions in California.[170] Soil $NO_X$ is generally included in photochemical modeling for ozone and $PM_{2.5}$ attainment plans, accounting for both natural and fertilizer-induced emissions, but may not account for the possible higher levels suggested by the Earthjustice Letters.

While California has adopted, and the EPA has approved,[171] regulations specifically designed to reduce VOC emissions from pesticide use in certain nonattainment areas, the EPA is unaware of any control measures specifically designed to reduce soil $NO_X$ from use of fertilizers or pesticides. The methods for reducing VOC emissions from pesticide use include specifications on allowable application methods and restrictions on use of high-VOC formations of pesticide products that contain certain chemicals as their primary active ingredient.

### 2. Evaluation of Earthjustice Recommendation

The Earthjustice Letters note that current rules contain no control measures or management practices to limit $NO_X$ emissions from soil and nitrogen-based fertilizer treatments and that, in light of recent studies, the $PM_{2.5}$ control strategy should fully account for soil $NO_X$.[172] Earthjustice states that studies suggest the District's inventory significantly underestimates $NO_X$ emissions from soil and that the EPA should analyze whether soil $NO_X$ contributes significantly to $NO_X$ emissions in San Joaquin Valley. Earthjustice notes that a determination that soil contributes significantly to $NO_X$ emissions in the Valley would not only lead to consideration of potential dairy and poultry manure land application and soil fertilization controls but also reconsideration of the conclusions that the Valley is "$NO_X$-limited" and that, in turn, ammonia controls at agricultural sources provide little to no benefit.

---

[169] 40 CFR part 93, subparts A and B.

[170] See e.g., Almaraz et al. (2018). Agriculture is a major source of $NO_X$ pollution in California, Science Advances, 4(1), doi:10.1126/sciadv.aao3477, 2018; available at *https://advances.sciencemag.org/content/4/1/eaao3477*. Sha et al. (2021). Impacts of soil $NO_X$ emission on $O_3$ air quality in rural California, Environmental Science & Technology, 55(10), 7113-7122, doi:10.1021/acs.est.0c06834; available at *https://pubs.acs.org/doi/10.1021/acs.est.0c06834*. Guo et al. (2020). Assessment of Nitrogen Oxide Emissions and San Joaquin Valley $PM_{2.5}$ Impacts From Soils in California, Journal of Geophysical Research: Atmospheres, 125(24), doi: 10.1029/2020JD033304; available at *https://doi.org/10.1029/2020JD033304*.

[171] 77 FR 65294 (October 26, 2012); 81 FR 64350 (September 20, 2016).

[172] Letter from Earthjustice dated May 18, 2022 to Michael S. Regan, EPA Administrator, attachment A, page 4 and attachment B, page 8.

### 3. Conclusion

No further evaluation of soil $NO_X$ controls as a contingency measure for the FIP is needed. The EPA most recently addressed the issue of $NO_X$ from soil due to the use of fertilizers and pesticides in the context of the Agency's final rule approving CARB's submission of emissions inventories of VOC and $NO_X$ for the 2015 ozone NAAQS for ozone nonattainment areas in California.[173] In the final rule, the EPA acknowledged the studies cited by a commenter finding that soil $NO_X$ emissions from fertilizer and pesticide use contribute to atmospheric $NO_X$ levels in California.[174] Particularly, the EPA acknowledged the growing body of research surrounding the identification and quantification of soil $NO_X$ emissions induced by fertilizer application in agricultural soils. However, in light of the uncertainties and disagreements among the studies regarding the contribution of fertilized cropland soils to $NO_X$ emissions in California, the EPA found that CARB's emission inventories met the applicable requirements of the CAA notwithstanding the absence of soil $NO_X$ emissions from fertilizer or pesticide use. Please see our final rule on CARB's emissions inventories for our evaluation and discussion of the various studies cited by a commenter and related to the issue of soil $NO_X$ emissions from fertilizer and pesticide use.[175]

We are unaware of any new information not considered at the time of our final action on CARB's emissions inventories that would change our position with respect to this issue. Thus, in the absence of reliable $NO_X$ emissions estimates from fertilizer or pesticide use, we find that development of contingency measures designed to reduce such emissions would not be appropriate at this time.

Lastly, we note that CARB has announced that it intends to conduct a public process to update the Soil $NO_X$ emission inventory category, including manmade fertilizer-induced emissions, for use in future SIPs. The State intends to include a science review process convening a subject matter expert review panel and funding an independent peer-review contract by the end of 2023 to examine the state of the science on soil $NO_X$ emissions and research recommendations.[176] The EPA encourages CARB and the districts governing California's $PM_{2.5}$ and ozone nonattainment areas to perform and keep abreast of research on $NO_X$ emissions from agriculture and their implications for air quality modeling and planning.

## D. General Conformity

### 1. Background

Section 176(c) of the CAA requires federal actions in nonattainment and maintenance areas to conform to the SIP's goals of eliminating or reducing the severity and number of violations of the NAAQS and achieving timely attainment of the standards. Conformity to the SIP's goals means that such actions will not: (1) Cause or contribute to violations of a NAAQS, (2) worsen the severity of an existing violation, or (3) delay timely attainment of any NAAQS or any interim milestone. The CAA also requires the EPA to promulgate criteria and procedures that federal agencies must follow to determine that actions conform to the SIP.

---

[173] See 87 FR 59015 (September 29, 2022).
[174] Id., at 59018.
[175] Id., at 59018-59020.
[176] "2023 $PM_{2.5}$ Plan for Attainment of the Federal 2012 Annual $PM_{2.5}$ Standard", Public Workshop, May 11, 2023. Presentation available at *http://www.valleyair.org/Workshops/postings/2023/05-11-23_PM25/presentation.pdf*. Workshop recording available at *https://www.youtube.com/watch?v=5tsTQRpGV_Q*.

The EPA's conformity regulations are codified at 40 CFR part 93, subparts A (referred to as "transportation conformity") and B (referred to as "general conformity"). Transportation conformity applies to transportation plans, programs, and projects developed, funded, and approved under title 23 U.S.C. or the Federal Transit Act, and general conformity applies to all other federally supported or funded projects.

The EPA first promulgated the General Conformity Regulation in November 1993.[177] The EPA revised the General Conformity Regulation in 2006, 2010 and 2016 to, among other changes, add applicability criteria for direct and indirect emissions of direct $PM_{2.5}$ and $PM_{2.5}$ precursors caused by a federal action.[178] The General Conformity Regulation ensures that federal actions not covered by the Transportation Conformity Regulation will not interfere with the SIP and encourages consultation between the federal agency and the state or local air pollution control agencies before or during the environmental review process, and provides for public participation (e.g., notification of and access to federal agency conformity determinations and review of individual federal actions).

Under the General Conformity Regulation, the conformity evaluation can be broken into three phases - applicability analysis, conformity determination, and review process. The applicability analysis phase under 40 CFR 93.153 is used to determine if a federal action requires a conformity determination for a specific pollutant. The EPA has established applicability thresholds (referred to as *de minimis* emission levels) for the NAAQS pollutants and their precursors. The *de minimis* emission levels are lower for higher nonattainment classifications. The *de minimis* levels for $PM_{2.5}$ (i.e., direct $PM_{2.5}$, oxides of nitrogen ($NO_X$), volatile organic compounds (VOC), sulfur dioxide and ammonia) are 100 tpy in $PM_{2.5}$ nonattainment areas classified as Moderate and 70 tpy in $PM_{2.5}$ nonattainment areas classified as Serious.[179]

If a conformity determination is needed, federal agencies can use one of several criteria set forth in 40 CFR 93.158 to show that the federal action conforms to the SIP. One such criteria is for the total of direct and indirect emissions from the action to be fully offset within the same nonattainment or maintenance area (or nearby area of equal or higher classification provided the emissions from that area contribute to the violations, or have contributed to violations in the past, in the area with the Federal action) through a revision to the applicable SIP or a similarly enforceable measure that effects emissions reductions so that there is no net increase in emissions of that pollutant.[180]

The SJVUAPCD requested that the EPA evaluate the potential for lowering the *de minimis* thresholds for $PM_{2.5}$ for general conformity purposes in San Joaquin Valley as a contingency measure.

### 2. Regulatory Context

In 1994, the SJVUAPCD adopted a general conformity rule (District Rule 9110 ("General Conformity")) establishing the same criteria and procedures as those found in the EPA's General Conformity Regulation, as it existed at that time, and the EPA approved the rule as a SIP revision in 1999.[181] When the EPA approves a state or local general conformity rule as part of a SIP, a conformity evaluation is

---

[177] 58 FR 63214 (November 30, 1993) (codified at 40 CFR part 51, subpart W, and 40 CFR part 93, subpart B).
[178] 71 FR 40420 (July 17, 2006); 75 FR 17254 (April 5, 2010); and 81 FR 58010 (August 24, 2016).
[179] 40 CFR 93.153(b)(1).
[180] 40 CFR 53.158(a)(2) and 40 CFR 93.158(a)(5)(iii).
[181] 64 FR 19916 (April 23, 1999).

governed by the approved state or local rule. The EPA's General Conformity Regulation contained in 40 CFR part 93, subpart B applies only for the portions, if any, of the part 93 requirements not contained in the state or local general conformity rule approved by the EPA.[182] Based on San Joaquin Valley's current designations and classifications for the relevant NAAQS, the *de minimis* emission levels that apply in the San Joaquin Valley are as follows:

*Table IV-1. General Conformity De Minimis Thresholds*

| **Parameter** | **$PM_{2.5}$ NAAQS** | **Ozone NAAQS** | **$PM_{10}$ NAAQS** |
|---|---|---|---|
| Pollutant and precursors of pollutant | Direct $PM_{2.5}$, $NO_X$, VOC, sulfur dioxide, Ammonia | VOC, $NO_X$ | Direct $PM_{10}$, $NO_X$ |
| Designation/ classification | Nonattainment/Serious | Nonattainment/Extreme | Maintenance |
| *De minimis* emissions level (tpy) | 70 | 10 | 100 |

Federal agencies that engage in, support in any way, provide financial assistance for, license or permit, or approve any activity in San Joaquin Valley must use the *de minimis* emission levels for their general conformity evaluations. Federal agencies that undertake actions or that operate facilities in San Joaquin Valley include the Federal Railroad Administration, Federal Aviation Administration, Department of the Navy (Lemoore Naval Air Station), Defense Logistics Agency (San Joaquin DLA Distribution center), Bureau of Reclamation (Central Valley Project), Bureau of Land Management, National Park Service (Sequoia and Kings Canyon National Parks), Army Corps of Engineers, the U.S. Postal Service and many others.

