No. 24-7270

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

COMMITTEE FOR A BETTER ARVIN, *et al.*,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*,

and

CALIFORNIA AIR RESOURCES BOARD, *et al.*,

*Respondent-Intervenors*.

Petition for Review of Final Action of the
U.S. Environmental Protection Agency

### PETITIONERS' REPLY BRIEF

BRENT J. NEWELL
LAW OFFICE OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
Telephone: (661) 586-3724
brent@lawofficenewell.com

COLIN O'BRIEN
TYLER SZETO
EARTHJUSTICE
1 Sansome Street, Suite 1700
San Francisco, CA 94104
Telephone: (415) 217-2000
cobrien@earthjustice.org
tszeto@earthjustice.org

*Attorneys for Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY .................................................................................. ix

INTRODUCTION ...........................................................................1

SUPPLEMENTAL STATEMENT OF FACTS ....................................1

ARGUMENT ...............................................................................3

I.     EPA violated the Clean Air Act when it approved PM2.5 contingency measures for the Valley that do not provide emissions reductions equivalent to one year's worth of reasonable further progress. ........................................3

     A.     Section 172(c)(9) of the Act requires contingency measures to provide one year's worth of reasonable further progress.....................................4

     B.     EPA's post hoc interpretation of section 172(c)(9) does not provide a valid basis for upholding the agency's approval. ..................................11

          1.     EPA's brief defends its approval with improper post hoc arguments...............................................................................11

          2.     Section 172(c)(9) does not delegate EPA unbounded authority to issue ad hoc approvals of contingency measures. ........................13

II.    EPA premised its approval on non-statutory, unbounded considerations of feasibility and unlawfully approved contingency measures that only achieve *de minimis* NOx emissions reductions...........................................................16

     A.     EPA has not demonstrated that Congress delegated discretion to fabricate a feasibility exemption for contingency measures. ................16

          1.     Section 172(c)(9)'s reference to measures that shall "take effect in any such case without further action" does not delegate EPA authority to grant exemptions on purported feasibility grounds. .18

          2.     General grants of authority elsewhere in the Act do not delegate EPA authority to adopt weak contingency measures based on purported feasibility considerations...............................................19

ii

3.      EPA has not demonstrated that other statutory provisions delegate it authority to approve weak contingency measures based on purported feasibility considerations.................................................21

B.      Even if the Act delegates to EPA discretion to consider feasibility, EPA arbitrarily approved the Valley's contingency measures. .....................23

C.      The absence of purported "low-hanging fruit" does not justify approval of *de minimis* contingency measures. .....................................................28

III.   EPA unlawfully and arbitrarily approved contingency measures that will become deficient after one triggering event. ...................................................30

CONCLUSION AND RELIEF REQUESTED .......................................................33

Form 8. Certificate of Compliance for Briefs............................................................35

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air All. Hous. v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) ..........................................21

*Ass'n of Irritated Residents v. EPA*,
   10 F.4th 937 (9th Cir. 2021) ......................................................................5, 10

*Ass'n of Irritated Residents v. EPA*,
   686 F.3d 668 (9th Cir. 2012) .............................................................................31

*Bunker Hill Co. v. EPA*,
   572 F.2d 1286 (9th Cir. 1977) ...........................................................................22

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962)...............................................................................12, 18

*California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v.
   United States*
   215 F.3d 1005 (9th Cir. 2000) ..........................................................................9

*City of Chicago v. Env't Def. Fund*,
   511 U.S. 328 (1994)..............................................................................................22

*Comm. for a Better Arvin v. EPA*,
   786 F.3d 1169 (9th Cir. 2015) .......................................................20, 26, 27, 33

*Edison Elec. Inst. v. OSHA*,
   849 F.2d 611 (D.C. Cir. 1988)................................................................27, 28

*Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA*,
   94 F.4th 77 (D.C. Cir. 2024)...............................................................................20

*Exxon Mobil Corp. v. EPA*,
   217 F.3d 1246 (9th Cir. 2000) ..................................................................8, 29

*Gen. Motors Corp. v. United States*,
   496 U.S. 530 (1990) ...............................................................................................23

iv

*Interstate Nat. Gas Co. v. S. Cal. Gas Co.*,
209 F.2d 380 (9th Cir. 1953) ............................................................2

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)................................................................*passim*

*Murray Energy Corp. v. EPA*,
936 F.3d 597 (D.C. Cir. 2019)..........................................................21

*Nat. Res. Def. Council, Inc. v. Reilly*,
976 F.2d 36 (D.C. Cir. 1992)............................................................21

*Nat. Res. Def. Council v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009).........................................................10

*Nat. Res. Def. Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011)...........................................................10

*Nat. Res. Def. Council v. EPA*,
31 F.4th 1203 (9th Cir. 2022) .....................................................12, 18

*Nat'l Rural Elec. Co-op. Ass'n v. SEC*,
276 F.3d 609 (D.C. Cir. 2002)..........................................................14

*Portland Cement Ass'n v. EPA*,
665 F.3d 177 (D.C. Cir. 2011)..........................................................31

*Ramaprakash v. FAA,*
346 F.3d 1121 (D.C. Cir. 2003).........................................................15

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
472 F.3d 882 (D.C. Cir. 2006) .........................................................10

*Sierra Club v. EPA*,
762 F.3d 971 (9th Cir. 2014) .....................................................15, 25

*Singh v. Ashcroft*,
393 F.3d 903 (9th Cir. 2004) .............................................................2

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...................................................................6, 17

v

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976)..........................................................................23

*Whitman v. American Trucking Ass'n*,
   531 U.S. 457 (2001)....................................................................18, 22

