**No. 24-7270**

**IN THE U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT**

COMMITTEE FOR A BETTER ARVIN, et al.,
Petitioners,
v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
Respondents,

and

CALIFORNIA AIR RESOURCES BOARD, et al.,
Respondent-Intervenors.

On Petition for Review of an Order of the
United States Environmental Protection Agency

**BRIEF OF STATES OF ALASKA, ALABAMA, ARKANSAS, IDAHO, INDIANA, LOUISIANA, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, PENNSYLVANIA, SOUTH DAKOTA, WEST VIRGINIA, AND WYOMING AS AMICI CURIAE IN SUPPORT OF REHEARING EN BANC**

CORI MILLS
ACTING ATTORNEY GENERAL

Sara J. Brennan
Laura Fox
Assistant Attorneys General
Department of Law
1031 West Fourth Ave., Suite 200
Anchorage, AK 99501
(907) 269-5289

*Attorneys for Amicus Curiae*
STATE OF ALASKA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................3
INTEREST OF AMICI CURIAE ..........................................................5
ARGUMENT ..........................................................................................5
I. Alaska has been trying for years to improve air quality around Fairbanks, and its options to achieve further progress are limited. ..................................6
II. EPA's approval of Alaska's plan for Fairbanks relied on the kind of "feasibility" analysis that the panel opinion forbids. ..................................10
III. The Fairbanks example demonstrates that "feasibility" encompasses a range of essential considerations grounded in Section 172(c)(9). ..........................11
IV. The panel opinion will lead to noncompliance, sanctions, and continued nonattainment rather than cleaner air. ..........................................................14
CONCLUSION .......................................................................................17

# TABLE OF AUTHORITIES

## STATUTES

42 U.S.C. § 7502(c)(9) ........ 5, 6, 10, 11, 13, 14, 15, 16
42 U.S.C. § 7502(c)(1). ........ 15

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 51.1003(b) ........ 7
40 C.F.R. § 52.31. ........ 16
40 C.F.R. § 52.31(e)(2). ........ 16
40 C.F.R. § 52.31(e)(1). ........ 16

## COURT RULES

Fed. R. App. P. 40(b)(2)(D) ........ 5

## FEDERAL REGISTER

74 Fed. Reg. 58688 (Nov. 13, 2009) ........ 7
82 Fed. Reg. 9035 (Feb. 2, 2017) ........ 7
82 Fed. Reg. 21711 (May 10, 2017) ........ 8
85 Fed. Reg. 7760 (Feb. 11, 2020) ........ 8
85 Fed. Reg. 54509 (Sept. 2, 2020) ........ 8
88 Fed. Reg. 84626 (Dec. 5, 2023) ........ 9
90 Fed. Reg. 1378 (Jan. 8, 2025) ........ 9
90 Fed. Reg. 1600 (Jan. 8, 2025) ........ 9
90 Fed. Reg. 1620 (Jan. 8. 2025). ........ 9, 10, 12, 13
90 Fed. Reg. 51529 (Nov. 18, 2025) ........ 6, 9

## OTHER AUTHORITIES

Aurora Energy Solutions, https://www.heatyourway.com/ (last visited Sept. 29, 2026) ........ 13
Off. of Plan., Env't, and Realty, Fed. Highway Admin., U.S. Dep't of Transp., *Clean Air Act Sanctions*, https://www.fhwa.dot.gov/Environment/air_quality/highway_sanctions/ (last visited Sept. 30, 2026) ........ 17

Div. of Air Quality, Alaska Dep't of Env't Conservation,
*Fairbanks PM2.5 – Background*,
https://dec.alaska.gov/air/anpms/communities/fbks-pm2-5-background (last visited Sept. 26, 2026) ..........7

Matthew Jentgen, EPA Region 10, Air and Radiation Div.

