Case No. 24-7270

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

COMMITTEE FOR A BETTER ARVIN, et al.,
*Petitioners,*
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents,*
and
CALIFORNIA AIR RESOURCES BOARD; and
SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT,
*Respondent-Intervenors.*

*On Petition for Review of Final Action of the Environmental Protection Agency*
*Agency No. EPA–R09–OAR–2023–0477*

# AMICUS CURIAE BRIEF OF THE COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT IN SUPPORT OF RESPONDENT-INTERVENORS' PETITION FOR REHEARING EN BANC

SHANNON STEVENSON
ROBYN WILLE
RYLIE SLAYBAUGH
COLORADO DEPARTMENT OF LAW
Natural Resources and Environment
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
*Attorneys for Amicus Curiae*

# TABLE OF CONTENTS


DISCLOSURE STATEMENTS ........ iii

GLOSSARY ........ iv

IDENTITY AND INTEREST OF AMICUS CURIAE ........ 1

SUMMARY OF THE ARGUMENT ........ 4

ARGUMENT ........ 4

I. The Panel's Decision Reflects a Fundamental Misunderstanding about the Act that Will Result in Severe Consequences for States ........ 5

A. First, the Panel Reads in a Specific Quantitative Requirement for Contingency Measures Where There is None ........ 6

B. Next, the Panel Refuses to Read in Consideration of Feasibility ........ 8

C. Finally, the Panel Ignores the Absurd and Illogical Consequences of its Construction ........ 10

II. The Panel's Decision Involves a Novel Question of Exceptional Importance ........ 13

CONCLUSION ........ 14


## ATTACHMENTS


Attachment A: 42 U.S.C. § 7410

Attachment B: 42 U.S.C. § 7502

Attachment C: 42 U.S.C. § 7511a

Attachment D: Petitioners' Opening Brief, *Ctr. for Biological Diversity v. Evn't Prot. Agency*, No. 26-9548 (10th Cir. Sep. 18, 2026)

Attachment E: Letter from Jill Hunsaker Ryan, Colorado Department of Public Health and Environmental, to Cyrus Western, Regional Administrator, U.S. EPA, Region 8 (May 29, 2026)

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Comm. for a Better Arvin v. Evn't Prot. Agency*, 788 F.3d 1169 (9th Cir. 2015) ....................9

*Ctr. for Biological Diversity v. Evn't Prot. Agency*, 129 F.4th 1266 (10th Cir. 2025) ....................11

*Ctr. for Biological Diversity v. Evn't Prot. Agency,* No. 26-9548 (10th Cir. filed June 8, 2026) ....................3, 13

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ....................6

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001) ....................13

*Keene-Stevens v. Comm'r of Internal Revenue*, 72 F.4th 1015 (9th Cir. 2023) ....................6

*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024) ....................5

*Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665 (9th Cir. 2003) ....................9

**Statutes**

42 U.S.C. § 7410 ....................12

42 U.S.C. § 7410(a)(2)(A) ....................8

42 U.S.C. § 7410 (a)(2)(E)....................9

42 U.S.C. § 7502 ....................5, 6, 7, 8, 9, 11, 12

42 U.S.C. § 7502(c)(1) ....................10, 11

42 U.S.C. § 7502(c)(9) ....................6, 7, 8, 11, 12

42 U.S.C. § 7511a ....................6

42 U.S.C. § 7511a(c)(9)....................7

42 U.S.C. § 7511a(e)(5)....................7

42 U.S.C. § 7604(a)(1)(A) ....................9

Colo. Rev. Stat. § 25-7-103.5 ....................1

Colo. Rev. Stat. § 25-7-105 ........................................................................ 1

Colo. Rev. Stat. § 25-7-109.5 ...................................................................... 1

**Rules**

Fed. R. App. P. 40(b)(2)(D) .................................................................. 4, 13

**Regulations**

5 Colo. Code Reg. § 1001-9 ........................................................................ 1

5 Colo. Code Reg. § 1001-26 ...................................................................... 1

5 Colo. Code Reg. § 1001-28 ...................................................................... 1

5 Colo. Code Reg. § 1001-29 ...................................................................... 1

5 Colo. Code Reg. § 1001-30 ...................................................................... 1

5 Colo. Code Reg. § 1001-31 ...................................................................... 1

5 Colo. Code Reg. § 1001-32 ...................................................................... 1

5 Colo. Code Reg. § 1001-34 ...................................................................... 1

Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Serious for the 2008 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 60926 (Oct. 7, 2022) ........................................................ 10

Clean Air Act Reclassification; Colorado; Reclassification of the Denver Metro/North Front Range 2015 Ozone Nonattainment Area to Serious, 89 Fed. Reg. 59832 (July 24, 2024) ...................................................... 10

Clean Air Plans; Contingency Measures for the Fine Particulate Matter Standards; San Joaquin Valley, California, 89 Fed. Reg. 80749 (Oct. 4, 2024) ...................... 2

Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter, 89 Fed. Reg. 101602 (Dec. 16, 2024) ............................... 2, 3

Air Plan Approval; Colorado; Serious Attainment Plan Contingency Measures and RACT Requirements for the 2008 8-Hour Ozone National Ambient Air Quality Standards for the Denver Metro/North Front Range Nonattainment Area, 91 Fed. Reg. 17857 (Apr. 9, 2026) ............................................ 2, 3, 13, 14

**Other Authorities**

House Bill 21-1266, 73rd Gen. Assemb., 1st Reg. Sess. (Colo. 2021) ....................1

House Bill 22-1244, 73rd Gen. Assemb., 2nd Reg. Sess. (Colo. 2022) ....................1

Memorandum from EPA on Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and PM (Dec. 3, 2024)................................2, 7, 12

Senate Bill 25-156, 75th Gen. Assemb., 1st Reg. Sess. (Colo. 2025) ......................1

## DISCLOSURE STATEMENTS

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* hereby submit the following corporate disclosure statement:

The Colorado Department of Public Health and Environment is a principal department of the State of Colorado. No counsel for a party authored this brief in whole or in part, and no person other than the amicus curiae or its counsel contributed money that was intended to fund the preparation of submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## GLOSSARY

The following is a glossary of the acronyms used in this brief:

| | |
|---|---|
| Act | Clean Air Act |
| California SIP revision | The plan revisions that are the subject of the Clean Air Plans; Contingency Measures for the Fine Particulate Matter Standards; San Joaquin Valley, California, 89 Fed. Reg. 80749 (Oct. 4, 2024) |
| Colorado Department | Colorado Department of Public Health and Environment |
| Contingency Measures SIP | Air Plan Approval; Colorado; Serious Attainment Plan Contingency Measures and RACT Requirements for the 2008 8-Hour Ozone National Ambient Air Quality Standards for the Denver Metro/North Front Range Nonattainment Area, 91 Fed. Reg. 17857 (Apr. 9, 2026) |
| EPA | United States Environmental Protection Agency |
| EPA AB | EPA's Answering Brief, Dkt Id. 28.1 |
| EPA Petition | EPA Petition for En Banc Rehearing, Dkt. Id. 77.1 |
| Fed. R. App. P. | Federal Rules of Appellate Procedure |
| Guidance | Memorandum from EPA on Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and PM (Dec. 3, 2024); Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter, 89 Fed. Reg. 101602 (Dec. 16, 2024) |
| HB | House Bill |
| NAAQS | National Ambient Air Quality Standards |
| NOx | Nitrogen Oxides |
| Pets. OB | Petitioners' Opening Brief, Dkt Id. 17.1 |
| Petitioners | Committee For a Better Arvin; Healthy Environment For All Lives; Medical Advocates for Healthy Air; National Parks Conservation Association; Sierra Club |

| | |
|---|---|
| Petition for Rehearing | Petition for Rehearing En Banc |
| PM | Particulate Matter |
| Opinion | Opinion by Judge Mendoze, Jr.; Dissent by Judge Bress, Dkt. Id. 72.1 |
| RACM | Reasonably Available Control Measures |
| Respondent-Intervenors | California Air Resources Board;<br>San Joaquin Valley Unified Air Pollution Control District |
| SB | Senate Bill |
| Section 110 | 42 U.S.C. § 7410 |
| Section 172 | 42 U.S.C. § 7502 |
| Section 182 | 42 U.S.C. § 7511a |
| SIP | State Implementation Plan |
| Valley | The San Joaquin Valley |

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Colorado Department of Public Health and Environment ("Colorado Department") regulates air pollution control efforts in Colorado. Colorado is at the forefront of efforts to reduce emissions, improve air quality, and mitigate impacts on climate change – all while maintaining a robust and functioning economy. For example, Colorado is the fourth largest oil producing state in the country[1] yet develops nation-leading regulatory programs to reduce emissions from the oil and gas sector.

Notwithstanding its innovative regulatory efforts,[2] Colorado's Front Range is currently in nonattainment under two National Ambient Air Quality Standards ("NAAQS") for ozone – the 2008 ozone NAAQS and the 2015 ozone NAAQS. The United States Environmental Protection Agency ("EPA") recently approved revisions to Colorado's state implementation plan ("SIP") addressing contingency

---

[1] *See* U.S. Energy Information Administration, *Colorado* (July 17, 2025); U.S. Energy Information Administration, *Imports made up 17% of U.S. energy supply in 2024, in the lowest share in nearly 40 years* (July 7, 2025).

[2] *See, e.g.*, Colo. Rev. Stat. § 25-7-103.5 (created by Senate Bill ("SB") 25-156, 75th Gen. Assemb., 1st Reg. Sess. (Colo. 2025)); Colo. Rev. Stat. § 25-7-105 (as modified by House Bill ("HB") 21-1266, 73rd Gen. Assemb., 1st Reg. Sess. (Colo. 2021)); Colo. Rev. Stat. § 25-7-109.5 (created by HB 22-1244, 73rd Gen. Assemb., 2nd Reg. Sess. (Colo. 2022)); 5 Colo. Code Reg. § 1001-9; 5 Colo. Code Reg. § 1001-26; 5 Colo. Code Reg. § 1001-28; 5 Colo. Code Reg. § 1001-29; 5 Colo. Code Reg. § 1001-30; 5 Colo. Code Reg. § 1001-31; 5 Colo. Code Reg. § 1001-32; 5 Colo. Code Reg. § 1001-34.

measures for the 2008 ozone NAAQS ("Contingency Measures SIP").[3] In approving the Contingency Measures SIP, EPA relied on its *Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter*[4] ("Guidance") advising how EPA will consider feasibility when assessing whether EPA will approve a SIP with less that the "recommended amount" of emission reductions achieved through contingency measures.[5] This is the same Guidance upon which EPA relied when approving California's SIP in the underlying case.

However, the panel determined that EPA exceeded its authority through its Guidance and its reliance on the Guidance to approve California's SIP revision. Although the plan revisions approved by EPA at Clean Air Plans; Contingency Measures for the Fine Particulate Matter Standards; San Joaquin Valley, California[6] ("California SIP revision") addressed particulate matter ("PM") and Colorado's

---

[3] Air Plan Approval; Colorado; Serious Attainment Plan Contingency Measures and RACT Requirements for the 2008 8-Hour Ozone National Ambient Air Quality Standards for the Denver Metro/North Front Range Nonattainment Area, 91 Fed. Reg. 17857 (Apr. 9, 2026).

[4] 89 Fed. Reg. 101602 (Dec. 16, 2024).

[5] Contingency Measures SIP, noting publication of the Guidance at Memorandum from EPA on Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and PM ("Guidance") (Dec. 3, 2024) pp. 33-48.

[6] Clean Air Plans; Contingency Measures for the Fine Particulate Matter Standards; San Joaquin Valley, California, 89 Fed. Reg. 80749 (Oct. 4, 2024).

Contingency Measures SIP addresses ozone, both SIPs rely on the same EPA Guidance. Colorado is similarly situated to California and could be directly impacted by this Court's determination about the validity of EPA's Guidance.

Moreover, EPA's approval of Colorado's Contingency Measures SIP was recently challenged in the Tenth Circuit by the Center for Biological Diversity and Sierra Club, and Colorado is a Respondent-Intervenor in the action.[7] Even though Colorado's SIP involves a different pollutant and different contingency measures regulations, the petitioners in the Tenth Circuit challenge rely on essentially the same allegations and arguments of the Petitioners in this case.[8] Because of the significant similarity between the two petitions—both of which challenge EPA approval of a state SIP relying on the EPA Guidance permitting feasibility considerations—the Tenth Circuit may look to the Ninth Circuit's decision in reaching its conclusion about EPA's authority to approve Colorado's Contingency Measures SIP. Therefore, Colorado has a direct and substantial interest in this petition, and the Colorado Department submits this amicus brief in support of Respondent-Intervenors' Petition for Rehearing En Banc ("Petition for Rehearing").

---

[7] *Ctr. for Biological Diversity v. Evn't Prot. Agency*, No. 26-9548 (10th Cir. filed June 8, 2026).

[8] *Compare* Petitioners' Opening Brief, *Ctr. for Biological Diversity v. Evn't Prot. Agency*, No. 26-9548 (10th Cir. Sep. 18, 2026) with Petitioners' Opening Brief, Dkt Id. 17.1 ("Pets. OB").

## SUMMARY OF THE ARGUMENT

Colorado agrees with the California Air Resources Board and San Joaquin Valley Unified Air Pollution Control District ("Respondent-Intervenors") that en banc review of the panel's decision is urgently needed. The panel's decision demonstrates a fundamental misunderstanding of the Clean Air Act ("Act"), and the decision will lead to severe consequences for states, requiring states to either: (1) withhold implementation of emission reduction measures to improve air quality that they would otherwise adopt sooner in order to preserve these measures for potential use as contingency measures; or (2) face sanctions if the state is unable to adopt or implement feasible measures to reduce emissions. This raises an issue of "exceptional importance,"[9] in which Colorado has a direct and substantial interest. Accordingly, the Court should grant the Petition for Rehearing.

## ARGUMENT

This proceeding involves a novel issue of exceptional importance: Was the Ninth Circuit panel correct to reject EPA's consideration of "feasibility" when reviewing the Act provision(s) for contingency measures while, at the same time, reading a specific "amount" of emission reductions into the same provision(s). As set forth in the Amicus Curiae Brief of the Colorado Department of Public Health

---

[9] Fed. R. App. P. 40(b)(2)(D).

and Environment in Support of Intervenors[10] previously filed, and reinforced here, the answer is no.

The panel's fundamental misapplication of statutory construction principles and resulting misconstruction of the Act has far-reaching implications for states. The panel's decision is unprecedented; if other circuits adopt the panel's flawed reasoning, it will hinder states' ability to implement contingency measures and comply with the Act, potentially resulting in severe sanctions for factors outside the states' control.[11]

## I. The Panel's Decision Reflects a Fundamental Misunderstanding about the Act that Will Result in Severe Consequences for States

The panel's interpretation of the Act misapprehends the plain language of the Act and leads to absurd results.[12] The panel erroneously dusted off only one of the "well-worn tools of statutory interpretation" to support its narrow holding that EPA improperly read a feasibility exception into 42 U.S.C. § 7502 ("Section 172"), of the Act.[13] Instead, the panel should have relied on the "full interpretive toolkit" to discern the best meaning of the statute.[14]

---

[10] Dkt. Id. 44.1.
[11] Opinion by Judge Mendoze, Jr.; Dissent by Judge Bress, Dkt. Id. 72.1 ("Opinion") pp. 53-54 (Bress, J., dissenting).
[12] *Id.* p. 23 (Bress, J., dissenting).
[13] *Id.* pp. 12-14.
[14] *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 408-09 (2024).

The only requirements in Section 172 for contingency measures are: (1) specific measures; (2) undertaken upon failure to make progress or to attain by the applicable attainment date; (3) without further action by the State or the Administrator.[15] Courts "determine if a statute's meaning is plain or ambiguous by looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."[16] The Court must "identify the interpretation that is more consistent with the broader context and primary purpose of the statute."[17] It is imperative that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available."[18]

### A. First, the Panel Reads in a Specific Quantitative Requirement for Contingency Measures Where There is None

Petitioners argued,[19] and the panel appears to have agreed,[20] that states must achieve a specific amount of emission reductions through contingency measures. Yet Section 172 of the Act does not explicitly prescribe the amount of emissions

[15] 42 U.S.C. § 7502(c)(9). The section of the Act with provisions for ozone contingency measures, 42 U.S.C. § 7511a ("Section 182"), is not directly before this Court.
[16] *Keene-Stevens v. Comm'r of Internal Revenue*, 72 F.4th 1015, 1026 (9th Cir. 2023) (internal citations omitted).
[17] *Id.* (internal citations omitted).
[18] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).
[19] Pets. OB pp. 36-40.
[20] Opinion pp. 9-10, Stating that the Valley's "contingency measures fell significantly short of required [Nitrogen Oxides ("NOx")] emission reductions…."

reductions that must be achieved through contingency measures.[21] Not even EPA claims that there is a minimum required amount of emission reductions in Section 172.[22] Thus, the panel's determination that a specific quantity is *required* by the Act's plain language[23] – and any resulting determination or implication that the California's SIP revisions must be disapproved for failure to meet that quantity of reductions – must be overturned.

---

[21] *See id.* p. 53 (Bress, J., dissenting) (noting that the amount of contingency measures to be achieved is EPA's "recommended target"). The Colorado Department notes that Section 182(c)(9), while not before this Court in this case, largely mirrors Section 172(c)(9), and does not provide a specific amount of reductions required, while Section 182(e)(5) is different, applies to extreme ozone nonattainment areas, and does require a specific amount of reductions to be achieved by contingency measures.

[22] *See* EPA Petition for En Banc Rehearing ("EPA Petition"), Dkt. Id. 77.1, pp. 9-11; Guidance p. 34 ("the [Act] does not specify the amount of reductions that CMs should achieve.").

[23] *See* Opinion pp. 9-10. Later, the panel states that it "neither endorse[s] nor reject[s] the EPA's use of 'one year's worth of progress' instead of the longstanding one year's worth of reasonable further progress standard because this petition rises and falls on feasibility." *Id*. p. 11 n.4. But while the panel does not decide between EPA's "one year's worth of progress" and Petitioners' "one year's worth of reasonable further progress", the panel does essentially decide that it's one or the other. And not, as Colorado Department argues, neither, where the plain language of the Act has no explicit requirements regarding amount.

### B. Next, the Panel Refuses to Read in Consideration of Feasibility

As with a specific amount, Section 172 of the Act does not use the word "feasibility" when referring to contingency measures. Yet while the panel reads in a requirement for amount, it confoundingly refuses to read in the much more basic concept of feasibility.

At a minimum, the panel should have taken a consistent approach. And as explained by dissenting Justice Bress, when read as a whole, Section 172 does not just *allow* for consideration of feasibility, it *requires* it.[24] This is evident from the plain language of Section 172(c)(9) and the overall scheme and structure of the Act.

Section 172(c)(9) of the Act explicitly requires that the state's SIP will provide for the implementation of measures to take effect without further action by the state or the EPA upon the triggering event.[25] Practically speaking, this means that years ahead of any potential trigger, the state must craft contingency measures under the assumption that the state *can and will* implement and enforce such measures without further action. The Act requires that states adopt *enforceable* measures.[26] The Colorado Department agrees with EPA that "…an 'infeasible

---

[24] *Id.* pp. 43-45 (Bress, J., dissenting).
[25] 42 U.S.C. § 7502(c)(9).
[26] *See e.g.,* 42 U.S.C. § 7410(a)(2)(A) (providing that SIPs must include "enforceable emission limitations and other control measures"). This is so that EPA and members of the public can, as a legal and practical matter, enforce them in

contingency measure' does not comply with the statute because it is decidedly not a contingency measure that can automatically go into effect."[27] The Act cannot require states to place into their SIP measures the state cannot feasibly implement and/or enforce.[28]

As articulated by this Court, enforceable emission measures are not "…aspirational goals nor unenforceable as a matter of discretion *or practicality*…"[29] It would be absurd to read into the Act a requirement to adopt measures the state cannot implement and enforce. Especially when the purpose of contingency measures and, more broadly, the Act, is to pursue and achieve emission reductions.[30]

---

court. *See* 42 U.S.C. § 7604(a)(1)(A) (authorizing civil actions for enforcement of an "emission standard or limitation").

[27] EPA Petition p. 2.

[28] EPA's Answer Brief, Dkt Id. 28.1 ("EPA AB") pp. 33-35. Further, such an interpretation could run afoul of Section 110(a)(2)(E) of the Act, which requires states to provide EPA assurances that the state will have "adequate…authority" to implement its plan. If a state is required by Section 172 to adopt a measure that cannot be implemented, can EPA make the finding that the State has the authority to implement it?

[29] *Comm. for a Better Arvin v. Evn't Prot. Agency*, 788 F.3d 1169, 1182 (9th Cir. 2015) (emphasis added).

[30] *Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003).

### C. Finally, the Panel Ignores the Absurd and Illogical Consequences of its Construction

Respondent-Intervenors explain in their Petition for Rehearing the perilous position the panel's decision risks placing states in.[31] That is: (1) forcing the state to withhold implementation of emission reduction measures in order to preserve them for use as contingency measures; or (2) subjecting the state to sanctions if it is unable to adopt or implement feasible measures. This is an absurd result.

Colorado is currently in nonattainment under two ozone NAAQS.[32] As a result, the state is constantly implementing emission reductions "as expeditiously as practicable[.]"[33] Colorado is doing this on a rolling basis, *e.g.*, Colorado submitted its Severe SIP for the 2008 ozone NAAQS in 2023[34] and submitted its Serious SIP for the 2015 ozone NAAQS in 2026.[35] With each reclassification,

---

[31] Respondent-Intervenors' Petition for Rehearing En Banc, Dkt. Id. 76.1, pp. 12-13.
[32] *See* Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Serious for the 2008 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 60926 (Oct. 7, 2022); Clean Air Act Reclassification; Colorado; Reclassification of the Denver Metro/North Front Range 2015 Ozone Nonattainment Area to Serious, 89 Fed. Reg. 59832 (July 24, 2024).
[33] 42 U.S.C. § 7502(c)(1).
[34] RAQC, *Ozone (2008 8-Hour Standard)* (2026) (noting that Colorado adopted its Severe SIP for the 2008 ozone NAAQS on Dec. 15, 2023).
[35] Serious State Implementation Plan for the DM/NFR Nonattainment Area for the 2015 Ozone National Ambient Air Quality Standard (June 30, 2025) which was adopted by the Air Quality Control Commission on November 21, 2025; Letter from Jill Hunsaker Ryan, Colorado Department of Public Health and

Colorado must implement more emission reduction measures, thus reducing the available control strategies Colorado can use as contingency measures.

It is nonsensical to read the Act to require Colorado, as a state struggling with ozone attainment and developing SIPs for multiple ozone NAAQS, to identify measures that achieve emission reductions and, rather than implement them to reduce ozone as quickly as possible, instead leave those reductions unrealized in hopes that the state will attain the NAAQS.[36] Instead, when states are engaged in multiple, overlapping planning efforts, Section 172(c)(1) of the Act requires states to implement reasonably available control measures "as expeditiously as practicable[.]"[37] Reading Section 172(c)(9) to require the withholding of emission control measures instead of implementing them to achieve attainment as expeditiously as practicable is not supported by the text, structure, or purpose of the Act.

The consequences of this construction of Section 172 are "steep".[38] California cannot create emission reduction measures where technology, economics, or the law defeat them. If the panel's construction of Section 172 is upheld, then California –

Environmental, to Cyrus Western, Regional Administrator, EPA, Region 8 (May 29, 2026).

[36] *See also* EPA Petition p. 17.

[37] 42 U.S.C. § 7502(c)(1).

[38] *Ctr. for Biological Diversity v. Evn't Prot. Agency*, 129 F.4th 1266, 1269 (10th Cir. 2025).

and potentially other states – must consider adopting measures that violate Section 172 in a different way or would not be approvable by EPA under 42 U.S.C. § 7410 ("Section 110"). As noted by Justice Bress, adoption of a technically infeasible contingency measure "would violate Section 172(c)(9)'s requirement that contingency measures 'take effect … without further action by the State.'"[39] And a state cannot adopt a measure as a contingency measure if it does not have the legal authority to implement it, because EPA would not be able to approve it under Section 110 of the Act. So, a state is left with no options, only to face sanctions under the Act, including potentially loss of federal highway funding. This construction is not supported by the Act, especially not with respect to a provision that acts as a gap-filler. As Justice Bress noted in his dissent,

> A State is not pivoting from its 'plan A' to its 'plan B' when it is required to activate its contingency measures…The 'interim' relief provided by contingency measures gives a State time to develop its actual 'plan B,' which is an amended SIP.[40]

For these reasons, en banc review is critical.

---

[39] Opinion p. 43 (Bress, J., dissenting).

[40] *See id.* pp. 26-27 (Bress, J., dissenting); *see also* Guidance p. 12 (recognizing that primary purpose of contingency measures is to ensure that after failing to attain a NAAQS by its attainment date, a state continues to achieve emission reductions while it undertakes its next planning exercise).

## II. The Panel's Decision Involves a Novel Question of Exceptional Importance

This matter involves a question of exceptional importance.[41] The reverberations of the panel's decision are of concern to several states but are already being felt in Colorado. As explained herein, EPA's approval of Colorado's Contingency Measures SIP is currently subject to litigation in the Tenth Circuit, in which petitioners heavily rely on the panel's decision:

> The Ninth Circuit already rejected EPA's new interpretation in *Committee for a Better Arvin*, 185 F.4th 957. Petitioners Center for Biological Diversity and Sierra Club (together, "Public Interest Groups") respectfully request this court do the same.[42]

While the Ninth Circuit's decision is not dispositive of the outcome for Colorado it is, in the least, persuasive. When a federal court is considering a novel issue of law, "they will generally consider how other courts have ruled on the same issue."[43] This includes the consideration of decisions of federal courts of appeals in different circuits.[44]

---

[41] Fed. R. App. P. 40(b)(2)(D).
[42] Petitioners' Opening Brief p. 3, *Ctr. for Biological Diversity v. Evn't Prot. Agency*, No. 26-9548 (10th Cir. Sep. 18, 2026).
[43] *Hart v. Massanari*, 266 F.3d 1155, 1169 (9th Cir. 2001).
[44] *Id.*

Colorado, as with California, did not come to EPA seeking an easy way out of the Act's contingency measures requirements. Rather, these states put together meaningful, robust demonstrations explaining why each state could not put forward measures that met EPA's *recommended* amount of emissions reductions for contingency measures in the manner proscribed by the Act.[45] For Colorado, this included over 100 pages of detailed rationale.[46] And, as EPA points out, there are numerous other places in the Act where feasibility is relevant despite not being explicitly mentioned.[47] While Colorado's Contingency Measures SIP is not before this Court, the Colorado Department asks this Court to revisit and review the panel's decision, due to its potential impact.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted this 1st day of October 2026,

PHILIP J. WEISER
Attorney General

*<u>/s/Robyn Wille</u>*
SHANNON STEVENSON*
Solicitor General
ROBYN WILLE*
First Assistant Attorney General

[45] *See* Opinion p. 53 (Bress, J., dissenting); EPA Petition pp. 4, 10-11.
[46] *See* EPA-R08-OAR-2024-0622-0006, select "April2025SIPSubmittal_DocumentSet1of2", select "18_Technical Support Documents" at 490-561.
[47] *See* EPA Petition p. 10.

LAURA TERLISNER MEHEW*
Senior Assistant Attorney General
RYLIE SLAYBAUGH*
Assistant Attorney General
Colorado Department of Law
Natural Resources and Environment
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Email Addresses:
Shannon.Stevenson@coag.gov
Robyn.Wille@coag.gov
Laura.Mehew@coag.gov
Rylie.Slaybaugh@coag.gov
*Counsel of Record
*Counsel for Amicus Curiae, Colorado Department of Public Health and Environment*

**CERTIFICATE OF SERVICE**

I certify that on October 1, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve this filing on the following:

Tyler Bridget Szeto
tszeto@earthjustice.org

Colin Casey O'Brien
cobrien@earthjustice.org

Brent Newell
brent@lawofficenewell.com

Sarah Izfar
sarah.izfar@usdoj.gov

Jonathan A. Wiener
jonathan.wiener@doj.ca.gov

Annette A. Ballatore
annette.ballatore@valleyair.org

Corey Moffat
corey.moffat@doj.ca.gov

PHILIP J. WEISER
Attorney General

/s/Robyn Wille
ROBYN WILLE*
First Assistant Attorney General
Colorado Department of Law
Natural Resources and Environment
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Email Address:
Robyn.Wille@coag.gov
*Counsel of Record

*Counsel for Amicus, Colorado Department of Public Health and Environment*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-7270

I am the attorney or self-represented party.