One large-scale federal action in San Joaquin Valley that has been the subject of multiple conformity determinations over the past decade is the California High-Speed Rail System project. The Federal Railroad Administration (FRA) is the lead federal agency on the project, and the FRA published a notice of the agency's most recent final general conformity determination at 87 FR 18461 (March 30, 2022). The most recent general conformity determination was made for construction and operation of the segment of the project between San Jose and Merced. The conformity determination provides emissions estimates for the relevant pollutants and pollutant precursors. While the emissions are expected to vary from year to year, the maximum estimated emissions of $NO_X$ would be approximately 56 tpy.[183] Maximum estimated annual emissions of direct $PM_{2.5}$, VOC, sulfur dioxide would be less than 10 tpy.[184] Emissions of ammonia were not calculated because they would be essentially zero.[185]

---

[182] 40 CFR 93.151.
[183] California High-Speed Rail Authority, San Jose to Merced Project Section, Final Federal General Conformity Determination, April 2022, page 9-3.
[184] Id.
[185] Id., page 7-1.

### 3. Evaluation of SJVUAPCD Recommendation

If evaluated as a contingency measure, under the authority of CAA section 176(c)(4)(A), the recommendation would be to revise the General Conformity Regulation to provide for the lowering of the *de minimis* emissions levels for emissions of direct $PM_{2.5}$ and $PM_{2.5}$ precursors ($NO_X$, VOC, sulfur dioxide and ammonia) caused by federal actions in Serious $PM_{2.5}$ nonattainment areas from 70 tpy to 25 tpy if triggered by one of the regulatory triggers listed in 40 CFR 51.1014(a). Structured in this way, the General Conformity Regulation would include a contingency measure for all Serious $PM_{2.5}$ nonattainment areas, including, but not limited to, the San Joaquin Valley. To an extent, this measure would align the *de minimis* emission levels for the $PM_{2.5}$ NAAQS in the General Conformity Regulation with the corresponding levels for the ozone NAAQS, which lowers the *de minimis* emission level to 25 tpy (for VOC and $NO_X$) for Serious areas that the EPA finds to have failed to attain the ozone NAAQS by the applicable attainment date and that are thereby reclassified as Severe.

Potential emissions reductions from this measure would derive from an increase in the number of federal actions that would need to demonstrate conformity using the criteria in 40 CFR 93.158, one of which would involve fully offsetting the direct and indirect emissions of direct $PM_{2.5}$ or $PM_{2.5}$ precursors if the pollutant-specific emissions exceed the 25 tpy *de minimis* emission levels. The EPA has no precise estimate of the number of conformity evaluations that would be impacted by the lowering of the *de minimis* emission levels for the $PM_{2.5}$ NAAQS in the years following a triggering event and that would require the federal agency to determine conformity using the criteria in 40 CFR 93.158 for the $PM_{2.5}$ NAAQS (i.e., because the estimated emissions would be greater than 25 tpy) where no such determination would otherwise have been required (i.e., because the emissions would have been less than 70 tpy). However, we have reviewed a number of large Federal actions proposed over the past ten years for which conformity determinations have been, or are being prepared, and found that estimated $PM_{2.5}$ emissions would exceed 25 tpy in the San Joaquin Valley in only one instance and only during two years of the multi-year construction phase.[186] This suggests that this potential measure would affect few actions in the years following a contingency measure triggering event and may not result in any additional emissions reductions in the first two years following such triggering event.

Alternatively, the SJVUAPCD could revise Rule 9110 to include this contingency measure, but under 40 CFR 51.851(e),[187] the District cannot do so without extending the same requirements to non-Federal entities. In this instance, "non-Federal entities" would refer to state and local governmental agencies that engage in, support in any way or provide financial assistance for, license or permit, or approve any

---

[186] See U.S. Department of the Interior, Bureau of Indian Affairs, Tejon Indian Tribe Trust Acquisition and Casino Project Final Environmental Impact Statement (October 2020), tables 3.4-3 and 3.4-4; U.S. Army Corps of Engineers, Delta Conveyance Project Draft Environmental Impact Statement (December 2022), table 3.3-5; Bureau of Reclamation, B.F. Sisk Dam Raise and Reservoir Expansion Project Final General Conformity Determination (May 2023), table 5-3; California High-Speed Rail Authority, Merced to Fresno Project Section Final General Conformity Determination (September 2012), table 6; California High-Speed Rail Authority, Fresno to Bakersfield Project Section Final General Conformity Determination (June 2014), table 6; California High-Speed Rail Authority, Bakersfield to Palmdale Project Section Final General Conformity Determination (July 2021), table 7; and California High Speed Rail Authority, San Jose to Merced Project Section Final General Conformity Determination (April 2022), table 10.

[187] 40 CFR 51.851(e): A State's or Tribe's conformity provisions may contain criteria and procedures more stringent than the requirements described in this subpart and part 93, subpart B, only if the State's or Tribe's conformity provisions apply equally to non-Federal as well as Federal entities.

activity. If adopted by the District in Rule 9110, the requirement to determine conformity using the criteria in 40 CFR 93.158 for actions with direct and indirect emissions greater than 25 tpy but less than 70 tpy for direct $PM_{2.5}$ or the $PM_{2.5}$ precursor would apply to state and local governmental actions as well as federal actions in the San Joaquin Valley. However, the same problem of quantification of the emissions reductions in the year or two after a triggering event would be the same for the District as described above for the EPA's implementation of this type of contingency measure.

#### 4. Conclusion

No further evaluation of revisions to the General Conformity Regulation as suggested by the District is needed. First, we have no reliable basis to estimate the emissions reductions that would be achieved in the year or two after a triggering event. It would depend upon a number of factors for which we have no basis to make a reasonable estimate, such as the number of federal actions for which conformity evaluations would be prepared and for which direct and indirect emissions would be greater than 25 tpy (but less than 70 tpy) for direct $PM_{2.5}$ or $PM_{2.5}$ precursors and the specific criteria in 40 CFR 93.158 that the applicable federal agency would rely on to make the conformity determination. Presumably, some federal agencies would rely on fully offsetting the associated emissions, but there are other criteria that may be available depending upon the specific pollutant involved.

Second, as a practical matter, at 10 tpd, the *de minimis* emission levels for the ozone precursors ($NO_X$ and VOC) for the San Joaquin Valley are already the lowest such levels provided for in the General Conformity Regulation and are lower than the *de minimis* emissions levels (25 tpy) that would be established under the potential contingency measure. We recognize that the 10 tpy *de minimis* emission levels for $NO_X$ and VOC that are based on the area's classification of Extreme for the ozone NAAQS do not apply to direct $PM_{2.5}$, sulfur dioxide or ammonia, but our review of large-scale Federal actions suggests that there would likely be few projects that would result in direct and indirect emissions amounting to more than 25 tpy for direct $PM_{2.5}$, sulfur dioxide or ammonia.

### E. In-Use Motor Vehicles

#### 1. Background

The transportation sector continues to be a major source of criteria pollutants and precursors, including $NO_X$ and VOC in nonattainment and maintenance areas across the country. While vehicle emissions per-mile have decreased due to advances in vehicle emission control technology, those controls can degrade over time. This can lead to excess pollution, especially now that older vehicles are staying on the road longer. Therefore, proper inspection and maintenance of passenger cars and trucks is important to ensure that vehicles are operating according to vehicle emissions standards and adequately protecting public health.

Vehicle inspection and maintenance, or I/M, is the periodic inspection of the emissions control systems of motor vehicles. The goal of I/M programs across the country is to identify and repair high-emitting vehicles to improve air quality in areas that are not attaining the NAAQS. To protect public health, the EPA sets new vehicle emission standards for vehicles sold in most states, and CARB sets new vehicle emissions standards for vehicles sold in California and in states adopting California new vehicle standards, but those regulations do not guarantee proper operation and maintenance of the vehicle's emission controls over its lifetime. State and local governments implement I/M programs to identify

high-emitting vehicles and notify owners or operators to have their vehicles repaired. Once those vehicles are repaired, they must be retested to verify that emissions are within the proper standards. I/M ensures that emission standards for cars and trucks are met even as the fleet ages and their effectiveness to reduce emissions per-mile degrades.