**Statutes**

42 U.S.C. § 7410(a)(2)(A) .......................................................19, 20, 30

42 U.S.C. § 7410(a)(5)(A)(i) ................................................................29

42 U.S.C. § 7410(a)(5)(C) ...................................................................29

42 U.S.C. § 7410(k)(3)..........................................................................19

42 U.S.C. § 7410(k)(5)...............................................................9, 10, 32

42 U.S.C. § 7410(m) ...............................................................................9

42 U.S.C. § 7501(1) .................................................................................5

42 U.S.C. § 7502(c) .................................................................................8

42 U.S.C. § 7502(c)(2)............................................................................5

42 U.S.C. § 7502(c)(9)....................................................................*passim*

42 U.S.C. § 7502(d) .................................................................................9

42 U.S.C. § 7502(e) ...............................................................................10

42 U.S.C. § 7509....................................................................................9

42 U.S.C. § 7509(a) ....................................................................9, 10, 32

42 U.S.C. § 7509(c) .................................................................................6

42 U.S.C. § 7509(c)(1)........................................................................2, 31

42 U.S.C. § 7509(d)(2)..........................................................................22

42 U.S.C. § 7511a(c)(2)(B)(ii)..............................................................22

42 U.S.C. § 7511a(e)(5)..........................................................................9

42 U.S.C. § 7511a(e)(5)(B) ............................................................................9

42 U.S.C. § 7513(c)(1) ...................................................................................8

42 U.S.C. § 7513(c)(2) ...................................................................................8

42 U.S.C. § 7513(e) ........................................................................................8

42 U.S.C. § 7513a(b)(2) ..................................................................................8

42 U.S.C. § 7513a(d) ......................................................................................8

42 U.S.C. § 7543(d) .......................................................................................29

42 U.S.C. § 7601(a)(1) .......................................................................19, 20, 21

42 U.S.C. § 7607(f) .......................................................................................33

## Regulations

40 C.F.R. § 51.1012(a) ....................................................................................5

40 C.F.R. § 51.1014 ......................................................................................17

## Federal Register Notices

57 Fed. Reg. 13498 (Apr. 16, 1992) ..........................................................6, 18

59 Fed. Reg. 41998 (Aug. 16, 1994) ..........................................6, 10, 18, 32

76 Fed. Reg. 69928 (Nov. 9, 2011) ..........................................................17, 29

81 Fed. Reg. 58010 (Aug. 24, 2016) .........................................................6, 17

82 Fed. Reg. 729 (Jan. 4, 2017) ...................................................................17

85 Fed. Reg. 44192 (July 22, 2020) .........................................................2, 31

88 Fed. Reg. 1454 (Jan. 10, 2023) .................................................................6

88 Fed. Reg. 87981 (Dec. 20, 2023) .......................................................19, 31

88 Fed. Reg. 87988 (Dec. 20, 2023) .......................................................12, 18

89 Fed. Reg. 56222 (July 9, 2024) .................................................................3

89 Fed. Reg. 80749 (Oct. 4, 2024)..................................................................*passim*

90 Fed. Reg. 30607 (July 10, 2025)................................................................3, 31

90 Fed. Reg. 31906 (July 16, 2025)....................................................................2

**Other**

Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399
   (1990).......................................................................................................22

H.R. Rep. No. 101-490, *reprinted in Congressional Research Service,*
   *A Legislative History of the Clean Air Act Amendments of 1990*
   (1993).........................................................................................................7

**GLOSSARY**

| | |
|---|---|
| BACM | best available control measures; required in certain areas by CAA § 189(b)(1)(B), 42 U.S.C. § 7513a(b)(1)(B) |
| Act or CAA | Clean Air Act, 42 U.S.C. §§ 7401–7671q |
| CARB | California Air Resources Board |
| District | San Joaquin Valley Unified Air Pollution Control District |
| EPA | United States Environmental Protection Agency |
| Five Percent Plan | required by CAA § 189(d), 42 U.S.C. § 7513a(d), for a serious nonattainment area's failure to attain a NAAQS |
| MSM | most stringent measures; required by CAA § 188(e), 42 U.S.C. § 7513(e), for a serious particulate matter nonattainment area to extend its attainment date |
| NAAQS or standard | national ambient air quality standard |
| NOx | nitrogen oxides; precursors to the atmospheric formation of fine particulate matter |
| PM2.5 | particulate matter with a diameter of 2.5 micrometers and smaller (also referred to as "fine particulate matter") |
| RACM | reasonably available control measures; required in certain areas by CAA §§ 172(c)(1), 189(a)(1)(C), 42 U.S.C. §§ 7502(c)(1), 7513a(a)(1)(C) |
| RFP | reasonable further progress; required by CAA § 172(c)(2), 42 U.S.C. § 7502(c)(2), and defined by CAA § 171(1), 42 U.S.C § 7501(1) |
| SIP | State Implementation Plan |
| Valley | San Joaquin Valley |

ix

## INTRODUCTION

Petitioners Committee for a Better Arvin et al. ("Air Advocates") challenge the U.S. Environmental Protection Agency's ("EPA") approval of certain air pollution controls known as "contingency measures" for the San Joaquin Valley ("Valley"). Prescribed by section 172(c)(9) of the Clean Air Act ("Act"), 42 U.S.C. § 7502(c)(9), contingency measures activate and help reduce emissions of harmful pollution—like fine particulate matter ("PM2.5") and nitrogen oxides ("NOx")—when an area's primary plan for improving air quality fails to make required progress. Even though Valley residents breathe some of the country's unhealthiest air, and the area's air quality plans have repeatedly failed to meet health-based standards, EPA abandoned its consistent, 30-year interpretation of section 172(c)(9) and approved *unprecedentedly weak* contingency measures. EPA's approval violates the best reading and any reasonable reading of section 172(c)(9) and therefore must be remanded to the agency.

## SUPPLEMENTAL STATEMENT OF FACTS

Respondent-Intervenors California Air Resources Board et al. ("California") adopted three contingency measures to collectively meet the Valley's contingency measure requirements for each of three National Ambient Air Quality Standards ("NAAQS" or "standard"): the 1997 Annual PM2.5 Standard, 2006 24-Hour PM2.5 Standard, and 2012 Annual PM2.5 Standard.

Based on recent data, on July 16, 2025, EPA proposed to find the Valley attained the 1997 Annual PM2.5 Standard. 90 Fed. Reg. 31906 (July 16, 2025).

Recent data also show the Valley failed to attain the 2006 24-hour PM2.5 Standard. As a serious nonattainment area, the Valley was required to attain the standard by December 31, 2024. 3-ER-358, 371, 85 Fed. Reg. 44192, 44205 (July 22, 2020). On May 28, 2025, EPA published data showing the Valley failed to attain the standard of 35 µg/m$^3$, with a design value of 48 µg/m$^3$ for the period 2022–2024.[1] As of the date of this brief, EPA had not yet made an official finding that the Valley failed to attain the standard, although such a finding was due no later than June 30, 2025. 3-ER-371, 85 Fed. Reg. at 44205 (establishing attainment deadline of Dec. 31, 2024); 42 U.S.C. § 7509(c)(1) (requiring attainment finding with six months of deadline).

Separately, EPA recently proposed to find the Valley failed to attain the

---

[1] Air Advocates request the Court take judicial notice of the design value data which EPA has published on its website. The Court may take judicial notice of the data as either generally known within the territorial jurisdiction of this Court or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned, even though such facts were not part of the administrative record. *See Singh v. Ashcroft*, 393 F.3d 903, 905–07 (9th Cir. 2004). Further, a court "may take judicial notice of records and reports of administrative bodies." *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953). The design value data is available on EPA's website, in Table 3b of the spreadsheet posted at https://www.epa.gov/system/files/documents/2025-06/pm25_designvalues_2022_2024_final_05_28_25.xlsx.

2

1997 8-hour Ozone Standard. 90 Fed. Reg. 30607 (July 10, 2025). One of the Valley's PM2.5 contingency measures at issue in this case—the Smog Check Contingency Measure—is also meant to provide contingent emissions reductions for the 1997 8-hour Ozone Standard. 2-ER-21, 25 tbl.2, 89 Fed. Reg. 56222, 56226 tbl.2 (July 9, 2024).