Memorandum to Docket No. EPA-R10-OAR-2024-0595 (Dec. 4, 2024),
https://www.regulations.gov/document/EPA-R10-OAR-2024-0595-0053 ..........11

State Air Quality Control Plan (Fairbanks Plan) § 7.11. ..........9, 12, 13, 14

Tim Ellis,
*Weather Service: Last Winter in Fairbanks Was Coldest on Record*, KUAC (Apr. 1, 2026, at 23:17 AKDT), https://fm.kuac.org/weather/2026-04-01/weather-service-last-winter-in-fairbanks-was-coldest-on-record. ..........6

## INTEREST OF AMICI CURIAE

To protect their people and the environment, the amici states work with the federal government under the cooperative-federalism framework created by the Clean Air Act (CAA). The amici states have a direct interest in this case because the panel opinion puts them in a bind. Many states are home to nonattainment areas like San Joaquin Valley, California and Fairbanks, Alaska, that have persistent difficulty meeting air quality standards despite their best efforts. The panel opinion obstructs the states' task of creating plans to improve air quality in such areas by banning consideration of a pivotal factor—a measure's feasibility—when states design contingency measures under Section 172(c)(9) of the CAA. *See* 42 U.S.C. § 7502(c)(9).

## ARGUMENT

Rehearing en banc is warranted under Fed. R. App. P. 40(b)(2)(D) because the panel decision presents a question of exceptional importance extending well beyond the San Joaquin Valley, impacting all states and air agencies with obligations under the CAA, including in the very different environment of Alaska. The question posed here matters to every nonattainment area and recurs with every state implementation plan cycle: may a state decline to adopt, as a CAA contingency measure, a control strategy that cannot actually be implemented and cannot actually produce emissions reductions within the time a contingency

measure must operate? The panel said no—holding that Section 172(c)(9) forbids considering feasibility when a state designs contingency measures. Op. 14, 20.

Alaska's experience in the Fairbanks nonattainment area illustrates the wide and problematic implications of the panel's answer. Alaska has spent nearly two decades working through the CAA's nonattainment process in good faith, improving the state's air quality to the best of its ability over time. But the EPA's most recent approval of Alaska's contingency measures for the Fairbanks area used the same reasoning that the panel has now held unlawful. *See* 90 Fed. Reg. 51529, 51540 (Nov. 18, 2025). And as a result, it is not clear what the panel majority expects Alaska to do when it prepares its next plan for the Fairbanks area. This uncertainty will likely lead to worse, not better, air quality for the people and environment of Alaska and the other amici states.

## I. Alaska has been trying for years to improve air quality around Fairbanks, and its options to achieve further progress are limited.

Fairbanks, one of Alaska's largest and northernmost cities, presents the perfect storm for particulate matter ($PM_{2.5}$), the extremely small particles—commonly caused by burning wood—that can lead to health problems. For one thing, Fairbanks gets quite cold. Last winter, the average temperature was around negative 14 degrees F, with over thirty days reaching negative 40 or below. Tim Ellis, *Weather Service: Last Winter in Fairbanks Was Coldest on Record*, KUAC (Apr. 1, 2026, at 23:17 AKDT), https://fm.kuac.org/weather/2026-04-01/weather-service-last-winter-in-fairbanks-was-coldest-on-record. For another thing,

Fairbanks is surrounded by hills on three sides, leading to frequent temperature inversions that trap pollution, particularly in winter months. Fairbanks's frigid winters lead the area's 100,000 or so residents to burn fuels like wood to stay warm, producing particulate matter that is trapped by the area's topography and climate. Div. of Air Quality, Alaska Dep't of Env't Conservation, *Fairbanks PM2.5 – Background*, https://dec.alaska.gov/air/anpms/communities/fbks-pm2-5-background (last visited Sept. 26, 2026).

Although Fairbanks's winters present a unique challenge, Alaska—like many states—has endeavored to meet its obligations under the CAA over the nearly twenty years since the EPA first designated this community as a nonattainment area in 2009. That year, the EPA revised the standard for $PM_{2.5}$ and designated Fairbanks as a CAA "moderate" nonattainment area, triggering Alaska's duty to submit its first state implementation plan (SIP). 74 Fed. Reg. 58688, 58690, 58702-58703 (Nov. 13, 2009).