**This brief contains** 3,208 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ____________.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Robyn Wille **Date** 10/1/26
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form34instructions.pdf*

**9th Cir. Case Number(s)** 24-7270

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Colorado Department of Public Health and Environment

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes ◉ No

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."
[2] To the extent it can be obtained through due diligence.

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

N/A.

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

N/A.

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

○ Yes ◉ No

If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

○ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

◉ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** /s/ Robyn Wille **Date** 10/1/26

*(use "*s/[typed name]*" to sign electronically-filed documents)*

# Attachment A
## 42 U.S.C. § 7410

KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter85. Air Pollution Prevention and Control (Refs & Annos)
Subchapter I. Programs and Activities
Part A. Air Quality and Emission Limitations (Refs & Annos)

42 U.S.C.A. § 7410

§ 7410. State implementation plans for national primary and secondary ambient air quality standards

Currentness

**(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems**

**(1)** Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

**(2)** Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall--

**(A)** include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

**(B)** provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to--

**(i)** monitor, compile, and analyze data on ambient air quality, and

**(ii)** upon request, make such data available to the Administrator;

**(C)** include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

**(D)** contain adequate provisions--

**(i)** prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will--

**(I)** contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

**(II)** interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

**(ii)** insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

**(E)** provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

**(F)** require, as may be prescribed by the Administrator--

**(i)** the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

**(ii)** periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

**(iii)** correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

**(G)** provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

**(H)** provide for revision of such plan--

**(i)** from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

**(ii)** except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

**(I)** in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

**(J)** meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

**(K)** provide for--

**(i)** the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

**(ii)** the submission, upon request, of data related to such air quality modeling to the Administrator;

**(L)** require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover--

**(i)** the reasonable costs of reviewing and acting upon any application for such a permit, and

**(ii)** if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

**(M)** provide for consultation and participation by local political subdivisions affected by the plan.

**(3)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409

**(B)** As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974, review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

**(C)** Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d) of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

**(4)** Repealed. Pub.L. 101-549, Title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409

**(5)(A)(i)** Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

**(ii)** Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

**(iii)** Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

**(B)** The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

**(C)** For purposes of this paragraph, the term “indirect source” means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

**(D)** For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations--

**(i)** exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

**(ii)** preventing maintenance of any such standard after such date.

**(E)** For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

**(6)** No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d) of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

**(1)** The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator--

**(A)** finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

**(B)** disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

**(2)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409

**(B)** No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

**(C)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409

**(D)** For purposes of this paragraph--

**(i)** The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

**(ii)** The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

**(iii)** The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

**(E)** No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

**(3)** Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

**(4)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409

**(5)(A)** Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

**(B)** In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

**(i)** establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

**(ii)** implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

**(C)** Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub.L. 101-549, Title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

**(1)** Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that--

**(A)** a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

**(B)** other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

**(2)** A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that--

**(A)** there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

**(B)** such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

**(3)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

**(4)** This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

**(5)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title, as in effect before August 7, 1977, or section 7413(d) of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

**(1)** In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines--

**(A)** meets the requirements of this section, and

**(B)** is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

**(2)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

**(3)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title as in effect before August 7, 1977, or under section 7413(d) of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

**(1)** Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

**(2)** The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3), no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed

to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State--

**(A)** in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

**(B)** in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development [1] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

CREDIT(S)

(July 14, 1955, c. 360, Title I, § 110, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub.L. 93-319, § 4, June 22, 1974, 88 Stat. 256; Pub.L. 95-95, Title I, §§ 107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub.L. 95-190, § 14(a)(1) to (6), Nov. 16, 1977, 91 Stat. 1399; Pub.L. 97-23, § 3, July 17, 1981, 95 Stat. 142; Pub.L. 101-549, Title I, §§ 101(b) to (d), 102(h), 107(c), 108(d), Title IV, § 412, Nov. 15, 1990, 104 Stat. 2404 to 2408, 2422, 2464, 2466, 2634.)

Notes of Decisions (431)

## Footnotes

1 So in original. Probably should be followed by a comma.

42 U.S.C.A. § 7410, 42 USCA § 7410
Current through P.L. 119-111. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment B

42 U.S.C. § 7502

KeyCite Yellow Flag
Proposed Legislation



42 U.S.C.A. § 7502

§ 7502. Nonattainment plan provisions in general

Currentness

**(a) Classifications and attainment dates**

**(1) Classifications**

**(A)** On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

**(B)** The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of Title 5 (concerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (l) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

**(C)** This paragraph shall not apply with respect to nonattainment areas for which classifications are specifically provided under other provisions of this part.

**(2) Attainment dates for nonattainment areas**

**(A)** The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date such area was designated nonattainment under section 7407(d) of this title, except that the Administrator may extend the

attainment date to the extent the Administrator determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures.

**(B)** The attainment date for an area designated nonattainment with respect to a secondary national ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable after the date such area was designated nonattainment under section 7407(d) of this title.

**(C)** Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the attainment date determined by the Administrator under subparagraph (A) or (B) if--

**(i)** the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

**(ii)** in accordance with guidance published by the Administrator, no more than a minimal number of exceedances of the relevant national ambient air quality standard has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this subparagraph for a single nonattainment area.

**(D)** This paragraph shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part.

**(b) Schedule for plan submissions**

At the time the Administrator promulgates the designation of an area as nonattainment with respect to a national ambient air quality standard under section 7407(d) of this title, the Administrator shall establish a schedule according to which the State containing such area shall submit a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title. Such schedule shall at a minimum, include a date or dates, extending no later than 3 years from the date of the nonattainment designation, for the submission of a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title.

**(c) Nonattainment plan provisions**

The plan provisions (including plan items) required to be submitted under this part shall comply with each of the following:

**(1) In general**

Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

**(2) RFP**

Such plan provisions shall require reasonable further progress.

**(3) Inventory**

Such plan provisions shall include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in such area, including such periodic revisions as the Administrator may determine necessary to assure that the requirements of this part are met.

**(4) Identification and quantification**

Such plan provisions shall expressly identify and quantify the emissions, if any, of any such pollutant or pollutants which will be allowed, in accordance with section 7503(a)(1)(B) of this title, from the construction and operation of major new or modified stationary sources in each such area. The plan shall demonstrate to the satisfaction of the Administrator that the emissions quantified for this purpose will be consistent with the achievement of reasonable further progress and will not interfere with attainment of the applicable national ambient air quality standard by the applicable attainment date.

**(5) Permits for new and modified major stationary sources**

Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of this title.

**(6) Other measures**

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

**(7) Compliance with section 7410(a)(2)**

Such plan provisions shall also meet the applicable provisions of section 7410(a)(2) of this title.

**(8) Equivalent techniques**

Upon application by any State, the Administrator may allow the use of equivalent modeling, emission inventory, and planning procedures, unless the Administrator determines that the proposed techniques are, in the aggregate, less effective than the methods specified by the Administrator.

**(9) Contingency measures**

Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this

part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

**(d) Plan revisions required in response to finding of plan inadequacy**

Any plan revision for a nonattainment area which is required to be submitted in response to a finding by the Administrator pursuant to section 7410(k)(5) of this title (relating to calls for plan revisions) must correct the plan deficiency (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part. The Administrator may reasonably adjust the dates otherwise applicable under such requirements to such revision (except for attainment dates that have not yet elapsed), to the extent necessary to achieve a consistent application of such requirements. In order to facilitate submittal by the States of adequate and approvable plans consistent with the applicable requirements of this chapter, the Administrator shall, as appropriate and from time to time, issue written guidelines, interpretations, and information to the States which shall be available to the public, taking into consideration any such guidelines, interpretations, or information provided before November 15, 1990.

**(e) Future modification of standard**

If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation.

CREDIT(S)

(July 14, 1955, c. 360, Title I, § 172, as added Pub.L. 95-95, Title I, § 129(b), Aug. 7, 1977, 91 Stat. 746; amended Pub.L. 95-190, § 14(a)(55), (56), Nov. 16, 1977, 91 Stat. 1402; Pub.L. 101-549, Title I, § 102(b), Nov. 15, 1990, 104 Stat. 2412.)

Notes of Decisions (59)

42 U.S.C.A. § 7502, 42 USCA § 7502
Current through P.L. 119-111. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment C
42 U.S.C. § 7511a

KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter85. Air Pollution Prevention and Control (Refs & Annos)
Subchapter I. Programs and Activities
Part D. Plan Requirements for Nonattainment Areas
Subpart 2. Additional Provisions for Ozone Nonattainment Areas

42 U.S.C.A. § 7511a

§ 7511a. Plan submissions and requirements

Currentness

**(a) Marginal Areas**

Each State in which all or part of a Marginal Area is located shall, with respect to the Marginal Area (or portion thereof, to the extent specified in this subsection), submit to the Administrator the State implementation plan revisions (including the plan items) described under this subsection except to the extent the State has made such submissions as of November 15, 1990.

**(1) Inventory**

Within 2 years after November 15, 1990, the State shall submit a comprehensive, accurate, current inventory of actual emissions from all sources, as described in section 7502(c)(3) of this title, in accordance with guidance provided by the Administrator.

**(2) Corrections to the State implementation plan**

Within the periods prescribed in this paragraph, the State shall submit a revision to the State implementation plan that meets the following requirements--

**(A) Reasonably available control technology corrections**

For any Marginal Area (or, within the Administrator's discretion, portion thereof) the State shall submit, within 6 months of the date of classification under section 7511(a) of this title, a revision that includes such provisions to correct requirements in (or add requirements to) the plan concerning reasonably available control technology as were required under section 7502(b) of this title (as in effect immediately before November 15, 1990), as interpreted in guidance issued by the Administrator under section 7408 of this title before November 15, 1990.

**(B) Savings clause for vehicle inspection and maintenance**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(i)** For any Marginal Area (or, within the Administrator's discretion, portion thereof), the plan for which already includes, or was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included, a specific schedule for implementation of a vehicle emission control inspection and maintenance program, the State shall submit, immediately after November 15, 1990, a revision that includes any provisions necessary to provide for a vehicle inspection and maintenance program of no less stringency than that of either the program defined in House Report Numbered 95-294, 95th Congress, 1st Session, 281-291 (1977) as interpreted in guidance of the Administrator issued pursuant to section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) or the program already included in the plan, whichever is more stringent.

**(ii)** Within 12 months after November 15, 1990, the Administrator shall review, revise, update, and republish in the Federal Register the guidance for the States for motor vehicle inspection and maintenance programs required by this chapter, taking into consideration the Administrator's investigations and audits of such program. The guidance shall, at a minimum, cover the frequency of inspections, the types of vehicles to be inspected (which shall include leased vehicles that are registered in the nonattainment area), vehicle maintenance by owners and operators, audits by the State, the test method and measures, including whether centralized or decentralized, inspection methods and procedures, quality of inspection, components covered, assurance that a vehicle subject to a recall notice from a manufacturer has complied with that notice, and effective implementation and enforcement, including ensuring that any retesting of a vehicle after a failure shall include proof of corrective action and providing for denial of vehicle registration in the case of tampering or misfueling. The guidance which shall be incorporated in the applicable State implementation plans by the States shall provide the States with continued reasonable flexibility to fashion effective, reasonable, and fair programs for the affected consumer. No later than 2 years after the Administrator promulgates regulations under section 7521(m)(3) of this title (relating to emission control diagnostics), the State shall submit a revision to such program to meet any requirements that the Administrator may prescribe under that section.

**(C) Permit programs**

Within 2 years after November 15, 1990, the State shall submit a revision that includes each of the following:

**(i)** Provisions to require permits, in accordance with sections 7502(c)(5) and 7503 of this title, for the construction and operation of each new or modified major stationary source (with respect to ozone) to be located in the area.

**(ii)** Provisions to correct requirements in (or add requirements to) the plan concerning permit programs as were required under section 7502(b)(6) of this title (as in effect immediately before November 15, 1990), as interpreted in regulations of the Administrator promulgated as of November 15, 1990.

**(3) Periodic inventory**

**(A) General requirement**

No later than the end of each 3-year period after submission of the inventory under paragraph (1) until the area is redesignated to attainment, the State shall submit a revised inventory meeting the requirements of subsection (a)(1).

**(B) Emissions statements**

**(i)** Within 2 years after November 15, 1990, the State shall submit a revision to the State implementation plan to require that the owner or operator of each stationary source of oxides of nitrogen or volatile organic compounds provide the State with a statement, in such form as the Administrator may prescribe (or accept an equivalent alternative developed by the State), for classes or categories of sources, showing the actual emissions of oxides of nitrogen and volatile organic compounds from that source. The first such statement shall be submitted within 3 years after November 15, 1990. Subsequent statements shall be submitted at least every year thereafter. The statement shall contain a certification that the information contained in the statement is accurate to the best knowledge of the individual certifying the statement.

**(ii)** The State may waive the application of clause (i) to any class or category of stationary sources which emit less than 25 tons per year of volatile organic compounds or oxides of nitrogen if the State, in its submissions under subparagraphs [1] (1) or (3)(A), provides an inventory of emissions from such class or category of sources, based on the use of the emission factors established by the Administrator or other methods acceptable to the Administrator.

**(4) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increased emissions of such air pollutant shall be at least 1.1 to 1.

The Administrator may, in the Administrator's discretion, require States to submit a schedule for submitting any of the revisions or other items required under this subsection. The requirements of this subsection shall apply in lieu of any requirement that the State submit a demonstration that the applicable implementation plan provides for attainment of the ozone standard by the applicable attainment date in any Marginal Area. Section 7502(c)(9) of this title (relating to contingency measures) shall not apply to Marginal Areas.

**(b) Moderate Areas**

Each State in which all or part of a Moderate Area is located shall, with respect to the Moderate Area, make the submissions described under subsection (a) of this section (relating to Marginal Areas), and shall also submit the revisions to the applicable implementation plan described under this subsection.

**(1) Plan provisions for reasonable further progress**

**(A) General rule**

**(i)** By no later than 3 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for volatile organic compound emission reductions, within 6 years after November 15, 1990, of at least 15 percent from baseline emissions, accounting for any growth in emissions after 1990. Such plan shall provide for such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen as necessary to attain the national primary ambient air quality standard for ozone by the attainment date applicable under this chapter. This subparagraph shall not apply in the case of oxides of nitrogen for those areas for which the Administrator determines (when the Administrator approves the plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii)** A percentage less than 15 percent may be used for purposes of clause (i) in the case of any State which demonstrates to the satisfaction of the Administrator that--

**(I)** new source review provisions are applicable in the nonattainment areas in the same manner and to the same extent as required under subsection (e) in the case of Extreme Areas (with the exception that, in applying such provisions, the terms "major source" and "major stationary source" shall include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 5 tons per year of volatile organic compounds);

**(II)** reasonably available control technology is required for all existing major sources (as defined in subclause (I)); and

**(III)** the plan reflecting a lesser percentage than 15 percent includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To qualify for a lesser percentage under this clause, a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher category.

**(B) Baseline emissions**

For purposes of subparagraph (A), the term "baseline emissions" means the total amount of actual VOC or $NO_x$ emissions from all anthropogenic sources in the area during the calendar year 1990, excluding emissions that would be eliminated under the regulations described in clauses (i) and (ii) of subparagraph (D).

**(C) General rule for creditability of reductions**

Except as provided under subparagraph (D), emissions reductions are creditable toward the 15 percent required under subparagraph (A) to the extent they have actually occurred, as of 6 years after November 15, 1990, from the implementation of measures required under the applicable implementation plan, rules promulgated by the Administrator, or a permit under subchapter V.

**(D) Limits on creditability of reductions**

Emission reductions from the following measures are not creditable toward the 15 percent reductions required under subparagraph (A):

**(i)** Any measure relating to motor vehicle exhaust or evaporative emissions promulgated by the Administrator by January 1, 1990.

**(ii)** Regulations concerning Reid Vapor Pressure promulgated by the Administrator by November 15, 1990, or required to be promulgated under section 7545(h) of this title.

**(iii)** Measures required under subsection (a)(2)(A) (concerning corrections to implementation plans prescribed under guidance by the Administrator).

**(iv)** Measures required under subsection (a)(2)(B) to be submitted immediately after November 15, 1990 (concerning corrections to motor vehicle inspection and maintenance programs).

**(2) Reasonably available control technology**

The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology under section 7502(c)(1) of this title with respect to each of the following:

**(A)** Each category of VOC sources in the area covered by a CTG document issued by the Administrator between November 15, 1990, and the date of attainment.

**(B)** All VOC sources in the area covered by any CTG issued before November 15, 1990.

**(C)** All other major stationary sources of VOCs that are located in the area.

Each revision described in subparagraph (A) shall be submitted within the period set forth by the Administrator in issuing the relevant CTG document. The revisions with respect to sources described in subparagraphs (B) and (C) shall be submitted by 2 years after November 15, 1990, and shall provide for the implementation of the required measures as expeditiously as practicable but no later than May 31, 1995.

**(3) Gasoline vapor recovery**

**(A) General rule**

Not later than 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to require all owners or operators of gasoline dispensing systems to install and operate, by the date prescribed under subparagraph (B), a system for gasoline vapor recovery of emissions from the fueling of motor vehicles. The Administrator shall issue guidance as appropriate as to the effectiveness of such system. This subparagraph shall apply only to facilities which sell more than 10,000 gallons of gasoline per month (50,000 gallons per month in the case of an independent small business marketer of gasoline as defined in section 7625-1 [2] of this title).

**(B) Effective date**

The date required under subparagraph (A) shall be--

**(i)** 6 months after the adoption date, in the case of gasoline dispensing facilities for which construction commenced after November 15, 1990;

**(ii)** one year after the adoption date, in the case of gasoline dispensing facilities which dispense at least 100,000 gallons of gasoline per month, based on average monthly sales for the 2-year period before the adoption date; or

**(iii)** 2 years after the adoption date, in the case of all other gasoline dispensing facilities.

Any gasoline dispensing facility described under both clause (i) and clause (ii) shall meet the requirements of clause (i).

**(C) Reference to terms**

For purposes of this paragraph, any reference to the term "adoption date" shall be considered a reference to the date of adoption by the State of requirements for the installation and operation of a system for gasoline vapor recovery of emissions from the fueling of motor vehicles.

**(4) Motor vehicle inspection and maintenance**

For all Moderate Areas, the State shall submit, immediately after November 15, 1990, a revision to the applicable implementation plan that includes provisions necessary to provide for a vehicle inspection and maintenance program as described in subsection (a)(2)(B) (without regard to whether or not the area was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included a specific schedule for implementation of such a program).

**(5) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase[3] emissions of such air pollutant shall be at least 1.15 to 1.

**(c) Serious Areas**

Except as otherwise specified in paragraph (4), each State in which all or part of a Serious Area is located shall, with respect to the Serious Area (or portion thereof, to the extent specified in this subsection), make the submissions described under subsection (b) (relating to Moderate Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. For any Serious Area, the terms "major source" and "major stationary source" include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 50 tons per year of volatile organic compounds.

**(1) Enhanced monitoring**

In order to obtain more comprehensive and representative data on ozone air pollution, not later than 18 months after November 15, 1990, the Administrator shall promulgate rules, after notice and public comment, for enhanced monitoring of ozone, oxides of nitrogen, and volatile organic compounds. The rules shall, among other things, cover the location and maintenance of monitors. Immediately following the promulgation of rules by the Administrator relating to enhanced monitoring, the State shall commence such actions as may be necessary to adopt and implement a program based on such

rules, to improve monitoring for ambient concentrations of ozone, oxides of nitrogen and volatile organic compounds and to improve monitoring of emissions of oxides of nitrogen and volatile organic compounds. Each State implementation plan for the area shall contain measures to improve the ambient monitoring of such air pollutants.

**(2) Attainment and reasonable further progress demonstrations**

Within 4 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan that includes each of the following:

**(A) Attainment demonstration**

A demonstration that the plan, as revised, will provide for attainment of the ozone national ambient air quality standard by the applicable attainment date. This attainment demonstration must be based on photochemical grid modeling or any other analytical method determined by the Administrator, in the Administrator's discretion, to be at least as effective.

**(B) Reasonable further progress demonstration**

A demonstration that the plan, as revised, will result in VOC emissions reductions from the baseline emissions described in subsection (b)(1)(B) equal to the following amount averaged over each consecutive 3-year period beginning 6 years after November 15, 1990, until the attainment date:

**(i)** at least 3 percent of baseline emissions each year; or

**(ii)** an amount less than 3 percent of such baseline emissions each year, if the State demonstrates to the satisfaction of the Administrator that the plan reflecting such lesser amount includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To lessen the 3 percent requirement under clause (ii), a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher classification. Any determination to lessen the 3 percent requirement shall be reviewed at each milestone under subsection (g) and revised to reflect such new measures (if any) achieved in practice by sources in the same category in any State, allowing a reasonable time to implement such measures. The emission reductions described in this subparagraph shall be calculated in accordance with subsection (b)(1)(C) and (D) (concerning creditability of reductions). The reductions creditable for the period beginning 6 years after November 15, 1990, shall include reductions that occurred before such period, computed in accordance with subsection (b)(1), that exceed the 15-percent amount of reductions required under subsection (b)(1)(A).

**(C) $NO_x$ control**

The revision may contain, in lieu of the demonstration required under subparagraph (B), a demonstration to the satisfaction of the Administrator that the applicable implementation plan, as revised, provides for reductions of emissions of VOC's and oxides of nitrogen (calculated according to the creditability provisions of subsection (b)(1)(C) and (D)), that would result in a reduction in ozone concentrations at least equivalent to that which would result from the amount of VOC emission reductions required under subparagraph (B). Within 1 year after November 15, 1990, the Administrator shall issue guidance concerning the conditions under which $NO_x$ control may be substituted for VOC control or may be combined with VOC

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

control in order to maximize the reduction in ozone air pollution. In accord with such guidance, a lesser percentage of VOCs may be accepted as an adequate demonstration for purposes of this subsection.

**(3) Enhanced vehicle inspection and maintenance program**

**(A) Requirement for submission**

Within 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for an enhanced program to reduce hydrocarbon emissions and $NO_X$ emissions from in-use motor vehicles registered in each urbanized area (in the nonattainment area), as defined by the Bureau of the Census, with a 1980 population of 200,000 or more.

**(B) Effective date of State programs; guidance**

The State program required under subparagraph (A) shall take effect no later than 2 years from November 15, 1990, and shall comply in all respects with guidance published in the Federal Register (and from time to time revised) by the Administrator for enhanced vehicle inspection and maintenance programs. Such guidance shall include--

**(i)** a performance standard achievable by a program combining emission testing, including on-road emission testing, with inspection to detect tampering with emission control devices and misfueling for all light-duty vehicles and all light-duty trucks subject to standards under section 7521 of this title; and

**(ii)** program administration features necessary to reasonably assure that adequate management resources, tools, and practices are in place to attain and maintain the performance standard.

Compliance with the performance standard under clause (i) shall be determined using a method to be established by the Administrator.

**(C) State program**

The State program required under subparagraph (A) shall include, at a minimum, each of the following elements--

**(i)** Computerized emission analyzers, including on-road testing devices.

**(ii)** No waivers for vehicles and parts covered by the emission control performance warranty as provided for in section 7541(b) of this title unless a warranty remedy has been denied in writing, or for tampering-related repairs.

**(iii)** In view of the air quality purpose of the program, if, for any vehicle, waivers are permitted for emissions-related repairs not covered by warranty, an expenditure to qualify for the waiver of an amount of $450 or more for such repairs (adjusted annually as determined by the Administrator on the basis of the Consumer Price Index in the same manner as provided in subchapter V).

**(iv)** Enforcement through denial of vehicle registration (except for any program in operation before November 15, 1990, whose enforcement mechanism is demonstrated to the Administrator to be more effective than the applicable vehicle registration program in assuring that noncomplying vehicles are not operated on public roads).

**(v)** Annual emission testing and necessary adjustment, repair, and maintenance, unless the State demonstrates to the satisfaction of the Administrator that a biennial inspection, in combination with other features of the program which exceed the requirements of this chapter, will result in emission reductions which equal or exceed the reductions which can be obtained through such annual inspections.

**(vi)** Operation of the program on a centralized basis, unless the State demonstrates to the satisfaction of the Administrator that a decentralized program will be equally effective. An electronically connected testing system, a licensing system, or other measures (or any combination thereof) may be considered, in accordance with criteria established by the Administrator, as equally effective for such purposes.

**(vii)** Inspection of emission control diagnostic systems and the maintenance or repair of malfunctions or system deterioration identified by or affecting such diagnostics systems.

Each State shall biennially prepare a report to the Administrator which assesses the emission reductions achieved by the program required under this paragraph based on data collected during inspection and repair of vehicles. The methods used to assess the emission reductions shall be those established by the Administrator.

**(4) Clean-fuel vehicle programs**

**(A)** Except to the extent that substitute provisions have been approved by the Administrator under subparagraph (B), the State shall submit to the Administrator, within 42 months of November 15, 1990, a revision to the applicable implementation plan for each area described under part C of subchapter II to include such measures as may be necessary to ensure the effectiveness of the applicable provisions of the clean-fuel vehicle program prescribed under part C of subchapter II, including all measures necessary to make the use of clean alternative fuels in clean-fuel vehicles (as defined in part C of subchapter II) economic from the standpoint of vehicle owners. Such a revision shall also be submitted for each area that opts into the clean fuel-vehicle program as provided in part C of subchapter II.

**(B)** The Administrator shall approve, as a substitute for all or a portion of the clean-fuel vehicle program prescribed under part C of subchapter II, any revision to the relevant applicable implementation plan that in the Administrator's judgment will achieve long-term reductions in ozone-producing and toxic air emissions equal to those achieved under part C of subchapter II, or the percentage thereof attributable to the portion of the clean-fuel vehicle program for which the revision is to substitute. The Administrator may approve such revision only if it consists exclusively of provisions other than those required under this chapter for the area. Any State seeking approval of such revision must submit the revision to the Administrator within 24 months of November 15, 1990. The Administrator shall approve or disapprove any such revision within 30 months of November 15, 1990. The Administrator shall publish the revision submitted by a State in the Federal Register upon receipt. Such notice shall constitute a notice of proposed rulemaking on whether or not to approve such revision and shall be deemed to comply with the requirements concerning notices of proposed rulemaking contained in sections 553 through 557 of Title 5 (related to notice and comment). Where the Administrator approves such revision for any area, the State need not submit the revision required by subparagraph (A) for the area with respect to the portions of the Federal clean-fuel vehicle program for which the Administrator has approved the revision as a substitute.

**(C)** If the Administrator determines, under section 7509 of this title, that the State has failed to submit any portion of the program required under subparagraph (A), then, in addition to any sanctions available under section 7509 of this title, the State may not receive credit, in any demonstration of attainment or reasonable further progress for the area, for any emission reductions from implementation of the corresponding aspects of the Federal clean-fuel vehicle requirements established in part C of subchapter II.

**(5) Transportation control**

**(A)** [4] Beginning 6 years after November 15, 1990, and each third year thereafter, the State shall submit a demonstration as to whether current aggregate vehicle mileage, aggregate vehicle emissions, congestion levels, and other relevant parameters are consistent with those used for the area's demonstration of attainment. Where such parameters and emissions levels exceed the levels projected for purposes of the area's attainment demonstration, the State shall within 18 months develop and submit a revision of the applicable implementation plan that includes a transportation control measures program consisting of measures from, but not limited to, section 7408(f) of this title that will reduce emissions to levels that are consistent with emission levels projected in such demonstration. In considering such measures, the State should ensure adequate access to downtown, other commercial, and residential areas and should avoid measures that increase or relocate emissions and congestion rather than reduce them. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(e) of this title and with the requirements of section 7504(b) of this title and shall include implementation and funding schedules that achieve expeditious emissions reductions in accordance with implementation plan projections.