The 2018 $PM_{2.5}$ Plan includes the following annual average (tons per day or tpd) emissions from on-road motor vehicles (other than motorcycles, heavy-duty diesel-powered trucks, buses, and motor homes).[188]

*Table IV-2. In-Use Motor Vehicle Emissions from the San Joaquin Valley 2018 $PM_{2.5}$ Plan*

| | 2013 | 2017 | 2019 | 2020 | 2022 | 2023 | 2024 | 2025 | 2026 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| Annual Average – Tons per Day | | | | | | | | | | |
| **$PM_{2.5}$** | 2.0 | 2.1 | 2.0 | 2.0 | 2.1 | 2.1 | 2.1 | 2.3 | 2.3 | 2.3 |
| **$NO_X$** | 33.8 | 21.7 | 17.1 | 15.4 | 12.4 | 11.3 | 10.2 | 9.3 | 8.4 | 7.3 |
| Winter Average – Tons per Day | | | | | | | | | | |
| **$PM_{2.5}$** | 2.0 | 2.1 | 2.0 | 2.0 | 2.1 | 2.1 | 2.1 | 2.3 | 2.3 | 2.3 |
| **$NO_X$** | 37.0 | 23.9 | 18.9 | 16.9 | 13.5 | 12.3 | 11.1 | 10.1 | 9.3 | 8.0 |

As a percentage of the area-wide emissions inventory, on-road motor vehicles (other than motorcycles, heavy-duty diesel-powered trucks, buses, and motor homes) constitute approximately 3 to 4 percent of the region-wide total for $PM_{2.5}$ and 5 to 7 percent of the region-wide total for $NO_X$.

### 2. Regulatory Context

California has operated an I/M program, also known as the “Smog Check” program, in certain areas of the State for over 30 years. Over the years, California has expanded both the geographical scope of the program and the types of vehicles covered by it. Under California law, the Bureau of Automotive Repair (BAR) is responsible for developing and implementing the State’s I/M program in coordination with the California Department of Motor Vehicles (DMV) while CARB is designated under California law as the agency responsible for the preparation of the SIP. The I/M program is one of the many elements of the California SIP. The most recent EPA approval of the California I/M program was published at 75 FR 38023 (July 1, 2010).

The California Smog Check program is a decentralized program that divides the State into three types of areas determined by the air quality in the designated area. These types of areas are Enhanced, Basic, and Change of Ownership. Requirements vehicle inspections, inspection equipment, and technician licenses differ among these types of areas. Generally, the type of area in which a Smog Check station is

---

[188] 2018 $PM_{2.5}$ Plan, App. B, p. B-4 and B-7. The specific source subcategories that are included in the emissions estimates include light-duty passenger (LDA), light-duty trucks-1 (LDT1), light-duty trucks-2 (LDT2), medium-duty vehicles (MDV), light heavy-duty gas trucks-1 (LHDV1), light heavy-duty gas trucks-2 (LHDV2), medium heavy-duty gas trucks (MHDV), and heavy heavy-duty gas trucks (HHDV).

located determines the required station license type and the station test equipment requirements. Likewise, the area in which a vehicle is registered designates what type of inspection applies.

Within California, the Enhanced I/M program is implemented in essentially all the South Coast Air Basin and the San Francisco Bay Area Air Basin, throughout the urbanized areas of San Diego County, Ventura County, the Sacramento Metro air quality planning area, and the San Joaquin Valley, and in certain other areas. The Basic I/M program is implemented elsewhere in the State except in the northern and eastern counties where the Change of Ownership I/M program applies. See Figure IV-1 for a map entitled "Map of Areas of California Affected by the Smog Check Program."[189]

As a general matter, Basic and Enhanced I/M programs both achieve their objective by identifying vehicles that have high emissions as a result of one or more malfunctions and requiring them to be repaired. Under the California I/M program, in both Basic and Enhanced areas, biennial Smog Check inspections are required for applicable vehicles at vehicle registration renewal, when there is a change of ownership, and at the time of initial registration for vehicles brought into California from elsewhere.

Where applicable, biennial Smog Check inspections are required for all motor vehicles powered by internal combustion engines that are registered within an area designated for program coverage with the exception of gasoline-powered motor vehicles manufactured prior to the 1976 model year (MY), gasoline-powered motor vehicles eight or fewer model-years old, diesel-powered vehicles manufactured prior to the 1998 MY, diesel-powered vehicles with a gross vehicle weight rating greater than 14,000 pounds, motorcycles, electric-powered vehicles, and certain other categories.[190]

Also, in both Basic and Enhanced I/M program areas, most 2000 MY and newer vehicles are subject to an On-Board Diagnostic (OBD) test. In Enhanced areas, most 1999 MY and older vehicles are subject to a dynamometer loaded mode emissions test whereas, in Basic areas, such vehicles are subject to a two-speed idle test.

In Enhanced I/M program areas, a portion of the vehicles are directed to receive biennial Smog Check inspections at a STAR certified Test Only station or a STAR certified Test and Repair station.[191] Under the California I/M program, a vehicle that must receive its biennial Smog Check inspection at a STAR certified Test Only station or a STAR certified Test and Repair station is referred to as a "Directed Vehicle." STAR-certified stations are stations that have met certain eligibility requirements and consistently meet a high standard for quality inspections.[192] In addition, licensing requirements for technicians are more stringent and the frequency of enforcement related activities such as on-road testing are greater in Enhanced areas than in Basic areas, but the two programs are essentially the same in all other respects. The California I/M program allows areas outside of the Enhanced areas to opt-in to the Enhanced I/M program in whole or in part. Some areas have opted in to the entire Enhanced I/M

---

[189] The reference for the map is BAR, Smog Check Reference Guide (August 2012), appendix A.
[190] California Health & Safety Code § 44011 and 16 California Code of Regulations (CCR) 3340.5.
[191] Under California's existing I/M program, in Enhanced I/M areas, "directed vehicles" include all 1976-1999 MY vehicles, and those newer vehicles identified as having the greatest likelihood of failing their next inspection. These vehicles are required ("directed") to be certified at STAR-certified stations. See BAR, "Smog Check Performance Report 2022," July 1, 2022, page 2, and BAR, "Smog Check Reference Guide 2019," October 23, 2019, page 6.
[192] BAR, "Smog Check Reference Guide 2019," October 23, 2019.

program other than having "Directed Vehicles." The program in such areas is referred to "Partial Enhanced" I/M.

More recently, CARB has adopted a Heavy-Duty Inspection & Maintenance Regulation (HD I/M Regulation) that applies to non-gasoline motor vehicles with GVWRs greater than 14,000 lbs. The HD I/M Regulation represents a comprehensive program with a multifaceted enforcement strategy to ensure that emission control systems on heavy-duty vehicles driven in California are operated as designed and are repaired quickly if they malfunction. In December 2022, CARB submitted the HD I/M Regulation to the EPA as a SIP revision.

### 3. Consideration of Expanding Enhanced I/M Program

In the San Joaquin Valley, motor vehicle owners may be subject to Basic, Partial Enhanced, or Enhanced Smog Check requirements depending upon the zip code for registration of the motor vehicle. Generally, the zip codes subject to Enhanced I/M include those in and around the cities of Stockton, Modesto, Merced, Madera, Fresno, Visalia and Bakersfield. Motor vehicle owners who register their vehicles using addresses in certain zip codes adjoining the areas subject to Enhanced I/M are subject to the requirements of the Partial Enhanced program. Motor vehicle owners in the San Joaquin Valley who register their vehicles using addresses outside of areas subject to Enhanced or Partial Enhanced I/M are subject to the requirements of the Basic I/M program. Population estimates for the San Joaquin Valley broken down by zip code and I/M program area are compiled in a memorandum to the file titled "Population of San Joaquin Valley by Zip Code and I/M Program."[193]

A potential contingency measure would be to expand the applicability of Enhanced I/M program requirements to motor vehicle owners who register their vehicles using addresses anywhere within the San Joaquin Valley.

Such a measure would affect motor vehicle owners who register their vehicles in Partial Enhanced I/M vehicles by directing all gasoline-powered vehicles manufactured in model-years 1976 through 1999 to be inspected at a STAR certified Test Only station or a STAR certified Test and Repair station. Figure IV-2 illustrates the locations of STAR-certified stations in the San Joaquin Valley. In Basic Areas, the potential measure would also direct such vehicles to a STAR certified Test Only station or a STAR certified Test and Repair station but would also require the vehicle to be inspected using the dynamometer loaded mode emissions test instead of the two-speed idle test that applies under existing conditions. We believe this potential measure would be economically and technologically feasible given that the requirements of the Enhanced I/M program are already being implemented in the urbanized areas of the San Joaquin Valley and throughout such areas of California as the South Coast Air Basin and the San Francisco Bay Area Air Basin.

[193] Memorandum to File, Subject: Population of San Joaquin Valley by Zip Code and I/M Program, dated June 20, 2023.

The specific types of vehicles that would be affected by this potential measure are those that are subject to an emissions test using BAR-97 specifications[194] and include the following:

- Gasoline and flex fuel (methanol and ethanol): all 1976-1999 MY vehicles;
- Gasoline and flex fuel (methanol and ethanol): MY 2000 or newer vehicles that have a gross vehicle weight rating (GVWR) of 14,000 pounds (lbs) or less if not equipped with OBD;
- Gasoline and flex fuel (methanol and ethanol): all vehicles with a GVWR greater than 14,000 lbs;
- Dedicated propane and CNG: all MY 1976-1999 vehicles less than 14,000 lbs GVWR; and
- Dedicated propane and CNG: MY 2000 or newer vehicles less than 14,000 lbs GVWR if not equipped with OBD.