## ARGUMENT

**I.**     **EPA violated the Clean Air Act when it approved PM2.5 contingency measures for the Valley that do not provide emissions reductions equivalent to one year's worth of reasonable further progress.**

All parties agree this Court reviews EPA's construction of section 172(c)(9) of the Clean Air Act, 42 U.S.C. § 7502(c)(9), de novo, "applying all relevant interpretive tools" to reach what the Court concludes is the "best" reading of the provision. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024); EPA Br. 26; California Br. 11. Employment of the full range of interpretive tools underscores that section 172(c)(9) is best read as requiring emissions reductions equivalent to one year's worth of reasonable further progress. Indeed, this is how EPA interpreted the section for 30 years.

EPA now points to a purported lack of detail in section 172(c)(9) and insists that Congress has delegated wide interpretive discretion to the agency. EPA Br. 23, 26. But EPA ignores *Loper Bright*'s admonition that perceived statutory ambiguity does not "necessarily reflect a congressional intent that an agency, as opposed to a

3

court, resolve the resulting interpretive question." 603 U.S. at 399.

The interpretive arguments EPA and California advance offer no grounds for upholding EPA's approval of the Valley's PM2.5 contingency measures because their briefs offer new, post hoc arguments that differ from the reasons relied upon in the agency's rulemaking.

Moreover, even if the "best reading" of the statute were that it delegates discretionary authority to EPA, that authority is still subject to "boundaries" and must be exercised in an "reasoned" manner. *Loper Bright*, 603 U.S. at 397. Here, EPA interprets section 172(c)(9) in an unbounded and ad hoc manner that led it to arbitrarily and unlawfully approve *de minimis* contingency measures for the Valley.

### A. Section 172(c)(9) of the Act requires contingency measures to provide one year's worth of reasonable further progress.

Applying the traditional tools of statutory interpretation, this Court should interpret section 172(c)(9), 42 U.S.C. § 7502(c)(9), to require emissions reductions equivalent to one year's worth of reasonable further progress. The language of section 172(c)(9), the legislative history, the statutory scheme, and EPA's original, contemporaneous interpretation all reinforce this best reading.

Section 172(c)(9) states that a plan to attain a PM2.5 standard "shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the [NAAQS] by the attainment date

4

applicable under this part." 42 U.S.C. § 7502(c)(9). The purpose of this section, as this Court has observed, is to "close[] any potential gap in progress should a nonattainment area miss a milestone." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 942 (9th Cir. 2021) ("*AIR II*").

EPA mistakenly argues section 172(c)(9) "does not expressly require that contingency measures achieve a specific quantity of emissions reductions." EPA Br. 28. In fact, section 172(c)(9)'s reference to "reasonable further progress" supplies a specific quantity of emissions reductions to be achieved because Congress defined "reasonable further progress" to mean "annual incremental reductions . . . for the purpose of ensuring attainment." 42 U.S.C. § 7501(1). Each nonattainment area calculates, at the time of a nonattainment plan's adoption, the specific quantity of annual incremental emissions constituting "reasonable further progress." *See* 42 U.S.C. § 7502(c)(2); 40 C.F.R. § 51.1012(a). Interpreting section 172(c)(9) to require that contingency measures accomplish emissions reductions equivalent to one year's worth of reasonable further progress provides a quantifiable and consistent benchmark that ensures contingency measures, if triggered, will meaningfully address any gap in making reasonable further progress or achieving attainment.

EPA originally adopted this interpretation in 1992—shortly after Congress enacted the section—and maintained it consistently until the agency approved the

PM2.5 contingency measures at issue here. *See* 3-ER-476, 477–78, 57 Fed. Reg. 13498, 13543–44 (Apr. 16, 1992); 3-ER-468, 472, 59 Fed. Reg. 41998, 42015 (Aug. 16, 1994); 3-ER-427, 435, 81 Fed. Reg. 58010, 58093/2 (Aug. 24, 2016); 88 Fed. Reg. 1454, 1489/3 (Jan. 10, 2023).[2] EPA's original interpretation, which was "issued contemporaneously with the statute" and "remained consistent over time," is "especially useful in determining the statute's meaning." *Loper Bright*, 603 U.S. at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

EPA now disputes that section 172(c)(9)'s reference to reasonable further progress supplies a specific quantity of emissions reductions, arguing that the section's mention of "attainment" could also be interpreted as "requir[ing] a specific quantity of emissions reductions." EPA Br. 36 n.7. This is incorrect and contradicts EPA's longstanding interpretation. While it is true that, in formulating their nonattainment plans, states must quantify the anticipated emissions reductions required to reach attainment (*see id.*), unlike reasonable further progress, an attainment determination is not based upon a calculation of emissions reductions achieved, but whether actual, measured ambient air quality in an area complies with the NAAQS. 42 U.S.C § 7509(c).

EPA and California also dispute the extent to which legislative history

---

[2] Air Advocates may cite to the 1st, 2nd, or 3rd column on a page as printed in the *Federal Register*. For example, the citation 81 Fed. Reg. 58010, 58093/2 cites to the 2nd column from the left on page 58093.

supports Air Advocates' reading of section 172(c)(9). Although they acknowledge that the relevant House Report states "[s]uch measures . . . are to be adequate to compensate for any emission reduction shortfall," H.R. Rep. No. 101-490, *reprinted in Congressional Research Service, A Legislative History of the Clean Air Act Amendments of 1990*, at 3248 (1993), they contend that contingency measures should not be required to achieve emissions reductions equivalent to one year's worth of reasonable further progress because "[t]hat shortfall is not knowable at the time a state selects contingency measures or EPA approves them." EPA Br. 32; *see also id*. at 36; California Br. 14. However, the lack of foreknowledge about the future shortfall is precisely why the best reading requires one year's worth of reasonable further progress: that amount is readily identifiable at the outset and the only way to ensure the measures will "*be adequate to compensate* for *any* emission reduction shortfall." H.R. Rep. No. 101-490, at 3248 (emphasis added). Conversely, allowing states to adopt anemic contingency measures—as EPA has done for the Valley—risks an inadequate and impotent remedy for a shortfall, contrary to congressional intent.

Other relevant provisions of the Act reinforce that section 172(c)(9) is best read as requiring emissions reductions equivalent to one year's worth of reasonable further progress. This interpretation reflects the Act's escalating stringency for persistent nonattainment areas and reinforces the Act's requirement that states

design plans to attain the PM2.5 NAAQS "as expeditiously as practicable." Air Advocates Br. 39–40 (citing 42 U.S.C §§ 7513(c)(1)–(2), (e); 7513a(b)(2), (d)). Furthermore, "[t]he overriding purpose of the Clean Air Act is to force the states to do their job in regulating air pollution effectively so as to achieve . . . the NAAQS." *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000). EPA's and California's contrary arguments about statutory context and structure are unavailing.