Alaska's initial plan submission—which was followed by further clarifying and supplementing submissions—identified primary control measures to try to improve air quality, such as a residential wood heating device changeout program. *See* 82 Fed. Reg. 9035, 9045 (Feb. 2, 2017). And as relevant here, the plan also identified "contingency measures," which are additional strategies that could be quickly implemented if certain benchmarks aren't met so that air quality continues to improve while Alaska works on a revised plan if needed. *See* 40 C.F.R. §

51.1003(b). Contingency measures are meant to serve as a "splint" to maintain at least some emissions reductions while a state works towards developing an updated plan. *See* Op. 27 (Bress, J., dissenting).

Due to worsening air quality conditions (and before Alaska had adequate time to meet attainment goals under its original SIP), EPA re-classified Fairbanks as a "serious" nonattainment area for $PM_{2.5}$. 82 Fed. Reg. 21711, 21712-21713 (May 10, 2017). This reclassification triggered two of the contingency measures identified in Alaska's original SIP: a real estate regulation requiring removal of old, uncertified wood stoves before a home sale, and a requirement for commercial wood sellers to register with the state and label wood as wet or dry. With these contingency measures in place, Alaska worked on a new serious-area SIP under heightened CAA requirements, which included adopting new primary control measures and new contingency measures.

Alaska developed and submitted a new SIP consistent with the reclassification. 85 Fed. Reg. 7760 (Feb. 11, 2020). But in the meantime, the serious-area attainment date—the date by which the Fairbanks area was supposed to meet the $PM_{2.5}$ standard—passed. EPA determined that the area failed to attain and denied Alaska's request for an extension of time. 85 Fed. Reg. 54509, 54510 (Sept. 2, 2020). EPA's decision triggered the single contingency measure adopted in the most recent SIP, which was to require removal of the highest-emitting EPA-certified wood stoves, all while Alaska worked on yet another SIP submission.

Even though Alaska did its best to comply with the new serious-area requirements, the EPA disapproved the contingency measures element of Alaska's next plan submission. The EPA determined that Alaska's sole proposed contingency measure would not create sufficient emissions reduction on its own and that "Alaska did not provide a reasoned justification for why the state could not adopt additional contingency measures." 90 Fed. Reg. 1600, 1625 (Jan. 8, 2025) (summarizing 88 Fed. Reg. 84626 (Dec. 5, 2023)); 90 Fed. Reg. 51529 (Nov. 18, 2025).

Alaska responded to the EPA's partial disapproval by doing exactly what the EPA required: providing a reasoned justification explaining why Alaska could not adopt additional contingency measures. *See* 90 Fed. Reg. 1378, 1379 (Jan. 8, 2025); State Air Quality Control Plan § 7.11.2.2 (Fairbanks Plan). Alaska evaluated each possible contingency measure individually, adopted three that it believed met the definition of contingency measures, and rejected the remaining measures that did not. *See* Fairbanks Plan §§ 7.11.3 - 7.11.4. It dismissed each rejected measure based on a finding that it was in some way infeasible, due to either jurisdictional, statutory, technical, or timing issues. *Id.* The EPA agreed with Alaska's analysis and approved Alaska's current plan, which remains in place and is no longer subject to challenge. *See* 90 Fed. Reg. 1620 (Jan. 8. 2025).

## II. EPA's approval of Alaska's plan for Fairbanks relied on the kind of "feasibility" analysis that the panel opinion forbids.

The panel opinion claims that it "maintains the status quo," Op. 20, but it does the opposite for Alaska: Alaska's current plan for Fairbanks was approved under reasoning the panel has now condemned. The panel opinion held that Alaska and the EPA may not consider whether contingency measures are feasible when developing and assessing them because, in the panel's view, Section 172(c)(9) contains no "feasibility exemption." Op. 7.

In approving Alaska's current plan after the back-and-forth described above, the EPA interpreted the CAA "not to require air agencies to adopt and impose infeasible measures," and concluded that "a demonstrated lack of feasible measures" is "a reasoned justification for adopting contingency measures that only achieve a lesser amount of emissions reductions." 90 Fed. Reg. 1620, 1624 (Jan. 8, 2025). In other words, the EPA used the reasoning the panel disapproved here.