**(6) De minimis rule**

The new source review provisions under this part shall ensure that increased emissions of volatile organic compounds resulting from any physical change in, or change in the method of operation of, a stationary source located in the area shall not be considered de minimis for purposes of determining the applicability of the permit requirements established by this chapter unless the increase in net emissions of such air pollutant from such source does not exceed 25 tons when aggregated with all other net increases in emissions from the source over any period of 5 consecutive calendar years which includes the calendar year in which such increase occurred.

**(7) Special rule for modifications of sources emitting less than 100 tons**

In the case of any major stationary source of volatile organic compounds located in the area (other than a source which emits or has the potential to emit 100 tons or more of volatile organic compounds per year), whenever any change (as described in section 7411(a)(4) of this title) at that source results in any increase (other than a de minimis increase) in emissions of volatile organic compounds from any discrete operation, unit, or other pollutant emitting activity at the source, such increase shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that such increase shall not be considered a modification for such purposes if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of volatile organic compounds concerned from other operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1. If the owner or operator does not make such election, such change shall be considered a modification for such purposes, but in applying section 7503(a)(2) of this title in the case of any such modification, the best available control technology (BACT), as defined in section 7479 of this title, shall be substituted for the lowest achievable emission rate (LAER). The Administrator shall establish and publish policies and procedures for implementing the provisions of this paragraph.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(8) Special rule for modifications of sources emitting 100 tons or more**

In the case of any major stationary source of volatile organic compounds located in the area which emits or has the potential to emit 100 tons or more of volatile organic compounds per year, whenever any change (as described in section 7411(a)(4) of this title) at that source results in any increase (other than a de minimis increase) in emissions of volatile organic compounds from any discrete operation, unit, or other pollutant emitting activity at the source, such increase shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of volatile organic compounds from other operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1, the requirements of section 7503(a)(2) of this title (concerning the lowest achievable emission rate (LAER)) shall not apply.

**(9) Contingency provisions**

In addition to the contingency provisions required under section 7502(c)(9) of this title, the plan revision shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone. Such measures shall be included in the plan revision as contingency measures to take effect without further action by the State or the Administrator upon a failure by the State to meet the applicable milestone.

**(10) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase emissions of such air pollutant shall be at least 1.2 to 1.

Any reference to "attainment date" in subsection (b), which is incorporated by reference into this subsection, shall refer to the attainment date for serious areas.

**(d) Severe Areas**

Each State in which all or part of a Severe Area is located shall, with respect to the Severe Area, make the submissions described under subsection (c) (relating to Serious Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. For any Severe Area, the terms "major source" and "major stationary source" include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 25 tons per year of volatile organic compounds.

**(1) Vehicle miles traveled**

**(A)** Within 2 years after November 15, 1990, the State shall submit a revision that identifies and adopts specific enforceable transportation control strategies and transportation control measures to offset any growth in emissions from growth in vehicle miles traveled or numbers of vehicle trips in such area and to attain reduction in motor vehicle emissions as necessary, in combination with other emission reduction requirements of this subpart, to comply with the requirements of subsection[5] (b)(2)(B) and (c)(2)(B) (pertaining to periodic emissions reduction requirements). The State shall consider measures specified in section 7408(f) of this title, and choose from among and implement such measures as necessary to demonstrate attainment with the national ambient air quality standards; in considering such measures, the State should ensure adequate access

to downtown, other commercial, and residential areas and should avoid measures that increase or relocate emissions and congestion rather than reduce them.

**(B)** The State may also, in its discretion, submit a revision at any time requiring employers in such area to implement programs to reduce work-related vehicle trips and miles travelled by employees. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(f) of this title and may require that employers in such area increase average passenger occupancy per vehicle in commuting trips between home and the workplace during peak travel periods. The guidance of the Administrator may specify average vehicle occupancy rates which vary for locations within a nonattainment area (suburban, center city, business district) or among nonattainment areas reflecting existing occupancy rates and the availability of high occupancy modes. Any State required to submit a revision under this subparagraph (as in effect before December 23, 1995) containing provisions requiring employers to reduce work-related vehicle trips and miles travelled by employees may, in accordance with State law, remove such provisions from the implementation plan, or withdraw its submission, if the State notifies the Administrator, in writing, that the State has undertaken, or will undertake, one or more alternative methods that will achieve emission reductions equivalent to those to be achieved by the removed or withdrawn provisions.

**(2) Offset requirement**

For purposes of satisfying the offset requirements pursuant to this part, the ratio of total emission reductions of VOCs to total increased emissions of such air pollutant shall be at least 1.3 to 1, except that if the State plan requires all existing major sources in the nonattainment area to use best available control technology (as defined in section 7479(3) of this title) for the control of volatile organic compounds, the ratio shall be at least 1.2 to 1.

**(3) Enforcement under section 7511d**

By December 31, 2000, the State shall submit a plan revision which includes the provisions required under section 7511d of this title.

Any reference to the term "attainment date" in subsection (b) or (c), which is incorporated by reference into this subsection (d), shall refer to the attainment date for Severe Areas.

**(e) Extreme Areas**

Each State in which all or part of an Extreme Area is located shall, with respect to the Extreme Area, make the submissions described under subsection (d) (relating to Severe Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. The provisions of clause (ii) of subsection (c)(2)(B) (relating to reductions of less than 3 percent), the provisions of paragraphs [6] (6), (7) and (8) of subsection (c) (relating to de minimus [7] rule and modification of sources), and the provisions of clause (ii) of subsection (b)(1)(A) (relating to reductions of less than 15 percent) shall not apply in the case of an Extreme Area. For any Extreme Area, the terms "major source" and "major stationary source" includes [8] (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 10 tons per year of volatile organic compounds.

**(1) Offset requirement**

For purposes of satisfying the offset requirements pursuant to this part, the ratio of total emission reductions of VOCs to total increased emissions of such air pollutant shall be at least 1.5 to 1, except that if the State plan requires all existing major sources in the nonattainment area to use best available control technology (as defined in section 7479(3) of this title) for the control of volatile organic compounds, the ratio shall be at least 1.2 to 1.

**(2) Modifications**

Any change (as described in section 7411(a)(4) of this title) at a major stationary source which results in any increase in emissions from any discrete operation, unit, or other pollutant emitting activity at the source shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that for purposes of complying with the offset requirement pursuant to section 7503(a)(1) of this title, any such increase shall not be considered a modification if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of the air pollutant concerned from other discrete operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1. The offset requirements of this part shall not be applicable in Extreme Areas to a modification of an existing source if such modification consists of installation of equipment required to comply with the applicable implementation plan, permit, or this chapter.

**(3) Use of clean fuels or advanced control technology**

For Extreme Areas, a plan revision shall be submitted within 3 years after November 15, 1990, to require, effective 8 years after November 15, 1990, that each new, modified, and existing electric utility and industrial and commercial boiler which emits more than 25 tons per year of oxides of nitrogen--

**(A)** burn as its primary fuel natural gas, methanol, or ethanol (or a comparably low polluting fuel), or

**(B)** use advanced control technology (such as catalytic control technology or other comparably effective control methods) for reduction of emissions of oxides of nitrogen.

For purposes of this subsection, the term "primary fuel" means the fuel which is used 90 percent or more of the operating time. This paragraph shall not apply during any natural gas supply emergency (as defined in title III of the Natural Gas Policy Act of 1978).

**(4) Traffic control measures during heavy traffic hours**

For Extreme Areas, each implementation plan revision under this subsection may contain provisions establishing traffic control measures applicable during heavy traffic hours to reduce the use of high polluting vehicles or heavy-duty vehicles, notwithstanding any other provision of law.

**(5) New technologies**

The Administrator may, in accordance with section 7410 of this title, approve provisions of an implementation plan for an Extreme Area which anticipate development of new control techniques or improvement of existing control technologies, and an attainment demonstration based on such provisions, if the State demonstrates to the satisfaction of the Administrator that--

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(A)** such provisions are not necessary to achieve the incremental emission reductions required during the first 10 years after November 15, 1990; and

**(B)** the State has submitted enforceable commitments to develop and adopt contingency measures to be implemented as set forth herein if the anticipated technologies do not achieve planned reductions.

Such contingency measures shall be submitted to the Administrator no later than 3 years before proposed implementation of the plan provisions and approved or disapproved by the Administrator in accordance with section 7410 of this title. The contingency measures shall be adequate to produce emission reductions sufficient, in conjunction with other approved plan provisions, to achieve the periodic emission reductions required by subsection (b)(1) or (c)(2) and attainment by the applicable dates. If the Administrator determines that an Extreme Area has failed to achieve an emission reduction requirement set forth in subsection (b)(1) or (c)(2), and that such failure is due in whole or part to an inability to fully implement provisions approved pursuant to this subsection, the Administrator shall require the State to implement the contingency measures to the extent necessary to assure compliance with subsections (b)(1) and (c)(2).

Any reference to the term "attainment date" in subsection (b), (c), or (d) which is incorporated by reference into this subsection, shall refer to the attainment date for Extreme Areas.

**(f) $NO_x$ requirements**

**(1)** The plan provisions required under this subpart for major stationary sources of volatile organic compounds shall also apply to major stationary sources (as defined in section 7602 of this title and subsections (c), (d), and (e) of this section) of oxides of nitrogen. This subsection shall not apply in the case of oxides of nitrogen for those sources for which the Administrator determines (when the Administrator approves a plan or plan revision) that net air quality benefits are greater in the absence of reductions of oxides of nitrogen from the sources concerned. This subsection shall also not apply in the case of oxides of nitrogen for--

**(A)** nonattainment areas not within an ozone transport region under section 7511c of this title, if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

**(B)** nonattainment areas within such an ozone transport region if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not produce net ozone air quality benefits in such region.

The Administrator shall, in the Administrator's determinations, consider the study required under section 7511f of this title.

**(2)(A)** If the Administrator determines that excess reductions in emissions of $NO_X$ would be achieved under paragraph (1), the Administrator may limit the application of paragraph (1) to the extent necessary to avoid achieving such excess reductions.

**(B)** For purposes of this paragraph, excess reductions in emissions of $NO_X$ are emission reductions for which the Administrator determines that net air quality benefits are greater in the absence of such reductions. Alternatively, for purposes of this paragraph, excess reductions in emissions of $NO_X$ are, for--

**(i)** nonattainment areas not within an ozone transport region under section 7511c of this title, emission reductions that the Administrator determines would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

**(ii)** nonattainment areas within such ozone transport region, emission reductions that the Administrator determines would not produce net ozone air quality benefits in such region.

**(3)** At any time after the final report under section 7511f of this title is submitted to Congress, a person may petition the Administrator for a determination under paragraph (1) or (2) with respect to any nonattainment area or any ozone transport region under section 7511c of this title. The Administrator shall grant or deny such petition within 6 months after its filing with the Administrator.

**(g) Milestones**

**(1) Reductions in emissions**

6 years after November 15, 1990, and at intervals of every 3 years thereafter, the State shall determine whether each nonattainment area (other than an area classified as Marginal or Moderate) has achieved a reduction in emissions during the preceding intervals equivalent to the total emission reductions required to be achieved by the end of such interval pursuant to subsection (b)(1) and the corresponding requirements of subsections (c)(2)(B) and (C), (d), and (e). Such reduction shall be referred to in this section as an applicable milestone.

**(2) Compliance demonstration**

For each nonattainment area referred to in paragraph (1), not later than 90 days after the date on which an applicable milestone occurs (not including an attainment date on which a milestone occurs in cases where the standard has been attained), each State in which all or part of such area is located shall submit to the Administrator a demonstration that the milestone has been met. A demonstration under this paragraph shall be submitted in such form and manner, and shall contain such information and analysis, as the Administrator shall require, by rule. The Administrator shall determine whether or not a State's demonstration is adequate within 90 days after the Administrator's receipt of a demonstration which contains the information and analysis required by the Administrator.

**(3) Serious and Severe Areas; State election**

If a State fails to submit a demonstration under paragraph (2) for any Serious or Severe Area within the required period or if the Administrator determines that the area has not met any applicable milestone, the State shall elect, within 90 days after such failure or determination--

**(A)** to have the area reclassified to the next higher classification,

**(B)** to implement specific additional measures adequate, as determined by the Administrator, to meet the next milestone as provided in the applicable contingency plan, or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(C)** to adopt an economic incentive program as described in paragraph (4).

If the State makes an election under subparagraph (B), the Administrator shall, within 90 days after the election, review such plan and shall, if the Administrator finds the contingency plan inadequate, require further measures necessary to meet such milestone. Once the State makes an election, it shall be deemed accepted by the Administrator as meeting the election requirement. If the State fails to make an election required under this paragraph within the required 90-day period or within 6 months thereafter, the area shall be reclassified to the next higher classification by operation of law at the expiration of such 6-month period. Within 12 months after the date required for the State to make an election, the State shall submit a revision of the applicable implementation plan for the area that meets the requirements of this paragraph. The Administrator shall review such plan revision and approve or disapprove the revision within 9 months after the date of its submission.

**(4) Economic incentive program**

**(A)** An economic incentive program under this paragraph shall be consistent with rules published by the Administrator and sufficient, in combination with other elements of the State plan, to achieve the next milestone. The State program may include a nondiscriminatory system, consistent with applicable law regarding interstate commerce, of State established emissions fees or a system of marketable permits, or a system of State fees on sale or manufacture of products the use of which contributes to ozone formation, or any combination of the foregoing or other similar measures. The program may also include incentives and requirements to reduce vehicle emissions and vehicle miles traveled in the area, including any of the transportation control measures identified in section 7408(f) of this title.

**(B)** Within 2 years after November 15, 1990, the Administrator shall publish rules for the programs to be adopted pursuant to subparagraph (A). Such rules shall include model plan provisions which may be adopted for reducing emissions from permitted stationary sources, area sources, and mobile sources. The guidelines shall require that any revenues generated by the plan provisions adopted pursuant to subparagraph (A) shall be used by the State for any of the following:

**(i)** Providing incentives for achieving emission reductions.

**(ii)** Providing assistance for the development of innovative technologies for the control of ozone air pollution and for the development of lower-polluting solvents and surface coatings. Such assistance shall not provide for the payment of more than 75 percent of either the costs of any project to develop such a technology or the costs of development of a lower-polluting solvent or surface coating.

**(iii)** Funding the administrative costs of State programs under this chapter. Not more than 50 percent of such revenues may be used for purposes of this clause.

**(5) Extreme Areas**

If a State fails to submit a demonstration under paragraph (2) for any Extreme Area within the required period, or if the Administrator determines that the area has not met any applicable milestone, the State shall, within 9 months after such failure or determination, submit a plan revision to implement an economic incentive program which meets the requirements

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of paragraph (4). The Administrator shall review such plan revision and approve or disapprove the revision within 9 months after the date of its submission.

**(h) Rural transport areas**

**(1)** Notwithstanding any other provision of section 7511 of this title or this section, a State containing an ozone nonattainment area that does not include, and is not adjacent to, any part of a Metropolitan Statistical Area or, where one exists, a Consolidated Metropolitan Statistical Area (as defined by the United States Bureau of the Census), which area is treated by the Administrator, in the Administrator's discretion, as a rural transport area within the meaning of paragraph (2), shall be treated by operation of law as satisfying the requirements of this section if it makes the submissions required under subsection (a) of this section (relating to marginal areas).

**(2)** The Administrator may treat an ozone nonattainment area as a rural transport area if the Administrator finds that sources of VOC (and, where the Administrator determines relevant, $NO_x$) emissions within the area do not make a significant contribution to the ozone concentrations measured in the area or in other areas.

**(i) Reclassified areas**

Each State containing an ozone nonattainment area reclassified under section 7511(b)(2) of this title shall meet such requirements of subsections (b) through (d) of this section as may be applicable to the area as reclassified, according to the schedules prescribed in connection with such requirements, except that the Administrator may adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions.

**(j) Multi-State ozone nonattainment areas**

**(1) Coordination among States**

Each State in which there is located a portion of a single ozone nonattainment area which covers more than one State (hereinafter in this section referred to as a “multi-State ozone nonattainment area”) shall--

**(A)** take all reasonable steps to coordinate, substantively and procedurally, the revisions and implementation of State implementation plans applicable to the nonattainment area concerned; and

**(B)** use photochemical grid modeling or any other analytical method determined by the Administrator, in his discretion, to be at least as effective.

The Administrator may not approve any revision of a State implementation plan submitted under this part for a State in which part of a multi-State ozone nonattainment area is located if the plan revision for that State fails to comply with the requirements of this subsection.

**(2) Failure to demonstrate attainment**

If any State in which there is located a portion of a multi-State ozone nonattainment area fails to provide a demonstration of attainment of the national ambient air quality standard for ozone in that portion within the required period, the State may petition the Administrator to make a finding that the State would have been able to make such demonstration but for the failure of one or more other States in which other portions of the area are located to commit to the implementation of all measures required under this section (relating to plan submissions and requirements for ozone nonattainment areas). If the Administrator makes such finding, the provisions of section 7509 of this title (relating to sanctions) shall not apply, by reason of the failure to make such demonstration, in the portion of the multi-State ozone nonattainment area within the State submitting such petition.

CREDIT(S)

(July 14, 1955, c. 360, Title I, § 182, as added Pub.L. 101-549, Title I, § 103, Nov. 15, 1990, 104 Stat. 2426; amended Pub.L. 104-70, § 1, Dec. 23, 1995, 109 Stat. 773.)

Notes of Decisions (28)

## Footnotes

1 So in original. Probably should be "subparagraph".

2 So in original. Probably should be section "7625".

3 So in original. Probably should be "increased".

4 So in original. No subpar. (B) has been enacted.

5 So in original. Probably should be "subsections".

6 So in original. Probably should be "paragraphs".

7 So in original. Probably should be "de minimis".

8 So in original. Probably should be "include".

42 U.S.C.A. § 7511a, 42 USCA § 7511a
Current through P.L. 119-111. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment D

Petitioners' Opening Brief, *Ctr. for Biological Diversity v. Evn't Prot. Agency*, No. 26-9548 (10th Cir. Sep. 18, 2026)

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 26-9548

CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator,

*Respondents.*

STATE OF COLORADO,

*Respondent-Intervenor.*

On Petition for Review of Final Action of the U.S. Environmental Protection Agency (EPA Docket No. EPA-R08-OAR-2024-0622)

# PETITIONERS' OPENING BRIEF

Ryan Maher
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
781-325-6303
rmaher@biologicaldiversity.org
*Counsel for Petitioners*

Benjamin Rankin
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
202-849-8402
brankin@biologicaldiversity.org
*Counsel for Petitioners*

* Oral Argument Requested

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............ iii
GLOSSARY OF ACRONYMS AND ABBREVIATIONS ............ x
INTRODUCTION ............ 1
JURISDICTIONAL STATEMENT ............ 3
STANDING ............ 4
STATEMENT OF THE ISSUES ............ 8
STATEMENT OF THE CASE ............ 9
I. The Denver area's enduring ozone problem ............ 9
II. The Clean Air Act's strategy for addressing ozone pollution ............ 12
A. National Ambient Air Quality Standards ............ 12
B. State Implementation Plans ............ 14
C. Nonattainment area requirements ............ 16
D. Section 110(*l*) of the Act ............ 17
III. The Clean Air Act's "contingency measures" requirement ............ 18
IV. EPA and Colorado's repeated failure to attain the ozone NAAQS ............ 21
V. Ozone contingency measures for the Denver area ............ 22
VI. Rulemaking history ............ 26
STANDARD OF REVIEW ............ 27
SUMMARY OF THE ARGUMENT ............ 29
ARGUMENT ............ 31
I. EPA's approval of Colorado's contingency measure in reliance on non-statutory, standardless considerations of feasibility violates the Clean Air Act and is arbitrary ............ 31
A. EPA exceeded its authority under the Clean Air Act by premising its approval on considerations of feasibility. ............ 32
B. The Clean Air Act does not afford EPA discretion to consider feasibility for contingency measures. ............ 37
C. EPA's standardless considerations of feasibility demonstrate that the agency's interpretation contravenes the Clean Air Act. ............ 42
II. EPA's failure to analyze the NOx emissions increases resulting from Colorado's contingency measure violates Section 110(*l*) of the Act and is arbitrary. ............ 46

A. EPA violated Section 110(*l*) of the Clean Air Act by failing to analyze the increases in NOx pollution resulting from Colorado's contingency measure. 48

B. EPA failed to consider several important aspects of the problem resulting from the NOx increases in its application of the "wholistic impact" approach. 55

III. Sections 172(c)(9) and 182(c)(9) do not condone a contingency measure that provides *de minimis* emissions reductions. 58

IV. Remedy 60

CONCLUSION 61
ORAL ARGUMENT STATEMENT 62
CERTIFICATE OF SERVICE 63
CERTIFICATE OF DIGITAL SUBMISSION 63
CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT 64

ATTACHMENT 1: EPA Final Rule, 91 Fed. Reg. 17,857 (Apr. 9, 2026)
ATTACHMENT 2: Declaration of Jonathan Evans (Sept. 15, 2026)
ATTACHMENT 3: Declaration of Scott Silber (Sept. 17, 2026)
ATTACHMENT 4: Declaration of Jeremy Nichols (Sept. 15, 2026)

## TABLE OF AUTHORITIES

### CASES

*Alaska Dep't of Envtl. Conservation v. EPA*
540 U.S. 461 (2004) .......... 27
*Allen v. United Props. & Constr., Inc.*
2008 WL 4748511 (D. Colo. Oct. 28, 2008) .......... 9
*Am. Great Lakes Ports Ass'n v. Schultz*
962 F.3d 510 (D.C. Cir. 2020) .......... 60
*Ass 'n of lrritated Residents v. EPA*
10 F.4th 937 (9th Cir. 2021) .......... 19, 21
*Ass'n of Irritated Residents v. EPA*
790 F.3d 934 (9th Cir. 2015) .......... 14
*Bahr v. EPA*
836 F.3d 1218 (9th Cir. 2016) .......... 20
*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*
72 F.4th 284 (D.C. Cir. 2023) .......... 12, 14, 17
*Border Power Plant Working Group v. DOE*
260 F. Supp. 2d 997 (S.D. Cal. 2003) .......... 56
*Catawba County v. EPA*
571 F.3d 20 (D.C. Cir. 2009) .......... 14, 57
*Cemex Inc. v. DOI*
560 F. Supp. 268 (D.D.C. 2021) .......... 60
*Center for Biological Diversity v. EPA*
129 F.4th 1266 (10th Cir. 2025) .......... 17, 49, 52
*Center for Biological Diversity v. EPA*
149 F.4th 1142 (10th Cir. 2025) .......... 12
*Center for Biological Diversity v. EPA*
75 F.4th 174 (3d Cir. 2023) .......... 17, 52
*Center for Biological Diversity v. EPA*
82 F.4th 959 (10th Cir. 2023) .......... 13, 14, 15, 17
*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
467 U.S. 837 (1984) .......... 37
*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971) .......... 27
*City of Chicago v. Env't Def. Fund*
511 U.S. 328 (1994) .......... 33

*Comm. for a Better Arvin v. EPA*
786 F.3d 1169 (9th Cir. 2015) ........ 58, 59
*Committee for a Better Arvin v. EPA*
185 F.4th 957 (9th Cir. 2026) ........ 3, 33, 34, 36, 39
*Dep't of Homeland Sec. v. MacLean*
574 U.S. 383 (2015) ........ 33, 36
*Dep't of Treasury, IRS v. FLRA*
494 U.S. 922 (1990) ........ 39
*Eagle Cnty. v. Surface Transp. Bd.*
82 F.4th 1152 (D.C. Cir. 2023) ........ 60
*Hall v. EPA*
273 F.3d 1146 (9th Cir. 2001) ........ 54
*Hunt v. Washington State Apple Advertising Comm'n*
432 U.S. 333 (1977) ........ 5
*In re Core Commc'ns, Inc.*
531 F.3d 849 (D.C. Cir. 2008) ........ 61
*Kelley v. City of Albuquerque*
542 F.3d 802 (2008) ........ 52
*Ky. Res. Council, Inc. v. EPA*
467 F.3d 986 (6th Cir. 2006) ........ 49
*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024) ........ 28, 36, 37
*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ........ 5
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ........ 28, 43, 54
*Nebraska v. EPA*
331 F.3d 995 (D.C. Cir. 2003) ........ 10
*NRDC v. EPA*
489 F.3d 1250 (D.C. Cir. 2007) ........ 60
*Oklahoma v. EPA*
723 F.3d 1201 (10th Cir. 2013) ........ 27
*Olenhouse v. Commodity Credit Corp.*
42 F.3d 1560 (10th Cir. 1994) ........ 28
*Rodway v. U.S. Dep't of Agriculture*
514 F.2d 809 (D.C. Cir. 1975) ........ 61
*Sierra Club de P.R. v. EPA*
815 F.3d 22 (D.C. Cir. 2016) ........ 13

*Sierra Club v. EPA*
21 F.4th 815 (D.C. Cir. 2021) .......... 21, 23
*Sierra Club v. EPA*
356 F.3d 296 (D.C. Cir. 2004) .......... 46
*Sierra Club v. EPA*
99 F.3d 1551 (10th Cir. 1996) .......... 11, 27
*Skaff v. Meridien N. Am. Beverly Hills, LLC*
506 F.3d 832 (9th Cir. 2007) .......... 58
*U.S. Magnesium, LLC v. EPA*
690 F.3d 1157 (10th Cir. 2012) .......... 12
*Union Elec. Co. v. EPA*
427 U.S. 246 (1976) .......... 12, 33, 38
*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*
21 F.4th 1229 (10th Cir. 2021) .......... 7, 15
*WildEarth Guardians v. EPA*
759 F.3d 1064 (9th Cir. 2014) .......... 49

**STATUTES**

42 U.S.C. § 7401 .......... 12
42 U.S.C. § 7407 .......... 14, 55
42 U.S.C. § 7408 .......... 13, 35
42 U.S.C. § 7409 .......... 13
42 U.S.C. § 7410 .......... 14, 15, 23, 39, 52
42 U.S.C. § 7410(*l*) .......... 17, 18, 48, 52, 53
42 U.S.C. § 7412 .......... 11, 34
42 U.S.C. § 7413 .......... 15
42 U.S.C. § 7502 .......... 33, 52
42 U.S.C. § 7502(a)(2) .......... 16
42 U.S.C. § 7502(a)(2)(A) .......... 16
42 U.S.C. § 7502(c)(6) .......... 15
42 U.S.C. § 7502(c)(9) .......... 18, 19, 31, 58
42 U.S.C. § 7509 .......... 40
42 U.S.C. § 7511 .......... 16
42 U.S.C. § 7511a .......... 16, 17
42 U.S.C. § 7511a(c)(9) .......... 18, 20, 31, 58
42 U.S.C. § 7511b .......... 34, 42
42 U.S.C. § 7513 .......... 42
42 U.S.C. § 7513(e) .......... 34
42 U.S.C. § 7513a .......... 42

42 U.S.C. § 7513b ... 42
42 U.S.C. § 7521 ... 35
42 U.S.C. § 7546 ... 35
42 U.S.C. § 7585 ... 35
42 U.S.C. § 7604(a) ... 15
42 U.S.C. § 7607(b)(1) ... 3
42 U.S.C. § 7625-1 ... 35
5 U.S.C. § 706 ... 27, 40

**OTHER AUTHORITIES**

73 Fed. Reg. 16,436 (Mar. 27, 2008) ... 13
75 Fed. Reg. 6,474 (Feb. 9, 2010) ... 11, 13
76 Fed. Reg. 69,896 (Nov. 9, 2011) ... 59
80 Fed. Reg. 65,292 (Oct. 26, 2015) ... 10
81 Fed. Reg. 26,697 (May 4, 2016) ... 22
81 Fed. Reg. 6,616 (Feb. 8, 2016) ... 18, 48
84 Fed. Reg. 70,897 (Dec. 26, 2019) ... 22
87 Fed. Reg. 60,897 (Oct. 7, 2022) ... 22
87 Fed. Reg. 60,926 (Oct. 7, 2022) ... 22, 45
87 Fed. Reg. 67,617 (Nov. 9, 2022) ... 12
88 Fed. Reg. 54,975 (Aug. 14, 2023) ... 23
88 Fed. Reg. 76,676 (Nov. 7, 2023) ... 22
89 Fed. Reg. 16,202 (Mar. 6, 2024) ... 53
89 Fed. Reg. 59,832 (July 24, 2024) ... 21
89 Fed. Reg. 80,749 (Oct. 4, 2024) ... 36
89 Fed. Reg. 85,119 (Oct. 24, 2024) ... 36
90 Fed. Reg. 19,447 (May 8, 2025) ... 17, 20, 22, 23, 24, 25, 26, 32, 59
90 Fed. Reg. 51,029 (Nov. 14, 2025) ... 42
91 Fed. Reg. 17,857 (Apr. 9, 2026) ... 3, 23, 25, 26

**RULES**

10th Cir. R. 17.1 ... 4
10th Cir. R. 28.1(A)(2) ... 4
Fed. R. Evid. 201(b) ... 9

**REGULATIONS**

40 C.F.R. § 50.10 ... 13
40 C.F.R. § 50.11 ... 13
40 C.F.R. § 50.15 ... 13

40 C.F.R. § 81.306 .......... 9, 22
40 C.F.R. pt. 50, Apps. L, N .......... 14
40 C.F.R. pt. 51, App. V, 2.2(d) .......... 18, 53, 55, 57
Reg. 25, Part A, § II.A.7 .......... 47
Reg. 25, Part B, § I.P.4.b .......... 24, 47

## STATEMENT OF RELATED CASES

On August 5, 2026, the Ninth Circuit Court of Appeals held that Respondents United States Environmental Protection Agency and its Administrator ("EPA") "exceeded [their] authority" under the Clean Air Act ("Act") by adopting the interpretation of the Act on which the first issue in this case hinges. *Committee for a Better Arvin v. EPA*, 185 F.4th 957, 960 (9th Cir. 2026) (Bress, J., dissenting).