Most motor vehicles on the roads in California are equipped with OBD, are not subject to emissions testing as part of the biennial Smog Check program, and would not be affected by this potential measure. This potential measure would also not affect the exemptions that currently exist under the California Smog Check program, such as vehicles that are eight model years old or newer, motorcycles, and other exempt categories.

The principal effect of this potential measure, if triggered, would be to subject all gasoline-powered 1999 MY and older passenger cars and trucks (not otherwise exempt from the I/M program) (and certain newer vehicles not equipped with OBD) throughout the San Joaquin Valley to the dynamometer loaded mode emissions test now only required for such vehicles in Enhanced I/M and Partial Enhanced I/M areas. Using this test, more vehicles would fail the test and be required to undergo repairs leading to a reduction in emissions from the failed vehicles. CARB has estimated that emissions reductions due to the change to the more rigorous emissions test would be approximately 0.06 tpd for $NO_X$ and 0.04 tpd for VOC in the San Joaquin Valley.[195]

CARB indicates that a contingency measure to change from Basic I/M to Enhanced I/M in the San Joaquin Valley would affect 126,291 vehicles (up to 14,000 pounds).[196] CARB notes that this is 64% of the 197,680 vehicles in Basic areas that are subject to some form of biennial inspection, but only 8.3% of roughly 1.5 million vehicles in the San Joaquin Valley that are subject to some form of biennial inspection.

There are many possible alternatives or variants for a contingency measure that could achieve additional emissions reductions from the current Smog Check program as implemented in San Joaquin Valley, including, but not limited to, the following alternatives or variants:

- Narrowing the newer vehicle exemption from the current eight model-years to a fewer number of model-years, e.g., from eight model years to seven model years. California Health & Safety

[194] BAR, "Smog Check Reference Guide 2019," October 23, 2019.
[195] CARB, "Expanding Enhanced I/M in the San Joaquin Valley," transmitted by email dated April 6, 2023, from Sylvia Vanderspek, Chief, Air Quality Planning Branch, CARB, to Meredith Kurpius, Assistant Director, EPA Region IX et al., subject: "Basic to Enhanced."
[196] The information in this paragraph is from the aforementioned CARB document, "Expanding Enhanced I/M in the San Joaquin Valley."

Code § 44011(a)(4)(B)(ii) provides for the expansion of the newer vehicle exemption from six model years to eight model years beginning in 2019 unless the CARB board "finds that providing an exception for these vehicles will prohibit the state from meeting the requirements of Section 176(c) of the federal Clean Air Act (42 U.S.C. Sec. 7401 *et seq*.) or the state's commitments with respect to the state implementation plan required by the federal Clean Air Act." Recently, CARB has committed to adopt a contingency measure for the San Joaquin Valley for the $PM_{2.5}$ NAAQS that would, if triggered, narrow the newer vehicle exemption from eight model years to seven model years in the San Joaquin Valley.[197]

- Converting the "Partial Enhanced" I/M area within San Joaquin Valley to "Enhanced." This would have the effect of directing certain vehicles, including all vehicles manufactured between 1976 and 1999, to STAR-certified stations for their tests.
- Extending the "Partial Enhanced" I/M area within the San Joaquin Valley to the ten zip codes in the current Basic area that contain the greatest number of residents. Approximately 58% of the population in the current Basic I/M area within the San Joaquin Valley reside in the top ten zip codes (by population). There are a total of 74 zip codes within the current Basic I/M area within the San Joaquin Valley.

### 4. Conclusion

No further evaluation of this potential measure or any of the alternatives or variants is needed for the contingency measure FIP because the EPA has no practical means to implement this measure. The Agency would need to develop, maintain and update databases for vehicle registration and ownership that duplicate databases already developed by DMV and BAR. The EPA would then need to hire staff and develop systems to notify vehicle owners in the Partial Enhanced and Basic I/M areas of San Joaquin Valley of their obligation to fulfill the additional I/M requirements following one of the triggering events and develop a means to withhold vehicle registration renewal without evidence of compliance with the additional requirements. The potential for widespread confusion with the overlapping state and federal requirements in this instance also argues against adoption of this measure as part of the FIP.

In contrast to the EPA, the State would not need to develop new systems or databases to implement this potential measure or its alternatives/variants but could rely on the systems and databases already in use for implementation of the existing Smog Check program. As noted previously, CARB has recently committed to adopt a contingency measure for San Joaquin Valley for the $PM_{2.5}$ NAAQS that would

[197] See letter from Steven S. Cliff, Ph.D., Executive Officer, CARB, to Martha Guzman, Regional Administrator, EPA Region IX, dated June 23, 2023. Through this letter, CARB has committed to bring to the CARB Board for consideration no later than February 28, 2024, and submit to the EPA no later than March 31, 2024, a contingency measure to implement a change to the exemptions for light-duty motor vehicles in the California Smog Check Program if triggered by an EPA determination under 40 CFR 51.1014(a). CARB indicates that the contingency measure for San Joaquin Valley for the $PM_{2.5}$ NAAQS will, within 30 days of the effective date of the EPA determining that an applicable triggering event occurred, obligate CARB to transmit a letter to the California BAR and DMV finding that providing an exception from Smog Check for certain vehicles will prohibit the state from meeting the state's commitments with respect to the SIP required by the CAA, effectuating a change to the Smog Check exemption for motor vehicles from eight or less model-years old to seven or less model-years old throughout the San Joaquin Valley.

narrow the newer vehicle exemption from eight model years to seven model years in the San Joaquin Valley if triggered by one of the regulatory triggers listed in 40 CFR 51.1014(a).

In addition, we note that, pursuant to California Health & Safety Code § 44003(c), with certain exceptions not relevant to the San Joaquin Valley, air districts that include areas classified as Basic I/M program nonattainment areas may request the implementation in those areas of test procedures and equipment required for Enhanced I/M program areas and any other program requirement specified for Enhanced I/M program areas.[198] Thus, the SJVUAPCD could adopt this contingency measure for approval as part of the California SIP. We note that, recently, two other air districts in California have adopted this same contingency measure as part of their attainment plan for the 2015 ozone NAAQS.[199] The EPA has not yet reviewed the contingency measure submitted by the two districts for compliance with all CAA requirements.

If the State and District were to adopt this contingency measure, then, to implement the contingency measure, within 30 days of a determination by the EPA of the type specified in 40 CFR 51.1014(a), the Executive Director (Air Pollution Control Officer) for the SJVUAPCD would make a formal request to the California BAR requesting implementation of the Enhanced I/M program throughout the entirety of the area of the SJVUAPCD. Pursuant to the provisions of California Health & Safety Code § 44003(c), the BAR would initiate the Enhanced I/M program and notify affected persons and stakeholders of the updated requirement without the need for additional formal regulatory action on the part of either the SJVUAPCD or BAR. This process for implementation would comply with the requirement under CAA section 172(c)(9) that contingency measures take effect without significant further action by the State or the EPA.

---

[198] In 2001, the District requested BAR to expand the Enhanced Smog Check program to additional areas. See CARB, Staff Report, "Proposed 2003 State Implementation Plan for Particulate Matter in the San Joaquin Valley," release date May 28, 2003, page 28.
[199] The Antelope Valley Air Quality Management District (AVAQMD) and the Mojave Desert Air Quality Management District (MDAQMD) adopted the expansion of Enhanced I/M throughout the applicable nonattainment area as a contingency measure in their combined attainment plan for the Western Mojave Desert air quality planning area for the 2015 ozone NAAQS. See MDAQMD, "Federal 70 ppb Ozone Attainment Plan (Western Mojave Desert Nonattainment Area," January 23, 2023, page 70; and AVAQMD, "Federal 70 ppb Ozone Attainment Plan (Western Mojave Desert Nonattainment Area," January 17, 2023, page 70.

Figure IV-1. Map of Areas of California Affected by the Smog Check Program (Copy of California BAR's Smog Check Reference Guide (August 2012 revision), Appendix A)

# APPENDIX A

**Areas of California Affected by the Smog Check Program**



*Figure IV-2. STAR-Certified Stations in the San Joaquin Valley*



# V. Supplemental Information

## A. Almond Harvesting Cost Effectiveness

### 1. Calculated Emission Reductions

The 2017 United States Department of Agriculture (USDA) Census of Agriculture for California reports that farms 1,000 acres and larger represent 41% of the almond bearing acreage in California.[200] If we assume this is similarly representative for farm size in the San Joaquin Valley, then we can approximate the bearing acreage of almonds in the San Joaquin Valley at operations over 1,000 acres. If zero almond farms used a low-dust control device now, and all almond farms started using such a device, we would estimate the emission reductions as follows:

> 4.68 tpd (almond pickup emissions in 2022) x 0.41 (proportion of almond bearing acreage at farms over 1,000 acres) x 0.51 (average control efficiency of low-dust harvesters) = 0.979 tpd direct $PM_{2.5}$ emission reduction (relative to 2022 pickup emissions) from almond farms larger than 1,000 acres.