*First*, EPA and California argue the Act "prioritizes adopting increasingly more stringent control measures at the outset," which they assert "leaves fewer options for contingency measures." EPA Br. 30; *see also* California Br. 16–17 (characterizing contingency measures as a "supplemental" strategy, distinct from "'core' control measures"). Tellingly, neither EPA nor California cites any statutory text in support of this argument. EPA Br. 30–31; California Br. 16–17. The Act's text plainly contradicts this argument, as it identifies contingency measures as a basic element of all PM2.5 nonattainment plans. *See generally* 42 U.S.C. § 7502(c).

*Second*, California erroneously invokes section 182(e)(5) of the Act, suggesting Congress was intentional about requiring contingency measures to achieve reasonable further progress in that provision, but not in section 172(c)(9). California Br. 12–13. Section 182(e)(5), which applies exclusively to "Extreme"

8

ozone nonattainment areas, allows a state to rely upon the "anticipate[d] development of new control techniques or improvement of existing control technologies" to demonstrate the state will attain the ozone standard. 42 U.S.C. § 7511a(e)(5). For such areas, Congress has specified that these contingency measures must go well beyond one year's worth of reasonable further progress and provide substitute emissions reductions "if the anticipated technologies do not achieve planned reductions." 42 U.S.C. § 7511a(e)(5)(B). Section 182(e)(5) therefore serves a different and broader purpose, and in no way undercuts that section 172(c)(9) is best read as requiring emissions reductions equivalent to one year's worth of reasonable further progress.

*Third*, California argues other portions of the Act are intended to ensure a plan achieves reasonable further progress, citing sections that address state implementation plan ("SIP") deficiencies generally. California Br. 15–16 (citing 42 U.S.C. §§ 7410(k)(5), 7410(m), 7502(d), 7509). But these general provisions do not override the more specific statutory requirement set forth in section 172(c)(9). *See, e.g.*, *California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1013 (9th Cir. 2000) ("It is fundamental that a general statutory provision may not be used to nullify or to trump a specific provision."). Moreover, California ignores that the Act's general provisions to address plan deficiencies involve a significant lag time before correction (*see* 42 U.S.C.

9

§§ 7410(k)(5), 7509(a)), and Congress instituted the contingency measure requirement to close this gap, directing that the measures must "take effect . . . without further action" to ensure ongoing, meaningful emissions reductions occur while the longer process for a plan revision unfolds. 42 U.S.C. § 7502(c)(9); *accord* 3-ER-472, 59 Fed. Reg. at 42015/1 (contingency measures "provide interim public health and welfare protection" while "a more formal SIP revision" is underway); *AIR II*, 10 F.4th at 942 ("the Act closes any potential gap in progress").

*Finally*, EPA argues it is not "contrary to the Act" for it to "change[] its longstanding position and adopt[] a new interpretation that . . . achieve[s] less emissions reductions than the previous approach." EPA Br. 46. Not so. The Act includes section 172(e), 42 U.S.C. § 7502(e), an "'anti-backsliding' provision" that prevents EPA from relaxing control requirements applicable to nonattainment areas except when a NAAQS itself has been relaxed. *Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1270–71 (D.C. Cir. 2009). The Act's "one-way ratchet" for attainment thus weighs heavily against any reading of the statute that diminishes contingency measures. *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 322 (D.C. Cir. 2011); *see also S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 903–04 (D.C. Cir. 2006) (stating withdrawal of "contingency plans . . . would constitute impermissible backsliding"). For this and all the other reasons above, section 172(c)(9) is best read to require contingency measures achieve emissions

10

reductions equivalent to one year's worth of reasonable progress.

**B.     EPA's post hoc interpretation of section 172(c)(9) does not provide a valid basis for upholding the agency's approval.**

EPA's and California's answering brief arguments regarding the best reading of section 172(c)(9), 42 U.S.C. § 7502(c)(9), wholly differ from the reasons EPA supplied in its approval and, in any event, are inadequate to uphold the agency's approval of the Valley's PM2.5 contingency measures.

**1.     EPA's brief defends its approval with improper post hoc arguments.**

In its brief, EPA argues it has been delegated authority to make "fact-specific determinations to assess whether contingency measures have a rational relationship to making reasonable further progress in attaining the NAAQS." EPA Br. 23; *see also* California Br. 19 (claiming EPA has been delegated discretion to determine adequacy under any "given circumstances"). According to EPA's brief, section 172(c)(9) merely requires the agency to "recommend[] that contingency measures achieve *some amount of continued progress* if a triggering event occurs." EPA Br. 27 (emphasis added). In other words, EPA's brief takes the position that the agency does not need to set a target quantity of emissions reductions to be achieved by contingency measures. *Id.* at 26.

EPA's litigation position differs from its underlying approval, in which EPA claimed section 172(c)(9) delegated it "the authority to determine *an amount of*

11

*emissions reductions that contingency measures should achieve* and thereby give meaning to the requirement . . . ." 1-ER-2, 6, 89 Fed. Reg. 80749, 80753/3 (Oct. 4, 2024) (emphasis added). The rulemaking identified a specific, universal target amount of emissions reductions applicable to contingency measures, stating "the recommended level of emissions reductions that contingency measures should achieve would represent one year's worth of 'progress' as opposed to one year's worth of [reasonable further progress]." 2-ER-114, 120, 88 Fed. Reg. 87988, 87994/2 (Dec. 20, 2023). The rulemaking also provided detailed instructions for calculating one year's worth of progress. *Id*.

EPA's newly articulated interpretation of section 172(c)(9), offered for the first time in its brief, cannot be credited to uphold the agency's approval of PM2.5 contingency measures for the Valley because "courts may not accept appellate counsel's post hoc rationalizations for agency action," and an agency decision may only be upheld "if at all, on the same basis articulated in the [agency's decision]." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962); *accord Nat. Res. Def. Council v. EPA*, 31 F.4th 1203, 1206–07 (9th Cir. 2022).

**2. Section 172(c)(9) does not delegate EPA unbounded authority to issue ad hoc approvals of contingency measures.**

Even if EPA's post hoc interpretation of section 172(c)(9) was properly before this Court—it is not—the agency's interpretation is nonetheless unlawful, and it arbitrarily approved the Valley's contingency measures.

EPA's interpretation fails in the first instance because the agency has not shown that section 172(c)(9), 42 U.S.C. 42 § 7502(c)(9), delegates discretion. Based on nothing more than its observation that section 172(c)(9) "does not expressly require that contingency measures achieve a specific quantity of emissions reductions," EPA insists the provision "'delegates discretionary authority' to EPA to assess whether a state's proposed contingency measures meet the Act's broad requirements." EPA Br. 28–29 (quoting *Loper Bright*, 603 U.S. at 395); *accord* California Br. 19; 1-ER-6, 89 Fed. Reg. at 80753. This facile logic runs afoul of *Loper Bright*, which cautioned against "presuming that statutory ambiguities are implicit delegations to agencies." 603 U.S. at 399. Noting that a lack of detail does not "necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question," *Loper Bright* emphasized that "every tool" available should be used "to determine the best reading of the statute and resolve the ambiguity." *Id*. at 399–400. As described above, "applying all relevant interpretive tools" reveals that section 172(c)(9)

13

requires contingency measures to reduce emissions equivalent to one year's worth of reasonable further progress. *See supra* Section I.A; *see also* Air Advocates Br. 36–45.