The EPA found that Alaska met its obligation under the CAA by proposing a single contingency measure consistent with Section 172(c)(9) and providing a reasoned justification why it could not adopt more (although Alaska had actually proposed three, the EPA deemed only one of them to be a valid contingency measure, deeming the other two to be "SIP strengthening measures" that aided the state's effort to attain but did not meet the definition of a contingency measure. *Id.* at 1627–29). The EPA analyzed the many measures Alaska examined and dismissed, explaining why each was not acceptable as a contingency measure

under Section 172(c)(9): some measures would achieve zero or negligible emissions reductions, some were "technologically infeasible," and some would not achieve emissions reductions within two years of the triggering event. *See* Matthew Jentgen, EPA Region 10, Air and Radiation Div. Memorandum to Docket No. EPA-R10-OAR-2024-0595 (Dec. 4, 2024), https://www.regulations.gov/document/EPA-R10-OAR-2024-0595-0053.

This is the path that Alaska has followed—the path that allowed Alaska to adopt contingency measures, secure EPA approval, and avoid sanctions while improving the area's air quality. But the panel opinion blocks this path going forward. Although the EPA's final rule approving Alaska's plan for the Fairbanks area is now beyond the window for legal challenges, these issues will recur with every future SIP cycle in Alaska, California, and beyond.

## III. The Fairbanks example demonstrates that "feasibility" encompasses a range of essential considerations grounded in Section 172(c)(9).

The panel majority refused to examine the actual feasibility analyses before it, saying that this had "no bearing" on its statutory interpretation of Section 172(c)(9). Op. 20. The Fairbanks example shows why that approach is misguided.

The concept of "feasibility" applied by Alaska and the EPA encompasses a range of essential considerations including climate, geography, infrastructure, and the timing required by Section 172(c)(9). *See* 42 U.S.C. § 7502(c)(9). The measures Alaska rejected failed for reasons beyond mere difficulty or cost. Instead,

as the dissent recognized for the rejected San Joaquin Valley measures, they could not "take effect" automatically and produce emissions reductions promptly. Op. 40-42 (Bress, J., dissenting).

For example:

- Requiring use of ultra-low sulfur diesel (ULSD) fuel. Because ULSD cannot be produced locally in Fairbanks, it would have to be transported via networks that are already near capacity. Demand for heating fuel peaks in winter, when transport is hardest. And storage would take years to create and build. 90 Fed. Reg. 1620, 1625, 1628 (Jan. 8, 2025); Fairbanks Plan § 7.11.3.3.1.1. As a result, the EPA explained that this measure "factually could not be implemented quickly following a triggering event, or achieve emissions reductions until several years following," and thus "would not satisfy the key purpose of contingency measures . . ." 90 Fed. Reg. 1620, 1628 (Jan. 8, 2025).

- Requiring pellet stoves. Alaska considered requiring new solid-fuel devices to meet a pellet-stove-level emissions standard. This measure would reduce emissions only as residents replace older stoves. More concerningly, pellet stoves require electricity to operate, and the frigid Fairbanks area often experiences winter power outages. 90 Fed. Reg. 1620, 1625, 1628 (Jan. 8, 2025). The EPA agreed that this option "is technologically infeasible as a contingency measure" because "given the extremely cold temperatures residents experience" in Fairbanks, "having a source of heat that does not rely on electricity remains a necessity." *Id.*; *see also* Fairbanks Plan § 7.11.3.3.2.

- Requiring lower moisture levels in cordwood. The EPA agreed with Alaska that this "would not be technologically feasible given the constraint on the dry wood supply in Fairbanks." 90 Fed. Reg. 1620, 1628 (Jan. 8, 2025). As Alaska explained, "there is a single dry wood kiln" that supplies the majority of commercial dry wood in the Fairbanks area, and "[r]equiring the kiln to achieve lower wood moisture content would require longer dry times, which would restrict the availability of dry wood in the area unless the kiln expanded capacity." *Id.* at 1626. The EPA agreed with Alaska that drier wood could not be reliably supplied within two years of a triggering event. *Id.* at 1625-26, 1628; *see also* Fairbanks Plan § 7.11.3.3.5. Notably,

this single commercial kiln will be shutting down at the end of 2026, leaving the community without a source of commercially dried wood. *See* Aurora Energy Solutions, https://www.heatyourway.com/ (last visited Sept. 29, 2026) (announcing a planned wind-down of operations).