The Ninth Circuit remanded EPA's approval of California air pollution rules required under Section 172(c)(9) the Act, 42 U.S.C. § 7502(c)(9), called "contingency measures"—the same pollution control requirement at issue here. *Id*. ("We conclude that the EPA exceeded its authority when it grafted a feasibility exemption onto Section 172(c)(9) of the Clean Air Act, and we remand").

Like the present matter, EPA approved California contingency measures that result in "emissions reductions [that] fall short of" the emissions reductions standard for contingency measures, based on the "infeasibility" of additional pollution-reducing measures. *Id.* at 962. Ruling for the environmental advocacy group petitioners, the Ninth Circuit concluded: "The EPA erred by plucking a feasibility exemption out of thin air and reading it into Section 172(c)(9) when the language of the provision does not provide

for one. So the challenged rule is contrary to the Act's best meaning and must be remanded to the EPA." *Id*. at 964; *see also id.* at 966 ("find[ing] that Congress did not implicitly grant the EPA discretion to consider feasibility with the language of Section 172(c)(9)").

The deadline for EPA to petition for rehearing or rehearing en banc of this Ninth Circuit decision is October 5, 2026, which postdates this opening brief. The issues raised in this appeal pertaining to Section 110(*l*) of the Act were not before the Ninth Circuit.

Also pending before the Ninth Circuit are two other appeals of EPA's actions on separate California contingency measures and the agency's interpretation regarding "infeasibility" for Section 172(c)(9). First, in *Central California Environmental Justice Network, et al. v. EPA*, Case No. 26-3281 (9th Cir.), petitioners filed their petition for review on May 20, 2026. Case No. 26-4880, Dkt. No. 1. The Ninth Circuit stayed proceedings until October 5, 2026, *id*., Dkt. No. 15, which postdates this opening brief.

Second, in *Central California Environmental Justice Network, et al. v. EPA*, Case No. 26-4880 (9th Cir.), petitioners filed their petition for review on July 30, 2026. Case No. 26-4880, Dkt. No. 2. A mediation conference has been scheduled, and the Ninth Circuit has provided a first extension of petitioners' opening brief to November 17, 2026. *Id*., Dkt. No. 15.

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to 10th Cir. R. 28.2(C)(4), the following is a glossary of the acronyms used in this brief:

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| NOx | Nitrogen Oxides |
| RTC | EPA's Response to Comments |
| SIP | State Implementation Plan |
| TSD | Colorado's Technical Support Document |
| VOCs | Volatile Organic Compounds |

## INTRODUCTION

For nearly twenty years, Colorado's "Denver Metro / North Front Range" area ("Denver area") has suffered from unhealthy levels of dangerous ozone air pollution, also known as "smog." Spanning nine counties, this area is home to over 3.3 million Coloradans.

The Denver area has violated an air quality standard meant to protect public health from ozone since EPA promulgated the standard in 2008. EPA and Respondent-Intervenor State of Colorado ("Colorado") have repeatedly failed to bring ozone levels below the health-based standard by the deadlines set by the Clean Air Act. As a result, the Denver Area now has a "severe" ozone problem under the Act. It is on the verge of an "extreme" ozone problem, because of the persistence and magnitude of unhealthy ozone levels.

EPA and Colorado's repeated failure to achieve the ozone standard has triggered a specific pollution reduction requirement under the Clean Air Act called "contingency measures." Among the Act's other comprehensive requirements for cleaning up pollution that violates federal standards, Congress ordered states to develop contingency measures that serve as a backup plan for when their primary strategies fail to achieve the standards by the statutory deadline.

Contingency measures are meant to take effect immediately after the state fails to achieve the standard by the deadline. This should provide the populace with interim relief from unhealthy pollution levels, as well as progress the area towards attaining the standard while the state develops a new plan for bringing pollution levels below the standard.

For over thirty years, EPA has interpreted Sections 172(c)(9) and 182(c)(9) of the Act to require contingency measures that achieve meaningful emissions reductions. However, in its approval of Colorado's single ozone contingency measure for the Denver area, EPA abandoned its long-standing interpretation—ignoring the Act's statutory language and structure—to require only trifling emissions reductions.

Colorado's contingency measure, which is already four years late, reduces ozone pollution by only a fraction of what it is supposed to achieve. It produces just two percent of the required emissions reductions, according to EPA and Colorado's own calculations. In reality, the contingency measure is even less effective. A defect in its design actually increases ozone-causing pollution, an important consideration EPA and Colorado failed to analyze.

Despite the availability of another pollution control requirement that could also serve as a contingency measure, and despite the need for real, immediate solutions for the Denver area, EPA seeks to radically undermine

the Clean Air Act's contingency measures requirement using a new, erroneous, and arbitrary interpretation of the Act.

The Ninth Circuit already rejected EPA's new interpretation in *Committee for a Better Arvin*, 185 F.4th 957. Petitioners Center for Biological Diversity and Sierra Club (together, "Public Interest Groups") respectfully request this Court do the same.

EPA's approval violates the Clean Air Act, is arbitrary and capricious, and deprives residents of the Denver area of the statutory health protections Congress required. The Public Interest Groups seek remand of EPA's approval.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review EPA's final action entitled "Air Plan Approval; Colorado; Serious Attainment Plan Contingency Measures and RACT Requirements for the 2008 8-Hour Ozone National Ambient Air Quality Standards for the Denver Metro/North Front Range Nonattainment Area" ("Final Rule") 91 Fed. Reg. 17,857 (Apr. 9, 2026) (Attachment 1) (Administrative Record ("AR") 00033–39).[1] Venue is

[1] Citation is to the bates numbers of the administrative record assembled by EPA—e.g., "(AR00001)." 10th Cir. R. 28.1(A). EPA has filed a certified list, Dkt.

appropriate in the Tenth Circuit because this approval is specific to Colorado. 42 U.S.C. § 7607(b)(1). The Center timely filed its petition for review on June 8, 2026. Dkt. 1.

## STANDING

The Public Interest Groups have standing to challenge EPA's approval of Colorado's deficient ozone contingency measure for the Denver area because their respective members live, work, and recreate in the Denver area and suffer from its enduring ozone pollution crisis. EPA's approval denies them the robust air pollution reductions the Clean Air Act requires.

As required to demonstrate Article III associational standing, the Center for Biological Diversity ("the Center") and Sierra Club each have members with standing to sue in their own right; the Public Interest Groups seek to protect their members and their interests from air pollution, which is directly germane to their organizational purposes; and the participation of the Public Interest Groups' individual members is not needed in this case. *Hunt v.*

16, and is not required to submit the record until its response deadline, 10th Cir. R. 17.1, so the Public Interest Groups cannot cite to record volumes per 10th Cir. R. 28.1(A)(2).

*Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see* Evans Decl. ¶¶ 2–12 (Att. 2).

Individuals have standing if they suffer an injury-in-fact that is both fairly traceable to EPA's action and redressable by the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

EPA's actions injure members of the Public Interest Groups in Colorado because air pollution will not be reduced in the required amounts as a result of EPA's approval of a deficient, *de minimis* contingency measure for the Denver area.

Scott Silber, for example, is a Center member who has lived within the Denver area violating the ozone standard for over 25 years. Silber Decl. ¶¶ 1–2 (Att. 3). He enjoys outdoor activities such as jogging, biking, hiking, and climbing, yet he developed asthma that is aggravated by poor air quality. *Id.* ¶¶ 3–4. Due to chronic exposure to air pollution, including ozone, he was also recently diagnosed with early-onset chronic obstructive pulmonary disease (COPD) and central sleep apnea. *Id.* ¶¶ 5–6. These conditions put him at an increased risk of stroke or cardiac arrest later in life. *Id.* ¶ 6. His sleep apnea requires him to use a ventilator to sleep, impairing his quality of life. *Id.* ¶¶ 7–8.

Poor air quality forces Mr. Silber to restrict or avoid the outdoor activities he loves, despite their importance to him and his health. *Id.* ¶¶ 13, 15, 17. Because air quality often deteriorates during the day, he must plan to avoid biking home in unhealthy air. *Id.* ¶ 15. Mr. Silber regularly incurs significant healthcare expenses, such as medications to treat his asthma, including EpiPens, and medical equipment, like a pulse ox monitor and respirator masks. *Id.* ¶¶ 9–11. Poor air quality from ozone, volatile organic compounds, and nitrogen oxides pollution thus injures Mr. Silber's health, finances, recreational opportunities, and aesthetic enjoyment of Colorado's great outdoors.

Jeremy Nichols, a member of the Center and Sierra Club, has lived in the Denver area for over twenty years. Nichols Decl. ¶¶ 1–2 (Att. 4). Mr. Nichols suffers injuries from air pollution, which impairs his hiking, camping, wildlife viewing, and enjoyment of the outdoors in the Denver area. *Id*. ¶ 3. Mr. Nichols avoids recreating outdoors when air quality, including ozone pollution, is especially bad, based on data from EPA-certified air quality monitors. *Id*. ¶¶ 7–8. This pollution causes him great concern over his health and that of his young son, whom he enjoys bringing with him, particularly for nearly daily hiking and bird watching. *Id*. ¶¶ 3, 5, 7–8. Mr. Nichols is aware of

the respiratory harms of this pollution, especially for vulnerable groups like children. *Id.* ¶ 4.

These injuries are concrete, actual or imminent, and fairly traceable to EPA's conduct. EPA's erroneous and arbitrary decision below allows for excess ozone, volatile organic compounds, and nitrogen oxides pollution that harms the public, including the Public Interest Groups' members, in the Denver area. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1242–46 (10th Cir. 2021). An order remanding EPA's approval means that Colorado will need to revisit its decision making and adopt meaningful contingency measures that reduce air pollution in compliance with the Clean Air Act.

## STATEMENT OF THE ISSUES

1. Whether EPA's approval of Colorado's contingency measure for the Denver area violates Sections 172(c)(9) and 182(c)(9) of the Clean Air Act, where EPA adopted a new interpretation of the Act that reads a feasibility exception into these contingency measures provisions.

2. Whether EPA's approval of Colorado's contingency measure violates Sections 172(c)(9) and 182(c)(9), or is otherwise arbitrary and capricious, where EPA adopted a subjective, non-statutory exception based on undefined feasibility considerations.

3. Whether EPA's approval violates Section 110(*l*) of the Act, or is otherwise arbitrary and capricious, where EPA conceded below that the contingency measure will increase emissions of nitrogen oxides pollution, but EPA and Colorado did not assess the consequences of this increased pollution for air quality.

4. Whether EPA's approval violates Sections 172(c)(9) and 182(c)(9), where EPA approved a contingency measure that only achieves *de minimis* emissions reductions and actually increases emissions of nitrogen oxides.

## STATEMENT OF THE CASE

### I. The Denver area's enduring ozone problem

Unhealthy levels of ozone pollution have persisted in the Denver area for nearly twenty years. The Denver area suffered from the eighth worst ozone levels in the country in 2025, according to the American Lung Association's compilation of EPA ozone monitoring data.[2]

The Denver area violating the health-based ozone standard covers all of Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, and Jefferson counties, as well as large swaths of Larimer and Weld counties. 40 C.F.R. § 81.306, at tbl. "Colorado–2008 8-Hour Ozone NAAQS." Over 3.3 million people reside in the Denver area, and therefore breathe unhealthy levels of ozone.[3]

---

[2] *See* Public Interest Groups' public comments on EPA's proposed rule, at 1 (June 24, 2025) (citing American Lung Association, *Most Polluted Cities*, https://www.lung.org/research/sota/city-rankings/most-polluted-cities) (AR00313).

[3] EPA, Green Book, 8-Hour Ozone (2008) Nonattainment Areas by State / County / Area (Aug. 31, 2026), https://www3.epa.gov/airquality/greenbook/hncty.html.

The Court may take judicial notice of this EPA data. *See* Fed. R. Evid. 201(b) (fact "not subject to reasonable dispute that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Allen v. United Props. & Constr., Inc.,* No. 07-cv-00214, 2008 WL 4748511 (D. Colo. Oct. 28, 2008) (judicial notice of "public records and government documents available from reliable sources on the internet."); *see*

Ground-level ozone, the principal ingredient of "smog," is a dangerous air pollutant that attacks the lungs and other parts of the body, contributing to respiratory problems, cardiovascular issues, and premature deaths. *See* 80 Fed. Reg. 65,292, 65,302–17 (Oct. 26, 2015). According to EPA, scientific evidence also suggests a causal relationship between exposure to ozone and adverse reproductive and developmental effects, including adverse birth outcomes. *Id*. at 65,338. Children, the elderly, people with respiratory conditions like asthma, and people who work or recreate outdoors are most at risk from ozone. *Id*. at 65,294.

Ozone also damages commercial crops; vegetation, including aspens; and other qualities of the environment. *Id*. at 65,371–73, 65,377–79.

Ozone, however, is not emitted directly by pollution sources. Rather, ozone forms when nitrogen oxides ("NOx") and volatile organic compounds ("VOCs")—both of which *are* emitted directly from pollution sources like motor vehicles, oil and gas well pads, and powerplants—mix in the presence of sunlight. *See* 80 Fed. Reg. at 65,300; *Sierra Club v. EPA*, 99 F.3d 1551, 1554

---

*also Sierra Club*, 964 F.3d at 893 n.9 (judicial notice of "document, which is published on the EPA's website"); *Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003) (judicial notice of information in EPA's database).

n.3 (10th Cir. 1996). Thus, NOx and VOCs cause harm both as "precursors" to ozone, and on their own.

By itself, NOx pollution is particularly harmful to the lungs. Even short-term exposure to NOx, over the course of minutes, can impact the respiratory system, aggravate asthma, and cause symptoms such as wheezing and difficulty breathing, often resulting in hospital admissions and emergency room visits. 75 Fed. Reg. 6,474, 6,480 (Feb. 9, 2010). Long-term exposure can cause respiratory illness, particularly in children. *Id*. at 6,479. People with asthma, as well as children and the elderly, are at greater risk of adverse health effects. *Id*. at 6,481–82.

VOCs include compounds that are classified as "hazardous air pollutants," including benzene, toluene, ethylbenzene, and xylenes. 42 U.S.C. § 7412(b)(1), (2). These hazardous air pollutants are the most pernicious chemicals regulated under the Clean Air Act, contributing to an array of adverse human health impacts, including cancer, cardiovascular disease, decreased lung function, and death. *Id*.

In the Denver area, ozone precursor pollution derives from an array of sources, meaning there should be an array of pollution control options available. The oil and gas industry is the largest human-caused source of ozone pollution in the Denver area. *See* 87 Fed. Reg. 67,617, 67,621 tbl. 1

(Nov. 9, 2022). "Power plants, motor vehicles, and combustion engines," among a variety of other sources, also emit ozone precursors in the area. *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 288 (D.C. Cir. 2023).

## II. The Clean Air Act's strategy for addressing ozone pollution

Congress adopted the Clean Air Act as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976). The Act establishes a comprehensive approach to protecting public health and welfare from air pollution. 42 U.S.C. §§ 7401–7671q. One of the primary goals of the Act is "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).

### A. National Ambient Air Quality Standards

EPA and states "share responsibility for implementing the Clean Air Act" pursuant to a cooperative federalism framework. *Center for Biological Diversity v. EPA*, 149 F.4th 1142, 1147 (10th Cir. 2025) (citing *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012)).

Pursuant to this framework, EPA must establish National Ambient Air Quality Standards ("NAAQS") for the most common and harmful air pollutants.

42 U.S.C. §§ 7408(a), 7409(a). The NAAQS cap the maximum concentrations of these pollutants allowed in the ambient air nationwide; that is, they "are standards that say the air can safely contain only so much of a particular pollutant." *Center for Biological Diversity v. EPA*, 82 F.4th 959, 962 (10th Cir. 2023) (quoting *Sierra Club de P.R. v. EPA*, 815 F.3d 22, 23 (D.C. Cir. 2016)).

Relevant to this case, EPA has established separate NAAQS for ozone and NOx, as harmful air pollutants that endanger public health and welfare. *See* 40 C.F.R. §§ 50.11, 50.15; *see also* 42 U.S.C. § 7408(a)(1). Specifically:

- In 2008, EPA revised the NAAQS for ozone, limiting ozone concentrations in the ambient air breathed by everyone in the nation to 75 parts per billion. 73 Fed. Reg. 16,436 (Mar. 27, 2008); *see also* 40 C.F.R. § 50.15 ("2008 Ozone NAAQS").
- In 2010, EPA revised the primary NAAQS for NOx, establishing a new concentration limit of 100 parts per billion. 75 Fed. Reg. 6,474; *see also* 40 C.F.R. § 50.11(b) ("2010 1-hour Nitrogen NAAQS"). Thus, NOx is regulated as a precursor to ozone and as an independent pollutant of concern. EPA refers to this NAAQS as a "1-hour" NAAQS because harms can result when people are exposed to NOx for just a few minutes. 75 Fed. Reg. at 6,491–92.

After EPA establishes or revises NAAQS, like those for ozone and NOx, it must identify which areas of the country are in compliance with the standard and which are not. *Center for Biological Diversity*, 82 F.4th at 962 (citing *Ass'n of Irritated Residents v. EPA*, 790 F.3d 934, 937 (9th Cir. 2015)); 42 U.S.C. § 7407(d)(1). Areas not in compliance with the NAAQS are designated "nonattainment" areas. 42 U.S.C. § 7407(d)(1)(A)(i). "Attainment areas" meet the NAAQS. *Id.* § 7407(d)(1)(A)(ii).

To assess air quality and NAAQS violations, EPA, states, and the public rely on a nationwide "network of air monitors that collect air quality data for any given area." *Catawba County v. EPA*, 571 F.3d 20, 30 (D.C. Cir. 2009) (citing 40 C.F.R. pt. 50, Apps. L, N). "The presence of a single violating monitor justifies a nonattainment designation. In the Denver metropolitan area, EPA found five of them" in a related ozone NAAQS process. *Weld County*, 72 F.4th at 290.

## B. State Implementation Plans

Pursuant to the Act's cooperative federalism framework, states formulate pollution control strategies in a State Implementation Plan ("SIP") that brings their nonattainment areas into compliance with the NAAQS and maintains air quality in attainment areas. 42 U.S.C. §§ 7410(a)(1), 7407(a). A

SIP must contain "enforceable emission limitations" on pollution and any "other control measures, means, or techniques" necessary to ensure that the NAAQS are achieved throughout the state. 42 U.S.C. §§ 7410(a)(1)–(2), 7502(c)(6).

States "must adopt and submit for the EPA's approval" any SIP revision. *Center for Biological Diversity*, 82 F.4th at 962 (citing 42 U.S.C. § 7410(a)(1), (a)(2)(H)). EPA must then determine whether SIP submittals are complete, meaning they have "the information necessary to enable the Administrator to determine" the submittal complies with the Act. 42 U.S.C. § 7410(k)(1)(A). Congress directed EPA to review complete SIP submittals and barred the agency from approving a SIP revision unless it meets all of the applicable requirements of the Clean Air Act. 42 U.S.C. § 7410(k)(2)–(4); *see also* § 7410(a)(2)(A).

After EPA approves the state's submittal, the SIP has "the force and effect of federal law." *Utah Physicians*, 21 F.4th at 1237. This means, *inter alia*, both EPA and members of the public can bring enforcement actions when requirements of the SIP are violated. *See* 42 U.S.C. §§ 7604(a), 7413.

### C. Nonattainment area requirements

For nonattainment areas like the Denver area, the Clean Air Act requires that the state achieve compliance with the NAAQS "as expeditiously as practicable." 42 U.S.C. §§ 7502(a)(2)(A), 7511(a)(1). As a backstop, the Act also sets a specific "attainment date" by which the state must bring the area into compliance with the NAAQS. *Id.* §§ 7502(a)(2); 7511(a)(1), (b)(1).

If a state fails to bring air quality in the nonattainment area into compliance with the NAAQS by the attainment date, EPA must downgrade the area to a worse nonattainment classification. *See id*. § 7511(b)(2)(A). Ozone nonattainment areas that fail to attain the NAAQS on time get progressively downgraded through "marginal," "moderate," "serious," "severe," and "extreme" classifications. *Id*. § 7511(a)(1), (b)(1).

Downgrading of the area results in a new statutory deadline for the state to attain the NAAQS, but the Act's directive to attain "as expeditiously as practicable" remains. *Id*. § 7511(a)(1), (b)(2)(A).

The Clean Air Act also adds additional pollution control requirements—on top of existing requirements—on nonattainment areas each time the area is downgraded to a worse classification. *See id.* §§ 7509(d), 7511a. In other words, "[a] worse nonattainment designation triggers more stringent

regulation." *Weld County*, 72 F.4th at 287 (citing 42 U.S.C. § 7511a(b)(1)(A)(i), (c)–(e)).

### D. Section 110(*l*) of the Act

In addition to the mandate that EPA can only approve SIP revisions that fully comply with the Clean Air Act, the Act bars EPA from approving a SIP revision meant to address a problem with one NAAQS at the expense of interfering with another.

Section 110(*l*) of the Act, 42 U.S.C. § 7410(*l*), acts as an "anti-backsliding provision" to protect air quality. *Center for Biological Diversity v. EPA*, 129 F.4th 1266, 1274 (10th Cir. 2025). Section 110(*l*) "prohibits the EPA from approving any revision to a SIP that 'would interfere with any applicable requirement concerning attainment . . . or any other applicable requirement of this [Act].'" *Center for Biological Diversity*, 82 F.4th at 962–63 (quoting 42 U.S.C. § 7410(*l*)); *see also* 90 Fed. Reg. 19,447, 19,459 (May 8, 2025) ("Proposed Rule") (AR00013) (recognizing the same). "'Attainment' in § 7410(*l*) refers to attainment of any NAAQS, not just the one for which a SIP or SIP revision has been submitted." *Center for Biological Diversity v. EPA*, 75 F.4th 174, 177 (3d Cir. 2023). "[O]ther applicable requirement[s]" include Clean Air Act "increments," which are the maximum allowable increases in

pollution concentrations above an established baseline level, and visibility protections. *See* 40 C.F.R. pt. 51, App. V, 2.2(d).

Section 110(*l*) is uniquely relevant to the ozone NAAQS because ozone's precursors—VOCs and NOx—can have an inverse relationship. One of the primary means by which VOCs are reduced is through combustion in a control device, like a flare or thermal oxidizer. However, combusting VOCs typically produces NOx as a byproduct. EPA, AP-42, Ch. 13.5: Industrial Flares, at 1-1 (Aug. 2019) (AR00333); 81 Fed. Reg. 6,616, 6,627 (Feb. 8, 2016); *see also* EPA, Response to Comments, at 11 ("Response to Comments" or "RTC") (AR00027). Thus, VOC emissions go down, but NOx emissions go up. But EPA cannot allow a state to rob Peter to pay Paul by pursuing one air quality goal at the expense of another.

## III. The Clean Air Act's "contingency measures" requirement

One of the requirements that applies to nonattainment areas is the adoption of pollution reduction measures called "contingency measures." 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). While the Clean Air Act sets forth detailed requirements for SIPs for nonattainment areas that are meant to bring air quality in line with the NAAQS by the statutory attainment deadlines, "Congress recognized that a State's implementation plan might not succeed."

*Ass 'n of lrritated Residents v. EPA,* 10 F.4th 937, 942 (9th Cir. 2021). That is where the Act's contingency measures requirement comes into play. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9).

"[T]he house report accompanying the 1990 amendments to the Act states that '[contingency] measures are to take effect without further action by the State o[r] Administrator, and are to be adequate to compensate for any emission reduction shortfall.'" *Committee for a Better Arvin*, 185 F.4th at 961 (quoting H.R. Rep. No. 101-490, *reprinted in Cong. Rsch. Serv., A Legislative History of the Clean Air Act Amendments of 1990*, at 3248 (1993)). Thus, these measures function as a "backup" in case the existing measures fall short. *Irritated Residents*, 10 F.4th at 947.

Accordingly, SIPs must provide for additional pollution reduction measures that are triggered immediately if the primary strategy of the nonattainment SIP fails to achieve attainment by the statutory deadline. Per Section 172(c)(9), contingency measures activate when a nonattainment area fails to attain the NAAQS by the attainment date—the relevant trigger in this case. *Id*. § 7502(c)(9).

Section 172(c)(9) also requires contingency measures that are triggered by failures to make the incremental emissions reductions necessary to achieve "reasonable further progress" under the Act, which is not the trigger at issue

here. *Id*. Similarly, Section 182(c)(9) requires contingency measures triggered by failures to make incremental reductions required to meet "milestones," also not at issue. *Id*. § 7511a(c)(9).

The Proposed Rule identified that Colorado's contingency measures must achieve emissions reductions equivalent to "'one year's worth' of progress" for the Denver area. Proposed Rule at 19,452 (AR00006).[4] This involves applying a calculation methodology prescribed by EPA to determine the "average annual reductions" that are "needed to ensure ongoing progress." *Id*. at 19,450 (AR00004).

Finally, multiple courts have faulted EPA for unlawful approvals of contingency measures in violation of Section 172(c)(9) of the Act. In 2016, the Ninth Circuit ruled in *Bahr v. EPA* that EPA violated the Act when it approved "[c]ontrol measures that have already been implemented" as contingency measures. 836 F.3d 1218, 1235–37 (9th Cir. 2016). Declining to defer to EPA's statutory interpretation, the Court ruled that Section 172(c)(9)

[4] As the Ninth Circuit recently noted, "the proposed rule required only 'one year's worth of progress.' This marked a departure from the EPA's traditional requirement that contingency measures provide for 'one year's worth of *reasonable further* progress,'" *Committee for a Better Arvin*, 185 F.4th at 962 (emphasis added), with the latter standard typically requiring more emissions reductions. Colorado did not get anywhere near meeting either emissions reduction standard, and the distinction is not directly at issue here.

plainly requires "control measures that will be implemented in the future" after being "triggered by the state's failure 'to make reasonable further progress' or to attain the NAAQS." *Id*. at 1235; *see also Sierra Club v. EPA*, 21 F.4th 815, 827–28 (D.C. Cir. 2021) (adopting *Bahr*'s rationale).