Data from the District's Low-Dust Nut Harvester Program[201] show that 85 low-dust harvesters have been deployed at farms and harvest contractors operating over 1,000 acres per year. These harvesters are reported to operate over 141,356 bearing acres. Thus, to date, almond orchards over 1,000 acres are already achieving approximately 0.291 tpd direct $PM_{2.5}$ reductions by operating these low-dust harvesters. The USDA Natural Resources Conservation Service Environmental Quality Incentives Program also funds low-dust harvesters at orchards in the San Joaquin Valley; however, we have not been able to obtain information about the number deployed to date through this program. To estimate the amount already deployed under NRCS and other means we assume a conservative value of 10% of the District's deployment to date, i.e., about 8 additional harvesters.

The District's program opened February 2021 and continues to take applications for low-dust harvesters. It is difficult to estimate how many more harvesters will be replaced prior to any new measure going into effect, but for the purpose of estimating emission reductions from a potential almond harvesting measure, we make the following assumption. If replacements continue to occur at the same pace of approximately 42 low-dust harvesters per year at farms over 1,000 acres, then we can expect another 42 harvesters to be replaced with low-dust harvesters at farms over 1,000 acres in the next year. Adding the above estimate of 8 harvesters outside the district's programs, this would bring us to approximately 50 low-dust harvesters deployed at farms over 1,000 acres.

We do not have data on typical usage for harvesting equipment (e.g., number of acres harvested per harvester per year). The 85 known low-dust harvesters operating at orchards operate over 141,356 bearing acres, so one estimate for their average use is approximately 1,663 acres per year. For the 50

---

[200] U.S. Department of Agriculture, "2017 Census of Agriculture California, State and County Data," April 2019. Available at *https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_State_Level/California/cav1.pdf*.

[201] Email dated February 8, 2023, from Emily Kneeland (SJVUAPCD) to Meredith Kurpius (EPA Region IX), Subject: "RE: EPA data info request to SJV District on potential CM source categories."

additional low-dust harvesters expected to be put into operation in the near-term, that would mean an additional 83,150 bearing acres could be using a low-dust harvester by the time a potential almond harvesting measure would go into effect.[202] This would achieve an additional 0.171 tpd direct $PM_{2.5}$ emission reductions at orchards over 1,000 acres, bringing the total estimated emission reductions already occuring from almond harvesting to 0.463 tpd direct $PM_{2.5}$.[203]

Considering the almond bearing acreage at farms greater than 1,000 acres that already operate low-dust harvesters, as well as additional low-dust harvesters anticipated in the near-term due to additional incentive-based replacements, a potential almond harvesting contingency measure, if triggered, would apply to approximately 185,484 almond bearing acres at farms greater than 1,000 acres (i.e., 80% of the remaining acres not already or soon to be harvested with a low-dust harvester). We assume a rule effectiveness rate of 80%, consistent with the EPA's historic practice.[204]

So, we would estimate the emission reductions from a potential almond harvesting control measure to be as follows:

- 4.68 tpd (almond pickup emissions in 2022) x 0.41 (proportion of almond bearing acreage at farms over 1000 acres) x 0.51 (average control efficiency of low-dust harvesters) x 0.80 (proportion of bearing acreage using low-dust harvester) = 0.783 tpd direct $PM_{2.5}$ emission reduction (relative to 2022) from almond farms larger than 1,000 acres where 80% of their pickup operations use low-dust harvesters;
- Minus low-dust almond harvesters already operating or anticipated in the near-term: 0.783 – 0.463 = 0.320 tpd direct $PM_{2.5}$;
- Considering rule effectiveness rate: 0.320 x 0.8 = **0.256 tpd direct $PM_{2.5}$.**

We note two additional considerations for these estimated reductions.

- The emission reductions estimated from deploying low-dust harvesters are based solely on research presented in Baticados et al. (2019).[205]
- The average usage calculated from the data from the District's incentive programs may not be representative of the operations to which a potential almond harvest measure would apply. The

---

[202] Alternatively, if we were to use a more conservative assumption that the average use if 1,000 acres/harvester/year, (e.g., for an almond farm just over the 1,000-acre threshold) then these additional harvesters would operate on 50,000 acres, rather than 83,150 acres.

[203] If we were to instead use the more conservative use of 1,000 acres/harvester/year, then the emission reductions associated with the equipment replacements that are anticipated to occur in the near-term would be 0.103 tpd direct $PM_{2.5}$ (rather than 0.171 tpd) and we would then estimate that the emission reductions would be 0.358 tpd direct $PM_{2.5}$ (rather than 0.290 tpd).

[204] In the absence of local category-specific rule effectiveness studies, the EPA has historically recommended an 80% default rule effectiveness value. 57 FR 13498, 13503 (April 16, 1992). More recent EPA Guidance provides additional flexibility for determining rule effectiveness values based on specific factors, but emphasizes that rule effectiveness "must be considered as part of the emission estimation calculation for controlled sources," and that the rationale for the rule effectiveness values chosen be documented. EPA, "Emissions Inventory Guidance for Implementation of Ozone and Particulate Matter National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations," August 2005, App. B.

[205] Baticados et al., "Particulate matter emission factors using low-dust harvesters for almond nut-picking operations," September 9, 2019. Available at *https://www.tandfonline.com/doi/pdf/10.1080/10962247.2019.1655500*.

District's program funds the owner of the harvesting equipment. Thus, equipment rentals and farming operations and harvesting contractors are eligible. If harvesting contractors and equipment rentals are included in the District's data for this farm size category, then the annual usage (1,663 acres/year) derived from the 85 harvesters under the District's program could be overly inflated and not entirely representative of this category.

### 2. Calculated Dollar Per Ton Cost Effectiveness

Typical annual usage data were not available to the EPA for harvesters at operations of 1,000 or more almond bearing acres. In the absence of this usage data, we have examined several scenarios for cost-effectiveness. As mentioned earlier, the average usage calculated from the data from the District's incentive programs of 1,663 acres per harvester per year may not be representative of the all operations to which a potential almond harvest measure would apply. Thus, we are including scenarios for cost-effectiveness that are based on the average from the District's program, and the threshold for operation size of the potential almond harvesting measure would apply to (i.e., 1,000 acres).

#### *a.* Self-Driven Harvester Cost-Effectiveness Scenarios

The data from the District's programs suggest that, at operations over 1,000 acres, self-propelled harvesters are more common, representing approximately 61% of the replacements. Cost effectiveness calculation parameters for various scenarios based off the purchase price of self-driven harvesters are represented in Table V-1 through Table V-6. To estimate cost-effectiveness ($/ton $PM_{2.5}$), the following inputs are assumed in the "Input Parameters" section of Table V-1 and Table V-4.

*Table V-1. Self-Driven Harvester Cost-Effectiveness Scenario Input Parameters – 1,000 acre/year*

| Input Parameters | Value | Units |
|---|---|---|
| Total Almond-bearing acreage | 1,159,189 | acres |
| Fraction of acreage @ farms > 1000 acres | 41% | |
| Large farm acreage | 475,267 | acres |
| Estimated annual harvester usage [a] | 1,000 | acres/yr |
| Percentage of acreage required to use | 80% | |
| Total almond-bearing acreage subject to use | 380,214 | acres |
| Acreage potentially using low-dust harvester | 224,506 | acres |
| Remaining acreage | 200,609 | acres |
| Estimated Remaining harvesters | 201 | harvesters |
| Annual Emission Reduction | 117 | tpy |
| Almond Harvester Capital Cost Estimate [b] | $250,000 | per harvester |

[a]1,000 acres represents the acreage threshold the proposed measure would apply towards (i.e., operations harvesting 1,000 or more acres of almonds).

[b] Capital cost estimate is based on self-propelled harvester models, which were selected for 52 (61%) of the 85 almond harvesters replaced under the District Low-Dust Nut Harvester program to date.[206]

[206] SJVUAPCD, "Contingency Measure Data Request from EPA," pp. 6-7, transmitted by email dated February 8, 2023, from Emily Kneeland, San Joaquin Valley APCD, to Doris Lo et al., EPA Region IX.

*Table V-2. Scenario 1 - SJVUAPCD Cost Methodology (10% interest rate, 10-year remaining useful life for CRF, 1,000 acre/year)*

| **Parameter** | **Value** | **Units** |
|---|---:|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $50,152,298 | |
| Capital Recovery Factor (CRF) | 0.1627 | |
| Total Annualized Capital Costs | $8,162,056 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $1,003,056 | $/yr |
| Total Annual Operating & Maintenance Costs | $1,003,056 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $8,162,056 | $/yr |
| Total Annual Operating Costs | $1,003,056 | $/yr |
| Total Annual Cost (TAC) | $9,165,102 | $/yr |
| **Cost Effectiveness** | **$78,468** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29,[207] which suggest that annual costs are approximately 2% of the total purchase price of the equipment.

*Table V-3. Scenario 2 - EPA Control Cost Manual Methodology (7% interest rate, 10-year remaining useful life for CRF, 1,000 acre/year)*

| **Parameter** | **Value** | **Units** |
|---|---:|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $50,152,298 | |
| Capital Recovery Factor (CRF) | 0.1424 | |
| Total Annualized Capital Costs | $7,140,559 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $1,003,046 | $/yr |
| Total Annual Operating & Maintenance Costs | $1,003,046 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $7,140,559 | $/yr |
| Total Annual Operating Costs | $1,003,046 | $/yr |
| Total Annual Cost (TAC) | $8,143,605 | $/yr |
| **Cost Effectiveness** | **$69,723** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggest that annual costs are approximately 2% of the total purchase price of the equipment.