Second, even if this Court were to find that section 172(c)(9) delegates some discretion to EPA, the agency has unlawfully assumed it possesses unbounded discretion. As the Supreme Court explained in *Loper Bright*, it remains the role of the Court "to independently interpret the statute and effectuate the will of Congress . . . by . . . fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." 603 U.S. at 395 (citation modified).

Here, EPA unlawfully eschews any boundaries or limits on its authority, claiming what amounts to an unlimited delegation of discretion. According to EPA, it reads section 172(c)(9), 42 U.S.C. § 7502(c)(9), to mean the agency is merely required to "recommend[] that contingency measures achieve *some amount* of continued progress if a triggering event occurs." EPA Br. 27 (emphasis added); *see also id*. at 36 ("contingency measures need only ensure there is continued progress"). Although EPA acknowledges that the amount of emissions reductions should be "material" (*id*. at 44 (quoting 1-ER-6, 89 Fed. Reg. at 80753)), the agency does not offer any rules or criteria for evaluating materiality, and its standards go unreasonably below any floor, as it approved *de minimis* emissions

14

reductions for the Valley. Air Advocates Br. 50–52; *see also infra* Section II.B. An agency "may not interpret" a provision "so flexibly as to read it out of the Act," as EPA has done here. *Nat'l Rural Elec. Co-op. Ass'n v. SEC*, 276 F.3d 609, 618 (D.C. Cir. 2002).

Further underscoring that its interpretation of section 172(c)(9) is arbitrary, EPA reserves for itself *the power to make different determinations for different states*, dependent on variables the agency does not identify. EPA Br. 23 (stating EPA will make "fact-specific determinations"); California Br. 19 (asserting EPA may "determine the adequacy of proposed contingency measures under the given circumstances"). This claim of unbounded discretion cannot be squared with any of the types of delegation recognized by *Loper Bright*. EPA's open-ended approach does not "give meaning to a particular statutory term," "prescribe rules to 'fill up the details' of a statutory scheme," or "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright*, 603 U.S. 394–95 (citations omitted). Instead, EPA seeks to interpret and apply section 172(c)(9) in an ad hoc manner, but "agency 'ad hocery' is impermissible." *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003); *accord Sierra Club v. EPA*, 762 F.3d 971, 983 (9th Cir. 2014) (finding EPA's grant of an "ad hoc waiver" constituted "unbounded discretion [that] exceeds the agency's authority").

15

II.     **EPA premised its approval on non-statutory, unbounded considerations of feasibility and unlawfully approved contingency measures that only achieve *de minimis* NOx emissions reductions.**

Further compounding the unlawfulness of EPA's decision to approve the Valley's contingency measures, the agency invented an unlawful feasibility exemption that it applied in an arbitrary manner. It is undisputed that, unlike other sections of the Act, section 172(c)(9), 42 U.S.C. § 7502(c)(9), does not identify any exceptions tied to feasibility considerations. EPA and California advance improper post hoc rationalizations that ultimately provide no textual basis for delegation. They also point to other provisions in the statutory scheme that do account for feasibility, which merely underscores Congress's separate intention for section 172(c)(9). In any event, even if section 172(c)(9) does afford EPA some discretion, the Act requires more than the trifling emissions reductions that the agency's unfettered, ad hoc approach led it to approve here. And the fact that amici curiae may find it difficult to adopt robust contingency measures in their own areas has no bearing on EPA's approval for the Valley.

A.     **EPA has not demonstrated that Congress delegated discretion to fabricate a feasibility exemption for contingency measures.**

EPA admits, as it must, that the plain language of section 172(c)(9), 42 U.S.C. § 7502(c)(9), "does not explicitly provide for consideration of whether specific measures are feasible." EPA Br. 33. Nonetheless, EPA and California insist Congress delegated EPA authority to excuse states from adopting meaningful

16

contingency measures based on claims of infeasibility. *Id.* at 32–35; California Br. 19–23. Their textual arguments, most of which are post hoc and improper, do not establish such a delegation of authority.

In determining whether section 172(c)(9) allows EPA to excuse compliance based on purported feasibility considerations, this Court owes EPA's interpretation no particular weight because it was not "issued contemporaneously with the statute" and has not "remained consistent over time." *Loper Bright*, 603 U.S. at 394 (citing *Skidmore*, 323 U.S. at 140). EPA claims it "has long interpreted the statute as allowing states to adopt contingency measures that provide less than EPA's recommended amount [of reductions] so long as the state provides a reasoned justification" (EPA Br. 38–39), but this is incorrect. Beyond this challenged action, EPA only cites as support one sentence from the preamble for its 2016 rulemaking to implement the PM2.5 standards, which did not codify any exemption. *See id.* (citing 81 Fed. Reg. 58010, 58067 (Aug. 24, 2016)); *see also* 40 C.F.R. § 51.1014. In fact, EPA has consistently *disapproved* states' proposals to adopt weak contingency measures, despite claims of infeasibility—which is what the agency should have done here. *See, e.g.*, 82 Fed. Reg. 729, 731 (Jan. 4, 2017); 76 Fed. Reg. 69928, 69947 (Nov. 9, 2011).

17

1. **Section 172(c)(9)'s reference to measures that shall "take effect in any such case without further action" does not delegate EPA authority to grant exemptions on purported feasibility grounds.**

For the first time in its answering brief, EPA asserts Congress delegated it discretionary authority to approve weak contingency measures based on feasibility considerations because section 172(c)(9) states that such measures are "to take effect in any such case without further action." EPA Br. 33 (quoting 42 U.S.C. § 7502(c)(9)). But nowhere in its proposed or final rule for the Valley's measures did EPA claim delegated authority from this language. *See* 2-ER-119–20, 131–35, 88 Fed. Reg. at 87993–94, 88005–09; 1-ER-6–11, 89 Fed. Reg. at 80753–58. Because this argument was not articulated by EPA in its decision, it offers no grounds for upholding EPA's approval. *See, e.g.*, *Burlington Truck Lines*, 371 U.S. at 168–69; *Nat. Res. Def. Council*, 31 F.4th at 1207 (9th Cir. 2022).

Even if it were not an improper post hoc rationalization of counsel, EPA fails to establish that Congress intended to delegate expansive interpretive authority to the agency by employing the phrase "to take effect in any such case without further action." Counsel for EPA opines that this language means "Congress required measures that could actually go into effect, not infeasible measures." EPA Br. 33. But the meaning of this language is straightforward: as EPA itself has observed, the quoted phrase merely means "no further rulemaking actions by the State or EPA would be needed to implement the contingency

18

measures." 3-ER-471, 59 Fed. Reg. at 42015/1; *accord* 3-ER-477, 57 Fed. Reg. at 13543/3. EPA's attempt to read a new, expansive meaning into the phrase fails because Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) (ruling that the Act bars EPA from considering implementation costs in setting NAAQS because there was no "clear" "textual commitment" allowing it to do so); *see also id.* (finding it "implausible" Congress would give EPA authority to consider implementation costs through use of the "modest words" "adequate margin" and "requisite").