- <u>Citation authority and increase of civil penalties.</u> The EPA agreed with Alaska that this proposed contingency measure would not help because Alaska's environmental agency already has penalty authority under state statute. 90 Fed. Reg. 1620, 1626 (Jan. 8, 2025); Fairbanks Plan § 7.11.3.3.6. And the state environmental agency does not have the power to give itself increased penalty authority without action by the state legislature. *Id*.

- <u>Establishing economic incentive-based programs.</u> The EPA agreed with Alaska that incentive programs—such as subsidizing cost of ULSD, natural gas, and electricity—did not meet the definition of a contingency measure because they would rely on economic encouragement rather than creating enforceable emission reductions. 90 Fed. Reg. 1620, 1626 (Jan. 8, 2025). Moreover, because the proposed programs would all rely on a subsidy beyond the state environmental agency's budget, establishing them would require action by the state legislature. *Id*.; Fairbanks Plan § 7.11.3.3.7.

- <u>Regulating aircraft emissions.</u> The EPA agreed with Alaska that reducing aircraft emissions would not be possible because states are prohibited from adopting more stringent standards for aircraft than the federal government. 90 Fed. Reg. 1620, 1625, 1628 (Jan. 8, 2025)

None of these rejections reflect a policy judgment that cleaner air costs too much. Each is a finding that the proposed measure could not actually do what Section 172(c)(9) requires a CAA contingency measure to do. The panel's opinion nonetheless lumps all these justifications together into forbidden "feasibility" analysis and gives no guidance on which considerations, if any, could survive.

## IV. The panel opinion will lead to noncompliance, sanctions, and continued nonattainment rather than cleaner air.

Looking forward, the panel opinion complicates and obstructs Alaska and other states' efforts to meet their obligations under the CAA.

Because the Fairbanks area has long been designated as nonattainment, it has become increasingly difficult for Alaska to find strategies to further improve air quality. Each plan submission and revision has considered what could be done to get the Fairbanks area into attainment with the $PM_{2.5}$ standard, as well as what contingency measures could be adopted to meet CAA requirements. With each iteration, fewer and fewer unused measures remain available.

For example, over the past four plan submissions, Alaska has adopted and implemented twenty-seven primary control measures, triggered three contingency measures, and has one contingency measure left and ready to be triggered. *See* Fairbanks Plan § 7.11.1. Most measures have focused on residential home heating. Few, if any, contingency measures remain on the table that could meet the requirements of Section 172(c)(9). This example demonstrates how the panel decision puts states like Alaska at risk of failing to meet their CAA obligations.

Without more contingency measures available, as the panel dissent noted, the only way a state could build up a reserve of effective and feasible contingency measures that could produce qualifying reductions would be to withhold otherwise effective and feasible control measures from its primary control strategy. Op. 53-54 (Bress, J., dissenting). The idea of withholding otherwise feasible, near-term

emission controls so they can be "saved" for use as contingency measures directly contravenes the CAA's purpose. Serious-area plans must identify, adopt, and implement all feasible measures "as expeditiously as practicable," and all controls needed for attainment must be in place no later than the start of the attainment year. *See* 42 U.S.C. § 7502(c)(1). Holding feasible measures in reserve to have them as contingency measures would only delay the real emissions reductions the CAA requires. In Fairbanks, for example, this would have meant delaying wood-smoke controls that could help protect residents' health now, so that the reductions could instead be saved for later as contingency measures.

Under the panel opinion, Alaska's hands are tied for its next plan for the Fairbanks area: either adopt *infeasible* contingency measures or accept disapproval and sanctions. A ULSD mandate would raise home-heating costs in an Arctic climate, likely pushing more households to burn wood and potentially worsening $PM_{2.5}$ rather than improving it. If Alaska may not reject a ULSD mandate on the grounds that it will not produce any emissions reductions for at least three years, then it would have to adopt, as a contingency measure, something that will not serve Section 172(c)(9)'s purpose. If Alaska may not reject a pellet-only stove standard on the grounds that residents in Fairbanks's frigid climate need a heating option that does not depend on electricity, then Section 172(c)(9) requires Alaska to adopt, as a contingency measure, something that will risk its residents' safety.