In *Association of Irritated Residents*, the Ninth Circuit called out EPA's approval of ozone contingency measures as "a transparent effort to circumvent *Bahr*." 10 F.4th at 946. The Court rejected EPA's attempt to rely on "emissions reductions from existing measures to make up for what everyone agrees otherwise would be an inadequate contingency measure." *Id*.

## IV. EPA and Colorado's repeated failure to attain the ozone NAAQS

EPA and Colorado have a long, unfortunate history of failing to control ozone in the Denver area. This continued noncompliance is largely due to EPA and Colorado's repeated failure to create effective SIPs that reduce ozone pollution to levels that meet the health- and welfare-based NAAQS.

Since EPA promulgated the 2008 ozone NAAQS, EPA and Colorado have failed six times to create a SIP that fixes the ozone problem in the Denver area. This has resulted in the area repeatedly failing to attain by the attainment date and being downgraded through the marginal, moderate, and serious nonattainment classifications. *See* 89 Fed. Reg. 59,832 (July 24, 2024); 87 Fed.

Reg. 60,897 (Oct. 7, 2022); 87 Fed. Reg. 60,926 (Oct. 7, 2022); 84 Fed. Reg. 70,897 (Dec. 26, 2019); 81 Fed. Reg. 26,697 (May 4, 2016). As a result, it is now a "severe" ozone nonattainment area for the 2008 ozone NAAQS. 40 C.F.R. § 81.306, tbl. "Colorado–2008 8-Hour Ozone NAAQS."

Specifically, this "severe" classification is the consequence of EPA and Colorado failing to bring the Denver area into compliance with the 2008 ozone NAAQS by the July 20, 2021 attainment date that applied when the Denver area was still in "serious" nonattainment. 87 Fed. Reg. at 60,927–28. This failure to attain was the triggering event for the contingency measures requirement at issue. Proposed Rule at 19,449 (AR00003). Thus, EPA and Colorado were supposed to have contingency measures in place that started reducing ozone four years ago.

The Denver area is on the verge of "extreme" nonattainment, with ozone levels that are not budging and a looming attainment date of July 20, 2027. 87 Fed. Reg. at 60,929.

## V. Ozone contingency measures for the Denver area

Colorado initially submitted to EPA contingency measures meant to satisfy this requirement of Sections 172(c)(9) and 182(c)(9) on March 22, 2021. 88 Fed. Reg. 76,676, 76,677 (Nov. 7, 2023).

EPA disapproved Colorado's initial contingency measures for the Denver area in November 2023. *Id*. EPA premised its disapproval on the D.C. Circuit decision in *Sierra Club*, 21 F.4th at 827–28, which, in turn, endorsed the Ninth Circuit's decision in *Bahr*, 836 F.3d at 1235–37. 88 Fed. Reg. 54,975, 54,977–98 (Aug. 14, 2023). Colorado's initial contingency measures impermissibly relied on pollution reductions that were already implemented, and thus were not "conditional and prospective," in contravention of Sections 172(c)(9) and 182(c)(9) of the Act. *Id*.

This disapproval started a two-year clock for Colorado to submit new contingency measures or for EPA to promulgate a "Federal Implementation Plan" that would fill the gap. 42 U.S.C. § 7410(c)(1).

In three SIP submittals from June 2023, May 2024, and April 2025, Colorado provided the contingency measures plan to EPA that underlies this case. Proposed Rule at 19,450 (AR00004). EPA approved this plan in the Final Rule.

The sole contingency measure that EPA approved[5] is meant to limit VOC emissions from motor vehicle coatings ("Motor Vehicle Coatings Measure").

[5] Colorado also submitted a second contingency measure related to oil and gas equipment. EPA determined that this measure "would not be viable as contingency measures" because its requirements were already in effect, in

*See* Colorado, Technical Support Document ("TSD") at 511 (AR07809); *see also* 5 C.C.R. 1001-29 ("Reg. 25"), Part B, § I.P.4.b (Colorado's codification of the requirement in its regulations) (AR00517). In relevant part, the Motor Vehicle Coatings Measure limits the VOC content of materials used by "automotive coating operations" to reduce VOC emissions resulting from use, transport, and storage of the materials. TSD at 511 (AR07809). Instead of using low-VOC-content materials, the Measure also allows regulated entities to use an emissions control system to destroy VOCs before they are emitted. Reg. 25, Part B, § I.P.4.b (AR00517).

Colorado determined, and EPA accepted, that it was required to reduce VOCs by 14.2 tons per day and NOx pollution by 8.9 tons per day to meet the reductions required by "one year's worth of progress." Proposed Rule at 19,452 (AR00006). Yet, according to Colorado's assessment, which EPA adopted below, the Motor Vehicle Coatings Measure reduces VOC emissions by 0.54 tons per day and produces zero reductions of NOx emissions. *Id*. at 19,454 (AR00008). Accordingly, in Colorado's own estimation, its contingency measure only achieves 3.8 percent of the required reductions of VOCs. TSD at 510 (AR07808). The Motor Vehicle Coatings Measure only

---

contravention of *Sierra Club*, 21 F.4th at 827–28. AR10035–36. It is not a contingency measure. Final Rule at 17,857 (AR00033).

achieves two percent of the required reductions for total ozone precursors (VOCs and NOx together). Proposed Rule at 19,452, 19,454 (AR00006, 8).

Colorado's assessment and EPA's Proposed Rule also do not contain any mention of the increase in NOx pollution that results from using emission control systems to destroy VOCs through combustion pursuant to the Motor Vehicle Coatings Measure. *See generally, e.g.*, TSD at 490–584, (AR07788–7882); Proposed Rule (AR00001–13). Instead, these materials represent that nitrogen oxide emissions reductions will be zero tons per day. EPA only acknowledged the increase in NOx pollution in response to the Public Interest Groups' comments on the Proposed Rule. RTC at 10–14 (AR00026–30).

Even though Colorado did not adopt a contingency measure that achieved the required emissions reductions, EPA determined that Colorado satisfied the contingency measure requirements of Sections 172(c)(9) and 182(c)(9) of the Clean Air Act based on the Motor Vehicle Coatings Measure and an "infeasibility justification" to "demonstrate why it is not possible to adopt additional measures." Final Rule at 17,858 (AR00034); RTC at 4 (AR00020).

## VI. Rulemaking history

EPA published notice of the Proposed Rule in the *Federal Register* on May 8, 2025. 90 Fed. Reg. 19,447 (AR00001–13). EPA proposed to approve Colorado's Motor Vehicle Coatings Measure and "infeasibility justification" as meeting the contingency measure requirements of Sections 172(c)(9) and 182(c)(9) that applied to the Denver area because of its failure to attain the 2008 ozone NAAQS in 2021. *Id*. at 19,455 (AR00009).

On June 24, 2025, the Public Interest Groups submitted comments objecting to EPA's proposal. AR00313–21. The Public Interest Groups detailed the same issues before this Court. *See* AR00315–21.

Despite the Public Interest Groups' comments, EPA determined that Colorado had satisfied the contingency measures requirement for the Denver area in the April 9, 2026 Final Rule. 91 Fed. Reg. 17,857 (AR00033–39). EPA's Final Rule and the accompanying Response to Comments adopts the analysis, findings, and conclusions presented in the agency's proposed rule. EPA, however, addressed the increases in NOx emissions from the Motor Vehicle Coatings Measure for the first time in its Response to Comments. RTC at 10–14 (AR00026–30).

The Center timely filed its petition for review to initiate this appeal on June 8, 2026. Dkt. No. 1. On July 2, 2026, Colorado filed its notice of intervention in the case. Dkt. 11.

## STANDARD OF REVIEW

The Clean Air Act does not set forth an applicable standard of judicial review for challenges to EPA approvals of SIP revisions. *See* 42 U.S.C. § 7607(b). Accordingly, this Court applies the general standard of review for agency action set forth in section 706 of the federal Administrative Procedure Act ("APA"). *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004); *Oklahoma v. EPA*, 723 F.3d 1201, 1211 (10th Cir. 2013).

Section 706 of the APA provides, in relevant part: "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Sierra Club v. EPA*, 99 F.3d 1551, 1555 (10th Cir. 1996). Additionally, if the action fails to meet statutory requirements, the Court must hold the agency action unlawful. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) (citing 5 U.S.C. § 706(2)(C)).

This Court reviews EPA's construction of the Clean Air Act *de novo*, exercising its "independent judgment in deciding whether [the] agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Section 706 "makes clear that agency interpretations of statutes . . . are *not* entitled to deference." *Id*. at 392 (emphasis in original). *Loper Bright* instructs the Court to "deploy[] its full interpretative toolkit" to determine the statute's "single, best meaning." *Id*. at 400, 454; *accord id*. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

In addition, an agency action is arbitrary, capricious, or an abuse of discretion, when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision which runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574–75 (10th Cir. 1994).

## SUMMARY OF THE ARGUMENT

Congress adopted Sections 172(c)(9) and 182(c)(9) of the Act to provide for meaningful back-up air pollution controls when the primary strategies in a SIP fail to achieve attainment of the NAAQS. However, in the proceeding below EPA effectively exempted Colorado from adopting contingency measures, which were already four years delayed.

The sole contingency measure approved by EPA achieves a fraction—just two percent—of the required reductions in ozone precursors (VOCs and NOx), according to EPA and Colorado's own calculations. In reality, it is even less effective, because it increases emissions of NOx.

Despite these deficiencies, EPA determined that Colorado had satisfied the Clean Air Act's contingency measures requirement for the Denver area. EPA did so based on a purported "infeasibility justification," in which Colorado claimed that it could not feasibly adopt any contingency measure beyond the Motor Vehicle Coatings Measure.

This was in error and arbitrary. Sections 172(c)(9) and 182(c)(9) do not include any feasibility exception for contingency measures, while numerous other Act provisions explicitly authorize feasibility considerations. Nor does the Act afford EPA discretion to introduce feasibility considerations

where none are provided for, or otherwise allow the standardless and arbitrary approach to evaluating feasibility that EPA applied below.

In addition, EPA and Colorado originally represented that the reduction in emissions of NOx from the Motor Vehicle Coatings Measure was zero. However, as EPA conceded in its response to the Public Interest Groups' comments, the Measure will increase NOx pollution. This triggers the Clean Air Act's anti-backsliding provision, Section 110(*l*), which does not allow EPA to approve a SIP revision that furthers one air quality goal at the expense of another. EPA's assessment of the increase in NOx emissions contravened this requirement, was arbitrary, and failed to consider several important aspects of the problem.

Finally, Sections 172(c)(9) and 182(c)(9) do not condone the approval of Colorado's lone contingency measure that only delivers *de minimis* VOC emissions reductions and actually increases emissions of NOx.

## ARGUMENT

### I. EPA's approval of Colorado's contingency measure in reliance on non-statutory, standardless considerations of feasibility violates the Clean Air Act and is arbitrary.

The plain language of Sections 172(c)(9) and 182(c)(9) does not identify any exceptions for feasibility considerations. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). A variety of other Clean Air Act provisions expressly provide for considerations of feasibility. Congress included feasibility exceptions where it wanted to. This lack of an explicit feasibility exception does not afford EPA discretion to insert one.

Section 172(c)(9) flatly declares that a SIP for a nonattainment area "shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part." *Id*. § 7502(c)(9).

Section 182(c)(9) sets forth the same operative language, but with respect to areas that fail to meet milestones: "In addition to the contingency provisions required under section 7502(c)(9) of this title, the plan revision shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone." *Id*. § 7511a(c)(9).

EPA admits, as it must, that "section 172(c)(9) and section 182(c)(9) do not explicitly provide for consideration of whether specific measures are feasible." EPA, *Guidance on the Preparation of SIP Provisions that Address the Nonattainment Area Contingency Measure Requirements*, at 33 ("2024 Guidance") (AR00292).

Nonetheless, in approving Colorado's Motor Vehicle Coatings Measure, EPA maintained that it could exempt a state from the requirement to adopt robust contingency measures as long as a state "explain[s] and document[s] the state's evaluation of existing and potential control measures . . . and the state's conclusions regarding whether such measures are feasible as contingency measures." Proposed Rule at 19,450 (AR00004). Even if EPA could consider feasibility for contingency measures, which it cannot, EPA's standardless test for feasibility is arbitrary.

### A. EPA exceeded its authority under the Clean Air Act by premising its approval on considerations of feasibility.

Numerous other provisions in the Clean Air Act *do* explicitly provide for infeasibility exceptions, unlike Sections 172(c)(9) and 182(c)(9). "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S.

383, 391 (2015); *see also City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994) ("Congress knew how to draft a[n] . . . exemption . . . when it wanted to."). As the Supreme Court noted in one of the first Clean Air Act cases it ever heard, "[w]here Congress intended the [EPA] Administrator to be concerned about economic and technological feasibility, it expressly so provided." *Union Elec.*, 427 U.S. at 257 n.5. Accordingly, the Court should not interpret Sections 172(c)(9) and 182(c)(9) to allow EPA to grant an exemption that does not appear in the text.

The canon of statutory interpretation that Congress acts deliberately when it omits language that is included elsewhere in a statute "applies with particular force" here. *MacLean*, 574 U.S. at 392. That is because "[f]easibility is expressly referenced numerous times throughout the Act and the term appears 'in close proximity' to Section 172(c)(9)." *Committee for a Better Arvin*, 185 F.4th at 964 (quoting *MacLean*, 574 U.S. at 392). Within Section 172 itself, Congress permitted the Administrator to consider "the availability and feasibility of the pollution control measures" when deciding the appropriate classification for nonattainment areas, 42 U.S.C. § 7502(a)(1)(A), and whether to extend an area's attainment date, 42 U.S.C. § 7502(a)(2)(A).

The same is true of Section 182. This section allows the EPA Administrator to approve an ozone SIP strategy that does not achieve the

emissions reductions that are typically required for "reasonable further progress" if the SIP "includes all measures that can feasibly be implemented in the area, in light of technological achievability." 42 U.S.C. § 7511a(b)(1)(A)(ii)(III), (c)(2)(B)(ii); *see also* § 7511b(e)(1)(A) (defining "best available controls" required for certain pollution sources in ozone nonattainment area as "the degree of emissions reduction that the Administrator determines, on the basis of technological and economic feasibility . . . is achievable"). Sections 172(c)(9) and 182(c)(9) do not include this language, by design.

The Ninth Circuit relied on several other examples of provisions with express feasibility considerations when rejecting the same interpretation of Section 172(c)(9) EPA offered below, stating "Congress *has* provided for feasibility considerations elsewhere in the Act." *Committee for a Better Arvin*, 185 F.4th at 963–64, citing:

- 42 U.S.C. § 7412(h)(1) ("if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard" for hazardous air pollutants EPA may promulgate other "design, equipment, work practice, or operational standard[s]");
- *Id*. § 7513(e) (allowing EPA to extend attainment dates if the SIP "includes the most stringent measures that . . . *can feasibly be*

*implemented in the area*" and providing for consideration of "the technological and economic feasibility of various control measures.");

- *Id*. § 7521(a)(5)(B) (vehicle regulations do not become effective until "it *would be feasible* to implement such standards, taking into consideration the restraints of an adequate leadtime for design and production"); *see also id*. § 7521(c)(1), (j)(3), (*l*)(1), (m)(2).

Additional examples abound. *See, e.g.*, 42 U.S.C. §§ 7408(f)(1)(A)(xv), 7546(b)(2)(A), 7571(a)(1)(B), 7585(b)(1), 7625-1(a)(1). Congress could have explicitly provided that EPA should consider feasibility in Section 172(c)(9), as it did in a variety of other provisions, but it did not.

As indicated above, in *Committee for a Better Arvin* the Ninth Circuit recently rejected and remanded the same interpretation of Section 172(c)(9) EPA relied on below to excuse Colorado's failure to adopt contingency measures that achieve the required emissions reductions. The Court premised its decision on the same interpretive canon espoused here, concluding: "EPA erred by plucking a feasibility exemption out of thin air and reading it into Section 172(c)(9) when the language of the provision does not provide for one. So the challenged rule is contrary to the Act's best meaning

and must be remanded to the EPA." 185 F.4th at 964 (quoting *MacLean*, 574 U.S. at 391).

In defense of its approval of the California contingency measures at issue in *Committee for a Better Arvin*, EPA asserted that "the statutory provisions applicable to other nonattainment area plan control measure requirements . . . allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible." 89 Fed. Reg. 80,749, 80,757 (Oct. 4, 2024); *see also* 89 Fed. Reg. 85,119, 85,123 (Oct. 25, 2024) (relying on the same rationale).

"In other words, the EPA's position is that explicit feasibility allowances elsewhere in the Act suggest that it can consider feasibility in this instance." *Committee for a Better Arvin*, 185 F.4th at 963. To the contrary, "the fact that other provisions in the Act provide for infeasibility exemptions—and that Section 172(c)(9) does not—fatally undermines the EPA's position." *Id.* Interpreting Sections 172(c)(9) and 182(c)(9) to include a feasibility exception defies the "single, best meaning" of these provisions of the Act. *Loper Bright*, 603 U.S. at 400.

### B. The Clean Air Act does not afford EPA discretion to consider feasibility for contingency measures.

In EPA's Response to Comments, the agency raised another argument rejected by the Ninth Circuit in *Committee for a Better Arvin*. EPA argued that "Congress granted the EPA discretionary authority to consider feasibility" for contingency measures even where Sections 172(c)(9) and 182(c)(9) do not include a feasibility consideration. RTC at 5 (AR00021). EPA's support for this argument is that "[b]y requiring only that a state adopt 'specific measures' that shall 'take effect,' and declining to impose any further qualifications under CAA sections 172(c)(9) and 182(c)(9), Congress granted" this discretionary authority. *Id*.

The Supreme Court, however, has directly rejected the presumption "that statutory ambiguities are implicit delegations to agencies." *Loper Bright*, 603 U.S. at 399. The Supreme Court reiterated that "ambiguities may result from an inability on the part of Congress to squarely answer the question at hand, or from a failure to even 'consider the question' with the requisite precision," but "[i]n neither case does an ambiguity necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question." *Id*. (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984)).

Trying to squeeze blood from a stone, EPA reads "feasibility" out of Congress' use of the terms "specific measures" and "take effect" in Sections 172(c)(9) and 182(c)(9). RTC at 5–6 (AR00021–22). In *Union Electric*, the Supreme Court rejected an electric utility company's attempt to interject a feasibility exception into a Clean Air Act provision where Congress did not expressly provide for one. 427 U.S. at 257–58. The utility argued that EPA should reject a SIP revision the utility claimed it would have trouble complying with because the Act implicitly allowed EPA to consider technological and economic infeasibility, where the Act requires that NAAQS be met "as expeditiously as practicable" and within a "reasonable time." *Id*. The utility further asserted that "what is 'practicable' or 'reasonable' cannot be determined without assessing whether what is proposed is possible." *Id*. at 258.

The Supreme Court firmly rejected this argument conflating other statutory considerations with a feasibility exception. *Id.* at 257–58. Because feasibility was not among the factors EPA needed to consider when evaluating a SIP revision, the Court concluded that "Congress intended claims of economic and technological feasibility to be wholly foreign to the Administrator's consideration of a state implementation plan." *Id*. at 256.

When the Ninth Circuit rejected EPA's argument that the agency has "discretionary authority" to consider feasibility for contingency measures in *Committee for a Better Arvin*, partially relying on *Union Electric*, the Court stated: "if the phrases 'as expeditiously as practicable,' and 'within a reasonable time' do not permit consideration of feasibility, it is difficult to see how 'specific measures to be undertaken,' a phrase even further disconnected from feasibility, would allow it." 185 F.4th at 965; *see also id.* at 965–66 (finding additional support for rejecting EPA's claim to "discretionary authority" in *Dep't of Treasury, IRS v. FLRA*, 494 U.S. 922, 931–32 (1990)).

In its Response to Comments, EPA also references three Clean Air Act provisions to support its claim that "the CAA delegates authority to the EPA" to assess the feasibility of contingency measures. RTC at 5 (AR00021). These provisions do not support EPA's position.

*First*, EPA cites Section 110(k)(3), 42 U.S.C. § 7410(k)(3), "which charges the EPA with reviewing state plans to ensure they meet all applicable requirements." RTC at 5 (AR00021). This is a nonstarter. Section 110(k)(3) provides that EPA "shall approve" a SIP revision, in whole or "in part," "if it meets all of the applicable requirements" of the Act. 42 U.S.C. § 7410(k)(3). This provision does not afford EPA blanket discretion to gap fill for those

applicable requirements. 5 U.S.C. § 706(2)(C) (agency action "in excess of statutory[] authority, or limitations" is unlawful).

*Second*, EPA draws on Section 182(c)(2)(B)(ii), 42 U.S.C. § 7511a(c)(2)(B)(ii), related to "reasonable further progress" for serious ozone nonattainment areas to argue that it can consider feasibility for Section 182(c)(9) contingency measures. RTC at 6 (AR00022). EPA does not reference Section 172(c)(9) measures here. The Section 182(c)(2) provision EPA relies on does contain an express feasibility exception. 42 U.S.C. § 7511a(c)(2)(B)(ii). The Section 182(c)(9) contingency measures requirement, however, is a separate provision of this same section and does not include a feasibility exception, indicating Congress' intent to exclude one. *MacLean*, 574 U.S. at 392. Further, the Motor Vehicle Coatings Measure was triggered by the Denver area's failure to attain the NAAQS and, accordingly, is a Section 172(c)(9) contingency measure. This EPA argument only targeted Section 182(c)(9) contingency measures, triggered by a failure to meet a "milestone." RTC at 6 (AR00022). Section 172(c)(9) is not implicated by EPA's oblique reference to Section 182(c)(2)(B)(ii).

*Third*, EPA's reliance on Section 179(d)(2), 42 U.S.C. § 7509(d)(2), also undercuts its position. EPA only partially quotes this provision in its Response to Comments. RTC at 6 (AR00022) ("SIP revisions to address

nonattainment areas must include 'all measures that can be feasibly implemented in the area in light of technological achievability, costs, and any non-air quality and other air quality-related health and environmental impacts.'" (citing a portion of 42 U.S.C. § 7509(d)(2))). EPA omits the important language that begins this sentence: "the [SIP] revision shall include such additional measures as *the [EPA] Administrator* may reasonably prescribe, including all measures that can be feasibility implemented in the area . . ." 42 U.S.C. § 7509(d)(2) (emphasis added).

This subsection of the Act provides that states must adopt new SIP revisions upon a nonattainment area's failure to attain, without any reference to feasibility exceptions. 42 U.S.C. § 7509(d)(1)–(2). This includes adopting contingency measures; again, without reference to feasibility. *Id*. § 7509(d)(2) ("The [SIP] revision required . . . shall meet the requirements of . . . section 7502."). The sentence EPA partially quotes then provides that it is *the EPA Administrator* that can "reasonably prescribe" any "additional measures"—on top of the Act's default SIP requirements for states—and the Administrator considers feasibility for those additional measures. *Id*. Congress included and excluded feasibility exceptions intentionally.

### C. EPA's standardless considerations of feasibility demonstrate that the agency's interpretation contravenes the Clean Air Act.

The Clean Air Act does not define feasibility, or infeasibility, in one universal way. Instead, where the Act does provide for feasibility considerations, the relevant factors vary depending on the control measure and requirement.[6]

Indeed, in other recent proceedings where EPA has derived a feasibility exception for contingency measures, EPA has acknowledged that determining infeasibility for various SIP control measures "depend[s] on the requirement." *See, e.g.,* 90 Fed. Reg. 51,029, 51,032 (Nov. 14, 2025) (EPA proposal to approve California contingency measures for ozone, as well as the state's "infeasibility demonstration").

Because Congress provided for no feasibility exception for contingency measures, there are no standards or criteria that provide bounds to EPA's feasibility consideration. This underscores EPA's erroneous interpretation of

[6] *See, e.g.*, 42 U.S.C. § 7511b(e)(1)(A) (defining "best available controls" for certain ozone sources); *id*. § 7513(e) (addressing "feasibility" for purposes of determining the "most stringent measures" for serious particulate matter areas); *id*. § 7513a(b)(1)(B) (requiring "best available control measures" for serious particulate matter nonattainment areas); *id*. § 7513b (requiring EPA to issue "[Reasonably Available Control Measures] and [Best Available Control Measures] guidance" for certain sources of particulate matter).

the Act—there are no statutory limits on EPA's feasibility consideration because there is no statutory authority to consider feasibility in the first place. Further, EPA's standardless consideration of feasibility means it arbitrarily "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

Adding to the errant and arbitrary nature of considering feasibility for contingency measures, EPA states in its Response to Comments that, in terms of standards, it "recommends that air agencies evaluate the economic feasibility of potential CMs based on a cost/ton threshold that is higher than what was considered in a fashion similar to the economic analysis for measures in the control strategy in the nonattainment area, including any thresholds associated with RACT determinations." RTC at 7 (AR00023) (quoting 2024 Guidance at 43 (AR00299)). EPA appears to suggest that there is a higher threshold for categorizing a potential contingency measure as infeasible, relative to feasibility considerations for other kinds of control measures, but the parameters are unbounded.

The Proposed and Final Rules do not otherwise identify any clear standards or criteria for how EPA will administer the exception to Sections 172(c)(9) and 182(c)(9) that EPA has crafted of whole cloth. Nor does the

2024 Guidance provide objective standards.[7] *See* 2024 Guidance at 33–45 (AR00292–304). Nothing in Sections 172(c)(9) or 182(c)(9) suggests EPA may grant standardless exemptions that can swallow the whole of the contingency measures requirement, or to otherwise exercise its authority in such an arbitrary manner.

Finally, the errant, arbitrary nature of EPA's approach to feasibility considerations is further underscored by EPA's incorrect determination "that there are no feasible control measures that could be adopted as contingency measures in addition to the motor vehicle coatings measures." Proposed Rule at 19,455 (AR00009). EPA and Colorado entirely failed to identify the availability of a pollution control measure that could serve as contingency measure.

As explained above, EPA and Colorado failed to bring ozone levels into compliance with the 2008 ozone NAAQS by the 2021 attainment date for the

---

[7] The 2024 Guidance expressly states that it "is not a rule or regulation" and "does not change or substitute for any law regulation, or other legally binding requirement." 2024 Guidance at 2 (AR00261). By its own terms it "is not legally enforceable" and "is not intended to and does not establish legally binding requirements." *Id*. Further, "[o]nly final EPA actions taken to approve or disapprove state implementation plan (SIP) submissions that implement any of the recommendations in this guidance would be final actions for purposes of CAA section 307(b)." *Id*. The 2024 Guidance has not been subject to judicial review.

"serious" classification. 87 Fed. Reg. at 60,936. Along with triggering the contingency measures requirement at issue, the failure to attain obligated Colorado to submit a new, stricter SIP for EPA approval to achieve attainment by the July 2027 attainment date for the "severe" classification. *Id*. at 60,931.

This severe SIP submittal, which EPA has not yet approved, contains a contingency measure. This measure would limit the VOC content of a variety of consumer products, like insect repellent, hair spray, and paint thinners. *See* Colorado, *State Implementation Plans for the Denver Metro and North Front Range Ozone Nonattainment Area*, at 10-4 to 10-5 (AR00949–50). Colorado estimated VOC emission reductions of 3.1 tons per day from the measure, *id*., which is low, but more than the 0.54 tons per day from the Motor Vehicle Coatings Measure.

Despite the availability of this contingency measure, EPA and Colorado did not consider it in this rulemaking or explain why not. The measure is sitting inactive as part of the severe SIP submittal. EPA was well aware of this contingency measure, because it was submitted to the agency in June 2023 as part of the same submittal package that contained the Motor Vehicle Coatings Measure, in the same section. AR00949–50.

That the measure is already part of another submittal is not an obstacle—Colorado repurposed the Motor Vehicle Coatings Measure from a separate SIP submittal.[8]

EPA and Colorado cannot "promise to do tomorrow what the Act requires today." *Sierra Club v. EPA*, 356 F.3d 296, 298 (D.C. Cir. 2004). The availability of this candidate contingency measure, and EPA and Colorado's failure to evaluate it, was arbitrary in and of itself, but this failure also exposes EPA's unmoored interpretation of the Act's contingency measures requirement.