---

[207] Iowa State University Extension and Outreach, "Ag Decision Maker A3-29, Estimating Farm Machinery Costs" May 2015; available at: *https://www.extension.iastate.edu/agdm/crops/pdf/a3-29.pdf*

*Table V-4. Self-Driven Harvester Cost-Effectiveness Scenario Input Parameters – 1,663* bearing *acre/year*

| **Input Parameter** | **Value** | **Units** |
|---|---|---|
| Total Almond-bearing acreage | 1,159,189 | acres |
| Fraction of acreage @ farms > 1000 acres | 41% | |
| Large farm acreage | 475,267 | acres |
| Estimated annual harvester usage [a] | 1,663 | acres/yr |
| Percentage of acreage required to use | 80% | |
| Total almond-bearing acreage subject to use | 380,214 | acres |
| Acreage potentially using low-dust harvester | 224,506 | acres |
| Remaining acreage | 200,609 | acres |
| Estimated Remaining harvesters | 121 | harvesters |
| Annual Emission Reduction | 117 | tpy |
| Almond Harvester Capital Cost Estimate [b] | $250,000 | per harvester |

[a] 1,663 acres represents the average annual use as estimated from the District's inventive program.

[b] Capital cost estimate is based on self-propelled harvester models, which were selected for 52 (61%) of the 85 almond harvesters replaced under the District Low-Dust Nut Harvester program to date.[208]

*Table V-5. Scenario 1 - SJVUAPCD Cost Methodology (10% interest rate, 10-year remaining useful life for CRF, 1.663 acre/year)*

| **Parameter** | **Value** | **Units** |
|---|---|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $30,157,726 | |
| Capital Recovery Factor (CRF) | 0.1627 | |
| Total Annualized Capital Costs | $4,908,031 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $603,155 | $/yr |
| Total Annual Operating & Maintenance Costs | $603,155 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $4,908,031 | $/yr |
| Total Annual Operating Costs | $603,155 | $/yr |
| Total Annual Cost (TAC) | $5,511,186 | $/yr |
| **Cost Effectiveness** | **$47,185** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggest that annual costs are approximately 2% of the total purchase price of the equipment.

[208] SJVUAPCD, "Contingency Measure Data Request from EPA," pp. 6-7, transmitted by email dated February 8, 2023, from Emily Kneeland, San Joaquin Valley APCD, to Doris Lo et al., EPA Region IX.

*Table V-6. Scenario 2 - EPA Control Cost Manual Methodology (7% interest rate, 10-year remaining useful life for CRF, 1,663 acre/year)*

| **Parameter** | **Value** | **Units** |
|---|---|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $30,157,726 | |
| Capital Recovery Factor (CRF) | 0.1424 | |
| Total Annualized Capital Costs | $4,293,782 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost[a] | $603,155 | $/yr |
| Total Annual Operating & Maintenance Costs | $603,155 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $4,293,782 | $/yr |
| Total Annual Operating Costs | $603,155 | $/yr |
| Total Annual Cost (TAC) | $4,896,936 | $/yr |
| **Cost Effectiveness** | **$41,926** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggest that annual costs are approximately 2% of the total purchase price of the equipment.

### *b.* PTO Type Harvester Cost-Effectiveness

In the event a farmer already uses a PTO-type conventional harvester or has a tractor they can spare for the task, the PTO low-dust harvester is less expensive than the self-propelled unit. Cost effectiveness calculation parameters for various scenarios based off the purchase price of PTO harvesters are represented in Table V-7 through Table V-12. These scenarios are only applicable to those operations that do not have to purchase a tractor to use a PTO harvester. If an operation would need to purchase a tractor and the PTO harvester, the cost-effectiveness scenarios would be closer to those for the self-propelled units.

*Table V-7. PTO Harvester Cost-Effectiveness Scenario Input Parameters – 1,000 acre/year*

| Input Parameter | Value | Units |
|---|---|---|
| Total Almond-bearing acreage | 1,159,189 | acres |
| Fraction of acreage @ farms > 1000 acres | 41% | |
| Large farm acreage | 475,267 | acres |
| Estimated annual harvester usage [a] | 1,000 | acres/yr |
| Percentage of acreage required to use | 80% | |
| Total almond-bearing acreage subject to use | 380,214 | acres |
| Acreage potentially using low-dust harvester | 224,506 | acres |
| Remaining acreage | 200,609 | acres |
| Estimated Remaining harvesters | 201 | harvesters |
| Annual Emission Reduction | 117 | tpy |
| Almond Harvester Capital Cost Estimate [b] | $80,000 | per harvester |

[a] 1,000 acres represents the acreage threshold the proposed measure would apply towards (i.e., operations harvesting 1,000 or more acres of almonds).

[b] Capital cost estimate is based solely on the PTO low-dust harvester models and does not include costs to purchase the tractor needed to propel these units.

*Table V-8. Scenario 1 - SJVUAPCD Cost Methodology (10% interest rate, 10-year remaining useful life for CRF, 1,000 acre/year)*

| Parameter | Value | Units |
|---|---|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $16,048,735 | |
| Capital Recovery Factor (CRF) | 0.1627 | |
| Total Annualized Capital Costs | $2,611,858 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $320,975 | $/yr |
| Total Annual Operating & Maintenance Costs | $320,975 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $2,611,858 | $/yr |
| Total Annual Operating Costs | $320,975 | $/yr |
| Total Annual Cost (TAC) | $2,932,832 | $/yr |
| **Cost Effectiveness** | **$25,110** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggests annual costs are approximately 2% of the total purchase price of the equipment.

*Table V-9. Scenario 2 - EPA Control Cost Manual Methodology (7% interest rate, 10-year remaining useful life for CRF, 1,000 acre/year)*

| Parameter | Value | Units |
|---|---|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $16,048,735 | |
| Capital Recovery Factor (CRF) | 0.1424 | |
| Total Annualized Capital Costs | $2,284,979 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $320,975 | $/yr |
| Total Annual Operating & Maintenance Costs | $320,975 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $2,284,979 | $/yr |
| Total Annual Operating Costs | $320,975 | $/yr |
| Total Annual Cost (TAC) | $2,605,954 | $/yr |
| | | |
| **Cost Effectiveness** | **$22,311** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggests annual costs are approximately 2% of the total purchase price of the equipment.

*Table V-10. PTO Harvester Cost-Effectiveness Scenario Input Parameters – 1,663 acre/year*

Note: Only applicable to operations that do not need to purchase a tractor to operate a PTO unit. Annual use estimated at 1,663 bearing acres.

| Input Parameter | Value | Units |
|---|---|---|
| Total Almond-bearing acreage | 1,159,189 | acres |
| Fraction of acreage @ farms > 1000 acres | 41% | |
| Large farm acreage | 475,267 | acres |
| Estimated annual harvester usage [a] | 1,663 | acres/yr |
| Percentage of acreage required to use | 80% | |
| Total almond-bearing acreage subject to use | 380,214 | acres |
| Acreage potentially using low-dust harvester | 224,506 | acres |
| Remaining acreage | 200,609 | acres |
| Estimated Remaining harvesters | 121 | harvesters |
| Annual Emission Reduction | 117 | tpy |
| Almond Harvester Capital Cost Estimate [b] | $80,000 | per harvester |

[a] 1,663 acres represents the average annual use as estimated from the District's inventive program.
[b] Capital cost estimate is based solely on the PTO low-dust harvester models and does not include costs to purchase the tractor needed to propel these units.

*Table V-11. Scenario 1 - SJVUAPCD Cost Methodology (10% interest rate, 10-year remaining useful life for CRF, 1,663 acre/year)*

| **Parameter** | **Value** | **Units** |
|---|---|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $9,650,472 | |
| Capital Recovery Factor (CRF) | 0.1627 | |
| Total Annualized Capital Costs | $1,570,570 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $193,009 | $/yr |
| Total Annual Operating & Maintenance Costs | $193,009 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $1,570,570 | $/yr |
| Total Annual Operating Costs | $193,009 | $/yr |
| Total Annual Cost (TAC) | $1,763,579 | $/yr |
| **Cost Effectiveness** | **$15,099** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggests annual costs are approximately 2% of the total purchase price of the equipment.

*Table V-12. Scenario 2 - EPA Control Cost Manual Methodology (7% interest rate, 10-year remaining useful life for CRF, 1,663 acre/year)*

| **Parameter** | **Value** | **Units** |
|---|---|---|
| Capital Cost | | |
| Total Capital Investment (TCI) | $9,650,472 | |
| Capital Recovery Factor (CRF) | 0.1424 | |
| Total Annualized Capital Costs | $1,374,010 | $/yr |
| Operating & Maintenance Costs | | |
| Operating Cost [a] | $193,009 | $/yr |
| Total Annual Operating & Maintenance Costs | $193,009 | $/yr |
| Total Cost | | |
| Total Annualized Capital Costs | $1,374,010 | $/yr |
| Total Annual Operating Costs | $193,009 | $/yr |
| Total Annual Cost (TAC) | $1,567,020 | $/yr |
| **Cost Effectiveness** | **$13,416** | **$/ton $PM_{2.5}$** |

[a] Annual operating & maintenance costs are based on purchase price and repair coefficients formulated by American Society of Agricultural and Biological Engineers for potato harvesters per ISUEO Ag Decision Maker A3-29, which suggests annual costs are approximately 2% of the total purchase price of the equipment.




# Chapter 2
## Air Quality Challenges and Trends

This page intentionally blank.