    **2.**     **General grants of authority elsewhere in the Act do not delegate EPA authority to adopt weak contingency measures based on purported feasibility considerations.**

EPA's and California's briefs also highlight some of the Act's general delegations of authority to EPA, suggesting they offer statutory grounds for the agency to carve out a feasibility exemption from contingency measures. *See* EPA Br. 27, 33 (citing 42 U.S.C. § 7410(k)(3)); California Br. 19–21 (citing 42 U.S.C. §§ 7410(a)(2)(A), 7601(a)(1)). Neither EPA's proposed nor final rule approving the Valley's contingency measures relied on any of these provisions, however. *See* 1-ER-2–19, 89 Fed. Reg. at 80749–66; 2-ER-106–38, 88 Fed. Reg. at 87981–8012. As noted above, the Court should reject arguments raised for the first time by counsel as impermissible post hoc rationalizations.

19

Counsel's litigation positions aside, EPA fails to show that any of these general grants of authority in the Act authorize it to undercut a state's obligation, pursuant to section 172(c)(9), to adopt robust contingency measures.

First, section 110(k)(3), 42 U.S.C. § 7410(k)(3), fails to provide any such delegation. This provision merely "charges EPA with reviewing State plans and approving them if they meet 'all the applicable requirements.'" EPA Br. 33. EPA admits that the obligation to adopt contingency measures as set forth in section 172(c)(9) is itself one such applicable requirement. EPA Br. 33. Nothing in section 110(k)(3) authorizes EPA to *alter* "applicable requirements." Rather, the provision just describes the agency's basic duty to approve or disapprove state plans based on compliance with the Act. *See, e.g.*, *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA*, 94 F.4th 77, 85 (D.C. Cir. 2024)

Section 110(a)(2)(A), 42 U.S.C. § 7410(a)(2)(A), likewise does not delegate to EPA any authority that would allow the agency to weaken section 172(c)(9)'s contingency measures requirement on purported feasibility grounds. Section 110(a)(2)(A) commands that each "plan submitted by a State shall" include control measures "as may be necessary or appropriate to meet the applicable requirements of [the Act]." 42 U.S.C. § 7410(a)(2)(A). Again, section 110(a)(2)(A) does not grant EPA authority to change an "applicable requirement" like contingency measures. Instead, as this Court recently highlighted, the purpose of the provision

20

is to ensure all "standards that are necessary for compliance" are "incorporated as part of the SIP, so as to be directly enforceable by EPA and by citizens." *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1177 (9th Cir. 2015) (holding the plain language of 42 U.S.C. § 7410(a)(2)(A) precluded EPA's decision to exclude measures from the SIP).

Nor does section 301(a)(1), 42 U.S.C. § 7601(a)(1), authorize EPA to weaken the statutory contingency measures requirement. Under this section, the "Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter." *Id*. But courts have routinely held that this "general grant of rulemaking power embodied in section 301" does not "trump the specific provisions of the Act" like section 172(c)(9). *Nat. Res. Def. Council, Inc. v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992); *accord Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019) ("A general grant of authority cannot displace the clear, specific text of the Act."); *Air All. Hous. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority.").

### 3. EPA has not demonstrated that other statutory provisions delegate it authority to approve weak contingency measures based on purported feasibility considerations.

Hewing more closely to the reasons set forth in EPA's decision on the Valley's contingency measures, EPA and California point to other provisions of

21

the Act that incorporate feasibility considerations and insist that Congress must have intended the same for section 172(c)(9), 42 U.S.C. § 7502(c)(9). For example, EPA highlights the requirements for "reasonably available control measures" in Moderate nonattainment areas, "best available control measures" in Serious areas, and "most stringent measures" for Serious areas that seek an attainment deadline extension—noting that considerations related to feasibility may be considered in states' development and EPA's approval of such measures. EPA. Br. 34; *see also* California Br. 22 (noting feasibility is addressed in 42 U.S.C. § 7509(d)(2), which addresses plan revisions following a failure to attain by the deadline).[3] Separately, amicus curiae Colorado Department of Public Health and Environment ("Colorado Department") cites the fact that feasibility may be considered when developing and approving plans for certain ozone nonattainment areas. Colorado Department Br. 7 (citing 42 U.S.C. § 7511a(c)(2)(B)(ii)).

But rather than supporting EPA's decision, Congress's explicit mention of

---

[3] California also inaccurately states that "this Court has specifically held that implementation plan measures 'cannot require a level of control technology that is technologically and economically infeasible.'" California Br. 21 (quoting *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1293 (9th Cir. 1977)). *Bunker Hill* concerned the potential application of a particular control technology to one specific facility. 572 F.2d at 1290–92. *Bunker Hill* did not address provisions applicable to particulate matter nonattainment areas or contingency measures, which Congress added to the Clean Air Act during the 1990 amendments, after this Court decided *Bunker Hill*. *See* Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399, 2414–15, 2458–60 (1990).

22

feasibility in other statutory sections supports the opposite conclusion, owing to the presumption "'that Congress acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another.'" *City of Chicago v. Env't Def. Fund,* 511 U.S. 328, 338 (1994) (citation omitted). Indeed, when interpreting the Clean Air Act, the Supreme Court has consistently declined to infer in an ambiguous section certain factors or requirements that are expressly identified in other sections of the Act. *See, e.g.*, *Whitman*, 531 U.S. at 467–68 ("We have . . . refused to find implicit in ambiguous sections of the CAA an authorization to consider costs that has elsewhere, and so often, been expressly granted.") (citing *Union Elec. Co. v. EPA,* 427 U.S. 246, 257, n.5 (1976)); *Gen. Motors Corp. v. United States,* 496 U.S. 530, 538, 541 (1990) (refusing to infer in certain provisions of the Clean Air Act deadlines and enforcement limitations that had been expressly imposed elsewhere).

Consequently, section 172(c)(9) is best read as requiring emissions reductions equivalent to one year's worth of reasonable further progress, without an exemption for purported feasibility considerations.

> **B.      Even if the Act delegates to EPA discretion to consider feasibility, EPA arbitrarily approved the Valley's contingency measures.**

Even if the Court were to find that the best reading of section 172(c)(9) delegates EPA some discretion to interpret the provision, it is still readily apparent that the agency acted arbitrarily when it approved contingency measures for the

Valley—particularly its decision to effectively exempt California from adopting meaningful contingency measures for purported feasibility concerns.