These infeasible measures not only fail to meet the requirements of Section 172(c)(9) but may be seen as punitive and unnecessary by residents. Adopting such measures could harden overall opposition to Alaska's attempts to improve air quality in the area and stall other control strategies, especially in an area where home heating is the main source of emissions and public participation in control efforts is essential. The Fairbanks example demonstrates that the panel opinion would push states toward measures that are slow, counterproductive, and publicly alienating—raising costs, risking more wood burning, and eroding trust—thereby delaying real progress toward clean air and leading to sanctions.

The sanctions at stake are serious. When EPA finds that a state's SIP does not meet CAA requirements it must consider specific sanctions provided by law. *See* 40 C.F.R. § 52.31. Highway sanctions result in a freeze on federal funding for and approval of transportation projects in the area. *See* 40 C.F.R. § 52.31(e)(2). The conformity freeze imposed on the Fairbanks area (after the EPA partially disapproved one of Alaska's plans) impacted approximately $150 million in road projects that caused project delays, funding uncertainty, and elevated planning risk. Looking forward, federal highway sanctions could withhold approximately $50 million per year of federal funding to the area.

Another possible sanction is the "offset sanction," which is a two-to-one emission offset for air permits. *See* 40 C.F.R. § 52.31(e)(1). This means that owners of new or modified sources of $PM_{2.5}$ in the area must offset any increased

emissions from their operation by reducing existing emissions by at least twice the amount of the increase (whereas the ratio would otherwise be one or one-and-a-half to one). This increased ratio is not only costly but, in some cases, may be unattainable. *See* Off. of Plan., Env't, and Realty, Fed. Highway Admin., U.S. Dep't of Transp., *Clean Air Act Sanctions*, https://www.fhwa.dot.gov/Environment/air_quality/highway_sanctions/ (last visited Sept. 30, 2026). This sanction could worsen the home heating crisis in the Fairbanks area by making it virtually impossible to permit new sources of emissions, halting critical infrastructure improvements for power generation.

The panel opinion thus forces a state like Alaska, with unique demands in a challenging climate, to choose between proposing a SIP that satisfies the CAA and actually protecting its people and environment, which, ironically, is the true singular goal of the CAA.

## CONCLUSION

For these reasons, the Court should grant rehearing en banc.

DATED: October 1, 2026.

Respectfully submitted,

CORI MILLS
ACTING ATTORNEY GENERAL

*/s/ Sara J. Brennan*

Sara J. Brennan
Laura Fox
Assistant Attorneys General
Department of Law
1031 West Fourth Ave., Suite 200
Anchorage, AK 99501
(907) 269-5289

*Attorneys for Amicus Curiae*
STATE OF ALASKA

Counsel for joining amici states:

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

TIM GRIFFIN
ATTORNEY GENERAL OF ARKANSAS

RAÚL R. LABRADOR
ATTORNEY GENERAL OF IDAHO

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

LIZ MURRILL
ATTORNEY GENERAL OF LOUISIANA

CATHERINE L. HANAWAY
ATTORNEY GENERAL OF MISSOURI

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

MICHAEL T. HILGERS
ATTORNEY GENERAL OF NEBRASKA

GENTNER DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA

DAVID W. SUNDAY
ATTORNEY GENERAL OF PENNSYLVANIA

MARTY J. JACKLEY
ATTORNEY GENERAL OF SOUTH DAKOTA

JOHN B. McCUSKEY
ATTORNEY GENERAL OF WEST VIRGINIA

KEITH G. KAUTZ
ATTORNEY GENERAL OF WYOMING

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 01, 2026.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Anadela Gallego*
Anadela Gallego
Law Office Assistant

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-7270

I am the attorney or self-represented party.

**This brief contains** 3,182 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ____.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Sara J. Brennan **Date** 10/01/2026
*(use "s/[typed name]" to sign electronically-filed documents)*