## II. EPA's failure to analyze the NOx emissions increases resulting from Colorado's contingency measure violates Section 110(*l*) of the Act and is arbitrary.

The Motor Vehicle Coatings Measure reduces VOC emissions by a meager 0.54 tons per day, when at least 14.2 tons per day of VOC reductions are required. Proposed Rule at 19,452, 19,454 (AR00006, 8). EPA and Colorado identified that the Measure produces no reductions of NOx, when at

[8] *See* Proposed Rule at 19,448 (AR00002) (describing how Colorado previously "identifie[d] motor vehicle coatings emission control requirements as a contingency measure for the Moderate ozone [SIP]," but "[t]he State is now repurposing the requirement as a contingency requirement for the Serious ozone [SIP].")

least 8.9 tons per day of reductions are required. TSD at 510 (AR7808). Thus, the Motor Vehicle Coatings Measure provides just two percent of the total required ozone precursor reductions. *Id*.

But the Motor Vehicle Coatings Measure is even less effective than that, because EPA and Colorado failed to account for the *increase* in NOx pollution that it causes. The Motor Vehicle Coatings Measures allows regulated entities to comply with the measure by using coating products with a lowered VOC content, which results in less VOC emissions from activities like usage and storage of the product. Reg. 25, Part B, § I.P.4.b (AR00517). But regulated entities can also elect to reduce VOCs with an "emission control system" that reduces VOCs by combusting them in control devices like flares and thermal oxidizers. *Id.*;[9] *see also* Reg. 25, Part A, § II.A.7 (AR00478) (defining "control device" to include a "flare" or "other device" that "will reduce the concentration of VOC in a gas stream by . . . combustion . . .").

These control devices reduce VOCs but produce NOx pollution as a byproduct. EPA, AP-42, Ch. 13.5: Industrial Flares, at 1-1 (Aug. 2019)

---

[9] Specifically, the Motor Vehicle Coatings Measure requires "the owner or operator of automative coating facilities" to "[u]se products manufactured on or after [May 1, 2026] that comply with the following VOC content limits in Table 4 or reduce VOC emissions from automotive coatings with an emission control system having a control efficiency of 90% or greater." Reg. 25, Part B, § I.P.4.b (AR00517).

(AR00333); *see also* 81 Fed. Reg. at 6,627 ("Flaring of gas produces NOx and particulate matter, both of which can cause respiratory and heart problems."). This is indisputable. *See* RTC at 11 (AR00027) (acknowledging "[t]hermal and catalytic oxidizers are combustion devices and [] they do produce NOx emissions" and "[f]lares, which do produce NOx emissions . . ."). Accordingly, the Motor Vehicles Coating Measure actually increases NOx pollution, which EPA conceded in its Response to Comments. *Id*. at 11, 13 (AR00027, 29).

Colorado's SIP submittal and EPA's Proposed Rule did not account for, assess, or even mention this increase in one of the two ozone precursors Colorado's contingency measures were supposed to reduce. It was not until the Public Interest Groups identified this fundamental defect that EPA acknowledged the issue with a deficient response in its Response to Comments.

### A. EPA violated Section 110(*l*) of the Clean Air Act by failing to analyze the increases in NOx pollution resulting from Colorado's contingency measure.

Section 110(*l*) of the Clean Air Act, 42 U.S.C. § 7410(*l*), provides that EPA "shall not approve a revision of a [SIP] if the revision would interfere with any applicable requirement concerning attainment . . . or any other applicable requirement" of the Act. This is one of the "anti-backsliding" features of the

Act—*Center for Biological Diversity*, 129 F.4th at 1274—meant to ensure that a state cannot make progress towards one air quality goal at the expense of another.

EPA's "longstanding view" of Section 110(*l*) is that SIP "revisions comply . . . 'as long as actual emissions in the air are not increased.'" *Id*. (quoting *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 995 (6th Cir. 2006)). That is so "even if the SIP merely maintain[s] the status quo." *Id*. (quoting *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1074 (9th Cir. 2014)).

However, as this Court explained, "[w]hen the EPA expects that a revision *may increase emissions* it typically requires a state to either (1) submit an air-quality analysis showing that the revision would not interfere with any applicable requirement or (2) substitute equivalent or greater emissions reductions to preserve status quo air quality." 129 F.4th at 1275 (emphasis added).

Here, "actual emissions" of NOx *are* "increased" by the Motor Vehicle Coatings Measure, as EPA conceded in its Response to Comments. RTC at 11, 13 (AR00027, 29). The Measure does not maintain the status quo for NOx pollution, it degrades it.

Yet EPA did not require Colorado to address this gap in its assessment with an air-quality analysis or to remedy it with substituted emissions

reductions. Nor did EPA itself evaluate the implications of increased NOx pollution for Clean Air Act requirements in the Denver area pursuant to Section 110(*l*).

Instead, EPA relied on a "[c]onsideration of the *wholistic impact* of [the] rule revision on attainment of the NAAQS." RTC at 14 (emphasis added) (AR00030). EPA concluded that "[w]hen considered *in totality*, the [Motor Vehicle Coatings Measure] will reduce NOx/VOC emissions and will have a net air quality benefit . . . Therefore, it is unnecessary for the EPA to conduct additional analysis to determine whether the more stringent requirements that are the subject of this rulemaking would interfere with attainment." RTC at 10 (emphasis added) (AR00026).

For the same reason—because the Motor Vehicle Coatings Measure "will reduce emissions" of ozone precursors overall—EPA excused Colorado from not "includ[ing] additional information to demonstrate that the NAAQS, prevention of significant deterioration increments, reasonable further progress, and visibility are protected if the plan is approved." *Id*. at 11 (AR00027).

In other words, EPA considered whether the net effect of the Motor Vehicle Coatings Measure is an overall reduction in ozone precursor emissions (NOx and VOC emissions, combined). According to EPA, even

though the Measure increases NOx, it makes greater reductions in VOCs, so the "wholistic impact" of the Measure is a net reduction in ozone precursors, and therefore ozone pollution.[10] In EPA's view, because the Measure reduces ozone precursors "in totality," no further analysis of NOx emissions was required of EPA or Colorado. RTC at 10, 11 (AR00026, 27).

This "wholistic impact" calculation could be reasonable when assessing the consequences of the Motor Vehicle Coatings Measure for ozone pollution (if adequately analyzed). Less ozone precursors overall should result in less ozone, even if VOC reductions are offset to a degree by NOx increases.

However, EPA's "wholistic impact" approach runs directly afoul of the text and purpose of Section 110(*l*). When evaluating a SIP revision that targets a particular pollutant of concern, like ozone here, Section 110(*l*) forces EPA and states to answer a question: what implications does the SIP revision have for *other* air pollutants that are not the target of the SIP submittal?

Several provisions of the Act other than Section 110(*l*) ensure that a SIP revision works to reduce the concentration of the specific pollutant the

---

[10] This is by no means the clear effect of the Motor Vehicle Coatings Measure. EPA did not estimate the specific NOx increases resulting from the Measure. Nor did EPA consider whether NOx emissions cause a disproportionate increase in ozone in parts of the Denver area that are "NOx-limited." *See infra* at 56.

revision is meant to target. *E.g.*, 42 U.S.C. § 7410(a)(1); 7502(c)(1), (6). Section 110(*l*), however, as an "anti-backsliding" provision, prevents that SIP revision from causing collateral damage to air quality by, *inter alia*, increasing emissions of other pollutants and interfering with the Clean Air Act requirements that apply to them. 42 U.S.C. § 7410(*l*) (EPA "shall not approve a revision of a plan if the revision would interfere with *any* applicable requirement concerning attainment . . . or *any* other applicable requirement" of the Act (emphasis added)); *see also Kelley v. City of Albuquerque*, 542 F.3d 802, 814 (2008) ("Congress did not add any language limiting the breadth of that word, so 'any' means all").

Thus, "'[a]ttainment' in § 7410(*l*) refers to attainment of any NAAQS, not just the one for which a SIP or SIP revision has been submitted." *Center for Biological Diversity*, 75 F.4th at 177. The same goes for "interfere[ing] with . . . any other applicable requirement" under the Act, including requirements like Clean Air Act increments and visibility. 42 U.S.C. § 7410(*l*).

EPA's "wholistic impact" approach, down to its very foundation, violates the text and purpose of Section 110(*l*).[11] While the Motor Vehicle Coatings

[11] The only support for the "wholistic impact" approach EPA relies on in its Response to Comments is the agency's citation of *Center for Biological Diversity*. RTC at 11, 13 (AR00027, 29) (citing 129 F.4th at 1275). That case contradicts EPA's position. There, this Court reiterated EPA's "longstanding

Measure reduces ozone precursors overall according to EPA's assessment, it increases NOx. RTC at 11, 13 (AR00027, 29). This necessitates additional analysis pursuant to Section 110(*l*) that is concerned with NOx as NOx, not just NOx as an ozone precursor. NOx has an independent NAAQS, 40 C.F.R. § 50.11, and is subject to its own Clean Air Act requirements, including increments and visibility, which Section 110(*l*) requires EPA to consider. 42 U.S.C. § 7410(*l*); 40 C.F.R. pt. 51, App. V, 2.2(d); *see also* RTC at 11 (AR00027).

EPA also regulates NOx as a precursor for fine particulate matter pollution—*see* 89 Fed. Reg. 16,202, 16,214 (Mar. 6, 2024)—and the NOx increases may interfere with the Act's requirements for this pollutant. EPA's "wholistic impact" approach, focusing on ozone alone, could not account for this.

Thus, the Motor Vehicle Contingency Measure is not "SIP-strengthening" with respect to NOx, and accordingly it is necessary for EPA and Colorado to develop "additional information to demonstrate that the NAAQS, prevention

position" that emissions increases typically require further analysis, or substituted emissions reductions, to satisfy Section 110(*l*), not anything resembling a consideration of "wholistic impact." 129 F.4th at 1275.

of significant deterioration increments . . . and visibility are protected if the plan is approved." RTC at 11 (AR00027).

Accordingly, EPA's "wholistic impact" determination violated Section 110(*l*) and EPA failed consider several important aspects of the problem of increased NOx emissions.[12] *See State Farm*, 463 U.S. at 43; 5 U.S.C. § 706(2)(A), (C) (action contrary to law and statute unlawful); *see also Hall v. EPA*, 273 F.3d 1146, 1155–56, 1160–61 (9th Cir. 2001).

---

[12] In *Center for Biological Diversity v. EPA*, the Center also raised this issue. 75 F.4th at 183. The Third Circuit did not reach it because of a procedural issue, but stated in dicta that:

> We cannot, however, ignore the agency's admission of error . . . EPA admits that it approved the use of a thermal oxidizer at Roystone to limit VOC emissions that does increase NOx emissions, even though the agency's approval stated that there were no NOx emissions. This error is undoubtedly concerning. The EPA's thorough identification and consideration of each air quality variable implicated by a given SIP revision is a key prerequisite of a reasonable § 7410(l) analysis—otherwise, it cannot accurately ascertain whether the revision will 'interfere with . . . [NAAQS] attainment,' as the statute requires. An emissions-based assessment that accounts only for the emissions being controlled by the relevant technology and not for the emissions being released by the control process itself could indicate that the agency may have 'entirely failed to consider an important aspect of the problem.'

75 F.4th at 184 n.6 (quoting *State Farm*, 463 U.S. at 43).

### B. EPA failed to consider several important aspects of the problem resulting from the NOx increases in its application of the "wholistic impact" approach.

In applying its "wholistic impact" approach, EPA also arbitrarily failed to connect the facts to its conclusion that Motor Vehicle Coatings Measure complied with Section 110(*l*). *Burlington Truck Lines*, 371 U.S. at 168; *State Farm*, 463 U.S. at 43.

Pursuant to the Act's cooperative federalism scheme, states "have the primary responsibility for assuring air quality" and formulating SIPs. 42 U.S.C. § 7407(a). This is far from a formality. States have experience with local air quality conditions, affected sources, and the impacted environment.[13] EPA's limited discussion of the NOx increases underscores the need for this experience.

EPA based its "wholistic impact" assessment of NOx and VOC emissions on general assumptions about the potential use of control devices by facilities affected by the Motor Vehicle Coatings Measure. RTC at 11 (AR00027). EPA

---

[13] EPA's regulations require that state "[SIP] submissions for review by EPA," like Colorado's contingency measure submission, must include "[t]he State's demonstration that the national ambient air quality standards, prevention of significant deterioration increments, reasonable further progress demonstration, and visibility, as applicable, are protected if the plan is approved and implemented." 40 C.F.R. pt. 51, App. V, 2.2(d). The SIP revisions submitted by Colorado do not contain any such demonstration, and EPA did not require it.

referenced materials that are not specific to the automative coatings industry, the Denver area (or even Colorado), or the Motor Vehicle Coatings Measure. RTC at 11–14 (AR00027–30). EPA did not estimate the increase in emissions of NOx or determine where these emissions might occur. *Id*.

Nor did EPA consider where the Denver area's ozone problem might be "limited" by NOx pollution. Because ozone results from the two precursors of VOCs and NOx, in areas where VOCs concentrations are high but NOx concentrations are low, adding emissions of NOx to the equation can cause a disproportionate increase in ozone. *See Border Power Plant Working Group v. DOE*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003) (explaining that the federal agency defendants identified that in "rural areas," ozone "does generally tend to be NOx-limited (i.e., adding more NOx increases ozone)"). EPA did not consider this important aspect of the problem, even though the Motor Vehicle Coatings Measure may exacerbate the ozone problem in certain areas.

EPA also dismissed the potential for violations of the NAAQS for NOx based on air monitoring data. RTC at 13 (AR00029). NOx, however, typically only travels short distances before depositing on land or water, or converting into other compounds like ozone. 89 Fed. Reg. 105,692, 105,703 (Dec. 27, 2024). Thus, NOx monitoring especially suffers from a "problem inherent in the monitoring process, namely, that a monitor only measures air quality in its

immediate vicinity." *Catawba*, 571 F.3d at 30. Monitoring data provides a poor representation of whether the NAAQS for NOx are being violated in any given location, which typically requires more elaborate air-quality analysis. *See* 40 C.F.R. pt. 51, App. V, 2.2(d). EPA failed to consider this. Further, the record contains evidence of violations of the NOx NAAQS in the Denver area, based on EPA computer modeling methods and State of Colorado data. AR00398–408.

Additionally, EPA failed to consider whether automative coating facilities might be located where background concentrations of NOx are high, like near a highway. Given the NAAQS of 100 parts per billion, if background concentrations are already 99 parts per billion, an increase in only two additional parts per billion would result in a violation. EPA also failed to consider whether the increased NOx emissions interfere with the Act's requirements for fine particulate matter, where it regulates NOx as a precursor to this pollutant. 89 Fed. Reg. at 16,214.

EPA's "wholistic impact" approach fails to consider several important problems deriving from the NOx increase and improperly departs from the text and purpose of Section 110(*l*), as well as the agency's own longstanding position that emissions increases implicate Section 110(*l*).

### III. Sections 172(c)(9) and 182(c)(9) do not condone a contingency measure that provides *de minimis* emissions reductions.

The Motor Vehicle Coatings Measure provides *de minimis* VOC emissions reductions and increases NOx pollution. The plain language of Sections 172(c)(9) and 182(c)(9) require much more. 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9). As a matter of "statutory interpretation[,] the ancient principle that the law does not care about trifles" applies to the Clean Air Act. *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1178 (9th Cir. 2015) (citing *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839–40 (9th Cir. 2007)).

Congress intended Sections 172(c)(9) and 182(c)(9) to require contingency measures that achieve meaningful emissions reductions adequate to address shortfalls in achieving reasonable further progress, attaining the NAAQS, or meeting milestones. Accordingly, the best reading of the statute mandates more than *de minimis* emissions reductions. Yet EPA approved Colorado's infeasibility justification, signing off on a contingency measure that provides scant VOC reductions while increasing NOx. EPA cannot interpret and apply the Act in a manner that diminishes the statutory obligation to nil. *See Comm. for a Better Arvin*, 786 F.3d at 1178 (the Clean Air Act does not care about trifles).

As discussed above, the Motor Vehicle Coatings Measure reduces VOC emissions by a scant 0.54 tons per day when at least 14.2 tons per day of VOC reductions are required. Proposed Rule at 19,452, 19,454 (AR00006, 8). This is less than four percent of the required VOC reductions, and only two percent of the required reductions in ozone precursors. *Id*. And that does not account for the increase in NOx pollution, which EPA and Colorado failed to estimate.

As another point of comparison, the emissions reductions here are less than emissions reductions that EPA itself previously insisted were *de minimis*. In *Committee for a Better Arvin v. EPA*, community groups challenged EPA's decision to not approve pollution reduction measures into California's SIP. 786 F.3d at 1177–78. EPA argued that it properly omitted the measures because "it determined that [the measures] produced only *de minimis* emission reductions and so did not affect EPA's overall attainment and reasonable further progress evaluations." *Id*. at 1178. Accepting EPA's position that the rules only provided "trifling emission control measures," the Ninth Circuit upheld EPA's decision. *Id*.

Those measures would have reduced 0.62 tons per day of NOx pollution in the relevant nonattainment area. 76 Fed. Reg. 69,896, 69,908 (Nov. 9, 2011). Here, EPA and Colorado estimate even lower reductions of VOCs of only 0.54 tons per day, with NOx pollution increasing. RTC at 11, 13

(AR00027, 29). These *de minimis* reductions simply do not meet the Section 172(c)(9) and Section 182(c)(9) requirement to adopt contingency measures.

## IV. Remedy

The appropriate remedy in this case is remand of EPA's approval of the ozone contingency measures without vacatur, but with a specific deadline by which EPA must act on remand. While vacatur is the presumptive remedy where, as here, a federal agency acted arbitrarily and contrary to law, *Eagle Cnty. v. Surface Transp. Bd*., 82 F.4th 1152, 1196 (D.C. Cir. 2023), and the Motor Vehicle Coatings Measure achieves *de minimis* emissions reductions, there is no material value to vacatur.

Remand without vacatur, however, divorces EPA and Colorado's responsibility to finalize meaningful contingency measures from clear Clean Air Act deadlines that govern SIP revisions. This raises the real possibility of agency delay. "Experience suggests that remand without vacatur sometimes invites agency indifference." *Cemex Inc. v. DOI*, 560 F. Supp. 268, 282 n.8 (D.D.C. 2021).[14]

[14] *See also NRDC v. EPA,* 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020).

For these reasons, if the Court does remand without vacatur, the Public Interest Groups respectfully request that the Court impose a 90-day deadline for EPA to respond to the remand order with a partial disapproval—*see* 42 U.S.C. § 7410(k)(3)—of the SIP submittal. *See, e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 861–62 (D.C. Cir. 2008) (Griffith, J., concurring) (ordering agency to respond to remand order within 90 days and ordering the rules vacated unless the agency notifies the court that it complied with the court's order before that date); *Rodway v. U.S. Dep't of Agriculture*, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (requiring agency "to complete new rule-making process within 120 days of the issuance of this opinion").

It will be the public that bears the burden of unhealthy levels of ozone pollution if EPA's approval is allowed to stand, or if EPA action on remand is delayed.

## CONCLUSION

For the reasons stated above, the Court should grant the Public Interest Groups' petition and remand EPA's determination that Colorado satisfied the Clean Air Act's contingency measures requirement.

## ORAL ARGUMENT STATEMENT

The Public Interest Groups submit that oral argument would be useful in this matter because the case presents questions of first impression, and it is relatively rare that Clean Air Act cases are litigated in this Court.

Dated: September 18, 2026

Respectfully submitted,

*/s/ Ryan Maher*

Ryan Maher
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
781-325-6303
rmaher@biologicaldiversity.org

*/s/ Benjamin Rankin (w/ permission*)

Benjamin Rankin
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
202-849-8402
brankin@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity and Sierra Club*

## CERTIFICATE OF SERVICE

I certify that on September 18, 2026, I electronically filed the foregoing PETITIONERS' OPENING BRIEF with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) All required privacy redactions have been made per 10th Cir. R. 25.5;

(2) If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Emsisoft Anti-Malware, Version 2024.12.0.12633 (updated July 24, 2026), and according to the program are free of viruses.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limitation and word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 12,522 words. Furthermore, this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Cambria font.

Dated: September 18, 2026

*/s/ Ryan Maher*

Ryan Maher
Center for Biological Diversity
1411 K St. NW, Ste. 1300
Washington, DC 20005
781-325-6303
rmaher@biologicaldiversity.org

*Counsel for Petitioners Center for Biological Diversity and Sierra Club*

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart AA—Missouri**

■ 2. In § 52.1320, the table in paragraph (c) is amended by revising the entry "10–5.570" to read as follows:

**§ 52.1320 Identification of plan.**

* * * * *

(c) * * *

EPA-APPROVED MISSOURI REGULATIONS

| Missouri citation | Title | State effective date | EPA approval date | Explanation |
|---|---|---|---|---|
| Missouri Department of Natural Resources | | | | |
| * * * | * | * | * | * |
| Chapter 5—Air Quality Standards and Air Pollution Control Regulations for the St. Louis Metropolitan Area | | | | |
| * * * | * | * | * | * |
| 10–5.570 | Control of Sulfur Emissions From Stationary Boilers. | 10/31/2019 | 4/9/2026, 91 FR [insert **Federal Register** page where the document begins]. | |
| * * * | * | * | * | * |

* * * * *

[FR Doc. 2026–06832 Filed 4–8–26; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R08–OAR–2024–0622, EPA–R08–OAR–2025–0233; FRL–12746–05–R8]**

### Air Plan Approval; Colorado; Serious Attainment Plan Contingency Measures and RACT Requirements for the 2008 8-Hour Ozone National Ambient Air Quality Standards for the Denver Metro/North Front Range Nonattainment Area

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is approving state implementation plan (SIP) submittals from the State of Colorado under the Clean Air Act (CAA) that address contingency measures and Reasonably Available Control Technology (RACT) requirements for the 2008 ozone National Ambient Air Quality Standard (NAAQS) for the Denver Metro/North Front Range (DMNFR) Serious ozone nonattainment area. The EPA finds that the State has met the applicable CAA requirements for Serious area contingency measures as well as RACT for certain stationary sources. Accordingly, the EPA is approving the respective SIP revisions to implement the submitted motor vehicle coating contingency measure, but we are not taking action on one of the identified contingency measures included in the submittals that concerns pneumatic controllers. In addition, the EPA is approving regulatory revisions that Colorado adopted to implement RACT requirements for landfill/biogas fired engines, refinery fuel process heaters, and a cold rolling mill, except that we are not taking final action on the RACT requirement for one refinery fuel process heater that was submitted by Colorado due to an identified error. The EPA is taking this action pursuant to the CAA.

**DATES:** This rule is effective on May 11, 2026.

**ADDRESSES:** The EPA has established dockets for the contingency measures and RACT requirements for this action under Docket ID No. EPA–R08–OAR–2024–0622 and EPA–R08–OAR–2025–0233, respectively. All documents in the dockets are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information.

**FOR FURTHER INFORMATION CONTACT:** Matthew Lang, Air and Radiation Division, EPA, Region 8, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado, 80202–1129, telephone number: (303) 312–6709, email address: *lang.matthew@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" means the EPA.

### I. Background

The background for this action is discussed in detail in our May 8, 2025 and June 18, 2025 proposals.[1] In the document published May 8, 2025, we proposed to approve SIP revisions submitted by Colorado on June 26, 2023, May 23, 2024, and April 2, 2025. These revisions were submitted, in part, to meet the contingency measures requirements of CAA sections 172(c)(9) and 182(c)(9) through adoption of requirements for automotive coating facilities and inclusion of an infeasibility justification for adoption of contingency measures providing for emission reductions of less than one year's worth of progress. In the proposed rulemaking published on June 18, 2025, we proposed to approve SIP revisions submitted by Colorado on June 26, 2023, May 23, 2024, May 30, 2024, and April 2, 2025. These revisions were submitted, in part, to meet the RACT requirement of CAA sections 172(c)(1) and 182(b)(2) through adoption of requirements for landfill/biogas fired engines, refinery fuel process heaters, and a cold rolling mill. The EPA also

[1] *See* 90 FR 19447 and 90 FR 25960, respectively.

issued interim final determinations concurrently with the May 8, 2025 and June 18, 2025 proposed approvals of Colorado's contingency measures and RACT SIP submissions to stay and defer sanctions pending from the EPA's prior disapproval actions for the two requirements.[2]

## II. Response to Comments

We received comments on the May 8, 2025 proposal and the accompanying interim final determination from the following commenters: (1) the Center for Biological Diversity (CBD), the Colorado Sierra Club, and Public Employees for Environmental Responsibility in a comment letter submitted jointly (herein referred to as CBD comments), and (2) an anonymous public commenter. We also received comments on the June 18, 2025 proposal and associated interim final determination from the following three commenters: two anonymous public commenters and from Suncor Energy. All comments received are located in the two dockets for this action listed above.

Concerning the May 8, 2025 proposal, the anonymous public comment is not directed to the proposed SIP revisions addressed in this rulemaking, and therefore the EPA is not responding to it. The comments from CBD raise concerns related to our proposed action on Colorado's contingency measures SIP submittal, including the associated infeasibility justification, and claim that the submittal does not satisfy the requirements of CAA sections 172(c)(9) and 182(c)(9). As to the June 18, 2025 proposal, one of the anonymous public comments is not relevant to the RACT requirements at issue in the proposed rule and the EPA is not responding to it. The other anonymous comment discusses requirements for cement production process heaters generally and is not specific to RACT for refinery fuel-fired process heaters addressed by the proposed rule. The comment on the June 18, 2025 proposal from Suncor Energy identifies an error in the associated regulatory revisions submitted by the State of Colorado. A summary of the comments on the May 8, 2025 and June 18, 2025 actions that are relevant to this final action and the EPA's responses are provided in the Response to Comments document, which is located in the rulemaking dockets for this action.

## III. Final Action

The EPA is finalizing approval of Colorado's SIP revisions related to the contingency measures requirement because we find that they satisfy CAA sections 172(c)(9) and 182(c)(9) for the DMNFR Serious ozone nonattainment area with respect to the 2008 ozone NAAQS. This includes approval of the adopted automotive coatings contingency measure, the infeasibility justification, and associated regulatory revisions to Regulation 7 (Reg. 7) and Regulation 25 (Reg. 25) identified in the May 8, 2025 proposed rule. The EPA is also finalizing approval of the majority of Colorado's SIP revisions related to the RACT requirement because we find that they satisfy CAA sections 172(c)(1) and 182(b)(2). This includes approval of regulatory requirements for landfill/biogas fired engines, refinery fuel process heaters, and a cold rolling mill located in Colorado's Reg. 7 and Regulation 26 (Reg. 26) detailed in the June 18, 2025 proposed rule. Specifically, the EPA is finalizing approval of the regulatory revisions identified in table 1 in this document (below) for which we proposed approval in the May 8, 2025 and June 18, 2025 proposed rules.

As described in the EPA's June 18, 2025 proposed rule,[3] the EPA is not taking action on the addition to Reg. 7, Part E, section II.A.4. from the June 26, 2023 SIP submittal that concerns the May 1, 2024 compliance date for equipment specified under sections II.A.1.d.-e. The EPA will propose action on the associated revision to section II.A.4. concurrently with the revisions to sections II.A.1.d.–e. in a future action.

The EPA is also not finalizing approval of revisions to Reg. 7, Part A, sections I.A.1.a., I.B.2.a.(iii), I.B.2.d., and I.B.2.d.(iii)–(iv), as well as the corresponding language in Reg. 25, Part A, sections I.A.1.a., I.B.2.a.(iii), I.B.2.d., and I.B.2.d.(iii)–(iv), which we had proposed approval of in our May 8, 2025 proposed rule. The revisions to these sections relate to the portion of northern Weld County which is included in the DMNFR nonattainment area for the 2015 ozone NAAQS but is not included within the DMNFR nonattainment area for the 2008 ozone NAAQS. As such, it is unnecessary to finalize our approval of the revisions referenced above in this action concerning contingency measures and RACT requirements for the Serious classification of the DMNFR nonattainment area for the 2008 ozone NAAQS. The EPA intends to address these revisions in a separate action at a later date.