## TABLE OF CONTENTS

2. Air Quality Challenges and Trends ........ 2-1
2.1 PM2.5 Challenges and Trends in the San Joaquin Valley ........ 2-1
2.1.1 Unique Climate and Geography ........ 2-1
2.1.2 The Valley's Carrying Capacity ........ 2-3
2.1.3 Population Growth in the San Joaquin Valley ........ 2-4
2.2 PM2.5 Emissions Inventory Trends ........ 2-5
2.3 PM2.5 Air Quality Trends ........ 2-7
2.3.1 Air Monitoring Network ........ 2-8
2.3.2 Air Quality Progress ........ 2-9
2.3.3 Impact of Exceptional Drought-Related Weather Conditions on Valley PM2.5 Concentrations ........ 2-11

## TABLE OF FIGURES

Figure 2-1 San Joaquin Valley Air Basin ........ 2-2
Figure 2-2 Atmosphere without and with Temperature Inversion ........ 2-3
Figure 2-3 Valley PM2.5 Winter Emissions Inventory Trend ........ 2-6
Figure 2-4 Valley Winter NOx Emissions Inventory Trend ........ 2-7
Figure 2-5 Valley Air Monitoring Sites ........ 2-8
Figure 2-6 Valley 24-hour PM2.5 Design Value Trend ........ 2-10
Figure 2-7 Valley Annual PM2.5 Design Value Trend ........ 2-11
Figure 2-8 Drought Extent and Severity in California ........ 2-12
Figure 2-9 Seasonal Average Stability and PM2.5 Concentrations ........ 2-13

## TABLE OF TABLES

Table 2-1 Estimated Valley and State Populations by County, 2015-2030 ........ 2-4
Table 2-2 Rainfall Totals for Select Cities Across California ........ 2-12

# 2. AIR QUALITY CHALLENGES AND TRENDS

## 2.1 PM2.5 CHALLENGES AND TRENDS IN THE SAN JOAQUIN VALLEY

The San Joaquin Valley's (Valley) natural environment supports one of the most productive agricultural regions in the country; the Sierra Nevada provides the necessary water for growing the abundance of crops, and a temperate climate provides a long growing season. However, these same natural factors present significant challenges for air quality: the surrounding mountains trap pollution and block airflow, and the mild climate keeps pollutant-scouring winds at bay most of the year. Temperature inversions, while present to some degree throughout the year, can last for days during the winter, holding in nighttime accumulations of pollutants.

Despite these challenges, the San Joaquin Valley Air Pollution Control District (District) is making progress in attaining the national ambient air quality standards (NAAQS, or standards) and improving public health for Valley citizens. Due to the significant investments made by Valley businesses and residents and stringent regulatory programs by the District and the California Air Resources Board (CARB), the Valley's ozone and PM2.5 precursor emissions are at historically low levels and air quality over the past few years has been better than any other time on record. Emissions from stationary sources have been reduced by 85%, cancer risk from exposure to air pollutants has been reduced by 95%, population exposure to elevated PM2.5 levels have been reduced by 85%, and population exposure to elevated ozone levels have been reduced by 90%.

### 2.1.1 UNIQUE CLIMATE AND GEOGRAPHY

The challenge to attaining the federal air quality standards in the Valley is grounded in the unique topographical and meteorological conditions found in the region. The Valley, as seen in Figure 2-1, is an inter-mountain valley encompassing nearly 25,000 square miles. Surrounded by mountain ranges to the west, east, and south; the airflow through the Valley can be blocked, leading to severely constrained dispersion. During the winter, high-pressure systems can cause the atmosphere to become stagnant for longer periods of time, where wind flow is calm and air movement is minimal. These stagnant weather systems can also cause severe nighttime temperature inversions, which exacerbate the build-up of PM2.5 and related precursors beneath the evening inversion layer.

**Figure 2-1 San Joaquin Valley Air Basin**




Under normal conditions, temperature decreases with increasing altitude, but during temperature inversions the temperature gradient is reversed, with temperatures increasing with altitude, causing warmer air to be above cooler air. Figure 2-2 shows that this reversal of the "normal" pattern impedes the upward flow of air, causes poor dispersion, and traps pollutants near the earth's surface. Temperature inversions are common in the Valley throughout the year. Since the inversion is often lower than the height of the surrounding mountain ranges, the Valley effectively becomes a bowl capped with a lid that traps emissions near the surface. When horizontal dispersion (transport flow) and vertical dispersion (rising air) are minimized, PM2.5 concentrations can build quickly, especially in the winter. These naturally occurring meteorological conditions have the net effect of spatially concentrating direct PM2.5 concentrations near their sources; promoting the formation and regional buildup of secondary species, particularly ammonium nitrate; and chemically aged organic carbon species, resulting in an increase in their relative toxicity.

Given these host of challenges, the District continues to pursue more effective emissions reductions to attain the PM2.5 standards through its numerous air quality attainment plans, regulatory control strategy and innovative non-regulatory emission reduction strategy that comprises of robust incentive programs, comprehensive legislative platform, and rigorous outreach and education efforts.

**Figure 2-2 Atmosphere without and with Temperature Inversion**[1]




### 2.1.2 THE VALLEY'S CARRYING CAPACITY

In the context of air quality, "carrying capacity" refers to the density of emissions that an air basin can "absorb" or "carry" and still meet ambient air quality standards for a given pollutant. The key factors that shape variations in a regional carrying capacity include meteorology, climate, and topography. The Valley's carrying capacity for PM2.5 is greatly affected by prevailing weather during the winter months and the region's topography (surrounding mountains). Temperature inversions are common during the winter months in the Valley. During these sometimes lengthy stagnant air episodes, PM2.5 emissions from daily activities rapidly build up to levels above the standard. During these events (or in anticipation of these events) that the District's Check-Before-

[1] Image source: http://ffden-2.phys.uaf.edu/212_spring2007.web.dir/Amber_Smith/Effects_of_Inversions.htm

You-Burn program and Real-time Air Advisory Network (RAAN) system intervene to inform (or require) the public to limit activity that generates PM2.5 emissions.

### 2.1.3 POPULATION GROWTH IN THE SAN JOAQUIN VALLEY

To further exacerbate current air quality challenges, the Valley is one of the fastest growing regions in California. The Population Research Unit of the California Department of Finance (DOF) released revised population growth projections in March 2017 that demonstrate how significantly the Valley's population is expected to grow in the coming years.

Based on the revised 2015 to 2030 DOF data, the Valley's population is expected to increase by 19.3% (Table 2-1). In contrast, the total population for the State of California is projected to increase by only 12.5% over the same time period. Increasing population generally means increases in air pollutant emissions as a result of increased consumer product use and more automobile and truck vehicle miles traveled (VMT). In addition to increased VMT resulting from increased Valley population, the Valley will also see increased vehicular traffic along the State's major goods and people movement arteries, both of which run the length of the Valley.

**Table 2-1 Estimated Valley and State Populations by County, 2015-2030**[2]

| County | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|
| Fresno | 979,636 | 1,033,095 | 1,088,990 | 1,145,673 |
| Kern[3] | 883,494 | 930,885 | 996,506 | 1,068,729 |
| Kings | 149,832 | 154,549 | 162,195 | 170,251 |
| Madera | 154,753 | 162,990 | 174,332 | 186,937 |
| Merced | 269,870 | 286,746 | 306,143 | 326,923 |
| San Joaquin | 728,110 | 782,662 | 838,755 | 894,330 |
| Stanislaus | 537,608 | 572,000 | 605,463 | 638,840 |
| Tulare | 464,337 | 487,733 | 513,541 | 540,580 |
| ***VALLEY TOTAL*** | ***4,167,640*** | ***4,410,660*** | ***4,685,925*** | ***4,972,263*** |
| ***CALIFORNIA TOTAL*** | **39,059,415** | **40,639,392** | **42,326397** | **43,939,250** |

While the bulk of the Valley's remaining emissions come from mobile sources outside of the District's regulatory authority, under the federal Clean Air Act (CAA), the responsibility to bring the region into attainment with the federal standards rests with the local air district. Additionally, the region will be subject to sanctions that would be devastating to the Valley's economy if mobile sources under federal regulatory authority are not adequately controlled. Given the enormity of the reductions needed for attainment, mobile sources, particularly in the goods movement sector, must transition

[2] *California Department of Finance. Retrieved July 18, 2018 from: http://www.dof.ca.gov/Forecasting/Demographics/projections/*
[3] *Includes entire Kern County population*

to zero or near-zero emission levels through the implementation of transformative measures. The District does not have the authority to implement regulations requiring ultra-low tailpipe emissions standards on mobile sources. New state and federal regulations coupled with a robust incentive-based emission reduction strategy are necessary to achieve the enormous reductions that are necessary to attain the federal standards. The U.S. Environmental Protection Agency (EPA) must take responsibility for implementing regulatory and incentive-based measures for sources under their jurisdiction. The District has been working closely with CARB to develop an attainment strategy that includes significant emissions reductions from mobile sources.

## 2.2 PM2.5 Emissions Inventory Trends

The emissions inventory is the foundation for the attainment planning process. The District and CARB maintain an accounting of PM2.5 and precursor emissions for the Valley based on known sources within the Valley and those sources outside the Valley that influence Valley air quality (inter-region transport). The District requires detailed accounting of emissions from regulated sources throughout the Valley. CARB makes detailed estimations of emissions from mobile, area, and geologic sources using known emissions factors for each source or activity and accounting for relevant economic and population data. Together, these feed into the emissions inventory that represents an estimate of how much direct pollution is going into the Valley air basin as a result of the cumulative pollutant-generating activities and sources.