EPA and California argue that Air Advocates do not challenge EPA's infeasibility determination (EPA Br. 39; California Br. 21 n.7), but this is incorrect. Air Advocates contend EPA's approval was arbitrary because: EPA lacks defined standards for assessing feasibility; it has offered contradictory statements about the availability and feasibility of further controls; and it ultimately approved trifling, *de minimis* emissions reductions. Air Advocates Br. 47–49. EPA's and California's answering briefs fail to rebut these arguments.

*First*, EPA and California fail to demonstrate that the agency's exercise of discretion to consider feasibility issues was subject to any boundaries or limits. According to EPA, it followed the agency's Draft Revised Contingency Measure Guidance, but EPA admits the guidance only identifies "*potential considerations for states to support their infeasibility determinations.*" EPA Br. 39–40 (emphasis added) (citing 2-ER-257–99). Moreover, the draft guidance is not "binding or enforceable" (2-ER-259 n.1), it does not provide any objective standards to assess relevant considerations (2-ER-286–97), and it disavows setting a minimum amount of emissions reductions. 2-ER-288. Ultimately, the draft guidance leaves it to EPA to make ad hoc decisions on a case-by-case basis. 2-ER-286–97; *see also*

24

California Br. 19 (stating EPA will make decisions depending on "the given circumstances").

Tellingly, EPA is unable to articulate a concrete difference between the statutory allowable feasibility determinations it reviews and approves for primary plan control measures (like best available control measures) and the purported infeasibility demonstrations the agency claims it has discretion to allow for contingency measures. *See* 1-ER-10, 89 Fed. Reg. at 80757; EPA Br. 40–41. EPA states there is "not an exact overlap" but does not otherwise identify any specific differences or boundaries. EPA Br. 41.

EPA's approval of the Valley's contingency measures thus was arbitrary because the agency has declined to recognize any limits that "fix[] the boundaries of [its] delegated authority," or objective criteria that "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries." *Loper Bright*, 603 U.S. at 395; *see also Sierra Club*, 762 F.3d at 983 (9th Cir. 2014) ("unbounded discretion exceeds the agency's authority").

*Second*, EPA contradicts itself by accepting California's assertion that the Valley's weak measures represent all that is feasible while insisting that the State can and will adopt more contingency measures if a triggering event occurs. *See* EPA Br. 49–50; 1-ER-12, 89 Fed. Reg. at 80759/2. EPA attempts to reconcile this disparity by averring that "feasibility determinations *change*" (EPA Br. 50

25

(emphasis added)), which further underscores the agency's utter lack of coherent boundaries to govern its feasibility evaluations.

*Third*, EPA and California are unable to demonstrate that the Valley's contingency measures accomplish anything more than *de minimis* emissions reductions of NOx, a precursor pollutant that contributes heavily to PM2.5 levels in the Valley. EPA admits the approved contingency measures "achieve only a small amount of NOx emissions reductions" (EPA Br. 44)—a significant understatement. It is undisputed that the Valley's three contingency measures provide NOx emissions reductions equivalent to 1.1% and 1.2% of one year's worth of reasonable further progress and between 1.3% and 6.3% of one year's worth of progress. Air Advocates Br. 51–52 (citing 1-ER-5 tbls.2 & 3, 89 Fed. Reg. at 80752 tbls.2 & 3). At such low levels of effectiveness, the measures provide fewer NOx emissions reductions than measures EPA characterized as (and this Court affirmed as) "*de minimis*" in *Committee for a Better Arvin v. EPA*, 786 F.3d at 1178.[4]

EPA and California attempt to deflect from the agency's prior assessment and the Court's decision in *Committee for a Better Arvin* on the grounds that the

---

[4] EPA and California note that the Valley's contingency measures reduce PM2.5 emissions at a level equivalent to one year's worth of reasonable further progress. EPA Br. 44; California Br. 24 n.8. Air Advocates do not challenge the adequacy of the contingency measures with respect to direct PM2.5 emissions.

case did not address "the question presented here." EPA Br. 44; *see also* California Br. 23 (suggesting this case presents a "different context"). But both *Committee for a Better Arvin* and the instant matter involve state planning to address the Valley's persistently high levels of PM2.5 which exceed several NAAQS. 786 F.3d at 1173. California also argues that contingency measures "are not required to meet a regulatory threshold" (California Br. 25), though EPA maintained a consistent threshold for contingency measures for 30 years before unlawfully abandoning it with this action. *See supra* section I.A. And EPA's new interpretation sets "one year's worth of progress" as a recommended threshold, though EPA maintains it can approve far less based on feasibility considerations. EPA Br. 45–46.

But whether or not section 172(c)(9) sets a specific emissions reductions benchmark for contingency measures to achieve, it is an inescapable fact that, in the instant case, EPA has approved unprecedently weak measures. They accomplish a tiny fraction of the emissions reductions that EPA has required previously, at a level this Court deemed *de minimis* and trifling. *Comm. for a Better Arvin*, 786 F.3d at 1178; Air Advocates Br. 52–53. Consequently, even if EPA has been afforded some authority to interpret section 172(c)(9), the agency has abused that discretion because of "the ancient principle that the law does not care about trifles." *Comm. for a Better Arvin*, 786 F.3d at 1178.

27

**C.** **The absence of purported "low-hanging fruit" does not justify approval of *de minimis* contingency measures.**

Amici curiae Colorado Department and South Coast Air Quality Management District et al. ("South Coast") each submitted briefs in support of California. The arguments advanced by the amici should be rejected because they reflect circumstances, issues, and analyses from outside of the Valley that were not before EPA in the administrative process for its approval of the contingency measures at issue in this case. Further, this Court should not entertain issues not briefed by the parties. *See Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 625 (D.C. Cir. 1988). If and when EPA acts on contingency measures for their respective areas, amici can challenge the agency's actions or intervene.

In sum and substance, the amici argue it would be challenging for them to adopt contingency measures that accomplish emissions reductions equivalent to one year's worth of reasonable further progress. *See* Colorado Department Br. 3, 11–15; South Coast Br. 7–9, 12–13. For example, Colorado Department argues that requiring meaningful contingency measures could require it to choose between adopting contingency measures or facing sanctions. Colorado Department Br. 15. This hypothetical is an obvious exaggeration, and the fact that adopting meaningful contingency measures might be difficult does not mean that states cannot do so. Colorado Department ultimately admits as much, noting that, "[f]or both Colorado and Intervenors, due to longstanding struggles with attainment of the NAAQS, the

28

low-hanging fruit—the easily identifiable control strategies—have all been picked." Colorado Department Br. 3. Struggling to attain the NAAQS should be a call to action to take meaningful steps to protect public health, however, rather than an excuse for doing less.

South Coast similarly exaggerates the challenges it faces, arguing that within the South Coast Air Basin there simply are not "any more stringent contingency measures that could be adopted." South Coast Br. 7. This assertion is not credible, as South Coast wholly fails to mention (*see id.* at 6–9, 15–16) that it and the California Air Resources Board can adopt mobile source operational restrictions and indirect source measures for large warehouses and other significant diesel pollution sources. *See* 42 U.S.C. § 7543(d) (preserving state authority to regulate mobile sources through operational measures); *id.* §§ 7410(a)(5)(A)(i), (a)(5)(C) (authorizing states to adopt indirect source review); Respondents' SER-150–52 (noting state-adopted indirect source review regulations can serve as contingency measures).