TABLE 1—SUMMARY OF EPA'S FINAL APPROVAL OF REVISIONS TO REGULATIONS 7, 25, AND 26

| Submittal | Revisions included in the EPA's final approval |
|---|---|
| June 26, 2023 | Reg. 7, Part A, sections I.B.2.a.(i)-(ii), I.B.2.c, I.B.2.e., II.A.13–18, II.C.1; Reg. 7, Part C, sections I.A.3.a., I.P; Reg. 7, Part E, sections I.D.4.a.(i)(B), II, II.A.4 (partial approval), II.A.4.a.(vii), II.A.4.b.(ii), II.A.5.a.(i), II.A.5.b.(i)(A)(2)–(3), II.A.5.b.(i)(B)(1)–(2), II.A.5.b.(ii)(A), II.A.5.b.(ii)(B)(1)–(2), II.A.5.b.(ii)(B)(6)–(7), II.A.5.b.(ii)(D)–(E), II.A.6.a.(i)–(ii), II.A.6.b.(viii)(F)–(G), II.A.6.c.(ii), II.A.7.f.(iii), V.A.6.b. |
| May 23, 2024 | Reg. 7, Part C, section I.P; removal of Reg. 7, Part E; Reg. 25, Part A; Reg. 25, Part B, sections I.A., I.P.; Reg. 25 appendix D–E; Reg. 26, Part A; Reg. 26, Part B. |
| May 30, 2024 | Reg. 26, Part A, section I.C, Reg. 26; Part B, sections I.C.1., II.A.4.f, II.A.5.b.(ii)(E)–(F), II.A.7.h, II.A.8.b.(i), V.A.1.a. |

[2] *See* 90 FR 19424 and 90 FR 25901, respectively.

[3] *See* 90 FR 25960 at footnote 21.

TABLE 1—SUMMARY OF EPA'S FINAL APPROVAL OF REVISIONS TO REGULATIONS 7, 25, AND 26—Continued

| Submittal | Revisions included in the EPA's final approval |
|---|---|
| April 2, 2025 .................................... | Reg. 25, Part A, section II.C.2.; Reg. 25, Part B, sections I.P.1.b., I.P.3., I.P.4.b., I.P.7.a., I.P.7.a.(vi), I.P.7.b., I.P.8; Reg. 26, Part B, sections II.A.4., II.A.4.g.(i), II.A.4.g.(iv)–(v), II.A.5.a.(iii), II.A.5.b.(i)(A), II.A.5.b.(ii)(B)(1), IX. |

**Note:** At this time, the EPA is not finalizing action on any of the revisions included in the June 26, 2023, May 23, 2024, May 30, 2024, and April 2, 2025 submittals besides those identified in table 1. This means that there are revisions to Reg. 7, Part E included as part of the June 26, 2023 submittal which will not yet be incorporated into the SIP as part of the newly established Reg. 26. Additionally, and as described previously, the EPA is not finalizing approval of the June 26, 2023 revisions to Reg. 7, Part A, sections I.A.1.a., I.B.2.a.(iii), I.B.2.d., and I.B.2.d.(iii)–(iv) concerning northern Weld County, as well as the corresponding language in the newly established Reg. 25, Part A, sections I.A.1.a., I.B.2.a.(iii), I.B.2.d., and I.B.2.d.(iii)–(iv). The EPA will act on these revisions and their incorporation into the SIP within Regulations 25 and 26 in a future action. With regards to the revisions to Reg. 26, Part B, section II.A.4.g.(iv), the EPA is not finalizing approval of the language included in table 3 of section II.A.4.g.(iv) concerning process heater H–1717 due to an identified error in that table. Finally, those sections marked as ''state-only'' in Colorado's SIP submittals are not included for incorporation into the SIP. Therefore, the EPA is not finalizing action on these sections, and any such sections which were relocated from Reg. 7 to Reg. 25 or Reg. 26 will continue to be ''state-only.''

In this final action EPA is not acting upon that portion of the SIP submission that incorporates heater H–1717 due to an error that was identified in the regulatory revisions submitted by the State of Colorado on April 2, 2025, concerning RACT determinations for individual refinery fuel process heaters. Colorado's technical support documentation accompanying its RACT determinations for process heaters, as well as the EPA's proposed rule, make clear that Colorado determined that additional controls were not technologically or economically feasible for all refinery fuel process heaters.[4] Colorado therefore adopted revisions at Reg. 26, Part B, section II.A.4.g.(iv) to identify the existing emission controls that were determined to represent RACT for individual units. For the process heater designated H–1717, the existing emission control was inadvertently listed as operation of ultra-low $NO_X$ burners. However, heater H–1717 is equipped with low $NO_X$ burners as shown in Colorado's supporting technical documentation at table 5 [5] and Colorado's analysis of economic infeasibility of ultra-low $NO_X$ burner or Selective Catalytic Reduction (SCR) retrofit, as summarized in tables 8 and 9 of the State's analysis, demonstrates the lack of additional feasible emission controls available for the unit.[6] In our proposed rule, the EPA concurred with Colorado's rejection of burner retrofits and SCR for heater H–1717 on the basis of economic infeasibility, highlighting that the EPA correctly evaluated Colorado's RACT determination despite the error in the submitted regulatory revisions.[7] However, due to the identified error, the EPA is not finalizing our proposed approval for RACT concerning process heater H–1717. We are also not finalizing approval of the language included in table 3 of the revision to Reg. 26, Part B, section II.A.4.g.(iv) concerning heater H–1717. The EPA intends to take action to approve RACT for heater H–1717 when the corrected rule text is submitted to the EPA by Colorado for incorporation into the SIP. The SIP's inclusion of inaccurate existing burner technology for process heater H–1717 in table 3 of Reg. 26, Part B, section II.A.4.g.(iv) does not affect our approval of Colorado's RACT SIP submittal for all other identified process heaters besides heater H–1717. To be clear, the EPA is not disapproving Colorado's SIP submission concerning process heater H–1717. Rather, because of the identified error in the State's submission, we are not acting upon that portion of the submission, and intend to approve an anticipated, future submission from Colorado that corrects the error.

Because the EPA is now finalizing approval of the portions of Colorado's SIP submittals that correct the prior contingency measure disapproval, the associated sanctions from EPA's November 7, 2023 are now fully relieved. The EPA is also finalizing approval of RACT requirements for landfill/biogas engines and a cold rolling mill and is determining that our prior December 8, 2023 disapproval concerning these specific sources is now resolved. Concerning RACT requirements for refinery fuel process heaters that were included in the EPA's December 8, 2023 disapproval, the EPA is finalizing our proposed approval that Colorado has adopted RACT for all of the affected units except for process heater H–1717 due to the identified error in Colorado's submitted regulatory language. Therefore, our December 8, 2023 disapproval concerning RACT and associated deferred sanctions will not be fully resolved until EPA receives and takes final action concerning RACT for heater H–1717. To be clear, the interim final determination issued June 18, 2025 remains in effect with sanctions deferred pending EPA action on an anticipated error correction to be submitted by Colorado.

## IV. Incorporation by Reference

In this document, the EPA is finalizing regulatory text that includes incorporation by reference. In accordance with requirements of 1 CFR 51.5, the EPA is finalizing the incorporation by reference of Colorado Air Quality Control Commission Reg. 7 pertaining to the ''Control of Ozone via Ozone Precursors and Control of Hydrocarbons via Oil and Gas Emissions (Emissions of Volatile Organic Compounds & Nitrogen Oxides),'' Reg. 25 pertaining to the ''Control of Emissions from Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals,'' and Reg. 26 pertaining to the ''Control of Emissions from Engines and Major Stationary Sources'' (as listed in table 1 above and discussed in section III.). The EPA has made, and will continue to make, these materials generally available through *https://www.regulations.gov* and at the EPA Region 8 Office (please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section of this preamble for more information). Therefore, these materials have been approved by the EPA for inclusion in the SIP, have been incorporated by reference by the EPA into that plan, are fully federally enforceable under sections 110 and 113 of the CAA as of the effective date of the final rulemaking of the EPA's approval, and will be incorporated by reference in the next update to the SIP compilation.[8]

[4] *See* April 2, 2025 SIP Submittal, Document Set 1 of 2, ''Technical Support Document for Reasonably Available Control Technology for Major Sources'' at 26–27 and 29–32, available in Docket ID No. EPA–R08–OAR–2025–0233. *See* also 90 FR 25960 at 25964 and 25966.

[5] *Id.* at 18.

[6] *Id.* at 29–32.

[7] *See* 90 FR 25960 at 25964 and 25966.

[8] 62 FR 27968 (May 22, 1997).

**V. Statutory and Executive Order Reviews**

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

- Is not a significant regulatory action subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Is not subject to Executive Order 14192 (90 FR 9065, February 6, 2025) because SIP actions are exempt from review under Executive Order 12866;
- Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because it approves a state program;
- Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001); and
- Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian Tribe has demonstrated that a Tribe has jurisdiction. In those areas of Indian country, the rule does not have Tribal implications and will not impose substantial direct costs on Tribal governments or preempt Tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

This action is subject to the Congressional Review Act (CRA), and EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by June 8, 2026. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Ammonia, Carbon oxides, Incorporation by reference, Intergovernmental relations, Lead, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

Dated: March 31, 2026.

**Cyrus M. Western,**

*Regional Administrator, Region 8.*

For the reasons stated in the preamble, the Environmental Protection Agency is amending 40 CFR part 52 as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart G—Colorado

■ 2. In § 52.320:

■ a. In the table in paragraph (c):

■ i. Under the center heading ''5 CCR 1001–09, Regulation Number 7, Control of Ozone Via Ozone Precursors and Hydrocarbons via Oil and Gas Emissions, (Emissions of Volatile Organic Compounds and Nitrogen Oxides), Part A, Applicability and General Provisions'', revise the entries ''I. Applicability'' and ''II. General Provisions''.

■ ii. Under the center heading ''5 CCR 1001–09, Regulation Number 7, Control of Ozone Via Ozone Precursors and Hydrocarbons via Oil and Gas Emissions, (Emissions of Volatile Organic Compounds and Nitrogen Oxides), Part C, Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals'', revise the entry ''I. Surface Coating Operations''.

■ iii. Removing the center heading ''5 CCR 1001–09, Regulation Number 7, Control of Ozone Via Ozone Precursors and Hydrocarbons via Oil and Gas Emissions, (Emissions of Volatile Organic Compounds and Nitrogen Oxides), Part E, Combustion Equipment and Major Source RACT'' and the entries ''I. Control of Emissions from Engines'', ''II. Control of Emissions from Stationary and Portable Engines and Other Combustion Equipment in the 8-Hour Ozone Control Area'', ''III. Control of Emissions from Specific Major Sources of VOC and/or $NO_X$ in the 8-Hour Ozone Control Area'', and ''IV. Control of Emissions from Breweries in the 8-hour Ozone Control Area''.

■ iv. Add the center heading ''5 CCR 1001–29 Regulation Number 25, Control of Emissions From Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals, Part A, Applicability and General Provisions'' and the entries ''I. Applicability'' and ''II. General Provisions'' at the end of the table.

■ v. Add the center heading ''5 CCR 1001–29 Regulation Number 25, Control of Emissions From Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals, Part B, Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals'' and the entries ''I. Surface Coating Operations'', ''Appendix D Minimum Cooling Capacities for Refrigerated Freeboard Chillers on Vapor Degreasers'', and ''Appendix E Emission Limit Conversion Procedure'' at the end of the table.

■ vi. Add the center heading ''5 CCR 1001–30 Regulation Number 26, Control of Emissions from Engines and Major Stationary Sources, Part A, Applicability and General Provisions'' and the entry ''I. General Provisions'' at the end of the table.

■ vii. Add the center heading ''5 CCR 1001–30 Regulation Number 26, Control of Emissions from Engines and Major Stationary Sources, Part B, Combustion Equipment and Major Source RACT'' and the entries ''I. Control of Emissions from Engines'', ''II. Control of Emissions from Stationary and Portable Combustion Equipment in the 8-Hour Ozone Control Area or Northern Weld County'', ''III. Control of Emissions from Specific Major Sources of VOC and/or $NO_X$ in the 8-Hour Ozone Control Area'', ''IV. Control of Emissions from Breweries in the 8-hour Ozone Control Area'', ''V. Control of Emissions from

Foam Manufacturing in the 8-hour Ozone Control Area'', and ''IX. Control of Emissions from Cold Rolling Mills'' at the end of the table.

■ b. In the table in paragraph (e):

■ i. Under the center heading ''Maintenance and Attainment Plan Elements'', add the entries ''Contingency Measures for the 2008 8-Hour Ozone National Ambient Air Quality Standard (NAAQS) Serious State Implementation Plan (Contingency Measures SIP)'' and ''Landfill/biogas fired engine, refinery fuel process heater, and cold rolling mill RACT for the 2008 8-Hour Ozone National Ambient Air Quality Standard (NAAQS) Serious State Implementation Plan'' after the entry titled ''Ozone (8-hour, 2015) DMNFR 2017 Base Year Inventory''.

The revisions and additions read as follows:

**§ 52.320 Identification of plan.**

* * * * *

(c) * * *

| Title | State effective date | EPA effective date | Final rule citation/date | Comments |
|---|---|---|---|---|
| * | * | * | * | * * * |
| **5 CCR 1001–09, Regulation Number 7, Control of Ozone Via Ozone Precursors and Hydrocarbons via Oil and Gas Emissions, (Emissions of Volatile Organic Compounds and Nitrogen Oxides), Part A, Applicability and General Provisions** | | | | |
| * | * | * | * | * * * |
| I. Applicability | 2/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | State-only provisions excluded. Previous SIP approval 8/5/11. Nonsubstantive changes approved 7/3/2018, 2/24/2021, and 11/5/2021. Revisions to I.A.1.a., I.B.2.a.(iii), I.B.2.d., and I.B.2.d.(iii)-(iv) excluded from approval dated 4/9/2026 insofar as related to northern Weld County. Revisions to I.A.1.c., I.B.1.a., I.B.1.c., I.B.1.d., I.B.2.h. and I.B.2.i. excluded from approval dated 4/9/2026. |
| II. General Provisions | 2/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | State-only provisions excluded. Previous SIP approval 8/5/11. Nonsubstantive changes approved 2/24/2021 and 11/5/2021. Appendix A excluded. |
| * | * | * | * | * * * |
| **5 CCR 1001–09, Regulation Number 7, Control of Ozone Via Ozone Precursors and Hydrocarbons via Oil and Gas Emissions, (Emissions of Volatile Organic Compounds and Nitrogen Oxides), Part C, Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals** | | | | |
| I. Surface Coating Operations. | 6/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | Previous SIP approval 8/5/2011; nonsubstantive changes approved 7/3/2018; substantive changes approved 2/24/2021; nonsubstantive changes approved 11/5/2021. Substantive changes limited approval/disapproval 5/9/2023. Revisions to I.L.4.b., I.L.4.d., I.N.7. and I.O.2. excluded from approval dated 4/9/2026. |
| * | * | * | * | * * * |
| **5 CCR 1001–29 Regulation Number 25, Control of Emissions From Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals, Part A, Applicability and General Provisions** | | | | |
| I. Applicability | 6/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | State-only provisions excluded. I.A.1.a., I.B.2.a.(iii), I.B.2.d., and I.B.2.d.(iii)–(iv) excluded from approval dated 4/9/2026 insofar as related to northern Weld County. |
| II. General Provisions | 2/14/2025 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | State-only provisions excluded. II.E., II.F., and appendix A excluded. |
| **5 CCR 1001–29 Regulation Number 25, Control of Emissions From Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals, Part B, Surface Coating, Solvents, Asphalt, Graphic Arts and Printing, and Pharmaceuticals** | | | | |
| I. Surface Coating Operations. | 2/14/2025 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | I.B. through I.O. excluded pending move from Regulation 7. |
| Appendix D Minimum Cooling Capacities for Refrigerated Freeboard Chillers on Vapor Degreasers. | 6/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | |

| Title | State effective date | EPA effective date | Final rule citation/date | Comments |
|---|---|---|---|---|
| Appendix E Emission Limit Conversion Procedure. | 6/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | |
| **5 CCR 1001–30 Regulation Number 26, Control of Emissions from Engines and Major Stationary Sources, Part A, Applicability and General Provisions** | | | | |
| I. General Provisions ........ | 2/14/2024 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | Appendix A excluded. |
| **5 CCR 1001–30 Regulation Number 26, Control of Emissions from Engines and Major Stationary Sources, Part B, Combustion Equipment and Major Source RACT** | | | | |
| I. Control of Emissions from Engines. | 2/14/2024 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | State-only provisions excluded. I.D.4.c. excluded from approval dated 4/9/2026. |
| II. Control of Emissions from Stationary and Portable Combustion Equipment in the 8-Hour Ozone Control Area or Northern Weld County. | 2/14/2025 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | State-only provisions excluded. II.A.1.c.-e., II.A.4. (4th paragraph), II.A.4.a.(v)–(vi), portions of II.A.4.d. and II.A.4.d.(i), II.A.4.d.(ii)–(iii), II.A.4.e.(ii), II.A.4.g.(iii), Row 4 of table 3 in II.A.4.g.(iv), II.A.5.a.(iv)–(v), II.A.5.b.(ii)(B)(5), II.A.5.b.(ii)(C), II.A.6.a.(iii)–(v), II.A.6.b.(viii)(C)–(E), and II.A.8.c. excluded from approval dated 4/9/2026. |
| III. Control of Emissions from Specific Major Sources of VOC and/or $NO_X$ in the 8-Hour Ozone Control Area. | 6/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | III.C. excluded from approval dated 4/9/2026. |
| IV. Control of Emissions from Breweries in the 8-hour Ozone Control Area. | 6/14/2023 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | |
| V. Control of Emissions from Foam Manufacturing in the 8-hour Ozone Control Area. | 2/14/2024 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | V.A.1.b., portion of V.A.4.a., and V.A.8.b. excluded from approval dated 4/9/2026. |
| IX. Control of Emissions from Cold Rolling Mills. | 2/14/2025 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | |

* * * * *

(e) * * *

| Title | State effective date | EPA effective date | Final rule citation/date | Comments |
|---|---|---|---|---|
| * * | * | * | * | * * |
| **Maintenance and Attainment Plan Elements** | | | | |
| * * | * | * | * | * * |
| **Denver Metropolitan Area** | | | | |
| * * | * | * | * | * * |
| Contingency Measures for the 2008 8-Hour Ozone National Ambient Air Quality Standard (NAAQS) Serious State Implementation Plan (Contingency Measures SIP). | 2/14/2025 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | Approval of previously disapproved element. |
| Landfill/biogas fired engine, refinery fuel process heater, and cold rolling mill RACT for the 2008 8-Hour Ozone National Ambient Air Quality Standard (NAAQS) Serious State Implementation Plan. | 2/14/2025 | 05/11/2026 | 91 FR [insert **Federal Register** page where the document begins], 4/9/2026. | Excluding process heater H–1717 due to identified error in Colorado's submission. |

| Title | State effective date | EPA effective date | Final rule citation/date | Comments |
|---|---|---|---|---|
| * * | * | * | * | * * |

[FR Doc. 2026–06837 Filed 4–8–26; 8:45 am]

BILLING CODE 6560–50–P

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 1

**[GN Docket No. 25–149; FCC 26–3; FR ID 294037]**

## Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission or FCC) adopted a Report and Order to update foreign ownership rules for common carrier and broadcast licensees to clarify the Commission's review under section 310(b) of the Communications Act of 1934. With regard to common carrier licensees, the Report and Order adopted rules to codify existing policy regarding which entity is the controlling U.S. parent; codify the Commission's advance approval policy regarding certain deemed voting interests; require identification of trusts and trustees; extend the remedial procedures and methodology to privately held companies; add requirements regarding the contents of remedial petitions; require the filing of amendments as a complete restatement to petitions for declaratory ruling; and clarify U.S. residency requirements. For broadcast licensees only, the Report and Order covers: how the Commission should process applications filed by a broadcast licensee during the pendency of a remedial petition for declaratory ruling under section 310(b)(4); and other foreign ownership considerations related to processing applications for NCE and LPFM stations. Regarding broadcast licensees only, the Report and Order directs the Media Bureau to issue processing guidelines detailing how the Commission would process applications filed by a broadcast licensee during the pendency of a remedial section 310(b)(4) petition; and clarifies other foreign ownership considerations related to processing applications for noncommercial educational (NCE) and low power FM (LPFM) stations.

**DATES:** *Effective date:* These rules are effective May 11, 2026.

**FOR FURTHER INFORMATION CONTACT:** Brenda D. Villanueva, Telecommunications and Analysis Division, Office of International Affairs, at *Brenda.Villanueva@fcc.gov* or (202) 418–7131. For additional information concerning the Paperwork Reduction Act (PRA) information collection requirements contained in this document, contact Cathy Williams at 202–418–2918, or via the internet at *Cathy.Williams@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's *Report and Order,* in GN Docket No. 25–149; FCC 26–3, adopted on January 29, 2026, and released on January 30, 2026. The full text of this document is available for public inspection and copying via ECFS at *http://apps.fcc.gov/ecfs* and the FCC's website at *https://docs.fcc.gov/public/attachments/FCC-26-3A1.pdf.* Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat. Alternative formats are available for people with disabilities (Braille, large print, electronic files, audio format), by sending an email to *fcc504@fcc.gov* or calling the Commission's Consumer and Governmental Affairs Bureau at (202) 418–0530 (voice), (202) 418–0432 (TTY).

*Final Regulatory Flexibility Analysis.* As required by the Regulatory Flexibility Act (RFA), the Commission has prepared this present Final Regulatory Flexibility Analysis (FRFA) of the possible significant economic impact on small entities by the policies and rules proposed in this Report and Order. The Commission will send a copy of this Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA). In addition, the Report and Order and FRFA (or summaries thereof) will be published in the **Federal Register**.

## Synopsis

## Discussion

In this Report and Order, we codify and clarify longstanding policies and practices with respect to the Commission's foreign ownership requirements and streamline its review processes under Section 310(b) of the Act. Certain updates apply to common carrier and broadcast licensees, and others apply only to broadcast licensees subject to section 310(b), as discussed below. Through these streamlining efforts, we promote efficiency, clarity, and consistency of our rules while continuing to analyze foreign investment to ensure that it complies with statutory requirements.

### *A. Common Carrier and Broadcast Licensees*

For common carrier and broadcast licensees,[1] we adopt the proposals in the Notice of Proposed Rulemaking 90 FR 26684 (*Section 310 NPRM*) to codify certain longstanding foreign ownership policies and practices to streamline the Commission's review process under Section 310(b). Specifically, we: (1) codify existing policy regarding which entity in the ownership chain should be designated as the controlling U.S. parent; (2) codify the Commission's advance approval policy regarding certain deemed voting interests; (3) amend our rules to clarify the requirement to identify trusts and trustees in petitions; (4) amend our rules to extend the remedial procedures to privately held companies and continue to allow privately held companies to use the methodology on a case-by-case basis; (5) amend our rules to clarify requirements regarding the contents of remedial Section 310(b) petitions; (6) specify the process of filing amendments to Section 310(b) petitions; and (7) clarify U.S. residency requirements.

#### 1. Controlling U.S. Parent Definition

As proposed in the *Section 310 NPRM,* we adopt a definition of controlling U.S. parent to provide regulatory certainty, ease administrative burdens, and codify the Commission's longstanding practice. For purposes of Section 310(b)(4), we define the controlling U.S. parent as ''the first controlling entity organized in the United States that is directly above the

[1] We refer to broadcast, common carrier wireless, aeronautical en route and aeronautical fixed radio station applicants and licensees (including broadcast permittees) and to common carrier spectrum lessees collectively as ''licensees'' unless the context warrants otherwise. We also use the term ''common carrier'' or ''common carrier licensees'' to encompass common carrier wireless, aeronautical en route and aeronautical fixed radio station applicants and licensees, and spectrum lessees. ''Spectrum lessees'' is defined in § 1.9003 of part 1, Subpart X (''Spectrum Leasing''). 47 CFR 1.9003.

**DECLARATION OF JONATHAN EVANS**
**(Case No. 26-9548, ATTACHMENT 2)**

I, Jonathan Evans, declare that the following statements are true and correct to the best of my knowledge, information, and belief, and are based on my personal experiences and my review of publicly available information:

1. I am the Legal Director of the Environmental Health Program and a senior attorney at the Center for Biological Diversity ("the Center"). I am also a member of the Center.

2. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and law. Based on the understanding that the health and vigor of human societies and the natural environment are closely linked, the Center works to protect natural resources like air in order to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for the people that interact with, depend on, and cherish these natural resources. The Environmental Health Program is focused on protecting biodiversity and human health from toxic substances.

3. The Center is a Section 501(c)(3) membership organization. The Center has approximately 3,000 members in the following counties that make up the Colorado Front Range nonattainment area: Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson, and parts of Weld and Larimer.

4. In my role at the Center, I am involved in strategic decision making and setting policy priorities for the work that the Center does to reduce the threats to the

environment and public health from toxic substances, including air pollution, and ozone pollution in Colorado's Front Range nonattainment area in particular.

5. The Center's Environmental Health Program works to reduce the threats posed by air pollution through scientific, legal, and policy mechanisms. I, as well as the Program, strive to represent the interests of our members in areas affected and am concerned about how the negative air quality is impacting them, their families, and the environment that they enjoy.

6. The Center has consistently worked, for over a decade, to reduce ozone pollution in Colorado's Front Range nonattainment area. This includes advocacy; challenges to EPA decisions on Colorado's ozone State Implementation Plans (*e.g.*, 10th Cir. case nos. 22-9546, 23-9503, 23-9565, 23-9566; D.C. Cir. case no. 21-1263); state and federal court challenges to deficient air pollution permits that allow excess ozone pollution (10th Cir. case no. 26-9539; Colorado Court of Appeals case nos. 2020CA2045, 2023CA2143; Colorado District Court case nos. 22-cv-31489, 24-cv-31489); and more.

7. Combating air pollution in the Front Range is an issue that is very important to me and the Environmental Health Program because we understand the health impacts of air pollutants, as well as the types and degree of harms from air pollutants to native wildlife and the ecosystems on which they depend. The Program is especially concerned with the effects that air pollutants, including ozone, volatile organic compounds, and nitrogen oxides, have on the environment and human health. I am aware of studies linking these air pollutants to a range of health impacts, such as

respiratory problems, increased incidences of hospitalization, and premature mortality.

8. I am aware that air pollution can negatively affect the health and persistence of the wildlife and plant life that I and the Center's other members appreciate observing, studying, photographing, and recreating among in the outdoors. I am further aware that air pollution like ozone can lead to smog and negatively affect my and the Center's other members' experiences in nature and the outdoors. They can additionally lead to broader ecosystem effects by affecting water quality and nutrient cycles.

9. I am aware that EPA approved Colorado's deficient and *de minimis* ozone contingency measure arbitrarily and in contravention of the Clean Air Act, which results in excess and illegal air pollution, harming our members collectively and hindering the work the Center does to protect the environment.

10. I support the Center's lawsuit.

11. Neither the claims asserted nor the relief requested in this lawsuit require the consideration of individual circumstances of any aggrieved member of the Center, given that the petition hinges on whether EPA complied with its statutory obligations, and the relief sought is remand of the invalid agency action. Accordingly, the participation of individual members is not required in this lawsuit.

12. The Center's mission of protecting human health and the environment will be advanced if the Court remands EPA's final action allowing excess, illegal air pollution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2026.

Jonathan Evans

**DECLARATION OF SCOTT SILBER**
**(Case No. 26-9548, ATTACHMENT 3)**

I, Scott Silber, declare that the following statements are true and correct to the best of my knowledge, information, and belief, and are based on my personal experiences and my review of publicly available information:

1. I am a member of the Center for Biological Diversity ("Center") and support the Center's efforts to reduce harms from air pollution.