The District uses the emissions inventory to develop control strategies, to determine the effectiveness of permitting and control programs, to provide input into air quality modeling, to fulfill reasonable further progress requirements, and to screen regulated sources for compliance investigations.

The following general list represents the major inventory categories for which emissions are recorded and tracked. Appendix B to this Plan contains the detailed accounting of the emissions inventory with projected emissions based on anticipated growth of each source and the anticipated control (regulatory or non-regulatory) of each source, if applicable.

- **Mobile sources** – motorized vehicles
  - On-road sources include automobiles, motorcycles, buses, and trucks
  - Other or off-road sources include farm and construction equipment, lawn and garden equipment, forklifts, locomotives, boats, aircraft, and recreational vehicles
- **Stationary sources** – fixed sources of air pollution
  - Power plants, refineries, and manufacturing facilities
  - Aggregated point sources, i.e. facilities (such as gas stations and dry cleaners) that are not typically inventoried individually, but are estimated as a group and reported as a single source category
- **Area sources** – human activity that takes place over a wide geographic area
  - Includes consumer products, residential wood burning, controlled burning, tilling, and unpaved road dust

- **Natural sources** – naturally occurring emissions
    - Geologic sources, such as petroleum seeps
    - Biogenic sources, such as emissions from plants
    - Wildfire sources

Figure 2-3 Valley PM2.5 Winter Emissions Inventory Trend shows the PM2.5 emissions inventory trend for the mobile, stationary, and area source categories.

**Figure 2-3 Valley PM2.5 Winter Emissions Inventory Trend**




Because NOx is a significant PM2.5 precursor and the Valley is NOx-limited, the District relies heavily on NOx emissions to reduce PM2.5 emissions. Figure 2-4 summarizes the NOx emissions inventory trends for the mobile, stationary, and area source categories. District and CARB control strategies for NOx play a significant roles in reducing both ozone and PM2.5 emissions.

**Figure 2-4 Valley Winter NOx Emissions Inventory Trend**




Emissions inventory trends show the progress made through progressive regulatory and non-regulatory activities, e.g. as rules are amended with tighter emission limits, or as reduction technologies improve, overall emissions decrease. Winter PM2.5 emissions have decreased significantly, in large part due to the effectiveness of Rule 4901 (Wood Burning Fireplaces and Wood Burning Heaters). Continued emissions reductions are based on current control strategies that will continue to take effect into the future. In light of the Valley's projected increase in population, the projected emissions reductions highlight the success of the control measures adopted and enforced by the District, CARB, and other regulatory agencies.

## 2.3 PM2.5 AIR QUALITY TRENDS

As a public health agency charged with monitoring Valley air quality and ensuring progress toward meeting national air quality standards, the District has established an extensive air monitoring network that provides ongoing data for evaluating such progress. Information from this extensive monitoring network, which began measuring PM2.5 concentrations in 1999, allows the District to track air quality trends that show progress toward attainment and inform the planning process for reaching attainment.

### 2.3.1 AIR MONITORING NETWORK

Numerous pollutants and meteorological parameters are measured throughout the Valley on a daily basis using an extensive air monitoring network managed by the District, CARB, and other agencies. This network measures pollutant concentrations necessary to show progress toward compliance with the NAAQS. The network also provides real-time air quality measurements used for daily air quality forecasts, residential wood-burning declarations, Air Alerts, and RAAN. Air quality monitoring networks are designed to monitor areas with high population densities, areas with high pollutant concentrations, areas impacted by major pollutant sources, and areas representative of background concentrations. Together, the District, CARB, and other agencies operate 38 air monitoring stations throughout the Valley. Most air monitoring sites in the Valley represent population exposures and/or maximum concentrations representative of neighborhood and regional scales.

**Figure 2-5 Valley Air Monitoring Sites**



PM2.5 is measured and expressed as the mass of particles contained in a cubic meter of air (micrograms per cubic meter, or $\mu g/m^3$). The data collected from the District's network of PM2.5 monitors is used to calculate design values for the 24-hour and annual PM2.5 standards, as outlined in EPA guidance and regulations.[4,5]

### 2.3.2 AIR QUALITY PROGRESS

Air quality progress can be assessed in several ways. The calculation of *design values* is the official method used to determine whether an area is in attainment of a standard; however, other indicators can reveal more about the progress being made toward attaining that standard. Comparing the days per year when each monitor exceeded the PM2.5 24-hour NAAQS threshold from year to year shows the progress in reducing the number of days with the highest concentrations, while quarterly averages can help to show progress with respect to seasonal peaks in concentration levels. Some of the conclusions from these analyses are included below, followed by a more detailed discussion in Appendix A.

Rather than using yearly maximum concentrations for the PM2.5 standards, EPA requires the use of design values for the attainment metric, which represents a three-year average of air quality data. Details on how PM2.5 design values are calculated are provided in Appendix A of this Plan. As seen in Figure 2-6 and Figure 2-7, the Valley maximum 24-hour and annual average PM2.5 design value trends show that although there are some year-to-year variation, progress has been made in reducing PM2.5 concentrations over the long-term sampling record in the Valley. The Valley's peak 24-hour design value has decreased by over 43% over the 1999–2017 period, while the peak annual design value has decreased by 30% over the same period.

[4] Environmental Protection Agency [EPA]: Office of Air Quality Planning and Standards. (1999, April). *Guideline on Data Handling Conventions for the PM NAAQS* (EPA-454/R-99-008). Retrieved from http://www.epa.gov/ttn/oarpg/t1/memoranda/pmfinal.pdf

[5] Interpretation of the National Ambient Air Quality Standards for PM2.5, 40 CFR Pt. 50 Appendix N (2012).

**Figure 2-6 Valley 24-hour PM2.5 Design Value Trend**



**Figure 2-7 Valley Annual PM2.5 Design Value Trend**




### 2.3.3 IMPACT OF EXCEPTIONAL DROUGHT-RELATED WEATHER CONDITIONS ON VALLEY PM2.5 CONCENTRATIONS

According to the U.S. Geological Survey, California experienced its worst drought in over a century between 2011 and 2015. The 2015-2016 winter season represented the fifth consecutive year of drought conditions in the Valley, and 2013-2014 was by far the driest winter during this time. On January 17, 2014, the Governor of California declared a drought emergency for all of California. Three years and two months later, the drought emergency declaration was finally lifted by the Governor of California on April 7, 2017. Figure 2-8 is a map produced by the National Drought Mitigation Center depicting the extent and severity of the drought affecting California as of March 8, 2016 and the degree of recovery that has occurred as of May 22, 2018.

**Figure 2-8 Drought Extent and Severity in California**




Many cities in California, including those in the Valley, had record low rainfall totals during 2013 calendar year, with some nearly 100-year old records being broken. Although rainfall totals slowly increased between 2015 and 2017, drought conditions have continued to persist despite a very wet 2016-2017 winter season (see Table 2-2).

**Table 2-2 Rainfall Totals for Select Cities Across California**

| Region | City | 1983-2013 | 2015 | 2016 | 2017 | Record Low Rainfall | |
|---|---|---|---|---|---|---|---|
| | | Average (inches) | Total (inches) | Total (inches) | Total (inches) | Year | Total (inches) |
| Northern California | San Francisco | 19.73 | 8.45 | 25.5 | 26.62 | 2013 | 3.39 |
| | Sacramento | 17.6 | 8.53 | 22.92 | 27.16 | 2013 | 5.81 |
| San Joaquin Valley | Modesto | 12.17 | 7.25 | 16.24 | 12.93 | 2013 | 4.69 |
| | Madera | 12.3 | 4.14 | 16.02 | 10.61 | 2013 | 3.8 |
| | Fresno | 11.03 | 8.98 | 13.65 | 13.21 | 2013 | 3.01 |
| | Visalia | 9.91 | 5.33 | 8.94 | 11.52 | 2013 | 3.47 |
| | Bakersfield | 6.19 | 3.99 | 7.13 | 5.38 | 1959 | 1.87 |
| Southern California | Los Angeles | 12.32 | 5.96 | 10.27 | 12.26 | 1947 | 3.14 |
| | San Diego | 10.2 | 9.92 | 10.23 | 7.92 | 1953 | 3.41 |

NCDC https://www.ncdc.noaa.gov/cdo-web/search;jsessionid=8EECF3E54DC2BBA9D4F96C444434A990
NWS Hanford http://w2.weather.gov/climate/local_data.php?wfo=hnx
NWS San Diego http://w2.weather.gov/climate/local_data.php?wfo=sgx
California Nevada River Forecast Center http://www.cnrfc.noaa.gov/rainfall_data.php

Case: 24-7270, 06/03/2025, DktEntry: 29.1, Page 191 of 191



During 2011–2015 winter seasons, extended periods of stagnation, and lack of ample precipitation were components of the historic drought that challenged the Valley's air quality during this period. These conditions overwhelmed the District's control measures and strategies, and contributed to the higher than expected PM2.5 concentrations and exceedances that occurred in the Valley during that period.

As demonstrated in Figure 2-9, the average PM2.5 concentration in the Valley has decreased over the period, despite low precipitation totals and increases in atmospheric stability over recent years. This provides evidence that the District and CARB comprehensive strategy have been achieving permanent emissions reductions.

**Figure 2-9 Seasonal Average Stability and PM2.5 Concentrations**