As their briefs make clear, if left to their own devices, amici and some other state and local authorities would not take the necessary steps to reduce air pollution and protect public health. But as EPA itself has acknowledged, while "the CAA requirement for contingency measures is difficult" for some areas, "the Act is clear on these requirements." 76 Fed. Reg. at 69947. Indeed, states' recalcitrance to

29

address persistent air quality problems is precisely why Congress took action, and the "overriding purpose of the Clean Air Act is to *force the states to do their job* in regulating air pollution effectively so as to achieve baseline air quality standards, the NAAQS." *Exxon Mobil Corp.*, 217 F.3d at 1255 (emphasis added).

**III.  EPA unlawfully and arbitrarily approved contingency measures that will become deficient after one triggering event.**

In approving contingency measures for the Valley that the agency knew would become deficient after just one triggering event, EPA acted unlawfully and arbitrarily.

EPA ignores the Act's requirement that states shall include enforceable contingency measures in the SIP. 42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(9). Rather than requiring sufficient contingency measures in the plan now or an enforceable commitment to adopt more contingency measures quickly, EPA approved the Valley's SIP based on its unenforceable expectation that California will at some later time submit new contingency measures after the first triggering event. 1-ER-12, 89 Fed. Reg. at 80759; EPA Br. 49–51.

EPA's approach directly contradicts the statute, which requires contingency measures to be "included in the plan," 42 U.S.C. § 7502(c)(9), and that each plan "include enforceable . . . control measures," 42 U.S.C. § 7410(a)(2)(A). Section 172(c)(9) is not satisfied by merely presuming California will eventually address an acknowledged shortfall. Congress meant for the Act's contingency measures

30

provision to provide prompt and material emission reductions if the primary control measures fail. A SIP that runs out of sufficient contingency measures after one triggering event and must await further rulemaking to respond to another defeats that purpose entirely.

EPA tries to downplay the problem by arguing "there is always a risk that contingency measures may be triggered." EPA Br. 49. However, approving the same contingency measures for multiple standards when EPA *knew* the SIP would become deficient after one triggering event is more than a mere risk, it is a deficiency in the SIP. *See, e.g.*, *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 677 (9th Cir. 2012) ("*AIR I*") (ruling it was arbitrary and capricious for EPA to approve a SIP in the face of evidence indicating it was substantially inadequate); *cf. Portland Cement Ass'n v. EPA,* 665 F.3d 177, 187 (D.C. Cir. 2011) (ruling it was arbitrary and capricious for EPA to base a decision on a premise the agency knew would be "disrupt[ed]").

Moreover, that "risk" has become a reality in the Valley. EPA's 2022–2024 design values show the Valley failed to attain the 2006 24-Hour PM2.5 Standard by the December 31, 2024 attainment date. *See supra* note 1. Although EPA has not issued a formal finding yet, statutory requirements obligated the agency to issue such a finding by June 30, 2025, a deadline that has now elapsed. *See* 3-ER-371, 85 Fed. Reg. at 44205; 42 U.S.C. § 7509(c)(1). Once EPA issues the required

finding of failure to attain, the three contingency measures will take effect, and the SIP will no longer contain the contingency measures required by section 172(c)(9). Air Advocates Br. 54–55; 1-ER-12, 89 Fed. Reg. at 80759/2.[5]

EPA and California point to section 110(k)(5), 42 U.S.C. § 7410(k)(5), as the solution to this deficiency; this provision gives EPA authority to make a "SIP Call" and require a revised plan to correct inadequacies. EPA Br. 51; California Br. 26–27. But section 110(k)(5) cannot substitute for the requirements of section 172(c)(9) as it would allow years to pass without adequate contingency measures in the SIP. *See* 42 U.S.C. § 7410(k)(5) (giving states 18 months to submit plan revisions upon a finding of inadequacy); 42 U.S.C. § 7509(a) (imposing sanctions 18 months after EPA makes a finding that a state failed to submit a required revision). During that time, there would be no statutorily sufficient contingency measures in place that could take effect upon a second triggering event. That directly contradicts the plain meaning and purpose of section 172(c)(9), which as EPA itself has explained, "is to ensure that additional measures . . . *immediately*

---

[5] Additionally, EPA has proposed to find that the Valley failed to attain the 1997 8-hour Ozone Standard. 90 Fed. Reg. at 30607. Once EPA issues the failure to attain finding for the 1997 8-hour Ozone Standard and the failure to attain finding for the 2006 24-hour PM2.5 Standard, the Smog Check Contingency Measure will no longer provide any more triggering events even though California adopted the measure to serve six NAAQS in the San Joaquin Valley. *See* 88 Fed. Reg. at 87983/2–3 (measure provides up to two triggering events and serves the 1997, 2008, and 2015 ozone NAAQS and the 1997 annual, 2006 24-hour, and 2012 annual PM2.5 NAAQS).

32

take effect when the area fails . . . to attain the [PM2.5] NAAQS in order to provide interim public health and welfare protection" while the State prepares a new SIP to correct the problem(s) in the previous SIP. 3-ER-472, 59 Fed. Reg. at 42015/1 (emphasis added).

Air Advocates do not argue, as California disingenuously states, that contingency measures "require their own contingency measures." California Br. 26. But rather, when the same contingency measures are adopted to cover multiple standards, they must achieve sufficient reductions to cover multiple triggering events, or the State must at least provide an enforceable commitment to adopt additional contingency measures. *See Comm. for a Better Arvin*, 786 F.3d at 1178–79 (affirming EPA's approval of enforceable commitments to adopt control measures).

EPA approved a plan that effectively exhausts all the Valley's contingency measures after one triggering event, leaving the Valley's plan insufficient to address subsequent events. In approving the same contingency measures for three different standards that EPA knew would become deficient after one triggering event, the agency acted unlawfully and arbitrarily.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Court should grant this Petition and remand EPA's approval of the Valley's PM2.5 contingency measures, and award Air

Advocates their costs of litigation, including reasonable attorneys' fees, pursuant to section 307(f) of the Act, 42 U.S.C. § 7607(f).

Respectfully submitted this 8th day of August, 2025.

LAW OFFICE OF BRENT J. NEWELL

s/ Brent J. Newell
Brent J. Newell

*Counsel for Petitioners*

EARTHJUSTICE

s/ Colin C. O'Brien
Colin C. O'Brien
Tyler Szeto

*Counsel for Petitioners*

34

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form08instructions.pdf](http://www.ca9.uscourts.gov/forms/form08instructions.pdf)

**9th Cir. Case Number(s)** <u>24-7270</u>_____

I am the attorney or self-represented party.

**This brief contains <u>7,934</u> words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ X ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ X ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>s/ Brent J. Newell</u>    **Date** <u>August 8, 2025</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

35