2. I live in Boulder in Boulder County, Colorado, which is part of the Front Range nonattainment area for ozone. I have lived in the Boulder area, on and off, for the past 25 years. I intend to continue living in Boulder.

3. I enjoy outdoor activities, including jogging roughly 50 to 60 miles over 2 to 3 weeks, biking, hiking and backpacking, playing pick-up ultimate Frisbee, and climbing, and I will continue to do so except for the limitations I discuss below. I regularly run near my household in Boulder and try to run at least three times per week.

4. I am often unable to go outdoors to exercise because of poor air quality because my asthma is triggered. Bad air quality is an irritant that affects my overall health in addition to asthma because it makes me feel lethargic and generally bad.

5. I have also recently been diagnosed with early-onset chronic obstructive pulmonary disease (COPD), a lung condition that makes it progressively harder to breathe, by damaging my airways and air sacs. This causes me shortness of breath, coughing and wheezing, chest tightness, and fatigue. At this stage, this condition may be reversible if I do an immense amount of rehabilitating work. Though, even with me

taking significant steps to address my COPD, it is uncertain whether I can reverse this condition. This work is expensive, as discussed further below, and takes up significant time that I would rather spend doing other things, including earning more income. Poor air quality, specifically exposure to ozone pollution, was assigned as the cause of the COPD because I am not a cigarette smoker.

6. Relatedly, I have developed an adverse breathing pattern that comes on when I sleep, which comes from an inability to properly regulate my breathing. This has resulted in a diagnosis of central sleep apnea. These conditions put me at an increased risk of stroke or cardiac arrest later in life because oxygen is not properly moving through the body. These are symptoms of long-term exposure to air pollution, including ozone pollution.

7. My doctor has instructed me to use a ventilator while I sleep because of the COPD and central sleep apnea. Without this support, I stop breathing repeatedly while I sleep, for up to two minutes, which damages my health in several ways. I typically have to use the ventilator when air quality is particularly bad, including from heightened ozone levels. The face apparatus can be difficult to tolerate, and I occasionally wake up to find that I unconsciously removed it during the night. When this happens, I'll wake up with shortness of breath.

8. Using a ventilator impairs my quality of life in several ways. For example, it takes an extra hour for me to lie down to sleep with the whole apparatus assembled, and for me to adjust to tolerate it enough to sleep. I need to clean the machine daily.

9. Due to the conditions poor air quality has caused and worsens, I have incurred a variety of monetary costs, putting aside the impacts to my health and well-being for

the moment. I have spent money, at my doctor's recommendation, on additional medical equipment. I purchased a pulse ox monitor to regularly assess my blood oxygen level and pulse, in order to assess what condition my body is in. To mitigate my chronic exposure to air pollution, including ozone and ozone precursor pollution, I have also spent money on 3M-brand VOC (volatile organic compound) respirator masks, with filters on each side. These masks require reusable cartridges, which I must purchase on an ongoing basis for them to remain effective.

10. Due to poor air quality, I must also use medications to treat my asthma, including a rescue inhaler and a preventive inhaler, and I carry medications such as an epinephrine auto injector and prednisone for emergency situations. All my asthma medications can cause negative side effects including lightheadedness, agitation, thrush, increased heart rate, and palpitations. These side effects can interrupt my normal activities. For example, I have had to take a break from whatever I was doing to let the side effects subside.

11. The medications are also expensive. While some of my asthma medication can be covered by my health insurance, I have had to pay for them out of pocket in the past if they are not covered by my health insurance, and the copay varies, as well. Asthma medications also must be replaced with new medications after their expiration date. Moreover, as insurance coverage changes, I have experienced moderately severe side effects from new medications substituted by insurance for my previous medications.

12. I am concerned that I may have to pay for my medication out of pocket in the future. This is frustrating for me because I would rather not have to spend money on medications needed because of poor air quality.

13. Due to poor air quality in and around where I live, I also bought a pass to a recreation center where I swim indoors, where the air quality is better. This is one of the costs, and time investments, I must undertake to try to reverse my early-onset COPD diagnosis. When swimming laps I do not suffer from asthma attacks or exacerbation of my COPD as I would if I were exercising outdoors when air quality is poor. I would prefer not to spend additional money on a pass for the recreation center. I do not want to exercise indoors because I prefer natural light to the artificial light indoors and would rather be running outdoors for my spiritual, aesthetic, and recreational enjoyment. I also sincerely miss the experience of deeply breathing in fresh air.

14. To plan my activities and to try to avoid triggering my asthma and COPD, I use an application on my phone to help me know the status of air quality. I often do not engage in activities where I exert myself, even though they are important to me and otherwise would, when the air quality is poor because it is not worth it to feel the discomfort and suffer the fear of a life-threatening episode if I have an asthma attack or exacerbate my COPD.

15. I can see the effects of ground-level ozone pollution in the Denver metropolitan area, in the form of smog, and I find them aesthetically displeasing and disconcerting, especially because I know the harm this pollution is doing to my health and well-being.

16. I have noticed that the air quality measurements can change during the day, and I must monitor air quality regularly to determine whether I need to change my behavior. I prefer to bike-commute, therefore deterioration of air quality during the day is especially problematic for me because I must avoid riding my bike if the air quality may deteriorate from the morning through the afternoon. If air quality deteriorates it could trigger an asthma attack if I am riding my bike, and then I may have to take the bus or find an alternative means to get home.

17. In my experience, air quality in the Boulder and foothills area has gotten worse recently and has limited my ability to enjoy outdoor activities and has negatively impacted my health. My use of the inhaler has increased since air quality has deteriorated in the Boulder area. This deterioration has brought on my COPD and sleep apnea.

18. My ability to experience the natural world is more limited now with bad air quality because there are fewer areas I can visit without it being a potential problem for my asthma or COPD. Ironically, I must drive to get to areas of cleaner air, which costs time and money for gas. I also am psychologically and emotionally troubled by being forced to drive further to exercise because I must spend money on and burn gasoline, which has negative air quality effects. If I want to experience the outdoors, I am forced to choose between protecting the environment by not driving further and doing things that keep me healthy such as outdoor physical activity. I also chose to purchase a gas-fueled van, rather than a plug-in hybrid electric vehicle, because I need space to rest in the back when my asthma or COPD is triggered.

19. My exercise regimen is critical to my health, quality of life, vitality, and longevity because regular exercise can reduce the risk of cholesterol and heart disease. To my knowledge, every male born before my parents (who died of natural causes) has died of heart disease before the age of 50. Among the men in my family, it is customary to compare our annual cholesterol test results. I have remained the only adult member of my family who has not been prescribed statins to regulate cholesterol, and rigorous aerobic exercise is a proven method for improving and maintaining those healthier outcomes. The less I can do that, the more it will cost me, in every way I can imagine. Limitations in my ability to exercise outdoors and maintain an active exercise regimen that I enjoy often casts a distressing burden on me psychologically and physically.

20. I am generally aware that the more asthma attacks one gets, the worse the condition is later. Prevention is important for me for some key reasons. If my asthma becomes worsened by an aggravated series of episodes, I could require more expensive medication or treatment. The more severe the treatment, the more severe the side effects are. I would prefer the freedom to prevent the need to purchase and carry an EpiPen everywhere I go. I would prefer not to have to fill an emergency stash of prednisone or other steroids every time the previous prescription expires. I would prefer to travel without the concerns and stress that I might forget, not have, or could not afford these medications. And I would certainly prefer to avoid the very notable and substantial side effects of these more intensive treatments.

21. In the years since my asthma has gotten worse, while running in Colorado, I have made a practice of letting people in my life know where my routine running routes

are, or where I will be if not routine, because, in the back of my mind, there is a chance that the next asthma attack will be the one for which my current remedies provide too little relief. If my airway were to close because of an asthma attack, I would only have four minutes until I would be brain dead; the prospect of my death because of an asthma attack triggered by poor air quality distresses me.

22. I support the Center's lawsuit. If the Court determines that EPA must require Colorado to achieve real reductions in ozone pollution through meaningful contingency measures for the Front Range, I will benefit from the resulting additional requirements to regulate ozone, volatile organic compounds, and nitrogen oxides pollution. The improved air quality will better benefit my health and my quality of life, and I will worry less about my health.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 17, 2026.



______________________

Scott Silber

**DECLARATION OF JEREMY NICHOLS**
**(Case No. 26-9548, ATTACHMENT 4)**

I, Jeremy Nichols, declare that the following statements are true and correct to the best of my knowledge, information, and belief, and are based on my personal experiences and my review of publicly available information:

1. I am a member of the Center for Biological Diversity and have been since 2011. I am also an employee of the Center and have been since 2023. The Center advocates for the protection of endangered species, their environment, and public health. In so doing, the Center advocates for clean air and water, healthy communities, protected landscapes, and for the conservation of imperiled fish, wildlife, and plants. I support the mission of the Center and all the work the organization does. Although I am also an employee of the Center, I have an independent and deep personal interest in my role as a Center member in protecting the environment and supporting the work of the Center to protect our health and the environment on behalf of its members.

2. I am also a member of the Sierra Club and have been since 2011. The Sierra Club has more than 1.4 million members and supporters who work for a safe and healthy community in which to live, smart energy solutions to combat global warming and an enduring legacy for America's wild places. Since 1892, the Sierra Club has been working to protect communities, wild places, and the planet itself. Sierra Club is the oldest and largest environmental organization in the United States. It has been a priority of the Sierra Club nationally and locally to protect clean air for all. I support the mission of the Sierra Club.

3. I have lived in the Denver Metro area for over twenty years and plan to live here for the foreseeable future. I currently live in the Lakewood located west of Denver,

but previously I've lived in Golden and Denver, all within the ozone nonattainment area. I greatly enjoy living in the Denver Metro area because of the amazing and diverse outdoor recreation opportunities in the region, as well as the beauty of living along the Colorado Front Range. The quality of life is great. I have three sons, two of whom are in their early twenties and have now moved away and one who will be one year old on September 21. I've enjoyed raising my children in this region here and getting them outside a lot to learn about and enjoy the natural world.

4. I love to get outside in the Denver Metro area. I enjoy viewing wildlife and in particular bird watching, especially with my youngest son. I get outside at least 4-5 times a week to go bird watching, preferably while on a long hike. I'm active on the online platform, eBird, and log my bird sightings and counts on this platform whenever I go out. I get out to open spaces and protected areas in all the metro area counties, including Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson (where I live), Larimer, and Weld. Some areas I'm particularly fond of visiting for hiking and wildlife viewing are Bear Creek Lake Park, Chatfield State Park, South Valley Open Space, Red Rocks Park and adjacent Matthews-Winters Open Space, Golden Gate Canyon State Park, Reynolds Park Open Space, the Rocky Mountain Arsenal National Wildlife Refuge, Barr Lake State Park, East Portal Recreation Area and the James Peak Wilderness, Brainerd Lake Recreation Area, the Clear Creek greenbelt, the South Platte River greenbelt, and the Bear Creek greenbelt here in Lakewood. I visit all of these areas at least a half dozen times or more every year. I also regularly visit many other areas, just a little less frequently. For example, I visit the Pawnee National Grassland in Weld County to view birds at least twice a year and manage to get up to Rocky Mountain National Park at least once a year. I intend

to continue regularly visiting open spaces and protected areas in the Denver Metro area to enjoy being outside, recreating, and viewing wildlife for the foreseeable future.

5. I am aware that the Denver Metro area suffers from high ground-level ozone. Ozone is the key ingredient of smog and forms when air pollution reacts with sunlight. I am aware that that the primary sources of ozone-forming pollution in the region are tailpipes, smokestacks at factories and the region's refinery, and oil and gas extraction activities. I understand that ozone is a respiratory irritant and can pose serious health risks, and not just to people with respiratory conditions. Children, seniors, and even healthy adults active outdoors are especially at risk due to the vulnerability of their respiratory systems. Because of this, the U.S. Environmental Protection Agency (EPA) has established air quality standards for ozone meant to protect public health and the environment. Compliance with these standards is supposed to ensure that ozone concentrations are limited to below levels considered unsafe for people. When air quality monitors indicate the standards have been exceeded, there's extra cause for health concern.

6. I am deeply aware of the region's ozone problems because it's an issue I've paid close attention to ever since moving to the Denver Metro area in early 2005. When I moved to the region, the area was starting to face serious ozone pollution problems, due in part to a boom in oil and gas drilling and production north of Denver. This made me concerned for my health and the health of my children. Shortly after moving to the area, I started a nonprofit membership organization to advocate for stronger air quality safeguards. That organization, called Rocky Mountain Clean Air Act, compelled the EPA in 2007 to designate the nine-county Denver Metro-North Front Range region, including

Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson, Larimer, and Weld Counties, as a nonattainment area due to violations of ozone air quality standards. At the time, the region was violating the first 8-hour ozone air quality standard adopted in 1997. Although that organization no longer exists, I have continued to be personally engaged in air quality issues in the region—personally, as a member of the Center and Sierra Club, and as an employee of environmental organizations—and I support organizations that are also engaged in working to protect clean air.

7. A nonattainment designation is supposed to spur an air pollution clean up and efforts to curtail ozone-forming emissions to bring areas back into compliance. Unfortunately, since the Denver Metro area was initially designated an ozone nonattainment area in 2007, the region has continued to suffer high ozone in the summer months. Since that time, ozone standards have been strengthened in 2008 and 2015 to better protect public health according to updated science. In the meantime, the Denver Metro area has grown substantially in population and industrial activity and is experiencing the latest oil and gas development boom fueled by horizontal drilling and hydraulic fracturing in the region. The nine-county nonattainment area has continued to violate ozone standards and struggle to bring ozone levels into compliance with air quality standards meant to protect public health and the environment.

8. Since moving to the Denver Metro area, I've paid close attention to ozone monitoring data and air quality alerts because of my regular outdoor recreation and because of my concern over my health and the health of my children. Where I currently live in Lakewood in the western Denver Metro area is near two ozone monitoring stations that every year record some of the highest summertime ozone levels in the region—the

Chatfield monitoring station and the monitoring station at the National Renewable Energy Laboratory in Golden. The western Denver Metro area generally experiences the highest ozone pollution, so it's a big concern of mine in the summertime. When ozone monitoring data is high and/or when there are alerts over the potential for high ozone, particularly over multiple days, I limit my outdoor activity out of concern for my health and also try to keep my children indoors. I limit the amount of time I'm outdoors or just stay indoors and avoid being outside altogether. This is a very frustrating thing to have to do. I greatly enjoy being outside outdoors and it is a core part of my quality of life. Curtailing outdoor activity where I live, whether it's hiking and viewing wildlife or outside my home gardening, interferes with and detracts from my enjoyment of life in the Denver Metro area. Unfortunately, due to the Denver Metro area's ongoing ozone problems, this has been a constant concern for more than 20 years. There has not been a single year I've lived in the Denver Metro area where ozone levels did not exceeded health standards during the summer months.

9. I am aware that due to the Denver Metro area's ongoing failure to comply with ozone air quality standards, the State of Colorado has been steadily required by the Clean Air Act to do more to curb pollution. Although state air regulators have adopted, and EPA has approved, air quality rules over the years, the monitoring data confirms it hasn't been enough. Recent reports from this past summer indicate the Denver Metro area continues to struggle with exceptionally high ozone and that the State of Colorado faces sanctions from the EPA for failing to comply with air quality standards. In the attached news article in the Colorado Sun from August 5, 2026, state officials confirmed the summer was one of the worst for ozone in recent years. *See* Exhibit 1, Booth, M., "9

Colorado Counties Keep Soaring Above Federal Ozone Limits, Risking Fresh Sanctions," *Colorado Sun* (Aug. 5, 2026). I am keenly aware that we experienced many days of high ozone this past summer as I avoided going outside on many occasions when I knew air pollution levels would be high. I also kept my infant son inside on high ozone days, which was frustrating to have to do because he gets very restless when cooped up in the house too long.

10. I am aware that because of persistently high ozone levels in the nine-county Denver Metro-North Front Range region, the State of Colorado has been required to revise and update its Clean Air Act State Implementation Plan (SIP) on numerous occasions. These SIP revisions are supposed to contain various elements, including the strategies the state intends to undertake to ensure reasonable progress toward complying with ozone standards, reasonably available control technology requirements, demonstrations of future attainment of the standards, and contingency measures to address high ozone if levels remain in violation of air quality standards. SIP revisions are submitted to the EPA for approval and can only be approved if they comply with the Clean Air Act. If they are not approved, EPA must develop a federal implementation plan in place of a SIP.

11. I am aware that one such SIP revision developed and submitted to the EPA for approval was required due to the Denver Metro-North Front Range region being classified as a "Serious" ozone nonattainment area for ozone standards adopted in 2008. The EPA approved portions of this SIP dealing with contingency measures in April of this year. The EPA approved Colorado's determination that it was not required by the Clean Air Act to adopt meaningful contingency measures to address high ozone if levels remain in violation of air quality standards in the Denver Metro-North Front Range region. The

EPA's decision also approved one contingency measure that will actually lead to an increase in ozone-forming pollution. I am aware that the Center for Biological Diversity and Sierra Club commented on EPA's proposed approval and have now challenged the approval for failing to comply with Clean Air Act requirements concerning contingency measures.

12. EPA's failure to comply with Clean Air Act requirements concerning contingency measures for the Denver Metro-North Front Range ozone nonattainment area harms me and will continue to harm me unless overturned. The EPA's decision effectively let Colorado off the hook for implementing pollution reduction measures required by the Clean Air Act in the face of ongoing high ozone pollution in the region. This has allowed Colorado to avoid further reducing ozone forming pollution that would help to bring the Denver Metro-North Front Range region into compliance with air quality standards. Since Colorado developed its "Serious" nonattainment SIP, the region has continued to violate the 2008 ozone air quality standards and in 2022 was reclassified as a "Severe" ozone nonattainment area. Clearly there was a need for contingency measures to respond to ongoing violations and take additional steps to curtail ozone forming pollution in the region. If additional contingency measures had been adopted, additional air pollution reductions would have been implemented, benefitting air quality and helping to keep ozone pollution levels in check. This would have helped to reduce the number and severity of high ozone days, meaning fewer days I would have to curtail my outdoor activity in the summertime. EPA's decision upholds Colorado's decision to forego additional pollution reduction measures, meaning I will face ongoing, if not more, days

during which I have to restrict my outdoor activity at my home and in the region. A decision overturning EPA will redress these harms.

13. Additionally, I am aware that EPA's decision regarding contingency measures will actually lead to an increase in certain ozone-forming pollution from automotive coating activities. The EPA's decision did not address whether this increase would interfere with Colorado's ability to attain ozone air quality standards or the standards for nitrogen oxides. This decision also harms me because it authorizes an increase in air pollution that is likely to contribute to ongoing high ozone levels and poor air quality. This means I will continue to face days during which I will have to restrict my outdoor activity, and EPA's decision will detract from and interfere with my enjoyment of the outdoors where I live. A decision reversing EPA will redress these harms.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in Lakewood, Colorado, September 15, 2026,



Jeremy Nichols

# Exhibit 1

Nichols Declaration

THE COLORADO SUN

NEWS: ENVIRONMENT

# 9 Colorado counties keep soaring above federal ozone limits, risking fresh sanctions

A new public health study reveals human cost of heavy summer 2026 ozone and demands state action, watchdogs say



Michael Booth
*4:08 AM MDT on Aug 5, 2026*

Case: 24-7270, 10/01/2026, DktEntry: 86.1, (170 of 177)
Appellate Case: 26-9548 Document: 22-5 Date Filed: 09/18/2026 Page: 11


As a haze shrouds the downtown skyline, motorists slowly navigate the southbound lanes of Pena Boulevard to leave Denver International Airport Tuesday, Nov. 26, 2024, in Denver. (AP Photo/David Zalubowski)

Record high temperatures and relatively stagnant air on the northern Front Range are pushing monitors for health-damaging ozone well past violations, and the accumulation of high readings ensure Colorado will fail a three-year averaging test to bring the choking gas below federal limits, local air quality officials said.

The 10 Front Range counties making up the ozone nonattainment area have already recorded 51 days above the Environmental Protection Agency cap of 70 parts per billion, with weeks left to go in the ozone danger season. Thirty-four of those days even spiked above the older, more lenient cap of 75 parts per billion. That compares with 23 total days above 70 ppb last year, when favorable winds and relatively cooler temperatures gave regional air officials some hope the counties could string together a couple of years attaining the limits.

Under the U.S. Clean Air Act, if the EPA determines Colorado has not made progress toward the ozone limits in averages taken from 2024 through 2026, the federal government

can impose new sanctions. That could include expanding the number of industrial sources that need an air pollution permit, or restrictions on volatile paints and household cleaners and solvents that give off ozone precursors.

Even after allowances for out-of-state wildfire smoke Colorado can't control, "now it appears that we can't make it" for the three-year average, said Mike Silverstein, executive director of the Regional Air Quality Council, which makes policy recommendations to state and local regulators.

"We got some hope in 2025 that the strategy package that we had in place was going to really hit the mark," Silverstein said, including programs to switch out highly polluting lawn and garden machinery with clean electric motors. "Our modeling from a couple years back indicated that we would be close, and that we had an opportunity to attain by 2026, but the data isn't bearing that out.

"It's obvious more work needs to be done, and emissions are simply too high in our regions for us to sustain or to achieve good air quality," Silverstein said.



Traffic on Interstate 25 in El Paso County, Colorado. (Brian Malone, Special to The Colorado Sun)

Wildfire smoke drifting in from intense Washington state and Oregon crises are **forecast to**

**make Front Range air quality worse over the next few days**.

The accumulation of bad readings comes at the same time a study lands from the Colorado School of Public Health detailing for the first time the hundreds of deaths and thousands of serious illnesses caused by the 10 counties' high ozone days. **Ozone causes lung and other tissue inflammation**, asthma attacks and other respiratory distress, hitting particularly hard at children and older adults with chronic obstructive pulmonary disease.

The School of Public Health study says that over the five years ending in 2024, the northern Front Range nonattainment area experienced 223 days above the 70 ppb standard that the EPA set in 2015. If the counties had instead met those limits in that time, it would have prevented 170 deaths, 390 respiratory hospitalizations, 120 asthma-related ER visits, and more than 35,000 school days missed from asthma, the authors say.

The societal cost of those excess, ozone-related deaths and health problems was estimated between $211 million and $580 million each year in 2024 dollars, the study says.

If ozone levels average 10 ppb higher than current observed measurements in coming years, 70 ppb standard during that time — and monitoring shows they did reach that high on some days — the Front Range could see 570 excess deaths, 1,310 excess respiratory hospitalizations, and nearly 120,000 missed days of school due to asthma. The cost of that rise in ozone would be between $712 million and $1.9 billion a year.

The Regional Air Quality Council asked for a study of ozone's real-world impacts, Silverstein said, but did not direct what the researchers chose to illustrate the problem.

"It's obvious by our data that we need to do even more, and that this study now provides us the evidence that we need to justify why more needs to happen," Silverstein said. "It's not just a number that the monitors read. It has implications for the public health of our community."

Study co-author Sheryl Magzamen, a Colorado State University epidemiology professor and School of Public Health researcher, said the report can help put human scale to decades of ozone battles in Colorado.

"Health needs to be — I'm not only saying this as a public health person, but a current resident of the nonattainment area — health needs to be part of the conversation when we're

talking about ozone policy," Magzamen said.

Ozone on the Front Range builds up when volatile organic compounds from oil and gas production and gasoline fumes combine with nitrogen oxides from burning fossil fuels in power plants and vehicle engines. They cook in sunlight and high heat, and are made worse with the addition of wildfire smoke.

The current nonattainment area includes Douglas, Arapahoe, Denver, Jefferson, Broomfield, Boulder, Adams, Weld and part of Larimer County.



Adams County senior oil and gas inspector Keith Huck is pictured during a routine inspection of PDC Energy's Baseline oil and gas well pad Feb. 7, 2024 in unincorporated Adams County. (Andy Colwell, Special to The Colorado Sun) Credit: Andy Colwell for The Colorado Sun

This summer's readings show Colorado's ozone problem is spreading beyond the traditional northern Front Range counties, said Jeremy Nichols, with the Center for Biological Diversity. Monitors in Gilpin and El Paso counties "both have three-year averages so far that are above the national ambient air quality standards.

Case: 24-7270, 10/01/2026, DktEntry: 86.1, (174 of 177)
Appellate Case: 26-9548 Document: 22-5 Date Filed: 09/18/2026 Page: 15

"What this increasingly confirms is that ozone is impacting a much larger contiguous region along the Front Range, potentially stretching from Pueblo County north to all of Larimer and Weld Counties, west to the high country of Gilpin and likely Clear Creek counties," Nichols said.

The state health department's Air Pollution Control Division could speed up mandatory mitigation measures by asking the EPA for an early declaration of "extreme" ozone violation status, the next downgrade from "severe," Nichols said. That would also move up the deadlines for the state Air Quality Control Commission to approve policy measures for a plan that meets the attainment limits.

"If the Polis administration sees the writing on the wall now, they should do something about it," Nichols said.

© 2026 The Colorado Sun
Powered by Newspack

# Attachment E:

Letter from Jill Hunsaker Ryan, Colorado Department of Public Health and Environmental, to Cyrus Western, Regional Administrator, U.S. EPA, Region 8 (May 29, 2026)

COLORADO
Department of Public Health & Environment

May 29, 2026

Cyrus Western
Regional Administrator
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202-1129

Dear Administrator Western:

The following action concerning revisions to state implementation plan (SIP) provisions in Regulation Number 3, Regulation Number 7, Regulation Number 25, Regulation Number 26 and Air Quality Standards, Designations and Emission Budgets is submitted to EPA for final approval and incorporation into the Colorado's SIP pursuant to 40 CFR Part 51, Appendix V, 2.1(a):

On November 21, 2025, the Air Quality Control Commission adopted revisions to:

- Air Quality Standards, Designations and Emission Budgets, (Air Quality Standards Regulation) Section V. to incorporate Motor Vehicle Emission Budgets (MVEBs) for use in the 2015 Serious SIP and satisfy the transportation conformity requirements of the CAA § 176(c).

- Regulation Number 3 to (1) revise the emission reduction credit (ERC) program and (2) revise the CAA § 185 fee program.

- Regulation Number 7 to (1) expand Reasonably Available Control Technology (RACT) requirements to transmission and storage segment sources in northern Weld County and (2) remove pneumatic controller requirements from the SIP.

- Regulation Number 25 to (1) establish RACT for aerospace coating operations and (2) remove RACT requirements for digital printing operations as there are no longer subject sources.

- Regulation Number 26 to (1) expand RACT to combustion equipment and engine requirements in northern Weld County, (2) expand RACT requirements for industrial waste facilities in northern Weld County, and (4) remove RACT requirements for poultry waste operations as there are no longer subject sources.

- Regulation Number 26 to make an administrative correction to Table 3 in Part B, Section II for point 001-0003-098 to fix a typographical error. The existing control technology is incorrectly listed in the table.

Additionally, on November 21, 2025, the Air Quality Control Commission adopted

State-only revisions to:

- Regulation Number 3 to (1) update references from Colorado EnviroScreen to Colorado's Disproportionately Impacted (DI) Community Map, (2) revise the definition of DI Community to include the criteria for mobile home parks, (3) clarify the point in the permitting process when a facility will determine if it is in a DI Community, and (4) make clarifying edits to permitting requirements for sources in DI Communities.

- Regulation Number 7 to (1) update references from Colorado EnviroScreen to Colorado's DI Community Map, (2) establish seasonal restrictions on venting associated with separator maintenance activities, and (3) extend the nitrogen oxides (NOx) intensity program.

The Commission also adopted typographical, grammatical, and formatting corrections throughout the regulations.

The revisions were adopted with modifications stated in the final motion.

The materials have been entered into EPA's CDX for your review. The Office of the Commission may submit any additional technical support documentation and administrative information needed for review directly to your staff. Should there be any questions regarding these materials, please contact the Commission Office at 303-692-3476.

Sincerely,

Jill Hunsaker Ryan

Jill Hunsaker Ryan, MPH
Executive Director

cc: Jeramy Murray, CDPHE Air Quality Control Commission
Michael Ogletree, CDPHE Air Pollution Control Division
Abby Fulton, EPA Region 8